SCHERN RICHARDSON FINTER DECKER, PLC
1640 S. Stapley Drive, Suite 132
Mesa, Arizona  85204
(480) 632-1929
Facsímile: (480) 632-1938
Email: courtdocs@srfdlaw.com
*Attorneys for Plaintiffs*
By:  Michael A. Schern #022996
       Adam B. Decker #021461
       Yusra B. Bokhari #029376

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Brian L. Bentley, an individual; Janna L. Bentley, an individual; O.R., a minor by and through her father and mother; G.E., a minor by and through her father and mother; B.J., a minor by and through his father and mother; M.J., a minor by and through his father and mother; T.A., a minor by and through his father and mother; S.L., a minor by and through her father and mother; B.M., a minor by and through her father and mother, <br><br> Plaintiffs, <br><br> v. <br><br> City Of Mesa, a public entity; Gregory A. McKay, in his official and individual capacities; Cristina Baggen, in her individual capacity as an employee of the State of Arizona Department of Child Safety; Gina Cordova, in her individual capacity as an employee of the State of Arizona Department of Child Safety; Darrel Palmer, in his individual capacity as a City of Mesa police officer; Edward Clifford, in his individual capacity as a City of Mesa police officer; Laurie | Case No.:  **2:17-cv-00966-DJH** <br><br><br> **SECOND AMENDED COMPLAINT** <br><br><br><br><br><br> **(Honorable Diane J. Humetewa)** |

Kessler, in her individual capacity as a City of Mesa police officer; Domenick Kaufman, in his individual capacity as a City of Mesa police officer; Lauren Glazer, in her individual capacity as a City of Mesa police officer; Molly Corfits, in her individual capacity as a City of Mesa police officer; and Rob Russo, in his individual capacity as a City of Mesa police officer,

Defendants.

For their Complaint, Plaintiffs Brian L. Bentley, Janna L. Bentley, and their minor children, through counsel, allege the following:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is proper pursuant to 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction is also conferred by 28 U.S.C. § 1331, because the claims for relief derive from the United States Constitution and the laws of the United States. Jurisdiction to grant Declaratory/Injunctive Relief is conferred by 28 U.S.C. § 2201 and 42 U.S.C. §1983.

3.      At all times relevant hereto, Defendants individually or collectively, under color of state law, deprived Plaintiffs of rights, privileges, or immunities secured by the United States Constitution and the laws of the United States.

4.      Venue before this Court is proper because the acts and omissions complained of herein occurred in Arizona, and all of the parties currently reside in the State of Arizona.

## PARTIES

5.      Plaintiffs, Brian L. Bentley ("Brian" or "Brian Bentley") and Janna L. Bentley ("Janna" or "Janna Bentley"), were and are husband and wife, residing in the County of Maricopa, State of Arizona.

6.     Brian and Janna had seven minor children, O.R., G.E., B.J., M.J., T.A., S.L., and B.M., residing with them.

7.     Collectively, Plaintiffs, Brian, Janna, O.R., G.E., B.J., M.J., T.A., S.L., and B.M., are referred to herein as "Plaintiffs" or the "Bentleys."

8.     Plaintiffs are individuals and citizens of the United States.

9.     Defendant Gregory A. McKay ("McKay") is an individual employed as the DCS Director. As DCS Director, with supervisory responsibility and authority over DCS and its caseworker employees and their supervisors, McKay had the plenary and final power to promulgate and implement policies governing the conduct of DCS in relation to the agency's removal of the Bentley children from their home and school, and the medical and forensic interviews of the Bentley children.

10.     Defendant McKay is a state actor as this term is used within the jurisprudence of 42 U.S.C. §1983. He is named herein in both his individual and official capacities.

11.     Defendant Cristina Baggen ("Baggen"), at all relevant times herein, is an individual employed as a DCS Caseworker.

12.     Defendant Baggen is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. She is named herein in her individual capacity.

13.     Defendant Gina Cordova ("Cordova"), at all relevant times herein, is an individual employed as a DCS Caseworker.

14.     Defendant Cordova is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. She is named herein in her individual capacity.

15.     Defendant City of Mesa ("City") is a municipality organized and existing under the laws of the State of Arizona. The Mesa Police Department ("MPD") is one of its departments.

16.     As the employer of MPD police officers, City had primary responsibility for the training, education, and supervision of those police officers. Upon information and belief, it was City which promulgated, encouraged, administered, and/or permitted, the policies,

practices, customs, and procedures under which the individual Defendant employees of City committed the acts or omissions complained of herein.

17.     Defendant Darrel Palmer ("Palmer"), at all relevant times herein, is an individual employed as an MPD police officer.

18.     Defendant Palmer is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. He is named herein in his individual capacity.

19.     Defendant Edward Clifford ("Clifford"), at all relevant times herein, is an individual employed as an MPD police officer.

20.     Defendant Clifford is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. He is named herein in his individual capacity.

21.     Defendant Peter Bina ("Bina"), at all relevant times herein, is an individual employed as an MPD police officer.

22.     Defendant Bina is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. He is named herein in his individual capacity.

23.     Defendant Laurie Kessler ("Kessler"), at all relevant times herein, is an individual employed as an MPD police officer.

24.     Defendant Kessler is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. She is named herein in her individual capacity.

25.     Defendant Lauren Glazer ("Glazer"), at all relevant times herein, is an individual employed as an MPD police officer.

26.     Defendant Glazer is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. She is named herein in her individual capacity.

27.     Defendant Molly Corfits ("Corfits"), at all relevant times herein, is an individual employed as an MPD police officer.

28.     Defendant Corfits is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. She is named herein in her individual capacity.

29.     Defendant Rob Russo ("Russo"), at all relevant times herein, is an individual employed as an MPD police officer.

30.     Defendant Russo is a state actor as this term is used within the jurisprudence of 42 U.S.C. § 1983. He is named herein in his individual capacity.

31.     Those Defendants who at relevant times herein were employed by DCS are sometime referred to herein as "DCS workers" and Defendants who at relevant times herein were employed by MPD are sometime referred to herein as "MPD officers."

## FACTUAL BACKGROUND & GENERAL ALLEGATIONS

32.     Brian, Janna, and their seven children are a family. As of April 1, 2016, all of the Bentley children were minors. O.R. was 14 years old, G.E. was 12 years old, B.J. was 11 years old, M.J. was 9 years old, T.A. was 7 years old, S.L. was 4 years old, and B.M. was 8 months old.

33.     Janna is a homemaker and dedicates her time to raising her children and family.

34.     Brian is an accountant and owns and operates a CPA firm, located in Mesa, Arizona.

35.     The Bentleys are lifelong residents of Mesa, Arizona. The Bentleys own the home they reside in, which is a 4,100 square foot home, situated on a one-acre lot in a quiet Mesa neighborhood.

36.     On March 31, 2016, at approximately 8:00 p.m. at the Bentley home, Janna instructed her 7-year old son T.A. to complete his chores. T.A. was unhappy with his mother's instructions and refused to comply.

37.     At approximately 10:15 p.m. Janna went to T.A.'s bedroom to check on him; however, T.A. was not in his bedroom.

38.     T.A.'s siblings, B.J. and M.J., informed Janna that T.A. had taken his blanket and pillow and left his bedroom.

39.     Janna spent the next hour looking for T.A. within the house and outdoors.

40. Brian was not at home at the time of T.A.'s disappearance. Because tax-filing deadlines were two weeks away, Brian had a heavy work load, and was working late at his office that night. At approximately 11:30 p.m., Janna and Brian spoke on the telephone and discussed a plan for finding T.A.

