MARK BRNOVICH
Attorney General

JAMES B. BOWEN, Bar No. 013774
CYNTHIA D. STARKEY, Bar No. 013418
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004-1592
(602) 542-7699 – JBB
(602) 542-7612 – CDS
Fax: (602) 542-3393
Defensephx@azag.gov
James.Bowen@azag.gov
Cynthia.Starkey@azag.gov
*Attorneys for State Defendants*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian L. Bentley, et al.,<br><br>　　　　　　　　　Plaintiffs,<br>vs.<br><br>City of Mesa, et al.,<br><br>　　　　　　　　　Defendants. | Case No: 2:17-cv-00966-PHX-DGC<br><br>**STATE DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF THE STATE'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

The State Defendants submit the following Separate Statement of Facts (SDSF) and the material portions of the record in support of their Motion for Summary Judgment. The State Defendants will also reference relevant portions of the SDSF in its response to Plaintiffs' Motion for Summary Judgement (Doc. 132-1).

1. Gilbert Fire Department Engineer Alex Ramos was the lead paramedic called to the Bentley home to evaluate T.A. on April 1, 2016 (Exhibit 1, 2:8-13; 7:4-6; Exhibit 2, ¶ 5).

1  2. T.A. was very agitated and pulling away from his father to the extent Ramos was not sure if he was just hyperactive or had some sort of medical condition (Exhibit 1, 4:7-11; Exhibit 2, ¶¶ 7-8).

3. T.A.'s mother specifically denied that the boy was on medications or had any known medical condition when asked by Ramos (Exhibit 1, 4:13-16; Exhibit 2, ¶¶ 9, 12)

4. T.A. father told paramedic Ramos that T.A. behaviors were not normal him (Exhibit 2, ¶ 10).

5. Ramos believed that T.A. needed to be evaluated because in his opinion the boy's behavior was not normal (Exhibit 1, 5:7-10; Exhibit 2, ¶ 12).

6. Ramos testified that because paramedics were unable to assess T.A. he felt "it would be best to take him to the hospital and have a doctor take a look at him (Exhibit 1, 5:17-23; 10:2-45; Exhibit 2, ¶¶ 17, 20).

7. In his experience, Ramos did not respond as if he were intimidated from the presence of strangers. In that situation the child "will more likely be clinging onto dad – like, get me away from these people – but he was actually pulling away from dad. I think that's what struck as kind of odd, his behavior was kind of odd, that he was even pulling away from his own dad" (Exhibit 1, 14:10-16).

8. Gilbert Fire Captain, Adam Hellmann observed that the father hold on to T.A., but he didn't really seem to want to be held at that moment (Exhibit 3, 6:11-16)

9. Hellmann testified that T.A. did not be in any jeopardy physically, but could not evaluate his mental health condition (*Id.*, 8:8-15).

10. Despite not seeing any outward signs of physical injury or illness, Hellmann says the patient needed to evaluate and his vital signs need to be documented (*Id*. 9:1-11).

11. Hellmann felt it was best that T.A. be evaluated at the hospital because police [and Baggen] wanted him evaluated and "Mom and Dad had agreed to be evaluated, but

