# Exhibit 1

Alex Ramos                                                    Page 1

1              THE COURT:  If you could state your name and spell

2      your last name for the record.

3              WITNESS:  My name is Alex Ramos.  Last name is R-A-M-

4      O-S.

5              THE COURT:  Thank you, sir.

6              Mr. Hawkins.

7                        **ALEX RAMOS,**

8      **having been first duly sworn, testified as follows:**

9                        **DIRECT EXAMINATION**

10     **BY MR. HAWKINS:**

11         Q    Mr. Ramos, where do you work?

12         A    I work for the Gilbert Fire Department.

13         Q    You know, we call police officers "officer so-and-so"

14     or doctor a "doctor so-and-so."  Is there a title for

15     firefighters that I should be calling you?  Is it Firefighter

16     Ramos?

17         A    It's Engineer Ramos.

18         Q    Engineer Ramos?

19         A    Yes.

20         Q    Thank you.

21              How long have you been a firefighter?

22         A    I've been a firefighter for 15 years.

23         Q    Could you explain to the jury what it takes to become

24     a firefighter?

25         A    There's a testing process you have to go through.  At

1   a minimum, you have to be at least an EMT to be a firefighter.

2   You could be a paramedic.  A paramedic just has advanced life

3   support credentials.  I was a paramedic when I got hired with

4   the fire department, so I worked on the ambulance for about two

5   and a half years before becoming a firefighter.

6       Q    You said you've been a firefighter for about 15 years?

7       A    Yes, sir.

8       Q    Were you working back on April 1, 2016?

9       A    Yes, sir.

10      Q    On that date, and on the morning of April 1, did you

11  respond to the Bentley home located in the area of Inverness and

12  32nd Street?

13      A    I did.

14      Q    Is that in the city of Mesa?

15      A    It is.

16      Q    Now, you're a Gilbert firefighter, so why did you

17  respond to a call in Mesa?

18      A    Correct.  The fire department has an agreement, what

19  we call "automatic aid," and basically what that states is that

20  when someone calls 911, we're on a GPS system through the entire

21  valley, so they'll send the closest fire truck, regardless of

22  what city you're in.  We just happened to be the closest fire

23  truck to their home when the 911 call came in.

24      Q    Why were you dispatched to that location?

25      A    I believe we were dispatched to assist on a missing

1  persons.

2       Q    At the time that you went to the location, the missing

3  child had not been found yet?

4       A    No.  When we got there, they had told us that the

5  child had been found.

6       Q    So presumably, somewhere between when you got called

7  and when you showed up, the child was found?

8       A    Correct.

9       Q    What did you do upon your arrival?

10      A    Like I said, when we got there, they had told us that

11  the child had been found.  And at some point, I don't know who

12  it was, but they had asked us if we could do an assessment on

13  the child, basically take a look at him and make sure that he

14  was okay because he had been missing overnight.

15      Q    Were you able to look at the child?

16      A    We did very briefly.  The child was located inside the

17  bathroom, I believe, with dad.  When we went in there to go talk

18  to him and kind of just take vital signs to make sure he was

19  okay, he appeared to be very agitated.  So to not agitate him

20  anymore than he already was, we didn't force ourself onto him.

21  You could see that he was, for the most part, fine.

22           As paramedics, the first things that we look for:  Is

23  there any life-threatening injuries or illness that we need to

24  treat right away?  That wasn't the case.  Other than agitated,

25  he seemed to be okay.  He didn't seem to be under any type of

Alex Ramos                                                    Page 4

1   distress, as far as being injured or ill.

2       Q    But it sounds like that agitation did, at least to

3   some extent, interfere with your ability to evaluate him?

4       A    Yes, for sure.  Like I said, that's why we didn't --

5   we didn't want to agitate him anymore, so we didn't force

6   ourself onto him.

7            The first thing that struck me:  I was like, he seems

8   pretty agitated.  Dad was trying to hold him.  He was pulling

9   away from dad and whatnot.  So the first thing that came to

10  mind:  Well, maybe he's just hyperactive or maybe he's, you

11  know, has some kind of medical condition.  So we were only in

12  there for like a minute.  We stepped out of the room, and I

13  believe I spoke to mom after I stepped out of the bathroom to

14  ask if he had any medical conditions, you know, if he's autistic

15  or anything like that.  I believe she said he did not have any

16  medical conditions and he wasn't on any medications.

17      Q    But something that you were seeing, and the way that

18  he was manifesting, caused you to think that there might be

19  something going on there as far as autism or some kind of

20  medication or something of that nature?

21      A    Yeah.  Correct.  Like I said, he was pretty agitated.

22  And for a seven-year-old, usually at that age we're able to go

23  down to their level, get on our knees and speak with them.  They

24  usually speak back with us.  But in this case, he was very

25  agitated, so we weren't able to do that.

Alex Ramos                                                    Page 5

1      Q    Did you speak to the parents about whether or not he

2   was autistic or medication or anything of that nature?

3      (Objection based on lack of foundation made by defense,

4   argument was presented by both counsel, and the objection was

5   sustained.)

6   **BY MR. HAWKINS:**

7      Q    Given the circumstances as they were relayed to you,

8   did you believe the child needed to be evaluated?

9      A    Yes.  And, again, just the way he was acting, we felt

10  it was not normal.

11          MR. TAIT:  I'm going to object to the use of the

12  pronoun "we":  calls for speculation.  Ask the witness to talk

13  about his perceptions, not speculate about other people's

14  perception.

15          THE COURT:  Thank you.  You understand the --

16          WITNESS:  Yes.

17      I felt that he needed to be evaluated because we

18  weren't able to do an assessment ourselves.  We weren't able to

19  get the vital signs on him.  We weren't able to get our hands on

20  him and ask him any questions to see if he was okay, if he felt

21  safe or if he was injured or hurt or anything like that.  So I

22  felt we couldn't just leave him without doing an assessment, at

23  least.

24  **BY MR. HAWKINS:**

25      Q    I think before the objection you had started to say

1   "based on the way he was behaving or acting."  Was there

2   something in his behavior that caused you to think he needed to

3   be evaluated?

4        A    Just like I said, the way that he was -- he appeared

5   to be very agitated.

6        Q    Now, when you spoke, you begin the say "we."  Was this

7   based on a conversation you had with other firefighters --

8        A    Yes.  As firefighters, we work with four people on the

9   trucks.  We have two paramedics and two EMTs.  So when we get

10  into situations like that, you know, we work as a team, so all

11  of our opinions matter.  I remember specifically asking one of

12  the firefighters, "Is it me, or is this child not acting

13  normal?"  He goes, "No, he's totally not acting normal for his

14  age.  He seems very agitated."

15           MR. HAWKINS:  The State has no further questions, Your

16  Honor.

17           THE COURT:  Thank you.  Just one moment.

18           Mr. Tait.

19                        **CROSS-EXAMINATION**

20  **BY MR. TAIT:**

21       Q    Officer Ramos, you said that T.A   had already been

22  found by the time you and your crew got there?

23       A    Correct.

24       Q    Now, one of the other members on the crew was Adam

25  Hellman, is that correct?

Alex Ramos                                              Page 7

```
1      A    Correct.  He's our captain.

2      Q    He's the captain?

3      A    Yes, sir.

4      Q    But you were taking lead on that call, not Captain

5  Hellman, correct?

6      A    Correct.

7      Q    You kind of alternate roles as you go to a scene, is

8  that fair to say?

9      A    Correct.  The two paramedics usually do the paperwork

10 on the incidents.  And the way that works, we just alternate.

11 It was my turn to do the report.

12     Q    Do you remember approximately what time you got to the

13 Bentley home?

14     A    I don't.

15     Q    Did you respond to the Bentley home as soon as you

16 were dispatched?

17     A    Correct.  We do.

18     Q    You guys don't dillydally or sit around after you've

19 been dispatched --

20     A    No.

21     Q    -- and say, "Oh, well, I'll get to that when I'm done

22 with this show or whatever?

23     A    No.  When the tones go off at the station, we have a

24 minute to get on the truck and be heading on the road.

25     Q    How far is it from your substation to the Bentley
```

Alex Ramos                                                    Page 8

1    home?

2        A    I don't know exactly how many miles.

3        Q    Your home is -- I'm sorry.  You weren't coming from

4    home, right, you were coming from the station?

5        A    We were coming from the fire station.

6        Q    The station, is it the station down on Guadalupe

7    between Val Vista and Lindsay Road?

8        A    Yes, sir.

9        Q    And the Bentley home is somewhere around north of

10   Baseline and south of the US 60 in between Val Vista and Lindsay

11   Road, correct?

12       A    Correct.

13       Q    So that's somewhere around one to two miles, correct?

14       A    Correct.

15       Q    So it wouldn't have taken you very long to get to the

16   Bentley home?

17       A    No, not at all.

18       Q    From the time that you were dispatched to the time

19   that you got to the Bentley home, it couldn't have been more

20   than 10 minutes, is that fair?

21       A    That's fair.

22       Q    And by the time you got there, T.A   was already

23   found, which means the fire department wasn't dispatched until

24   sometime, at least, either close to the time that T.A   was

25   found or maybe some significant time after T.A   was found.  But

Alex Ramos                                                        Page 9

1   assuming that T.A. was found over two hours after the police

2   department arrived on scene, then fair to say that the fire

3   department wasn't even called to help until close to two hours

4   after?

5       A    I don't know when he was found.

6       Q    And you were called to the scene to help look for

7         correct?

8       A    If I remember correctly, like I said, when the call

9   came in, it was to help locate a missing person or a missing

10  child.

11      Q    You were in the bathroom for, you said, about a

12  minute.  Possible it was longer than that --

13      A    Possibly.

14      Q    -- closer to five minutes, maybe six?

15      A    I don't think it was that long.  I mean, possibly, but

16  I don't think so.  We were in there very briefly, maybe one to

17  two minutes.

18      Q    If there was a body cam that kind of shows you in the

19  -- actually, let me show you the body cam just to make sure that

20  this was you in the bathroom.

21          Officer Ramos, you said that your basis for wanting

22   T.A. to get checked out, it wasn't based on any signs that you

23  saw of any injuries or illness, it was based out of an abundance

24  of caution you should get him checked out, "Since he's a little

25  too agitated for us to do it, we should do that at some point";

1   correct?

2       A    Yeah, he was too agitated for us to do it, so I felt

3   it would be best to take him to the hospital and have a doctor

4   take a look at him.

5       Q    So it wasn't mom and dad saying, no, you can't check

6   him out.  The reason you didn't check him out there in the

7   bathroom is because he was agitated, correct?

8       A    Right, correct.

9       Q    So if anyone had said that their belief was that Mr.

10  Brian Bentley or Janna Bentley said, no, you can't do your

11  evaluation, to the firefighters in the bathroom, that would've

12  been a misunderstanding on their part?

13      A    Yeah.  I never heard that.

14      Q    But Ms. Bentley did tell the police, I think with you

15  present, that they needed some time to calm him down, correct?

16      A    I don't recall that.

17      Q    You don't recall it happening, or you think that it

18  did not happen?

19      A    No, I'm not saying I don't think it didn't happen.  I

20  just don't recall.

21      Q    You just don't remember that?

22      A    Yes.

23      Q    Fair enough.  Now, you talked with the prosecutor

24  about his behavior being, you know, what you considered to be

25  unusual, but did Brian and Janna both give explanations as to

1  why his behavior was the way it was?

2      A    No.  Like I said, I asked more specifically if he had

3  any medical conditions, and she said no.  So I asked, "Does he

4  take any medications?"  Because a lot of times we'll ask

5  patients, "Do you have any medical history," and they'll tell us

6  no.  So we'll be like, "So you don't take any medications?"

7  "No," or we'll have a list of medications.  So I always follow-

8  up, "Do you take any medications?"  Because if they tell me yes,

9  then they do have a medical history.  But mom said, no, he does

10 not take any medications, so I assumed he was healthy and no

11 medical condition.

12     Q    Right.  And I know you had that conversation with

13 mother after you left the bathroom.

14     A    Correct.

15     Q    But do you recall a time in the bathroom where Mr.

16 Brian Bentley, or dad, tells people, specifically as you're

17 standing in the bathroom and Officer Clifford is standing to

18 your left -- and I think you had another firefighter in there,

19 correct?

20     A    Correct.

21     Q    So there was three grown men in there and then a DCS

22 worker and then Gina Cordova walks into the room.  Do you

23 remember that?

24     A    I don't remember who all was in that bathroom.

25 Obviously, dad was in there with the child, I was in there, and

1    at least one more firefighter was in there.

2        Q    Do you recall dad telling this DCS worker,

3    sarcastically, "Why don't you bring everyone in here" and then

4    saying, "He's just not responding well to this"?

5        A    I don't recall that.

6        Q    Do you recall being in the bathroom when mom walks in

7    and says, "He's overwhelmed with all of this.  He can't collect

8    himself and calm down.  Can we just have a moment alone?"  Do

9    you recall that?

10       A    I don't recall that.

11       (A segment of the video was published to the court.)

12       Q    Do you recall whether or not you were in the bathroom

13   at this point?

14       A    I don't recall.

15       Q    You may have been, may have not been?

16       A    Right.  It's the same bathroom.  I don't recall if

17   that was exactly when I was in there.

18       Q    Maybe it'll become clear here in a minute.

19       (A segment of the video was published to the court.)

20       Q    There's someone there with a hat on.

21       A    Yes.

22       Q    Is that the other firefighter?

23       A    Yes.  It's firefighter Urwiler (phonetic).

24       Q    Do recall now if you were there in the bathroom with

25   him at this point?

1    A    Yes, at that point I was.  I recall that.

2    Q    So right now we have at least you, the other

3  firefighter -- Urwiler?

4    A    John Urwiler.

5    Q    John Urwiler and then Officer Clifford over to the

6  back, whose body cam is capturing all of this, correct?

7    A    I don't know what officer was there.

8    Q    But it wasn't a firefighter wearing the body cam?  It

9  was a police officer?

10    A    No.  We don't wear the body cams.

11    Q    So at this point there's three adult men in the room

12  with dad and  T.A.    You don't know  T.A., correct?

13    A    Correct.

14    Q    You didn't know him before this?

15    A    No.

16    (A segment of the video was published to the Court.)

17    Q    You recall now Ms. Cordova comes into the room as well

18  to join you guys?

19    A    Yeah, watching it, obviously, yeah, I see it now.  But

20  prior to that I don't remember it.

21    Q    I'm not trying to beat you up for not remembering.  I

22  just want to make sure that we know what actually happened, so

23  this is just to refresh your memory.

24        Now, dad said something to the effect of "one more set

25  of eyes on the kid"?

1       A    Yes.

2       (A segment of the video was published to the court.)

3       Q    By that statement from dad, do you understand that

4    statement to mean he didn't really actually want to bring

5    everybody into the bathroom, right?

6       A    Yeah.  I heard the sarcasm.

7       Q    He was saying he's really not responding well to all

8    of these people around him.  Was that what your impression is,

9    hearing that statement?

10      A    Yes and no.  And the reason I say that is because,

11   typically, a child at that age, if he is intimidated from having

12   all those people in there, he will more likely be clinging onto

13   dad -- like, get me away from these people -- but he was

14   actually pulling away from dad.  I think that's what struck as

15   kind of odd, his behavior was kind of odd, that he was even

16   pulling away from his own dad.

17      Q    How many situations have you been in with a child and

18   a seven-year-old in the bathroom with dad whose house is --

19   there was a lot of people in the house outside the bathroom,

20   correct?

21      A    Yes.

22      Q    I mean, we're talking about at least a dozen probably,

23   right?

24      A    Yes.

25      Q    And then four grown strangers in the bathroom.  How

1    many times have you encountered that situation?

