Duncan J. Stoutner (No. 020699)
CITY OF MESA ATTORNEY'S OFFICE
MS-1077, P.O. Box 1466
Mesa, Arizona 85211-1466
Telephone: (480) 644-2343
mesacityattorney@mesaaz.gov

Kathleen L. Wieneke (No. 011139)
Christina Retts (No. 023798)
WIENEKE LAW GROUP, PLC
1095 West Rio Salado Parkway, Suite 209
Tempe, Arizona 85281
Telephone: (602) 715-1868
Facsimile: (602) 455-1109
kwieneke@wienekelawgroup.com
cretts@wienekelawgroup.com

Attorneys for City Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian L. Bentley, et al.,<br><br>　　　　　　　Plaintiffs,<br><br>vs.<br><br>City of Mesa, et al.,<br><br>　　　　　　　Defendants. | Case No. 2:17-cv-00966-DJH<br><br>**CITY DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>(Honorable David G. Campbell) |

The City of Mesa and individually named police officers Bina, Kessler, Kaufman, Russo, Clifford, Palmer, and Glazer (collectively "City Defendants"), pursuant to Local Rule of Civil Procedure 56.1(b), respectfully submit the following Separate Statements of Fact to support their Cross Motion for Summary Judgment.

**CITY DEFENDANTS' SEPARATE STATEMENT OF FACTS**

The City of Mesa and individually named police officers Bina, Kessler, Kaufman, Russo, Clifford, Palmer, and Glazer (collectively "City Defendants") submit this Statement of Facts in support of their Motion for Summary Judgment.

**Facts Regarding the 911 Call for Help**

1. In March of 2016, seven-year-old T.A. was one of several children born to Janna and Brian Bentley living at 3045 E. Inverness in Mesa, Arizona. *See* Second Amended Complaint, ¶¶ 5,6.

2. The Bentley residence was located in a residential neighborhood bounded on the east by 32nd Street, to the south Baseline Road, to the north the U.S 60 Superstition Freeway, and to the west a canal. *See* Ex. 2, Bentley 385-386. On March 31, 2016, water from irrigation was still pooled in the neighborhood yards. *Id.* The overnight temperature in the area dropped to 50 degrees or slightly below. Ex. 20, ¶ 13.

3. A residential group home for sex offenders was located at 1820 South Los Alamos, two houses to the west of the Bentley home. The Bentleys were aware of the presence of the group home before T.A. went missing and had warned their children to stay away from the home because of the dangers associated with it, including drug and criminal activity. Ex. 5, Janna Bentley Depo at 132-134; Ex. 7, Brian Bentley Depo at 76; Ex. 16, Palmer Dec. ¶¶ 10-11; Ex. 17, Rudolph Dec. ¶¶ 8-12.

4. As of March 2016, T.A. had not been diagnosed by any medical care provider with Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiance Disorder (ODD), or any medical or mental condition which would qualify him as special needs. Ex 5, Janna Bentley Depo at 72-73.

5. At approximately 8:00 a.m. on April 1, 2016, Plaintiff Janna Bentley called 911 to report her seven-year-old son missing and ask for police assistance in locating him. Ex. 31, CAD

History Printout. In the 911 call, Mrs. Bentley provided information about what T.A. was wearing, and explained to the 911 operator that T.A. had no mental or physical impairments. *Id.*

### The Search

6. Mesa Police responded to the Bentleys' 911 call for help to find their son. At approximately 8:18 a.m., Mesa Police Officer Jackson and Sergeant Walters arrived and spoke with Mrs. Bentley outside of her home. Ex. 15, Walters Dec. ¶¶ 1-8.