41. T.A. had hidden from his parents on multiple occasions before, and his behavior on this occasion was not uncommon. At times, he had opted to sleep in hiding, in a closet or homemade fort, instead of the comforts of his bed. On one previous occasion, T.A. had even sneaked away to the home of Janna's and Brian's close friends and neighbors.

42. Over the next few hours, Janna and Brian remained in contact with each other, as Janna and the two oldest Bentley children searched the Bentley's property and neighboring yards. Janna called neighbors, who turned on their floodlights, and she drove around the neighborhood looking for T.A.

43. At approximately 1:30 a.m., on April 1, 2016, Brian arrived at home and immediately began searching for T.A. Shortly after Brian's arrival, Janna sat down to nurse her 8-month old child B.M., an infant, who was still not sleeping through the night. Having had a long day and exhausted from her efforts in trying to locate T.A., Janna fell asleep at approximately 2:30 a.m.

44. Brian continued to search for T.A. until 3:30 a.m.

45. Brian was aware that this was not the first time T.A. had hidden from him and Janna. T.A. had improved his hiding each time he did it. Brian knew that this time, T.A. had his blanket and pillow, that T.A. was not wearing shoes, and that T.A. had not left the Bentley home on a bicycle.

46. The Bentley neighborhood was a safe neighborhood.

47. The neighborhood families were familiar with each other's children, and those children were familiar with the neighborhood properties.

48. Based upon those facts, and after confirming that all of the exterior flood lights at the Bentley home were turned on and that all of the exterior doors were unlocked, Brian

laid down on the tile floor directly in front of the front door of the Bentley home and waited for T.A.

49.     Less than three hours later, at approximately 6:30 a.m., Brian, Janna, and two of the Bentley children, continued their search for T.A.

50.     Brian and Janna went to several neighbors' homes and enlisted their assistance.

51.     By 7:15 a.m., over a dozen people were looking for T.A.

52.     At approximately 7:50 a.m., Brian and Janna concluded that they were facing a more serious situation than they had experienced with T.A. previously.

53.     At approximately 8:00 a.m., Janna called 911 and requested the assistance of MPD to help locate T.A.

54.     At approximately 8:15 a.m., officers from MPD began to arrive at the Bentley home.

55.     For the next two hours, scores of police officers searched for T.A.

56.     Officers searched the neighborhood around the Bentley home on foot, with the Bentleys and their family and friends, and a helicopter was searching for T.A. using aerial surveillance.

57.     At 10:15 a.m., one of the Bentley's neighbors spotted T.A., hiding in a bush in the front yard of Bentley's next-door neighbor.

58.     The neighbor signaled to Brian where T.A. was hiding. Brian approached the area and gently retrieved T.A. from the bushes where he had been camped out with his pillow, blanket, and a small bag of food.

59.     Brian picked T.A. up from the bushes and saw that T.A. was rattled, upset, nervous, and scared when he was found.

60.     In no way was T.A. physically harmed at the time he was found.

61.     Brian lifted T.A. into his arms, and calmly spoke to his son as he carried T.A. home.

62.    As Brian walked from the next-door neighbor's yard to the Bentley home carrying T.A., he passed several MPD officers who witnessed T.A. smiling.

63.    T.A. was not crying or hysterical.

64.    T.A. did not present any physical ailments, he was not bleeding, coughing, wheezing, or exhibiting any symptoms of anything other than a 7- year old who was in trouble for disobeying his mother and hiding from his parents.

65.    Brian stopped briefly to thank the officers for their assistance and advised the officer's that the issue had been resolved as T.A. had been found and was physically unharmed.

66.    The officers with whom Brian spoke could see that T.A. was fine and in his father's arms. The officers also saw that Brian was not yelling at T.A. or otherwise abusing T.A. in any manner whatsoever.

67.    The officers did not leave at this time.

68.    Brian continued to walk towards his home with T.A. in his arms.

69.    Standing on the other side of the Bentley yard from where Brian was walking with his son, Defendant Palmer yelled at Brian and told him to remain outside of his home because paramedics from the Gilbert Fire Department were on their way to check out T.A.

70.    Having observed that T.A. was rattled but physically unharmed, Brian informed Officer Palmer that paramedics were unnecessary.

71.    After informing Defendant Palmer that paramedics were unnecessary, Brian continued walking with his son into the garage of the Bentley home and into the house, closing the door behind him.

72.    While Brian was taking T.A. into the house to calm and relax him, Janna was informing the neighbors who were looking for T.A. that he had been found and thanking them for their help.

73.    No one from MPD or DCS was inside the Bentley home when Brian took T.A. into the house.

74.     As Brian soothed and carried T.A. down the hall through his home, Defendant Palmer burst through the closed door, the same door Brian had entered the home through moments before and closed behind him.

75.     Defendant Palmer followed Brian through the house while yelling that Gilbert Fire Department was going to examine T.A.

76.     Defendant Palmer summoned other MPD officers and DCS workers into the Bentley home, including Defendant Clifford, who stood guard over Brian and T.A., refusing to let them out of his sight.

77.     As Brian and Janna attended to T.A., the Bentley home was quickly invaded by multiple armed MPD officers and DCS workers who lurked about the house.

78.     MPD officers forced O.R. and G.E. outside of their home, separating them from their parents, and refused to let them back inside.

79.     MPD officers and DCS workers then escorted paramedics into the Bentley home and to the bathroom where Brian sat with T.A.

80.     Brian and Janna repeatedly told MPD officers, DCS workers, and the paramedics that their son was fine, and they reassured MPD, DCS, and the paramedics that they would take T.A. to their family physician that same day as soon as things had quieted down at their home.

81.     The now several armed MPD officers and DCS workers in the Bentley home, would not take no for an answer.

82.     Paramedics on the scene could clearly observe that T.A. was fine and not in need of emergency aide.

83.     Wanting to get their home cleared as soon as possible of the uninvited and unnecessary crowd, Brian and Janna relented and allowed the paramedics to examine their son.

84.     The paramedics confirmed, in front of both MPD officers and DCS workers, what T.A.'s parents already had told them – that T.A. was perfectly fine.

85.     After the paramedics completed their examination, confirmed T.A. was fine, and cleared him, Brian took T.A. to T.A.'s bedroom and laid him on his bed.

86.     Defendant Clifford followed Brian and T.A. into T.A.'s bedroom.

87.     Additional MPD officers and a DCS worker entered T.A.'s bedroom.

88.     Brian explained to them that T.A. was fine; however, Defendant Kessler, Defendant Bina, Defendant Baggen and Defendant Cordova vehemently disagreed with the Bentleys and the examining paramedics, and proclaimed that "it was too late," and that T.A. would have to be evaluated at a hospital.

89.     A DCS worker believed to be Defendant Baggen began to converse with T.A. about topics one would expect to discuss with an unfamiliar 7-year old boy. T.A. responded normally to the DCS worker, at times laughing and smiling.

90.     MPD officers Defendant Kessler and Defendant Bina and DCS workers Defendant Baggen and Defendant Cordova again told Brian that T.A. needed to be transported in an ambulance for a full medical evaluation at a hospital.