1  maybe not at an E.R.  And so I felt that the best way to try to appease both sides would
2  be to take him to the hospital" (*Id*. 10:8-20).
3      12.  Bentley Bobrow, M.D. suggests that "a large number of potentially serious
4  and even life-threatening causes of T.A. agitation," including some form of intoxication,
5  environmental exposure, endocrine disorder, electrolyte abnormality, infection, or
6  serious mental health issue (Exhibit 4 at 2).
7      13.  Bobrow opined that paramedics knew or should have known there was a
8  potential for serious complication that required a higher level of medical care (*Id.* at 4)
9      14.  Janna Bentley and her attorney, Martin Schern, were provided with a "Notice
10 of Duty to Inform" which specifically stated "DCS has no legal authority to compel or
11 make you cooperate with the investigation . . ." (Exhibit 5).
12     15.  The notice was signed and acknowledged by the attorney for the Bentleys
13 after which the forensic interview of T.A. proceeded (*Id*.).
14     16.  There was a group home in the Bentley's neighborhood that housed juvenile
15 sex offenders (Exhibit 6, Exhibit 7 at 7).
16     17.  Mesa Police Detective Robert Russo when to school to pick up T.A. siblings,
17 most likely most likely at the request of a Mesa Police Department supervisor to take
18 them to the Mesa Family Advocacy Center  (MFAC) to be forensically interviewed
19 (Exhibit  8, 38:8-39:21; Exhibit 9, ¶ 8-10).
20     18.  Neither Baggen nor Cordova were involved in the decision to pick up BJ and
21 MJ at school or to bring them to MFAC (Exhibit 10, 65:18 – 66:4; Exhibit 12, 80:17 –
22 81: 3).
23     19.  Brian Bentley retrieved T.A. from his hiding place across from the group
24 home.  T.A. fought to get away from Brian (AXON 15).
25     20.  The Bentleys did not initially believe T.A. needed to check at hospital, but
26 agreed after they were told T.A. would be taken into temporary custody otherwise
27 (Exhibit 2, ¶ 13; Exhibit 13).
28

3

21. Cordova was not involved in the discussion regarding the medical examination. She was sitting with T.A. in a bedroom far away from the conversation (Audio conversation of Cordova with T.A.; Exhibit 11).

22. Baggen was asked if T.A. could leave the MFAC, but after consulting her supervisor said he needed to be forensically interviewed before leaving (Exhibit 15; Audio recording of lobby conversation).

23. Janna appears to agree to interview (Exhibit 18; Audio recording of lobby conversation; Exhibit 12, 102:17 – 103:6).

24. Prior to completing interview, Baggen provided with a Notice of Duty to Inform (See ¶ 14).

25. With concurrent police and DCS investigations of possible child abuse or neglect, the respective roles of the agencies are set forth in Multi-Disciplinary Protocols (Exhibit 7 at 10).

26. The DCS investigators follow the lead of the law enforcement agency so as not to impede any possible criminal charges (*Id.*; Exhibit 12, 59: 22 – 60:4)

27. Gilbert Fire Department Paramedics indicated that a medical assessment of T.A. was necessary to determine whether he suffered any serious physical or mental health condition (Exhibit 7 at 10).

28. Baggen indicated that if the family did not agree to transport to hospital for assessment, she was prepared to issue a temporary custody notice. However, the need was averted when Janna Bentley agreed (AXON 11[time stamp 28:59-29:28]).

29. Paramedic/Engineer Ramos stated that the parents' refusal of hospital assessment would be classified a "high-risk refusal" because of how long T.A. had been missing, the paramedics were unable to talk with him or properly evaluate him because of his agitation (Exhibit 7 at 12; Exhibit 7).

30. Baggen, numerous law enforcement offices and medical personnel, including Ramos were particularly concerned because of T.A. unusual behavior, especially in light