2          A     Specifically, inside of the bathroom?

3          Q     In a small confined space like that?

4          A     A lot.  Not necessarily in the bathroom but in small

5    bedrooms, small homes, and small trailers.  We go on a lot of

6    incidents like this where there's a lot of people.

7          Q     And it's unusual for a child in that circumstance to

8    want to -- and you don't know that he was trying to pull away

9    from dad when he was in the bathtub, right?  He was trying to

10   hide behind the curtain?  He could've been trying to hide from

11   the strangers, right?

12         A     No, he was.  On the video, dad's trying to grab him,

13   and he's pulling away from dad.

14         Q     Well, I guess we'll agree to disagree on what that

15   shows, whether dad's pulling him towards him or whether dad's

16   trying to keep him in the bathtub as he's trying to get out of

17   the bathroom.

18         A     Okay.

19         Q     Did you see that?

20         A     Say that again.

21         Q     T.A. was actually trying to get out of the bathroom,

22   right?

23         (Objection as being argumentative made by the prosecution

24   was overruled.)

25

1  **BY MR. TAIT:**

2      A    He's trying to get out of the bathroom?  Sure.  I

3  don't know.

4      Q    Did you see T.A. try to get out of the bathtub and

5  dad says, "You're not going anywhere, just stay here"?

6      A    I did see that, yeah.

7      Q    So  T.A. was trying to get away from everyone in that

8  bathroom, right?

9      A    Sure.

10     Q    Is it unusual for a seven-year-old, if the seven-year-

11  old believes that they're in trouble, to want to kind of pull

12  away?

13     A    Not from his own parent.

14     Q    Right.  Because if he thinks that he's in trouble,

15  maybe for something that he did, then the seven-year-old might

16  want to get away from his parents in that circumstance, right?

17     A    Possibly.

18     Q    And the fact that T.A. was agitated, you agree that

19  doesn't mean that he has any kind of mental deficiency or

20  anything like that?

21     A    Correct.  Like I said, that was our impression and I

22  clarified it with mom, and she said, no, he wasn't on -- have

23  any medical condition.

24     Q    And certainly the fact that T.A. was pulling away

25  from -- or you perceived him to be pulling away from dad, that

1    could just mean that T.A. wanted to be in his own space alone

2    because he felt like he was in trouble or he was scared of the

3    strangers.  It could have meant a whole number of things, right?

4        A    Sure.

5        Q    And you said you didn't recall mom coming into the

6    room and asking for time to calm him down?

7        A    I don't remember.

8        Q    You don't recall that happening?

9        A    Yeah.

10       (A segment of the video was published to the court.)

11       Q    Actually, do you recall a conversation where Ms.

12   Cordova is kind of carrying on about, I don't know, Dora the

13   Explorer or Airbender or some kind of TV show, like talking to

14   dad while dad's trying to calm  T.A. down?

15       A    I don't recall the conversation.

16       (A segment of the video was published to the court.)

17       Q    Does it appear to you at this point that he is kind of

18   cuddling into dad at this point?

19       A    I can't really see him.

20       (A segment of the video was published to the court.)

21       A    Yeah.  Yeah, he's--

22       (A segment of the video was published to the court.)

23       Q    Based on this circumstance, does it appear as though

24   dad is trying to comfort and calm  T.A. down and this DCS worker

25   is asking about The Last Airbender and things like that?

Alex Ramos                                                    Page 18

1    A    It does appear that way.  Was I still in the bathroom
2  at that point?  Because I don't remember.
3    Q    We could go back and watch it.  I didn't see you exit
4  the bathroom, but you can probably tell me.
5    (A segment of the video was published to the court.)
6    Q    So right here, there was just a question from some
7  male standing right in front of the door.  Did you hear that?
8    A    Yes.  That was firefighter John Urwiler.
9    Q    Were you still in the bathroom at that point?
10   A    At that point, I still would've been in the bathroom.
11   Q    Okay.  So let's watch and see if we can see you walk
12 out of the bathroom when Ms. Cordova comes in.
13   A    Okay.
14   (A segment of the video was published to the court.)
15   Q    Appeared as though Ms. Cordova closed the door behind
16 her when she walked in, correct?
17   A    Yeah.  And you can only see half the door, though, so
18 we could've possibly got behind her.  The only reason I'm
19 bringing it up because I don't remember this part.
20   Q    You don't remember this part?
21   A    Yeah.
22   Q    Okay.  So it's possible that you guys were able to --
23   A    Possibly.
24   Q    -- in that time where she walked in --
25   (A segment of the video was published to the court.)

Mesa/Bentley 005645

Alex Ramos                                                                    Page 19

1        Q      She's standing in the doorway there.

2        A      (Affirmative response.)

3        Q      And you think it's possible you walked out in that

4    space in that short of time?

5        A      Maybe not.  Maybe.  I don't know.  I'm not sure.

6        Q      Assuming the door stays closed -- and the jury can

7    review the video and see that themselves -- but for the sake of

8    time...

9        (A segment of the video was published to the court.)

10       Q      So Ms. Bentley does give an explanation there about

11   why      might be behaving that way, correct?

12       A      Because there was a lot of people in there.

13       Q      But you don't recall whether you were still in the

14   bathroom at that point?

15       A      No, that does sound familiar.  Now that I see it, I

16   possibly was still in there.

17       Q      That refreshes your memory?

18       A      It did, with her walking in there.  Because I remember

19   when she walked in there, I think we walked out behind her, and

20   that's when I spoke to her about him.

21       Q      Thank you for that.  No one's expecting anyone to have

22   a perfect memory, so I'm not trying to beat you up about that.

23              Not only did Brian provide an explanation for   T.A.'s

24   behavior, but Janna provided, really, the same explanation,

25   right?

Alex Ramos                                                    Page 20

1        A      (Affirmative response.)

2        Q.     That  T.A. was acting this way because he's

3   overwhelmed by the presence of all these people that he doesn't

4   know?

5        A      Yes.

6        Q      You don't have any reason to disagree with them?

7        A      No, not at all.

8        Q      You're a parent, right?

9        A      Yes.

10       Q      In this situation, fair to say it's the Bentleys who

11  were in the best position to know why their child is acting the

12  way he is?

13       A      They know their child better than anyone else.

14  Correct.

15       Q      The signs of hypothermia are visible even to an

16  untrained person, right?

17       A      Yes.

18       Q      They seem to be typically lethargic as opposed to

19  amped up?

20       A      Correct.

21       Q      There is often discoloration of the skin, the skin can

22  turn blue?

23       A      Correct.

24       Q      And there were no signs of hypothermia on  T.A. ,

25  correct?

1    A    No.

2    Q    In fact, given his agitated state, you were confident

3    that hypothermia wasn't present?

4    A    Correct.

5         MR. TAIT:  No further questions, Your Honor.

6         THE COURT:   Thank you.

7                     **REDIRECT EXAMINATION**

8    **BY MR. HAWKINS:**

9    Q    If a seven year old was out all night long in

10   temperatures that go into the 40s, is hypothermia a concern?

11   A    It is a concern.  And matter of fact, it was one of

12   the first things that popped into my brain, was like, "Okay, it

13   was cold outside and he was outside all night."  I didn't know

14   what he was wearing when he was missing, but we knew that he had

15   been outside overnight.  After seeing him --

16        (Objection based on leading made by prosecution was

17   overruled.)

18   **BY MR. HAWKINS:**

19   Q    When you arrived, at some point did --

20        (Objection based on lack of foundation made by defense,

21   argument was presented by both counsel, and the objection was

22   sustained.)

23   **BY MR. HAWKINS:**

24   Q    At some point, upon your arrival, was it conveyed to

25   you that this child had possibly been out all night?

Alex Ramos                                                    Page 22

1        A    Yes.

2        Q    That information that you gather upon first arriving,

3   is that something that you do in every situation?

4        A    Yes.  Because when we got there, we wanted to know

5   what the situation was -- and I forget who it was -- me and an

6   officer, had told us the child was already found.  I'm not sure

7   if it was me or one of the crewmembers asked, "Where was he

8   found and how long was he missing?"  And he said, "Well, he was

9   missing all night.  They just found him this morning."  So my

10  assumption was that he was missing overnight outside, because

11  they said they had found him in the bushes, I believe, or

12  something like that, somewhere outside.

13       Q    Just to be clear, you weren't on that street all night

14  long watching  T.A. Bentley, right?

15       A    No.

16       Q    Now, you said, knowing what you were told and being

17  aware of the situation, one of the first things you were

18  concerned about was hypothermia?

19       A    Yes, because it was cold outside, if I recall, and we

20  didn't know what the child was wearing at the time.  We don't

21  know if he had a sweatshirt or a jacket on or if he just had

22  pajamas on.  We didn't know.  So it crossed my mind, well,

23  possible hypothermia, the child being outside.

24       Q    And that concern about hypothermia, does that increase

25  if the child didn't have a jacket and was just wearing pajamas?

Alex Ramos

Page 23

1    A    Yes.

2         MR. HAWKINS:  Judge, that's all I'm going to ask about

3    hypothermia.  I don't know if this is the time you wanted to...

4         THE COURT:  Would you like to cross on that, sir?

5         MR. TAIT:  No.  I think the witness made it clear that

6    it was just an assumption.

7         THE COURT:  Thank you, sir.

8         You may proceed.

9         MR. HAWKINS:  Thank you, Judge.

10        THE COURT:  No worries.

11   **BY MR. HAWKINS:**

12   Q    Now, Engineer Ramos, you don't work for the police

13   department, right?

14   A    Correct.

15   Q    You work for the fire department?

16   A    Correct.

17   Q    Do you know the Bentleys?

18   A    I do not know the Bentleys.

19   Q    When you responded, you weren't investigating any type

20   of a crime or anything of that nature, were you?

21   A    No, not at all.  That's not what we do.

22   Q    Why were you there?

23   A    We were there, like I said, initially to help locate a

24   missing person or a missing child.  When we got there, it was

25   apparent that he was already found.  And at some point, I don't

Alex Ramos                                                     Page 24

1   know who it came from, asked if we could just take a look at the

2   child to make sure he was okay.

3       Q    So at that point did your role become just trying to

4   make sure this kid was okay?

5       A    Correct.

6           MR. HAWKINS:  I don't have any further questions,

7   Judge.

8           THE COURT:  Any questions from any member of the jury

9   for this witness?  Any questions at all?

10          No questions being asked by the jury.  Thank you so

11  much.

12      (End of testimony)

13                      **(END OF PAGE)**

Alex Ramos

## CERTIFICATION OF TRANSCRIPT

I, Jennifer L. MacGregor, do hereby certify that the foregoing was transcribed from a digital recording not made by me, but transcribed verbatim by me or under my supervision to the best of my ability, taken at the time and place set out in the record above.

Jennifer L MacGregor

Digitally signed by: Jennifer L MacGregor
DN: CN = Jennifer L MacGregor C = US O = IdenTrust ACES Business Representative OU = COMBAT VETERAN VOICEWRITERS LLC
Date: 2019.03.28 08:39:16 -07'00'

JENNIFER L. MACGREGOR, AAERT CET-817

CVV Transcripts

1146 N. Mesa, Dr., Ste 102-107

Mesa, AZ 85201

(480) 250-8830

# Exhibit 2

DECLARATION OF ALEX RAMOS

STATE OF ARIZONA      )
                      ) ss.
County of Maricopa    )

ALEX RAMOS, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am a Certified Paramedic employed by the Town of Gilbert Fire and Rescue Department, and I was on duty and employed in that capacity on the day of April 1, 2016.

3.      On the morning of April 1, 2016, our four-person team consisting of two EMTs and two Paramedics, operating as Town of Gilbert Fire Department Ladder 253, were dispatched to 3045 E. Inverness in Mesa, Arizona.

4.      We were asked to do a Paramedic/EMT assessment of a seven-year-old child who had reportedly been missing outside overnight, and had just been found that morning in bushes somewhere outside.

5.      On behalf of our four-person team, I took the lead on this call, and I also coordinated with my fellow paramedics and EMTs.

6.      After arriving, I learned that the seven-year-old boy was inside the bathroom with his father.

7.      In the bathroom we intended to take vitals and talk to the child in order to make sure he was okay, but I saw that he appeared to be very agitated.

{00326898.1}

8.      His agitation was to such a degree that we were not able to get our hands on the child at all and get his answers to questions to see if he was okay, if he felt safe, or if he was injured or hurt.

9.      Because of my observation that the child was very agitated, I asked the mother if the child had any pre-existing medical conditions, such as autism, and if the child was on any medications, and I recall her telling me that he had no pre-existing medical conditions and he was not on medication.

10.     I asked the father if the way the child was acting in the bathroom was normal behavior for the child, and the father told me that his behavior was not normal for him.

11.     Due to the fact that the child was not speaking back to us when we tried to talk to him, based on my previous experiences that children of that age usually speak back to us, based on my understanding that child was not acting normally for him, and due to my observation that the child was very agitated, I believed he was too agitated for us to complete an assessment of him, or to take vitals.  Accordingly, we decided we would not force ourselves onto the child to obtain vitals and complete an assessment.

12.     Based on the circumstances relayed to me (that the seven-year-old was missing outside overnight, that he had no pre-existing medical conditions and was not on any medications, and that he was very agitated), I also believed he was acting in a way that was not normal for his age based on my experience.

13.     I also recall confirming with one of the Firefighter/EMTs present with me in the bathroom that he also believed the child was not acting normal for his age and was appearing to be very agitated.

{00326898.1}

14.     In the best interest of the child, I recommended that he needed to be evaluated at a hospital by a medical doctor. I believed a medical doctor in a hospital would be in a better position to conduct an evaluation to determine any behavioral issue or physical injury not readily apparent by looking at the child fully clothed.

15.     As a result of seeing the child appear very agitated in the bathroom, I did not want to get him even more agitated by trying to complete a physical examination or by trying to obtain vitals. In fact, our four-person team did not take any vitals despite ultimately transporting him to the hospital so as to not upset the child.

16.     While at the Bentley home, I believed that Mrs. Bentley ultimately consented to the child being transported by ambulance to the hospital.

17.     I did not believe at the time that I was in the home that it was in the best interest of the child for myself or our paramedics to leave the scene without him first being transported to a hospital to be evaluated by a doctor.

18.     The child was transported in the ambulance where paramedics/EMTs were present with him, and his mother rode in the ambulance with him.

19.     As noted in the Gilbert Fire and Rescue Patient Care Report, and consistent with my recollection of the incident, at approximately 11:40 a.m. when we were ready to leave the house in the ambulance, we elected to not take the child's vitals because we did not want to risk upsetting the child.

20.     Our four-person team determined that the child would be transported to Banner Health's Cardon Children's Medical Center, which I believed was an appropriate

facility considering the child's age and the circumstances of the child being missing overnight.

21.    On arrival to the hospital, my work concluded on this incident after the child's care was transferred to the Emergency Room Registered Nurse and after a report was given verbally to the ER doctor.

Further affiant sayeth not.



ALEX RAMOS

SUBSCRIBED AND SWORN TO before me, a Notary Public, this _18th_ day of September, 2019, by ALEX RAMOS, in the capacity and for the purposes herein stated.