7. Sergeant Walters learned the following from Mrs. Bentley:

   a. That the child did not want to do his chores and had been missing since approximately 9:15 p.m. last night; that Mrs. Bentley saw the child was not in his bed at 10:15 p.m.; that he was last seen outside hiding at that time. Ex. 1, Axon 24 at :33-1:16; Ex. 15, Walters Dec. ¶ 9.

   b. That she and her family searched inside, searched her yard and searched neighbors' yards until approximately 2:00 or 2:30 a.m. Ex. 1, Axon 24 at 1:16-1:19; Ex. 15, Walters Dec. ¶ 10.

   c. That the child's pillow and blanket were missing. Ex. 15, Walters Dec. ¶ 11.

   d. That they searched and then stopped looking; that the neighbors immediately next door to the east looked in their house and did not find him; that her husband got home at 2:00 a.m.; that when they woke up they searched some more. Ex. 1, Axon 24 at 1:54-2:06; Axon 24 at 5:04 – 5:24; Ex. 15, Walters Dec. ¶¶ 12,16.

   e. That last week, the child told his mother he would run away. Ex. 1, Axon 24 at 4:15-4:41; Ex. 15, Walters Dec. ¶ 14.

   f. In response to every question any officer asked about whether T.A had any mental or mental diagnosis, Mrs. Bentley said no. Ex. 5, Janna Bentley Depo at 73.; Ex. 1, Axon 24 at 4:43-5:04; Ex. 15, Walters Dec. ¶ 15.

    g. That he had just crossed Baseline alone and without permission. Ex. 1, Axon 24 at 6:02-7:05; Ex. 15, Walters Dec. ¶ 17.

    h. That police officers could enter her home. Ex. 1, Axon 24 at 7:08-7:20; Ex. 15, Walters Dec. ¶ 18.

  8. Mr. Bentley advised that it was possible that the missing child could be at places the child was familiar with, such as their church, which was located across Baseline Road, down 32nd Street, or at Harmony Park, which was across the US 60 freeway from the home. Ex. 1, Axon 22 at 3:30-4:00.

  9. Mesa police officers searched inside the Bentley home, in the Bentleys' neighborhood, a canal immediately west of the neighborhood, Baseline Road to the south, a park and business districts to the east, and the U.S. 60 freeway to the north. Responding officers also knew and understood the presence of the group home for juvenile sex offenders and the significance of its proximity to the Bentley residence. Ex. 19, Kessler Dec. ¶¶ 9, 14; Ex. 16, Palmer Dec. ¶¶ 10-11; Ex. 17, Rudolph Dec. ¶¶ 8-12.

  10. Sergeant Walters contacted the Mesa Family Advocacy Center ("MFAC"), and, during a telephonic briefing, provided Sergeant Kaufman, Sergeant Bina, and Detective Kessler, with the information he learned from Mrs. Bentley:

- The child did not want to do his chores and had been missing since approximately 9:15 pm last night;
- That he was last seen outside hiding at that time;
- That at 10:20 pm the mother realized he was not in bed;
- That she and her family searched inside, searched her yard and searched neighbors' yards until approximately 2:00 or 2:30 a.m.;
- That she confirmed last night that the neighbors' immediately next door to the east looked in their house and did not find him;

- That her husband, Mr. Bentley, came home from work at about 2 a.m.;
- That they searched some more and then stopped;
- That when they woke up, they searched some more and then called the police;
- That he recently crossed Baseline alone and without permission;
- That last week he told his mother that he would run away;
- That Sergeant Walters believed it was unusual that Mrs. Bentley was so calm.

Ex. 15, Walters Dec. ¶¶ 7- 21; Ex. 19, Kessler Dec. ¶¶ 5-6; Ex. 20, Bina ¶¶ 9-10.

11. Sergeant Kaufman designated the investigation a missing persons investigation and a suspicious circumstances investigation, and he assigned Detectives from the MFAC's Special Victims Unit to investigate. Ex. 21, Kaufman Dec. ¶ 9.

12. Detective Kessler and Cristina Baggen of the State of Arizona Department of Child Service ("DCS") went to the Bentley home, as did Sergeant Kaufman and Sergeant Bina. Ex. 19, Kessler Dec. ¶¶ 7-8.