91.     This announcement came after the paramedics, who are trained medical professionals, had concluded that T.A. was in good health.

92.     Moments later, Brian began to walk out of T.A.'s bedroom to find Janna. As Brian exited the bedroom, Defendant Clifford followed him.

93.     Brian found Janna in the foyer of the Bentley home, where she was being scolded by multiple MPD officers and DCS workers for "allowing their son to stay out all night."

94.     As MPD officers and DCS workers scolded Brian and Janna, and despite the paramedics' evaluation and clearance, they continued to demand that T.A. be transported in an ambulance to be medically evaluated at a hospital.

95.     Brian and Janna again advised MPD officers and DCS workers, that they would take T.A. to their family physician that same day.

96.     MPD officers Defendant Kessler and Defendant Bina, along with DCS workers Defendant Baggen and Defendant Cordova, told Brian and Janna that they did not have a

choice in the matter and demanded that T.A. be taken in an ambulance to a hospital to be medically evaluated.

97.     Brian attempted to return to T.A.'s bedroom, where T.A. was alone with another DCS worker. Defendant Clifford, who was armed with a firearm, grabbed Brian by the left arm and pushed Brian away from the doorway to T.A.'s bedroom and told Brian that he was not allowed to enter the bedroom and be with his son.

98.     At this time, Brian retrieved his cell phone from his pocket to call his attorney. As Brian dialed, he walked towards the master bedroom, which was unoccupied, and Defendant Clifford continued to follow him, never letting Brian get more than a few feet away.

99.     As Brian entered the master bedroom calling his attorney, he turned to Defendant Clifford and asked why he was following him. Defendant Clifford responded that he would not allow Brian to be out of his sight inside the house, because he did not want Brian to have access to a firearm.

100.   Defendant Clifford told Brian "if you want to make a phone call in private, I will let you go outside." Dialing his attorney, Brian walked back towards the foyer where Janna was, and Defendant Clifford stopped at the doorway to T.A.'s bedroom, standing guard.

101.   Back at the foyer, Brian saw that the MPD officers and DCS workers were continuing their rebuke of Janna. With raised voices, the MPD officers and DCS workers berated Brian and Janna for not calling MPD sooner to report T.A. missing.

102.   At this time, MPD officers and DCS workers, continued to demand that T.A. be transported in an ambulance to a hospital to be medically evaluated, but also ~~heighted~~ added the requirement that DCS would take him.

103.   Brian and Janna again told MPD and DCS that they would take T.A. to their family doctor immediately.

104. MPD officers believed to be Defendant Kessler, Defendant Bina, and DCS worker Defendant Baggen each took turns advising Brian and Janna that DCS was going to take custody of T.A. because DCS had a "TCN."

105. When Brian and Janna asked what "TCN" meant, the officers told them that it was an acronym for Temporary Custody Notice, a document giving legal "custody of T.A. to the State."

106. Brian advised the MPD officers and the DCS worker that he had just spoken with his attorney on the phone and that the attorney was on his way to the Bentley's home. Brian asked the MPD officers and DCS worker to take no further action until his attorney arrived.

107. The MPD officers and DCS worker told Brian and Janna, "it's too late, we have a TCN and we're taking him."

108. In fact, the MPD officers and DCS workers knew that there was no Temporary Custody Notice and the MPD officers and DCS workers knew that their statements and claims to Brian and Janna about having a Temporary Custody Notice were completely false.

109. Janna pleaded with MPD officers and DCS workers to allow her to ride with T.A. to the hospital. A DCS worker reluctantly agreed, over the objection of the MPD officers Defendant Kessler and Defendant Bina.

110. T.A. was unwillingly loaded into an ambulance. Janna sat with her son in the ambulance, and they were transported to Cardon Children's Hospital in Mesa, Arizona.

111. Defendant Clifford followed the ambulance to the hospital, continuing MPD's constant watch and custody over T.A., and now Janna.

112. At the hospital, T.A. was medically examined by Dr. Kuni Shah. Defendant Clifford monitored the examination, still never letting T.A. and Janna out of his sight.

113. Dr. Shah found that there was absolutely nothing wrong with T.A., a fact that had already been confirmed by his parents and the paramedics.

114.   At approximately 12:40 p.m., as T.A. was about to be discharged from Cardon Children's Hospital, Janna communicated with Brian on her cell phone to make arrangements for Brian to pick her and T.A. up from the hospital.

115.   However, during the call, Defendant Clifford advised Janna that T.A. was not free to leave his custody, and that he would be transporting T.A. and Janna in his MPD patrol vehicle to the Mesa Family Advocacy Center ("MFAC") located at 225 E. 1st Street in Mesa, Arizona.

116.   The MFAC is an MPD police substation and entry into the MFAC can only be accessed through locked gates and doors monitored and controlled by MPD officers and DCS workers.

117.   At approximately 1:20 p.m., Defendant Clifford placed T.A. and Janna in the backseat of his patrol vehicle and left Cardon Children's Hospital en route to the MFAC.  At approximately 1:40 p.m., T.A. and Janna arrived at the MFAC in the custody of Defendant Clifford.

118.   As Janna and T.A. walked through another set of locked doors into the MFAC office, Janna let out an audible gasp. Approximately 40 feet in from of Janna, secured in a large room behind thick plate glass were Janna's 11-year old and 9-year old sons, B.J. and M.J., sitting at a small table in the room with an unidentified woman, believed to be a DCS worker or MPD officer.

119.   Earlier that day, at approximately 10:15 a.m., MPD dispatched Defendant Russo to Great Hearts Academy ("GHA") where B.J. and M.J. were attending school. Defendant Russo gave GHA administrators a fabricated reason for MPD's need to take custody of B.J. and M.J. and gave specific order to GHA administration not to call Brian or Janna to notify them that MPD was taking custody of their children and transporting them to an unknown location.

120.   Based on the lie of Defendant Russo to GHA administrators, GHA complied with Defendant Russo's demand and released B.J. and M.J. into the custody of Defendant Russo.

121.   At the MFAC, MPD officers Defendant Kessler and Defendant Bina, along with DCS workers, appeared and explained to Janna that B.J. and M.J. had been removed from their school and interviewed at the MFAC according to "standard protocol" and that the intent of MPD and DCS "was to ensure that the children were okay."

122.   Not only did MPD remove B.J. and M.J. from school after making false statements to GHA officials, neither MPD nor DCS obtained the consent of either parent before interviewing B.J. and M.J.

123.   MPD officer Defendant Kessler, while standing shoulder-to-shoulder with Defendant Bina, and a DCS worker believed to be Defendant Baggen, asked Janna if she would consent to T.A. being interviewed by a "forensic interviewer."

124.   In response to the MPD officer's request for Janna's consent to have T.A. interviewed, Bentley's attorney, who met Janna and T.A. at the MFAC, asked if T.A. was free to leave. MPD officer Defendant Kessler said "yes, he's free to go" and Bentley's attorney said to Janna, "then let's go."

125.   Within seconds, as Janna and her attorney stepped forward to retrieve T.A. and exit the MFAC, MPD officer Defendant Bina spoke up and began scolding Janna and expressing his personal opinion regarding the Bentley's method of parenting their children.