4

1 of the length of time that he was missing and the circumstance in which he was found
2 (Exhibit 7 at 12 [Exhibit 12 - 93:5-21; Exhibit 15; Exhibit 2, ¶ 12).
3     31.  Also, almost immediately after Brian Bentley left T.A. he calmed down,
4 which raise concerns and required exploration (Exhibit 7 at 12 [Exhibit 15] Baggen
5 Deposition 93:5-21; Exhibit 11, ¶ 15).
6     32.  Janna Bentley agreed to the interview of T.A. when she and her attorney were
7 advised that T.A. would be released after the interview (Exhibit 7 at 12 [Exhibit 17]).
8     33.  Ms. Bentley reported a strange man in the neighborhood the night prior to
9 T.A. disappearing (Exhibit 7 at 14 [AXON 24 at ~1:30 to 1:40].
10     34.  Janna Bentley acknowledges that the decision not to call the police had been
11 reckless (Exhibit 7 at 12 [AXON 10 at ~9:35]).
12     35.  The Bentley's own child welfare agency expert agrees that it is reasonable for
13 DCS child welfare workers to "heed" the paramedic's recommendation the T.A. be seen
14 by a doctor (Exhibit 16 - 74:9-20).
15     36.  According to the Bentley's expert testified that the concept of "globally
16 minimal" assessments was started with the federal government then came down to the
17 individual states to decide whether to use them.  (Exhibit 16- 88:1-7; 88:16-24; 89: 8-12;
18 89: 15-19).
19     37.  Tim Turner also agrees that whenever possible, the DCS workers should
20 strive to reach a compromise the does not require taking the child into temporary state
21 custody (Exhibit 16 - 101:4-19).
22     38.  The Bentley's expert concedes that if DCS provided them with a Notice of
23 Duty to Inform explaining that they did not have to cooperate with the child welfare
24 investigation,  the Bentleys knew or should have known that they could leave and need
25 not cooperate (Exhibit 16 - 105: 7-22).
26     39.  Cordova accompanied T.A. and Janna Bentley in the ambulance where T.A.
27 was examined, but she was not involved in the decision making process.  She had no
28

5

1  sustentative discussions with anyone and primarily tried to entertain T.A. and keep him
2  calm (Exhibit 11, ¶¶ 17-18).
3      40.  Cordova remained with T.A. until the completing of the exam. Janna Bentley
4  was also in the examination room with T.A. for the entire process (Exhibit 11, ¶ 19).
5      41.  Following the examination had no further involvement in the case (Exhibit
6  11, ¶ 21).
7      42.  Cordova was not involved in any substantive discussions involving the
8  investigation and spent almost all of her time with T.A. in the bathroom and bedroom,
9  trying to develop a connection with him (Exhibit 11, ¶¶ 5, 6).
10     43.  Cordova did not arrive at the Bentley's home until after T.A. had been
11 located and I only spoke to Kessler and Baggen (Exhibit 11, ¶¶ 4, 5, 6).
12     44.  Cordova conducted a global interview with T.A. which is a general
13 assessment tool used by child welfare workers to gather general background on a child
14 (Exhibit 11, ¶ 16).
15     45.  Following T.A.'s assessment at Cardon Children's Hospital, Cordova had no
16 further involvement in the case (Exhibit 11, ¶ 21).
17     46. Baggen was concerned when learned that the Bentleys scaled down, and
18 arguably stopped search for T.A. after God told them he was okay.  This was not a
19 personal judgment of the Bentleys, but a professional assessment (Exhibit 12, 9:3-6).

RESPECTFULLY SUBMITTED this 20th day of September, 2019.

                Mark Brnovich
                Attorney General


                /s/  James B. Bowen
                James B. Bowen
                Cynthia D. Starkey
                Assistant Attorneys General
                *Attorneys for State Defendants*

Original of the foregoing electronically
filed this 20th day of September, 2019, with:
Clerk of the United States District Court
using the CM/ECF System for filing and
transmittal of a Notice of Electronic Filing
to the following registrants:

Michael A. Schern
Adam B. Decker
Yusra B. Bokhari
Schern Richardson Finter Decker, PLC
1640 South Stapley Drive, Suite 132
Mesa, Arizona 85204
*Attorneys for Plaintiffs*

Duncan J. Stoutner
Jason K. Reed
Sarah Marie Staudinger
Assistant City Attorneys
City of Mesa Attorney's Office
MS-1077
 Post Office Box 1466
Mesa, Arizona 85211-1466
*Attorneys for City of Mesa Defendants*

Kathleen L. Wieneke
Christina Retts
Wieneke Law Group, PLC
1095 West Rio Salado Parkway, Suite 209
Tempe, Arizona 85281
*Attorneys for City of Mesa Defendants*

Copy of the foregoing emailed this
20th day of September, 2019, to:

Honorable David G. Campbell
U.S. District Court of Arizona
Campbell_chambers@azd.usacourts.gov

/s/Eleanor Powell
Legal Assistant to AAG James B. Bowen
#8051604