Notary Public

DEBORA M. DANA
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 585784
Expires July 04, 2023

Exhibit 3

### In The Matter Of:
*State of Arizona v.*
*Janna Bentley and Brian Bentley*

---

*Testimony of Captain Adam Hellmann*
*August 7, 2017*
*Before the Honorable Valerye Boyer-Wells*

---

*Griffin Group International*
*2398 E. Camelback Road*
*Suite 260*
*Phoenix, AZ 85016*

Original File CDBB05172019.txt
Min-U-Script® with Word Index

Before the Honorable Valerye Boyer-Wells

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

State of Arizona,                    )
                                     )
       Plaintiffs,                   )
                                     )
            vs.                      ) Case Nos. 2016046691
                                     )            2016046692
Janna Bentley and Brian Bentley,     )
                                     )
       Defendants.                   )
                                     )

REPORTER'S TRANSCRIPTION OF RECORDED PROCEEDINGS

Before The Honorable Valerye Boyer-Wells

Testimony of Captain Adam Hellmann

August 7, 2017

PREPARED BY:

TERESA A. WATSON, RMR
Certified Reporter
Certificate No. 50876

PREPARED FOR:
Yusra Bokhari, Esquire

(Original)

BENTLEY01275

Before the Honorable Valerye Boyer-Wells

2

1                          I N D E X

2     WITNESS:                                         PAGE:

3     CAPTAIN ADAM HELLMAN

4          Direct Examination by Mr. Tait                4
           Cross-Examination by Mr. Hawkins             11
5          Redirect Examination by Mr. Tait             14

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BENTLEY01276

Before the Honorable Valerye Boyer-Wells

3

1    COUNSEL APPEARING:

2    For the Plaintiffs:

3        TAIT & HALL, PLLC
         Ryan Tait, Esquire
4        4455 East Camelback Road, Suite C250
         Phoenix, Arizona  85018

5    For the Defendant:

6        MESA CITY PROSECUTOR'S OFFICE
7        Paul Hawkins, Esquire
         250 East 1st Avenue #222
8        Mesa, Arizona  85210

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Beginning of requested excerpt.)

2          MR. TAIT:  Thank you, Your Honor.  Captain Adam

3    Hellmann of the Gilbert Fire Department.

4          JUDGE BOYER-WELLS:  Thank you.  If you could

5    raise your right hand.

6          (Witness sworn in.)

7          JUDGE BOYER-WELLS:  Thank you.  If you could

8    have a seat, sir.  And if you could also state your name and

9    spell your last name for the record.

10          THE WITNESS:  Adam Hellmann, H-e-l-l-m-a-n-n.

11          JUDGE BOYER-WELLS:  Thank you.  Mr. Tait.

12          MR. TAIT:  Thank you, Your Honor.

13

14                  DIRECT EXAMINATION

15    BY MR. TAIT:

16          Q.   Captain Hellmann, you are a captain of the Gilbert

17    Fire Department, correct?

18          A.   Correct.

19          Q.   How long have you been a firefighter?

20          A.   Twenty-seven years.

21          Q.   Were you present at the home of Brian and Janna

22    Bentley on April 1st of 2016?

23          A.   Yes.

24          Q.   Were you part of the four-person fire crew that went

25    to their home that day?

BENTLEY01278

5

1      A.    Yes.

2      Q.    And were you the firefighter on that crew with the

3  most experience?

4      A.    The most years on.

5      Q.    Okay.  I don't mean to force you into being

6  immodest.

7            And the purpose of your -- of your going to the

8  Bentley home, was that to help search for a missing person?

9      A.    Correct.

10      Q.    And when you arrived at the home, had that person

11  already been found?

12      A.    Yes.

13      Q.    And was that TA Bentley?

14      A.    Yes.

15      Q.    What did you do when you arrived at the Bentley

16  home?

17      A.    How much detail do you want?  Do you want me to --

18  so we got off the truck, grabbed our equipment, typically four

19  boxes, different medical equipment, and walk into the house

20  to --

21      Q.    When --

22      A.    -- start our evaluation.

23      Q.    When you got into the house, did you see TA

24  Bentley?

25      A.    Not initially.

6

1      Q.   Where did you first see him?

2      A.   In the bathroom.

3      Q.   Okay.  And when you got into the bathroom, you were

4   there to -- once you found out that he had been found, you

5   wanted to do an evaluation.  Was that standard protocol when

6   you get called to a call like this?

7      A.   Typically.

8      Q.   And when you first saw TA, he was already in the

9   bathroom?

10     A.   Correct.

11     Q.   When you observed TA, what was his demeanor?

12     A.   Initially, his father was trying to hold on to him,

13  and then, you know, we're trying to do an evaluation on him.

14  And at that point, he didn't really seem like he wanted to be

15  held at that very moment.  And so he was standing in the

16  bathtub behind his father.

17     Q.   Okay.  And were you able to do an evaluation on

18  TA?

19     A.   So to get a blood pressure and a pulse and things

20  like that, not at that moment.

21     Q.   Okay.  The first -- you -- you don't -- your

22  complete evaluation doesn't involve only the ones that are,

23  you know, using medical equipment.  Is that fair to say?  You

24  do a visual evaluation first?

25     A.   Correct.  You get an initial impression.

Before the Honorable Valerye Boyer-Wells

7

1       Q.   And what are you looking for in the initial

2   impression?

3       A.   Typically, you want to look for level of

4   consciousness, responsiveness, how they're reacting to their

5   environment, specific to, like, their age, that type of thing.

6   We'd also look at skin -- skin color and condition, and you

7   know, and when people's skin is discolored, it kind of gives

8   you a good indicator of how sick they potentially are.

9       Q.   Okay.  And did TA have any skin discoloration or

10  anything that caused you to believe that he had a -- an

11  illness?

12      A.   No.

13      Q.   Are the signs of hypothermia visible?

14      A.   They are.

15      Q.   Did TA exhibit any signs of hypothermia?

16      A.   No.

17      Q.   Were you able to rule out hypothermia based on your

18  visual inspection of TA?

19      A.   We were able to get a really good idea that

20  physically, he wasn't -- he wasn't ill physically at that

21  point.  There was nothing physically wrong with him from our

22  initial impression.

23      Q.   Did you see anything that was evidence of a physical

24  injury?

25      A.   No.

Before the Honorable Valerye Boyer-Wells

8

1    Q.   Now, do firefighters make medical -- or I'm sorry --

2    mental health diagnoses?

3    A.   That's a difficult -- a little bit of a difficult

4    question to answer.  They -- we do get a certain amount of

5    training on mental health, but when you look at the scope of

6    what a paramedic actually does, we are not actually there to

7    diagnose people.

8    Q.   Now, based on TA's behavior, were -- was there

9    sufficient information based on your training to -- to

10   diagnose him with any kind of mental health condition as

11   opposed to him responding to those unique circumstances?

12   A.   Like I said, we don't really diagnose people.  But

13   physically, I can say he wasn't in any jeopardy physically.

14   As far as mental health, that would -- that would be not for

15   me to evaluate or really to diagnose, I should say.

16   Q.   Okay.  Was it -- based on your impressions of TA,

17   was it of -- is it a reasonable explanation that his erratic

18   behavior may have been based on the presence on strangers in

19   the home?

20   A.   Absolutely.  All children respond differently to,

21   you know, different stimulus around them.

22   Q.   Okay.  And is it fair to say that parents who have a

23   long history with their child would be in perhaps the best

24   situation to assess that?

25   A.   Yes.

BENTLEY01282

Before the Honorable Valerye Boyer-Wells

9

1      Q.   Now, even though you didn't see any signs of

2   physical injury or illness, you still wanted to do the check,

3   the evaluation with the tools.  And what's -- what's behind

4   that decision?

5      A.   Every time we have a patient interaction where --

6   there's supposed to be documentation of that, and part of the

7   documentation would be vital signs, which would be a blood

8   pressure, pulse, respiratory rate, skin color/condition,

9   pupillary response, and so as part of our documentation,

10  that's just something we do.  Just every patient essentially

11  gets that.

12     Q.   That's standard protocol?

13     A.   It is.

14     Q.   And the reason that you didn't do a full evaluation,

15  did that have -- was that because of the way TA was  reacting,

16  or was there ever a point where Brian or Janna said,  "No, we

17  don't want -- we don't want him to have an evaluation  by the

18  fire department"?

19     A.   The -- our vital signs wouldn't have been accurate

20  if we're, like, trying to restrain somebody.  So if I was to

21  try to restrain someone and hold them down to take a blood

22  pressure, it wouldn't be an accurate indicator of what their

23  blood pressure actually was, just as an example.

24     Q.   So to reason that TA wasn't given the full

25  evaluation was because he was in a kind of a worked-up state?

BENTLEY01283

10

1      A.    Correct.

2      Q.    And Brian never said, "No, you can't -- you can't do

3   the evaluation"?

4      A.    No.

5      Q.    You also accompanied TA and Janna to the

6   hospital, correct?

7      A.    Correct.

8      Q.    And the -- TA being transported to the hospital,

9   was that, in your opinion, a matter of medical necessity based

10  on something you saw, or more just something that was done to

11  kind of -- as an extra precaution to rule things out?  Or did

12  you -- were you involved in that decision?

13     A.    I was involved in that decision.  The decision was

14  based on trying to bring a little bit of, like, calmness to

15  the house.  I don't know if that's the right way to say that.

16  I know that they -- that the police wanted him to be

17  evaluated, and Mom and Dad had agreed for him to be evaluated,

18  but maybe not at an ER.  And so I felt that the best way to

19  try to appease both sides would be to take him to the

20  hospital.

21     Q.    So you went with them to the hospital, and that --

22  but that -- again, that wasn't based on some -- something that

23  you saw that you said, "Wow, this kid really needs to see a

24  doctor"?

25     A.    Correct.

BENTLEY01284

Before the Honorable Valerye Boyer-Wells

11

1      Q.   And at the hospital, the doctor cleared TA?

2      A.   By the time that happens, we're usually gone.

3      Q.   Okay.  So you --

4      A.   So we take the patient there.  We drop them off, and

5  we're gone.

6      Q.   So you didn't actually observe the doctor's

7  evaluation?

8      A.   Correct.

9            MR. TAIT:  No further questions, Your Honor.

10          JUDGE BOYER-WELLS:  Thank you.  Mr. Hawkins.

11          MR. HAWKINS:  Thank you, Your Honor.

12

13               CROSS-EXAMINATION

14  BY MR. HAWKINS:

15      Q.   Did you believe that the TA needed to be

16  evaluated?

17      A.   Not from a medical standpoint.

18      Q.   So if a seven-year-old has been out all night long

19  by himself --

20          MR. TAIT:  Judge, I'm just going to renew the

21  objection previously made that we don't have evidence that he

22  was out all night long.

23          JUDGE BOYER-WELLS:  Noted.  Go right ahead.

24  BY MR. HAWKINS:

25      Q.   If a seven-year-old has been out by himself all

BENTLEY01285

12

1    night long unsupervised, in temperatures potentially down in

2    the 40s, is it your opinion that that child doesn't need to be

3    evaluated to make sure nothing has happened to him?

4        A.   That's not my opinion.  My opinion would be that

5    there's a potential for a now hypothermia.  That is correct.

6    But again, from initial impression and -- and seeing the

7    activity level and stuff with TA, I didn't feel that was  the

8    case with him.

9        Q.   But you would agree that the risk, the threat of

10   hypothermia was certainly present?

11       A.   Absolutely.

12       Q.   Now, you mentioned -- well, let me ask you this:

13   Would you expect a child that was afraid of strangers being in

14   the home to pull away from their parents or to cling to their

15   parents?

16       A.   I think that every child responds differently.  I

17   mean, I've literally evaluated hundreds of children over the

18   years, and every one responds a little bit differently.  And

19   so that's when I typically will defer to the parents and ask

20   them is there anything that we need to know about your child,

21   you know, that -- outside of, like, medical issues.

22       Q.   But --

23       A.   If I saw that type of thing happen.

24       Q.   Okay.  But you do agree with me, and I think you

25   already testified that it -- at least when you initially saw

13

1   TA, his father was trying to hold on to him.

2        A.   Correct.

3        Q.   Okay.  So TA was attempting to pull away?

4        A.   Correct.

5        Q.   And to be clear -- well, let me ask you, I guess.

6   When you spoke to the Bentleys -- did you speak to the

7   Bentleys?

8        A.   I did.

9        Q.   Okay.  When you spoke to them, did they indicate to

10  you that TA did not have any mental issues as far as being

11  autistic or anything of that nature?

12       A.   Correct.

13       Q.   And he wasn't on any kind of medications or things

14  of that nature?

15       A.   I don't know if I asked that specifically, but I

16  asked about medical conditions.

17       Q.   Okay.  Now, you mentioned that the police wanted him

18  to be transported.  Would it surprise you that Officer Ramos

19  testified that he said that the child needed to be

20  transported?

21       A.   No.

22       Q.   Or evaluated, I should say.  Sorry.

23       A.   It would not.

24       Q.   Mr. Hellmann, you are actually good friends with the

25  Bentley family, are you not?

BENTLEY01287

14

1        A.   I -- to be honest with you, I've never seen them

2   before that day.

3        Q.   Okay.  And what about their family members?

4        A.   So I found out six months later that Janna Bentley's

5   brother is a friend of mine.

6        Q.   How'd you find that out?

7        A.   I had his wife call me, just out of the blue.

8        Q.   "His wife" being -- the brother's wife?

9        A.   Correct.

10        Q.   I see.  And was it to discuss this case?

11        A.   Yes.  Yes.

12        Q.   Okay.

13        A.   Not necessarily the proceedings of the case, but

14   they were -- they said, "We're thankful you were there."

15   That's why.

16             MR. HAWKINS:  I have no further questions,

17   Judge.

18             JUDGE BOYER-WELLS:  Thank you.  Just one

19   moment.  Thank you.

20             Mr. Tait, redirect?

21             MR. TAIT:  Thank you.

22

23             REDIRECT EXAMINATION

24   BY MR. TAIT:

25        Q.   When you say that the risk of hypothermia is

Before the Honorable Valerye Boyer-Wells

15

1    present, is that -- is that based largely on just the fact

2    that you don't know when somebody has been outside, if the

3    temperature, you know, got down below 50, you're not really

4    sure what their exposure was, whether or not they were --

5    well, let me ask it this way:   Is there a risk of hypothermia

6    when you don't have any information about how well protected

7    the person was from the cold?

8        A.   I don't know if "risk" is the right word, but if I

9    don't have any idea, then you -- you have a high index of

10   suspicion that someone would be hypothermic if they were out.

11       Q.   So if you don't know, for instance, whether the

12   person was wrapped in a blanket, you don't know what they were

13   wearing, you don't know how long they were exposed to any

14   particular temperature, all of the those things would increase

15   your desire to check for hypothermia.  Is that fair to say?

16       A.   Correct.

17       Q.   But without knowing all these things, can you assess

18   what the risk that they actually would have gotten hypothermia

19   was?

20       A.   I mean, like I said, as I walk into a room -- I

21   mean, looking at your skin color right now, I can tell you're

22   not hypothermic.  And so when I walk into the room and I see

23   the activity level, like we said, skin color and condition,

24   which you can see from across the room, it right away kind of

25   made that issue kind of go away for me.

BENTLEY01289

Before the Honorable Valerye Boyer-Wells

16

1     Q.   Okay.  You said that you saw that TA at some

2   point pulled away, but could you make any assessment about

3   whether TA was pulling away because he was afraid somehow  of

4   his dad or because he was afraid that there was strangers  in

5   the house or something else?

6     A.   It would be speculation for me to say which, which

7   it was.

8     Q.   You had no indication that TA had -- that there

9   was any kind of -- anything about his relationship that his

10  dad that was causing him to react that way?

11    A.   Couldn't tell.

12    Q.   Janna Bentley's brother, you found out six months

13  later -- six months later is a friend of yours.  Would that

14  cause you to come into court and lie for the Bentleys?

15    A.   No.

16    Q.   Do you think that that impacted at all what your

17  testimony is today?

18    A.   No.

19         MR. TAIT:  No further questions, Your Honor.

20         JUDGE BOYER-WELLS:  Thank you.

21         Do I have any questions from the jury for this

22  witness?  Any questions at all?  Getting all "no's."  Thank

23  you.