13. When MFAC Detective Kessler arrived at the scene, she learned from a briefing outside the home of the existence of the residential group home for juveniles. Ex. 19, Kessler Dec. ¶ 14.

14. After talking with Mesa P.D. Officers on scene, Detective Kessler and Ms. Baggen introduced themselves to Mrs. Bentley, who was inside the Bentley home. Just as they sat down in the Bentley's living room, at approximately 10:15 a.m., Detective Kessler heard that someone may have spotted T.A. Ex. 19, Kessler Dec. ¶ 15.

**T.A. is Found and Need for Medical Evaluation**

15. Detective Kessler hurried outside to see that T.A. was in bushes in the back yard of the home immediately west of the Bentley home. Mr. Bentley grabbed his son and picked him up. Ex. 19, Kessler Dec. ¶ 16, Brian Bentley Depo at 53:2-9.

16. Detective Kessler saw that T.A. looked upset and was pushing away from his father, Mr. Bentley. Video showing Mr. Bentley carrying his son from the neighbor's yard to his home shows the child's legs askew and him resisting his father's hold. *See* Ex. 1, Axon 15. Mr. Bentley admits his son was "wiggly" and that there was resistance to his hold on him. Ex. 7, Brian Bentley Depo at 53:4-19; Ex. 19, Kessler Dec. ¶¶ 16-17; Ex. 18, Clifford Dec. ¶ 10.

17. Mr. Bentley carried T.A. to the neighbor's driveway area. T.A. remained agitated and was non-responsive to questions, simply grunting. Ex. 1, Axon 15; Ex. 16, Palmer Dec. ¶¶ 14-17; Ex. 18, Clifford Dec. ¶¶ 10-12.

18. Mesa Police Officers Clifford, Palmer, and Detective Kessler observed Mr. Bentley's interaction with his son and watched T.A. struggle to get free of his father's grasp and became concerned that there was something wrong. Ex. 18, Clifford Dec. ¶¶ 10-12, 5-27; Ex. 16, Palmer Dec., ¶ 17, 5-22; Ex. 19, Kessler Dec., ¶¶ 16, 6-24. Believing something was wrong with the child, Officer Clifford asked Mr. Bentley if he wanted the medics to come check out the child since he had been out outside all night and Mr. Bentley said "that was fine." Ex. 18, Clifford Dec. ¶¶ 10-17; Ex. 8, Brian's Journal Account at Bentley 510 - 511.

19. Mr. Bentley continued inside, carrying T.A., and Mesa P.D. Officers Palmer and Clifford entered the home, believing there was something wrong with the child. Ex. 8, Brian's Journal Account at Bentley 510 – 511; Ex. 16, Palmer Dec. ¶¶ 17-22; Ex. 18, Clifford Dec. ¶¶ 10-17.

20. Once inside, Mr. Bentley started to take T.A. inside a bathroom in the house when he heard one of the Mesa P.D. Officers explain that paramedics were on the way. Id. at ¶¶ 13-14; *see* Ex. 8, Brian's Journal Account at Bentley 510 – 511; Ex. 16, Palmer Dec. ¶¶ 20-22; Ex. 18, Clifford Dec. ¶¶ 15-17.

21. Mr. Bentley responded to the Mesa P.D. Officer by saying "that was fine and that we'd be waiting in the bathroom." Ex. 8, Brian's Journal Account at Bentley 511.

22. Paramedics from the Town of Gilbert Fire & Rescue Department arrived and attempted to evaluate T.A. while he was located inside the home's bathroom with Mr. Bentley. The paramedics were unable to perform the medical assessment of T.A. in the bathroom, including take a blood pressure, assess pulse ox, use a stethoscope, lift up his shirt to observe bruises or marks, or even take his temperature. Ex. 7, Brian Bentley Depo at 51-52; 61-63; Ex. 10, Ramos Dec.

23. The entire time the paramedics were at the Bentley home, the paramedics had no physical contact with T.A. Ex. 7, Brian Bentley Depo at 62.