126.   Having been told by Defendant Kessler just seconds before that T.A. was free to leave the MFAC, Bentley's attorney spoke directly to Defendant Bina asked if T.A. was free to leave. Defendant Bina disagreed with Defendant Kessler's affirmative response to the question that T.A. was free to leave and Defendant Bina reiterated his personal opinions regarding the Bentley's method of parenting their children.

127.   Bentley's attorney continued asking Defendant Bina if T.A. was free to leave and Defendant Bina responded sharply, "No, he is not free to go! He is in the custody of the State."

128.   Bentley's attorney asked Defendant Bina under what authority T.A. was in the custody of the State and Defendant Bina responded, "under a Temporary Custody Notice."

129.   Defendant Bina was lying as he knew that there was no Temporary Custody Notice and knew that his statements and claims to Bentley's attorney about having a Temporary Custody Notice were completely false.

130.   Having just seconds before advised that T.A. was free to leave, Defendant Kessler knew that there was no Temporary Custody Notice and that her fellow MPD officer Defendant Bina was lying.

131.   The DCS worker standing shoulder-to-shoulder with Defendant Kessler and Defendant Bina also knew that that there was no Temporary Custody Notice and that Defendant Bina was lying.

132.   The Bentley's attorney then asked MPD officers Defendant Kessler and Defendant and DCS workers if B.J. and M.J. were free to go. The officers and DCS workers told Janna and her attorney that B.J. and M.J. were free to leave because they had already been "forensically interviewed" before Janna's arrival at the MFAC.

133.   Janna called a family friend to pick up B.J. and M.J. and drive them home. Janna escorted the two boys to the locked door where her friend was waiting, and they were taken home.

134.   Because MPD officers and DCS workers had not asked for, or received consent from Brian or Janna to "forensically interview" B.J. and M.J., and because MPD advised that T.A. was "in the custody of the State," Janna was perplexed when MPD and DCS again asked her if she would consent to T.A. being "forensically interviewed."

135.   Janna asked if she or her attorney could be present during the interview. The present MPD officer Defendant Kessler and DCS workers said no.

136.   Janna asked what would happen if she refused to give consent to T.A. being "forensically interviewed" behind closed doors. MPD officer Defendant Kessler and DCS worker believed to be Defendant Baggen advised that if Janna refused consent, T.A. would remain in the State's custody, essentially unable to go home.

137.   T.A. was escorted to another room at the MFAC, behind another locked door, and "forensically interviewed" by MPD officer Defendant Glazer.

138.   The interview was "monitored" by armed MPD officers Defendant Kessler, Defendant Corfits, and Defendant Russo.

139.   Later that afternoon, T.A. was allowed to leave the MFAC with his mother Janna, and they went home.

140.   DCS worker Defendant Baggen authored an Assessment of Impending Danger regarding the Bentleys. The Assessment of Impending Danger is an official DCS report based on the DCS Investigator's initial contact/investigation with a family to determine whether children are safe in the home and whether a present or impending danger exists.

141.   The DCS Assessment of Impending Danger for the Bentley family states, "There are no concerns regarding the parent's ability to properly care for and protect their children."

142.   The report includes basic information and a biographical summary of the family to include family members, type of home, living conditions, etc. The report pertaining to the Bentleys, however, also included multiple references to their faith.

143.   Official reports from several MPD officers also included multiple references to the Bentley's faith. Excerpts from the DCS and MPD reports include the following statements:

    a. "There is concern the family's religion/ faith impairs their judgment."

    b. "When asked why she did not notify PD of T.A.'s disappearance at that time Janna said, "I prayed about it and felt calm." She said she knew T.A. was safe. When asked how she knew Janna said God told her."

c. "She advised me god told them T.A. was safe, so they decided to go to bed at 0300 hour. She advised me God told her he was safe and now that we found him safe, so God was right."

d. "Mother reported they 'prayed' about it and 'God' told them that T.A. would be alright so the family went to bed. After informed the family that the Department had concern regarding T.A.'s safety and health due to this incident and would have to take custody."

e. "T.A. ran away from home and the parents went to sleep at 2:00am because 'God' told them he would be okay."

144. DCS worker Defendant Baggen determined that "[n]o further intervention is needed at this time."

145. On April 21, 2016, DCS's investigation into the Bentley family was approved for dismissal by DCS supervisor Marja Jones, who concluded that "it appears that there are no safety threats or risk areas identified that would warrant the need for further DCS intervention. Case is approved for closure."

146. On May 19, 2016, Bentleys made a public records request to MPD seeking all records related to the events of April 1, 2016 as set forth above, and specifically those related to the removal of B.J. and M.J. from their school.

147. At the request for the individual Defendants herein, on August 9, 2016, only a few days after their request for public records, the State of Arizona criminally charged Brian and Janna with one count of child neglect and one count of contributing to the delinquency of a minor. Both charges were misdemeanors.

148. A plea offer was made to Brian and Janna as follows: thirty (30) days in jail for each parent, and two (2) years probation.

149. The decision to charge Brian and Janna criminally was made after MPD became aware of Bentley's public records request for the police reports and records related to the events of April 1, 2016 as set forth herein, and specifically those related to the removal of B.J.

and M.J. from their school, with the hope that Brian and Janna would be dissuaded from filing a lawsuit against the City, MPD, MPD officers, and DCS employees.

150.   A five-day jury trial commenced on July 31, 2017. Following trial, on August 9, 2017, the jury found Brian and Janna not guilty on all counts.

**COUNT I – 42 U.S.C. § 1983**
*Unlawful Entry – 4th Amendment*
(Entry to Bentley Home)

151.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

152.   Defendants entered Bentley's home without the consent of Bentleys.

153.   Defendant Clifford was armed with a firearm when he entered the Bentley's home.

154.   Defendant Kessler was armed with a firearm when she entered the Bentley's home.

155.   Defendant Bina was armed with a firearm when he entered the Bentley's home.

156.   At the time MPD officers and DCS workers entered the Bentley's home, MPD officers had no intention of placing any of the Plaintiffs under arrest.

157.   At the time MPD officers and DCS workers entered the Bentley's home, none of the Plaintiffs were in the custody of MPD.

158.   At the time MPD officers and DCS workers entered the Bentley's home, none of the Plaintiffs were in the custody of DCS.

159.   MPD officers did not have a warrant to enter the Bentley's home.

160.   At the time MPD officers and DCS workers entered the Bentley's home, a Temporary Custody Notice had not been served upon Brian Bentley or Janna Bentley.

161.   At the time MPD officers and DCS workers entered the Bentley's home, MPD officers had no objectively reasonable grounds to believe that entering the Bentley's home was necessary to prevent the destruction of any evidence.

162.   At the time MPD officers and DCS workers entered the Bentley's home, MPD officers had no objectively reasonable grounds to believe that entering the Bentley's home was necessary to prevent a crime from being committed.

163.   All individual Defendants, both employees of the Department of Child Safety and officers with the Mesa Police Department, were integral participants in the decision to make the unreasonable entry into the Bentleys' home.

164.   At the time MPD officers and DCS workers entered the Bentley's home, MPD officers had no objectively reasonable grounds to believe that entering the Bentley's home was necessary to render emergency medical treatment to prevent serious bodily harm or death.

165.   There were no exigent circumstances present making it impractical for MPD to seek and receive a warrant to enter the Bentley's home prior to making entry.