24         May this witness be excused?

25         MR. TAIT:  Yes, Your Honor.

17

1          MR. HAWKINS:  Yes, Judge.

2          JUDGE BOYER-WELLS:  Thank you.  That means you

3  can be excused, Captain Hellmann.  However, the rule has been

4  invoked, meaning you cannot talk to -- about your testimony to

5  any other witnesses.  You can't tell them what happened in

6  court until the case is over and the jury has already reached

7  a decision, because that rule has been invoked, but you are

8  free to leave.

9          THE WITNESS:  Okay.

10          JUDGE BOYER-WELLS:  Okay?  And also, if you do

11  talk to the attorneys about anything, just make sure it's not

12  in the presence of any other witness.

13          THE WITNESS:  Okay.

14          JUDGE BOYER-WELLS:  Okay.  Thank you so much

15  for your service and your time, sir.

16          (End of requested excerpt.)

17

18

19

20

21

22

23

24

25

BENTLEY01291

Before the Honorable Valerye Boyer-Wells

18

1    STATE OF ARIZONA    )
                         )        ss.
2    COUNTY OF MARICOPA  )

3

4        BE IT KNOWN that the foregoing proceedings were reported

5    by me, TERESA A. WATSON, Registered Merit Reporter, Certified

6    Reporter, Certificate No. 50876, State of Arizona, from an

7    electronic recording and were reduced to written form under my

8    direction; that the foregoing 17 pages constitute a true and

9    accurate transcript of said electronic recording, all done to

10   the best of my skill and ability.

11       I FURTHER CERTIFY that I am in no way related to any of

12   the parties hereto, nor am I in any way interested in the

13   outcome hereof.

14       DATED at Phoenix, Arizona, this 17th day of May 2019.

15

16

17       _____

18                TERESA A. WATSON, RMR
                  Certified Reporter
19                Certificate No. 50876

20

21

22

23

24

25

BENTLEY01292

State of Arizona v.
Janna Bentley and Brian Bentley

Before the Honorable Valerye Boyer-Wells Testimony of Captain Adam Hellmann
August 7, 2017

### A

able (3)
6:17;7:17,19
Absolutely (2)
8:20;12:11
accompanied (1)
10:5
accurate (2)
9:19,22
across (1)
15:24
activity (2)
12:7;15:23
actually (6)
8:6,6,9:23;11:6;
13:24;15:18
Adam (2)
4:2,10
afraid (3)
12:13;16:3,4
again (2)
10:22;12:6
age (1)
7:5
agree (2)
12:9,24
agreed (1)
10:17
ahead (1)
11:23
amount (1)
8:4
appease (1)
10:19
April (1)
4:22
around (1)
8:21
arrived (2)
5:10,15
assess (2)
8:24;15:17
assessment (1)
16:2
attempting (1)
13:3
attorneys (1)
17:11
autistic (1)
13:11
away (6)
12:14;13:3;15:24,
25;16:2,3

### B

based (9)
7:17;8:8,9,16,18;
10:9,14,22;15:1
bathroom (3)
6:2,3,9
bathtub (1)
6:16
Beginning (1)
4:1
behavior (2)
8:8,18
behind (2)
6:16;9:3
below (1)
15:3
Bentley (6)
4:22;5:8,13,15,24;
13:25
Bentleys (3)
13:6,7;16:14
Bentley's (2)
14:4;16:12
best (2)
8:23;10:18
bit (3)
8:3;10:14;12:18
blanket (1)
15:12
blood (4)
6:19;9:7,21,23
blue (1)
14:7
both (1)
10:19
boxes (1)
5:19
BOYER-WELLS (10)
4:4,7,11;11:10,23;
14:18;16:20;17:2,10,
14
Brian (3)
4:21;9:16;10:2
bring (1)
10:14
brother (2)
14:5;16:12
brother's (1)
14:8

### C

call (2)
6:6;14:7
called (1)
6:6
calmness (1)
10:14
can (5)
8:13;15:17,21,24;
17:3
Captain (4)
4:2,16,16;17:3
case (4)
12:8;14:10,13;17:6
cause (1)
16:14
caused (1)
7:10

causing (1)
16:10
certain (1)
8:4
certainly (1)
12:10
check (2)
9:2;15:15
child (6)
8:23;12:2,13,16,
20;13:19
children (2)
8:20;12:17
circumstances (1)
8:11
clear (1)
13:5
cleared (1)
11:1
cling (1)
12:14
cold (1)
15:7
color (3)
7:6;15:21,23
color/condition (1)
9:8
complete (1)
6:22
condition (3)
7:6;8:10;15:23
conditions (1)
13:16
consciousness (1)
7:4
court (2)
16:14;17:6
crew (2)
4:24;5:2
CROSS-EXAMINATION (1)
11:13

### D

Dad (3)
10:17;16:4,10
day (2)
4:25;14:2
decision (5)
9:4;10:12,13,13;
17:7
defer (1)
12:19
demeanor (1)
6:11
Department (3)
4:3,17;9:18
desire (1)
15:15
detail (1)
5:17
diagnose (4)
8:7,10,12,15

diagnoses (1)
8:2
different (2)
5:19;8:21
differently (2)
8:20;12:16,18
difficult (2)
8:3,3
DIRECT (1)
4:14
discoloration (1)
7:9
discolored (1)
7:7
discuss (1)
14:10
doctor (2)
10:24;11:1
doctor's (1)
11:6
documentation (3)
9:6,7,9
done (1)
10:10
down (3)
9:21;12:1;15:3
drop (1)
11:4

### E

else (1)
16:5
End (1)
17:16
environment (1)
7:5
equipment (3)
5:18,19;6:23
ER (1)
10:18
erratic (1)
8:17
essentially (1)
9:10
evaluate (1)
8:15
evaluated (6)
10:17,17;11:16;
12:3,17;13:22
evaluation (12)
5:22;6:5,13,17,22,
24;9:3,14,17,25;10:3;
11:7
even (1)
9:1
evidence (2)
7:23;11:21
EXAMINATION (2)
4:14;14:23
example (1)
9:23
excerpt (2)

4:1;17:16
excused (2)
16:24;17:3
exhibit (1)
7:15
expect (1)
12:13
experience (1)
5:3
explanation (1)
8:17
exposed (1)
15:13
exposure (1)
15:4
extra (1)
10:11

### F

fact (1)
15:1
fair (3)
6:23;8:22;15:15
family (2)
13:25;14:3
far (2)
8:14;13:10
father (3)
6:12,16;13:1
feel (1)
12:7
felt (1)
10:18
find (1)
14:6
Fire (4)
4:3,17,24;9:18
firefighter (2)
4:19;5:2
firefighters (1)
8:1
first (4)
6:1,8,21,24
force (1)
5:5
found (5)
5:11;6:4,4;14:4;
16:12
four (1)
5:18
four-person (1)
4:24
free (1)
17:8
friend (2)
14:5;16:13
friends (1)
13:24
full (2)
9:14,24
further (3)
11:9;14:16;16:19

BENTLEY01293

**G**

gets (1)
9:11
Gilbert (2)
4:3,16
given (1)
9:24
gives (1)
7:7
good (3)
7:8,19;13:24
grabbed (1)
5:18
guess (1)
13:5

**H**

hand (1)
4:5
happen (1)
12:23
happened (2)
12:3;17:5
happens (1)
11:2
Hawkins (6)
11:10,11,14,24;
14:16;17:1
health (4)
8:2,5,10,14
held (1)
6:15
Hellmann (5)
4:3,10,16;13:24;
17:3
H-e-l-l-m-a-n-n (1)
4:10
help (1)
5:8
high (1)
15:9
himself (2)
11:19,25
history (1)
8:23
hold (3)
6:12;9:21;13:1
home (7)
4:21,25;5:8,10,16;
8:19;12:14
honest (1)
14:1
Honor (6)
4:2,12;11:9,11;
16:19,25
hospital (5)
10:6,8,20,21;11:1
house (4)
5:19,23;10:15;16:5
How'd (1)

14:6
hundreds (1)
12:17
hypothermia (9)
7:13,15,17;12:5,
10;14:25;15:5,15,18
hypothermic (2)
15:10,22

**I**

idea (2)
7:19;15:9
ill (1)
7:20
illness (2)
7:11;9:2
immodest (1)
5:6
impacted (1)
16:16
impression (4)
6:25;7:2,22;12:6
impressions (1)
8:16
increase (1)
15:14
index (1)
15:9
indicate (1)
13:9
indication (1)
16:8
indicator (2)
7:8;9:22
information (2)
8:9;15:6
initial (4)
6:25;7:1,22;12:6
initially (3)
5:25;6:12;12:25
injury (2)
7:24;9:2
inspection (1)
7:18
instance (1)
15:11
interaction (1)
9:5
into (7)
5:5,19,23;6:3;
15:20,22;16:14
invoked (2)
17:4,7
involve (1)
6:22
involved (2)
10:12,13
issue (1)
15:25
issues (2)
12:21;13:10

**J**

Janna (5)
4:21;9:16;10:5;
14:4;16:12
jeopardy (1)
8:13
JUDGE (13)
4:4,7,11;11:10,20,
23;14:17,18;16:20;
17:1,2,10,14
jury (2)
16:21;17:6

**K**

kid (1)
10:23
kind (8)
7:7;8:10;9:25;
10:11;13:13;15:24,
25;16:9
knowing (1)
15:17

**L**

largely (1)
15:1
last (1)
4:9
later (3)
14:4;16:13,13
least (1)
12:25
leave (1)
17:8
level (3)
7:3;12:7;15:23
lie (1)
16:14
literally (1)
12:17
little (3)
8:3;10:14;12:18
long (6)
4:19;8:23;11:18,
22;12:1;15:13
look (3)
7:3,6;8:5
looking (2)
7:1;15:21

**M**

matter (1)
10:9
may (2)
8:18;16:24
maybe (1)
10:18
mean (4)

5:5;12:17;15:20,21
meaning (1)
17:4
means (1)
17:2
medical (7)
5:19;6:23;8:1;
10:9;11:17;12:21;
13:16
medications (1)
13:13
members (1)
14:3
mental (5)
8:2,5,10,14;13:10
mentioned (2)
12:12;13:17
mine (1)
14:5
missing (1)
5:8
Mom (1)
10:17
moment (3)
6:15,20;14:19
months (3)
14:4;16:12,13
more (1)
10:10
most (2)
5:3,4
much (2)
5:17;17:14

**N**

name (2)
4:8,9
nature (2)
13:11,14
necessarily (1)
14:13
necessity (1)
10:9
need (2)
12:2,20
needed (2)
11:15;13:19
needs (1)
10:23
night (3)
11:18,22;12:1
no's (1)
16:22
Noted (1)
11:23

**O**

objection (1)
11:21
observe (1)
11:6

observed (1)
6:11
off (2)
5:18;11:4
Officer (1)
13:18
once (1)
6:4
one (2)
12:18;14:18
ones (1)
6:22
only (1)
6:22
opinion (4)
10:9;12:2,4,4
opposed (1)
8:11
out (11)
6:4;7:17;10:11;
11:18,22,25;14:4,6,7;
15:10;16:12
outside (2)
12:21;15:2
over (2)
12:17;17:6

**P**

paramedic (1)
8:6
parents (4)
8:22;12:14,15,19
part (3)
4:24;9:6,9
particular (1)
15:14
patient (3)
9:5,10;11:4
people (2)
8:7,12
people's (1)
7:7
perhaps (1)
8:23
person (4)
5:8,10;15:7,12
physical (2)
7:23;9:2
physically (5)
7:20,20,21;8:13,13
point (4)
6:14;7:21;9:16;
16:2
police (2)
10:16;13:17
potential (1)
12:5
potentially (2)
7:8;12:1
precaution (1)
10:11
presence (2)

State of Arizona v.
Janna Bentley and Brian Bentley

Before the Honorable Valerye Boyer-Well-Testimony of Captain Adam Hellmann
August 7, 2017

8:18;17:12
**present (3)**
 4:21;12:10;15:1
**pressure (4)**
 6:19;9:8,22,23
**previously (1)**
 11:21
**proceedings (1)**
 14:13
**protected (1)**
 15:6
**protocol (2)**
 6:5;9:12
**pull (2)**
 12:14;13:3
**pulled (1)**
 16:2
**pulling (1)**
 16:3
**pulse (2)**
 6:19;9:8
**pupillary (1)**
 9:9
**purpose (1)**
 5:7

**R**

**raise (1)**
 4:5
**Ramos (1)**
 13:18
**rate (1)**
 9:8
**reached (1)**
 17:6
**react (1)**
 16:10
**reacting (2)**
 7:4;9:16
**really (6)**
 6:14;7:19;8:12,15;
 10:23;15:3
**reason (2)**
 9:14,24
**reasonable (1)**
 8:17
**record (1)**
 4:9
**redirect (2)**
 14:20,23
**relationship (1)**
 16:9
**renew (1)**
 11:20
**requested (2)**
 4:1;17:16
**respiratory (1)**
 9:8
**respond (1)**
 8:20
**responding (1)**
 8:11

**responds (2)**
 12:16,18
**response (1)**
 9:9
**responsiveness (1)**
 7:4
**restrain (2)**
 9:20,21
**right (6)**
 4:5;10:15;11:23;
 15:8,21,24
**risk (5)**
 12:9;14:25;15:5,8,
 18
**room (3)**
 15:20,22,24
**rule (4)**
 7:17;10:11;17:3,7

**S**

**saw (6)**
 6:8;10:10,23;
 12:23,25;16:1
**scope (1)**
 8:5
**search (1)**
 5:8
**seat (1)**
 4:8
**seeing (1)**
 12:6
**seem (1)**
 6:14
**service (1)**
 17:15
**seven-year-old (2)**
 11:18,25
**sick (1)**
 7:8
**sides (1)**
 10:19
**signs (5)**
 7:13,15;9:1,7,19
**situation (1)**
 8:24
**six (3)**
 14:4;16:12,13
**skin (7)**
 7:6,6,7,9;9:8;
 15:21,23
**somebody (2)**
 9:20;15:2
**somehow (1)**
 16:3
**someone (2)**
 9:21;15:10
**sorry (2)**
 8:1;13:22
**speak (1)**
 13:6
**specific (1)**
 7:5

**specifically (1)**
 13:15
**speculation (1)**
 16:6
**spell (1)**
 4:9
**spoke (2)**
 13:6,9
**standard (2)**
 6:5;9:12
**standing (1)**
 6:15
**standpoint (1)**
 11:17
**start (1)**
 5:22
**state (2)**
 4:8;9:25
**still (1)**
 9:2
**stimulus (1)**
 8:21
**strangers (3)**
 8:18;12:13;16:4
**stuff (1)**
 12:7
**sufficient (1)**
 8:9
**supposed (1)**
 9:6
**sure (3)**
 12:3;15:4;17:11
**surprise (1)**
 13:18
**suspicion (1)**
 15:10
**sworn (1)**
 4:6

**T**

**TAIT (11)**
 4:2,11,12,15;11:9,
 20;14:20,21,24;
 16:19,25
**talk (2)**
 17:4,11
**TA(22)**
 5:13,23;6:8,11,18;
 7:9,15,18;8:16;9:15,
 24;10:5,8;11:1,15;
 12:7;13:1,3,10;16:1,
 3,8
**TA's (1)**
 8:8
**temperature (2)**
 15:3,14
**temperatures (1)**
 12:1
**testified (2)**
 12:25;13:19
**testimony (2)**
 16:17;17:4

**thankful (1)**
 14:14
**though (1)**
 9:1
**threat (1)**
 12:9
**today (1)**
 16:17
**tools (1)**
 9:3
**training (2)**
 8:5,9
**transported (3)**
 10:8;13:18,20
**truck (1)**
 5:18
**try (2)**
 9:21;10:19
**trying (5)**
 6:12,13;9:20;
 10:14;13:1
**Twenty-seven (1)**
 4:20
**type (2)**
 7:5;12:23
**typically (4)**
 5:18;6:7;7:3;12:19

**U**

**unique (1)**
 8:11
**unsupervised (1)**
 12:1
**using (1)**
 6:23
**usually (1)**
 11:2

**V**

**visible (1)**
 7:13
**visual (2)**
 6:24;7:18
**vital (2)**
 9:7,19

**W**

**walk (3)**
 5:19;15:20,22
**way (5)**
 9:15;10:15,18;
 15:5;16:10
**wearing (1)**
 15:13
**what's (2)**
 9:3,3
**wife (3)**
 14:7,8,8
**without (1)**
 15:17

**Witness (7)**
 4:6,10;16:22,24;
 17:9,12,13
**witnesses (1)**
 17:5
**word (1)**
 15:8
**worked-up (1)**
 9:25
**Wow (1)**
 10:23
**wrapped (1)**
 15:12
**wrong (1)**
 7:21

**Y**

**years (3)**
 4:20;5:4;12:18

**1**

**1st (1)**
 4:22

**2**

**2016 (1)**
 4:22

**4**

**40s (1)**
 12:2

**5**

**50 (1)**
 15:3

Exhibit 4

<u>DECLARATION OF BENTLEY J. BOBROW</u>

STATE OF TEXAS     )
                      ) ss.
County of Harris     )

BENTLEY J. BOBROW, being first duly sworn upon his oath, deposes and says:

1.     I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.     As noted on my curriculum vitae at the time of my report in this case, labeled as Mesa/Bentley 005454-5507, I have been a board-certified Emergency Physician and was an EMS Medical Director for 24 years. I served as a Distinguished Professor of Emergency Medicine and the Associate Director of the Arizona Emergency Medicine Research Center, was the Medical Director of the Arizona Department of Health Services, Bureau of EMS and Trauma System for 15 years, and my role included development of EMT guidelines, regional protocols, and case quality reviews of EMS agencies and individual EMTs.