24. While in the bathroom, Mr. Bentley held T.A. in a bear hug position with his face and body obscured from view, except when T.A. was standing in the bathtub clawing upward, with his face towards the back wall. Ex. 7, Brian Bentley Depo at 63; Ex. 32, photo; Ex. 1, Axon 11 at 1:00-1:30. T.A.'s clothing remained on the entire time so that medical personnel on scene could not observe any potential marks underneath his clothing. *Id.*

25. After holding T.A. in his lap in the bathroom in the bear hug position, Mr. Bentley took a towel and placed it over T.A., completely hiding him from view. Ex. 1, Axon 11 at 10:00-10:30.

26. Approximately three minutes after covering T.A.'s body with a towel in the bathroom, Mr. Bentley removed T.A. from the bathroom and took T.A to a darkened bedroom, placed him in a lower bunkbed and covered him completely with a blanket, once again hiding him completely from view. Ex. 1, Axon 11 at 13:16-13:38.

27. In an attempt to explain T.A.'s behavior, Gilbert Fire Paramedic Alex Ramos asked Mrs. Bentley whether T.A. had any pre-existing diagnoses or conditions, and learned he had none, and was not on any medications. Ex. 9, Ramos Dec. ¶ 9.

28. Paramedic Ramos asked Mr. Bentley if this was normal behavior for T.A and learned it was not: and then reached his own conclusion, based on his training and experience,

that T.A. was not acting normal for a seven-year-old child. Ex. 29, Gilbert Fire Patient Care Report; Ex. 9, Ramos Dec. ¶¶ 10-13.

29. Paramedic Ramos stepped out of the bathroom and advised the family that the paramedics recommended that T.A. be transported to see a medical doctor at a hospital due to the child's extreme agitation, his abnormal behavior, and their inability to complete an evaluation. Ex. 9, Ramos Dec. ¶¶ 14-15.

30. Detective Kessler had re-entered the home and believed the paramedics' recommendation was due to a medical emergency after learning that paramedics recommended a medical transport of T.A. to the hospital because paramedics could not evaluate him. Ms. Baggen of DCS also explained to Mr. Bentley, with Mrs. Bentley and paramedics in the room, that T.A. needed to be medically evaluated. Ex. 1, Axon 11 at 14:09-14:58; Ex. 1, Axon 10 at :29-1:15; Ex. 18, Clifford Dec. ¶¶ 31-32; Ex 19, Kessler Dec. ¶¶ 18-28.

31. Mesa Sergeant Bina had entered the home believing there was a medical emergency related to T.A., and after learning that paramedics recommended a medical transport of T.A. to the hospital and that the parents were not in agreement, he told Mrs. Bentley, referring to the Gilbert Fire personnel, "We're basing our decisions off of what their observations were medically." Ex. 1, Axon 11 at 28:56 – 29:28; Ex. 20, Bina Dec. ¶¶ 8, 12-26.

32. In the foyer, Mrs. Bentley spoke directly to Paramedic Adam Hellmann about his recommendation as to whether T.A. needed the medical evaluation by a medical doctor via an ambulance taking T.A. to the hospital. Ex. 1, Axon 11 at 27:30-27:36. Bentley Bobrow, M.D., opined that there were a number of potentially serious causes of T.A.'s behavior that are potential causes of abnormal behavior, due to the fact that T.A. had been missing for an extended period of time and could not offer any reliable history, such as some form of intoxication, some type of physical abuse, environmental exposure, traumatic brain injury, an endocrine disorder such as hypoglycemia, other electrolyte abnormality. Gilbert Paramedics knew or should have known

there was a potential for serious complication that required a higher level of medical care. Ex. 25 at Mesa/Bentley 5449, 5451.

33. Mrs. Bentley told Paramedic Hellmann, "I'm all for him getting checked out. I want to know everything's okay." "Is this the only way? To go with him to the hospital right now for a medical evaluation?" Ex. 1, Axon 11 at 28:56-29:28; Ex. 1, Axon 10 at 13:20-15:15.