166.   Each member of the Bentley family is guaranteed important protections under the Fourth Amendment and the Fourteenth Amendment to the Constitution.

167.   Defendants' entry into Bentley's home was wrongful and violated Bentley's Constitutional rights.

168.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

169.   The nature of the conduct described above was shocking to the conscience and done with an evil mind.

### COUNT II– 42 U.S.C. § 1983
### *Unreasonable Seizure of Person – 4th Amendment*
(Seizure of Brian Bentley)

170.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

171.   Immediately after T.A. was found, Brian carried T.A. into the Bentley home.

172.   Brian sat with T.A. first in a bathroom, and then in T.A.'s bedroom as MPD officers and DCS workers spoke to Janna in another area of the Bentley home.

173.   MPD officers and DCS workers were mere feet away from Brian in the bathroom and in T.A.'s bedroom as he consoled T.A.

174.   Overhearing MPD officers and DCS workers tell Janna that T.A. would be taken to a hospital in an ambulance, Brian stepped out of T.A.'s bedroom to enter the discussion with Janna and the MOD officers and DCS workers occurring less than fifteen feet from T.A.'s bedroom door.

175.   Moments later, Brian began to walk back to T.A.'s bedroom.  As Brian attempted to enter into T.A.'s bedroom, Defendant Clifford faced Brian in front of the doorway to T.A.'s bedroom, removed his right hand from his gun belt, and forcefully grabbed onto Brian's left arm below the shoulder. While gripping Brian's arm, Defendant Clifford pushed Brian away from T.A.'s bedroom and told Brian that he would not be allowed to see T.A.

176.   As Brian walked away from T.A.'s bedroom, he removed his cell phone from his pocket and began to dial his attorney, walking toward another bedroom in the Bentley home.

177.   Defendant Clifford followed Brian's every step and told Brian that in addition to not being allowed to be in the same room as his son T.A., he was not allowed to be alone anywhere alone inside his own home.

178.   Having already been physically restrained once by Defendant Clifford when attempting to see his son in his own home, Brian feared that if he closed or even attempted to close a door so that he could speak to his attorney in private, that Defendant Clifford would become more physical and violent towards Brian.

179.   At no time during events set forth herein was Brian armed with a weapon of any type.

180.   Except those which were carried by all of the MPD officers, at no time during events set forth herein did Defendant Clifford or any other MPD officer or DCS worker view a weapon inside the Bentley home such as a firearm, knife (other than kitchen utensils

exclusively in the kitchen area), stun gun, pepper spray, baseball bat or Billy club, crossbow, etc.

181.  At all times during the events set forth herein, Defendant Clifford was armed with a firearm and other weapons.

182.  At no time during events set forth herein did Brian make any threats to Defendant Clifford or any other MPD officer or DCS worker.

183.  At no time during events set forth herein did Brian display verbal or physical hostility to Defendant Clifford or any other MPD officer or DCS worker.

184.  Defendant Clifford had no objectively reasonable grounds to believe that physically restraining Brian to prevent him from being with his son in his own home was necessary to prevent the destruction of evidence, to prevent a crime, or to render emergency medical treatment to prevent serious bodily harm or death.

185.  Defendant Clifford had no objectively reasonable grounds to believe that preventing Brian from freely moving about his own home was necessary to prevent the destruction of evidence, to prevent a crime, or to render emergency medical treatment to prevent serious bodily harm or death.

186.  Defendant Clifford had no objectively reasonable grounds to believe that preventing Brian from speaking privately in his own home with his lawyer was necessary to prevent the destruction of evidence, to prevent a crime, or to render emergency medical treatment to prevent serious bodily harm or death.

187.  Defendant Clifford's action of physically restraining Brian was a seizure of Brian's person.

188.  Defendant Clifford's action of preventing Brian from freely moving about his home was a seizure of Brian's person.

189.  Defendant Clifford's action of preventing Brian from speaking privately in his own home with his lawyer was a seizure of Brian's person.

190.   Defendants' seizure of Brian's person was unreasonable and violated Brian's Constitutional rights.

191.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

192.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## **COUNT III– 42 U.S.C. § 1983**
### *Unreasonable Seizure of Person – 4th Amendment*
(Seizure of B.J. and M.J.)

193.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

194.   On the morning of April 1, 2016, Janna Bentley arranged for two of the Bentley children to be driven to school while she and Brian, accompanied by other family members, neighbors, and friends, continued to look for T.A.  Siblings B.J. and M.J., who were 11 and 9 years old respectively at the time, arrived at Great Hearts Academy ("GHA") and attended their respective classes, while the search for their brother T.A. continued.

195.   T.A. was found by a neighbor of the Bentleys at 10:15 a.m.

196.   At approximately 10:30 a.m., Defendant Russo arrived at the administrative offices of GHA where B.J. and M. J. attended school.

197.   Defendant Russo identified himself to GHA administrators as an MPD officer.

198.   Defendant Russo told GHA administrators that he was assisting with the search for T.A. and told GHA administrators that he needed to take B.J. and M.J. into custody. Defendant Russo explained to GHA administrators the reason B.J. and M.J. were to be released to his custody, but that reason was false and fabricated by Defendant Russo.

199.   Defendant Russo informed GHA administrators that B.J. and M.J. did not need to be released to his custody because of a child abuse investigation.

200.   Defendant Russo instructed GHA administrators that he was taking B.J. and M.J. into custody and that because of "special circumstances," GHA administrators were not to notify Brian or Janna Bentley that their two children were taken into custody by an MPD officer.

201.   Defendant Russo instructed GHA administrators to keep his visit and custody of B.J. and M.J. a secret.

202.   Defendant Russo, armed with a firearm, took physical custody of B.J. and M.J. and placed the siblings in his MPD vehicle.

203.   When B.J. and M.J. asked why they were being taken from their school, Defendant Russo lied to them and fabricated a story.

204.   When B.J. and M.J. asked if their parents knew they were being picked up from school, Defendant Russo said "yes" and continued to lie to them with a fabricated a story attempting to explain why they were now with a police officer being taken to a strange place.

205.   When B.J. and M.J. asked where they were being taken, Defendant Russo lied to them and did not tell them they were being taken to the MFAC to be interviewed by police officers and "forensic interviewers."

206.   Defendants knew that Defendant Russo went to GHA and took B.J. and M.J. into custody, and Defendants knew that Brian and Janna Bentley were unaware that B.J. and M.J. were taken into custody.

207.   Defendants knowingly failed to notify Brian or Janna Bentley that B.J. and M.J. were taken into custody.

208.   Defendants never informed Brian or Janna Bentley that B.J. and M.J. were taken into custody.

209.   Brian and Janna Bentley first learned that B.J. and M.J. were not at GHA where they went to school that morning at approximately 2:00 p.m. when Janna arrived at the MFAC with T.A.

210.   Defendants had no objectively reasonable grounds to believe that taking B.J. and M.J. into custody was necessary to prevent the destruction of evidence, to prevent a crime, or to render emergency medical treatment to prevent serious bodily harm or death.

211.   Defendant Russo's action of taking B.J. out of school and into his custody was a seizure of B.J.'s person.

212.   All individual Defendants, both employees of the Department of Child Safety and officers with the Mesa Police Department, were integral participants in the decision to seize M.J. and B.J., with DCS Defendants providing advice and consent for such seizure.