3.     I make this Declaration by incorporating by reference my April 16, 2019, report in this case, titled Case Review and labeled as Mesa/Bentley 005448-005453, and my curriculum vitae, labeled as Mesa/Bentley 005454-5507, both of which I declare to be true and accurate at the time I drafted them.

4.     Further affiant sayeth not.

BENTLEY J. BOBROW

SUBSCRIBED AND SWORN TO before me, a Notary Public, this ⎯⎯11⎯⎯ day of September, 2019, by BENTLEY J. BOBROW, in the capacity and for the purposes herein stated.

Notary Public

ANNETTE K. ROBERTS
My Notary ID # 7842212
Expires June 10, 2021

Bentley v. Department of Child Services and the City of Mesa

Case Review

I was asked to review the case of Bentley v. Department of Child Services and the City of Mesa specifically from the viewpoint of appropriateness and completeness of prehospital medical care rendered by the Emergency Medical Technicians involved.

I have been a board-certified Emergency Physician and an EMS Medical Director for 24 years. I am a Distinguished Professor of Emergency Medicine and the Associate Director of the Arizona Emergency Medicine Research Center and have been the Medical Director of the Arizona Department of Health Services, Bureau of EMS and Trauma System for 15 years. My role includes the development of EMT guidelines, regional protocols, and case quality reviews of EMS agencies and individual EMTs. My CV is attached.

I have reviewed the documentation for this case including the EMS written first care reports from the Gilbert Fire Department and Rural Metro Corporation, EMT trial testimony, Axon bodycam video, Mesa Police Department records, 9-1-1 recording, and the developmental evaluations of T.A. My opinions on the medical appropriateness and quality of care provided are based on my professional emergency medicine and EMS clinical work experience, knowledge of state and local EMS protocols and standards of prehospital practice, and the patient care reports detailing the events of this case occurring on April 1st, 2016.

Event:

T.A.'s family called 9-1-1 at 08:01 on April 1st, 2016 and T.A.'s mother reported that her 7-year-old son T.A. had been missing since 21:15 the night before. The Mesa Police Department was dispatched to T.A.'s family home for a missing person call. T.A.'s family, neighbors, and Mesa PD all performed an extensive search of the entire area around T.A.'s home including areas around the neighborhood and the nearby water canal. At approximately10:13 am T.A. was found and had presumably been sleeping in the bushes overnight for ~ 13 hours. Mesa PD requested EMS providers respond to medically evaluate T.A. to rule out any possible problems.

Gilbert Fire Department was then dispatched to the family's home, arriving on scene at 10:28.

The Gilbert Fire Department EMTs and Rural Metro EMTs both responded to T.A.'s home and made written first care reports. They each individually documented that T.A. was agitated to the point which they were not able to adequately assess him. T.A. would not allow the EMTs to examine him or perform a routine set of vital signs including pulse rate, blood pressure, respiratory rate, pulse oximetry, and in this case temperature, or obtain a blood sugar check.

1

The Axon videos were closely reviewed.  Axon video number 15 was taken very soon after T.A. was found in the neighbor's bushes.  In this video, T.A. is noted to be highly agitated as his father carries him and he is noted to be attempting to get out of his father's arms.  T.A. does not have the appearance of being relieved to see his father or to be found; rather he is nearly uncontrollable.  Then on Axon video 11601 for several minutes in the bathroom at the family's home T.A. continues to be very difficult to control, even to the point where he would not allow the EMTs to come near him or evaluate him.  At minute 01:10 in this Axon video, T.A.'s father says to Gilbert EMT-Paramedic Alex Ramos, "…He has never done something like this before."

T.A.'s behavior did not fit with anything he had done previously per his family who knows him best.  Gilbert EMT-Paramedic Alex Ramos stated in his trial testimony, *"Well, it -- what crossed my mind was like, I don't think he was acting appropriate for his age.  And what I mean by that, he wasn't, like, clinging onto dad, acting scared, whatnot.  He was more agitated, didn't want anything to do with anybody, including the family member, his dad.  So it crossed my mind he might be almost autistic maybe."*

Obtaining a complete set of vital signs is a fundamental component of the EMT patient evaluation. This is particularly indicated for any patient presenting with agitation and/or altered mental status as was the case with T.A.  Not being able to perform this standard assessment. As the Gilbert EMT-Paramedic Alex Ramos accurately stated in his trial testimony with respect to his standard patient assessment, "…*consist of doing a physical exam on the patient, meaning get your hands on and palpating the head and body and taking a set of vital signs, pulse rate, respirator -- respiratory rate, blood pressure, skin color, skin tone, looking at oxygen levels*."

The events surrounding T.A. being missing for ~ 13 hours were highly unusual for multiple reasons. These include the extended duration he was missing, his behavior once located, the fact his parents repeatedly said he had never done this before, a large number of potentially serious and even life-threatening causes of his agitation, the unknown factors of where he had been, including a nearby canal and youth home. The EMT's duty to follow their standard treatment protocols when this highly unusual scenario did not fit precisely into any of their common scenarios.

There were numerous aspects of this patient encounter and particularly with the timeline being highly atypical which added to the number of potentially serious causes of the boy's behavior.  These potential causes (not in order of likelihood) included the possibility of some form of intoxication, some type of physical abuse, environmental exposure, a traumatic brain injury, an endocrine disorder such as hypoglycemia, or other electrolyte abnormality, an infection, or a serious mental health issue.  Each of these are a potential cause of abnormal behavior and due to the fact T.A. had been missing for an extended period of time and could not offer any reliable history, each of these required considerations.  The fact that it was not extremely cold that night is irrelevant because there was a plausibility that T.A. had suffered from environmental exposure.

Mesa/Bentley 005449

As Dr. Coffman stated on page 8 of her sworn testimony, most 7-year old children are grounded in the present moment and do not possess the decision-making capability to fully understand all of the consequences of their actions. They are not fully prepared to deal with what they may encounter. In this case, T.A. was not able to fully understand all the risks and what could happen to him by leaving his home and being outside overnight for 13 hours.

Gilbert EMT-Paramedic Alex Ramos documented, *"After a long discussion with the parents they agreed to let the child be transported to the hospital. L253 followed up and the pt. mom also rode in the ambulance with us to the hospital."* Rural Metro EMT-Paramedic Zebadiah Miller also documented that T.A. was transported to the hospital without incident.

In Axon video 10 at approximately minutes 13-16 the Gilbert Fire Department EMTs are discussing with T.A.'s parents what is the best course of action to assure his health and safety. After the open discussion, T.A.'s mother agrees to T.A. being transported to Cardon's Children's Hospital which is the closest most appropriate hospital for T.A. There is not any apparent argument or any evidence that T.A. is transported to the hospital without consent.

Then on Axon video 02 which takes place immediately after ambulance transport, at approximately minute 12, T.A. and his mother are noted to be inside the emergency department and the mother signs the transport agreement without any objection or disagreement.

Emergency Medical Technicians are trained to evaluate patients (without the benefit of knowing the entire history of their patients) in undifferentiated prehospital settings and to look for behavioral, anatomical, and physiological abnormalities that *could* represent emergency medical conditions. They operate under both off-line and on-line medical protocols which are designed to cast a wide net and not miss any potentially serious conditions. EMTs are trained that once called to perform an evaluation, if they find anything *other* than completely normal, typical, scenarios, behavior, vital signs, physical exam, the EMTs are required to transport their patient to the hospital for further medical care. Had they done anything other than what they did, in this case, it would have been highly unusual for them, and they would not have been following their protocols. This is one of the reasons that a patient with abnormal vital signs is specifically prohibited from refusing care or refusing transportation to the hospital if the EMTs believe there is a likelihood of an emergency medical condition.

Gilbert EMT-Paramedic Alex Ramos did exactly what all EMTs are trained to do which is to evaluate their patient and situation as thoroughly as possible and to look at the complete circumstances of both. When asked in trial testimony whether he thought T.A. needed to be transported to the hospital, EMT-Paramedic Alex Ramos stated, *"I don't recall. If -- if I did, it was probably more towards the line that he probably should, just based on we can't do a physical exam on him, and we couldn't get vital signs on him.*

Mesa/Bentley 005450

*And based on the fact that he had been missing overnight was a long time, so there was a lot of unknowns.  So, I -- I just kind of felt, in the best interest of the child, he probably should be looked at by a doctor, just to -- just to be safe and make sure he was okay.*"

It is not reasonable to expect the EMTs to function as "on-scene physicians."  They do not have the training to do this and are not allowed to practice as physicians, make the same patient evaluation or treatment decisions, administer the same treatments.  EMT-Paramedic Alex Ramos reaffirms this while being questioned in his trial testimony about, what *he thought* a physician would look for when examining T.A.  He clearly understood his training and scope of practice and he correctly stated, "*I don't know. cause, like I said, I don't know how far a doctor would take an exam, you know.  A doctor could take it all the way to, hey, let's do a chest x-ray, to make sure his lungs are fine.  I don't know how far a doctor would take it.  That's something we can't do in the field.  We could just do a physical, visual exam on him. Do a pal -- you know, palpate his little body and take his vital signs is all we could do out in the -- in the field...... So for me to say, okay, just sign here, a refusal form, without having any vital signs or actually doing the physical exam, I -- I just wouldn't be doing my job to the fullest.*"

While T.A.'s behavior that day was not normal to any EMT, the Gilbert EMTs had very good reason to question whether T.A.'s behavior was even normal for him. This was clear by the testimony of Gilbert EMT-Paramedic Alex Ramos who stated, "*You know, at this point, I didn't know any history on the patient.  So I asked mom if there was any medical conditions that we needed to know about, about the child, like if he was on any medicine or anything.  And she said, no, that he was healthy, not on any medications.*" This statement by the patient's mother to the EMT-Paramedics certainly led them to believe there could be something else causing his highly unusual state of agitation since the patient's mother herself said he did not have a history of any similar behavior.

EMTs frequently encounter patients and family members who call 9-1-1 for help and then later decide they do not want or need transportation to the hospital. This is a common occurrence which EMTs encounter every day.  When this happens, EMTs must decide whether there is the potential for a medical emergency and whether there is any other social dynamic or ulterior motive which could be influencing the patient (or in this case guardian's) decision making.

EMS Providers and Law Enforcement Officers are required to make decisions in complex and fluid situations where all of the facts and details may not be completely known or entirely clear.  When this happens, they make the best decision they can with a focus on what is in the best interest of their patient and in this case what was in the best interest of 7-year-old T.A.  The patient in this case, T.A., was behaving bizarrely and it was not clear to anyone, including his family, exactly why this was. This could have been for any number of reasons as outlined above.  The EMTs knew there was a potential for serious complication and they rightly decided he urgently required a higher level of medical care. Emergency Medical Technicians are *the* medical experts on the

Mesa/Bentley 005451

scene.  It would have been extraordinary for the Law Enforcement Officers on the scene to go against the recommendations of the Gilbert Fire Department EMTs when they recognized that it was in T.A.'s best interest to be transported to the hospital for evaluation (as opposed to later or in a medical office setting).  The Mesa Police Department and the Department of Child Services officials at the scene were correct in agreeing and assisting with this decision focused on T.A.'s health and safety.

EMTs do not have the luxury of knowing the results of tests performed later.  In other words, it is not appropriate or fair to judge their decision making based on all the details and test results, and the events have become clearer.  They must make judgments with limited information in compressed time-frames, and they must err on the side of caution to prevent missing any serious conditions. This is termed *over-triage* and is a well known and necessary aspect of prehospital medical care.  Frankly, had the EMTs done anything other than what they did, it would have been substandard care.

As to the issue of why the EMTs did not transport T.A. to the family's physician, they do not do this by licensure as they are permitted to transport patients to certified hospitals and not private medical offices.

There was also the suggestion that T.A.'s family be allowed to sign a refusal of care form and not have T.A. transported.  As EMT-Paramedic Alex Ramos states in his testimony,  *"Given the circumstances, I think even after doing the physical exam and doing vital signs, I probably would have called my doctor 'cause -- and would consider that call, what we call a high-risk refusal.  And the reason I think it would be a high-risk refusal is because, like I said, the child had been missing for -- for quite a while."*

Arizona's Central Region guidelines clearly state that one of the criteria required for a patient to refuse care or refuse transportation to the hospital is that the patient has a complete set of normal vital signs.  Because of T.A.'s agitation, EMTs were not able to obtain any vital signs.  Therefore the option of allowing T.A.'s parents to refuse care would have been clearly against their local EMS protocols. Please see attached Arizona EMS Central Region Guidelines referred to as the Red Book.  Specifically Pages 12-14, and page 16 which explicitly states which patients can refuse care and transport to the hospital along with the criteria for refusal.  From the <u>AEMS Red Book</u>:

- The patient must meet all of the following criteria:

Is an adult (18 or over), or if under 18, is being released to a parent, guardian, responsible party, or law enforcement personnel

Is oriented to person, place, time, and event.

Exhibits no evidence of:

Altered level of consciousness

Alcohol or drug use that impairs judgment

Mesa/Bentley 005452

Understands the nature of his/her medical condition, as well as the risks, and consequences of refusing care. (Decision making capacity.)

- An adult accepting care for a minor must sign the refusal form.

Arizona's Central Region Guidelines stipulate that (See Red Book Attached):

**Criteria 1:**   Non-emergency category must have vital signs within the following limits:

|  | Adult | Child |
|---|---|---|
| •Temp* | < 101 | < 101 |
| •Respirations | 10 to 24 | 20 to 30 |
| •BP | 90 to 160 systolic<br>60 to 110 diastolic | 70 mm Hg + (2 times age in years)** |
| •Pulse | 60 to 100 | 60 to 150 |

* If fever suspected

My summary of the facts of this case is: On March 31st-April 1st, 2016, T.A. was missing from his home overnight for over 13 hours and when he was found he was agitated to the point where EMTs were unable to perform a medical assessment. The event was highly unusual, and T.A.'s behavior was not normal for him as stated several times by the family. There were numerous potential serious things which could have happened to T.A. while he was outside the entire night. T.A. deserved a thorough evaluation and performing such a proper medical assessment required a complete history and physical examination. This evaluation was not possible at the family's home due to T.A. being agitated and inconsolable, and the EMTs recognized the scope of potential complications warranted a qualified medical provider. The EMTs appropriately followed their protocol and standard prehospital medical practice and did so with professionalism. They transported T.A. to the hospital for full evaluation with his T.A.'s mother.