34. The Gilbert Patient Care Report documented that the parents were advised that "the pt. should be transported to the hospital to be examined and looked at by a doctor. They asked us if we were seeing something physically wrong with him and we advised them that we could not do a detailed assessment, and that it was in the best interest of the pt. to be looked at by a doctor." Ex. 1, Gilbert Fire Patient Care Report; Ex. 9, Ramos Dec. ¶¶ 14-15.

35. Gilbert Paramedic Hellmann responded, "I think it would be the best way to do it." Bentley Bobrow, M.D., opined that the Gilbert Paramedics knew or should have known there was a potential for serious complication that required a higher level of medical care. Ex. 25 at Mesa/Bentley 5451; Ex. 1, Axon 10 at 14:55; Ex. 1, Axon 10 at 13:20-15:15.

36. Paramedic Hellmann invited Mrs. Bentley to ride in the ambulance with him and T.A. Ex. 1, Axon 10 at 15:07; Ex. 1, Axon 10 at 13:20-15:15. Bentley Bobrow, M.D., opined that paramedics are the medical experts on the scene, and that they are not licensed to transport patients to private medical offices. Ex. 25 at Mesa/Bentley 5451-52.

**The Bentleys' Consent to Medical Evaluation and Transport**

37. The Gilbert paramedic documented in his Patient Report: "After a long discussion with the parents they agreed to let the child be transported to the hospital." Ex. 29, Gilbert Fire Patient Care Report; Ex. 9, Ramos Dec. ¶ 16.

38. Mrs. Bentley rode in the back of ambulance with T.A. So as not to upset T.A. on the way to the hospital, no vitals were taken en route. *Id.* On the way, T.A. was "very calm, acting normal and talking to mom." *Id., see also* Ex. 9, Ramos Dec. ¶ 19.

39. T.A. was transported to Banner Desert Hospital Emergency Room and seen by Dr. Kunal. Ex. 30, Banner/Cardon Medical Rec. at Mesa/Bentley 000554. A physical examination was performed. Dr Shah concluded: "Given the strange circumstances of this child's running away from home, I believe this patient would benefit from further evaluation by DCS and investigation by the police." *Id., see also* Ex. 9, Ramos Dec. ¶ 19.

40. The medical records notes reflect that the plan is "for further investigation by DCS and police department that will occur at an outside facility." The family was counseled on the plan and the parent "agrees with the treatment and follow up plan." Ex. 30, Banner/Cardon Medical Rec. at Mesa/Bentley 000555; *see also* Ex. 1 Axon 2 at 9:20-11:17.

### Officer Clifford's Interaction with Mr. Bentley

41. After putting T.A. in the darkened bedroom, Mr. Bentley left the bedroom and went into the foyer to talk to his wife and others gathered there. Officer Clifford was standing outside the open door of T.A.'s bedroom while DCS worker Cordova was inside the bedroom talking quietly to T.A. Ex. 1, Axon 11 a 14:09-14:58, Ex. 18, Clifford Dec.

42. Mr. Bentley then left the foyer and attempted to walk into the open door of T.A.'s bedroom by walking past Officer Clifford who was standing in the open doorway. Ex. 1, Axon 11 at 15:18-16:02; Ex. 18, Clifford Dec.

43. Officer Clifford, recognizing that Mr. Bentley was agitated and upset, extended his right hand, placing it on Mr. Bentley's left bicep, and explained, "I'm sorry I can't let you back in there right now…Look, I don't want this to go south" Ex. 1, Axon 11 at 15:18-16:02, Ex. 18, Clifford Dec.

44. Mr. Bentley took a step back, and then stood in the hall and began to make a call on his cell phone. He then began to walk into another room which had not been cleared. Officer Clifford explained that he would not follow him outside if he wanted privacy, but because how things had been going, he was not going to allow him to be alone in a room. Instead of choosing

to go outside for privacy to make his call, Mr. Bentley chose to make his call in the bathroom with the door open directly across from Officer Clifford. Ex.1, Axon 11 at 16:40-17-01; Ex. 18, Clifford Dec.