213.   Defendant Russo's action of taking M.J. out of school and into his custody was a seizure of M.J.'s person.

214.   Defendants' seizure of B.J. and M. J. was unreasonable and violated the Constitutional rights of B.J. and M.J.

215.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

216.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## <u>COUNT IIII– 42 U.S.C. § 1983</u>
### *Unreasonable Seizure of Person – 4th Amendment*
(Seizure of T.A.)

217.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

218.   Within minutes of T.A. being found, paramedics from Gilbert Fire Department ("GFD") examined T.A. GFD paramedics checked T.A.'s vitals, respiration, pulse, skin, body temperature, blood pressure, pupils, and asked the appropriate questions to determine whether medical treatment was necessary.

219.   MPD officers and DCS workers however, did not like hearing from GFD that there was nothing wrong with T.A. And, although there had been absolutely no signs or indications from T.A. or any other Bentley family member that T.A. had been physically or

sexually abused in any way whatsoever, MPD officers and DCS workers wanted to go on a fishing expedition and ask those T.A. those types of questions in a "forensic interview" behind closed doors and alone.

220.   MPD officer and DCS workers told Janna and Briand that if they did not voluntarly allow T.A. to be taken into custody for "medical evaluation," that T.A. would be taken into custody by force. When Brian and Janna asked MPD officers and DCS worked by what authority they could take T.A. into custody, MPD officers and DCS workers lied and claimed to have a TCN.

221.   T.A. was taken into custody and transported to the hospital and then to the MFAC.

222.   Defendants' actions of taking T.A. to the hospital and the MFAC was a seizure of T.A.'s person.

223.   Defendants' seizure of T.A. was unreasonable and violated T.A.'s Constitutional rights.

224.   All individual Defendants, both employees of the Department of Child Safety and officers with the Mesa Police Department, were integral participants in the decision to seize T.A.

225.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

226.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

**COUNT V– 42 U.S.C. § 1983**
*Unlawful Interrogation – 4th Amendment*
(Interrogations of T.A., B.J., and M.J.)

227.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

228.   DCS workers and MPD officers unlawfully interrogated T.A. in the Bentley home when they privately interviewed T.A. in his bedroom and physically prevented Brian from being present during the interrogation.

229.   DCS workers and MPD officers unlawfully interrogated B.J. and M.J. at the MFAC when they secretly interviewed B.J. and M.J. and prevented Brian or Janna from being present during the interrogations.

230.   DCS workers and MPD officers unlawfully interrogated T.A. at the MFAC when they privately interviewed T.A. and prevented Janna from being present during the interview.

231.   DCS workers and MPD officers unlawfully interrogated T.A. at the MFAC when they privately interviewed T.A. and refused to allow legal counsel for the Bentley family to be present during the interrogation.

232.   Defendants' interrogations of T.A., B.J. and M.J. was unreasonable and violated the Constitutional rights of T.A., B.J. and M.J.

233.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

234.   All individual Defendants, both employees of the Department of Child Safety and officers with the Mesa Police Department, were integral participants in the decision to interrogate T.A., B.J., and M.J., with DCS employees providing advice and consent for such interrogations.

235.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

**COUNT VI– 42 U.S.C. § 1983**
*Unauthorized Medical Examinations – 4th & 14th Amendment*
(Examinations of T.A.)

236.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

237.   Parental consent was not obtained for any of the examinations of T.A. In the alternative, DCS workers and MPD officers coerced parental consent from Brian and Janna Bentley by falsely claiming that if parental consent was not given, T.A. would be taken into custody by virtue of a TCN, and examined anyway.

238.   T.A. was examined by GFD at the Bentley home, and by a medical doctor at Cardon Children's hospital.

239.   The examinations of T.A. were conducted at the behest of DCS workers and MPD officers.

240.   The examinations of T.A. were not conducted at the behest of the Bentleys.

241.   The examinations of T.A. were undertaken for investigative purposes.

242.   Defendants did not have a court order directing the medical examination of T.A.

243.   There were no exigent circumstances requiring that T.A. undergo multiple examinations.

244.   The medical examination of T.A. at the behest of DCS workers and MPD officers were wrongful and violated the Constitutional rights of Brian and Janna Bentley and T.A.

245.   As a result of Defendants' wrongful and unreasonable conduct described above, Plaintiffs have been damaged.

246.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## **COUNT VII– 42 U.S.C. § 1983**
### *Interference with Parent/Child Relationship –1st, 4th, and 14th, Amendments*

247.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

248.   Brian and Janna Bentley have a liberty interest in the companionship and society of their children.

249.   The acts and omissions of the Defendants as set forth herein interfered with and deprived Brian and Janna Bentley of their liberty interest in the companionship and society of their children.

250.    The acts and omissions of the Defendants as set forth herein which interfered with and deprived Brian and Janna Bentley of their liberty interest in the companionship and society of their children were acts and omissions of deliberate indifference on the part of Defendants.

251.   The acts and omissions of the Defendants as set forth herein which interfered with and deprived Brian and Janna Bentley of their liberty interest in the companionship and society of their children were wrongful and violated the Constitutional rights of Brian and Janna Bentley and T.A.

252.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

253.   All individual Defendants, both employees of the Department of Child Safety and officers with the Mesa Police Department, were integral participants in the interference with the Bentleys' right to familial association.

254.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## <u>COUNT VIII– 42 U.S.C. § 1983</u>
### *Religious Discrimination –1st Amendment*

255.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

256.   The First Amendment to the United States Constitution guarantees the Bentleys freedom to exercise their religion and to pray in their home.

257.   Janna Bentley informed DCS workers and MPD officers that in addition to searching for T.A., and enlisting friends and family in the search, she and her family prayed about the wellbeing of T.A.

258.   The Bentleys religious beliefs were used to discriminate, harass, and unlawfully seize and interrogate members of the Bentley family.

259.   The inclusion of multiple references to the Bentleys' faith in multiple DCS and MPD reports indicate underlying discrimination and bigotry exercised by MPD and DCS.

260.   DCS workers and MPD officers wrongfully discriminated, harassed, and unlawfully seized and interrogated members of the Bentley family because of Janna's Bentley's belief that God hears and answers prayers.

261.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

262.   All individual Defendants, both employees of the Department of Child Safety and officers with the Mesa Police Department, were integral participants in the interference with the Plaintiffs' religious beliefs.

263.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## COUNT VIII– 42 U.S.C. § 1983
### *Municipal Liability*

264.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

265.   At all relevant times herein, Defendants City, MPD, and DCS, established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies") which policies were the cause of violation of Bentleys' constitutional rights granted to them pursuant to 42 U.S.C. § 1983, as well as the case of Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments, including but not limited to:

a. The Defendants' policies of detaining and/or removing children from their parents without exigent circumstances, court order, and/or consent of their parents;

b. The Defendants' policies of removing children from the legal and physical custody of their parents beyond a reasonable period after the basis for any such removal is negated, had it ever existed;

c. The Defendants' policies of personnel (MPD officers and DCS workers) insisting on the existence of a court order or TCN to authorize state custody of children, when no such order or TCN exists;

d. The Defendants' policies of providing non-emergency medical care to minors without parental approval and/or a court order;

e. The Defendants' policies of removing minors from their schools without parental consent or court order and directing school administrators not to inform the minors' parents;

f. The Defendants' policies of providing "forensically interviewing" minors without parental approval and/or a court order; and,

g. By acting with deliberate indifference in implementing a policy, practice, or procedure of non-existent and/or inadequate training, and/or by failing to train their respective caseworkers, officers, agents and employees, in providing for the Constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to the investigation of child abuse and neglect. Defendants had duties to Plaintiffs at all times to establish, implement and follow policies, which confirm and provide for the protections guaranteed Plaintiffs under the United States Constitution, including the First, Fourth, and Fourteenth Amendments; to use reasonable care to select, supervise, train, control, and review the activities of all agents, officers, and employees in their employ, including within DCS and

MPD; and further, to refrain from acting with deliberate indifference to the Constitutional rights of Plaintiffs herein so as to not cause the Plaintiffs the injuries and damages alleged herein.