*Bentley J. Bobrow   MD*

_____     4/16/2019

Bentley J. Bobrow, MD

Mesa/Bentley 005453

Exhibit 5

CSO-1005A (8-14)
PS-045 (1-13)

ARIZONA DEPARTMENT OF CHILD SAFETY

## NOTICE OF DUTY TO INFORM

When the Department of Child Safety (DCS) receives an allegation of child abuse or neglect by a parent, guardian custodian or adult member of household and a report is taken, Arizona law requires DCS to conduct an investigation. The following allegation concerning your child (or children) is currently being investigated by DCS.

Neglect

This *notice* is to inform you that:

- DCS has no legal authority to compel or make you cooperate with the investigation or to accept services, but it is our hope that by working together we can find solutions to ensure that your child (or children) is safe and that your family has what it needs.
- DCS has a duty to proceed with the investigation even if you decide not to cooperate to ensure that your child (or children) is safe, although we would prefer to carry on with the investigation with your support.
- DCS has the authority to petition the Juvenile Court for a determination that your child (or children) is dependent and in need of protection. Your refusal to cooperate with the investigation or services offered does not in itself form a basis for DCS to take temporary custody of your child (or children), unless it is clearly necessary to protect your child (or children) from abuse or neglect.
- You have the right to provide written, telephonic or verbal responses to the allegation, including any documentation, and to have the information considered in determining whether your child (or children) is in need of child safety services.
- Anything you say or write can be used in a court proceeding and may be included in DCS's report of the investigation.
- Any written response that you provide, including any documentation, will be included in the DCS case record.
- Any information that you provide in response to the complaint or allegation(s) will be considered during the investigation.
- You have the right to appeal determinations made by DCS about the results of the investigation and will be notified in writing of these results and how to appeal.
- You have the right to file a complaint with the Arizona Ombudsman-Citizens Aide. The telephone number in Phoenix is (602) 277-7292, and statewide toll-free is 1-800-872-2879. The Ombudsman-Citizen Aide office is available to handle inquiries, concerns and complaints about agency actions, including DCS.

More information about DCS and your parental rights are outlined in the pamphlet, **"Guide to Department of Child Safety"** that I am leaving with you today.

**ASK: Is the child's parent(s) of American Indian heritage/ancestry?** ☐ Yes ☐ No

*If Yes, Mother's Tribe:* _____ *Father's Tribe:* _____

☐ Unknown *(explain):* _____

By signing this form, you are acknowledging that I have reviewed the information contained in this notice with you.

| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | PARENT, GUARDIAN OR CUSTODIAN'S NAME *(Please print)* | DATE |
|---|---|---|
|  | MINNIE A SCHERN, ATTY FOR BENTLEY | 4/01/2016 |
| DCS REPRESENTATIVE'S SIGNATURE | DCS REPRESENTATIVE'S NAME *(Please print)* | DATE |
|  | Krishna Began | 4/1/16 |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for department services is available upon request. • Disponible en español en la oficina local.

AZ-STATE000088

# Exhibit 6



# Incident/Investigation Report

Case Number: 2016-0920181

Agency: Mesa Police Department

## Supplement Information

| Supplement Date | Supplement Type | Supplement Approving | Approval Date |
|---|---|---|---|
| 06/01/2016 00:00:00 | INVESTIGATION | (12898) KESSLER, L | 06/01/2016 14:43:04 |
| | | Approving Supervisor | Approval Date |
| | | (12362) LAWES, M | 06/03/2016 14:05:16 |

## Supplement Notes

On April 1, 2016 at approximately 0830 hours, I was assigned DR 20160920181 as a walk-in case. I was briefed on the case and learned that seven year old ███ Bentley had been missing from his residence at 3045 E. Inverness, Mesa, AZ since approximately 2115 hours the previous night. It was reported ███ and his mother Janna Bentley had gotten into an argument and ███ left. It was reported Janna had looked for ███ until approximately 0200 hours and then went to bed. ███ had not returned home this morning and the police were then contacted at 0803 hours.

I reviewed the CAD comments that stated 7 year old, ███ Bentley, missing since 2115 hours last night. He has a history of running away and RP has checked the whole neighborhood. He didn't want to do chores last night and when he's mad he normally runs off to hide or go sit out in the backyard in a tree. The reporting party had checked the whole house and backyard and said ███ took a pillow and blanket.

Myself as well as other Mesa Family Advocacy detectives responded to 3045 E. Inverness. I immediately noticed there was a very large police presence with officers searching for ███ I also noticed a large neighborhood/community response and learned everyone was there to help look for ███ I contacted Officer Jackson, #19550. She told me she had spoken with ███ s mother, Janna Bentley. Janna had told her that on the night of March 31 she had asked ███ to do his chores and he got upset. She said she wasn't concerned because it's normal for ███ to hide inside the house when he's upset. She said around 2200 hours she could not find ███ and she became concerned and called her husband Brian who was at work. She learned from one of her other children that ███ had taken a pillow and blanket. She said she searched the house and yard until her husband got home around 0200 hours. When they still couldn't find ███ they "prayed about it and felt calm" and went to bed. Officer Jackson said Janna told her the next morning ███ still wasn't home so she took her sons to school. When she returned she called Mesa PD because she was concerned.

Officer Jackson said she spoke with ███ father, Brian Bentley. He told her it's not uncommon for ███ to hide for a couple of hours. He said he arrived home around 0200 hours and looked for ███. When he couldn't find him he went to bed. He said this morning ███ still had not returned.

A list of ███ friend's name was provided as well as places that were familiar to ███. All were checked by Mesa PD and ███ was not located. Officers searched the neighborhood surrounding 3045 E. Inverness and ███ was not located. His school was checked and he was not there. ███ was entered into NCIC/ACIC as a missing person. Officer Jackson told me that the Mesa PD Air Unit was dispatched and searched for ███. They conducted an area check and made announcements for him. The Maricopa County Sheriff's Department K-9 unit was notified and they responded to look for ███

Officer Jackson told me that a canvas of the neighborhood was conducted to look for ███. She said during the search, officers were made aware of a juvenile sex offender group home that was just two houses to the west of 3045 E. Inverness at 1820 S. Los Alamos. Officer Jackson said she asked Janna if she knew about the sex offender group home and she said she did.

Mesa/Bentley 000076

Exhibit 7

## DECLARATION OF KARIN KLINE

I, Karin Kline, am over the age of 18 years of age, and I am competent to provide the information contained in this Declaration.  If called upon to testify in this matter, I could and would testify as follows:

1. I have more than thirty years work experience as a social worker, exclusively in the field of child welfare.

2. The Arizona Attorney General's Office asked me to review the Department of Child Safety file and related materials involving the events that form the basis of the lawsuit entitled *Bentley v. City of Mesa et al.* 17-cv-0966.

3. Attached as Exhibit A to this declaration is a true and accurate copy of my report that includes a description of my qualifications, a summary of the materials that I reviewed, and my professional opinions.

4. I declare and certify, under penalty of perjury, that the statements set forth in this declaration are true and correct to the best of my memory.

**DATED** this 18th day of September, 2019.

*Karin Kline*
Karin Kline

8207205

1

# EXHIBIT A

April 17, 2019

RE: Bentley v. DCS, 2: 17-cv-00966-DJH Brian L. Bentley, an individual; Janna L. Bentley, an individual; O.R., a minor by and through her father and mother; G.E., a minor by and through her father and mother; B.J., a minor by and through his father and mother; M.J., a minor by and through his father and mother; T.A., a minor by and through his father and mother; S.L., a minor by and through her father and mother; B.M., a minor by and through her father and mother, Plaintiffs, v, City Of Mesa, a public entity; Gregory A. McKay, in his official and individual capacities; Cristina Baggen, in her individual capacity as an employee of the State of Arizona Department of Child Safety; Gina Cordova, in her individual capacity as an employee of the State of Arizona Department of Child Safety; Darrel Palmer, in his individual capacity as a City of Mesa police officer; Edward Clifford, in his individual capacity as a City of Mesa police officer; Laurie Kessler, in her individual capacity as a City of Mesa police officer; Domenick Kaufman, in his individual capacity as a City of Mesa police officer; Lauren Glazer, in her individual capacity as a City of Mesa police officer; Molly Corfits, in her individual capacity as a City of Mesa police officer; and Rob Russo, in his individual capacity as a City of Mesa police officer, Defendants.

I was requested by the Arizona Attorney General's office to provide opinions about whether the State Defendants, Arizona Department of Child Safety (DCS) met the applicable standard of care regarding the initial investigation of Plaintiffs, including the joint investigation with Mesa Police, the roles and responsibilities of State defendants and Mesa Police during the joint investigation, and requiring T.A. to be medically examined following his return. Also, whether DCS met the standard of care when it substantiated the allegations of neglect against the parents after they were found not guilty in their criminal case. I was provided with documents regarding the case from the Arizona Attorney General's office.

The opinions expressed in this report have been formed based on the information provided to me thus far, my own experience, research and education. Should further information become available this could influence the opinions and it may be necessary to amend the report.

### Experience

I have been a social worker since 1985. My professional experience has been exclusively in the field of child welfare. Throughout my career, I have been directly involved investigating, managing and reviewed thousands of Child Protective Services cases, primarily for the purposes of evaluating policy, procedure and required practice compliance.

I began my professional career working for the Arizona Department of Economic Security, Division of Children Youth and Families, Child Protective Services in July

1

AZ-STATE 000826

1985. From 1985 to 1990, I was a direct practice case manager (CPS Specialist) with responsibility for conducting child welfare case management and investigation activities. From 1990 to 1995, I supervised direct practice case managers responsible for both investigation and ongoing case management activities.

In January 1995, I accepted a temporary appointment to work for the Deputy Director responsible for the Division of Children, Youth and Families where my primary role was to interpret and research policy related to the operations of Child Protective Services. In November 1995, I began working in a community non-profit agency supervising staff providing child abuse prevention services to families with a newborn child. In October 1997, I returned to state service at the Arizona Department of Economic Security where I remained until April 2011. During that time, I held a variety of administrative positions, each involving review of Child Protective Services cases and assessing compliance with policy and practice of Child Protective Services.

In May 2011, I began working for Arizona State University (ASU). My primary responsibilities at ASU were to manage child welfare projects. Including revising training for the state child welfare agency and child welfare community. I also consulted on child welfare related evaluation projects. From May 2011, to July 2014, I had oversight responsibility for managing the Arizona Citizen Review Panels. Citizen Review Panels are required by the Child Abuse Prevention and Treatment Act of states receiving federal funding through the Act. The panel members are community volunteers whose purpose is to review child welfare practice in the state. This was primarily through review of Child Protective Services cases.

I retired from state service in March 2018. Beginning in May 14, 2018, I began working as a consultant for ASU at the Center for Child Well Being. As of June 6, 2018, I have been working at the Family Involvement Center where I serve as the Director of Child Welfare Initiatives. At the Family Involvement Center my position is responsible for building and managing programs that support child welfare involved families.

I also continue to be involved in child welfare through my current appointments to the Morrison Institute Child Welfare Leadership Advisory Board, and the City of Phoenix Domestic Violence Review Board. I am also a current member of the Arizona Child Fatality Review Board and a member of the Family Involvement Center advisory board.

I have additional experience teaching social work classes to graduate students specializing in child welfare at Arizona State University. This includes a course on assessment and intervention of child welfare involved families when domestic violence, mental illness and substance abuse are a concern and another on the ecological model applied to child welfare families.

AZ-STATE 000827

I have previously provided testimony in one case in 2013, CV11-00046-Phx-Ros Demaree V. John Krause, Jennifer Hunter, Laura Pederson, Gretel Hopkins, Deborah Harper, Amy Van Ness and Robert Pegues, two cases in 2015 CV2013-005449 VanHorn Vs. State of Arizona and CV2013015102 Raggio Vs. State of Arizona and one case in 2016, 2:14-2548-JTM-KGG Naomi Boone v. TFI Family Services, Inc. and the State of Kansas; and three cases in 2018 17-00710-CV-W-GAF, A.G. by her next friend Tabetha Wilson vs. Great Circle, Inc, Case No: C 2016-000646 Jackson et al., v. State of Arizona et al and CV2015-010790 Arturo Lopez vs Child Protective Services, Veronica Telles and Alberto Robles.

**Records reviewed**

Interviews
>           Sergeant Bina
>           Officer Chopra
>           Christina Baggen
>           Gina Cordova
>           Detective Kessler
>           Adam Hellman
>           Alex Ramos
>           Melanie Ophiem
>           Detective Russo
>           Dr. Kathryn Coffman
>           Gina Cordova conversation w Talon Bentley

Plaintiffs' Rule 26(A)(1) First Supplemental Disclosure Statement
>           Photographs
>           Body Camera Footage
>           Interviews
>           Documents

Plaintiffs' Rule 26(A)(1) Second Supplemental Disclosure Statement Bates: Bentley 470-521
>           T.A.'s School Records
>           T.A.'s Multidisciplinary Evaluation Team
>           (MET) Report
>           T.A.'s Health Record
>           Brian Bentley's Account of the Incident
>           Janna Bentley's Account of the Incident
>           Stephanie Muir's Account of the Incident

Plaintiffs' Rule 26(A)(1) Third Supplemental Disclosure Statement Bentley 522-723
>           All responsive Facebook posts
>           All responsive Facebook messages
>           Emails responsive to the Court's 12/4/18 Order
>           Expenses incurred by the Bentley's

Transcription of previously disclosed Mesa/Bentley 000167 Audio Recording
Transcription of previously disclosed Bentley 427 Audio Recording
Updated contact information for individuals contacted by the Bentley's

State Defendants' Exhibits
State Defendants' Second Supplemental Disclosure Statement
Arizona Department of Child Safety Intake Summary (AZ-STATE 000001-000009)
Arizona Department of Child Safety Intake Summary - Police Version (AZ-STATE 000010-000014)
Arizona Department of Child Safety Case Notes (AZ-STATE 00015-00021)
Arizona Department of Child Safety Case Event (AZ-STATE 00022)
Arizona Department of Child Safety Assessments and Plans (AZ-STATE 00023-00029)
Arizona Department of Child Safety Case Build (AZ-STATE 00030-00058)
Arizona Department of Child Safety Comprehensive Child Safety and Risk Assessment (AZ-STATE 00059-00066)
Arizona Department of Child Safety Investigations (AZ-STATE 00067-00081)
Arizona Department of Child Safety Notes and Communications (AZ-STATE 00085-00087)
Arizona Department of Child Safety Notice of Duty to Inform (AZ-STATE 00088)
Arizona Department of Child Safety Correspondence (AZ-STATE 00089-00014)
City of Mesa Police incident Report (AZ-STATE 00090-000118)
Arizona Department of Child Safety fax to City of Mesa Police Department (AZ-STATE 000119-000121)
Map of the Bentley Residence located at 3045 East Inverness Avenue, Mesa, AZ 85204-7210
The Arizona Department of Child Safety Protective Services Review Team Supporting Documentation and Exhibits for Docket Number 18C-897291-DCS and 897291 A-DCS (AZ-STATE 000123-000232)
A partial transcript of proceedings from the Administrative Law Hearing Nos. 18c-897291-DCS and 18c-897291 A-DCS (consolidated) dated January 10, 2018 with the Arizona Department of Child Safety (AZ-STATE 000233-000264)
Plaintiffs' Second Amended Complaint (Doc. 59)