### The Temporary Custody Notice ("TCN")

45. Detective Kessler and Sergeant Bina believed DCS was taking temporary custody of T.A. by means of a TCN. Ex. 20, Bina Dec. ¶¶ 19-21; Ex. 19, Kessler Dec. ¶¶ 33-34.

46. Several references were made to a TCN throughout the morning. Sergeant Bina asked Ms. Baggen if she had the temporary custody notice ready. Ex. 1, Axon 11 at 15:18-16:02. When she responded affirmatively, Sergeant Bina asked her to serve it. Ex 1, Axon 11 at 15:18-16:02. Ms. Baggen never stated there was no TCN. Ex. 20, Bina Dec. ¶ 25; Ex.19, Kessler Dec. ¶ 34.

47. Thereafter, in the foyer, temporary custody and the TCN continued to be discussed with Mrs. Bentley and Mr. Bentley present, along with Ms. Baggen, Sergeant Bina, and Detective Kessler:

    a. Ex. 1, Axon 10 at 4:22-4:31;

    b. Ex. 1, Axon 11 at 21:00-21:26;

    c. Ex. 1, Axon 10 at 12:12-12:23;

    d. Ex. 1, Axon 11 at 25:09-25:23;

    e. Ex. 1, Axon 11 at 25:30-25:35.

48. Ms. Baggen never informed Detective Kessler or Sergeant Bina that she had changed her mind about taking temporary custody of T.A. or that no TCN had been actually prepared. Detective Kessler and Sergeant Bina knew Ms. Baggen needed a DCS supervisor's approval for temporary custody, they knew she was in contact with her supervisor, but they were not privy to the DCS supervisors' conversations with Ms. Baggen. Ex. 20, Bina Dec. ¶¶ 18-27; Ex.19, Kessler Dec. ¶¶ 25-35.

49. Detective Kessler and Sergeant Bina understood that Ms. Baggen had a TCN with her that she had filled out, and that Ms. Baggen—as opposed to police officers—was the person to serve it and explain this DCS form. Ex. 20, Bina Dec. ¶¶ 21, 18-27; Ex. 19, Kessler Dec. ¶¶ 27-28, 25-35.

50. After Mrs. Bentley finished talking with Paramedic Hellmann about Paramedic Hellmann's recommendation, Sergeant Bina continued to explain that T.A. was in temporary custody of the DCS. Ex.1, Axon 6 at :53-1:04.

51. No one corrected or clarified with Sergeant Bina or Detective Kessler. Ex. 20, Bina Dec. ¶ 25; Ex. 19, Kessler Dec. ¶ 34.

52. Sergeant Bina and Detective Kessler continued to believe that T.A. was in temporary custody of DCS. Ex. 20, Bina Dec. ¶¶ 19-21; Ex. 19, Kessler Dec. ¶¶ 33-34.

53. Officer Clifford drove separately to the hospital and observed T.A.'s evaluation, where Mrs. Bentley and the Office of Child Welfare's Gina Cordova were present. Ex. 18, Clifford Dec. ¶¶ 60-61.

54. Officer Clifford believed that T.A. was in temporary custody of DCS. Ex. 1, Axon 2 at :30-:35.

55. During the medical evaluation by the emergency room doctor, Officer Clifford heard the doctor discussing a continued investigation by DCS. Ex. 1, Axon 2 at 9:26-10:15.

### T.A.'s Forensic Interview

56. After the evaluation, Officer Clifford drove T.A. and Mrs. Bentley to the Mesa Family Advocacy Center where Officer Clifford understood that T.A. was to be forensically interviewed. Ex. 18, Clifford Dec. ¶ 67.