266. Defendants City, MPD, and DCS, breached their duties and obligations to Plaintiffs, including, but not limited to, failing to establish, implement and follow the correct and proper constitutional policies, procedures, customs, and practices, by failing to properly select, supervise, train, control, and review their respective agents and employees as to their compliance with constitutional safeguards; and by permitting named Defendants, and other defendants whose identities are not yet known, to engage in unlawful and unconstitutional conduct as herein alleged.

267. Defendants City, MPD, and DCS knew, or should have known, that by breaching the aforesaid duties and obligations that it was foreseeable that it would, and did cause Plaintiffs to be injured and damaged by the wrongful polices and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their respective legal duties and obligations to Plaintiffs.

268. Defendants City, MPD, and DCS also provided inadequate and/or non-existent training including but not limited to;

a. Non-existent and/or inadequate training on the Fourth and Fourteenth Amendments as same apply in the context of a missing child investigation that may involve removal of children from their parents(s);

b. The existence and/or use of protective temporary custody notices provided for under Arizona law;

c. The emotional trauma and psychological damage to a child removal; and,

d. The clearly established law of this federal circuit on the issues of warrantless removals, exigency, least intrusive means, and the proper investigation before removal of a child.

269.   As a direct and proximate result of Defendants actions or inactions in relation to Defendants' policies, practices, procedures, and/or customs, and/or non-existent/inadequate training, and in accordance with 42 U.S.C. §1983, Plaintiffs' civil rights have been violated to such an extent that they have suffered and will continue to suffer, general and special damages, including but not limited to, physical and/or mental anxiety and anguish, as well as incurring attorney fees, costs, and expense, including those as authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

### COUNT IX – 42 U.S.C. § 1983
### *Wrongful Prosecution – 14th Amendment*
### (Criminal Prosecution)

270.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

271.   The individual Defendants caused a prosecution to be instituted and continued against Plaintiffs.

272.   This prosecution was instituted and continued without probable cause.

273.   The prosecution terminated in Plaintiffs' favor.

274.   The individual Defendants sought the prosecution of Brian and Janna to deprive them of their constitutional rights, including:

    a. Their First Amendment right of access to the courts; the prosecution was intended to interfere or preclude their ability to seek approve relief for the wrongful seizure of their children; and

    b. To create a factual basis for further interference with the Bentley family, interference that would directly interfere with the Bentley's freedom of religion and right of familial association.

275.   As a result of Defendant's wrongful conduct described above, Plaintiffs have been damaged.

276.   The nature and conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

### COUNT IX – 42 U.S.C. § 1983
*Malicious Prosecution/Wrongful Institution of Civil Proceedings – 4th & 14th Amendment*
### (DCS Central Registry Prosecution)

277.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

278.   In addition to the criminal prosecution, DCS caused a prosecution to be instituted and continued against the Bentley's to be entered onto the DCS Central Registry for over 705 days.

279.   This investigation, which was based on the same allegations of abuse or neglect which were fully litigated through the Bentley's criminal trial, where the Bentley's were acquitted on all charges, was instituted and continued without probable cause.

280.   Despite being made aware of the Bentley's acquittal, DCS instituted a civil action against the Bentleys.

281.   DCS's continued investigation was motivated by malice and resulted in the harassment of the Bentleys.

282.   On or about June 20, 2017, DCS mailed virtually identical letters to Brian and Janna Bentley, the contents of the letters reads the same, however the names and genders are different per recipient.  The letter sent to Jana Bentley reads:

> The Department of Child Safety (DCS) completed its investigation of report #897291, received on 4/1/2016.  As a result of this investigation, DCS has reason to believe that you neglected [T.A.], in violation of A.R.S. §8-201 et. seq. DCS plans to enter the following finding in the confidential DCS Central Registry:
>
> On or about April 1, 2016, Jenna Bentley neglected Talon Bentley, Age 8, when she failed to provide supervision as [TA] ran away from home on 3/30/16 and she stopped searching for him at 3:00am because "God" told her [TA] would be okay.  Police and/or authorities were not

contacted until 8:00am on 4/1/16.  [TA] was found sleeping in a neighbor's yard, across the street from a sex offender group home. Mrs. Bentley was aware of the group home; thereby placing the child at unreasonable risk of harm for injury, abduction, harm from a stranger and possible death. [*sic*].

283.   The Bentleys responded to these letters on July 10, 2017, informing DCS that they would be appealing the decision and completed the "Request for DCS Findings Appeal" to request a hearing before an Administrative Law Judge. The Bentley's also informed DCS that they were awaiting a criminal trial on the matter.

284.   On July 17, 2017, Ms. Paula Cargill of DCS responded stating that the Bentleys were not entitled to a hearing at the Office of Administrative Hearings (OAH) because the Bentleys were "involved in another legal action involving the same allegation of abuse or neglect." In the same letter, DCS stated that the Bentleys would not be placed on the DCS Central Registry while the criminal action was pending. The Bentley's were given six months to provide an update to DCS regarding the status of the legal proceedings, and should they fail to, the Bentley's would be placed on the Central Registry.

285.   On August 10, 2017, the Bentleys provided a follow up letter in response to the July 17, 2017 letter and informed DCS that both Brian and Janna had been found not guilty on all counts brought against them.

286.   At the conclusion of the criminal trial, the Bentleys were relieved that the DCS investigation of report #897291 was finally complete and they would be able to move on from this matter.

287.   On August 16, 2017 and August 21, 2017, DCS informed the Bentleys that their investigation was still ongoing.  DCS provided that it was now investigating the information the Bentleys had provided DCS in order to make a final determination as to whether the Bentleys would be placed on the Central Registry.

288.   The DCS communication regarding the continued investigation to place the Bentleys on the Central Registry came as a surprise to the Bentleys, who felt that the resolution of the criminal trial would also resolve the DCS investigation.

289.   The Bentleys inquired about the necessity and credibility of DCS's continued investigation, however, DCS persisted that while a guilty verdict from the criminal trial would have resulted in an automatic entry onto the Central Registry, but a finding of not guilty did not resolve the DCS investigation.

290.   DCS justified its decision to bring this action because the civil proceedings would be subject to the probable cause standard, as opposed to the preponderance of the evidence standard which was applied in the criminal prosecution.

291.   Despite the fact that DCS's case lacked probable cause from the very beginning, DCS continued to pursue this action.