City of Mesa Defendants' Exhibits
Notice of Claim (Mesa/Bentley 000001-000010)
Amended Complaint (Mesa/Bentley 000011-000047)
Mesa Police DR 2016 0920181 *redacted* (Mesa/Bentley 000048-000086)
Mesa Police DR 2016 0920181 CAD History Inquiry Selection Detail *redacted* (Mesa/Bentley 000087-000103)
Mesa Police DR 2016 0920181Telephone and/or Radio Recording Authentication (Mesa/Bentley 000104)

4

Mesa Police DR 2016 0920181 Catalog Report (Mesa/Bentley 000125)
2016 0920181 a – Janna Bentley 911 call (Mesa/Bentley 000126) Mesa
Police DR 2016 0920181 b – Red Mountain (Mesa/Bentley 000126)
2016 0920181 c – PSAP (Mesa/Bentley 000127)
2016 0920181 d – Red Mountain Talk (Mesa/Bentley 000128)
2016 0920181 e – (Mesa/Bentley 000129)
2016 0920181 f – (Mesa/Bentley 000130)
2016 0920181 g – (Mesa/Bentley 000131)
2016 0920181 h – (Mesa/Bentley 000132)
2016 0920181 I – (Mesa/Bentley 000133)
2016 0920181 j – (Mesa/Bentley 000134)
2016 0920181 k – (Mesa/Bentley 000135)
MCSO CAD Event History – MC16075354 (Mesa/Bentley 000136-000138)
Video from AXON body camera 2016 0920181 1 (Mesa/Bentley 000139)
Video from AXON body camera 2016 0920181 2 (Mesa/Bentley 000140)
Video from AXON body camera 2016 0920181 3 (Mesa/Bentley 000141)
Video from AXON body camera 2016 0920181 4 (Mesa/Bentley 000142)
Video from AXON body camera 2016 0920181 5 (Mesa/Bentley 000143)
Video from AXON body camera 2016 0920181 6 (Mesa/Bentley 000144)
Video from AXON body camera 2016 0920181 7 (Mesa/Bentley 000145)
Video from AXON body camera 2016 0920181 8 (Mesa/Bentley 000146)
Video from AXON body camera 2016 0920181 9 (Mesa/Bentley 000147)
Video from AXON body camera 2016 0920181 10 (Mesa/Bentley 000148)
Video from AXON body camera 2016 0920181 11 (Mesa/Bentley 000149)
Video from AXON body camera 2016 0920181 12 (Mesa/Bentley 000150)
Video from AXON body camera 2016 0920181 13 (Mesa/Bentley 000151)
Video from AXON body camera 2016 0920181 14 (Mesa/Bentley 000152)
Video from AXON body camera 2016 0920181 15 (Mesa/Bentley 000153)
Video from AXON body camera 2016 0920181 16 (Mesa/Bentley 000154)
Video from AXON body camera 2016 0920181 17 (Mesa/Bentley 000155)
Video from AXON body camera 2016 0920181 18 (Mesa/Bentley 000156)
Video from AXON body camera 2016 0920181 19 (Mesa/Bentley 000157)
Video from AXON body camera 2016 0920181 20 (Mesa/Bentley 000158)
Video from AXON body camera 2016 0920181 21 (Mesa/Bentley 000159)
Video from AXON body camera 2016 0920181 22 (Mesa/Bentley 000160)
Video from AXON body camera 2016 0920181 23 (Mesa/Bentley 000161)
Video from AXON body camera 2016 0920181 24 (Mesa/Bentley 000162)
Audio of Lauren Glazer's interview of T.B. (Mesa/Bentley 000163)
Audio of MFAC lobby conversation on April 1, 2016
Records received in response to subpoena from Rural/Metro Corp.
*redacted* (Mesa/Bentley 000163)
Records received in response to subpoena from Melmed Center *redacted*
(Mesa/Bentley 000458-000469)
Records received in response to subpoena from Gilbert Pediatrics *redacted*
(Mesa/Bentley 000470-000482)
Records received in response to subpoena from Town of Gilbert Fire &

Rescue Department *redacted* (Mesa/Bentley 000483-000488)
Declaration for records received in response to subpoena from Town of
Gilbert Fire & Rescue (Mesa/Bentley 000489)
Verizon Wireless Response to subpoenas for cell phone records, providing no
records and explaining that Janna and Brian Bentley are not the account
owners/account holders (000490-000500)
Records received in response to subpoena from All Star Pediatrics *redacted*
(Mesa/Bentley 000501-000513)
Records received in response to subpoena from Banner Desert *redacted
(Mesa/Bentley 000514-000591)

Bentley 01139 - 01171 Evidence Review Analysis of Timothy Turner;
Plaintiffs' Rule 26(A)(l) Fifth Supplemental Disclosure Statement;
Deposition of Gina Cordova dated January 17, 2019;
Deposition of Laurie Kessler dated January 24, 2019;
Deposition of Domenick Kaufman dated January 29, 2019; and
Deposition of Robert Russo dated January 29, 2019.
Deposition of Christina Baggen dated March 6, 2019

DCS Policy and Procedure Manual
        Chapter 2 Section 3 Conducting Interviews effective February 12, 2016
        Chapter 2 Section 5 Substantiating Maltreatment effective February 21, 2014
Maricopa County Multi-Disciplinary Protocol for the Investigation of Child Abuse
Arizona Revised Statutes:
        § 8-821 retrieved from:  https://law.justia.com/codes/arizona/2016/title-
8/section-8-821/
        § 8-456 retrieved from:  https://law.justia.com/codes/arizona/2016/title-
8/section-8-456/
        § 8-811(F)(1) retrieved from:
        https://law.justia.com/codes/arizona/2016/title-8/section-8-811/
        § 8-201(25) retrieved from:
        https://law.justia.com/codes/arizona/2016/title-8/section-8-201/
        §8-451 (B) Retrieved from
        https://law.justia.com/codes/arizona/2016/title-8/section-8-451/
Arizona Administrative Code R-21-4-105

**Background**
On April 1, 2016 Brian and Janna Bentley were the parents of seven children ranging
in age from 9 months to 14 years.

The Arizona Department of Child Safety (DCS) became involved with this family on
April 1 2016, when Mesa Police Detective Laurie Kessler from the Mesa Family
Advocacy Center requested assistance from DCS specialist Christina Baggen to
respond to a call involving the Bentley's seven-year-old child, T.A. who had been
reported to the police that morning as missing since the night before. DCS Office of

Child Welfare Investigations (OCWI). Gina Cordova also responded to the home to assist as needed. (Deposition of Gina Cordova pages 35-38)

Detective Kessler and DCS Investigator Christina Baggen's responded to the family's home. When Detective Kessler and Mrs. Baggen's arrived, numerous people and agencies were inside and outside the Bentley's home assisting in the search. This included patrol officers, detectives, a police helicopter, family, friends church members and neighbors. While at the home, Mrs. Baggen's and Detective Kessler obtained information that there was a group home in the neighborhood that housed juvenile sex offenders. (Mesa/Bentley 000076)

While the police were searching for T.A., Mesa Police Detective Robert Russo was assigned to respond to the elementary school T.A. and two of his siblings attended and brought the two siblings to the Mesa Family Advocacy Center to be interviewed. In deposition testimony, Detective Russo reported it was most likely at the request of a supervisor that he took the 11 and 9-year old siblings to the Mesa Family Advocacy Center. (Russo Deposition of p. 38-39) Neither Mrs. Baggen or Mrs. Cordova were involved in the decision to bring the children to the advocacy center. (Deposition of Gina Cordova pages 65-66 & Deposition of Christina Baggen pages 80-81)

At just after 10:00 a.m. and shortly after Detective Kessler and Mrs. Baggen began interviewing Mrs. Bentley, T.A. was found by a neighbor hiding in a bush across the street from the juvenile group home. (AXON video 11 Bentley 000149 – 21:40-21:49) Mr. Bentley was the first to reach T.A. and pulled T.A. out of his hiding place. Once found, T.A. began fighting to get away from his father kicking his legs and squirming as he was carried by his father into the house. (AXON video 15 Bentley 000153) Mesa police officer Clifford asked Mr. Bentley if he wanted medics to check on T.A. because he had been out all night and he said he wanted them to come. (Mesa/Bentley 000058)

After T.A. was found, Mesa police requested that paramedics respond to evaluate T.A. Gilbert Fire & Rescue responded but were unable to evaluate T.A. due to T.A. being agitated.  Gilbert Fire recommended T.A. be transported to the hospital for a medical evaluation.  Initially the Bentley's did not agree with the need for transport to the hospital but after it was discussed that T.A. would be taken into temporary custody in order to be evaluated they eventually agreed.  (Mesa/Bentley 000483)

While the discussion about the medical exam was taking place, Ms. Cordova sat with T.A. in his bedroom.  (Bentley 457 Gina Cordova conversation with T.A.) Mrs. Bentley rode in the ambulance with T.A. to the hospital where he was examined. Before Detective Kessler left the Bentley's home Mr. Bentley agreed to bring his older children to the Mesa Family Advocacy Center so they could be interviewed. (Mesa/Bentley 000077)

After T.A. was examined at the hospital and discharged, he and Mrs. Bentley were taken to the Mesa Family Advocacy Center (MFAC) by a Mesa Police Officer (AXON video 1 Mesa/Bentley 000139) where it was expected they would meet Mr. Bentley. Mrs. Bentley's attorney, Mike Schern met Mrs. Bentley at the Mesa Family Advocacy center. Upon their arrival Detective Kessler and Sergeant Bina met with Mrs. Bentley and her attorney and discussed having T.A. participate in a forensic interview. Detective Kessler explained that the interview was standard protocol. She stated her primary concern was to make sure nothing had happened to T.A. due to the close proximity of the juvenile sex offender group home to where T.A. had been found. She also explained that during an investigation they talk to everybody in the house. (Bentley 562 – Bentley 563) Before Mrs. Bentley answered Mr. Schern asked if they were free to go and after some discussion about the concerns Sergeant Bina responded that T.A. was not free to go. Sergeant Bina then reported T.A. was in the custody of the state. When asked on whose authority, Detective Kessler suggested they include DCS in the discussion. (Bentley 563- Bentley 566).

While waiting for Mrs. Baggen, Sergeant Bina asked whether the other children were at the Advocacy Center. Mr. Schern responded that they were not. (Bentley 572) When Mrs. Baggen's joined the discussion she explained her supervisor stated T.A. needed to be interviewed. She stated if they wanted to leave they could, along with the other children, but T.A. could not until he was interviewed. (Bentley 576 - Bentley 577) It appears Mrs. Bentley then agreed to the interview (Mesa Bentley 000063). Prior to completing the interview Ms. Baggen provided Ms. Bentley with a Notice of Duty to Inform. Following T.A.s interview Mrs. Bentley and the children left the center. Ms. Baggen's went to the home where she observed one of the older children. (AZ-STATE000088)

On April 20, 2016 the allegation of neglect of T.A. by Brian and Janna Bentley was proposed for substantiation and entered into the case record. After review and approval from the supervisor, (AZSTATE000073) the record was turned over to the Protective Services Response Team to make the determination about the findings. (AZSTATE000022) The DCS case was closed on April 21, 2016. (AZSTATE000022)

On June 1, 2016 the Mesa police submitted misdemeanor neglect charges against the Bentleys and the City Prosecutor filed the charges. (Mesa/Bentley 000079, Mesa/Bentley 000081 & Mesa/Bentley 000083)

On August 9, 2017 after a trial, the Bentley's were found not guilty. (AZSTATE 000184 & AZSTATE 000185)

**Opinion**

1. It is my opinion the DCS defendants met the standard of care in completing the investigation of this report as required by state law, DCS policy and practice and was consistent with their training.

2. It is my opinion Mrs. Cordova had no official role in the investigation and made no decisions involving the actions taken by DCS. It appears Mrs. Cordova's role was limited to observing T.A with Mr. Bentley in the bathroom and sitting with T.A. after Mr. Bentley left him in his bedroom.
3. It is my opinion that both the medical exam and interview of T.A. was necessary in order to complete a thorough investigation.
4. It is my opinion the Bentley's agreed to both the medical exam but had they not, probable cause existed to take T.A. into DCS custody to determine if T.A. was suffering from a serious physical injury or condition.

**Discussion:**

Arizona Revised Statute found in A.R.S. §8-456 (C)(1) requires DCS to "Make a prompt and thorough investigation. An investigation must evaluate and determine the nature, extent and cause of any condition created by the parents, guardian or custodian or an adult member of the victim's household that would tend to support or refute the allegation that the child is a victim of abuse or neglect and determine the name, age and condition of other children in the home. If an investigator has sufficient information to determine that the child is not a victim of abuse or neglect, the investigator may close the investigation."
(https://law.justia.com/codes/arizona/2016/title-8/section-8-456/

The purpose of the department is provided for in A.R.S. §8-451 that states in (B) "The primary purpose of the department is to protect children."

Consistent with these statutes, DCS policy contained in Chapter 2: Section 3 "When conducting an investigation, the Department shall gather relevant and sufficient information to determine:
- The name, age, location, and current physical and mental condition of all children in the home of the alleged victim;
- The nature, extent and cause of any condition created by the parents, guardians, custodian, or adult member of household that would support or refute the allegation that the child is a victim of abuse or neglect; and
- Whether any child in the home is at risk of abuse or neglect in the future."

Based on the DCS policy and state law, DCS's responsibility was to gather the relevant and sufficient information during the investigation to make the required determinations.

In this case, the DCS child abuse hotline received a report at 9:38 a.m. on April 1, 2016 alleging neglect of T.A. by Mr. and Mrs. Bentley. The report information indicated T.A. was missing and had not been seen since 9:15 p.m. on March 31, 2016. Although aware T.A. was missing the police were not contacted until 8:00 a.m. on April 1, 2016. At the time the report was made, T.A. had not been located. The reporter indicated there was concern because the mother and father waited so long to call the police. (AZ-STATE-000004)

DCS investigator Christina Baggen responded to the home with Mesa Police Detective Laurie Kessler. DCS practice is to investigate allegations that are or may be identified as criminal conduct (if true would result in criminal charges being filed). DCS investigators are co-located with police in facilities such as the Mesa Family Advocacy Center to encourage joint investigations in these situations. Joint investigations are a partnership with law enforcement requiring clear role delineation. The roles and responsibilities for law enforcement and DCS investigators are delineated in the Multi-disciplinary Protocol for the Investigation of Child Abuse.

The statement of purpose for the protocol indicates the protocol was developed to, "coordinate the involvement and interaction of each agency in Maricopa County involved with providing care, treatment, and assistance to all children, whether victims or witnesses, where criminal conduct is suspected. This Protocol serves to ensure each child is treated with dignity, fairness, and respect and protected from harassment, intimidation, or abuse, and to minimize the secondary trauma that can accompany investigations of criminal conduct." The protocol identifies the role of law enforcement to coordinate the response. (Maricopa County Multi-Disciplinary Protocol for the Investigation of Child Abuse page not numbered) Consistent with Ms. Baggen's deposition testimony, DCS's practice is to follow the lead of law enforcement so as not to impede the law enforcement investigation. (Deposition of Christina Baggen pages 59-60)

This was in no way a typical investigation in that DCS is not usually involved in an active missing child search. There were many people at the home and an active intense effort to find T.A. Once T.A. had been found, Gilbert Fire was also called to the home.

When the family was resistant to having T.A. medically examined Mrs. Baggen's contacted her supervisor and was advised to take T.A. into temporary custody so that he could be evaluated. This however, did not occur as Mrs. Bentley eventually agreed to the transport and medical evaluation. (AXON video 11 Bentley 000149 – 28:59-29:28). Gilbert Fire indicated the medical evaluation was necessary in order to determine T.A.'s physical and mental condition. (Interview with Alex Ramos)

Although the Temporary Custody Notice was not served, had it been this would have been consistent with DCS policy and state law[1] which allow DCS or the police

---

[1] 8-821. Taking into temporary custody; medical examination; placement; interference; violation; classification

A.  A child shall be taken into temporary custody in proceedings to declare a child a temporary ward of the court to protect the child, pursuant to an order of the juvenile court on a petition by an interested person, a peace officer or a child safety worker under oath that reasonable grounds exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect. If a child is taken into temporary custody pursuant to this section, the child's sibling shall also be taken into temporary custody only if reasonable grounds independently exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect.