57. Mrs. Bentley and her lawyer, Mike Schern, asked Detective Kessler and Sergeant Bina if T.A. was free to go before submitting to a forensic interview, and whether the TCN entailed

a requirement that T.A. be forensically interviewed. Ex. 20, Bina Dec. ¶ 44; Ex.19, Kessler Dec. ¶ 44.

58. Detective Kessler and Sergeant Bina asked for Ms. Baggen of DCS to join them and answer the question. Ex. 19, Kessler Dec. ¶ 47.

59. Ms. Baggen, after talking to her DCS supervisor, told Mrs. Bentley and Mr. Schern that T.A. was not free to leave until T.A. had been forensically interviewed. Ex. 20, Bina Dec. ¶¶ 44-47; Ex. 19, Kessler Dec. ¶¶ 49-50.

60. Ms. Baggen then provided a DCS form to Mrs. Bentley and to Mr. Schern, titled Notice of Duty to Inform. Ex. 26, DCS Notice of Duty to Inform Form at AZ-STATE000088. The Duty to Inform advised that DCS has no legal authority to compel cooperation with the investigation. Mr. and Mrs. Bentleys' attorney signed the Duty to Inform on April 1, 2016. Ex. 5, Janna Bentley Deposition, 39:1-16.

61. Mesa P.D. Forensic Interviewer Lauren Glazer conducted a forensic interview of T.A., and as part of the investigation, Ms. Glazer also conducted a forensic interview of two other siblings of T.A. who shared a bedroom with T.A. and had arrived at their school while T.A. was still missing. Ex. 23, Glazer Dec. ¶ 7.

62. Detective Kessler submitted a recommendation for a misdemeanor charge against Mrs. Bentley and Mr. Bentley for violating A.R.S. § 13-3619. Ex. 19, Kessler Dec., at ¶ 54.

63. The prosecutor, Paul Hawkins, the Assistant City Attorney with the City of Mesa, was the prosecutor who reviewed the Mesa Police Department's submittal for criminal charges against Brian and Janna Bentley for misdemeanor crimes under A.R.S §§13-3619 and 3613. Ex. 24, Hawkins Dec., at ¶¶ 2, 4.

64. Prosecutor Hawkins found sufficient probable cause to commence prosecution against the Bentleys for violating A.R.S §13-3619 and A.R.S §13-3613. Ex. 24, Hawkins Dec., at ¶¶ 5-8.

65. Despite the jury finding the City had not met its burden of proving beyond a reasonable doubt that Mr. and Mrs. Bentley had committed the crimes for which they were charged, A.R.S §§13-3619 and 3613, Hawkins believed there was still probable cause to warrant prosecution. Ex 24, Hawkins Dec., at ¶ ¶ 9-16.

Dated this 20th day of September, 2019.

                                WIENEKE LAW GROUP, PLC

                    By:   */s/ Kathleen L. Wieneke*
                             Kathleen L. Wieneke
                             WIENEKE LAW GROUP, P.L.C.
                             1095 West Rio Salado Parkway, Suite 209
                             Tempe, Arizona 85281

                             Duncan J. Stoutner
                             CITY OF MESA ATTORNEY'S OFFICE
                             MS-1077
                             PO Box 1466
                             Mesa, Arizona 85211-1466
                             *Attorneys for City of Mesa Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael A. Schern
Yusra B. Bokhari
SCHERN RICHARDSON FINTER DECKER, PLC
1640 South Stapley Drive, Suite 132
Mesa, Arizona 85204
*Attorneys for Plaintiffs*

James B. Bowen
ARIZONA ATTORNEY GENERAL'S OFFICE
2005 North Central Avenue
Phoenix, Arizona 85004-1592
*Attorney for State Defendants*

1 | Duncan J. Stoutner
2 | Jason K. Reed
3 | CITY OF MESA ATTORNEY'S OFFICE
4 | MS-1077
5 | PO Box 1466
6 | Mesa, Arizona 85211-1466
7 | *Attorney for City of Mesa Defendants*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By: */s/ Tara B. Zoellner*