292.   On November 14, 2017, DCS stated that it had completed its investigation of report #897291 and found that a finding against the Bentleys should be entered in the DCS Central registry, reading as follows:

> On or about April 1, 2016, Brian Bentley neglected [T.A.], age 8, when he failed to provide supervision as he ended looking for the missing child for a period of approximately five to six hours before taking any further action to locate [T.A.]; thereby placing [T.A.] at unreasonable risk of harm for abduction, harm from a stranger, injury, and possible death.

> On or about April 1, 2016, Janna Bentley neglected [T.A.], age 8, when she failed to provide supervision as she ceased looking for the missing child for several hours before taking any further action to locate [T.A.]; thereby placing [T.A.] at unreasonable risk of harm for abduction, harm form a stranger, and injury.

293.   This was a blow to the Bentleys, who in turn requested an OAH hearing to appeal this decision. The OAH hearing was held on January 9, 2018 in front of Administrative Law Judge Kay A.  Abramsohn.

294.   At the conclusion of the January 9, 2018 hearing, ALJ Abramsohn advised she had twenty (20) days to complete her decision and provide it to DCS.  In turn, DCS would have thirty (30) days to notify the Bentleys as to whether they would adopt the decision or contest it.

295.   ALJ Abramsohn issued a detailed ten page decision including findings of fact and conclusions of law, ruling in favor of the Bentleys and concluding that DCS had not established probable cause for the DCS findings that Brian and Janna Bentley had neglected their child.  (Exhibit A: Administrative Law Judge Decision).

296.   On March 15, 2018, the Bentleys received a letter from DCS adopting the Administrative Law Judge Decision and stating that Bentleys would not be entered in the DCS Central Registry.

297.   As a result of DCS's wrongful conduct described above, Plaintiffs have been damaged.

298.   The nature and conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## COUNT X – 42 U.S.C. § 1983

### *Supervisor Liability – 14th Amendment*

299.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth in full.

300.   At all times relevant hereto, Defendant Gregory McKay was the director of the Arizona Child Protective Services.

301.   He personally participated and approved of the unconstitutional policies and practices in this matter, including but not limited to:

      a. Warrantless removal of children from their parents and homes,

      b. Medical treatment without exigency or consent by parents, and

      c. The inadequate training of DCS case workers and investigators.

302.   As a result of Defendants' wrongful conduct described above, Plaintiffs have been damaged.

303.   The nature of the conduct described above was shocking to the conscience and deliberately indifferent to the constitutional rights of the Plaintiffs.

## COUNT XI DECLARATORY/INJUNCTIVE RELIEF

304.   Plaintiffs incorporate herein by reference the preceding paragraphs as if set forth fully herein.

305.   DCS has wrongfully, unlawfully, and with deliberate indifference to the rights of Plaintiffs, and with utter disregard of its duties and obligations to Plaintiffs, acted, practiced and/or adopted policies, practices, procedures, customs, and/or training that violated Plaintiffs' constitutional rights. This includes the right to be free from governmental interference as to their familial associations, from unreasonable searches or seizures, and non-consensual and unwarranted medical examinations, including those relating to child abuse allegations and related actions and proceedings.

306.   DCS and its management have knowingly failed to address their subordinate employees' improper, unlawful and unconstitutional actions, conduct and policies at the time of the incidents at issue in the present actions.  Presently, DCS has not changed or modified such actions, customs, training, practices, and/or policies to conform to law, and continues to seize children from their parents without a court order authorizing removal, probably cause, or exigency, and to perform physical exams on such children without a court order, exigency, or notice to, or the presence of, their parents.

307.   DCS' practice and training permits its social workers to seize a child from the custody of his or her parents without a warrant, under non-exigent circumstances, and to perform physical exams on such children without a court order, exigency, or notice to the parents, or presence of the parents. This unlawful practice continues today.

308.   DCS' wrongful and unlawful conduct, actions and/or policies, unless and until enjoined and restrained by order of this court, will cause, and continue to cause, great and irreparable injury to Plaintiffs, and other individuals and citizens, in that DCS will continue to act in accordance with said unlawful policies, and with deliberate indifference to its duties and obligations under state and federal law, including those under the First, Fourth and Fourteenth Amendments as alleged herein.

309.  Plaintiffs have no adequate remedy at law to prevent or prohibit DCS and its social workers from continuing, and/or repeating, its unlawful and unconstitutional conduct and policies other than through injunctive relief.

310.  Plaintiffs remain at risk from future unconstitutional conduct by the Department of Child Safety. As noted above, T.A. had hidden from his parents on multiple occasions before, and his behavior on this occasion was not uncommon. Although the trauma T.A. experienced as a result of DCS' conduct in the present may discourage any such future conduct by T.A., this is unknown. Thus, absent a declaration and injunction, Brian and Janna are presented with a horrible Hobson's dilemma, the need to seek law enforcement assistance should this happen again, but with the knowledge that seeking such assistance will result in false claims that Brian and Janna themselves are abusive parents.

311.  Further, the Plaintiffs remain adherents to their religious beliefs, and should anything happen to any of their children, will continue to seek divine intervention and protection – in addition to (and not in lieu of) seeking proper attention to these issues themselves. However, as set forth herein, the DCS has, and will continue in the future, absent judicial relief, utilize any requests for divine intervention as evidence of negligent parenting.

312. Plaintiffs, therefore, seek an order enjoining and prohibiting DCS from continuing, but not limited to, the following:

    a. The custom and practice of detaining and/or removing children from their school, family and homes without exigent circumstances (immediate danger of serious bodily injury), court order and/or consent;

    b. The policy, custom, and practice of medically examining and policy, custom, and practice children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

    c. The policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

d. The custom and practice of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the court, causing an interference with parental rights, including those as to familial relations;

e. The policy of acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to missing child cases;

f. The custom, policy, and/or practice of fraudulently charging parents with child neglect where none exists.

## JURY DEMAND

Plaintiffs demand a jury trial as to all issues so triable.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as to all causes of action, as follows:

1. Award of general, special and compensatory damages in an amount to be proven at trial, but in no event less than $1,000,000.00;

2. Punitive damages against individually named Defendants, as allowed by law;

3. Attorneys' fees pursuant to 42 U.S.C. § 1988, and any other appropriate statue;

4. Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief to be based upon a separate application);

5. Costs of suit incurred herein; and,

6. Such other and further relief as the Court may deem just and proper.

DATED this 7th day of November, 2018.

SCHERN RICHARDSON FINTER DECKER, PLC

By: _____

1640 South Stapley Drive, Suite 132
Mesa, Arizona 85204
Attorneys for Plaintiffs

1

**CERTIFICATE OF SERVICE**

2

3

I hereby certify that on November 7th, 2018, I electronically transmitted the foregoing document to the Clerk's Office using CM/ECF System for filing to the following CM/CMF registrants:

4

5

James B. Bowen
ARIZONA ATTORNEY GENERAL'S OFFICE
1275 W. Washington
Phoenix, AZ 85007-2926
*Attorney for State Defendants*
Defensephx@azag.gov
James.Bowen@azag.gov

6

7

8

9

10

Duncan J. Stoutner
Jason K. Reed
CITY OF MESA ATTORNEY'S OFFICE
MS-1077
PO Box 1466
Mesa, Arizona  85211-1466
*Attorney for City of Mesa Defendants*
mesacityattorney@mesaaz.com

11

12

13

14

15

16

*/s/Ronnie Sue Taxin*

17

18

19

20

21

22

23

24