AZ-STATE 000835

to take a child into temporary custody for up to twelve hours in order to obtain a medical evaluation because, "probable cause exists to believe that the child is ... suffering serious physical or emotional injury that can only be diagnosed by a medical doctor or psychologist." To determine if a child should be taken into temporary custody, "the interested person, peace officer, child welfare investigator or child safety worker shall take into consideration: As a paramount concern the child's health and safety."

(A.R.S.§ 8-821 retrieved from: https://law.justia.com/codes/arizona/2016/title-8/section-8-821/)

In this case there was probable cause to believe a medical examination was required to determine if T.A. was suffering from a serious physical injury or condition based on the recommendation of Gilbert Fire and also because T.A. had been out of the home overnight and there was no way to determine if he had suffered any kind of injury, had been harmed in any way or had his health impacted by being out in the cold. This conclusion is supported by the statements of Gilbert Fire paramedic, Alex Ramos who said in his defense interview, "The parents were advised that the pt.[*sic*] (T.A.) should be transported to the hospital to be examined and looked at by a doctor. They asked us if we were seeing something physically wrong with him and we advised them that we could not do a detailed assessment, and that it was in the best interest of the pt. [*sic*] (T.A.) to be looked at by a doctor. The pt. [*sic*] (T.A.) mom and dad at that point said that they did not want the pt. [*sic*](T.A.) transported to the hospital and that they would call a family doctor, that was a friend of theirs to look

---

B.  A child may be taken into temporary custody by a peace officer, a child welfare investigator or a child safety worker if temporary custody is clearly necessary to protect the child because probable cause exists to believe that the child is either:
   1.  A victim or will imminently become a victim of abuse or neglect.
   2.  Suffering serious physical or emotional injury that can only be diagnosed by a medical doctor or psychologist.
   3.  Physically injured as a result of living on premises where dangerous drugs or narcotic drugs are being manufactured. For the purposes of this paragraph, " dangerous drugs" and " narcotic drugs" have the same meanings prescribed in section 13-3401.
   4.  Reported by the department to be a missing child at risk of serious harm.
C.  In determining if a child should be taken into temporary custody, the interested person, peace officer, child welfare investigator or child safety worker shall take into consideration:
   1.  As a paramount concern the child's health and safety.
   2.  Whether the parent is willing to participate in any services that are offered to the parent.
D.  A person who takes a child into custody pursuant to subsection B, paragraph 2 of this section shall immediately have the child examined by a medical doctor or psychologist. After the examination the person shall release the child to the custody of the parent or guardian of the child unless the examination reveals abuse or neglect. Temporary custody of a child taken into custody pursuant to subsection B, paragraph 2 of this section shall not exceed twelve hours.
E.  A child who is taken into temporary custody pursuant to this article shall not be detained in a police station, jail or lockup where adults charged with or convicted of a crime are detained.
F.  A child shall not remain in temporary custody for more than seventy-two hours excluding Saturdays, Sundays and holidays unless a dependency petition is filed.
G.  A person who knowingly interferes with the taking of a child into temporary custody under this section is guilty of a class 2 misdemeanor.

at the pt. [*sic*] (T.A.)" Mr. Ramos also stated that he would have classified the parent's refusal as a high-risk refusal because of how long T.A. had been missing, they could not talk to T.A, because he was so agitated, there could have been injuries they could not see and there were too many unknowns. He would have called the hospital for advice. (Interview with Alex Ramos). (253  Mesa/Bentley 000483)

Once advised T.A. should be transported to the hospital for a medical exam Ms. Baggen could not leave without taking some action to ensure T.A.'s safety.

The interview with T.A. was required in order to determine the nature, extent and cause of any condition created by the parents, that would support or refute the allegation T.A was a victim of abuse or neglect.

DCS policy found in Chapter 2: Section 3 requires that, "Unless case specific circumstances indicate otherwise, the Department shall conduct in-person interviews with the following individuals:
- The reporting source (this may be conducted by phone and not in-person);
- The identified child victim;
- Any child living in the home where the alleged abuse or neglect occurred;
- The alleged perpetrator(s);
- The custodial parent, guardian, custodian; and..."

In this case, law enforcement was the reporting source. T.A. was the identified child victim. The investigation was being conducted jointly with law enforcement and law enforcement wanted T.A. to be interviewed.  Although T.A. had been cleared medically, it was still unknown if anything happened to him that caused him to run away and hide or happened to him while he had been missing.  His behavior upon being found was noted by Mrs. Baggen's and numerous law enforcement officers as being unexpected and the cause of his behavior was also unknown.   (Deposition of Christina Baggen, page 93, Mesa/Bentley 000053, Mesa/Bentley 000057, Mesa/Bentley 000058- Mesa/Bentley 000059, Mesa/Bentley 000067, & Mesa/Bentley 000077) One officer noted T.A. calmed down almost as soon as Mr. Bentley left the room. (Mesa/Bentley 000059) Mrs. Baggen's testified in her deposition that she was aware of the behavior change and she felt T.A. needed to be interviewed to find out what was going on. (Deposition of Christina Baggen, page 93) Additionally, T.A. had been found in close proximity to a home that housed juvenile offenders including children who had committed sexual offenses.

Ms. Bentley was provided with a Notice of Duty to Inform, which provided Ms. Bentley with the information that, "DCS has no legal authority to compel or make you cooperate with the investigation... but it is our hope that by working together we can find solutions to ensure that your child (or children) is safe..." The Notice of Duty to Inform was a was signed by Mr. Schern her attorney prior to the interview taking place.  (AZ-STATE000088)Mrs. Bentley agreed to the interview when she and her attorney were advised T.A. would be released after the interview. (BENTLEY578)

Although DCS policy is to interview each of the children in the home, this was not done in this case. The Bentley's did not want the investigator to speak to the older children. The policy allows for exceptions when circumstances of the case indicate otherwise. In this case it was reasonable for the investigator to respect the Bentley's wishes related to those interviews as sufficient information had been gathered to determine whether abuse or neglect had occurred and whether any child in the home was at risk of abuse or neglect in the future. A DCS supervisor agreed that the information gathered was sufficient and approved the case for closure. (AZ-STATE000066)

**Opinion**

5. It is my opinion the DCS defendant's gathered sufficient information to make a determination that T.A. had been neglected and met the standard of care in proposing the allegation be substantiated.

**Discussion:**

A.R.S. § 8-201(25) provides the definition of neglect:

" Neglect" or " neglected" means:
(a) The inability or unwillingness of a parent, guardian or custodian of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare..."

Based on my review of this case the Bentley's failed to provide T.A. with supervision, clothing and shelter when they were unable to find him and did not contact the police for assistance. Knowing he was missing, the Bentley's ceded their search and either went to sleep or fell asleep, leaving T.A. at unreasonable risk of harm. When Mrs. Bentley finally did call for help T.A. had not been seen in almost 11 hours and had been known to be missing for over 10 hours. That alone placed T.A at an unreasonable risk of harm to his health and welfare especially when the additional circumstances are considered:

- Mrs. Bentley told her husband she didn't think T.A. was in the house (Bentley 509)
- Mrs. Bentley reported to the police that she was aware there was a group home for juveniles that housed children who had committed sex offenses and Mrs. Bentley had gone to the home that morning. (Mesa/Bentley 000053, Mesa/Bentley 000056, Mesa/Bentley 000057)
- Mr. and Mrs. Bentley, "had identified the group home as an "off-limits" home to the Bentley children" (Evidence Review & Analysis of Timothy Turner)

- Mr. and Mrs. Bentley were aware T.A. had recently crossed Baseline Rd (a busy intersection) by himself a week earlier and was empowered. They realized their scope of where they look was now bigger. Mrs. Bentley reported people had died crossing at that location. She also stated that that was why she had gone to the church (AXON body camera 2016 0920181 24 at approximately 6 minutes 25 seconds to 7 minutes 5 seconds and again at 7 minutes 25 seconds to 7 minutes 35 seconds Mesa/Bentley 000162) Had T.A. crossed Baseline that night it would have been in the dark.
- Mrs. Bentley reported T.A. recently reported he would run away (AXON body camera 2016 0920181 24 at approximately 4 minutes 17 seconds to 4 minutes 35 seconds Mesa/Bentley 000162)
- Mr. and Mrs. Bentley were aware there had been current irrigation and standing water in their yard and in the neighborhood
- Mrs. Bentley reported seeing a strange man in the neighborhood the night prior when she was looking for T.A. and had watched him until he left. (AXON body camera 2016 0920181 24 at approximately 1 minute 30 seconds to 1 minutes 40 seconds Mesa/Bentley 000162)
- Mr. and Mrs. Bentley should have been aware, there was a canal with water in it that T.A. could have fallen into.
- Mrs. Bentley acknowledged that the decision not to call the police had been reckless. (AXON body camera 2016 0920181 10 at approximately 9 minutes 35 seconds Mesa/Bentley 000148)

**Opinion**

6. It is my opinion the Protective Services Review Team met the standard of care in following the process to substantiate the allegation as required by state law, DCS policy and practice and was consistent with their training.

**Discussion:**

On April 20, 2016 Mrs. Baggen sent a letter to the Bentley's notifying them that the DCS investigation was closed and the allegations would be proposed for substantiation. The letter advised the Bentley's they would receive notice from the Protective Services Review team about the appeal process (AZ-STATE000089)

On April 20, 2016 the allegations of neglect were proposed for substantiation and entered into the case record. After review and approval from the supervisor, (AZSTATE000073) the record was turned over to the Protective Services Response Team PSRT) to make the determination about the findings. (AZSTATE000022) The DCS case was closed on April 21, 2016. (AZSTATE000022)

On June 20, 2017 DCS PSRT Specialist Shea Flores sent individual letters to both Mr. and Mrs. Bentley notifying them of the Department's intent to substantiate the allegation of neglect and place them on the Central Registry. Their right to appeal was explained in the letter. (AZSTATE000193- AZSTATE000194 &

AZSTATE000199) AZSTATE000200)

As was their right, after being notified of the proposed substantiation finding both Mr. and Mrs. Bentley requested to appeal the finding. (AZ-STATE000205 & AZ-STATE000206)

On July 17, 2017, DCS PSRT Specialist Paula Cargill sent individual letters to both Mr. and Mrs. Bentley informing them pursuant to state statute, § ARS 8-811(F)(1) they were not entitled to a hearing at that time because they were involved in another legal action involving the same allegations. They were advised that at the conclusion of that hearing their request for a hearing to appeal the allegations would be reconsidered at that time. (AZ-STATE 000195 & AZ-STATE 000201)

On August 10, 2017 the Bentley's attorney sent a letter to PSRT Specialist Paula Cargill to provide the not guilty findings from the criminal trial in Mesa and to request that DCS reverse its findings and decision to place the Bentley's on the CPS Central Registry. (AZ-STATE 000210)

On August 16, 2017 Mrs. Cargill sent a letter to Mr. Bentley advising him that his request for a hearing had found him eligible for a hearing. He was advised the Protective Services Review Team would review the DCS investigation and any information he provided. The letter also explained that if the decision was made that the finding should be entered into the Central Registry a hearing would be set. (AZ-STATE 000197)

On August 21, 2017 Mrs. Cargill sent a similar letter was sent to Mrs. Bentley (AZ-STATE000203)

On November 16, 2017 the Bentley's were advised that a hearing had been scheduled for January 10, 2018 (AZ-STATE000224 & AZ-STATE000225)

While there is a concern that DCS continued their effort to substantiate the neglect allegations even after the criminal case was resolved, state law, § ARS 8-811(F)(1) and DCS policy contained in Chapter 2: Section 5 governs the process for substantiating allegations of neglect and entering substantiated findings on the Central Registry. This includes notifying the alleged perpetrator of the intent to substantiate the allegations and their right to appeal.

Although the allegations were addressed in a criminal case the burden of proof in the criminal case was a higher standard (beyond a reasonable doubt) than what is required to substantiate neglect in a DCS case. Arizona Administrative Code R-21-4-105 identifies that the burden of proof for substantiating abuse or neglect is probable cause.[2] DCS policy defines probable cause for substantiating maltreatment

---

[2] R21-4-105. Investigation Findings; Required Documentation

as meaning "the information gathered during the investigation would lead a reasonable person to believe that an incident of abuse or neglect occurred, and that the abuse or neglect was committed by the parent, guardian or custodian." (Chapter 2: Section 5)

It is my understanding after the hearing concluded the allegations were unsubstantiated.  Regardless of the outcome of that hearing, DCS had a policy and procedure to follow and in this case did so, as they would in any other case, therefore meeting the standard of care.

*Karin Kline*

---

A. After completing an investigation, the DCS Investigator or Child Safety Specialist shall propose substantiation if there is probable cause to believe a child was abused or neglected or, if not, shall unsubstantiate the allegation.

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Brian L. Bentley, et al.,           )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 ) No. 2:17-cv-00966-DJH
                                    )
City of Mesa, et al.,               )
                                    )
            Defendants.             )
                                    )


DEPOSITION OF ROBERT RUSSO


Mesa, Arizona
January 29, 2019
1:41 p.m.


REPORTED BY:
MARISA L. MONTINI, RPR
Certified Reporter
Certificate Number 50176

PREPARED FOR:
ASCII/COPY

(Certified Copy)

1   the time 10:40.  And you testified earlier that you would

2   have arrived at the school before 10:13 inasmuch as the

3   child was located at 10:13 and you found out about it

4   afterwards.  If you had arrived at the school sometime

5   prior to 10:13, what were you doing at the school for

6   those 30 minutes or so between the time you arrived and

7   the time that this document was signed?

8       A.   What happened was I was given direction.  I went

9   to the school with Ms. Glazer.  Upon arrival and our way

10  into the school, the traffic came out that they were

11  found.  Once they were found, I -- we left without

12  speaking to staff at all and were on our way back to the

13  MFAC when I was given direction via radio or phone call

14  that I needed to go back and get the kids.

15      Q.   Okay.  Who gave you that direction?

16      A.   I don't know.

17      Q.   You're not going to take direction from some

18  patrol officer; right?

19      A.   No.

20      Q.   Who would have you taken direction from that day?

21           MR. STOUTNER:  Form.

22           THE WITNESS:  The case agent, any

23  supervisor, and I mean any supervisor, patrol or

24  otherwise, and I could have taken -- I mean, I could have

25  taken direction from another SVU detective that was close

39

1  to the case.  It's not to suggest that I did, but I would

2  have.

3  BY MR. SCHERN:

4      Q.   Understood.  To be clear, though, the direction

5  would have come to you, correct, and not to Lauren Glazer

6  who then would have said to you, hey, we need to go back

7  and get the kids?

8      A.   To me.

9      Q.   It would have come to you?

10     A.   Yeah.

11     Q.   And in your interview with Mr. Tait, you said

12 that you weren't exactly sure who gave you direction to go

13 get the kids, but that question wasn't specific as to the

14 direction in the morning or the subsequent direction that

15 was given to you, and in response to that question,

16 Mr. Tait asked you who sent you to get the kids.  Your

17 response was probably would have been Kessler or Bina.

18 Kaufman says that the direction in the morning came from

19 him.  Is it -- can you rule out Kaufman giving you the

20 direction to go back?

21     A.   No.

22          MR. STOUTNER:  Form.

23 BY MR. SCHERN:

24     Q.   Could have been Bina; correct?

25     A.   Correct.