**Index of Exhibits**
**to Defendants' Statement of Facts**

Exhibit 1    Axon Video Clips (DVD with 24 videos)

Exhibit 2    Google Maps Images (Exhibit 8 to Janna Bentley's Deposition)

Exhibit 3    Plaintiffs' Responses to City of Mesa Defendants' First Set of
             Interrogatories (Exhibit 2 to Janna Bentley's Deposition)

Exhibit 4    Plaintiffs' Responses to City of Mesa Defendants' Second Set of
             Interrogatories (Exhibit 3 to Janna Bentley's Deposition)

Exhibit 5    Janna Bentley's Deposition Transcript Excerpts

Exhibit 6    Janna Bentley's Account of the Incident

Exhibit 7    Brian Bentley's Deposition Transcript Excerpts

Exhibit 8    Brian Bentley's Account of the Incident

Exhibit 9    Declaration of Alex Ramos

Exhibit 10   Alex Ramos' Criminal Trial Transcript

Exhibit 11   Adam Hellmann's Criminal Trial Transcript

Exhibit 12   Melanie Opheim's Criminal Trial Transcript

Exhibit 13   MFAC Lobby Transcript

Exhibit 14   Cristina Baggen's Deposition Transcript

Exhibit 15   Declaration of Brian Walters

Exhibit 16   Declaration of Darrel Palmer

Exhibit 17   Declaration of Marcus Rudolph

Exhibit 18   Declaration of Edward Clifford

Exhibit 19   Declaration of Laurie Kessler

Exhibit 20   Declaration of Peter Bina

Exhibit 21   Declaration of Domenick Kaufman

**Index of Exhibits**
**to Defendants' Statement of Facts**

Exhibit 22    Declaration of Robert Russo

Exhibit 23    Declaration of Lauren Glazer

Exhibit 24    Declaration of Paul Hawkins

Exhibit 25    Declaration of Ben Bobrow

Exhibit 26    DCS Notice of Duty to Inform

Exhibit 27    Timothy Turner's Deposition Transcript Excerpts

Exhibit 28    A.R.S. 8-821 in effect on 4/1/2016 (Exhibit 12 to Kessler's Deposition)

Exhibit 29    Town of Gilbert Paramedic's Patient Report excerpts

Exhibit 30    Banner/Cardon Medical Record excerpts

Exhibit 31    CAD History Printout Excerpt

Exhibit 32    Screen shot from Axon 11 in Bentley's bathroom (Exhibit 15 to Brian
Bentley's Deposition)

Exhibit 33    Brian Bentley's Criminal Trial Testimony

Exhibit 34    Gina Cordova's Deposition Transcript

Exhibit 1
AXON VIDEOS

Exhibit 2







BENTLEY-386

Exhibit 3

RECEIVED

APR 3 0 2018

CITY OF MESA
CITY ATTORNEY'S OFFICE

1  SCHERN RICHARDSON FINTER DECKER, PLC
2  1640 S. Stapley Drive, Suite 132
   Mesa, Arizona  85204
3  (480) 632-1929
   Facsímile: (480) 632-1938
4  Email: courtdocs@srfdlaw.com
   *Attorneys for Plaintiffs*
5  By:  Michael A. Schern #022996
         Adam B. Decker #021461
6        Yusra B. Bokhari #029376



EXHIBIT 2
WITNESS: J. Bentley
DATE: 5.17.19
Karine Moore-Deysie, RPR

7

8          UNITED STATES DISTRICT COURT
                 DISTRICT OF ARIZONA
9

10 Brian L. Bentley, an individual; Janna L.     Case No.:  2:17-cv-00966-DJH
   Bentley, an individual; O.R., a minor by
11 and through her father and mother; G.E., a
   minor by and through her father and
12 mother; B.J., a minor by and through his      PLAINTIFFS' RESPONSES TO CITY
   father and mother; M.J., a minor by and       OF MESA DEFENDANTS' FIRST SET
13 through his father and mother; T.A., a             OF INTERROGATORIES
   minor by and through his father and
14 mother; S.L., a minor by and through her
   father and mother; B.M., a minor by and
15 through her father and mother,
16
17              Plaintiffs,
18 v.
19 City Of Mesa, a public entity; Gregory A.
   McKay, in his official and individual
20 capacities; Cristina Baggen, in her
   individual capacity as an employee of the
21 State of Arizona Department of Child
   Safety; Gina Cordova, in her individual
22 capacity as an employee of the State of
   Arizona Department of Child Safety;
23 Darrel Palmer, in his individual capacity as
   a City of Mesa police officer; Edward
24 Clifford, in his individual capacity as a
   City of Mesa police officer; Laurie

1
2
3
4
5
6
7

Kessler, in her individual capacity as a City of Mesa police officer; Domenick Kaufman, in his individual capacity as a City of Mesa police officer; Lauren Glazer, in her individual capacity as a City of Mesa police officer; Molly Corfits, in her individual capacity as a City of Mesa police officer; and Rob Russo, in his individual capacity as a City of Mesa police officer,

Defendants.

8    Pursuant to Rule 33, Federal Rules of Civil Procedure, Plaintiffs, Brian L. Bentley and

9   Janna L. Bentley along with their minor children (collectively "Plaintiffs" or "Bentleys"), by

10  and through undersigned counsel hereby respond to Defendant City of Mesa's First Set of

11  Interrogatories, dated March 26, 2018.

12    These responses are made without waiver of any communications or materials subject

13  to the attorney-client, work product, or other privileges under Arizona law.  These responses

14  should not be construed as agreement that any answer, information, or documents produced

15  or provided is ultimately admissible.

16

17    As set forth herein, many of the City of Mesa's requests are objectionable, and seek

18  answers, information, and documentation that is beyond the scope of discovery and

19  inadmissible under the Rules of Evidence.

20    Discovery is still ongoing.  The Bentleys' reserve the right to amend, revise, clarify or

21  supplement these responses, as additional information becomes available.

22  ///

23  ///

24  ///

## RESPONSES TO INTERROGATORIES

1.    With specificity and in detail, including the date, time, location, address, and circumstances, list each instance in which police were called to locate T.A. between January 1, 2010 through March 30, 2016.

**Response:**

A.  Mid-April 2011:  Brian Bentley arrived home with all five (5) children, at the time, from one of the children's baseball game.  Brian Bentley parked the car inside the garage and the children got out.  T.A. wandered off as Brian began unloading the chairs and equipment from the car.  Brian called the neighbors and the police.

A girl from the neighborhood, who had previously babysat T.A., found T.A. playing with rocks behind a planter wall in a neighbor's front yard.

B.  Late September/Early October 2014:  In the neighborhood around 3612 E. Powell Way, Gilbert, Arizona.  The Bentleys travelled to an unfamiliar neighborhood in Gilbert, Arizona, to deliver food to a friend who was temporarily residing therein.  As soon as the Bentleys parked and opened the car door, T.A. bolted towards a nearby park.  Brian and Janna ran after T.A. to locate him.  They looked for a few minutes and when they were unable to locate T.A., Brian and Janna called the police.  The Police did report to the area. Right as the police were arriving, Janna found T.A. hiding behind a pillar of a nearby house.

C. April 1, 2016:  This is the incident central to this case and discussed in detail in the Complaint and underlying pleadings.

2.      With specificity and in detail, including the date, time, location, address, and circumstances, list each instance from January 1, 2010 through March 30, 2016 in which T. A. left Plaintiffs' residential property without the knowledge or permission of Plaintiffs.

**Response:**

When T.A. was approximately five (5) years old, the Bentley family was preparing to go to the park.  T.A. and his older brother, wanting a head start, got on their bikes and attempted to race to the park.  Before Janna could catch up with them, neighbor Shawnee Jarman saw the two boys and called Janna.

3.      With specificity and in detail, including the date, time, location, address, and circumstances, list each instance from January 1, 2010 through March 31, 2016 in which Plaintiffs believed T.A. was missing or otherwise unable to be located by Plaintiffs or any other individual for more than 1 hour.

**Response:**

Subject incident of April 1, 2016.  Please see Complaint.

4.      With specificity and in detail, list each health provider of T.A, from January 1, 2010 through the present, including but not limited to, Primary Care Physicians (PCPs), psychiatrists, psychologists, counselors, medical doctors, naturopathic doctors and any other doctors or physicians, chiropractors, and any health or health care providers related to emergency rooms, emergency departments, urgent care facilities, hospitals, clinics, pharmacies, and any health or health care providers regarding vision or hearing.

**Response:**

Limited Objection.  This interrogatory is overbroad and beyond the scope of discovery.  The information may be applicable for the time frame relevant to this litigation, from April 1, 2016 and onwards.

    A.  Dr. Randy Levine, Gilbert Pediatrics.

    B.  Dr. Kuni Shah and other Physicians at Cardon Children's Hopsital.

    C.  Dr. Kristin Abbate, Psy.D., Melmed Center.

    D.  Barbara Porter, Therapist.

See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

    5.    With specificity and in detail, including full names, addresses, phone numbers, and email addresses, list each person you contacted in any way on March 31, 2016, regarding T.A. being missing or otherwise unable to be located, including but not limited, the means of your communication, what was communicated by you, and what was communicated by the person at issue.

**Response:**

Janna Bentley contacted her family members on March 31, 2016 regarding T.A.  The Bentleys also contacted the following individuals:

    A.  Gary Porter: 602-738-5830.  Janna had in person communication with Mr. Porter.

    B.  Alana Porter: 480-694-1942.  Janna texted Ms. Porter and had in person communication with Ms. Porter.

    C.  Mark Alexander: 480-980-3953.  Janna texted Mr. Alexander and had in person communication with Mr. Alexander.

D. Kendra Swan Alexander: 623-217-9234.  Janna texted Ms. Alexander and had in person communication with her.

See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

6.       With specificity and in detail, including full names, addresses, phone numbers, and email addresses, list each person you contacted in any way on April 1, 2016, regarding T.A. being missing, including but not limited, the means of your communication, what was communicated by you, and what was communicated by the person at issue.

**Response:**

Limited Objection.  This interrogatory is too broad and extremely burdensome, if possible, to completely identify and disclose.  The known names and phone numbers of the individuals contacted on April 1, 2016 are provided below.  Plaintiffs' reserve the right to supplement this information as it becomes

A. Shawnee Jarman: 480-570-1668.  Address currently unavailable.

B. Amy King: 480-250-5887.  Address currently unavailable.  Ms. King is the Women's Group Leader at the Bentleys' Church who contacted the women connected with the group through their group contact.  Two additional women group leaders, from nearby churches, were contacted through these efforts and they also spread the message – approximately 100-150 individuals were sent information to help find T.A.

- Jalen Rudd: 480-239-7277
- Derek Rudd: 602-388-6474
- Brenda Rudd: 602-418-3344
- Taya Washburn: 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
- Becky Bentley: 480-221-8667
- Olivia Bentley: 480-521-3867
- Ellie Bentley: 480-459-6505
- Sara Fisk: 602-363-3833
- Dan Fisk: 602-363-2833
- Brynne Dalton: 949-235-6764

- Stephanie Porter: 480-773-2410
- Stephanie Muir: 818-571-2993
- Mary Cavenee: 480-516-4949
- Kemp Morris: 480-892-9684
- Judi Morris: 480-272-0202
- Sarah Whitmore: 480-254-5885
- Julie Porter: 480-518-2715
- Mindi Ortega: 480-703-6863
- Summer Earl: 480-268-0342
- Kathy Cureton: 480-414-2413
- Frank Bennett: 480-688-1818
- Don Yancey: 480-227-1316
- Deb Yancy: 480 203-8685
- Ward Andrews: 480-250-8005
- Lisa Andrews: 480-250-8006
- Megan Klug: 480-628-2188
- Lisa Boren and Son: phone number(s) unknown at this time

- Jackson Crawford: 480-648-6368
- Cyndi Hansen: 480-242-7922
- Jamie Ashdown: 801-369-2921
- Casey Ashdown: 480-235-2688
- The Ashdowns' neighbor, name and phone number currently unknown.
- Rob Coon: 602-803-4226
- Niki Coon: 602-614-7102
- Carie Rogers: 480-330-9650
- Wendy and Craig Nelson: 602-291-5065
- Jeanie Fletcher: phone number currently unknown.
- Shannon Juncker: 480-406-5799
- Lou Kirby: phone number currently unknown.
- Kathy Kirby: phone number currently unknown.

See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

7.    With specificity and in detail, including full names, addresses, phone numbers, and email addresses, list each person you believe searched for T.A. on March 31, 2016, including the approximate time when the individual started searching and when the individual stopped searching.

**Response:**

Janna Bentley and the minor children G.E, O.R., B.J., and M.J., searched for T.A. on March 31, 2016.  Janna began searching for T.A. at approximately 10:15 p.m. and enlisted the help of the aforementioned minor children.

In addition, sometime after 10:15 p.m. Ms. Kendra Swan Alexander, Mr. Mark Alexander, Mr. Gary Porter, and Ms. Alana Porter also looked for T.A.  The contact information has been provided in the response to Interrogatory 5.

See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

8.      With specificity and in detail, including full names, addresses, phone numbers, and email addresses, list each person other than Mesa P.D. Officers who you believe searched for T.A. on April 1, 2016, including the approximate time when the individual started searching and when the individual stopped searching.

**Response:**

See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

9.      With specificity and in detail, including the dates, times, circumstances, and the full names and addresses of neighbors or friends, explain each instance prior to March 31, 2016 where T.A. left Plaintiffs' home without Plaintiffs' permission or knowledge and slept inside a neighbor's house overnight.

**Response:**

None.

Discovery is still ongoing.  Plaintiffs' reserve the right to amend, revise, clarify, or supplement these Responses, as additional information becomes available.

DATED this 25th day of April, 2018.

SCHERN RICHARDSON FINTER DECKER, PLC

By: _____
1640 South Stapley Drive, Suite 132
Mesa, Arizona 85204
Attorneys for Plaintiffs

Page 8 of 9

1   ORIGINAL sent via first-class mail to:

2   Duncan J. Stoutner
3   Jason K. Reed
    CITY OF MESA ATTORNEY'S OFFICE
4   MS-1077
    PO Box 1466
5   Mesa, Arizona  85211-1466
    *Attorney for City of Mesa Defendants*
6   mesacityattorney@mesaaz.com

7   COPY of the attached was sent via first-class
8   Mail to:

9   James B. Bowen
    ARIZONA ATTORNEY GENERAL'S OFFICE
10  2005 North Central Avenue
    Phoenix, AZ 85004-1592
11  *Attorney for State Defendants*
12  Defensephx@azag.gov
    James.Bowen@azag.gov
13

14

15  *By: /s/Ann Bernzen*

16

17

18

19

20

21

22

23

24

Exhibit 4

1   SCHERN RICHARDSON FINTER DECKER, PLC
2   1640 S. Stapley Drive, Suite 132
    Mesa, Arizona 85204
3   (480) 632-1929
    Facsimile: (480) 632-1938
4   Email: courtdocs@srfdlaw.com
    *Attorneys for Plaintiffs*
5   By: Michael A. Schern #022996
         Adam B. Decker #021461
6        Yusra B. Bokhari #029376

7

8              UNITED STATES DISTRICT COURT
                  DISTRICT OF ARIZONA
9

10   Brian L. Bentley, an individual; Janna L.    **Case No.: 2:17-cv-00966-DJH**
     Bentley, an individual; O.R., a minor by
11   and through her father and mother; G.E., a
     minor by and through her father and       **PLAINTIFFS' RESPONSES TO CITY**
12   mother; B.J., a minor by and through his   **OF MESA DEFENDANTS' SECOND**
     father and mother; M.J., a minor by and      **SET OF INTERROGATORIES**
13   through his father and mother; T.A., a
     minor by and through his father and
14   mother; S.L., a minor by and through her
     father and mother; B.M., a minor by and
15   through her father and mother,
16
17                Plaintiffs,
18   v.
19   City Of Mesa, a public entity; Gregory A.
     McKay, in his official and individual
20   capacities; Cristina Baggen, in her
     individual capacity as an employee of the
21   State of Arizona Department of Child
     Safety; Gina Cordova, in her individual
22   capacity as an employee of the State of
     Arizona Department of Child Safety;
23   Darrel Palmer, in his individual capacity as
     a City of Mesa police officer; Edward
24   Clifford, in his individual capacity as a
     City of Mesa police officer; Laurie

EXHIBIT 3
WITNESS: J. Bentley
DATE: 5.17.19
Karine Moore-Deysie, RPR


RECEIVED
OCT 2 2 2018
BY: ...........................

Kessler, in her individual capacity as a City of Mesa police officer; Domenick Kaufman, in his individual capacity as a City of Mesa police officer; Lauren Glazer, in her individual capacity as a City of Mesa police officer; Molly Corfits, in her individual capacity as a City of Mesa police officer; and Rob Russo, in his individual capacity as a City of Mesa police officer,

Defendants.

Pursuant to Rule 33, Federal Rules of Civil Procedure, Plaintiffs, Brian L. Bentley and Janna L. Bentley along with their minor children (collectively "Plaintiffs" or "Bentleys"), by and through undersigned counsel hereby respond to Defendant City of Mesa's Second Set of Interrogatories, dated September 12, 2018.

These responses are made without waiver of any communications or materials subject to the attorney-client, work product, or other privileges under Arizona law. These responses should not be construed as agreement that any answer, information, or documents produced or provided is ultimately admissible.

As set forth herein, many of the City of Mesa's requests are objectionable, and seek answers, information, and documentation that is beyond the scope of discovery and inadmissible under the Rules of Evidence.

Discovery is still ongoing. The Bentleys' reserve the right to amend, revise, clarify or supplement these responses, as additional information becomes available.

///

///

///

# RESPONSES TO INTERROGATORIES

10.     With specificity and in detail, list the full name, address, and phone number of each medical practitioner who provided services to each Plaintiff from January 1, 2010 through the present.

**Response**: Limited Objection.  This interrogatory is duplicative, overbroad and beyond the scope of this litigation.  Without waiving any objection(s) hereto, Plaintiffs agreed to provide medical records for all Plaintiffs, excluding T.A., from January 1, 2012.  Furthermore, the responsive information has previously been disclosed in Interrogatory 4.

1.  Eric Huish, DO
    4915 E. Baseline Road, Suite 126
    Gilbert, AZ 85234
    (480) 969-3096

    Treated Janna Bentley on a number of occasions.

2.  Steve Millilus, DO
    4915 E. Baseline Road, Suite 126
    Gilbert, AZ 85234
    (480) 832-0480

    Pediatrician who has treated the minor children.

3.  Wendy Nelson, NP
    4121 E. Valley Auto Drove, Suite 110
    Mesa, AZ 85206
    (480) 820-2533

    Has treated O.R.

See Plaintiff's Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

11.    With specificity and in detail, list the full name, address, and phone number of each medical provider who provided services to each Plaintiff for Plaintiffs' physical or mental anxiety and anguish as alleged in Paragraph 269 of Plaintiffs' First Amended Complaint.

**Response:**

1.  Barbara Porter
    True Perceptions, Emotional Release Facilitator
    24005 E. Southern, Suite 2
    Tempe, AZ 85282
    (480) 570-8850

2.  Randi Gray, LPC, NCC
    Randi Gray Counseling
    3740 E. Southern Ave, Suite 209
    Mesa, AZ 85206
    (480) 553-7743

3.  Kristin Abbate, Psy.D.
    Melmed Center
    4848 E. Cactus Road, Suite 940
    Scottsdale, AZ 85254
    (480) 443-0050

4.  Michelle Cox
    Building Family Connection
    (480) 459-1460

    Responsive information as to T.A. has already been disclosed.  Discovery is still ongoing, and Plaintiffs reserve the right to supplement this response as more information becomes available.   See Plaintiff's Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

12.    With specificity and in detail, list each counselor, therapist, bishop, social worker, or teacher with whom any Plaintiff discussed the subject matter of the litigation, including the full name of each individual present, the date, time, location, and substance of the discussion.

**Response**: Limited Objection.  The scope of this interrogatory is duplicative and overbroad.  Without waiving any objection(s) hereto, Plaintiffs provide the following information:

1. On or about April 4, 2016, and subsequently thereafter, Plaintiffs' spoke with the following teachers and school officials at Archway Classical Academy Arete, regarding the incident and the unauthorized transportation of the children:

   a.   Headmaster: Mr. Gillingham

   b.   Assistant Headmaster: Ms. Pantalena

   c.   Mrs. Sipe, T.A.'s teacher at the time of the incident

   d.   Mrs. Hervas, M.J.'s teacher at the time of the incident

   e.   Mr. Rollo, B.J.'s teacher at the time of the incident.

2. Religious Leaders: Spoke with these individuals soon after the incident.

   a.   Tim Lines

   b.   Rob Coon

   c.   Alana Porter

Discovery is still ongoing, and Plaintiffs reserve the right to supplement this response as more information becomes available. See Plaintiff's Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

13.     With specificity and in detail, list the cell phone number, cell phone brand, make and model, cell phone provider, name of the account holder(s), and account number for each cell phone owned or used by Janna Bentley, Brian Bentley, G.E., O.R., B.J., M.J., or T.A. on March 31, 2016 and April 1, 2016.

**Response**:  Only Brian and Janna Bentley had cell phones during this period.

1.  Janna Bentley: 480-459-6505 – Samsung Galaxy Note 5

2.  Brian Bentley:  480-459-6504 – Samsung Galaxy Note 5

    Both of these cell phones were held under the same account and service provider: Verizon Wireless, account number 470466877-00001.

14.     With specificity and in detail, please provide the following information regarding the video titled "Stop the government's abuse of the Bentleys", posted by Public Integrity Alliance on YouTube, at https://www.youtube.com/watch?v=fZmQ_cSQpqM: the creator, editor, publishers and producer of the video; the name and contact information for every person that contributed to the creation of the video and to the written summary of the video; whether any money was paid to create the video, and if so, the amount, the payor(s), the payee(s); the method of payment and the date(s) of payment; the date the video was completed; the date(s) any Plaintiff communicated with the creator, editor, publishers and produce, the substance of the communication(s), and the purpose of the video.

**Response**:  None.  Plaintiffs are unaware of the requested information.  Plaintiffs were not aware of or involved with the production, creation, or financing of said video.

15.     For every social media account, blog, or other online forum associated with or belonging to Plaintiffs, please state:   the website, web address, name/title of the blog/form/account, user name, email address, password, and login information associated with each account and with which Plaintiff the account is associated, including for personal social media accounts, and for group social media accounts, such as "Stand with the Bentleys."

**Response**:  Objection.  This interrogatory is overbroad and beyond the scope of discovery.  Without waiving any objection(s), Plaintiffs have agreed to provide any information from Facebook.com for Brian and Janna Bentley.  See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

16.     With specificity and in detail, including the date, time location, address, and circumstances, list EVERY instance from January 1, 2010 through the present in which T.A. left an area, structure, building, property, or any other location without the knowledge or permission of Plaintiffs and/or any person in charge of his care.

**Response**: Limited Objection.   Pursuant to Rule 26(b) of the Federal Rules of Civil Procedure, this request is duplicative.  Without waiving any objection(s), this information was provided in the First Set of Interrogatories, specifically in response to Interrogatories 1 and 2.  Plaintiffs' reserve the right to supplement these responses as additional information becomes available.   See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto.

17.     Identify all impeachment evidence you have access to, or that you may utilize at trial, including the name and address, and a description of any and all testimony to be provided by impeachment witnesses at trial.

**Response**:  Objection.  This request is overbroad and burdensome.  Without waiving any objection(s), the following, which is available to the City of Mesa, may be utilized at trial:

1. City of Mesa Police Report

2. City of Mesa Police Departments' CAD History from April 1, 2016.

3. Criminal Trial Records

4. Detective Russo

5. Detective Kessler

Plaintiffs reserve the right to supplement this response as additional information becomes available. See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto. See also, Response to Interrogatory 18.

18.    Identify any statements or admissions of any City of Mesa employee or former employee that YOU have knowledge of, that you may introduce or use at trial under Fed. R. Evid. 801(d)(2), including the name of the person who made the statement, the date/time of the statement, and all persons present when the statement was made.

**Response**:  Objection.  This request is overbroad and burdensome.  Without waiving any objection, the following, any and all statements of any and all Defendants pertaining to:

    1.  The existence of a restraining order;

    2.  The existence of a temporary custody notice;

    3.  The existence of a sex offender home;

    4.  The removal of the children from school

Plaintiffs reserve the right to supplement this response as additional information becomes available.  See Plaintiffs' Rule 26(a)(1) Initial Disclosure Statement and supplements thereto. See also, Response to Interrogatory 17.

19.    Identify and describe with particularity each and every act or omission by each Defendant that you contend constitutes an alleged constitutional violation, and identify each and every fact, person or document, that supports this contention.

**Response**: Objection.  This request is overbroad and burdensome.  Additionally, this information is already presented in the underlying Complaint.  Discovery is still ongoing,

1   Plaintiffs reserve the right to supplement this response as additional information becomes

2   available.

3

4          Discovery is still ongoing.  Plaintiffs' reserve the right to amend, revise, clarify, or

5   supplement these Responses, as additional information becomes available.

6

7          DATED this 17th day of October, 2018.

8

9                                           SCHERN RICHARDSON FINTER DECKER, PLC

10                                          By: _____
                                                1640 South Stapley Drive, Suite 132
11                                              Mesa, Arizona 85204
                                                Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

ORIGINAL sent via first-class mail to:

Duncan J. Stoutner
Jason K. Reed
CITY OF MESA ATTORNEY'S OFFICE
MS-1077
PO Box 1466
Mesa, Arizona 85211-1466
*Attorney for City of Mesa Defendants*
mesacityattorney@mesaaz.com

COPY of the attached was sent via first-class
Mail to:

James B. Bowen
ARIZONA ATTORNEY GENERAL'S OFFICE
2005 North Central Avenue
Phoenix, AZ 85004-1592
*Attorney for State Defendants*
Defensephx@azag.gov
James.Bowen@azag.gov

COPY of the attached was sent via first-class
Mail to:

Kathleen L. Wieneke
Christina Retts
Wieneke Law Group, PLC
1095 West Rio Salado Parkway, Suite 209
Tempe, AZ 85281

*By: /s/Ann Bernzen*

Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


BRIAN L. BENTLEY; et al.,          )
                                   )
                                   )
              Plaintiffs,          )
                                   )
vs.                                )  No. CV 2:17-cv-00966-DJH
                                   )
CITY OF MESA; et al.,              )
                                   )
              Defendants.          )
_____)


VIDEOTAPED DEPOSITION OF JANNA L. BENTLEY


Mesa, Arizona
May 17, 2019
9:06 o'clock a.m.


Prepared For:



Prepared By:  Karine Moore-Deysie, RPR

Certified Court Reporter

No. 50293

1      Q.   What Stephanie was this?

2      A.   Porter.

3      Q.   And did she tell you what lawyer she was

4   referring to?

5      A.   I think it may be her brother.

6      Q.   And did --

7      A.   But I don't know.

8      Q.   Did she tell you what that brother's name was?

9      A.   No.

10     Q.   What's Stephanie Porter's maiden name?

11     A.   Whiting.   Whiting.

12     Q.   Did you ever speak with this lawyer?

13     A.   Never.

14     Q.   Did you authorize Mr. Schern to act on your

15   behalf on April 1st, 2016?

16     A.   Yes.

17          (Exhibit No. 5 was marked.)

18     Q.   BY MS. WIENEKE:  Mrs. Bentley, I'm showing you

19   what's been marked as Exhibit No. 5 to your deposition

20   which bears the Bates label ARIZONA STATE000088.  This

21   is a document from Arizona Department of Child Safety

22   entitled "Notice of Duty to Inform."

23          Have you ever seen this document before?

24     A.   Yes.

25     Q.   Okay.  When did you first see this document?

1      A.   April 1st, 2016.

2      Q.   When do you recall first being given this

3  document?

4      A.   At that holding center, Family Advocacy Center.

5      Q.   And do you see that Mr. Schern's signature

6  appears on the document in the lower third, Michael A.

7  Schern, attorney for Bentley, dated April 1st, 2016?

8      A.   Yes.

9      Q.   And did you authorize Mr. Schern to sign this

10  on your behalf?

11      A.   Yes.

12      Q.   Okay.

13           Is -- do we have a stipulation as to what

14  you want to call the children?  Do you want them to be

15  called initials, or do we call him T.A., or what do you

16  want to do to --

17           MR. SCHERN:  We'll go off the record --

18           MS. WIENEKE:  -- for privacy?

19           MR. SCHERN:  -- for a moment.

20           MS. WIENEKE:  Let's go off the record.

21           THE VIDEOGRAPHER:  Off the record at 9:51 a.m.

22           (A discussion was held off the record.)

23           THE VIDEOGRAPHER:  We are on the record at

24  9:55 a.m.

25           MS. WIENEKE:  Off the record the parties had a

1      Q.   In the school year of 2015-2016, where was --

2  what school did T.A. attend?

3      A.   Great Hearts Academy.

4           MS. COURT REPORTER:  I'm sorry.  What was that?

5           THE WITNESS:  Great Hearts Academy.

6      Q.   BY MS. WIENEKE:  What were the hours of

7  attendance?

8      A.   School started at 7:55, I think.

9      Q.   And what was the routine for T.A.?  What time

10 did T.A. have to go, leave the house to get to school on

11 time?

12     A.   7:20, between 7:20-7:30.

13     Q.   Who typically would take T.A. to school?

14     A.   I would.

15     Q.   Who else would go to school with T.A.?

16     A.   B.J. and M.J.

17     Q.   What time -- how would T.A. get home from

18 school?

19     A.   My neighbor usually.

20     Q.   What time?

21     A.   It varied on what they had after school and

22 stuff, but it was around 3:00ish I would say, give or

23 take 30 minutes.  Earlier on Wednesdays, later on a day

24 one of them had a study thing and a car pool.

25     Q.   What time would T.A. and -- what time would

1      Q.    What would the frequency be of that?

2      A.    I couldn't say.

3      Q.    But would it be more typical that you would

4  take T.A. to school?

5      A.    During tax season, yes.

6      Q.    So during tax season, which this was, it would

7  be unusual for your husband to take T.A. to school?

8      A.    Correct.

9      Q.    Because during tax season, your husband would

10  probably already be at work, right?

11     A.    Something like that.

12     Q.    And in March, April is tax season, right?

13     A.    Correct.

14     Q.    So what would the reason be to have tardy

15  issues for T.A.?

16           MR. SCHERN:  Objection; form, foundation.

17     Q.    BY MS. WIENEKE:  In other words, was it your

18  issues, or was it T.A.'s issues?

19     A.    Well, it could have been any of the brothers

20  because we all went together, but, no.  If he was having

21  a rough morning, then what -- you know, whether it's not

22  getting up, not wanting to brush his hair, something

23  like that, sure.

24     Q.    Is it accurate to say that this 2015-2016

25  school year T.A. was in the second grade, right?

1      A.    Yes.

2      Q.    And at that time, the second grade, T.A. was

3   not under any IEP, correct?

4      A.    Correct.

5      Q.    T.A. did not qualify for any special education,

6   correct?

7      A.    During that school year, yeah, no.

8      Q.    We're talking about second grade at Great

9   Hearts, correct?

10     A.    Correct.

11     Q.    So would it be fair to say that given that in

12  the second grade at Great Hearts was not under any IEP,

13  did not qualify for any special education, that as far

14  as the school was concerned, T.A. was not considered a

15  special needs child?

16     A.    Correct.

17     Q.    And you didn't consider him a special needs

18  child with respect to his education, correct?

19     A.    No.

20     Q.    Is that correct?

21     A.    Correct.

22     Q.    To your knowledge, T.A. had not been diagnosed

23  by any medical care provider with ADHD, correct?

24     A.    I'll say correct.

25     Q.    T.A. had not been diagnosed by any medical care

1    provider with any obsessive-compulsive disorder,

2    correct?

3        A.   Correct.

4        Q.   T.A. had not been diagnosed with any condition

5    such as autism as of April 1st, 2016, correct?

6        A.   Autism, no.

7        Q.   And it is correct to say that in response to

8    every question asked by every police personnel to you,

9    including the 911 operator, whether T.A. had any medical

10   or mental diagnosis, your response was no, correct?

11       A.   Correct.

12       Q.   Do you mind if we take a break and use the

13   restroom?  Is that okay?

14       A.   (No verbal response.)

15           MS. WIENEKE:  Is that okay with everybody?

16           THE VIDEOGRAPHER:  This ends media one of the

17   deposition of Janna Bentley.  We are off the record at

18   10:34 a.m.

19           (A recess was taken from 10:34 to 10:58 a.m.)

20               (Exhibit No. 7 was marked.)

21           THE VIDEOGRAPHER:  This begins media two in the

22   deposition of Janna Bentley.

23               We are on the record at 10:58 a.m.

24       Q.   BY MS. WIENEKE:  Mrs. Bentley, I've had marked

25   as Exhibit No. 7 to your deposition Brian Bentley's

1      A.   No.

2      Q.   Do you know whether Brian still has these text

3    messages on his phone?

4      A.   No.

5      Q.   When is the last time you looked on Brian's

6    phone to see if he has text messages from March 31st and

7    April 1st?

8      A.   Never.

9      Q.   Do you ever email Brian at his work email on

10   March 31st and/or April 1st?

11     A.   Not that I recall.

12     Q.   Since we took a break, is there any testimony

13   that you have given today that you want to supplement,

14   amend, change?

15     A.   No.

16     Q.   Can you take a look at Exhibit No. 4, and in

17   Exhibit No. 4, you'll see in the responses some

18   information from your cell phone and Brian's cell phone.

19          Do you see that?

20     A.   Yeah.

21     Q.   It looks like, for example, in response to

22   interrogatory number 20, at 10:25 p.m., from

23   480-459-6505 a call was made by you to Brian Bentley.

24          Did I read that correctly?

25     A.   What time?

1     Q.    10:25.  It's the very first --

2     A.    Oh, yeah.

3     Q.    -- entry.

4     A.    Sorry.  Yes.

5     Q.    And is that your phone number, 480-459-6505?

6     A.    Yes.

7     Q.    That's your cell phone?

8     A.    Yes.

9     Q.    And then at 11:18 p.m. on March 31st, using

10    that same cell phone, you called Brian Bentley again.

11              Do you recall that?

12    A.    Yes.

13    Q.    And is it, based on these records, your belief

14    that at 10:25 p.m. on March 31st, 2016, was the first

15    time you called Brian to let him know that you could not

16    find T.A.?

17    A.    Yes.

18    Q.    It looks like the next call you made to Brian

19    was on 4/1/2016 at 7:24 a.m.

20              Do you see that?

21    A.    Yep.

22    Q.    Yes?

23    A.    Yes.

24    Q.    All right.  Who is Becky Bentley?

25    A.    Brian's mother.

1     A.   No, no.

2     Q.   How long did you have to wait for your

3   daughter?

4     A.   That's what I don't remember.  Sometimes they

5   get out on time; sometimes they don't.  I don't

6   remember.

7     Q.   Once you picked her up, did you make any stops?

8     A.   I don't remember if we were in a car pool with

9   one of her friends I could have dropped off by close by,

10  a minute or two from our home.  I could have.

11    Q.   Do you believe that the entire transaction

12  picking up your daughter could not have lasted more than

13  30 minutes?

14    A.   Oh, yeah.  Less than 30 minutes.

15    Q.   Less than 30 minutes?

16    A.   Yeah, safe to say.

17    Q.   You believe you probably would have been at

18  home no later than 9:30?

19    A.   Yeah.  Yes.

20    Q.   And when you arrived at 9:30, did you go and

21  check on T.A.?

22    A.   No.

23    Q.   When was the first time you checked on T.A.?

24    A.   It was after 10:00.

25    Q.   How long after 10:00?

1      A.    I couldn't say for sure.  10:15ish.

2      Q.    Where were the other children when you checked

3    on T.A.?

4      A.    I was down speaking with O.R. and G.E., my two

5    oldest children, and all the rest were in bed.

6      Q.    When you say they were in bed, where were they

7    in bed?

8      A.    In their beds sleeping.

9      Q.    Everybody in that room that T.A. shared with

10   his brothers were asleep except T.A. who was not in his

11   bed?

12     A.    Yes.  And my other children were in their

13   rooms, yeah.

14     Q.    Do you still own the Inverness house?

15     A.    No.

16     Q.    You have no ownership interest in it at all?

17     A.    None.

18     Q.    Who is Kendra Swan?

19     A.    She was my next-door neighbor on Inverness.

20     Q.    When you are facing the Inverness house, with

21   the street to your back, which side of the house does

22   Kendra Swan live?  To the right or to the left?

23     A.    To the left.

24     Q.    And who lives to the right?

25     A.    Gary and Alana Porter.

```
 1                  Do you understand?

 2       A.   I understand.

 3       Q.   Okay.

 4       A.   They searched on their own, which is why I

 5  cannot answer that question.  They searched.  I was not

 6  with them the whole time.  They came over; we said this;

 7  they split up.  I don't know exactly what they did.

 8       Q.   Have they shared with you what they did?

 9       A.   I'm sure -- yes, we have talked about it.  I

10  don't know every move they made though.  They

11  searched -- I know they searched their home, their yard.

12       Q.   Okay.

13       A.   And I don't know what else they did.

14       Q.   All right.  So we have these phone records that

15  can assist us in recreating what did you that night.

16            Did you contact anybody else other than

17  your neighbor, Kendra Swan, and through the text message

18  Mrs. Porter about T.A. on March 31st, 2016?

19       A.   And Brian.

20       Q.   Of course.

21       A.   Right.  No.

22       Q.   There's an entry at 11:56 p.m. that is made by

23  the landline to Janna.

24            Do you know what that is?

25       A.   Probably my daughter calling me.
```

1     A.   Correct.

2     Q.   So that would have been the first time you

3  contacted anybody in your family, outside of your

4  husband, that T.A. was missing, correct?

5     A.   Correct.

6     Q.   And that would have been after you called 911,

7  true?

8     A.   True.

9     Q.   The night before, during your search, you drove

10 over to where your grandfather lived, correct?

11    A.   Correct.

12    Q.   But you did not go inside, correct?

13    A.   Correct.

14    Q.   And you didn't notify your grandfather or

15 your -- is it your aunt that lives there?

16    A.   Uh-huh.

17    Q.   Yes?

18    A.   Yes.

19    Q.   -- that T.A. was missing, correct?

20    A.   Right.

21    Q.   Am I correct?

22    A.   I did not notify him.

23    Q.   When the siblings went to school in the morning

24 of April 1st, did you notify the school that T.A. would

25 not be coming to school that day because -- well, for

1    any reason?

2        A.    No.

3        Q.    So it's fair to say then that on the morning of

4    April 1st, you did not notify the school that T.A. was

5    missing?

6        A.    Correct.

7        Q.    Before April 1st, 2016, there were two other

8    occasions in which you, your family notified the police

9    because T.A. was missing, correct?

10       A.    Correct.

11       Q.    On these two occasions, these were occasions

12   where T.A. had run off and had not been, quote, "hiding"

13   in your home, correct?

14       A.    Correct.

15       Q.    In those incidents did each of those incidents

16   occur outside of the jurisdiction of Mesa?

17            MR. SCHERN:  Objection; form, foundation.

18            THE WITNESS:  One.  One, yes; one, no.

19       Q.    BY MS. WIENEKE:  Okay.  So let's take a look at

20   Exhibit No. 2 and on page 3 of 9, non-uniform

21   interrogatory number 1.  The first one, capital letter

22   A, you say, "Mid-April 2011."

23            T.A. would have been two?

24       A.    Yes.

25       Q.    Where did this happen?  What city?

```
 1   did it happen at night after bedtime?

 2       A.   It depends if it was like a Friday night and we

 3   were playing or something together as families.  So

 4   those would be the only circumstances usually at night.

 5       Q.   Well, I'm asking you, give me a circumstance

 6   where after bedtime, kids are put to bed, and now T.A.

 7   has gone missing and he's found hiding at Kendra's.

 8            Give me one instance when that happened.

 9       A.   I don't recall.  I don't recall any incidences.

10       Q.   When you put the kids to bed, do you lock the

11   doors to your house?

12       A.   Yeah.

13       Q.   To your knowledge --

14       A.   Unless kids aren't home yet.  I keep them open

15   for older kids, so not always, but, yes, sometimes.

16       Q.   When your neighbors, Kendra, when she puts her

17   kids to bed, does she lock her doors?

18            MR. SCHERN:  Objection; form and foundation.

19            THE WITNESS:  I would imagine so.  When

20   everyone is in for the night, right?

21       Q.   BY MS. WIENEKE:  Right.

22            What are Kendra's ages (sic)?

23       A.   She had a teenage daughter this whole time.  So

24   she had an older child out.

25       Q.   She had little ones though?
```

```
 1      Q.    Right.

 2      A.    Right.  I mean, even at night, anywhere.

 3      Q.    Sure.

 4      A.    It's just -- I couldn't say it's one place or

 5  the other.

 6      Q.    So is the rocking chair in the master bedroom?

 7      A.    Yes, so was our baby.

 8      Q.    What?

 9      A.    So was our baby.  She was in our closet.

10      Q.    Where is she?

11      A.    She was in our walk-in closet in her little

12  Pack 'n Play.

13      Q.    Okay.  So you sat in the rocking chair to start

14  to nurse the baby, and then you moved to the bed in the

15  master bedroom?

16      A.    Yeah.  I must have -- yeah.

17      Q.    Well, you're not --

18      A.    I remember myself in the chair.  It's because I

19  remember myself in the chair, but I know my legs were

20  aching.  That's the last memory I have.  So I wrote "in

21  the bed," so I trust I must have moved to the bed if I

22  wrote it.

23      Q.    And was it because you wrote it, but is it also

24  because you remember waking up in the bed?

25      A.    I don't, I don't know.
```

1      Q.    Okay.

2      A.    I remember the light of the window.  That's my

3   memory.  And thinking, ah, you know, and jumping.  So I

4   don't remember.  I just remember the light in the

5   window.

6      Q.    When you woke up, where was baby?

7      A.    My arms.

8      Q.    Were you still kind of propped up?  Yes?

9      A.    Yeah, yes.

10     Q.    And you woke up around what time?

11     A.    It was light out, so around 6:00ish, you know,

12   6:00-something.

13     Q.    Did you wake up on your own, or did an alarm

14   clock go off?

15     A.    I just woke up on my own.

16     Q.    And then what did you do when you woke up?

17     A.    Laid the baby down on the bed, and I ran to see

18   if, you know, what had happened when I fell asleep.

19             I don't know how long I fell asleep and

20   that's when I found Brian propped by the front door.

21     Q.    Did you have to nurse baby again though that

22   morning when you woke up?

23     A.    You mean at 6:00?

24     Q.    Yes, ma'am.

25     A.    She was still asleep.

```
 1      A.    Kemp.

 2      Q.    Who is Kemp?

 3      A.    Called him Grandpa Morris.  Kemp, he's just a

 4    man in our neighborhood.  Cowboy.

 5      Q.    In your journal entry, you say that on the

 6    night before, when you called Brian, the two of you made

 7    a plan.

 8            What was the plan?

 9      A.    He would look with me when he got home, and we

10    did that, looked together.  We brainstormed together.

11    We deducted, okay, pillow and blanket is gone; he went

12    to sleep somewhere in a really good hiding place.  He's

13    sleeping; he doesn't have shoes on; the bikes are here;

14    and he was close.  And we felt it.  We knew he was

15    close.  We felt that the whole time.

16      Q.    Okay.  You told Brian you were worried, right?

17      A.    Correct.

18      Q.    You said, "I'm not sure I can sleep or do

19    anything until I know where he is," correct?

20      A.    Correct.

21      Q.    And that's because --

22      A.    I'm a mother.

23      Q.    You're a mother.  And you wanted your boy?

24      A.    (No verbal response.)

25      Q.    And you didn't mean to fall asleep?
```

1    None of the neighbors were privy to know what, for what

2    reason those kids were in the group home.

3           MS. WIENEKE:  Move to strike; nonresponsive.

4              And, I'm sorry, Ms. Bentley, what I asked

5    you was:  You were asked by one of the investigating

6    officers whether you knew there was a sex offender home

7    in the neighborhood, and you replied yes.

8              Do you recall that?

9           MR. SCHERN:  Objection; form, foundation.

10          THE WITNESS:  There's no way I could have known

11   that.  I knew there was a group home in the

12   neighborhood.

13    Q.   BY MS. WIENEKE:  But the question that you were

14   asked in the investigation was whether you knew there

15   was a sex offender home in the neighborhood, correct?

16          MR. SCHERN:  Objection; form and foundation.

17          THE WITNESS:  Because the police officer said

18   there was, so I assumed he knew.  And I knew there was a

19   group home.  And he said:  Did you know?

20              So, yes, I knew there was a group home is

21   the question I was answering.

22    Q.   BY MS. WIENEKE:  But the question that was

23   asked of you was whether there was a sex offender home,

24   and your reply was yes, correct?

25          MR. SCHERN:  Objection; form, foundation.

 1            THE WITNESS:  My answer stands.

 2      Q.   BY MS. WIENEKE:  Go ahead and answer.

 3            MR. SCHERN:  Objection; asked and answered,

 4  form, foundation.

 5      Q.   BY MS. WIENEKE:  You can answer.

 6            MR. SCHERN:  She's already answered.

 7            THE WITNESS:  I did answer.

 8            MR. SCHERN:  Twice.

 9      Q.   BY MS. WIENEKE:  You haven't answered the

10  question that I have asked, and I'm entitled to an

11  answer to the question that I have asked.

12            MR. SCHERN:  You asked the question twice,

13  Kathy.  She's answered it twice.  You just don't like

14  the answer she's given you.

15      Q.   BY MS. WIENEKE:  We'll come back to that.

16            And can you identify where the group home

17  was that you were aware of -- I'll give you my pen --

18  prior to April 1st, 2016?

19      A.   (Witness marking on exhibit.)

20      Q.   And you put a circle on the home on Los Alamos,

21  correct?

22      A.   Correct.

23      Q.   And you knew that there were teenagers living

24  at that group home, correct?

25      A.   Correct.

1      Q.   And you had warned your children to stay away
2   from that group home, correct?
3      A.   Correct.
4      Q.   You had warned them to stay away from that
5   group home why?
6      A.   Because we didn't know who was there.
7      Q.   You didn't know who was there?
8      A.   Yeah.  As neighbors, we weren't aware of who
9   was in and out of there.  We weren't privy to that, so
10  stranger policy applies then.
11     Q.   And what did -- who did you believe would be
12  residing in the group home filled with teenagers?
13     A.   I -- anything would be a speculation.  I didn't
14  know.  We weren't given that information.  We tried to
15  get it.
16     Q.   You tried to get it removed --
17     A.   We weren't given that information.
18     Q.   Oh, you tried to get the information?
19     A.   Yes.
20     Q.   From whom?
21     A.   The City.  The neighbors tried.  We moved in
22  after.  So it wasn't allowed.
23     Q.   And the reason why you wanted to have your
24  children not go near that home was because you were
25  concerned that there might be teenagers residing in that

1    home that may have been involved in nefarious

2    activities, correct?

3         A.    Correct, strangers.

4         Q.    Nefarious activities to possibly include drug

5    activity?

6         A.    Perhaps.

7         Q.    Possibly include criminal activity?

8         A.    Perhaps.

9         Q.    I want to ask you about the morning of April

10   1st, 2016, before you called the police at 8:00 a.m.

11            Can you tell me all of the people that you

12   contacted either by phone, in person, or by text to ask

13   them to assist you in your search for T.A.?

14        A.    Well, my immediate neighbors were already

15   involved and knew again in the morning.  And I do have a

16   neighbor named Shawnee who I guess it was dark when I

17   went out again, because it was kind of dark when I saw

18   her on the road, and I told her.  And she's our

19   neighborhood communicator.  So she has a group messaging

20   that goes out through email or whatever she does, she

21   sent it out.

22            So she contacted our neighborhood.  We're

23   a tight-knit neighborhood.

24            And from there it spread to people in my

25   church, spread to other groups, different, you know,

1           You don't have any reason to believe that

2    what we see on the video and the words that you uttered

3    on the video are anything other than truthful?

4         A.   I remember my words.

5         Q.   Okay.  And your words that we see on the video

6    are truthful?

7         A.   They're definitely my emotions at the moment

8    for sure.

9         Q.   Well, I'm not asking you about your emotions

10   respectfully.  I'm asking about your words.  And I want

11   to know whether we can count on the words spoken in the

12   video as being truthful.

13           MR. SCHERN:  Objection; form, foundation.

14           THE WITNESS:  Baseline wasn't a road I wanted

15   him to cross without me.

16        Q.   BY MS. WIENEKE:  I'm sorry.  I can't hear you.

17        A.   Baseline Road was -- what I said in the video

18   were my feelings for him at that time.

19        Q.   And I'm not trying to mislead you.  I'm not

20   asking just about the Baseline Road incident.  I'm

21   talking about the entire -- entirety of your words that

22   are captured on the Axon video.

23           If we look at the Axon video, whether it

24   be in video number 1 or video number 24, can we rely on

25   the words that you spoke in those videos as being

1   truthful?

2          MR. SCHERN:  Objection; form, foundation.

3          THE WITNESS:  Yes.

4   Q.   BY MS. WIENEKE:  Officer Rudolph, you remember

5   Officer Rudolph, one of the Mesa officers at the scene?

6          I think you call him Elder Rudolph.

7   A.   If I saw his face, I would know for sure the

8   one.  I think -- I'm, I'm, I'm pretty sure I remember

9   who that is.  Was he at our trial?

10          I don't know.  I'm sorry.  I don't, I

11  didn't -- I don't have their names and faces.  I don't

12  know who most of them were.  So the face I could tell

13  you.

14  Q.   You recall Officer Rudolph said that there was

15  "a sex offender house here"?

16          You recall him saying that?

17  A.   Again, my -- I answered the question about the

18  house.  The conversation, how I said it is how it went

19  down.

20          I remember standing.  He said:  This is

21  the house.

22          Yes, I knew this house was here.  This

23  group home was here.

24  Q.   Okay.  You remember that Gilbert Fire

25  Department responded to your home?

1        Q.   I guess I don't understand how those are

2    inconsistent, the doctor telling T.A. to obey his

3    parents --

4        A.   I don't --

5        Q.   -- how is that inconsistent with there still

6    being an investigation?

7        A.   I'm just saying it was different with DCS and

8    police in the room.  That's all.

9        Q.   Oh, I see.  Understood.  Okay.

10            All right.  So once T.A. was found, did

11   you see Brian pull him out of the bushes?

12       A.   T.A. moved -- I got there just after he had

13   gotten him out of the bushes.  I was feeding the baby at

14   the time.

15       Q.   Where were you feeding?

16       A.   In my front room, my home.

17       Q.   In where?

18       A.   In the front room of my home.

19       Q.   And what did you do next?

20       A.   I ran to where he was found.

21       Q.   Okay.  And what did you do then?

22       A.   I tried to just get down and look at him, and

23   his eyes wouldn't stop moving, darting from everyone

24   around there.  He was nervous, scared.  I couldn't get

25   him just to look at me.

1   before, was he angry?

2       A.   He was -- he didn't want to do his jobs, and he

3   was teasing everyone else.

4       Q.   Was he mad that he didn't want to do his job?

5       A.   Yeah.  He didn't want to do his work, so he

6   just said that -- I told him that he could either do his

7   chores and cooperate, or he was going to go sit in his

8   dad's office.

9       Q.   Is it accurate that between the time period of

10   3:00 a.m. and about 6:00 a.m. nobody was looking for

11   T.A.?

12       A.   I couldn't say for sure.  I don't know what --

13   I only know what happened to me around those times.

14       Q.   Well, you've talked to Brian about it, right?

15       A.   Right.

16       Q.   You knew what Brian was doing?

17       A.   Inadvertently he fell asleep.  He doesn't know

18   what time, you know.  These are all approximate guesses,

19   but....

20       Q.   But you don't know of anyone else besides you

21   or --

22       A.   I don't.

23       Q.   -- Brian that may have been looking for him,

24   right?

25       A.   Correct.

1      Q.   So assuming Brian fell asleep around 3:00 and

2  you started looking for T.A. around 6:00, nobody was

3  looking for Brian -- for T.A. during that time period,

4  correct?

5           MR. SCHERN:   Objection; form, foundation.

6           THE WITNESS:   Correct.

7      Q.   BY MS. WIENEKE:   Do you know how Mr. Coon was

8  contacted?

9      A.   Probably the neighborhood.

10     Q.   So, Mrs. Bentley, we identified in Exhibit

11 No. 8 the bush surrounding that tree where T.A. was

12 found.

13          Had you ever known T.A. to hide in that

14 particular bush before?

15     A.   No.

16     Q.   And you had never known T.A. to leave your home

17 at night and hide out at night before, correct?

18     A.   Not outside our home, no.

19     Q.   And it would be fair to say that as a mom, I

20 mean, I call it "spidey sense," but you had a particular

21 spidey sense, a mother's intuition, about T.A.; would

22 that be fair to say?

23     A.   Yes.

24     Q.   You knew his habits?

25     A.   Yes.

1     Q.   And, by the way, the major cross streets

2   closest to the Inverness address, that would be like

3   32nd Street and then Broadway?

4     A.   Baseline.

5     Q.   Or Baseline?

6          How far is it from Baseline, that

7   Inverness house?  Do you know?

8     A.   Maybe a quarter of a mile.

9     Q.   How about 32nd Street; how far is that house

10  from 32nd Street?

11    A.   Less than that.

12    Q.   Less than?

13    A.   I don't know.  Three, four hundred yards.  I

14  guess that's a quarter of a mile though, huh?  So....

15         You have the map right here.

16    Q.   Well, we had the Google map; we can look at

17  it.  I just was wondering from your memory.

18         You lived there nine years, correct?

19    A.   Right.

20    Q.   The night of the -- when you first realized

21  that T.A. wasn't around or he had left or was someplace;

22  you couldn't find him, when you started checking places,

23  did you check the group home that you knew about, over

24  at that group home to see if he was in that area?

25    A.   Did I --

1      Q.   Yeah, you were checking.  I think you said you

2  checked --

3      A.   I just looked around the whole neighborhood.

4      Q.   Did you go over to the group home and check

5  that out?

6      A.   I didn't go into anyone's house but the

7  Alexanders' and Porters'.

8      Q.   Did you -- you didn't knock on the door to see

9  if anybody --

10     A.   Not anyone else but Alexanders and Porters.

11          MR. SCHERN:  Let him finish his question.  It

12  will make it difficult for Switzerland over there.

13          THE WITNESS:  Sorry.

14     Q.  BY MR. BOWEN:  The other thing I also wanted to

15  follow up, the journal that you keep, you've kept a

16  journal essentially for, like, I imagine most of your

17  adult life you keep a journal?

18     A.   To some degree.

19     Q.   Can you just -- I just want to make sure I

20  understand how this is done.

21          Is this something you write in every day

22  to discuss your feelings and things that happened and --

23  is it something you make entries in every day or do you

24  do it once a month or do it whenever something strikes

25  you as being important, needs to be journaled?

```
 1    it never was more than an hour that it took you to find
 2    him?
 3         A.   Correct.
 4              MR. BOWEN:  I don't have any other questions.
 5              MS. WIENEKE:  Do you have anything, Mike?
 6              MR. SCHERN:  I do not.
 7              MS. WIENEKE:  I have a few follow-ups.
 8
 9                        EXAMINATION
10    BY MS. WIENEKE:
11         Q.   Mrs. Bentley, in Exhibit No. 1, which is your
12    journal entry, on the last page, BENTLEY-520, the second
13    paragraph from the bottom, about midway up that
14    paragraph, you write, "They searched their roof.  We
15    searched our roof."
16              Did I read that correctly?
17         A.   Yeah.
18         Q.   Had T.A. ever hid on your roof before?
19         A.   No.
20         Q.   Had he ever hid on the neighbor's roof before?
21         A.   No.
22         Q.   So tell me how you searched your roof.
23         A.   Just being thorough really.
24         Q.   No.  I mean, physically how did you do it?
25         A.   Oh, you can get up easy on our roof from the
```

Exhibit 6

Janna Bentley
Notes on April 1st. 2016 - when Talon hid from us in our neighbor's bushes

Written April 10th and 17th.
All interactions as I can remember.  Not chronological.

Approximately 8:00 AM
The first police to arrive at our house was the woman, darker skin, hair in ponytail.  She asked me immediately why I didn't call earlier about Talon.  I told her we felt such peace as we prayed and that we feel he is close by.  She asked again.  I don't know from where this comment came, but I remember telling her that perhaps because the last time I called the policeman that showed up said such hurtful and scary things to my 4/5 year old Talon and it bothered me.  (That policeman went on to say what a bad and abnormal child he was and that he could force him to a hospital where they could inject something into him to make him stop moving.  Talon was squirming when I had him in my arms as police arrived that day.  I found him just after I called police that day.)

That police woman asked me the names and ages and schools of all of my children.  I didn't think much of it and offered any information she asked.  Other police arrived and I allowed them permission to search my house for Talon.  When they came out we brain stormed any possible areas he could be.  We were sending my girls on bikes to check places we already had and neighbors were putting white flour x on the houses that had been searched inside and out.  Emerald Bay and Harmony Park Wards all searched their areas.  A message was sent to all of our Gilbert 12th ward and many searched their neighborhoods, the canals, the church and more.  Areas we had searched through the night and morning plus more.

One officer told me to stay put at home so I would be here when he was found.  Over time more and more police arrived.  I gave them a recent photo of Talon and asked what they suggested about us putting it out on social media.  They said they would get back to me and never did. A friend put it out on facebook anyway and many nearby started searching parks.

The whole time the search is going on I keep looking at the treetops.  I mention to Megan Klug and Shawnee Jarman that I just keep expecting him to pop his head up at any time. " I feel like he his watching me and close, " I told them.

Another police asks for the names, ages and schools of our children again.  I don't think much of it other than the police are a bit disorganized.  I gave them the information again.

A group of officers and street dressed persons are standing under Schreiner's Tree during much of the search.  I assume they are detectives or making a game plan.  I see a couple of women in that mix.  I later would identify them as CPS.

Many police show up.  Some join forces with friends on the canal (Jackson Crawford, Jalen).  Some follow girls to Jennifer and Grandpas.  Some search the immediate neighbor's houses.  More police officers than areas to search.

Police helicopter comes and calls out Talon's name.  Church area is searched many times by Kendra and friends.

BENTLEY-514

No one talks to neighbors about us.  Many neighbors arrive at our house later that day saying they would gladly go anywhere to vouch for us.  I think, "Why did CPS or officers not talk to them to make judgement on situation instead of traumatizing our children? "

Bishop Rob Coon sprints off at one time saying he saw a head pop up he thought.  Police follow.  No Talon.  (They were feet from him but couldn't see him at the time.)

Robert's girlfriend (Trump house) was the one to spot Talon.  She was on the second floor of their home on the balcony and saw him move from his main hiding spot to another.  She and Robert run telling Brian where he is and Brian gets him with great effort as he is climbing into some bushes behind Gary and Alana's greenhouse.

I am inside on the couch and as I attempt to feed Braelynn, 2 DCS workers are just telling me their name when someone yells they found Talon.  I run out of the house with baby still eating and hand her to friend Jamie to go see Talon.  He is nervous.  He can't seem to make eye contact as Brian tries to hold him still.  He wants to run.  I get down at his level and try to make eye contact with no luck. His energy is rattling and I can tell he is way overwhelmed and scared.  We agree to have Brian go take him inside alone so that he can calm down without all of the eyes.

Four policemen stop me to tell me I should have called them sooner.  M. Reyes, who I had been drawn to by his positive "we will find him mom" energy, was now telling me that I needed a wake up call and should have called sooner if I cared about my son.  They give me the "you are a horrible mom routine."  I listened to them tell me that if I can't find him after 15 minutes of looking I should call them.  They explained the infrared capabilities they have in their choppers, etc.  I told them that I would call earlier next time and could see how that would allow for the radius to be covered to be so much smaller.  Again, the badgering seemed to continue.  Reynolds was somewhat calm and patient as he continued on.  I explained that I understood what they were saying and that we had felt peace that we would find him as we prayed and searched through the night.

I go and hug and thank the girlfriend and tell point people→ members of the ward and such that he is found and ask them to call off the troops everywhere and get the word out.  I walk back to be with Talon.  Stephanie Porter  pulled up in her car just as I am making it back to our walkway.  She hustles to me and with such urgency tells me that she needs to talk to me NOW.  Is that okay?  I wanted to be near Talon, so we went in but the house was full of police and others.  We went to the school room and she told me, "Janna, you do not have to let them in your house.  You tell them that you and your husband want some time to pray and hold him and let him get calm.  If they come after attacking Talon's behavior, you say of course he isn't acting normal.  He is scared.  Give us some time. "

Truthfully, I heard and processed all that she said, but I didn't know why I would need it...until I went into Talon. He was in the bathroom with Brian.  They were sitting on the tub and he was trying to escape again. He wanted to hide from it all and we could tell.    3 paramedics, one DCS worker and a police were in the bathroom as well.  Brian told me he was just getting Talon to talk and calm down when they all came in and now he wouldn't respond.  I asked them to please give us a chance to be with him.  ==The Alex Ramos, paramedic said that Talon wasn't behaving normally and needed to have a full evaluation by a doctor.==  I said, no problem.  I would be happy to take him to a doctor.  I knew someone who would see us immediately once Talon was calm.  They could come with if they wanted, but until he was calm there would be no

success in trying to force a physical exam.  He left the room frazzled.  I had Talon and he was trying to run, so Brian took him again and I went to ask everyone to give us some time.  The taller DCS woman worker grabbed me right upon exiting the bathroom.  Inches from my face she tells me that they need to interview Talon right now.  I told her he is scared with all of these strangers in our house and that Brian and I would like some time alone with him to calm him down first.  She said that would not be and and option.  A man (who later at the Family Advocacy Center told me he was a supervisor/sergeant) then came into the picture.  Aggressively he told me I could not tell them they couldn't talk to Talon and that they could take him right now if they wanted.  I asked him why they would do that.  They said that it was best for Talon.  I told them they didn't even know Talon.  How could they possibly know what was best for Talon?  She begins to say that I didn't call them early enough and therefore obviously didn't know what was best.   Brian hears them ganging up on me and after having "asked permission" to lay Talon down in his bed and allowing him to hide under his blanket, Brian comes out to talk to them as well.  I hand him his phone and tell him to call Mike Schern.  I say Stephanie said to call a lawyer (for us that means Mike Schern)  as soon as possible

(AT some pointBrian tries to go into our bedroom to make this phone call and the police deny him access to our own room).

Stephanie Muir comes to the door to come in and join us and the police will not allow her in, shutting the door directly in her face as I tell them to let her in.

I can't remember the exact words.  Thankfully my brother Jalen who was kicked out of my home came back in through the garage and began recording the whole conversation when he heard what was happening.  The police in the kitchen told him to leave and he said he was my brother and that was his nephew and he wasn't going anywhere.

I continue this conversation and Supervisor/Sergeant  and the shorter DCS woman start "code talking" about what I think is TRC form or something. He says, "Let do it.  MAke the call." I ask them what they are code talking about.  He says they aren't code talking.  I feel that it means  "let's take the child.  Restrain the parents. "  They won't explain.  Brian and I have police on both sides of us.  Another police comes from behind.  There are 3 DCS workers in front of us.  3 paramedics.  More police in our front room.  One at the hallway.  Another DCS worker back in the room is with Talon.  She is the one from the bathroom that I didn't notice there.  She is talking to him.  He is calm now.  I point that out to the workers.  Can you hear that just getting away from so many strangers watching him and hovering that he is calming down? Now would be a much better time to  do a physical exam.  "Too late" the Sergeant says.  "We are going with what the paramedics tell us he needs and you are denying medical treatment to your son. " At this comment, I realize that I feel something different coming from a particular man back against the wall by the light switches.  I feel him.  I mention.  Okay, let's talk to a paramedic then.  I point to this man against the back wall.  I ask him do you think it is necessary that we force my son into an ambulance and take him immediately for medical attention?  I remember pleading with him with my eyes.  The sergeant tried to block my view of him and interrupt us, but something wouldn't allow that.  This man, Adam Hellman, steps over by our entry closet.  I ask him , "Can you read/hear my soul?  Do you understand what I am asking you?  What would be the best choice for my family to make right now and not just for right now? "  He said. I think I do understand.  What if you agree to the ambulance transport and go with your son to get the check up they want to do? .  If you will do this I think we can avoid some of what's about to happen."  He looks over for approval from  the Sergeant now in our front room (probably arranging the "kidnapping" of our other sons).   I ask Adam if he will come with me on the

==ambulance please.  He says yes.  I then ask them to please wait until I feed my baby and then I will go.  I go out to find braelynn.==

Jamie Ashdown meets me on our driveway as my house is crawling with police leaving me no private place to breastfeed Braelynn.  I sit on the driveway in shock as I tell Jamie that they were about to restrain Brian and I and take Talon.  They were whispering about it and I could feel it.  I prepared the girls on what to feed Braelynn throughout the day and what to do if it went late past the time she would want to nurse again.  Jamie told me how they tried to kick Jalen out of our house and he refused and how he recorded the conversation.  She told Bishop how they wouldn't listen to me at all just ask for time with Talon before they pounced on him.  I finished feeding Braelynn...that feeding I had begun just as talon was found.  I went back into see Talon.

A policeman.  The one who would be at the hospital blocked me at the front of hallway telling me I can't go back.  I look at him and say, "what?"  What is this about?  He asks permission to move aside and I go to Talon's bedroom door and a DCS worker (Latino, black shirt)  is blocking entrance to his room.  I told him I am coming to see my son.  He looks down the hall for permission and then allows me back.  Talon is on the bed conversing with the DCS worker in the purple shirt.  I think her name is Jeanna, or maybe Jeanna was the one taking orders from Sergeant supervisor.  Talon is laughing and telling me about what they made out of tearing up paper.  We hug and we all talk about what food he took with him when he went to hide and how that was why he didn't need to come back for breakfast.
I tell him that we are going to go see a doctor who is going to make sure he is okay.
He tells me, why? I am totally fine.
I know.  We just want to make sure.

I told Brian to get the girls so we can say a family prayer.  We ask them to leave our house so we can pray.  They say no.  We say please some of you leave we have already agreed to go with you.  Purple shirt DCS worker and a couple of police stay.  We gather with Olivia, Ellie, Talon, Braelynn, Jalen, Mom Rudd, Bishop Coon.  Brian says the prayer.  He can barely get through it, his emotions are so strong and we are scared for our son and for our family.  Bishop and Brian give Talon a blessing.  I hug everyone.  Talon gets strapped to a gurney, with a smile and excitement spilling out through it.  Jalen takes a picture of him.

Steph Muir hands me her phone as I am about to mount the ambulance.  It's STeph Porter.  She tells me she has checked with a lawyer and we do not have to allow them to do anything and we can ask them to leave and by law they have to.  I tell her, it is so much worse than that Steph.  They were about to take Talon.  I knew I had to do everything I could to stay with him.

I leave on the ambulance.  Talon is so happy.  He sees the fire truck following us and is very excited.  I hold back my frustration with him never getting to see the situation and consequences of his action with calm eyes.  He goes straight from getting calm to party time.  They give him gloves to blow up and he can hardly contain himself.  ==I thank Adam.  I ask him if I can ask a few questions without putting him into a compromising situation.  He tells me he has been a paramedic for 26 years.  He tells me how common the situation is that just happened.  As we walk through the hallway of the hospital I tell him privately thank you.  I felt something call to me and your words quieted  the ugliness in our home and changed things for us.  He told me he was praying hard to know what to say and how to say it.  I asked for counsel.  He said he was no expert, but felt that if I went along with what they wanted and allowed the medical tests and questioning it would most likely be better.  He mentioned something about a Father's love.==  I felt

then, that perhaps my Dad had spurred that miraculous intervention...or maybe it was Father in Heaven.  I definitely felt a Father's love.  It was a blessing...even a miracle that would provide a way for us to have our children all together that night.

Talon was thrilled to get his own TV to watch in the ER and after I was asked for health insurance information (awesome, right?") the ambulance personnel asked me to sign something authorizing payment for transport.  He said whether or not I signed it, we would be billed, it was just a matter if it would be given to insurance first or not.

A nurse takes his blood pressure.  Doctor and nurses enter and Talon begins to get overwhelmed again.  Too many people.  Some nurses agree to go out so that Police and DCS can stay inside.  Sara Fisk comes to the door as it is closing and is kept outside.

The M.D. that came in was obviously gifted with children.  He immediately saw Talon's distraction with TV and turned it off and began to ask him questions.  Talon told him that he had hid and slept in the neighbor's bushes and had taken food, water, pillow and blanket.  Doc asked him if he got cold several times.  He said no each time.  "I brought my warm blanket."  Talon told Doc that he didn't want to go to his Dad's office and sit, which is what he was going to have to do if he didn't do his chores.  Doc asked him if his hiding place was so good, why did he move?  Talon told Doc that he got bored.  Doc said, "So you didn't want to sit at your Dad's office because it is boring so you go hide in a bush and get bored ? Sounds like you need to listen and obey your parents.  Sometimes you don't like to, but we all got to do things we don't like sometimes."

Doc looks at his chest and back and checks him for marks.  No marks.  Doc leaves.

Sara comes in.  We talk and wait.

==The officer seems to know nothing other than he keeps saying that he was told Talon is a "ward of the state", but not sure if that is the right term.==  I am frustrated that the law enforcement officer has no idea of the law at this time.  I have been  by lawyer, through Brian's text, that it is best to stay quiet and make not problems until they move us at which point the lawyer will meet us and help to get us away from them.

I ask the nurses to please not give him the box of presents they so kindly come in with.  (Talon didn't even notice.  He was so engrossed with cartoons.)  I turn to the DCS worker and ask her, Are you a mother?  Do you have kids? " She says yes.  "Can you not see how much more difficult this is making it for my son to learn from his actions?"

She doesn't answer the question directly.  She mentions that sometimes they have to assume the worst.  I disagree and tell her that sometimes you can just look around and use your judgement and assume good too...or even just use your logic and heart to make and assessment.

(Jalen also heard this DCS worker tell the DCS man with the black shirt that Talon was calm and could be interviewed here at the house.  He relays this message to the taller DCS woman and she says no.  They will not allow that.  Jalen asks the man in black if he heard correctly.  That man says yes.  I think Jalen said that he recorded it too. )

BENTLEY-518

We are told that Talon has to be with police because he is a ward of the state.  I go with him in the back of the police car to the holding facility (Family Advocacy Center).  (Talon thinks he is at a theme park and loving all of these adventures.  I just keep my energy as even as possible).  Lawyer Mike and I are texting so he knows the minute I arrive.  He is there waiting.  Talon runs to the playroom because he sees Bryson and Mason. I stand still in shock for a moment  that they are there.  I don't even know what to think as I say,  "They took my boys from school without our knowledge." I go in here.  Mason and Bryson are eating fast food.  Mason comes to me and says, "Mom why didn't you tell us someone we didn't know was coming to get us? You said you would never do that." I tell him I didn't know.  I hug them both.  Not even sure if I can tell them we are taking them home ASAP.  Bryson is doing his homework.  They both went from quiet to happy as I go into the room.  I worry what they are thinking.  They are strong and I feel that.  I see that someone bought them fast food.

Mike and I wait.  Talon stays with the boys.  We can see them through the glass door and windows.  Eventually, the two DCS women (Taller and shorter form house) come down.  They aren't as aggressive.  I am ticked that they took my boys though and I am just trying to not ask them what they heck were they thinking?  Sergeant Supervisor comes out at which point I ask his title and he tells me.  Mike asks him if the boys are free to go.  He won't answer.  Mike ignores all other comments he makes and repeats the question, "Are we free to go?"  5 or 6 times this happens.  Finally, Sergeant Supervisor says no. Mike says, "That's all I was asking. He asks something along the lines of by what order are you holding them? He mentions what I think is the TRC again.  Mike says okay.  "What will it take for us to leave with them?"  He says Talon has to be interviewed alone with their forensic investigator.  Mike says to do it and we agree.  A woman I haven't seen takes him back.  They so no when I ask if purple shirt DCS can accompany him as well as she seemed somewhat humane toward Talon.  She is actually OWIC, which I think is just a division of DCS. Maybe their emergency or off hours division.  Anyway, he goes back.  They give us their claim of negligence against us and ask us to sign the forms.  Mike signs them.  I tell short DCS worker how ironic it is that they accuse of being and unsafe place for our kids, then they take my other two boys from their safe school and bring them here without telling their parents.  How is that responsible or safe?  GRRRRRRR. It is so wrong  We ask what is the procedure after the interview with Talon.  "It depends what we find out, " we are told.

Meanwhile, Mike says , "Let's get your other boys out of here.  Sara Fisk who followed us, comes back to get  Mason and Bryson.  She takes them home."

When Talon comes back they tell us we can go. Mike asks for a copy of the TRC.  Shorter DCS (Christina)  worker says they don't have one.  They didn't file one.  Mike says, "So that man lied to me?"  We leave.

Mike takes me and Talon home.  It is approximately 3:10.  We are reunited with everyone. Two women  DCS workers follow us home so that they can "lay eyes on Savanna". As soon as they see her, they take off.

We are exhausted.

My girls tell me how Steph Porter took them to pray in the front yard and police told them to leave.  They went to our side yard and prayed there.  Steph Porter told her to come give me a hug while they were all ganging up on me inside.  She was scared to come into our house and the police wouldn't let her.

BENTLEY-519

<u>The night before Talon is found</u>:

Talon didn't want to do his chores and kept sneaking around to play. I told him that if he would rather sit at Dad's office and practice self-control, he could do that, but that I couldn't sit and watch only him the way Dad could, "so do your part if you want to stay home. I want you home."

I waited for Grammi to drop Ellie home from gymnastics before I went to get Olivia from volleyball. At this point, Talon is out front sitting on a chair. I tell Ellie to finish family prayer and help the boys and Savanna to bed please while I get Olivia. Ellie sees Talon pop his head in about 915 or so and invites him to come for family prayer and he goes out laughing.

I get home and immediately go down to thank Ellie and we talk for a bit. She says she thinks Talon went to his room. I go up and check after talking and Talon is not there. I begin the search for him. I search the house many, many times. He is a good hider and often moves around as I am looking. I search the yard. I search the house. I search the yard. I search the Alexander's yard. I search Alana's yard. I call Kendra and Mark. They search their house and yard. They search their roof. We search our roof. Alana and Gary turn their lights on. We turn our lights on. I search all of our yards again. I drive the neighborhood. I drive Harmony Park. I search the church. I am texting Brian. He says Talon is fine and he will find him when he gets home. I keep searching. Ellie and Livvy are helping. Livvy is searching yards with flashlight. She gets in car with me and drives around. We are all worried and tired. They go to bed after 1.

I keep looking and driving around. Brian gets home at 2:00ish from work. He searches the house and yard several times. We kneel at Talon's bed and pray. We feel calm and peace and that he is okay. We do not feel that we need to involve more people. Sometime after 3, Braelynn wakes up and I sit in bed to feed her. Brian is in the chair by the propped open front door...sure Talon will get hungry or uncomfortable and come home. AT 6 something I wake up with the light and put Braelynn in bed. I had fallen asleep. I begin the search again. I check his bed, the yard. I drive around. I check the church. I tell my neighbor Shawnee and she gets everyone on the search. Kendra takes the kids to school and then I call the police. Bishop Coon and Kemp nearby searching as I do. Fate would have it, I was maybe 30 to 40 feet from him when I called the police.

BENTLEY-520

Exhibit 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

BRIAN L. BENTLEY; et al.,       )
                                )
                                )
            Plaintiffs,         )
                                )
vs.                             )  No. CV 2:17-cv-00966-DJH
                                )
CITY OF MESA; et al.,           )
                                )
            Defendants.         )
_____)

VIDEOTAPED DEPOSITION OF BRIAN L. BENTLEY

Mesa, Arizona
May 17, 2019
2:07 o'clock p.m.

Prepared For:

Prepared By:  Karine Moore-Deysie, RPR

             Certified Court Reporter

             No. 50293

1      A.   She texted me that he was missing, and I was in

2   the middle of work, so I told her that I would check

3   when I got home.

4             If you define that as a plan, then that

5   was our plan.

6      Q.   Okay.  So is that, is that what you -- is that

7   what you believe is the plan?  Is that what you thought

8   it was?

9      A.   Yes.  That I would come home and check when I

10   got home, yes.

11      Q.   Okay.  And what did you do when you got home?

12      A.   I talked to my wife about where she had

13   searched, and then I began my own search.

14      Q.   Where did you go?

15      A.   I searched in the home; I searched in our yard;

16   searched in the neighbors' yards.

17      Q.   How long did you spend searching?

18      A.   Probably -- well, we didn't necessarily stop

19   searching until he was found.

20      Q.   How is that?

21             MR. SCHERN:  Object to form of the question.

22             THE WITNESS:  I don't understand your question.

23      Q.   BY MS. WIENEKE:  Well, you heard your wife

24   testify that she started nursing your young baby around

25   2:30 or so, right?

```
 1      A.   Correct.

 2      Q.   And fell asleep?

 3      A.   Yes.

 4      Q.   So she stopped searching then, right?

 5      A.   Well, she was nursing.  She wasn't searching

 6  actively, correct.

 7      Q.   And then she fell asleep and woke up at 6:00?

 8      A.   That's what we know, yes.

 9      Q.   So she wasn't searching then either, right?

10      A.   That period of time, correct.

11      Q.   Okay.  So what time did you fall asleep?

12      A.   I don't remember.

13      Q.   So you weren't searching when you were asleep,

14  were you?

15      A.   Correct.

16      Q.   So your statement was inaccurate?

17           MR. SCHERN:  Objection.

18           THE WITNESS:  No.

19      Q.   BY MS. WIENEKE:  Okay.

20      A.   To my knowledge.

21      Q.   I'm sorry.  When you said we never stopped

22  searching --

23      A.   Correct.

24      Q.   -- your wife was sleeping, right?

25      A.   Uh-huh, correct.
```

1      Q.   She wasn't searching when she was sleeping,

2   right?

3      A.   Correct.

4      Q.   You were sleeping?

5      A.   Correct.

6      Q.   You weren't searching when you were sleeping?

7      A.   Correct.

8      Q.   Okay.  All right.  You got up at about, what,

9   6:45?

10      A.   I was woken up about 6:45.

11      Q.   Right.  And your wife had been searching for a

12   little bit before she woke you up, right?

13      A.   Yes.

14      Q.   And you were -- were you in a chair, or were

15   you propped up by the door?

16      A.   I was by the door, on the floor.

17      Q.   On the floor?

18      A.   Correct.

19      Q.   Do you all lock your doors at night typically?

20      A.   Typically.

21      Q.   Okay.  And were you aware that your wife had

22   called 911 before she called?

23      A.   I don't understand the question.  Was I aware

24   that she called 911 before she called?

25      Q.   Right.  Did you know she was going to call 911?

1      Q.   BY MS. WIENEKE:  Sure.  If you were the one

2    that entered -- put -- excuse me, entered the code

3    leaving work that night, early morning of April 1st,

4    that that would be the best evidence of when you

5    actually left your building?

6      A.   If that was me -- if I was the last one there,

7    yes.

8      Q.   You've testified that you were, right?

9      A.   That was my recollection.

10     Q.   Okay.  And you certainly agree with your wife

11   that at no time in the past did T.A. ever leave home at

12   night and leave your property, correct?

13     A.   Correct.

14     Q.   And at certainly no time before did he ever

15   leave home at night, leave your property, and bring

16   provisions, such as a loaf of bread, water, and cheese

17   sticks?

18     A.   Correct.

19     Q.   And I don't mean to be that specific about the

20   food; I'm just talking about bring food with him.

21     A.   Correct.

22     Q.   Do you know when it was the last time that T.A.

23   had been evaluated by a doctor before this incident?

24     A.   I don't recall.

25     Q.   Now, when you were in the bathroom and the

```
 1   paramedics were in there, no paramedics ever were able

 2   to do an assessment of T.A., such as taking his blood

 3   pressure, correct?

 4          MR. SCHERN:  Objection to the form of the

 5   question.

 6          THE WITNESS:  Can you rephrase the question or

 7   repeat it?

 8      Q.   BY MS. WIENEKE:  Sure.

 9              You were in the bathroom with T.A.,

10   correct?

11      A.   Correct.

12      Q.   There were paramedics in the bathroom with

13   T.A., correct?

14      A.   Correct.

15      Q.   And you observed the paramedics in there with

16   you and T.A., correct?

17      A.   Correct.

18      Q.   And you didn't see any paramedics get close

19   enough to T.A. to be able to take a blood pressure of

20   T.A., correct?

21      A.   Correct.

22      Q.   You didn't see the paramedics be able to take a

23   pulse, put a pulse ox -- do you know what a pulse ox

24   is?  That little thing they clamp on the finger.

25              You didn't see them do that to T.A --
```

1      A.   No.

2      Q.   -- correct?

3      A.   Correct.

4      Q.   In fact, they didn't even bring their tool kit

5   in there with them, did they?

6      A.   I don't recall what instruments they brought

7   in.

8      Q.   You didn't see them bring any instruments in

9   the bathroom, did you?

10      A.   I don't recall.

11      Q.   The paramedics never got to lift up T.A.'s

12   shirt to see if there were any marks or bruises or

13   scrapes or anything, did they?

14      A.   No.

15      Q.   In fact, the paramedics never got do any

16   assessment of T.A., other than the brief view that they

17   got of T.A. as you carried him into the house and

18   carried him into the bedroom and carried him into the

19   bathroom, correct?

20           MR. SCHERN:  Object to the form of the

21   question, foundation.

22           THE WITNESS:  I don't know what other

23   opportunities were there.

24               You're asking if I know of any other

25   opportunities to evaluate him.  I don't know.

1      Q.   BY MS. WIENEKE:  Well, let's talk about it.

2           You got him out of the bushes, right?

3      A.   Correct.

4      Q.   You got him into your arms, and as you carried

5   him from the bushes into the house, T.A. was kicking and

6   screaming, correct -- not screaming.  He was kicking and

7   flailing, correct?

8      A.   He was wiggly.

9      Q.   He was kicking his legs, right?

10     A.   He was wiggly.

11     Q.   Well, what do you mean by "wiggly?"  Do you

12   mean wiggly-giggly or wiggly kicking and kicking and

13   kicking and resisting your efforts to carry him into the

14   house?

15          MR. SCHERN:  Object to the form of the

16   question.

17          THE WITNESS:  There was resistance.

18     Q.   BY MS. WIENEKE:  Right.

19     A.   To have me hold him.

20     Q.   Right.

21          And then when you got him into the house

22   and then you carried him into the bathroom, he was still

23   resistant, correct?

24     A.   No.

25     Q.   Okay.  In the video, you had to bear hug him in

1    requested and provided.

2        Q.    BY MS. WIENEKE:  All what information?

3        A.    That was requested in the interrogatories.

4        Q.    Okay.  I'm not limiting what I'm saying to the

5    interrogatories.  I'm asking you something different.

6        A.    Can you repeat your question then?

7        Q.    Sure.

8              Did you ask your neighbors and the folks

9    that participated in the search:  Hey, I don't have

10   these things on my phone anymore.  I may have texted

11   with you on March 31st and April 1st.  Do you have any

12   texts with us from March 31st to April 1st?  Can you

13   check your phones and see if you do and give them to me?

14       A.    All of that was asked, yes.

15       Q.    You did ask them?

16       A.    Yes.

17       Q.    All right.  So you understood that when there

18   was a conversation going on in the hallway, at the

19   entryway of your door, that at that time there had been

20   no medical evaluation of T.A. at that point, correct?

21       A.    At which point?  Can you be more specific?

22       Q.    Sure.  When you had been in the bathroom with

23   T.A., right?  Are you with me?

24       A.    Yeah.

25       Q.    You knew at that time there had been no medical

1    evaluation of T.A., right?  The paramedics had been in

2    there, but they couldn't get to him.  They didn't do any

3    blood pressure; they hadn't lifted up his shirt; they

4    hadn't gotten near him, right?

5        A.   Correct.

6        Q.   So you knew at that point there had been no

7    medical evaluation by any of the paramedics on scene,

8    right?

9        A.   How would you define "medical evaluation?"

10       Q.   Well, I'm talking about talking vitals; I'm

11   talking lifting up his shirt.

12       A.   They didn't have physical contact with him, no.

13       Q.   Okay.  So no medical evaluation, right?

14       A.   No physical contact with him.

15       Q.   No medical evaluation, right?

16       A.   I'm not a medical professional; I couldn't

17   answer what kind of evaluation would be done.

18       Q.   Well, I just defined it for you, right?

19       A.   No blood pressure was taken, correct.

20       Q.   No blood pressure, no stethoscope to his chest?

21       A.   No.

22       Q.   No pulse ox that we just talked about, right?

23       A.   Correct.

24       Q.   No pulse was taken?

25       A.   Correct.

1      Q.   Right?

2           No temperature was taken, right?

3      A.   Correct.

4      Q.   I mean, you don't have to be a doctor to know

5  about those basic things, right?

6           No lifting up the shirt, right?

7      A.   Correct.

8      Q.   In fact, they really couldn't even look at him

9  because you had him in this position as shown on

10 Exhibit No. 15, correct?

11          MR. SCHERN:  Objection.

12     Q.   BY MS. WIENEKE:  In the bathroom?

13     A.   I don't know what point that was taken, but he

14 was -- I, I -- my recollection is he wasn't always in

15 that position.  There were various positions that he was

16 in, but that nearly all the times he was in my arms

17 except for when he was in the bathtub.

18     Q.   Right.  And when he was in the bathtub, his

19 back was towards -- facing the wall, right?

20     A.   Which wall?

21     Q.   The back wall -- I mean strike that.

22          His face was towards the back wall, so his

23 back was towards where your wife is standing?

24     A.   Correct.

25     Q.   All right.  And then you put a towel over him,

1    right?

2        A.    Yes.

3        Q.    So nobody could see him at that point, right?

4        A.    Correct.

5        Q.    And then you took him into a dark bedroom and

6    put a blanket over him so no one could see him, right?

7        A.    To calm him down, yes.

8        Q.    Regardless of your reason, you took him into

9    the back bedroom and put a blanket over him so no one

10   could see him, right?

11           MR. SCHERN:  Object to the form of the

12   question.

13           THE WITNESS:  I didn't put the blanket on him

14   so that no one could see him.

15       Q.    BY MS. WIENEKE:  I'm not talking about your

16   motivation, sir.  I'm just saying:  Once the blanket was

17   placed over him, no one could see him, right?

18       A.    Correct.  Nobody could see him with the blanket

19   over him.

20       Q.    Right.

21           And so when you went into the foyer of

22   your home by your front door -- you understand where

23   that area is?

24       A.    Yes.

25       Q.    At that point nobody had had eyes on him to be

1    I'm asking you outside, where unknown.

2            Do you believe that T.A. would have been

3    safer outside, not -- or maybe even on your property;

4    under a wood pile, in irrigation water, outside unknown,

5    in 47 degrees, wearing what he was wearing, do you

6    believe he would have been at greater risk being

7    outside, exposed to those elements, than he would have

8    been inside your home?

9            MR. SCHERN:  Objection; form, foundation.

10   Q.   BY MS. WIENEKE:  For the time period he was

11   missing from 10:15 to 10:00 -- for 12 hours, till

12   10:15 a.m.

13           MR. SCHERN:  Objection; form, foundation.

14           THE WITNESS:  It's -- like I said, I, I don't,

15   I don't know what risks specifically there would be.  It

16   would be, it would be speculation at that point.

17   Q.   BY MS. WIENEKE:  Well?

18   A.   There are risks wherever children are.

19   Q.   Sure.  And let's talk about some of those

20   risks.

21   A.   Okay.

22   Q.   Some of those risks would have been the

23   elements, the temperature, right?  Outside?

24   A.   Correct.

25   Q.   Those same risks are not present inside your

1   home, right?

2        A.    Correct.

3        Q.    Some of those risks would have been exposure to

4   the irrigation water, which you wouldn't be able to see

5   as well at night, which are not present in your home,

6   right?

7        A.    Correct.

8              MR. SCHERN:   Objection; form, foundation.

9        Q.    BY MS. WIENEKE:   Some of those risks would have

10  been getting hit by a car in a street.   Not present in

11  your home, right?

12       A.    Correct.

13       Q.    Some of those risks would have been wandering

14  into the group home.   Not present in your house, right?

15             MR. SCHERN:   Objection; form, foundation.

16             THE WITNESS:   Right.

17       Q.    BY MS. WIENEKE:   Some of those risks would have

18  been wandering into the canal area in the dark.   Not

19  present in your house, right?

20       A.    Correct.

21       Q.    Do I have to keep going?

22       A.    You can.

23       Q.    Okay.

24       A.    There's risks inside of a home as well --

25       Q.    Sure.

1     A.   It's a possibility.

2     Q.   And that's not something that he would be

3  exposed to within your home, correct?

4     A.   I'm not trying to be flippant, but I mean, if

5  someone were to enter a home illegally, then there's

6  that risk.

7     Q.   Well, you lock your doors at night, right?

8     A.   There's other ways to enter a home.

9     Q.   Right.  And you would be there to protect T.A.

10 though, right?

11    A.   During busy season, later in the evenings.

12    Q.   Okay.  But your wife would be there to protect

13 T.A., right?

14    A.   That would be the hope, yeah.

15    Q.   And if T.A. had gone missing and was out in the

16 elements, all alone, there would be nobody to protect

17 T.A. from that stranger, right?

18    A.   If he were alone?

19    Q.   Right.

20    A.   Correct.

21    Q.   Right.  Okay.

22         You understand that decisions are made for

23 the best interest of your child, right?

24         MR. SCHERN:  Objection; form, foundation.

25         THE WITNESS:  I don't understand the question.

Exhibit 8

Brian Bentley
April 17th, 2016

I was at work when I received a phone call from Janna on Thursday, March 31, 2016 at 11:18 p.m. saying she couldn't find Talon. I immediately prayed and felt like he was okay, just hiding well somewhere. I told her to keep looking and that I would look when I got home from work. Janna had gone to pick up Olivia from volleyball and had asked Ellie to pray with the kids and get them to bed. She had specifically told her to not force Talon but just keep an eye on him. She told me that when she got home, she spoke with Olivia and Ellie about their days and sometime a little bit later I believe she asked how Talon had done. Ultimately, she discovered Talon was not in his bed and began looking for him. The boys said that he had left their room with his pillow and blanket and they thought he had gone to our room or the homeschool room to sleep. I received a text from Janna at 12:15 a.m. on Friday, April 1, 2016 saying she still couldn't find him.

Janna - "No luck finding him. Pray please. I am not sure I can sleep or do anything until I know where he is. Alexander's and porters have searched their yards."
Brian - "I'll pray right now…"
Brian - "Did you look under his bed or between his bed and the wall?"
Janna - "Yes"
Brian - "I'll scour the house when I get home."
Janna - "We have and I am doing it again."
Brian - "I know you have. He's fine wherever he is."

Janna texted me at 12:32 a.m.:

Janna - "I don't think he is in our house. WHat if you don't find him in the house, then what?"
Brian - "I don't know."

Janna texted me at 12:40 a.m.:

Janna - "I'm worried"
Brian - "Don't be. He is fine."
Brian - "I will find him when I get home."

I continued to pray and consider the situation and still felt peace that he was fine. He is a good hider and I figured they just hadn't searched well enough. I got home around 1:15 a.m. and began searching immediately. Spent about 30 minutes looking through our home. After that, I spent another hour searching outside in our yard and briefly in the neighbors' yards. Looked in their vehicles, etc. Janna and I discussed the circumstances of his disappearance. She told me that the Porters and the Alexanders had both searched their yards and homes. I was confident that he was close by and I figured that he had stowed away in one of their homes. Janna told me that he had no shoes on and that all of the bikes were still here. With his pillow and blanket, I just knew he was sleeping somewhere close. My thought was that he would get tired of wherever he was and would come home in the middle of the night. Finally at about 3:30 a.m. or so, I turned on all of the lights outside, left the doors open and laid down in front of our front door so that if/when he came in, he'd bump into me.
I dozed on and off until about 6:45 a.m. and got up to get the boys ready for school and ask them to help look through the yards again. Janna went over to the Alexanders again to ask

BENTLEY-509

them to search their home again.  They did not find him.  Janna started reaching out to all of the neighbors and within 5 minutes we had an army of people outside looking for Talon.  We started to get a little more worried because it was light out and figured he'd come home to eat, etc.  However, we continued to pray and continued to receive a strong impression and feeling that he was fine and was close by.  After making one more thorough search through our home, our yards, etc. we went downstairs and knelt and prayed, asking Heavenly Father to help us know what to do.  Janna made a few more phone calls around 8:00 a.m. and when she spoke with Kemp Morris, Kemp told her to call the cops and she felt like it was time to do so.  Shortly after that the cops started showing up and asking questions, etc.  I took off on a bike and started branching out the search a little.  However, as I was riding through the neighborhood to the east of ours, I just kept feeling like he wasn't that far away from our home.  I spent about 15 minutes riding my bike through the neighborhood and parks over there and decided to go back home.  I jumped in my truck to drive over to the church and search near there since Talon is familiar with that area.  After about another 15 or 20 minutes, I drove home and decided that I would stay near our home to keep looking because it just didn't feel like he was far away.  By this time there were what seemed like 20-30 cops all over our yard and neighborhood.  They had asked us if they could search our house which we freely allowed them to do.  Two of the cops asked me specific questions of what I knew of his disappearance.  They both asked me why we didn't call the cops sooner and I repeated to them everything that we had done to look for him, how we felt like he was close, how he didn't have shoes and hadn't taken a bike, how he had his pillow and blanket, how he was a good hider and we figured we would find him soon.  I suppose we could understand their concern that we hadn't called earlier but we felt like we were transparent and open about our reasons and shared everything we could to help try to find Talon.  It was about 9:00 a.m. or so and at this point I mostly hung around the front yard speaking with neighbors about where they had been, how they had looked, sharing information, etc.  At this point I noticed what looked like a group of reporters over in the Andrews' yard.  They did not have uniforms on and had notepads, bags, etc. and they weren't speaking with anyone but were huddled in a group by themselves, occasionally speaking to a cop.  I didn't think much of it at the time.

Some of the cops approached us and assured us they were doing everything they could to find Talon and one even shared with us his confidence that he had a "gut feeling" that Talon was close by based on all of the facts we had given.  There was a helicopter with a bullhorn making an announcement and the number of neighbors and church members that were looking for Talon was growing.  Finally, at about 10:20 a.m., one of our neighbors said he thought he saw a boy in the side bushes of the Porters yard.  I raced over to their side yard and saw Talon trying to climb deeper into the bushes.  I reached in and grabbed him out.  He was very determined to get away from me.  He was pretty amped and struggled and struggled with me trying to hold him.  I picked him up and then took him out to the the Porters driveway.  I knelt down and continued to try to speak with Talon.  I told him he was okay, he didn't need to run away and that he was safe.  At no time did I sense that he was injured or harmed in anyway.  Here was a 7-year-old boy that had been caught doing something he shouldn't have done, with a front-row view of cops, neighbors, helicopters, etc. having looked for him.  I knew he was embarrassed, scared, and nervous about what was going to happen to him.  I felt like it was my job to hold him and let him know how we would work it all out.  After a few more minutes of struggling with him, I felt like I needed to take him back home, away from all of the eyes of the cops, etc.  I picked him up and started walking over to our house.  At this point, one of the cops approached me and asked me if I thought he needed to be checked out by paramedics.  I said I didn't think so, that I thought he was fine physically, just a little anxious with all of the people staring at him and embarrassed about the situation, etc.  He told me it wouldn't cost us anything to have him checked out and I said something like, "Okay, if it's not any trouble, that's fine.  However, right

BENTLEY-510

now he's still pretty anxious as you can see so a physical check-up isn't going to be very successful." I kept walking towards the house and got him to our kitchen, sat him down on our kitchen bench and told him that we were alone now and that he was safe. As he started to open up a little to me and tell me what happened, two cops walked in our side door. The instant they came in, he started to try to escape again so I grabbed him and told the cops that he just needed some space from everyone and that he would be fine once he calmed down. I picked him up and started to take him to the bathroom when the same cop told me that the paramedics were on their way. I told him that was fine and that we'd be waiting in the bathroom. I took Talon to the boys bathroom, closed the door and let him go which I immediately identified was a relief to him to be away from everyone. After about 3 or 4 minutes he finally calmed down enough to start talking to me again. I asked him if he was hurt and he said no. I asked him if he was cold and he said no. I asked him where he had stayed all night and he said in the Porters yard. At this point, the cop opened the door and said the paramedics could probably just do the check-up in the bathroom since it was a big space. Once again, when the cops came in, Talon started trying to hide so I grabbed him and just held on to him. He wasn't squirming as much as he had been but was still pretty wiggly. At this point, three paramedics came into the bathroom and started asking questions. They asked if Talon was autistic, if this was normal behavior for him, etc. I told them that he wasn't autistic and that he was just a little nervous with all of these strangers around asking questions, etc. knowing that he was the cause of all of the attention. I told them that he's just an energetic 7-year-old boy that was just caught doing something he shouldn't have and is not wanting to speak to a bunch of strangers that are cops, paramedics, etc. I told them that they wouldn't get much of a response from him at that moment and that he would need a few minutes to settle down before being responsive to any questions, etc. This seemed to really frustrate the paramedics. I heard two of them say, "This is stupid. Let's get out of here." After they left, I noticed that the one cop continued to stay in the bathroom and that another lady come in. I said, "Oh great, another set of eyes on the boy." I told them that he just needed to be alone for a little bit so that he could calm down. They said they would be staying in the bathroom and just keep an eye on Talon. At this point, Talon was not struggling as long as my arm was covering his face. I grabbed a towel and covered him up and he almost immediately relaxed. I kept telling everyone that he just needed to be left alone for a while and asked them to leave but they refused. I was tired enough at this point that I just sat there with Talon on my lap with him covered up, hoping to help him feel safe. The lady started to try to talk to Talon and it was really bothering me because I knew this wasn't going to help him. She finally stopped and we sat there for maybe another 5 minutes. Finally, I whispered to Talon and ask if I could put him in his bed and cover him up with a blanket and he vigorously nodded his head. I figured he was as exhausted as I was and I could sense he just needed to be in his own familiar space with a blanket to hide him from the mounting chaos in our home. I picked him up, took him to his bed, laid him down and covered him up. I hugged him some more and asked him if he wanted anything to eat. He told me no and I knew that he was starting to come around a little. The cop and the lady were right on our heals and followed us into the bedroom. I had been completely oblivious to everything that was happening out in our entryway but began to hear Janna getting a little excited with someone and so I left Talon's side to see what was going one. I could hear an argument over medical care and something about taking Talon and something about their perspective that Talon was in danger. I stormed out to find another lady getting in Janna's face and our front entryway full of cops and people I did not know. I stormed over to the individual that was in Janna's face and fairly excitely told her to consider things from our perspective and from Talon's perspective a 7-year-old boy had sat and watched an army of neighbors and cops and a helicopter looking for him and now he was caught. He was nervous and embarrassed and scared of what was going to happen. We had barely had a moment to digest everything and everything was happening as a whirlwind and they were talking about taking Talon away for a medical observation?!?!? I don't remember who (there

were probably 20+ people in our front entryway at this point) but there were accusations made that we had refused medical care for Talon and that this was now a criminal investigation.  Janna countered (several times) that at no time had we refused medical care and that we were simply asking for a moment to digest everything and let things calm down before trying to force Talon to submit to some medical evaluation.  The repeated claim from DCS was that it was too late and that they were taking Talon whether or not we agreed.  At this point I became extremely nervous with the situation.  I immediately turned to go back to be with Talon and the cop that had hovered over us in the bathroom and in Talon's bedroom was blocking the door.  He told me I was not allowed to be in the room with Talon.  I could see a woman hovering over Talon's bed and I told the cop to move so I could be with my son while a stranger was in there with him.  He said no and refused to move.  I decided to call Mike Schern at this point and turned down the hallway to walk to my bedroom to make the call.  At 10:52 a.m., I grabbed my cell phone and tried to close the door to our bedroom when the cop kicked the door open and said I would not be allowed to be alone in my house.  He informed me that he was going to follow me wherever I went.  I called Mike and told him that Mesa PD had taken over our house and they and DCS were threatening to forcibly take Talon and our other children away.  He told me to tell them not to do anything or take anyone and that he would be at our house as soon as possible and that it would be about 10 minutes before he or someone from the office would be here.  I then went back out to the entryway to be with Janna and see what was going on and to tell them we had our attorney coming.  It was at this point that I started to remember the group huddled together in the Andrews' yard.  The group had been the DCS workers and a Mesa PD detective that were standing in front of our front door controlling the situation.  They had forced everyone out of our house and had locked the front door.  They were explaining how they had complete authority to take Talon with or without our approval and that was exactly what they were going to do.  It was just a matter of whether we were going to be agreeable to it or not.  They kept saying that this was now a criminal investigation and that "it was going to happen" (Talon being taken) and there was nothing we could do.  One of the DCS workers explained that because we had waited so long to call the cops and because we had refused medical attention for Talon, they were taking over and that they were going to take our children to their "advocacy center" to be interviewed and held.  She then said that I had taken Talon away from everyone after he was found and that I had been alone with him (as if that was a crime).  The cop that had followed us into the house when we were in the kitchen must have discussed this with them because they then said, "And your husband went into the bathroom alone with your son and close the door."  I then told her why I had done that and turned to the cop to have him confirm that I had told them that I was taking Talon in the bathroom so that he could be alone and try to relax.  The cop refused to acknowledge our dialog and then said, "I have no idea what happened or why you went in there or what you were doing in there."  I told him that I knew he was standing outside the door, that he knew the door was unlocked, that he could certainly hear what was being said inside and that he had opened the door a couple of times to tell me about the paramedics; he refused to acknowledge any of it.  At this point when I looked around and saw all of the DCS and cops standing around witnessing this with blank stares as if this was normal, I yelled out, "Are all of you just going to stand around and be complicit in this?  Is this right what is happening?"  Blank stares by all.

Sometime in this exchange I told them that we had our attorney coming and I asked that everything be put on hold until he could arrive so that we could know what our rights were since no one present was interested in assisting us.  The detective and the DCS workers started to explain that they had some sort of paperwork or order and I told them to wait until our attorney arrived so that we could know what our rights were since no one present was interested in assisting us (again).  They said they could wait a few minutes but they weren't going to wait long before they just took Talon away.  I also asked them why they hadn't made their presence

BENTLEY-512

known sooner?  Why they stood back and watched the search take place and didn't inform us of what they were doing there and what their purpose was?  The question was not answered because of the chaos in the house.

The detective asked again how much longer before our attorney was going to get there and I told him a few minutes.  One of the DCS workers then tried to explain AGAIN that they were going to take Talon to be evaluated.

BENTLEY-513

Exhibit 9

<u>DECLARATION OF ALEX RAMOS</u>

STATE OF ARIZONA    )
                         ) ss.
County of Maricopa    )

ALEX RAMOS, being first duly sworn upon his oath, deposes and says:

1.     I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.     I am a Certified Paramedic employed by the Town of Gilbert Fire and Rescue Department, and I was on duty and employed in that capacity on the day of April 1, 2016.

3.     On the morning of April 1, 2016, our four-person team consisting of two EMTs and two Paramedics, operating as Town of Gilbert Fire Department Ladder 253, were dispatched to 3045 E. Inverness in Mesa, Arizona.

4.     We were asked to do a Paramedic/EMT assessment of a seven-year-old child who had reportedly been missing outside overnight, and had just been found that morning in bushes somewhere outside.

5.     On behalf of our four-person team, I took the lead on this call, and I also coordinated with my fellow paramedics and EMTs.

6.     After arriving, I learned that the seven-year-old boy was inside the bathroom with his father.

7.     In the bathroom we intended to take vitals and talk to the child in order to make sure he was okay, but I saw that he appeared to be very agitated.

8.      His agitation was to such a degree that we were not able to get our hands on the child at all and get his answers to questions to see if he was okay, if he felt safe, or if he was injured or hurt.

9.      Because of my observation that the child was very agitated, I asked the mother if the child had any pre-existing medical conditions, such as autism, and if the child was on any medications, and I recall her telling me that he had no pre-existing medical conditions and he was not on medication.

10.     I asked the father if the way the child was acting in the bathroom was normal behavior for the child, and the father told me that his behavior was not normal for him.

11.     Due to the fact that the child was not speaking back to us when we tried to talk to him, based on my previous experiences that children of that age usually speak back to us, based on my understanding that child was not acting normally for him, and due to my observation that the child was very agitated, I believed he was too agitated for us to complete an assessment of him, or to take vitals.  Accordingly, we decided we would not force ourselves onto the child to obtain vitals and complete an assessment.

12.     Based on the circumstances relayed to me (that the seven-year-old was missing outside overnight, that he had no pre-existing medical conditions and was not on any medications, and that he was very agitated), I also believed he was acting in a way that was not normal for his age based on my experience.

13.     I also recall confirming with one of the Firefighter/EMTs present with me in the bathroom that he also believed the child was not acting normal for his age and was appearing to be very agitated.

14.     In the best interest of the child, I recommended that he needed to be evaluated at a hospital by a medical doctor. I believed a medical doctor in a hospital would be in a better position to conduct an evaluation to determine any behavioral issue or physical injury not readily apparent by looking at the child fully clothed.

15.     As a result of seeing the child appear very agitated in the bathroom, I did not want to get him even more agitated by trying to complete a physical examination or by trying to obtain vitals. In fact, our four-person team did not take any vitals despite ultimately transporting him to the hospital so as to not upset the child.

16.      While at the Bentley home, I believed that Mrs. Bentley ultimately consented to the child being transported by ambulance to the hospital.

17.     I did not believe at the time that I was in the home that it was in the best interest of the child for myself or our paramedics to leave the scene without him first being transported to a hospital to be evaluated by a doctor.

18.     The child was transported in the ambulance where paramedics/EMTs were present with him, and his mother rode in the ambulance with him.

19.     As noted in the Gilbert Fire and Rescue Patient Care Report, and consistent with my recollection of the incident, at approximately 11:40 a.m. when we were ready to leave the house in the ambulance, we elected to not take the child's vitals because we did not want to risk upsetting the child.

20.     Our four-person team determined that the child would be transported to Banner Health's Cardon Children's Medical Center, which I believed was an appropriate

facility considering the child's age and the circumstances of the child being missing overnight.

21.    On arrival to the hospital, my work concluded on this incident after the child's care was transferred to the Emergency Room Registered Nurse and after a report was given verbally to the ER doctor.

Further affiant sayeth not.

_____

ALEX RAMOS


SUBSCRIBED AND SWORN TO before me, a Notary Public, this _18th_ day of September, 2019, by ALEX RAMOS, in the capacity and for the purposes herein stated.

_____

Notary Public



DEBORA M. DANA
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 565784
Expires July 04, 2023

Exhibit 10

Alex Ramos                                                           Page 1

```
 1              THE COURT:  If you could state your name and spell

 2   your last name for the record.

 3              WITNESS:  My name is Alex Ramos.  Last name is R-A-M-

 4   O-S.

 5              THE COURT:  Thank you, sir.

 6              Mr. Hawkins.

 7                      ALEX RAMOS,

 8   having been first duly sworn, testified as follows:

 9                   DIRECT EXAMINATION

10   BY MR. HAWKINS:

11       Q      Mr. Ramos, where do you work?

12       A      I work for the Gilbert Fire Department.

13       Q      You know, we call police officers "officer so-and-so"

14   or doctor a "doctor so-and-so."  Is there a title for

15   firefighters that I should be calling you?  Is it Firefighter

16   Ramos?

17       A      It's Engineer Ramos.

18       Q      Engineer Ramos?

19       A      Yes.

20       Q      Thank you.

21              How long have you been a firefighter?

22       A      I've been a firefighter for 15 years.

23       Q      Could you explain to the jury what it takes to become

24   a firefighter?

25       A      There's a testing process you have to go through.  At
```

Alex Ramos                                                    Page 2

1    a minimum, you have to be at least an EMT to be a firefighter.

2    You could be a paramedic.  A paramedic just has advanced life

3    support credentials.  I was a paramedic when I got hired with

4    the fire department, so I worked on the ambulance for about two

5    and a half years before becoming a firefighter.

6         Q    You said you've been a firefighter for about 15 years?

7         A    Yes, sir.

8         Q    Were you working back on April 1, 2016?

9         A    Yes, sir.

10        Q    On that date, and on the morning of April 1, did you

11   respond to the Bentley home located in the area of Inverness and

12   32nd Street?

13        A    I did.

14        Q    Is that in the city of Mesa?

15        A    It is.

16        Q    Now, you're a Gilbert firefighter, so why did you

17   respond to a call in Mesa?

18        A    Correct.  The fire department has an agreement, what

19   we call "automatic aid," and basically what that states is that

20   when someone calls 911, we're on a GPS system through the entire

21   valley, so they'll send the closest fire truck, regardless of

22   what city you're in.  We just happened to be the closest fire

23   truck to their home when the 911 call came in.

24        Q    Why were you dispatched to that location?

25        A    I believe we were dispatched to assist on a missing

Alex Ramos                                                        Page 4

1    distress, as far as being injured or ill.

2        Q    But it sounds like that agitation did, at least to

3    some extent, interfere with your ability to evaluate him?

4        A    Yes, for sure.  Like I said, that's why we didn't --

5    we didn't want to agitate him anymore, so we didn't force

6    ourself onto him.

7            The first thing that struck me:  I was like, he seems

8    pretty agitated.  Dad was trying to hold him.  He was pulling

9    away from dad and whatnot.  So the first thing that came to

10   mind:  Well, maybe he's just hyperactive or maybe he's, you

11   know, has some kind of medical condition.  So we were only in

12   there for like a minute.  We stepped out of the room, and I

13   believe I spoke to mom after I stepped out of the bathroom to

14   ask if he had any medical conditions, you know, if he's autistic

15   or anything like that.  I believe she said he did not have any

16   medical conditions and he wasn't on any medications.

17       Q    But something that you were seeing, and the way that

18   he was manifesting, caused you to think that there might be

19   something going on there as far as autism or some kind of

20   medication or something of that nature?

21       A    Yeah.  Correct.  Like I said, he was pretty agitated.

22   And for a seven-year-old, usually at that age we're able to go

23   down to their level, get on our knees and speak with them.  They

24   usually speak back with us.  But in this case, he was very

25   agitated, so we weren't able to do that.

Mesa/Bentley 005631

1        Q    Did you speak to the parents about whether or not he

2    was autistic or medication or anything of that nature?

3        (Objection based on lack of foundation made by defense,

4    argument was presented by both counsel, and the objection was

5    sustained.)

6    **BY MR. HAWKINS:**

7        Q    Given the circumstances as they were relayed to you,

8    did you believe the child needed to be evaluated?

9        A    Yes.  And, again, just the way he was acting, we felt

10   it was not normal.

11            MR. TAIT:  I'm going to object to the use of the

12   pronoun "we":  calls for speculation.  Ask the witness to talk

13   about his perceptions, not speculate about other people's

14   perception.

15            THE COURT:  Thank you.  You understand the --

16            WITNESS:  Yes.

17            I felt that he needed to be evaluated because we

18   weren't able to do an assessment ourselves.  We weren't able to

19   get the vital signs on him.  We weren't able to get our hands on

20   him and ask him any questions to see if he was okay, if he felt

21   safe or if he was injured or hurt or anything like that.  So I

22   felt we couldn't just leave him without doing an assessment, at

23   least.

24   **BY MR. HAWKINS:**

25       Q    I think before the objection you had started to say

**CERTIFICATION OF TRANSCRIPT**

I, Jennifer L. MacGregor, do hereby certify that the foregoing
was transcribed from a digital recording not made by me, but
transcribed verbatim by me or under my supervision to the best
of my ability, taken at the time and place set out in the record
above.

Jennifer L
MacGregor

Digitally signed by: Jennifer L
MacGregor
DN: CN = Jennifer L MacGregor C =
US O = IdenTrust ACES Business
Representative OU = COMBAT
VETERAN VOICEWRITERS LLC
Date: 2019.03.28 08:39:16 -07'00'

_____

JENNIFER L. MACGREGOR, AAERT CET-817

CVV Transcripts

1146 N. Mesa, Dr., Ste 102-107

Mesa, AZ 85201

(480) 250-8830

Mesa/Bentley 005652

Exhibit 11

# In The Matter Of:

*State of Arizona v.*
*Janna Bentley and Brian Bentley*

---

*Testimony of Captain Adam Hellmann*
*August 7, 2017*
*Before the Honorable Valerye Boyer-Wells*

---

*Griffin Group International*
*2398 E. Camelback Road*
*Suite 260*
*Phoenix, AZ 85016*

Original File CDBB05172019.txt
**Min-U-Script® with Word Index**

BENTLEY01274

Before the Honorable Valerye Boyer-Wells

4

1                    (Beginning of requested excerpt.)

2                         MR. TAIT:  Thank you, Your Honor.  Captain Adam

3    Hellmann of the Gilbert Fire Department.

4                         JUDGE BOYER-WELLS:  Thank you.  If you could

5    raise your right hand.

6                         (Witness sworn in.)

7                         JUDGE BOYER-WELLS:  Thank you.  If you could

8    have a seat, sir.  And if you could also state your name and

9    spell your last name for the record.

10                        THE WITNESS:  Adam Hellmann, H-e-l-l-m-a-n-n.

11                        JUDGE BOYER-WELLS:  Thank you.  Mr. Tait.

12                        MR. TAIT:  Thank you, Your Honor.

13

14                        DIRECT EXAMINATION

15   BY MR. TAIT:

16        Q.   Captain Hellmann, you are a captain of the Gilbert

17   Fire Department, correct?

18        A.   Correct.

19        Q.   How long have you been a firefighter?

20        A.   Twenty-seven years.

21        Q.   Were you present at the home of Brian and Janna

22   Bentley on April 1st of 2016?

23        A.   Yes.

24        Q.   Were you part of the four-person fire crew that went

25   to their home that day?

Before the Honorable Valerye Boyer-Wells

5

1        A.    Yes.

2        Q.    And were you the firefighter on that crew with the

3    most experience?

4        A.    The most years on.

5        Q.    Okay.   I don't mean to force you into being

6    immodest.

7              And the purpose of your -- of your going to the

8    Bentley home, was that to help search for a missing person?

9        A.    Correct.

10        Q.    And when you arrived at the home, had that person

11    already been found?

12        A.    Yes.

13        Q.    And was that TA Bentley?

14        A.    Yes.

15        Q.    What did you do when you arrived at the Bentley

16    home?

17        A.    How much detail do you want?   Do you want me to --

18    so we got off the truck, grabbed our equipment, typically four

19    boxes, different medical equipment, and walk into the house

20    to --

21        Q.    When --

22        A.    -- start our evaluation.

23        Q.    When you got into the house, did you see TA

24    Bentley?

25        A.    Not initially.

BENTLEY01279

Before the Honorable Valerye Boyer-Wells

10

1       A.    Correct.

2       Q.    And Brian never said, "No, you can't -- you can't do

3  the evaluation"?

4       A.    No.

5       Q.    You also accompanied TA and Janna to the

6  hospital, correct?

7       A.    Correct.

8       Q.    And the -- TA being transported to the hospital,

9  was that, in your opinion, a matter of medical necessity based

10 on something you saw, or more just something that was done to

11 kind of -- as an extra precaution to rule things out?  Or did

12 you -- were you involved in that decision?

13      A.    I was involved in that decision.  The decision was

14 based on trying to bring a little bit of, like, calmness to

15 the house.  I don't know if that's the right way to say that.

16 I know that they -- that the police wanted him to be

17 evaluated, and Mom and Dad had agreed for him to be evaluated,

18 but maybe not at an ER.  And so I felt that the best way to

19 try to appease both sides would be to take him to the

20 hospital.

21      Q.    So you went with them to the hospital, and that --

22 but that -- again, that wasn't based on some -- something that

23 you saw that you said, "Wow, this kid really needs to see a

24 doctor"?

25      A.    Correct.

BENTLEY01284

Before the Honorable Valerye Boyer-Wells

13

1  TA, his father was trying to hold on to him.

2       A.   Correct.

3       Q.   Okay.  So TA was attempting to pull away?

4       A.   Correct.

5       Q.   And to be clear -- well, let me ask you, I guess.

6  When you spoke to the Bentleys -- did you speak to the

7  Bentleys?

8       A.   I did.

9       Q.   Okay.  When you spoke to them, did they indicate to

10 you that TA did not have any mental issues as far as being

11 autistic or anything of that nature?

12      A.   Correct.

13      Q.   And he wasn't on any kind of medications or things

14 of that nature?

15      A.   I don't know if I asked that specifically, but I

16 asked about medical conditions.

17      Q.   Okay.  Now, you mentioned that the police wanted him

18 to be transported.  Would it surprise you that Officer Ramos

19 testified that he said that the child needed to be

20 transported?

21      A.   No.

22      Q.   Or evaluated, I should say.  Sorry.

23      A.   It would not.

24      Q.   Mr. Hellmann, you are actually good friends with the

25 Bentley family, are you not?

Before the Honorable Valerye Boyer-Wells

18

1  STATE OF ARIZONA    )
                       )        ss.
2  COUNTY OF MARICOPA  )

3

4       BE IT KNOWN that the foregoing proceedings were reported

5  by me, TERESA A. WATSON, Registered Merit Reporter, Certified

6  Reporter, Certificate No. 50876, State of Arizona, from an

7  electronic recording and were reduced to written form under my

8  direction; that the foregoing 17 pages constitute a true and

9  accurate transcript of said electronic recording, all done to

10 the best of my skill and ability.

11      I FURTHER CERTIFY that I am in no way related to any of

12 the parties hereto, nor am I in any way interested in the

13 outcome hereof.

14      DATED at Phoenix, Arizona, this 17th day of May 2019.

15

16

17      _____

18                      TERESA A. WATSON, RMR
                        Certified Reporter
19                      Certificate No. 50876

20

21

22

23

24

25

BENTLEY01292

Exhibit 12

1      (Ms. Melanie Opheim entered the courtroom.)

2      THE COURT:  Please have a seat, and good morning.

3      MS. OPHEIM:  Good morning.

4      THE COURT:  And if you could state your name and spell your

5   last name for the record?

6      MS. OPHEIM:  Melanie Opheim; O-P-H-E-I-M.

7      THE COURT:  Thank you.

8         Mr. Tait?

9                      **MELANIE OPHEIM,**

10   **having been first duly sworn, testified as follows:**

11                    **DIRECT EXAMINATION**

12   **BY MR. TAIT:**

13      Q     Ms. Opheim, do you recall the context in which we

14   first spoke?

15      A     I do.

16      Q     And what was that?

17      A     Regarding my home in the neighborhood.

18      Q     And were you initially contacted regarding this case

19   by me or by somebody from the City?

20      A     It was by somebody from the City.

21      Q     And you had a discussion with--was it Mr. Hawkins?

22      A     It was.

23      Q     And then, after that discussion, did he set up an

24   interview for us to have over the phone that--so that I could

25   speak with you?

1     A     Correct.

2     Q     And that was somewhere around July 20th, is that

3 right?

4     A     Correct.

5     THE COURT:  Of what year?  Just for the record.

6     MR. TAIT:  Of 2017.

7     THE COURT:  Thank you, so much.

8 **BY MR. TAIT:**

9     Q     Is that correct.

10    A     I trust you; yes.

11    Q     It wasn't a year ago, right?

12    A     No.

13    Q     All right.  So let's--what is the group home called

14 that you own--or, operate?

15    A     The U-Turn Foundation.

16    Q     Okay.  And, is that a non-profit organization?

17    A     It is.

18    Q     You--what kind of services do you offer?

19    A     Therapeutic services.

20    Q     For what age group?

21    A     For youth, males, 12 to 18--12 to 17.

22    Q     Okay.  Now, is it true that some of these individuals

23 in the home have sexual issues?

24    A     Some of them possibly have issues related to that

25 issue.

Mesa/Benltley 005709

Exhibit 13

TRANSCRIPT OF LOBBY CONVERSATION

JANNA BENTLEY

*STATE v JANNA and BRIAN BENTLEY*

CV2016-046691

Interview Date:  April 1, 2016

1          DET. KESSLER:  Hi, again.

2          MS. BENTLEY:  Hello.

3          DET. KESSLER:  Everything okay at the hospital?  It's all

4     right?

5          MS. BENTLEY:  Yeah.  He had some presents and movies

6     and--yeah.

7          DET. KESSLER:  Okay.  All right.

8               Is this your attorney?

9          ATTORNEY:  Hi.

10         DET. KESSLER:  Hi.

11         MS. BENTLEY:  This is my attorney.

12         ATTORNEY:  I'm Mike.  Hi.

13         DET. KESSLER:  Hi.  I'm Laurie Kessler.

14         ATTORNEY:  Here you go, Laurie.

15         DET. KESSLER:  Thank you.  Oh, I got one of these

16    earlier--

17         ATTORNEY:  Yeah.

18         DET. KESSLER:  --with Mr. Finters.

19         ATTORNEY:  Aaron, yeah.

20         DET. KESSLER:  Yes.  This is--here.  You guys, you

21    can--if you want to just let me talk to mom for a minute.

22         FEMALE:  Okay.

23         DET. KESSLER:  Yeah.

24              Just standard protocol, just to make sure that he's

1    okay.  And, you know, he was gone for so long out in the cold

2    that what was super concerning to us was the sex offender

3    house like literally right across the street from where he was

4    found; the canal, but several things that were very

5    concerning.  But the sex offender house, that was like--he was

6    found in the bushes here, and it was right there.

7         So it's just standard protocol that we are concerned

8    as we are and our whole intent is to make sure that the child

9    or children are okay.  That, absolutely, that was it.

10         I think that there was a little miscommunication,

11    and I understand that it was frustrating for you because you

12    just want to make sure he's okay as well as everyone there.

13    There was just a lot of people there and stuff.  So--all

14    right?

15         We asked you guys to come here because, as in any

16    case we work, when there is children in the house and

17    something happens to one, we generally talk to everybody in

18    the house, everybody in the house.  And so that was our

19    intention today.

20         So I think you saw your other two.  Did you see?

21    MS. BENTLEY:  Yeah.  I didn't know they were here.

22    DET. KESSLER:  Yeah.  We talked to them.  They didn't

23    even really know that he was missing.

24    MS. BENTLEY:  Yeah, they slept through.  I spoke with

1    [indiscernible].

2         DET. KESSLER:  Yeah.  Okay.  Would it be okay if our

3    forensic interviewer--all she does is--she is dedicated to

4    talking with children--if she talked with Talon briefly?

5         ATTORNEY:  Is he free to go?

6         DET. KESSLER:  Yeah.  Nobody is--

7         ATTORNEY:  Then let's go.

8         SERGEANT:  [Indiscernible].  Again, our concerns are he

9    was gone for so long.  We don't know--nobody knew where his

10   whereabouts were for nine hours.

11        ATTORNEY:  I could appreciate that.  Is he free to go?

12        DET. KESSLER:  Well--

13        SERGEANT:  If he was molested--

14        ATTORNEY:  Is he free to go?

15        SERGEANT:  If he was molested--

16        ATTORNEY:  Is he free to go?

17        SERGEANT:  --or sexually assaulted and you're--

18        ATTORNEY:  You really think the mother needs to be told

19   that, that she doesn't know?  Do you really think that?  Is he

20   free--

21        SERGEANT:  I don't know if she understands the gravity of

22   this.

23        ATTORNEY:  Is he free to go?

24        DET. KESSLER:  Well, this is partially a criminal--

1          ATTORNEY:  I'm going to ask him one more time.

2          SERGEANT:  He is not--

3          DET. KESSLER:  It's not a yes or no question.

4          SERGEANT:  He is not free to go.

5          ATTORNEY:  That's all I wanted you to answer me.

6          SERGEANT:  Okay.

7          ATTORNEY:  That's all I wanted.

8          SERGEANT:  Okay.

9          ATTORNEY:  That's it.  I'm not going to be pugilistic

10    with you.  I just wanted to know.  Okay?

11         SERGEANT:  He's in custody of the State right now.

12         ATTORNEY:  Under what authority?  Can you give me some--

13         SERGEANT:  Temporary custody notice.

14         ATTORNEY:  Under what authority though?

15         SERGEANT:  Because of the neglect that we--

16         ATTORNEY:  No.  No.

17         SERGEANT:  --experienced at the house.

18         ATTORNEY:  Okay.

19         DET. KESSLER:  We can bring DCS out here.  I mean, we

20    work cases in conjunction with DCS.

21         ATTORNEY:  Uh-huh.

22         DET. KESSLER:  But they do their part of it.  We do our

23    part of it.  I mean, we work the cases together, but they're

24    obviously a separate agency.

1              I can go grab the DCS worker and have her come out

2    here and explain her side of it, her--when I said her side,

3    but not her side of it, but DCS's side of it.

4        ATTORNEY:  Okay.

5        MS. BENTLEY:  Do you work for--where do you work?

6        SERGEANT:  Here.

7        MS. BENTLEY:  So I am sorry.  Where am I?  I got brought

8    here by a police officer, so--

9        SERGEANT:  At the Advocacy Center.

10       MS. BENTLEY:  So you're not with DCS?

11       SERGEANT:  No.

12       MS. BENTLEY:  What are you with?

13       SERGEANT:  Mesa Police Department.

14       MS. BENTLEY:  So are you just like an investigator or a

15   detective?

16       SERGEANT:  I'm a supervisor.

17       MS. BENTLEY:  What does that mean?

18       SERGEANT:  A sergeant.

19       MS. BENTLEY:  A sergeant?  Okay.

20           So--'cause he is the one who was telling her what to

21   do at my house.  That's why I was curious to know if they work

22   together.  They do or they don't?  No?

23       SERGEANT:  Who was I telling what to do?

24       MS. BENTLEY:  The DCS worker.

1        SERGEANT:  I wasn't telling her to do anything.

2        DET. KESSLER:  Huh-uh.

3        MS. BENTLEY:  Well, when you say temporary custody of the

4    State, it was you telling her to go do that?

5        SERGEANT:  No, I didn't.

6        DET. KESSLER:  No, he has no authority to do that.

7        MS. BENTLEY:  Oh.

8        DET. KESSLER:  She was contacting her supervisor by phone

9    when we were out at your house.

10        MS. BENTLEY:  But it wasn't his prompting?  You didn't

11    say that?  Oh.

12        DET. KESSLER:  No.

13        MS. BENTLEY:  I guess I misunderstood.  That's what it

14    felt like on my end because I was asking, "Why do you guys

15    keep saying about some sort of acronym?"  And no one was

16    willing to explain to me what they were talking about when you

17    were just calling--she's called--

18        SERGEANT:  No, we explained it to you.

19        MS. BENTLEY:  What did you explain to me?

20        SERGEANT:  They should have explained it to you.

21        MS. BENTLEY:  Who is they?

22        SERGEANT:  They told you what TCN stood for.

23        DET. KESSLER:  Uh-huh.

24        MS. BENTLEY:  What does it stand for?

1          SERGEANT:  Temporary Custody Notice.

2          MS. BENTLEY:  And what is that?

3          SERGEANT:  That's a temporary custody notice that the

4     State can take--move a child from the custody of the parent.

5          DET. KESSLER:  Oh.

6          FEMALE:  One second.

7          DET. KESSLER:  Okay.

8          MS. BENTLEY:  On any grounds?

9          FEMALE:  Should I get Cristina [ph]?

10         DET. KESSLER:  Yes, please.

11         SERGEANT:  If we feel that there's neglect going on.

12         MS. BENTLEY:  And so, we had established that the concern

13    was his medical health and state.  And I said, "All I ask is

14    for a minute to calm him down before they did their medical

15    test."  The paramedic told me I could take him to my family

16    doctor.  You remember this conversation, I'm sure.

17         SERGEANT:  No.  No.

18         DET. KESSLER:  Right.  That's not how it went though.

19         SERGEANT:  Everything was coordinated.

20         DET. KESSLER:  We're not going to go back over that.

21    There is really no need to.  We asked you guys to come here

22    today so that we could basically wrap things up.

23         ATTORNEY:  Okay.  What do we need to do to wrap it up?

24         DET. KESSLER:  Well, that's what we're asking, if our

1   forensic interviewer could speak with Talon.

2       ATTORNEY:  Is that part of the TCN?

3       DET. KESSLER:  We're asking for DCS.  That was the DCS

4   supervisor that just ran up the stairs.  She's going to have

5   the DCS case worker that's assigned to this case come join us.

6       ATTORNEY:  Okay.

7       SERGEANT:  Where did she go?  Did she go upstairs, or did

8   she go outside?

9       DET. KESSLER:  I don't know.  Let me check back here.  I

10  thought she was--oh, yeah, there she is.

11      FEMALE:  Hi.

12      SERGEANT:  Sarah left.  We don't know where she went.  Is

13  she coming back?

14      FEMALE:  Oh, we got another one come up, sir.

15      SERGEANT:  Okay.

16      FEMALE:  She'll be right back.

17      DET. KESSLER:  They asked if they are free to go without

18  speaking--without concluding the investigation, without

19  concluding what we're here for.

20      FEMALE:  [Indiscernible].

21      DET. KESSLER:  Yeah.

22      FEMALE:  I'm going to go get Sarah real quick.

23      DET. KESSLER:  Okay.

24          She is going to grab her supervisor.

1          ATTORNEY:  Okay.  Thanks.

2          MS. BENTLEY:  Thank you.

3               I missed your name.

4          FEMALE:  Gina.

5          MS. BENTLEY:  Gina.  Okay.  Thank you.  I was trying to

6     remember it.

7          FEMALE:  You too.

8          SERGEANT:  Do you think it was okay for a seven-year-old

9     to be out all night without being--knowing his whereabouts?

10         ATTORNEY:  I'm not going to argue with you about

11    something like that.

12         SERGEANT:  I'm asking you a question.  I'm not arguing

13    with you.

14         ATTORNEY:  My opinion is completely irrelevant.

15         SERGEANT:  We put a lot of resources in this for a

16    missing person.  We were on the cusp of calling the FBI out to

17    help our search.

18         ATTORNEY:  I can appreciate that.

19         SERGEANT:  And I don't think you understand the gravity

20    of what we were doing.

21         ATTORNEY:  That's an assumption on your part, and I think

22    you're incorrect.  I get it, but I'm not--

23         SERGEANT:  I don't think you get it, sir.

24         ATTORNEY:  Okay.

1        MS. BENTLEY:  Thank you.

2        DET. KESSLER:  Oh, did Cristina find you?

3        FEMALE:  She is on her way.

4        FEMALE:  Did she find me?  Is she looking for me?

5        DET. KESSLER:  Yes, she is.

6        FEMALE:  Did she go out this way?

7        DET. KESSLER:  She did.

8        FEMALE:  That means she's probably headed up that way.

9        MS. BENTLEY:  [Indiscernible] about.

10   [Phone ringing.]

11        SERGEANT:  Are the other children here?

12        ATTORNEY:  No.

13        SERGEANT:  Even though you guys agreed to bring them here

14   at one o'clock?  What was the reason behind that?

15        ATTORNEY:  Well, they received--they have been advised

16   not to bring them.

17        SERGEANT:  By who?

18        ATTORNEY:  By me.

19        SERGEANT:  Okay.  Because we were under the understanding

20   that you were going to bring them voluntarily down here

21   because if you weren't, they were going to be taken under

22   temporary custody as well.

23        ATTORNEY:  Well--

24        SERGEANT:  So you didn't live up to your end of the

1    bargain on that one.

2         ATTORNEY:  I don't know what bargain you're talking

3    about.

4         SERGEANT:  Well--

5         ATTORNEY:  This is the first time you've seen me.

6         SERGEANT:  You don't work together with their attorneys

7    over there?

8         DET. KESSLER:  Right.  Isn't Aaron your partner?

9         ATTORNEY:  Yeah.

10        SERGEANT:  We should have taken them.

11        ATTORNEY:  We should have taken them?  Is that what you

12   said?

13        MS. BENTLEY:  It's interesting how you--

14        SERGEANT:  DCS should have taken them.

15        MS. BENTLEY:  It's interesting that you're not talking--

16        DET. KESSLER:  We only want to make sure your children

17   are safe.

18        MS. BENTLEY:  It sounds like it.

19        DET. KESSLER:  Whether or not you believe that, we are

20   not the ones that--

21        MS. BENTLEY:  [Indiscernible - crosstalk]  I believe your

22   intentions are [indiscernible].  I do.

23        DET. KESSLER:  We are not the ones that when we got the

24   call, we were there immediately to look for your son.

1      MS. BENTLEY:  Thank you.

2      ATTORNEY:  We don't question your intentions at all.

3      MS. BENTLEY:  Thank you.

4      ATTORNEY:  [Indiscernible].

5      DET. KESSLER:  No, but we're questioning her intentions.

6  That's what the question is.

7      MS. BENTLEY:  That's really good too.

8      DET. KESSLER:  That's what the--

9      MS. BENTLEY:  That's fair.  We got that.  I understand

10  that.

11      DET. KESSLER:  Well, I'm glad you do.  I'm glad you

12  understand that--

13      MS. BENTLEY:  I understand that.  We do.

14      DET. KESSLER:  --because from my understanding, you don't

15  think that there's anything wrong with your seven-year-old son

16  being out all night by himself.

17      MS. BENTLEY:  That's what you understood by me asking for

18  time alone with him--

19      DET. KESSLER:  No.

20      MS. BENTLEY:  --to calm him down?  And that's what you

21  understood from that?

22      DET. KESSLER:  No, that's what I understand from speaking

23  with other officers on scene.

24      FEMALE:  Cristina's running to get something right now.

1        DET. KESSLER:  Okay.

2        FEMALE:  [Indiscernible].

3        DET. KESSLER:  Uh-huh.  Yeah.

4        SERGEANT:  Did the Office of Child Welfare person, did

5    she respond with DCS's request or do you know?

6        DET. KESSLER:  I don't know how she got--got them.

7        SERGEANT:  Where did they go?

8        DET. KESSLER:  Huh?  Over there.

9        SERGEANT:  Huh?

10       DET. KESSLER:  They went over there, and Gina said that

11   she went to get something.

12       FEMALE:  Did you hear from [indiscernible]?

13       FEMALE:  Who?

14       FEMALE:  [Indiscernible].

15       FEMALE:  No.  [Indiscernible].  Maybe.

16       MS. BENTLEY:  [Indiscernible.]

17       ATTORNEY:  [Indiscernible.]

18       MS. BENTLEY:  [Indiscernible.]

19       SERGEANT:  Why don't you folks have a seat, and then

20   we'll go see if--

21       FEMALE:  Okay.

22       SERGEANT:  --they're--what's taking so long.

23       FEMALE:  Okay.  That was my supervisor, and she said

24   Talon does need to be interviewed, so if you guys want to

1    leave, you can leave, but Talon can't leave until he's been

2    interviewed.

3         ATTORNEY:  Okay.  And the other kids?

4         FEMALE:  Talon is our main concern right now.

5         ATTORNEY:  I beg your pardon?

6         FEMALE:  Talon is our main concern.

7         ATTORNEY:  So the other kids are free to go?

8         FEMALE:  Uh-huh.

9         ATTORNEY:  Okay.  All right.  And Talon, what's the

10   procedure for that interview?

11        FEMALE:  He'll be forensically interviewed by our trained

12   forensic interviewer.

13        ATTORNEY:  How long?  Can you just give us an idea of

14   when that'll happen?

15        DET. KESSLER:  Right now.

16        FEMALE:  Right now.

17        MS. BENTLEY:  What does that entail?  I'm not familiar

18   with--

19        DET. KESSLER:  It involves him telling--

20        MS. BENTLEY:  He gets questioned and--

21        DET. KESSLER:  It's just open-ended questions.  It's

22   nothing leading, no leading questions.  She talks to him about

23   school and home life, his family first, and then asks him

24   about last night.

1          ATTORNEY:  Is that recorded?

2          DET. KESSLER:  It is.

3          ATTORNEY:  [Indiscernible.]

4          MS. BENTLEY:  [Indiscernible.]

5               Can Cristina is with him?

6          DET. KESSLER:  I'm sorry?

7          MS. BENTLEY:  In the interview.

8          FEMALE:  I'm Gina.

9          MS. BENTLEY:  Oh, Gina [indiscernible].

10         DET. KESSLER:  No, the forensic interview is done with a

11    forensic interviewer and the child.

12         FEMALE:  And it's done by someone very trained, and the

13    kids aren't traumatized at all during it.

14         MS. BENTLEY:  Okay.

15         ATTORNEY:  (Indiscernible.]

16         FEMALE:  It's pretty low key.

17         ATTORNEY:  [Indiscernible.]

18              Are you telling me that him being released right now

19    is--will not happen without that interview?

20         FEMALE:  At this point in time, yes.

21         ATTORNEY:  How long does that usually take?

22         FEMALE:  Not that long, about 15--

23         DET. KESSLER:  Fifteen.  Yeah.

24         FEMALE:  --20 minutes at most.

1        DET. KESSLER:  Fifteen, twenty minutes.  He's seven, so

2   it's not very long at all.

3        FEMALE:  Okay.  I'm going to go ahead and give you my

4   duty temp form.  [Indiscernible.]

5   [End of recording.]

Exhibit 14

# In The Matter Of:

*Bentley vs.*
*City of Mesa*

*Cristina Baggen*
*March 6, 2019*
*Videotaped*

*Griffin Group International*
*2398 E. Camelback Road*
*Suite 260*
*Phoenix, AZ 85016*

Original File CB030619.txt
Min-U-Script® with Word Index

Videotaped

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Brian L. Bentley, et al.,        )
                                 )
             Plaintiffs,         )
                                 )
vs.                              ) No. 2:17-cv-00966-DJH
                                 )
City of Mesa, et al.,            )
                                 )
             Defendants.         )
                                 )

VIDEOTAPED DEPOSITION OF CRISTINA BAGGEN

Mesa, Arizona
March 6, 2019
9:43 a.m.

REPORTED BY:
MARISA L. MONTINI, RPR
Certified Reporter
Certificate Number 50176

PREPARED FOR:
ASCII/COPY

(Certified Copy)

Videotaped

2

1                          I N D E X
     WITNESS                                          PAGE
2
     CRISTINA BAGGEN
3
             Examination by Mr. Schern              5
4            Examination by Mr. Stoutner            97
             Examination by Mr. Stoutner            112
5            Examination by Mr. Bowen               126

6

7                      E X H I B I T S

8    NUMBER                                       PAGE

9    16        Reporter's Transcript of Recorded   43
               Interview
10              (96 pages)

11   17        Arizona Department of Child Safety   97
               Notice of Duty to Inform
12              (AZ-STATE000088)
               (1 page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1             THE VIDEOTAPED DEPOSITION OF CRISTINA BAGGEN

2    was taken at 9:43 a.m. on Wednesday, March 6, 2019, at the

3    Law Offices of Schern Richardson Finter Decker, PLC, 1640

4    South Stapley Drive, Suite 132, Mesa, Arizona, before

5    MARISA L. MONTINI, Certified Reporter, Certificate Number

6    50176, in and for the County of Maricopa, State of

7    Arizona, pursuant to the Federal Rules of Civil Procedure.

8

9    COUNSEL APPEARING:

10

     For the Plaintiffs:
11                   Schern Richardson Finter Decker, PLC
                     By:  Michael A. Schern, Esq.
12                        Yusra Bokhari, Esq.
                          Aaron R. Clouse, Esq.
13                   1640 South Stapley Drive
                     Suite 132
14                   Mesa, Arizona 85204

15   For the State Defendants:
                     Office of the Attorney General
16                   By:  James B. Bowen, Esq.
                     Assistant Attorney General
17                   2005 North Central Avenue
                     Phoenix, Arizona 85004-1592
18

     For the City of Mesa Defendants:
19                   City of Mesa Attorney's Office
                     By:  Duncan J. Stoutner, Esq.
20                   20 East Main Street
                     Suite 800
21                   Mesa, Arizona 85211

22   Also Present:
                     Chris Eichler, CLVS
23                   Legal Video Specialists

24

25

**Videotaped**

                                                                    **4**

 1                                          Mesa, Arizona
                                            March 6, 2019
 2                                          9:43 a.m.

 3

 4              THE VIDEOGRAPHER:  We're on the record.

 5   This is the videotaped deposition of Cristina Baggen taken

 6   by the plaintiffs in Case Number 2:17-cv-00966-DJH styled

 7   Brian Bentley, et al., versus City of Mesa, et al., filed

 8   in the United States District Court, District of Arizona.

 9              Today's date is March 6th, 2019 at 9:43 a.m.

10   Our location is 1640 South Stapley Drive, Suite 132 Mesa,

11   Arizona.  Marisa Montini is the certified reporter with

12   Griffin Group International, 2398 East Camelback Road,

13   Phoenix, Arizona.  My name is Chris Eichler.  I'm the

14   certified legal video specialist with Legal Video

15   Specialists, 3033 North Central Avenue, Phoenix, Arizona.

16              Counsel, would you please identify yourself

17   for the record at this time starting with plaintiffs'

18   counsel first, please.

19              MR. SCHERN:  Mike Schern for the plaintiffs.

20              MR. BOWEN:  James Bowen for defendants

21   Baggen and -- what's Gina's --

22              THE WITNESS:  Was Cordova.  Bell.

23              MR. BOWEN:  It's Bell now.  Let's say

24   Cordova just to keep the record.  I know her as Cordova

25   primarily.  Sorry.

1           MR. STOUTNER:  Duncan Stoutner for the City
2   of Mesa defendants.
3           THE VIDEOGRAPHER:  Thank you, counsel.  The
4   court reporter will now swear in the witness.
5
6                   CRISTINA BAGGEN,
7   a witness herein, having been first duly sworn by the
8   Certified Reporter to tell the truth and nothing but the
9   truth, was examined and testified as follows:
10
11                   EXAMINATION
12  BY MR. SCHERN:
13      Q.   Good morning.  My name is Mike Schern.  I'm the
14  attorney for the plaintiffs in this case, the Bentleys,
15  and I understand that you have been married since this
16  event and that your last name has changed to Gutierrez; is
17  that correct?
18      A.   No, I've been divorced.
19      Q.   I apologize.
20      A.   That's okay.
21      Q.   You've been divorced.
22      A.   Yes.
23      Q.   Okay.
24      A.   It's my maiden name.
25      Q.   Okay.  I never know what to say in that --

**6**

1    congratulations or sorry.

2         A.    Congratulations.  We're good.

3         Q.    Okay.  I'll -- I'll do my best to -- to call you

4    by Ms. Gutierrez.  I may slip up from time to time and say

5    Baggen.  I hope you won't be offended by that.

6         A.    No problem.

7         Q.    Okay.  Have you ever had your -- your deposition

8    taken before?

9         A.    Yes, sir.

10        Q.    Okay.  Was that when you were a plaintiff in a

11   case or a defendant in a case or a witness?

12        A.    It was for the criminal case.

13        Q.    Okay.  So I believe you're referring to an

14   interview that you had with Ryan Tait in April of '17.  Is

15   that what you're referring to?

16        A.    I don't recall his name.

17        Q.    Okay.

18        A.    But it was at the office as well.

19        Q.    Okay.  How about besides that, have you ever had

20   your -- your deposition taken?

21        A.    No, sir.

22        Q.    Okay.  And I -- something where there's a court

23   reporter present, those types of things?

24        A.    I mean, I've been to court for the State but --

25        Q.    You've testified as a witness?

1      A.   Correct.

2      Q.   Okay.  Have you ever been a party to a lawsuit?

3   Aside from a family proceeding, like a divorce proceeding,

4   have you ever been a party to a -- to a civil lawsuit

5   before, plaintiff or a defendant?

6      A.   No.

7      Q.   Have you had any -- have you had any alcohol in

8   the last 24 hours?

9      A.   No, sir.

10     Q.   Are you taking any medications that might affect

11   your -- your memory or your ability to understand my

12   questions today?

13     A.   No.

14     Q.   From -- from time to time during your deposition

15   today, I will refer to this case, and when I refer to --

16   to this case, I'm referring to the -- the lawsuit, of

17   course, at hand and the events of April 1st, 2016.  I'm

18   not referring to anything else, just the events of 2016 at

19   the Bentleys' home, at the MFAC and the hospital and

20   anything related to that -- that day or the day following

21   and then this matter.  Is that fair?  You understand what

22   I'm talking about?

23     A.   Yes.

24     Q.   Besides your lawyer, have you spoken with anyone

25   else about this case?

8

1      A.   No.

2      Q.   And when you see me turning pages like this,

3  that's a good thing because that means I'm skipping over

4  things and we're -- we're getting rid of things that I

5  don't need answers to.

6              Who did you -- who was your employer on

7  April 1st, 2016?

8      A.   At that time, I was with the Department of Child

9  Safety.  So the State of Arizona.

10     Q.   Okay.  And is your employer still the state of

11 Arizona but you're with a different department, OCWI or

12 something like that?

13     A.   That's correct.

14     Q.   And how long after -- well, let me ask it this

15 way:  When did you make the transition from DCS to OCWI?

16     A.   Just over two years ago.

17     Q.   About how long after April 1st, 2016, was that?

18     A.   About almost two years.

19     Q.   Okay.

20     A.   Almost.

21     Q.   So then you would have made the transition from

22 DCS to OCWI in April of 2018?

23     A.   The end of February of 2018.

24     Q.   Okay.

25     A.   No.

Videotaped

9

1    Q.   Are you confused?

2    A.   No.

3    Q.   Would you like me to re-ask the question?

4    A.   Yes, please.

5    Q.   You bet.

6         What I'm -- what I'm trying to understand is

7    when did you shift from working for DCS over to OCWI?

8    A.   I've been there two years, so that would have

9    been in the end of February 2017.

10   Q.   Okay.

11   A.   So the end of '17 -- February 2017.

12   Q.   Got it.

13        And when you were -- on April 1st, 2016, did

14   you have a work cell phone?

15   A.   Yes, I did.

16   Q.   And is that different than the cell phone or cell

17   number that you have now for work?

18   A.   Yes.

19   Q.   Okay.  And what was that number that you had for

20   your work cell phone in 2016?

21   A.   I have no idea.

22   Q.   Okay.  Was it provided to you by DCS?

23   A.   Yes.

24   Q.   Okay.  And you don't recall what that number is

25   anymore?

Videotaped

10

1      A.    I do not.

2      Q.    And I'm assuming that you don't have the same

3   device anymore; is that correct?

4      A.    That's correct.

5      Q.    And in -- at that time, April of 2016, did you

6   ever use your work cell phone to communicate with

7   superiors at your office, police officers, other

8   individuals involved in an investigation?

9      A.    Yes.

10      Q.    And did you communicate by voice over that

11   telephone or by text or by both?

12      A.    I don't recall specifics, but I -- I know for

13   sure I did do voice.  I cannot tell you if there was --

14   if -- if it was text.  I can't recall that.

15      Q.    Okay.  Do you recall specifically if you ever

16   used that phone to communicate with superiors or officers

17   about the Bentley matter?

18      A.    Will you ask that question again?

19      Q.    Sure.  Do you recall if you used your work cell

20   phone to communicate with anyone, including other DCS

21   workers, superiors, OCWI workers or police officers, about

22   the Bentley matter, the investigation that day?

23      A.    Yes, I did.

24      Q.    Okay.  Do you recall who that communication would

25   have been with?

11

1    A.    I don't recall specifics.  I mean, to the best of

2    my recollection, it would have been my supervisor,

3    probably detectives and OCWI.

4    Q.    Okay.  Who -- who was your supervisor on

5    April 1st, 2016?

6    A.    Sara Greenway.

7    Q.    Greenway?

8    A.    Uh-huh.

9    Q.    Spelled like the street?

10   A.    Yes.

11   Q.    At that time, April 1st, 2016, I imagine you had

12   a personal cell phone as well?

13   A.    Yes.

14   Q.    Did you ever use that personal cell phone to

15   communicate work matters?

16   A.    No, sir.

17   Q.    Is there someone at DCS that would know the

18   telephone number that you used for your work cell phone in

19   April 1st, 2016?

20   A.    I have no idea.

21   Q.    Did you turn over that phone, if you will, or

22   give it back to DCS when you made the transition to OCWI?

23   A.    I did.

24   Q.    When -- and when you were at DCS, I'm assuming

25   you had a work e-mail address?

12

1     A.   Correct.

2     Q.   What was that e-mail address?

3     A.   Our prior e-mails -- it's changed twice.  I have

4  no idea at that time.  We've changed.

5     Q.   Okay.

6     A.   I couldn't tell you.

7     Q.   In April, April 1st, 2016, you would have had a

8  DCS e-mail address; correct?

9     A.   Correct.

10    Q.   And is it your testimony that since April 1st,

11  2016, prior to you leaving to OCWI, it changed?

12    A.   I don't recall when it changed.

13    Q.   Okay.  Did -- did you use your DCS e-mail to

14  communicate with anyone, your supervisor, OCWI workers,

15  police officers, about the Bentley matter?

16    A.   I don't recall.

17    Q.   I assume that you also had and/or have a personal

18  e-mail address; correct?

19    A.   Correct.

20    Q.   A personal e-mail account.

21         Would you have used your personal e-mail

22  account to communicate with anyone about the Bentley

23  matter, this case, anything like that?

24    A.   Definitely not.

25    Q.   Okay.  Did you ever take any notes about the

13

1    Bentley case?

2        A.    Yes.

3        Q.    And would those notes that you're referring to be

4    part of DCS's elec- -- I'll call it the electronic file?

5               MR. BOWEN:   Form.

6               Go ahead.

7               THE WITNESS:   The -- if you're talking about

8    the CSRA?

9    BY MR. SCHERN:

10       Q.    Yes.

11       A.    Yes.

12       Q.    How about any other notes?  Did you take any

13   handwritten notes and then use those handwritten notes to

14   enter into the CSR?

15       A.    Those would have been entered into the CSRA.

16       Q.    Your handwritten notes?

17       A.    Yes.

18       Q.    So you would have taken handwritten notes at

19   the -- at the time of your investigation; right?

20       A.    Correct.

21       Q.    And then what?  You would have gone back to your

22   office at some point, sat down in front of a computer and

23   entered those notes into CSRA?

24       A.    That's correct.

25       Q.    And would you have entered those notes into CSRA

1    personally or would you have given them to an assistant or

2    secretary to enter into the database, the CSRA?

3         A.   To the best of my recollection, I entered those

4    notes.

5         Q.   Okay.  What did you do with the handwritten notes

6    that you made?

7         A.   Those are shredded.

8         Q.   Is that practice in all of your cases with -- in

9    making personal notes, that they get shredded?

10        A.   Yes.

11        Q.   How soon after you use those notes to enter that

12   content into CSRA would you have shredded them?

13        A.   Immediately.

14        Q.   And would you have used -- would your office have

15   used a -- a shredding service where the notes that are to

16   be shredded get deposited into a big bin and a shredding

17   service comes and shreds them or was there an actual

18   shredder that you would have put the notes through?

19        A.   It's a big bin.

20        Q.   Big bin with a shredding service?

21             So other than the notes that were

22   handwritten that you made and then destroyed after you

23   entered them into CSRA, are there any other notes that you

24   made about this case, personal, journal entries, other

25   work diaries, calendar entries, anything like that?

15

1      A.    That -- can you clarify that question --

2      Q.    Sure.

3      A.    -- as to --

4      Q.    Sure.  So -- so I understand that -- and I'm --

5    I'm talking about the Bentley case only and the Bentley

6    investigation and, you know, the events of April 1, 2016,

7    and this case, this civil case.

8              I understand that you took handwritten

9    notes.  Would you have done that at the time -- or at the

10   scene on April 1st, 2016, made your notes?

11     A.    Yes.

12     Q.    Okay.  So I understand you made those pers- --

13   those -- those handwritten notes, and then at some point

14   you go back to your office, sit down in front of a

15   computer and you enter the notes you've made on your -- in

16   handwriting into the CSRA and then you destroy those

17   handwritten notes.

18              Are there any other notes or memoranda that

19   you would have made, such as like a personal note, maybe

20   in a day planner, a personal day planner, anything like

21   that about the Bentley case?

22     A.    Nothing personal.  There was a TCN that was never

23   served that was shredded.

24     Q.    Okay.  So -- and you would have done that at the

25   scene; is that correct?

1       A.   I would have done --

2       Q.   At the Bentley home?

3       A.   I would have done what?

4       Q.   This TCN that you're referring to.

5       A.   That almost happened at the scene.

6       Q.   Okay.  So we'll talk about that.

7            How about any other writing of any type,

8    anything else that you would have made regarding this

9    case?

10      A.   Not to my knowledge.

11      Q.   Okay.  Did -- did anyone else, whether -- anyone,

12   police officers, OCWI workers, other DCS workers,

13   neighbors, anyone, did anyone else give you notes that

14   they had made regarding the Bentley case?

15      A.   To the best of my recollection, I did get some

16   notes from Gina as she spoke to the child.

17      Q.   And are we talking about Gina Cordova, slash,

18   Bell?

19      A.   Yes.

20      Q.   Okay.  Got it.

21           And so she gave you some notes about --

22   about what?  What were they about?

23      A.   Whatever she spoke to Talon about.

24      Q.   Okay.  And were -- would those have been

25   handwritten notes or would she have e-mailed you something

17

1  or texted you something?

2       A.   Both are -- are possibilities.  I don't recall

3  exactly which one that she used.

4       Q.   And what would you have done with those notes

5  that she gave you?

6       A.   Entered into the CSRA.

7       Q.   And then shredded them?

8       A.   If there was something handwritten, yes.

9       Q.   And if it was something that was, say, she

10 e-mailed you her notes, you would have used her e-mail to

11 enter them into CSRA?

12      A.   Correct.

13      Q.   And then what would have become of that e-mail?

14      A.   Typically my standard practice is that I -- if

15 there are e-mails, I will print them out with the file.

16      Q.   Okay.  Do e-mails that -- that you would have

17 received to your -- I'll call it the DCS account, your DCS

18 e-mail account, would you ever delete any e-mails?

19      A.   I delete e-mails, yes.

20      Q.   Okay.  Did you delete any e-mails regarding the

21 Bentley investigation, the Bentley case?

22      A.   I can tell you with the system we had, the e-mail

23 system back at that time, after your mailbox was at a

24 certain level, you had to delete e-mails otherwise you

25 could not receive or send e-mails anymore.  So that's a

1    possibility.  Once a case is closed out and all the

2    documentation is in the CSRA or the file, then I would

3    delete e-mails.

4        Q.   Okay.  Would -- so if an e-mail comes in

5    regarding, you know, the Bentley case, you receive an

6    e-mail from an officer or from Ms. Cordova, would it be

7    practice to print that e-mail out and put it in the file?

8        A.   That was practice, yes.

9        Q.   Okay.  So -- so there wouldn't be any e-mails

10   that you received about the Bentley case that wouldn't be

11   printed out to put in the file; is that correct?

12       A.   To the best of my knowledge.

13       Q.   Okay.  What is your educational background?

14       A.   I have a bachelor's in psychology, a master's in

15   psychology, and I've completed all the class credits for

16   my Ph.D.

17       Q.   Kind of an ABD, all but dissertation?

18       A.   Pretty much.

19       Q.   And your master -- or I'm sorry.  Your Ph.D.,

20   what was -- what was the focus of that?

21       A.   That was in counseling psychology.

22       Q.   Counseling psychology.

23            And do you have plans to complete that?

24       A.   That's personal.

25       Q.   Fair enough.

Videotaped

19

```
 1              How about do you have -- you know, I
 2   understand, of course, you have a bachelor's degree.  You
 3   have a master's degree.  I'll call it ABD on your Ph.D.,
 4   which is pretty impressive.
 5              How about any other certificates related to
 6   any -- any particular field, certificates of completion
 7   or -- or something like that?
 8       A.   I've done numerous trainings.  I have a
 9   certificate that doesn't pertain to this.  It's a mental
10   game coach professional.  I have done new case manager
11   trainings, safety trainings, risk trainings, privacy
12   trainings, DDD trainings, domestic violence trainings,
13   child prevention -- child abuse prevention trainings,
14   post-traumatic effects of child abuse, neurological
15   effects of child abuse, sexual -- sexual trafficking of
16   children, amongst others.  Those are the -- those are the
17   main ones.  Oh, and I have been forensically trained.
18       Q.   For forensic interviewing?
19       A.   Yes.
20       Q.   And that's quite a -- that's quite a laundry
21   list.  Pretty impressive.
22              Did all of -- all of that occur prior to
23   April 1, 2016?  I imagine it didn't.
24       A.   I couldn't give you specific dates on that
25   without looking it up.
```

1    Q.   Sure.  How long -- okay.  Fair enough.

2         How about any -- in any licensures, are

3    you -- do you have any licenses in any field?

4    A.   No.

5    Q.   Okay.

6    A.   Oh, I will let you know I was forensically

7    trained prior to April 1st -- April 1st, though.

8    Q.   April 1st, 2016?

9    A.   Yes.

10   Q.   Got it.

11        How about employment history?  I understand

12   we talked about OCWI and how long you've been there.

13   Before that you were with DCS.  So tell me about, you

14   know, your employment history prior to OCWI?

15   A.   I've worked with the seriously mentally ill as a

16   case manager, and I've worked with children with

17   disabilities.  I've worked as a coach --

18   Q.   How long --

19   A.   -- coaching kids from age three to 17.

20   Q.   Okay.  So how -- when did you start over at DCS?

21   A.   I started back in May of 2012.

22   Q.   And prior to that, what did you do?

23   A.   I was coaching competitive sports.

24   Q.   Okay.  What kind?  What sport?

25   A.   Soccer.

1      Q.   All right.  And obviously that -- I'm assuming

2   you -- were you working with kids?

3      A.   Yes.

4      Q.   So obviously you're working with kids doing that,

5   but had you ever worked with -- with children or on

6   children's behalf in a capacity other than as a coach

7   prior to -- prior to that?

8      A.   Other than as a coach?

9      Q.   That was a horrible question.

10      A.   Yeah.

11      Q.   I apologize.

12            So -- so you start with DCS in May 2012.

13   Prior to that, were you -- were you working with kids or

14   on behalf of kids other than, like, coaching?

15      A.   Just with the coaching.

16      Q.   Okay.  So when you started working for DCS in

17   May 2012, what was your role there?

18      A.   I was hired on as a hotline intake specialist.

19      Q.   Okay.  And how long did you do that?

20      A.   About a year and a half.

21      Q.   Okay.  And so from there as a hotline specialist

22   with DCS, what was your next role with the agency?

23      A.   I became an investigator.

24      Q.   Okay.  And did that role change at all until you

25   left or was that the role you had when you left as an

1    investigator?

2         A.    Was that the role I had until I came to OCWI?

3         Q.    Yes.

4         A.    Yes.

5         Q.    I say left.  That's what I mean.

6         A.    I just wanted to clarify.

7         Q.    Yeah.  So your -- your two roles while you were

8    working with DCS were that as a hotline --

9         A.    Intake specialist.

10        Q.    -- intake specialist and then as an investigator.

11   While you were an investigator, were there different

12   categories of what types of cases you would investigate or

13   were they -- is it just -- and I'm not familiar with it so

14   that's why I ask.  Is there just one -- if you're an

15   investigator, you handle all these cases that come in or

16   is there a specific type of case that you get assigned to?

17        A.    At that time, we were a specialized unit.  We

18   would more so handle criminal conduct cases.  We would

19   work jointly with PD and OCWI.

20        Q.    When you say at that time, you're talking about

21   April 1, 2016?

22        A.    At that time, we were still a specialized unit,

23   yes.

24        Q.    Okay.  Okay.  And at that time in April -- I'm

25   going to say that date over and over again today, I bet,

23

1    date April 1, 2016, did you office at the Mesa Family

2    Advocacy Center, the MFAC?

3        A.   Yes.

4        Q.   That's where you would show up and report for

5    work every day?

6        A.   Correct.

7        Q.   Had -- had you -- was that your office since you

8    became an investigator over there or always was that your

9    office?

10       A.   While I was investigations with DCS, that was my

11   office.

12       Q.   Okay.  And did that change when you went over to

13   OCWI?

14       A.   Yes.

15       Q.   What did you do -- excuse me -- to prepare for

16   your deposition today?

17       A.   I reviewed my CSRA, and I was provided an audio

18   recording to try to identify an unknown.  I believe it was

19   at the center, unknown voice.

20       Q.   An audio recording?

21       A.   Yes.

22       Q.   Was -- was that the audio recording of -- that --

23   that was made at the MFAC with Mrs. Bentley and -- and me?

24   Is that the recording you're referring to?

25       A.   If that was you, yes.

1    Q.   I don't know.  I don't know what you listened to.

2  Okay.

3    A.   Yeah, Detective Kessler was there.

4    Q.   Okay.  Was Detective Bina there?

5    A.   I believe Sergeant Bina --

6    Q.   Sergeant.

7    A.   -- was there.  I believe my supervisor stepped in

8  and out a split second trying to find me.

9    Q.   Would that be Mrs. -- Ms. Greenway --

10    A.   That was Sara Greenway.

11    Q.   -- Sara Greenway.

12         Okay.  Anyone else on that tape or that

13  recording?

14    A.   That's what I recall.

15    Q.   Okay.  Okay.  So you reviewed your CSRA, listened

16  to a recording.  What else did you do to prepare for your

17  deposition today?

18    A.   That's pretty much it.

19    Q.   Okay.  Have -- did you ever look at any of the

20  Axon video from the police officers in this case?

21    A.   No.

22         MR. BOWEN:  Form.  Form.

23         Go ahead and answer it if you can.

24  BY MR. SCHERN:

25    Q.   From time to time, your attorney will -- will

1    object, and I would say and then I'll tell you to answer

2    but I won't because I can't give you direction like that.

3    We most likely will tell you to answer unless he -- unless

4    there's something privileged and he instructs you not to

5    answer.  If he objects to form, those types of things, you

6    can still answer the question.

7                    So you never looked at any video for the

8    case?

9         A.   Not that I recall.

10        Q.   Okay.  Any other audio that you ever listened to

11   for the case?

12        A.   Not that I recall.

13        Q.   Okay.  Did you -- did you ever listen to the

14   forensic interview recordings of any of the Bentley

15   children?

16        A.   I was there for part of that interview, but

17   that's as much as I saw of it.  I just observed.

18        Q.   Okay.  So it's my understanding that -- that

19   there were three interviews -- three children interviews,

20   Bryson, Mason and Talon.  Talon, of course, was the boy

21   that was the subject of everything.

22                    When you say that you were there for part of

23   the interview, do you know which one of those interviews

24   you're referring to?

25        A.   That was Talon's --

1      Q.    Okay.

2      A.    -- interview.

3      Q.    Okay.  You didn't see the ones with the other two

4    boys?

5      A.    No, sir.

6      Q.    And when you -- did you view that interview of

7    Talon through CCTV or were you actually present in the

8    room?

9      A.    I was observing from another room.

10     Q.    Through a video?

11     A.    Uh-huh.  I don't know specific names for it.

12     Q.    Right.  It's my understanding that Detective

13   Russo also observed that interview of Talon remotely

14   through video.

15           Were you with Detective Russo during that

16   time?

17     A.    I don't recall who was in there.

18     Q.    Okay.  You -- when I -- in response to the

19   question I asked you earlier about have you ever had your

20   deposition taken before, you referred to your interview in

21   the criminal matter, and I would submit to you that that

22   was with a gentleman by the name of Mr. Tait, Ryan Tait.

23   You recall that interview; correct?

24     A.    I recall going to that interview, correct.

25     Q.    Based upon the information that you had at the

1    time, you know, in fairness, all the information you had

2    at the time, is it safe to say that and fair to say that

3    the answers that you gave to Mr. Tait during that

4    interview were truthful?

5        A.    Yes.

6        Q.    Okay.  And you haven't reviewed that interview?

7        A.    I wouldn't have access to that.

8        Q.    Okay.  That -- I'll submit to you that that

9    interview took place on April 19th, 2017, that interview

10   with Mr. Tait.

11             Have you become aware of any facts since

12   that interview that you were not aware of at the time you

13   gave that interview?

14       A.    Since the interview on April 19th?

15       Q.    Uh-huh.  Yeah.

16       A.    No.

17       Q.    And what I -- here's the hypothetical.  Well, I

18   gave this interview on April 19th, and then, you know, a

19   year later I find out that Talon is a serial killer.

20   There's a fact that I wasn't aware of then.  That hasn't

21   changed; right?  Nothing you've become aware of?

22       A.    No.

23       Q.    Got it.

24       A.    Not that I recall.  Let me state that better.

25       Q.    Again, I'm crossing stuff off like this.  That's

1  good.  It means we're just skipping through and we'll get

2  out of here sooner.

3              I don't want you to reveal any confidential

4  information or privileged information that would be

5  between you and your lawyer so think about this question

6  before you answer it.

7              Have you provided your attorney with a copy

8  of all of the documents, e-mails, text messages,

9  recordings, videos and notes regarding this case that were

10  at some point or another in your custody or control?

11      A.   Did I physically, no.

12      Q.   Okay.

13      A.   Have they gotten the records, yes.  I did not

14  provide them.

15      Q.   And would those have been provided through your

16  supervisor at DCS?

17              MR. BOWEN:  Foundation; form.

18              If you know, answer it.  Go ahead.

19              THE WITNESS:  I don't believe so.  I -- I

20  don't know the answer to that one.

21  BY MR. SCHERN:

22      Q.   Okay.  Who do you understand to be your attorney

23  in this case?  Mr. Bowen?

24      A.   Jim.

25      Q.   Okay.  Has there been any time when you've had a

1    discussion with Mr. Bowen and there's been someone else in
2    the room or on the phone with you?
3        A.    Kwan?  Is that her name?
4        Q.    Kwan?
5        A.    Yes.
6        Q.    Okay.  I'm going to hand you what has been
7    previously marked as Exhibit Number 3, and can you tell me
8    what this document is?
9        A.    This is our CSRA.
10       Q.    Okay.  And is this the document that you were
11   referring to when you testified that you took your
12   handwritten notes and transcribed them into the CSR --
13   CSRA.  Is this it?
14       A.    Correct.
15       Q.    And did you say that you had looked at this
16   document in preparation of your deposition today?
17       A.    Correct.
18       Q.    Is there anything in this document that after,
19   you know -- or two years later, almost three years later
20   after the event, having had time to think about it and
21   having reviewed it recently, is there anything in this
22   document that is inaccurate?
23       A.    Not that I'm aware of.
24       Q.    So on this document at -- I'm looking at the
25   first page and -- let's see.  It looks like Section 1,

1    background information, and then subcategory A prior

2    history, there's an entry here that says, "There are no

3    prior DCS reports."

4                    Do you see what I'm referring to?

5         A.    Yes.

6         Q.    And then down at the -- at the bottom of that

7    same box, "There's not" -- "there does not appear to be a

8    pattern of abuse at this time.  This is the family's first

9    report."

10                   Then underneath there, it's -- it says

11   hyphen Baggen, comma, Cristina at a date and time?

12                   Does that -- I'll call it a -- I guess I'll

13   call it a signature block there.  I don't know what else

14   to refer to it as.  But where it says, you know, hyphen

15   Baggen, comma, Cristina, does that mean that you entered

16   the information above your name?

17        A.    If my name is the only name on there, correct.

18        Q.    Okay.  So like -- so in that box, Section 1A,

19   your name is the only one on there.  So that means that

20   you were the only one who wrote in that box; right?

21        A.    Correct.

22        Q.    Okay.  If I could have you turn to -- down at the

23   bottom of that document, you'll see a series of numbers.

24   Those are called Bates numbers.  If I can have you turn to

25   the page, the last -- where the last two digits of the

1    Bates number are 61, and it looks like on that page, I'll

2    call it Bates label 61, that box that's -- looks like a

3    subcategory B, each alleged child victim.

4                   Do you see that one?

5         A.    Yes.

6         Q.    Down at the bottom of that box, you're the only

7    name on there, right, hyphen, Baggen, Cristina, at

8    4/20/2016 at 3:12.  So based on my understanding of what

9    you just told me, since you're the only name in there,

10   that means that you're the only one that would have wrote

11   the content that's in that box B; right?

12        A.    Yes.

13        Q.    So it says there in box B, "On 4/1/16 about

14   10:30 a.m., Talon was interviewed by OCWI Cordova alone in

15   his bedroom.  Talon appeared to have good hygiene and

16   appeared well nourished.  He was dressed appropriate for

17   the weather.  Talon appears to be developmentally on

18   track.  There were no visible bruises or marks on Talon at

19   the time of the interview.  Talon reported living with

20   mother, father, brothers and sisters.  He reported getting

21   along with everyone at the home.  He reported having

22   enough food in the home."

23                   So this is a reference to an interview that

24   took place with Gina Cordova and Talon Bentley.  And you

25   weren't there, right, if she was alone in the room with

1   him?

2       A.   When she spoke to him, no.

3       Q.   And so this comment here about Talon was

4   interviewed by Cordova in his bedroom.  He appeared to

5   have good hygiene, appeared well nourished, dressed, that

6   information that you're putting into box B here, that

7   would have come from Gina Cordova's notes; is that

8   correct?

9       A.   Or information she provided me verbally or --

10  verbally.

11      Q.   All right.  Fair enough.

12           But when we're -- that statement, the second

13  sentence there, "Talon appeared to have good hygiene,

14  appeared well nourished, dressed appropriate for the

15  weather, appears to be developmentally on track, no

16  visible bruises or marks at the time of interview," that

17  information would have come from Gina Cordova; correct?

18      A.   To the best of my knowledge.

19      Q.   And she would have given you that information

20  either on the notes that she gave you or she would have

21  verbally told you; is that correct?

22      A.   As part of our child assessment, yes.

23      Q.   Got it.

24           Do you -- when did you -- let me back up

25  here.

1              So about 10:30 a.m. on 4/1/16, Talon was

2    interviewed by Ms. Cordova alone in his bedroom, and while

3    that's happening, where -- where are you?  Are you talking

4    to the parents out in the foyer of the home?

5         A.    Wherever Detective Kessler was, I was with her.

6    I was probably at her side.

7         Q.    Okay.  When was the first time you spoke with

8    Ms. Cordova after that 10:30 a.m.?  Because she's

9    interviewing Talon at 10:30 a.m.; right?

10        A.    Correct.

11        Q.    Assume -- assume it's -- I don't know -- half

12   hour, assume it's 20 minutes, whatever, put a number on

13   there.  It doesn't matter to me.  Assume she speaks with

14   him for 20 minutes, when was the first time you speak with

15   Ms. Cordova?  Is it later that day?  Is it immediately

16   after she interviews the child?

17                 MR. STOUTNER:  Form.

18                 THE WITNESS:  I did walk into the room where

19   she was with the child at one point.  I can't tell you a

20   specific time.

21   BY MR. SCHERN:

22        Q.    Okay.

23        A.    And we probably said a couple words.  I don't

24   recall what was said at that point in time.

25        Q.    Okay.  When -- were you aware of when she -- when

34

1  she concluded her interview with Talon?  Were you aware of

2  that, hey, she's done in there or was it a surprise to

3  you?  All of a sudden she's gone, Talon's just there.  How

4  did you know that she was finished with her interview with

5  him?

6      A.   To the best of my knowledge, I walked over to

7  check on Gina and she was in the room with him.  I don't

8  know when she finished her interview.

9      Q.   Okay.  Sorry about that.  I'm having a -- there

10  we go.

11           At some point on April 1st, 2016, Talon ends

12  up in the back of an ambulance; right?

13      A.   Correct.

14      Q.   Did Ms. Cordova give you this information that

15  you included in your notes here before or after he was put

16  in that ambulance?

17      A.   I couldn't tell you that.  I don't recall.

18      Q.   Okay.  But to be certain, at some point, this

19  information that you've included in section B here came

20  from Ms. Cordova; correct?

21      A.   From -- from part of her assessment, yes, and

22  some is observation of the child.

23      Q.   If I could have you turn to Bates label -- on

24  that same document, same exhibit, the page that's -- the

25  Bates label, last two digits are 64.

1            Up there at the top of that page, it says

2    section A, assessment of present danger, the box at the

3    bottom of it has your name and yours is the only name in

4    there, which I understand from your testimony to mean that

5    you were the one that would have wrote this information in

6    that box; correct?

7        A.   Correct.

8        Q.   And it says, "At the time of the initial

9    investigation on 4/1/16, Talon was forensically

10   interviewed at the MFAC and did not disclose any abuse or

11   neglect."

12            I understand that based on your testimony,

13   that you observed some of the interview but not all of it;

14   is that correct?

15       A.   That is correct.

16       Q.   How did you come to conclude that he did not

17   disclose any abuse or neglect if you observed only part of

18   it?

19       A.   Based on the part that I did see and the other

20   individuals who were observing the interview as well as

21   the forensic interviewer.

22       Q.   So you would have had communications with the

23   forensic interviewer, Mrs. -- I think it's Glazer?

24       A.   Glazer.  Glazer.  We talk about, right after the

25   interview, if there's any questions or if anything stood

1    out.

2        Q.   So -- and she would have told you he didn't

3    disclose anything?

4                    MR. STOUTNER:   Form.

5    BY MR. SCHERN:

6        Q.   Is that correct?

7        A.   She would have -- I can't say she's the one that

8    said it.

9        Q.   Okay.

10       A.   I don't -- I can't recall that specific, but it

11   was discussed in there.

12       Q.   Okay.  That next box down, the B, assessment of

13   risk factors for each child, again, this was authored by

14   you, correct, section B?

15       A.   Correct.

16       Q.   It says, "There is a risk that Talon will run

17   away again because he has a history of running away.

18   Talon is a smart child, prepares when he runs away.  There

19   is a concern that the parents will not contact the

20   authorities if Talon runs away again."

21                   Why did you put that part?  What is that --

22   that sentence, "There is concern that the parents will not

23   contact authorities if Talon runs away again"?

24       A.   That was part of the overall assessment.  He's

25   ran away before.  They were resistant with whatever they

Videotaped

37

1    were being asked for and refused to engage further with

2    the investigations or allowing others to be interviewed

3    and there's concern that they will not contact law

4    enforcement.

5        Q.   Is there a -- is there a law that requires a

6    parent to report a missing child?

7                  MR. STOUTNER:  Form.

8                  MR. BOWEN:  Join.

9                  THE WITNESS:  I couldn't give you specifics

10   on the laws.

11   BY MR. SCHERN:

12       Q.   Are you aware of one?  Are you aware of any law

13   that requires a parent to report a missing child?

14                 MR. STOUTNER:  Form.

15                 THE WITNESS:  Everybody is a mandated

16   reporter.  That's the best I can give you on that.

17   BY MR. SCHERN:

18       Q.   And what do you base that on?

19       A.   If there's abuse, neglect or a child is unsafe,

20   it is a parent or anyone else's responsibility.

21       Q.   If a child is missing, does that mean that the

22   child is unsafe?

23                 MR. STOUTNER:  Form.

24                 MR. BOWEN:  Form.

25                 THE WITNESS:  I can give you my personal

Videotaped

38

1    judgment or thought about that, but that's not the

2    reality.

3    BY MR. SCHERN:

4        Q.   If a child is -- if a parent can't find their

5    child for a few hours, does that mean that the child is

6    being neglected?

7                    MR. BOWEN:  Form.

8                    MR. STOUTNER:  Form.

9                    THE WITNESS:  It's a possibility.

10   BY MR. SCHERN:

11       Q.   I mean -- because you testified a moment ago that

12   parents -- that everyone is a mandatory reporter, I think

13   you said, with respect to abuse, neglect and a child being

14   unsafe; right?  Is that what you said?  Is that yes?

15                   MR. BOWEN:  Yes?

16                   THE WITNESS:  Correct.

17   BY MR. SCHERN:

18       Q.   And so my question is:  If a child simply can't

19   be found, does that mean that there's been abuse, neglect

20   or that the child is unsafe?

21                   MR. BOWEN:  Form.

22                   MR. STOUTNER:  Form.

23                   THE WITNESS:  It's a possibility and that's

24   why the investigation would need to be done.

25   ///

Videotaped

39

1    BY MR. SCHERN:

2       Q.   Have you ever had any -- any -- you've had it

3    sounds like a lot of training with DCS and OCWI on all

4    kinds of matters involving neglect, abuse.

5            Have you had any training that included any

6    reference to a statutory requirement that a parent report

7    a missing child?

8       A.   I couldn't give you specifics.  I don't know.

9       Q.   You don't know?

10      A.   No.

11      Q.   The next and last sentence in that box B on

12   page 6 of 8 of the CSRA where you wrote, "There is concern

13   the family's religion," slash, "faith impairs their

14   judgment."

15           Why did you include that in your --

16      A.   Where is that?  I'm sorry.

17      Q.   Sure.  On page 6 of 8 of the CSRA, the Bates

18   label is 64, box B, second from the top where it says,

19   "Assessment of risk factors for each child."  The last

20   sentence in that box B, "There is concern the family's

21   religion," slash, "faith impairs their judgment."

22           MR. BOWEN:  It's just the box you were

23   just -- the last sentence of the -- of the box he was just

24   discussing with you.

25           THE WITNESS:  Oh, okay.  Assessment.

1    There's two assessments.

2    BY MR. SCHERN:

3        Q.    Okay.  Box B.

4        A.    Sorry.  I didn't get that part.

5        Q.    That's all right.  "There is concern that the

6    family's faith," slash -- I'm sorry.  "There is concern

7    that the family's religion," slash, "faith impairs their

8    judgment."

9               What did you mean by that when you included

10    this in the CSRA?

11        A.    That was based on the parents' interviews stating

12    that and it is also in the CSRA.  Can I look back on it?

13        Q.    Sure.

14        A.    On mother's interview that God told them Talon

15    would be all right so the family went to bed.

16        Q.    And can you tell me where you were referring to?

17        A.    Yes.

18        Q.    Is it page 2 of 8 of the CSRA?

19        A.    Document ending with 63, section D, it is about

20    midway through.

21        Q.    Okay.

22        A.    There's also a section --

23        Q.    Okay.  So hold on.  Let's focus on that one first

24    just so we don't get too confused.

25               So -- so page 5 of 8 of the CSRA, the Bates

Videotaped

41

1    label on that page ends with 63.  That box D at the top

2    and, again, this -- we can surmise that you were the

3    author of the content in this box D, correct, because

4    yours is the only name on there; right?

5        A.    Correct.

6        Q.    Okay.  And so it states that, "On 4/1/16, mother

7    and father were interviewed by Mesa PD, various officers.

8    See file for DP report.  See joint investigation section

9    for details of the parents' interviews."  It says, "Around

10   10:40, mother was resistant to allow Talon to medically be

11   examined against EMT's advices."

12               Then a few sentences from that, it says,

13   "They were explained the concerns that they stopped

14   looking for Talon last night and went to sleep while their

15   7-year-old child was missing.  Mother reported they,"

16   quote, "prayed," closed quote, "about it and," quote,

17   "God," closed quote, "told them that Talon would be all

18   right so the family went to bed."

19               Now, where are you getting that information

20   that you included in the report?

21       A.    That was based off of the interview with mother

22   in the home.

23       Q.    An interview that you conducted or that someone

24   else conducted?

25       A.    It is a joint investigation, so we are with law

1   enforcement, and typically we let them do their role first

2   and any additional questions, then we will follow up.

3        Q.   Okay.  Is it your testimony that you were present

4   at any point in time when Janna Bentley said that they

5   prayed about it and that God told them that Talon would be

6   okay so that they went to bed?

7        A.   You're asking if I was present?

8        Q.   Yes.

9        A.   Yes.

10       Q.   When Janna said we prayed about it.  God told us

11  we would be okay so we went to bed, you were present?

12       A.   I was present.

13       Q.   Who else was present?

14       A.   I don't recall.  I was by Detective Kessler, and

15  there were a lot of people around.

16       Q.   Okay.  Was there an officer around wearing a body

17  camera?

18       A.   To the best of my recollection, there was --

19  there were several officers.

20       Q.   With body cameras?

21       A.   Correct.

22                 MR. STOUTNER:  Form; foundation.

23                 MR. SCHERN:  16?

24                 (Deposition Exhibit Number 16 was marked

25  for identification.)

Videotaped

43

```
1              MR. SCHERN:  This will be 16.
2    BY MR. SCHERN:
3        Q.   So this is a -- a certified transcript of your
4    interview that took place with Mr. Tait on April 19th,
5    2016 and --
6        A.   2017.
7        Q.   I'm sorry, 2017, correct.  Thank you for
8    correcting me on that.
9                If I could have you turn to page 46 of that
10   document, I believe there's page numbers in the upper
11   right-hand corners.  If I could have you look at -- at --
12   let's see.  We'll start at -- start at line 6 where the
13   question from Mr. Tait is, "What were the concerns that
14   they weren't going to get it done based on?"
15               And I think what the background here is that
16   Mr. and Mrs. Bentley -- you know, there's some talk of,
17   hey, you need to have your son checked out by a doctor,
18   and Mr. and Mrs. Bentley are saying we'll take him to our
19   own family doctor and from this interview it expresses we
20   didn't know that they were going to get it done.
21               And so it picks up where Mr. Tait says,
22   "What were the concerns that they weren't going to get it
23   done based on?"  And you say, "Again, they didn't seem to
24   understand the severity of the situation."
25               Mr. Tait, "Let's -- I'll stop you right
```

1    there and I'll come back to it.  What was the severity of

2    the situation in your mind?"

3                    Your answer, "A 7-year-old child out alone

4    all night, no supervision.  There's a sex offender group

5    home within walking distance.  The parents stopped

6    searching for the kid.  The parents did not contact PD

7    when -- before they went to bed or they feared he was

8    still gone.  Their religious belief was concerning because

9    the child was still in danger."

10                   So there you mention that their religious

11   belief is a concern again, and I -- I guess,

12   Ms. Gutierrez, I want to understand that better.

13                   Why was their religious belief a concern?

14   Was that simply because of what you allege you heard

15   Ms. Bentley say that they had prayed about it and God told

16   them that their son would be okay?

17       A.   I believe so.

18       Q.   What was their religious belief?

19                   MR. BOWEN:  Form.

20                   MR. STOUTNER:  Form.

21   BY MR. SCHERN:

22       Q.   Well, you say, "Their religious belief was

23   concerning because the child was in danger," and then your

24   CSRA says, "There's concern that their religion," slash,

25   "faith impairs their judgment."

Videotaped

45

1              What -- what was their religion?  What
2     religion are you referring to?
3                   MR. BOWEN:  Form.
4                   MR. STOUTNER:  Form.
5                   MR. SCHERN:  What's the form on that.
6                   MR. BOWEN:  She's already actually
7     testified, I think, as to what her concern was.
8                   MR. SCHERN:  No.  I'm asking a different
9     question.  We can -- I can have the reporter read back the
10    record.
11                  MR. BOWEN:  Well, it's still form.  It's --
12                  MR. SCHERN:  What's the form?  I have a
13    right to hear the objection.
14                  MR. BOWEN:  Well, she can't tell you what
15    religion.  She just testified --
16                  MR. SCHERN:  I'm asking her.
17                  MR. BOWEN:  No.  But she can't tell you what
18    religion she was.  She's testified as to what this person
19    said as to why they went to bed.  That's her basis.  What
20    religion?  I don't know.  Maybe she --
21                  MR. SCHERN:  I don't need you to answer the
22    question.  I'm asking her the question what was their
23    religious belief.
24                  MR. BOWEN:  I'm still going to object to
25    form --

1                   MR. SCHERN:  Okay.

2                   MR. BOWEN:  -- because it's a vague question

3     as -- what do you mean by religion?  Do you need to know

4     her denomination?  Do you need to know if she's Muslim?

5     What --

6                   MR. SCHERN:  All right.  That's enough.

7     BY MR. SCHERN:

8         Q.   So -- so you -- you stated, "Their religious

9     belief was concerning because the child was still in

10    danger," and "there's concern that the family's religion,"

11    slash, "faith impairs their judgment."

12                  What was your understanding was their

13    religious belief?  What did you understand their religious

14    belief to be?

15        A.   That God told them Talon would be okay and they

16    stopped searching.

17        Q.   Do you know if they are members of a particular

18    religion?

19        A.   No, I do not.

20        Q.   So you don't know if they go to church on Sunday?

21        A.   I do not.

22        Q.   You don't know if they believe in the Bible?

23        A.   I do not.

24        Q.   You didn't know if they believed in the Quran?

25        A.   I do not.

47

1      Q.   You didn't know if they prayed to Allah?

2      A.   No.

3      Q.   Or to Jesus Christ?

4      A.   No.

5      Q.   Your concern was that Janna Bentley believed that

6   she could pray to God and that God had told her that their

7   son would be okay; is that right?

8               MR. STOUTNER:  Form.

9   BY MR. SCHERN:

10     Q.   Is that what your concern was?

11     A.   The concern was that they stopped searching after

12  that.

13     Q.   But that's not what you wrote.  The -- you wrote

14  the concern is their religious belief.

15               MR. STOUTNER:  Form.

16  BY MR. SCHERN:

17     Q.   Right?

18     A.   Correct.

19     Q.   Okay.  And you didn't -- you didn't write the

20  concern was that they stopped searching.  You wrote the

21  concern was their religious belief.

22               MR. STOUTNER:  Form.

23               MR. BOWEN:  She didn't -- form.

24  BY MR. SCHERN:

25     Q.   And -- and here you say there's concern that

1  their faith and religion impairs their judgment.  How

2  would their -- explain that.  How does their faith or

3  religion impair their judgment?

4      A.   As stated in the CSRA, God told them Talon would

5  be okay and they went to bed or sleep.

6      Q.   Okay.  And how did that impair their judgment?

7      A.   They left a 7-year-old child out all night

8  unsupervised when there's a sex offender group home --

9      Q.   Okay.

10     A.   -- close to the home.

11     Q.   And who told you that there was a sex offender

12  group home near the Bentleys' house?

13     A.   I do not recall where that information came from.

14     Q.   Okay.  But you didn't have any personal knowledge

15  whether there was a sex offender home there or not, did

16  you?

17     A.   Personally?

18     Q.   Yeah.

19     A.   No.

20     Q.   You were relying on information that was received

21  from someone else; correct?

22     A.   Information that was received during the

23  investigation, correct.

24     Q.   But you don't know who that information came

25  from; right?

1     A.   I do not.

2     Q.   Okay.  And so you wrote in there that -- in your

3  report, that there was concern that -- that he was out all

4  night because there was a sex offender home.  That's

5  included in there; right?  I mean, it is.

6     A.   That is part of the concern.

7     Q.   Right.

8     A.   Correct.

9     Q.   So we understand that concern.  There's concern

10 because he was out all night.  They didn't know where he

11 was.  We understand that concern, but what is the concern

12 that God -- that they prayed to God and God says your son

13 is going to be fine.  Why is that a concern?

14               MR. STOUTNER:  Form.

15               MR. BOWEN:  Go ahead and answer it.  I'll

16 join.  Go ahead and answer it again.

17               THE WITNESS:  I'll tell you the same thing

18 again because God told them Talon would be okay, they went

19 to bed or to sleep and stopped searching for their

20 7-year-old child.

21 BY MR. SCHERN:

22     Q.   And was there anything -- Talon did end up being

23 okay; right?  I mean, he wasn't harmed in any way, was he?

24               MR. STOUTNER:  Form; foundation.

25               THE WITNESS:  Thankfully not.

**Videotaped**

50

1  BY MR. SCHERN:

2      Q.   So Janna's belief that God told her he was going

3  to be okay, that was right, wasn't it?

4              MR. BOWEN:  Form.

5  BY MR. SCHERN:

6      Q.   Wasn't it?

7              MR. BOWEN:  Form.

8              THE WITNESS:  That's a personal belief.

9  BY MR. SCHERN:

10     Q.   Do you believe in God?

11             MR. BOWEN:  Form.  And not relevant but

12  answer.

13             THE WITNESS:  That's a personal belief.

14  BY MR. SCHERN:

15     Q.   You're not going to answer the question?

16     A.   It's not pertinent to this case.

17     Q.   No.  It's absolutely pertinent to this case.

18  We've made a claim about religious discrimination, and you

19  put in your report that the State, you, include in your

20  report that God and the family's religion, their faith in

21  God, is a concern to the State, and I do expect you to

22  explain that and the judge is going to expect you to

23  explain that.

24             MR. BOWEN:  And I think not, but do what you

25  feel comfortable with.  I'm not going to tell you one way

1    or the other.  It's not relevant to anything in this case

2    but ...

3                    THE WITNESS:  On that documentation is a

4    professional assessment, not a personal assessment.

5    BY MR. SCHERN:

6        Q.   A professional assessment of what?

7        A.   Of the investigation.

8        Q.   What does that mean?  A professional assessment

9    of what?

10       A.   Of the information collected.

11       Q.   Are you trying to say that it's a professional

12   assessment of their faith and religion and how it impacts

13   them?

14       A.   Their faith is not my concern.

15       Q.   But it -- with respect, ma'am, it is your

16   concern.  You expressly state that it is your concern in

17   your report.  Are you now saying it's not your concern?

18   Because it is in the report, it was a concern.

19                   MR. BOWEN:  Form.  Go ahead and answer and

20   we'd like to take a break after she's done answering.

21                   MR. SCHERN:  Okay.

22                   THE WITNESS:  That impeded their ability to

23   protect their child.

24                   MR. SCHERN:  Okay.  We can take a break.

25   Let's go off the record.

52

1           THE VIDEOGRAPHER:  Off the record.  The time

2   is 10:58 a.m.  This is the end of Media One.

3           (A recess was taken from 10:58 a.m. to

4   11:21 a.m.)

5           THE VIDEOGRAPHER:  We're back on the record.

6   The time is 11:21 a.m.  This Begins Media Two.

7   BY MR. SCHERN:

8       Q.   On -- on April 1st, 2016, how did you first

9   become aware that the Bentley boy couldn't be found?

10      A.   To the best of my recollection, Detective Kessler

11  came into our office, and I was the only one there at the

12  time and she notified me.

13      Q.   And your office was at the MFAC; is that correct?

14      A.   Correct.

15      Q.   I don't -- I don't know if you're aware of this

16  or if you were involved, but based on prior deposition

17  testimony, we learned that the call comes in from the

18  Bentleys reporting their child missing and that Mesa

19  Police Department had a -- had a briefing that morning

20  when the call came in, kind of a, hey, let's get together

21  and assignments will be made on how we're going to find

22  this kid.

23           Were you involved in that -- in that

24  briefing at all?

25      A.   Not that I recall, no.

1    Q.   Okay.  So Detective Kessler came and said, hey,

2    there's a situation here.  What did she tell you?

3                    MR. STOUTNER:  Form.

4                    THE WITNESS:  If I can look back at the

5    CSRA?  I mean, she told me that there was a 7-year-old

6    child -- excuse me -- who had ran away from home and not

7    been -- or who had ran away from home.  I believe she told

8    me the child -- again, this is the best of my

9    recollection, the child had run away the night before and

10   law enforcement was contacted that morning.

11   BY MR. SCHERN:

12   Q.   Okay.  And how did you get to the Bentleys' home?

13   You drove there?

14   A.   I went with Detective Kessler.

15   Q.   In her vehicle?

16   A.   Correct.

17   Q.   How long after -- and just a rough estimate.  How

18   long after she came to your office and apprised you of the

19   situation was it before you left with her in the vehicle

20   to go to the Bentley home?

21   A.   I don't recall.

22   Q.   An hour?  Half hour?

23   A.   Honestly, I couldn't tell you.  I don't know.

24   Q.   After -- after Detective Kessler made you aware

25   of the situation, did you speak with anyone else at the

1   MFAC about the situation before you left?

2                   MR. STOUTNER:  Form.

3                   THE WITNESS:  I know I contacted my

4   supervisor to inform her of the information I was just

5   provided.

6   BY MR. SCHERN:

7        Q.   Okay.

8        A.   I don't recall speaking to anyone else.  I don't

9   remember.

10       Q.   Okay.  So a call comes into the police department

11   from the Bentleys about their missing child, and police

12   department then gets DCS involved via you; correct?

13       A.   Correct.

14       Q.   Does DCS always get involved in missing child

15   cases?

16                   MR. STOUTNER:  Form.

17                   THE WITNESS:  I don't have an answer for you

18   on that one.  I don't keep stats.

19   BY MR. SCHERN:

20       Q.   Was there a particular reason that DCS got

21   involved in this case?

22                   MR. STOUTNER:  Form.

23                   THE WITNESS:  Because the information was a

24   report, and if a report is made, we have to investigate

25   it.

1  BY MR. SCHERN:

2      Q.   So are -- so are we talking about a report other

3  than just, hey, my child is missing?  What kind of report

4  are you referring to?  A report to DCS?

5      A.   The report was made to DCS, correct.

6      Q.   And what was that report?  That the child was

7  missing?

8      A.   If I can --

9      Q.   Sure.  Please.

10     A.   -- refer to the CSRA.

11     Q.   Yeah.  And understand, I don't mean to -- I don't

12  mean to be -- I'm certainly not meaning to be tricky here

13  or complicated, but I'm not involved with DCS, right?  So

14  when I think of report, I understand the Bentleys call

15  say, hey, my child is missing.  So I think they report

16  their child missing, and I -- what I'm hearing is that now

17  a separate report is made to DCS, and I'm thinking there's

18  got to be more in that report than just, hey, a child is

19  missing, right?  Because so what?  Why would DCS get

20  involved with every missing child?  What -- what else is

21  there that would get DCS involved here?  So that's where

22  I'm -- that's what I'm trying to understand here?

23     A.   So there is --

24              MR. STOUTNER:  Form.

25              THE WITNESS:  -- certain criteria that must

1  be met.  Based on the synopsis that was written in the

2  CSRA, which is document ending on 59, section A, that

3  Talon had left the home unsupervised and was gone all

4  night.  He had taken his blanket and pillow.  The parents

5  stopped searching for him around 2:00 a.m. and did not

6  report him missing.  That fell under the neglect category

7  and that's why it was categorized as neglect.

8  BY MR. SCHERN:

9     Q.  Okay.  That -- that helps me understand why DCS

10  was involved.  So it would have been based on that report,

11  not just that he was missing, but that the parents

12  didn't --

13     A.  If that's part of the report criteria necessary,

14  then yes.

15     Q.  Okay.  I understand.  Had you worked with

16  Detective Kessler before on other matters?

17     A.  Yes, I have.

18     Q.  Prior to April 1st, 2016?

19     A.  Yes, I have.

20     Q.  Any of those matters involve a missing child or a

21  child that had ran away or was hiding?

22     A.  I do not recall specifically if it was with her,

23  but I have worked another missing child case.

24     Q.  Okay.  How many other cases prior to April 1,

25  2016, had you worked with Detective Kessler?

57

1     A.   I don't have a solid number on that.

2     Q.   I don't need a solid one.  An estimate.  Over 20?

3     A.   I don't know.  Whoever -- whatever detective is

4  assigned, we tag along with them.  So I don't know.

5     Q.   Do you know what time you arrived at the Bentley

6  home with Detective Kessler?

7     A.   I do not recall.

8     Q.   Had the boy been found before you got to the

9  home?

10    A.   No, he had not.

11    Q.   How long after you got to the home was it until

12 he was found?

13    A.   I don't recall.

14    Q.   And it's my understanding that before you left

15 the MFAC, you would have contacted your supervisor, Sara

16 Greenway, and apprised her of the situation; is that

17 correct?

18    A.   Correct.

19    Q.   Anyone else at DCS that you would have apprised

20 of the situation?

21    A.   No.  I don't know who made the call, actually.  I

22 can't answer that question because I don't know.  I don't

23 have the report -- the report in front of me, so I don't

24 know who actually called it in.  It might have been me.

25 It might have not.  I don't know.

**Videotaped**

58

1    Q.   When you say called it in, called -- help me

2    understand.  What -- what does that mean?  Called what in?

3    A.   Called the report into the hotline, make the

4    report to the hotline.

5    Q.   Yeah.  Is that what you're referring to?

6    A.   Correct.

7    Q.   So the -- the report to DCS, that came from

8    Detective Kessler, correct, to you?

9                    MR. STOUTNER:  Form.

10   BY MR. SCHERN:

11   Q.   Is that what I understand?

12   A.   Correct.

13   Q.   And then -- and then would there be a separate

14   call, a report made to the hotline?

15   A.   Yes.

16   Q.   Okay.  And that would have been made by you or

17   someone else?

18   A.   Could have been me, a supervisor, law

19   enforcement.

20   Q.   Okay.

21   A.   Someone else.

22   Q.   Okay.  But you were the -- you were the first

23   person that got wind of this particular situation, and you

24   got that from Detective Kessler; right?

25                    MR. BOWEN:  Form.

1              THE WITNESS:  Correct.

2     BY MR. SCHERN:

3         Q.   So you get to the Bentley home with Detective

4     Kessler, and what are your observations when you get

5     there?

6         A.   To the best of my recollection, there were a lot

7     of people, law enforcement, civilians.  I don't know who

8     everybody was that was there.

9         Q.   Okay.  And what did you -- what did you do when

10    you got there to the scene?

11        A.   I followed Detective Kessler wherever she --

12    whoever she interviewed, whoever she spoke with.  I

13    followed with her.

14        Q.   Okay.  Did you ever initiate any conversations

15    with the -- the Bentleys, their -- Mr. and Mrs. Bentley,

16    their children or anything like that, or was that

17    something Detective Kessler did --

18              MR. STOUTNER:  Form.

19    BY MR. SCHERN:

20        Q.   -- and you observed?

21        A.   I did not initiate conversations.

22        Q.   Okay.  And is that fair to say how the -- the

23    investigation went the whole time you were at the

24    Bentleys, you were letting the police kind of take the

25    lead on it?  Is that what I understand?

1            MR. STOUTNER:  Form.

2            THE WITNESS:  Law enforcement needs to

3    complete their investigation, correct.  We cannot impede

4    on that investigation.

5    BY MR. SCHERN:

6        Q.   Okay.  And at -- at what point did this become a

7    criminal investigation?  As soon as the -- the call comes

8    in or rather as soon as you're apprised of the situation

9    or -- because I'm looking at this, and I'm not asking you

10   a question here.  I'm just laying some context here.

11            There's two scenarios; right?  We've got a

12   missing child.  That's one issue, find the kid, right.

13   And then there's the issue of did the parents, you know,

14   do anything wrong, which is another -- another part of

15   that.  So we know that 911 call comes in saying, hey, I

16   can't find my child.  That's not a criminal matter.

17   That's we've got to find this kid.  At some point, though,

18   a criminal investigation ensues; is that correct?  At some

19   point, a criminal investigation ensues?

20            MR. BOWEN:  Form.

21            MR. STOUTNER:  Join.

22            THE WITNESS:  I believe so.

23   BY MR. SCHERN:

24       Q.   Okay.  And -- well, if you were there the whole

25   time with Detective Kessler, you know that at some point

1   she told Mr. or Mrs. Bentley this is a criminal

2   investigation; right?  You recall that?

3       A.   I don't recall specifics.

4       Q.   Okay.  Your role at DCS on April 1, 2016, was

5   that of a criminal investigator; is that correct?

6       A.   I was there on behalf of Department of Child

7   Safety for the child safety investigation.

8       Q.   Okay.  And I've heard in other depositions in

9   this matter, and I believe you've referred to it a few

10  times, this -- this concept of a -- of a joint

11  investigation that DCS and OCWI and police department,

12  that this is a joint investigation; right?

13               MR. STOUTNER:  Form.

14               THE WITNESS:  Correct.

15  BY MR. SCHERN:

16      Q.   What -- who is -- who is running point in that --

17  on that joint investigation?

18               MR. STOUTNER:  Form.

19               MR. BOWEN:  Form.

20  BY MR. SCHERN:

21      Q.   Who's the leader in this situation?

22               MR. STOUTNER:  Form; foundation.

23               THE WITNESS:  Investigations are done

24  together but law enforcement takes lead.

25  ///

62

1  BY MR. SCHERN:

2      Q.   Okay.  And at any point in -- in this matter on

3  April 1, 2016, does Detective Kessler ask you for your

4  input or your recommendation?  Did that happen?

5      A.   I don't recall.

6      Q.   I'll ask the same question about Sergeant Bina.

7  At any point, did Sergeant Bina ask you for your input or

8  your assessment or your recommendation?

9      A.   I don't recall.

10      Q.   It's my understanding that there was a briefing

11  at the home.  Do you recall that?

12                MR. BOWEN:  At the home?

13                MR. SCHERN:  At the home.

14  BY MR. SCHERN:

15      Q.   When you arrived and -- Detective Kessler said

16  there was some type of a briefing.

17      A.   If law enforcement arrives prior to the

18  detectives, then they will brief them on the information

19  they have collected.

20      Q.   The law enforcement that were there would brief

21  you folks?

22      A.   Correct.

23      Q.   Got it.  And did that happen?

24      A.   To the best of my recollection, yes.

25      Q.   Okay.  Do you recall what information was -- was

1   provided to you at that briefing?

2       A.   I don't recall details.

3       Q.   Okay.

4       A.   Or I can't recall the details.  Sorry.

5       Q.   Sure.  Now, on April 1, 2016, Gina Cordova

6   doesn't work with DCS.  She -- well, she may work with

7   them collaboratively, but she works for OCWI on April 1,

8   2016; is that correct?

9       A.   Correct.

10      Q.   How did she get involved or do you know?  I know

11  at some point she shows up at the scene.  Do you know how

12  she became involved?

13      A.   I honestly don't remember how she became

14  involved.

15      Q.   Okay.  Do you know what her role was on April 1,

16  2016?  What was her role in the investigation?

17      A.   To the best of my recollection, it was as a

18  support to DCS.

19      Q.   And what -- what -- as someone that's supporting

20  DCS, having that role from OCWI, she's there to support

21  DCS, what would DCS's expectations be of that support

22  person?

23              MR. BOWEN:  Form.

24              Go ahead.

25              THE WITNESS:  They're there to help out,

1   assist in whichever way necessary.

2   BY MR. SCHERN:

3       Q.   Okay.  Do you know how was the -- or who made the

4   decision for Ms. Cordova to interview Talon in his

5   bedroom?

6                  MR. BOWEN:  Form; foundation.

7                  Go ahead, if you know.

8                  THE WITNESS:  I don't recall specifics.

9   BY MR. SCHERN:

10      Q.   Is that something that you would have been

11  involved in that discussion, hey, this person should --

12  because you're forensically trained as well?

13      A.   Correct.

14      Q.   And so how is that decision made of who should do

15  this?  I mean, you, her, someone else?

16                 MR. STOUTNER:  Form; foundation.

17                 MR. BOWEN:  Join.

18                 THE WITNESS:  It could have been -- again,

19  this -- this is the best of my recollection.  It could

20  have been I told her or a detective might have or she

21  might have just gone in and said who -- you know, where do

22  you need me?  Hey, he hadn't been talked to.  I mean,

23  there's different possibilities of how it could have

24  happened.

25  ///

1    BY MR. SCHERN:

2        Q.    Sure.   And I can appreciate the fact that there's

3    a lot of moving parts in an investigation.   There's

4    different agencies, departments with different roles,

5    everything from police to fire to ambulance to DCS to OCWI

6    to Maricopa County Sheriff's Department.   There's a lot of

7    moving parts.

8                  If -- if someone has, you know, a question

9    if you have a question about, hey, do -- do we need to

10   talk to these other kids or pull people out of school or

11   have this person transported, who's the ultimate decision

12   maker?   Because remember we're talking about a lot of

13   agencies and departments working.   Is there a particular

14   point person that's going to give direction or may have

15   the final say?

16                  MR. BOWEN:   Form.

17                  MR. STOUTNER:   Form; foundation.

18                  THE WITNESS:   With these investigations, we

19   follow law enforcement's lead.   We're not allowed to talk

20   to anyone or speak to anyone unless they give us

21   permission to.

22   BY MR. SCHERN:

23       Q.    While they're conducting their criminal

24   investigation?

25       A.    Correct.

1     Q.   At -- at OC -- you're at OCWI right now, and your
2  role there is -- is that as a criminal investigator at
3  OCWI?
4                 MR. BOWEN:  Form.
5                 Go ahead.
6                 THE WITNESS:  Yes.  We investigate criminal
7  conduct reports or allegations.
8  BY MR. SCHERN:
9     Q.   Can you -- can you describe to me what's the
10  difference in -- in your role as a criminal investigator
11  with OCWI, what's the difference between that and an
12  investigator at DCS?  I understand -- forget about the
13  agency, but one is for DCS and one is OCWI, but what's the
14  difference in those -- in those roles that you have now?
15     A.   The main difference right now is that OCWI
16  investigates possible child -- criminal child -- felony
17  child -- felony criminal child abuse cases.  Sorry.
18  That's a tongue twister.  DCS investigates all other
19  reports.
20     Q.   Okay.  When you say all other reports?
21     A.   Of abuse and neglect to a child.
22     Q.   Okay.  Because maybe not all -- is it fair to say
23  in part that's because maybe not all reports are criminal
24  but all criminal matters would involve the safety of a
25  child --

1              MR. BOWEN:  Form.

2    BY MR. SCHERN:

3       Q.   -- with respect to -- we're talking about

4    children; right?

5       A.   If we're talking about children.

6       Q.   Right.  Just talking about children.

7       A.   Correct.

8       Q.   Okay.  You get to the scene.  You're more or less

9    shadowing Detective Kessler?

10             MR. STOUTNER:  Form.

11             THE WITNESS:  If that's what you want to

12   call it.

13   BY MR. SCHERN:

14      Q.   I don't know what else to call it.  I mean,

15   unless you have some other thing to call it.  You're

16   observing; right?

17      A.   I follow them wherever they go so --

18      Q.   Right.  And I say observing.  I don't mean to

19   minimize like that, like, oh, just an observer because

20   you're obviously gathering information.  So you're --

21   you're observing.  You're shadowing here.  You're

22   gathering information.

23             At -- at some point while you're there, do

24   you make any contact with your supervisor, with

25   Ms. Greenway, or anyone else at DCS?

68

1     A.   At any point while we were at the home?

2     Q.   Yeah, while you're at the home.

3     A.   Yes, I spoke to my supervisor.

4     Q.   Is that Sara Greenway?

5     A.   Correct.

6     Q.   And what were the circumstances the first time

7  you spoke with her at the -- while you were at the Bentley

8  home?

9     A.   Concerns that they did not want to have Talon

10  medically evaluated although EMT said -- excuse me -- said

11  he needed to be medically evaluated.

12     Q.   Okay.  Did -- did you ever personally hear anyone

13  from the fire department say that he needed to be

14  medically evaluated at the hospital?

15     A.   I did hear an EMT say that.

16     Q.   Do you remember who the EMT was speaking to,

17  addressing that comment to?

18     A.   I was standing by Detective Kessler.  I couldn't

19  give you specifics if he was looking at me or her.  I was

20  with her.

21     Q.   Okay.  And I'll ask:  Do you recall who the EMT

22  was?

23     A.   No.

24     Q.   Okay.  And at some point, did Mr. and/or

25  Mrs. Bentley say we'll take him to our own doctor?

1       A.    At some point that was said.

2       Q.    And how did you feel about that?

3       A.    To the best of my recollection, we did not

4    believe they would take him to the doctor.

5       Q.    Okay.  I can appreciate your answer, but I don't

6    want to know about we.  I want to know what -- what did

7    you think about that.

8       A.    I will say the department did not believe.

9       Q.    Okay.  And inasmuch as you're following the lead

10   of the detectives, what was your understanding that the

11   detectives, Mesa PD, thought about that?

12              MR. BOWEN:  Form; foundation.

13              MR. STOUTNER:  Form.

14              MR. BOWEN:  Go ahead.

15              THE WITNESS:  I believe we were in agreement

16   if I can recall correctly.

17   BY MR. SCHERN:

18      Q.    Do you recall the -- the point in time, not the

19   actual time, but what you were doing at the point in time

20   when Talon was located?  You're at the scene.

21      A.    To the best of my recollection, I believe we -- I

22   was with Detective Kessler.

23      Q.    Do you recall what -- whether you were inside or

24   outside the house when he was found?

25      A.    To the best of my recollection, we were inside

1    possibly talking to mother.  I can't tell you specifically
2    if that was where we were or not.
3         Q.   Did -- did you ever observe Talon being brought
4    into the house?
5         A.   I did.
6         Q.   So would that be -- would it be fair to say,
7    then, that you must have been outside?
8         A.   Yes.  Well, wherever -- I don't know if we walked
9    out or what we did when we found out.  I'm saying
10   Detective Kessler and myself, but we did walk to the front
11   of the house and that's when they brought Talon out.
12        Q.   Okay.  Do you recall who was bringing him out or
13   taking him to the house?
14        A.   I do not know who brought him out, but if I can
15   recall, father took him into the home.
16        Q.   Did -- when was the first time you had any
17   interaction with Talon?  Even if that interaction is just
18   a greeting or a salutation, when is the first time you
19   would have had any interaction with him that day?
20        A.   That would have been -- where I physically was,
21   like, in the same room or something with him?
22        Q.   Right.  Yeah.
23        A.   That would have been when I went to check on Gina
24   in the home, and she was in a bedroom talking to him.
25        Q.   Okay.  So you weren't present at any time when

1  Talon was in the bathroom with dad and/or fire department?

2  You weren't present in the room?

3      A.   I was never in the bathroom.

4      Q.   Okay.  So what was the difference between the

5  interview that Gina Cordova had with Talon in his bedroom

6  and the interview of Talon later at the MFAC?  What was

7  the difference between those two interviews?

8                MR. STOUTNER:  Form; foundation.

9                MR. BOWEN:  Form.

10                THE WITNESS:  Gina completed our, what's

11  called, global interviews, which is basic family dynamic

12  type information.  She was not allowed to talk about the

13  allegations.

14  BY MR. SCHERN:

15      Q.   Okay.  What do you mean she wasn't allowed to

16  talk about the allegations?  What -- what was -- what were

17  the allegations at that point?

18      A.   Regarding the situation, what happens that night,

19  anything regarding to the police investigation we can't

20  discuss until we're either with law enforcement or law

21  enforcement has completed their role.

22      Q.   Okay.  And at -- when Talon was interviewed at

23  the MFAC, had law enforcement completed its role at that

24  time?

25                MR. STOUTNER:  Form.

1              THE WITNESS:  No.

2     BY MR. SCHERN:

3         Q.   Were you ever concerned that Talon was a victim

4     of any type of sexual abuse by his father or mother?

5         A.   We do not have any allegations stating that.

6         Q.   So you weren't concerned that he was the victim

7     of any of that; right?

8         A.   Again, we didn't have allegations.  Our concerns

9     are allegations and what comes after the investigation.

10        Q.   So just to clear up, there's no allegation,

11    there's no concern; right?

12        A.   If it --

13             MR. BOWEN:  Form.

14             Go ahead.

15             THE WITNESS:  Sorry.  I lost my train of

16    thought.

17    BY MR. SCHERN:

18        Q.   That's okay.  So -- so -- yeah.  My question was

19    were you ever -- did you ever have any concerns that Talon

20    was a victim of sexual abuse at the hands of his father or

21    mother.  You said you didn't have any allegations of that,

22    and I said so if there's no allegations of it, then

23    there's no concern that he was a victim of that at the --

24    at the hands of his parents?

25        A.   If there is -- if there are no allegations or no

1   disclosures from the children, correct.

2       Q.   At -- did you ever -- did you ever tell the

3   parents what your reason was for being at the home?

4               MR. STOUTNER:   Form.

5               THE WITNESS:   I don't recall specifics, but

6   I do believe Detective Kessler introduced me.

7   BY MR. SCHERN:

8       Q.   Okay.

9       A.   And I was with the Department of Child Safety.

10      Q.   Okay.   And do you recall whether Mr. or

11  Mrs. Bentley said why are you here or anything like that?

12      A.   I don't recall.

13      Q.   So how long were you at the home with Detective

14  Kessler would you say?

15      A.   I don't know.

16      Q.   An hour?

17      A.   I don't know.

18      Q.   At some point in time while you're at the home,

19  did -- did you ever get the impression that -- that Talon

20  was -- was in immediate danger?

21      A.   You're asking me if at some point I felt he was

22  in immediate danger?

23      Q.   Uh-huh.

24      A.   Yes.

25      Q.   When was that?

1      A.    When we were informed that he needed to be
2  medically evaluated due to the surrounding circumstances
3  and the concerns for what could have happened to him while
4  he was out all night, and we were being informed by
5  medical professionals that he needed to be medically
6  evaluated.

7      Q.    Okay.  And you believed that he was in immediate
8  danger of -- of what?

9      A.    I believe he was in imminent danger due to what
10  could have happened.  We didn't know because we hadn't
11  interviewed him.  I mean, there's a sex offender group
12  home right down the road, and he was out all night.  So we
13  don't know until we spoke with Talon what happened.

14      Q.    So you arrive at the home prior to him being
15  found, and at some point while you're at the home, he is
16  found.  He's back in his home with mom and dad.  What is
17  the imminent danger of physical injury that could come to
18  him at that point moving forward?

19      A.    I didn't say physical injury.

20      Q.    Okay.

21      A.    The danger was that the parents were reluctant to
22  take him to the doctor.  He needed to be checked out
23  immediately, and they didn't want that to happen.  They
24  wanted him to rest and calm down, and there's criminal and
25  DCS investigation.  There are -- there is evidence that

1   needs to be collected if something did happen.

2       Q.   Okay.  Once he was found and he's back in the

3   home, did you have a concern that he was in imminent

4   danger of physical injury?

5               MR. STOUTNER:  Form.

6               MR. BOWEN:  Form.

7               THE WITNESS:  There were no allegations of

8   physical abuse again.  At that point in time, he had not

9   even been observed physically to see if he had any

10  injuries on him.

11  BY MR. SCHERN:

12      Q.   Okay.  But there wasn't -- there wasn't a

13  concern, was there, based on the information that you had,

14  there wasn't a concern that, hey, if -- if we all leave

15  the house, Brian and Janna are going to physically abuse

16  Talon?  There wasn't a concern of that, was there?

17              MR. BOWEN:  Form.

18              THE WITNESS:  There were no allegations of

19  that.  At this point in time, Talon had not been

20  interviewed, and it was important he be interviewed.

21  BY MR. SCHERN:

22      Q.   And Ms. Cordova interviewed him at the scene in

23  the global interview, was it?

24      A.   Correct.

25      Q.   And had, based on her notes or report to you, had

1    found that there appeared to be okay.  Again, it's not a

2    medical interview.  I understand that.  But didn't reveal

3    any abuse.

4              Was there any indication at all that the boy

5    would be the victim of -- of any physical abuse?

6              MR. STOUTNER:  Form; foundation.

7    BY MR. SCHERN:

8         Q.   Did they give you any indication of that?

9              MR. BOWEN:  Join.

10             THE WITNESS:  Again, if -- that's not the

11   information that's provided to us until we speak to the

12   children and if they disclose something, then it becomes

13   an issue if that's not brought to our attention or there's

14   no indication.

15   BY MR. SCHERN:

16        Q.   Okay.  How about -- was there any indication that

17   any of the other Bentley children were in imminent danger

18   of suffering some type of a physical injury?

19             MR. STOUTNER:  Foundation.

20             MR. BOWEN:  Form.

21             Go ahead.

22             THE WITNESS:  I'm going to stick to our

23   report.  There were no allegations of physical abuse.  It

24   was neglect.

25   ///

1  BY MR. SCHERN:

2      Q.   Okay.  You were -- you were concern that the

3  Bentleys had been neglectful of, at the minimum, Talon,

4  because they didn't -- you know, they let him stay out all

5  night or didn't call the police, right, until 8:00 in the

6  morning.  He had been out all night.  You were concerned

7  that they were being neglectful; is that correct?

8      A.   That's where the neglect came.

9      Q.   But -- but you weren't concerned that they were

10  physically abusive; right?

11      A.   Again, those were not our allegations.  Our

12  allegations were neglect.

13      Q.   I understand.  I'm not trying -- look I'm not

14  trying to be --

15      A.   No, no.  I get it.

16      Q.   -- cutesy and all that.  I'm just saying if

17  there's no allegations, then you weren't concerned if

18  there was physical abuse; right?  You weren't, were you?

19              MR. BOWEN:  Form.  Form.

20              THE WITNESS:  That's not what I was

21  investigating.  I was investigating neglect.

22  BY MR. SCHERN:

23      Q.   Okay.  Did you observe any of the children at the

24  home?

25      A.   I did.  To the best of my recollection, I believe

1    the baby was with mom and there might have been -- no, I

2    think there were two older siblings there.

3         Q.   I -- I say this with all sincerity.  I can't

4    imagine some of the horrific things that you see in your

5    job.  It makes my stomach turn when I think about what

6    some people do to their children, and you're -- you've had

7    training on what to look for, right, for physical abuse?

8    Is that a fair assessment?

9         A.   Correct.

10        Q.   Did you see any of those physical signs on any of

11   the Bentley children?

12        A.   There were no physical injuries on the children.

13        Q.   Was the -- did you observe the Bentleys' home to

14   be clean and maintained?

15        A.   From the small area that I did see, it appeared

16   clean.

17        Q.   A couple times throughout your deposition today,

18   you've referred to, I believe, the medical personnel on

19   the scene, the EMTs or fire department, saying that he

20   needed to -- that Talon needed to be medically evaluated;

21   correct?

22        A.   Correct.

23        Q.   And in your interview with Mr. Tait, the question

24   was asked, "So am I understanding this correctly that the

25   EMTs make the decision about whether a medical clearance

1    is necessary, and then either DCS or the police are kind

2    of -- they're going to enforce that?"  And your response

3    is, "Correct."

4              So my question is if -- if the emergency

5    personnel, fire, EMTs, if they had said he's fine.  We've

6    checked him out.  He doesn't need to be medically

7    evaluated, would that have been -- would that have been

8    the end of the discussion with respect to Talon needing to

9    be medically evaluated?

10             MR. STOUTNER:  Form.

11             THE WITNESS:  To the best of my knowledge,

12   that would have been the end because it's a medical

13   professional telling you this.

14   BY MR. SCHERN:

15   Q.   Okay.  And in that -- in that same line of -- of

16   questioning at the interview, Mr. Tait asks you, "What was

17   the urgency of doing the medical evaluation right then at

18   that time?  Did the EMTs say that it had to happen at that

19   moment?"  And you answered, "No.  We were concerned that

20   they weren't going to do it.  Again, because they didn't

21   understand the severity of the situation."

22             Is that -- do you still feel that way?

23   Because remember Bentleys had said we'll take him to our

24   medical doctor, and you're not sure you're actually going

25   to do that, and so it's the medical professionals that are

1    there, the EMTs, these guys.  They're not saying that it

2    has to happen at that moment, do they?

3                    MR. STOUTNER:  Form; foundation.

4    BY MR. SCHERN:

5        Q.   They never say that?

6                    MR. BOWEN:  Form.

7                    THE WITNESS:  I don't recall that specific.

8    I couldn't -- I couldn't tell you that.  I don't recall

9    that.

10   BY MR. SCHERN:

11       Q.   Okay.  But your concern was that if the Bentleys

12   are left alone to take him to their own doctor, we don't

13   know that they'll actually do it and we want to make sure

14   that it gets done.  Is that a fair statement?

15       A.   We were told by a medical professional that it

16   needed to be done.

17       Q.   Okay.  Now, there were -- are you aware that --

18   that two of the other Bentley children, Bryson and Mason,

19   were at school while you were at the scene and that they

20   ended up being removed from school and taken over to the

21   MFAC.  Are you aware of that?

22       A.   I was aware that they were interviewed at the

23   Center, yes.

24       Q.   Okay.  At -- did you have any involvement in that

25   discussion about the boys being picked up from school and

1    taken over to the MFAC?

2         A.   I don't recall, but I don't believe so.

3         Q.   Okay.  So your testimony is that DCS didn't

4    instruct Officer Russo or Laurie Glazer to go pick up the

5    kids.  Is that your testimony?

6         A.   I did not instruct anybody to pick up the kids.

7         Q.   Do you know if Sara Greenway did?

8         A.   I don't know.

9                   MR. BOWEN:  Form.

10   BY MR. SCHERN:

11        Q.   Do you know who did?

12        A.   I don't know.

13        Q.   Is it -- it's fair to say that DCS and OCWI, you

14   guys weren't going to leave the Bentley home until Talon

15   was medically evaluated, is that correct, or sent to be

16   medically evaluated?

17                  MR. BOWEN:  Form.

18                  Go ahead and answer.

19                  THE WITNESS:  I was instructed that since it

20   was told to us by a medical professional he needed to be

21   evaluated, that we could not leave until he was at least

22   in transport or was agreed that that would happen

23   immediately.

24   BY MR. SCHERN:

25        Q.   Who gave you that instruction?

1      A.    That would have come from a supervisor.

2      Q.    I beg your pardon?

3      A.    That would have come from my supervisor.

4      Q.    From Sara Greenway?

5      A.    Correct.

6      Q.    And at -- at points in your interview with

7  Mr. Tait, he asked you questions about that, how decisions

8  were made or what things were considered, and you say from

9  time to time we -- we staffed -- we staffed it.  What does

10  that mean, we staffed it?

11      A.    Is he talking about me and my supervisor or

12  was --

13      Q.    That's a -- let me -- yeah, let's put some

14  context on it.

15            So here's -- here's a question.  Bentleys

16  asked why they could not be evaluated by their own doctor,

17  and you say to Mr. Tait, "I believe so and that's why we

18  had to -- again, that was staffed and had to move forward

19  to make sure that the child was medically evaluated."

20            So my question is who -- what does that

21  mean, staffed?

22      A.    Staffing means I have to provide my supervisor

23  with the information, all of the information and knowledge

24  I have, and we are informed how we need to proceed from

25  there.

1    Q.   Okay.  Anyone else at DCS involved that day or

2  was it just you and -- and Sara Greenway?

3    A.   I don't recall anyone else being involved.

4    Q.   Okay.  So Talon goes off to the hospital, and

5  would you agree that -- that he had a medical evaluation

6  at the hospital?

7              MR. STOUTNER:  Foundation.

8              THE WITNESS:  I was informed he was

9  medically evaluated at the hospital.

10  BY MR. SCHERN:

11    Q.   And was -- who informed you of that?

12  Ms. Cordova?

13    A.   I don't recall exactly who told me about that.

14    Q.   Okay.  But at some point, he's -- he's cleared,

15  right, by the doctors at the hospital?

16              MR. STOUTNER:  Form.

17              THE WITNESS:  That's what I was informed.

18  BY MR. SCHERN:

19    Q.   Okay.  And from the hospital, Talon is

20  transported to the MFAC; correct?

21    A.   That's the information I was provided.

22    Q.   Okay.  Do -- do you know why he was transported

23  to the MFAC?

24    A.   To be forensically interviewed.

25    Q.   And was that a decision that DCS made that he

1    needed to be forensically interviewed at the MFAC?

2        A.   To the best of my recollection, it was a joint

3    decision made between law enforcement and DCS.

4        Q.   Okay.  At the -- at the Bentley home, were Brian

5    and Janna Bentley ever told that their son needed to be

6    forensically interviewed at the MFAC?

7               MR. STOUTNER:  Foundation.

8               THE WITNESS:  I don't recall that specific.

9    BY MR. SCHERN:

10       Q.   But your concern, as you've expressed it, was

11   that the EMS said that the boy needed to be medically

12   evaluated and that prompted you to make sure that he was

13   medically evaluated; right?

14       A.   Correct.

15       Q.   EMS never said anything about him needing to be

16   forensically interviewed, did they?

17       A.   I don't know that answer.

18       Q.   Well, you never heard that from EMS, did you?

19       A.   I don't recall hearing anything.

20       Q.   And when was that joint decision made for him to

21   be forensically interviewed at the MFAC?

22               MR. STOUTNER:  Form.

23               THE WITNESS:  I don't know when that was

24   made.

25   ///

1  BY MR. SCHERN:

2      Q.   You, at the beginning of your deposition,

3  referred to a recording that you listened to about a

4  conversation that happened at the MFAC.  Was it -- was it

5  your understanding that other Bentley children were going

6  to be brought to the MFAC to be interviewed on the

7  afternoon of April 1st, 2016?

8      A.   I believe so.

9      Q.   Okay.  Did you want that to happen?

10              MR. BOWEN:  Object the form.

11              Go ahead.

12              THE WITNESS:  All children need to be

13  interviewed in our investigations, whether it was done by

14  law enforcement or us.  The children needed to be

15  interviewed.

16  BY MR. SCHERN:

17      Q.   And what was your understanding of the

18  circumstances under which the Bentley children were going

19  to be interviewed at the MFAC?  Was someone from DCS going

20  to bring them to the MFAC?  Were his parents going to

21  bring them to the MFAC later on?  What was your

22  understanding how that was going to happen?

23              MR. BOWEN:  Form.

24              THE WITNESS:  I don't recall specifics, but

25  I believe the parents were going to bring the children.

1    You can't quote me on that.  I don't remember the

2    specific.

3    BY MR. SCHERN:

4        Q.    Okay.  And that was later in the afternoon that

5    they were going to do that?

6        A.    At some point.

7        Q.    All right.  Why -- why didn't DCS -- well, let me

8    ask it this way:  Did you think it was necessary to remove

9    the children from the Bentley home and have them

10   interviewed at MFAC?

11                   MR. BOWEN:  Form.

12                   MR. STOUTNER:  Form.

13                   THE WITNESS:  I did not remove the children

14   from the Bentley home.

15   BY MR. SCHERN:

16       Q.    I understand that.  My question is this:  Did you

17   believe it was necessary to remove the children that were

18   at the Bentley home, not Talon, do you believe it was

19   necessary to remove them and take them to the MFAC to be

20   interviewed?

21                   MR. BOWEN:  Form.

22                   MR. STOUTNER:  Form.

23                   THE WITNESS:  I can't tell you that answer,

24   but I can tell you best practice is interviewing children

25   in a neutral environment.

1  BY MR. SCHERN:

2      Q.   Sure.

3      A.   Which is away from home or school or whatever

4  that may be.

5      Q.   But -- but you didn't feel it was necessary

6  for -- for DCS or the police to remove them without the

7  parents consent to accomplish that interview, did you?

8              MR. STOUTNER:  Form.

9              MR. BOWEN:  Form.

10              THE WITNESS:  That's not my judgment.

11  BY MR. SCHERN:

12      Q.   Well, what do you mean it's not -- it's not your

13  judgment?

14      A.   If law enforcement wants to have them interviewed

15  at the Center, then they would be interviewed at the

16  Center if that was -- it was agreed upon.

17      Q.   Right.  But I'm talking about DCS.  Did -- did

18  you, did DCS, think it was necessary to remove the

19  children from the home and have them interviewed at the

20  MFAC?

21              MR. BOWEN:  Form.

22              MR. STOUTNER:  Form.

23              THE WITNESS:  I can tell you those children

24  needed to be interviewed as part of the investigation.

25  ///

88

1    BY MR. SCHERN:

2        Q.   I can appreciate that.  I hear what you're

3    saying.

4        A.   Where it happens is -- I mean, I -- I can't tell

5    you exactly where the best place is for something to

6    happen.

7        Q.   But -- I hear what you're saying, but you didn't

8    feel it was necessary to take custody of those kids

9    without the parents' consent, take them somewhere to be

10   interviewed, whether it was the MFAC or Disneyland.  You

11   didn't feel it was necessary we've got to take these guys

12   and interview them.  You didn't feel that that was

13   necessary, did you?

14                   MR. STOUTNER:  Form.

15                   MR. BOWEN:  Form.

16                   THE WITNESS:  That all the children needed

17   to be taken custody of to interview them?

18   BY MR. SCHERN:

19       Q.   Correct.

20       A.   No.

21       Q.   And was that because they weren't in any sort of

22   immediate danger?

23                   MR. BOWEN:  Form.

24                   MR. STOUTNER:  Form.

25                   THE WITNESS:  The other children were not

1   our victim child, correct.

2   BY MR. SCHERN:

3       Q.   How many times have you been present when a child

4   is taken into custody pursuant to a temporary custody

5   notice?

6       A.   I don't have an answer for that.

7       Q.   At least ten?

8       A.   I couldn't tell you.

9       Q.   At least one?

10      A.   I've been present, yes.

11      Q.   Okay.  While you were at the Bentley home, was a

12  temporary custody notice discussed?

13      A.   Discussed, yes.

14      Q.   Okay.  Was it discussed amongst you and law

15  enforcement?

16      A.   Yes.

17      Q.   What was that discussion?

18              MR. BOWEN:  Form.

19              MR. STOUTNER:  Join.

20              THE WITNESS:  That if the parents continued

21  to not allow him to get medically evaluated, that we would

22  have to serve custody.

23  BY MR. SCHERN:

24      Q.   That DCS would have to issue the temporary

25  custody notice?

1     A.    The Department of Child Safety would be issuing.

2     Q.    Okay.  And did you have that -- did you have a

3  discussion about that with your supervisor Sara Greenway?

4     A.    Any time you have to take custody, you have to

5  discuss it with a supervisor.

6     Q.    So you did discuss it with Sara Greenway?

7     A.    Yes.

8     Q.    And did Sara Greenway say that if Talon -- or if

9  the parents did not agree to have him medically evaluated,

10  that DCS would issue a TCN?

11     A.    To the best of my recollection, yes.

12     Q.    And during those discussions about the TCN, were

13  any of the other children discussed?

14     A.    I don't recall.

15     Q.    Did you have any discussions with Sara Greenway

16  about interviewing any of the other Bentley children?

17     A.    I don't recall.

18     Q.    If I could have you look at Exhibit 16,

19  page 62 -- what does a TCN look like?  Physically what

20  does it look like?

21     A.    It's a carbon copy form indicating what the

22  removal or the reason for removal is and how it was served

23  to the parents.

24     Q.    Okay.  And so let's look at -- let's look at page

25  61 of -- of Exhibit 16, and looks like there's some

1    discussion about a TCN.  So page 61, line 16, where you

2    say, "Well, here's what you need to know is the TCN was

3    not served, because right before they finally said, fine,

4    we'll do it or something to that matter.  I don't know

5    exact words.  I can't put it in your mouth or my mouth or

6    anyone else's.  I can tell you that it was written and

7    rewritten several times because they seemed to be

8    agreeable to it and then they would change their mind and

9    finally, ultimately, they were agreeable to it so it was

10   not served."

11              So am I to understand that there was a TCN

12   that was prepared and ready to go and it just didn't

13   need get -- it ended up not being necessary?

14        A.   Are you asking about prior to us going out to the

15   home or what are you asking?

16        Q.   At any point in time.

17        A.   It was not prepared prior to receiving -- or

18   going out to the home.

19        Q.   Sure.

20        A.   While we were at the home, after staffing it with

21   my supervisor when they did not seem to want to get him

22   medically evaluated, then I did start to write out the

23   TCN.

24        Q.   Okay.  And -- and it's a form in triplicate that

25   you keep with you because that's part of your job; right?

1      A.    It's part of the forms that we do need

2   occasionally, yes.

3      Q.    And is it my understanding from -- from your

4   answer to Mr. Tait that it was written and rewritten

5   several times?  Do you recall what you meant by that?

6      A.    I had -- I did have it written out after I

7   staffed it with my supervisor, and it was in hand ready to

8   give to the parents, but then they agreed so that was

9   taken off the table.

10      Q.    Okay.  Do you know what was meant by rewritten

11   several times?

12      A.    Initially I had -- I had Talon -- so that was --

13   is at the Center, I had to be prepared in case the parents

14   did not allow Talon to be forensically interviewed, I was

15   going to have to serve that TCN.

16      Q.    Okay.

17      A.    So that's why it was rewritten.

18      Q.    Okay.  Okay.  And that would have been for a

19   forensic interview, not for a medical evaluation; correct?

20      A.    Correct.

21      Q.    And --

22      A.    To clarify, the second one, correct.

23      Q.    Right.  And do you know -- or when was the

24   decision made that he needed to be forensically

25   interviewed?  Because if you wrote one at the home for the

1  medical evaluation and then had to rewrite one for the

2  forensic interview, somewhere in there a decision is made;

3  right?

4      A.   Correct.

5      Q.   He's got to be forensically interviewed.  When

6  was that decision made?

7                MR. STOUTNER:  Foundation.

8                THE WITNESS:  That decision was made due to

9  the observations of Talon's behavior when he did first

10 interact with father when he was found.  I had been

11 provided information that his behavior had changed after

12 father was no longer in the room, so based on our concerns

13 for child neglect, we needed to interview Talon to find

14 out what was going on.

15 BY MR. SCHERN:

16     Q.   And you didn't think about those factors until

17 after parents had agreed for him to be medically

18 interviewed, is that correct -- or medically evaluated?

19                MR. STOUTNER:  Form.

20                THE WITNESS:  Initially the important thing

21 was getting the medical evaluation.

22 BY MR. SCHERN:

23     Q.   Okay.  When -- when was the first time DCS

24 informed Mr. or Mrs. Bentley that Talon had to be

25 forensically interviewed?

1      A.   I couldn't give you a specific time.  It was

2  sometime during the conversations, interviews with the

3  parents.

4      Q.   Wouldn't it have had to be at the MFAC because

5  DCS isn't at the hospital; right?

6      A.   The medical evaluation would have been at the

7  home.

8      Q.   The home.  Correct.

9           So at the home, they're told child has to be

10  medically interviewed.  My question was:  When was the

11  first time DCS informed parents that Talon had to be

12  forensically interviewed?

13           MR. STOUTNER:  Foundation; form.

14           THE WITNESS:  That was at the Center.

15  BY MR. SCHERN:

16      Q.   In your experience working with DCS, how often is

17  the religion or the faith of a child's parents a factor in

18  DCS's investigation?

19           MR. BOWEN:  Form.

20           THE WITNESS:  It's not a factor in DCS's

21  investigation.

22  BY MR. SCHERN:

23      Q.   In -- in your experience with DCS and the

24  investigations that you've been involved with at DCS, how

25  often is a family's or the parents faith or religion a

Videotaped

95

1    concern to DCS?

2                    MR. BOWEN:  Form.

3                    THE WITNESS:  As stated in the CSRA, the

4    concern was that they stopped searching because God told

5    them their child was okay.  That was a professional

6    assessment, not a personal one.

7    BY MR. SCHERN:

8        Q.   Well, that wasn't my -- I appreciate your

9    response but that wasn't what I asked.  What I asked was:

10   How often in your experience with DCS is the parents'

11   faith or religion a concern to DCS?

12                   MR. BOWEN:  Form.

13                   Go ahead.

14                   THE WITNESS:  If it allows a child to be a

15   victim or abused, then it is a concern.  I can't tell you

16   how often.

17   BY MR. SCHERN:

18       Q.   And in -- in this matter, in the Bentleys' case,

19   was it -- was it your assessment, DCS's assessment, that

20   the faith and/or religion of the Bentleys placed their

21   child at risk?

22                   MR. BOWEN:  Form.

23                   Go ahead.

24                   THE WITNESS:  Will you restate that

25   question?

**Videotaped**

96

 1                    MR. SCHERN:  Sure.  Can you read it back?

 2                    (The requested portion of the record was

 3    read.)

 4                    THE WITNESS:  It was a professional

 5    assessment that the child was placed at risk due to that

 6    belief.

 7                    MR. SCHERN:  I think I'm about finished.

 8    I'm going to take a short break, go over my notes and

 9    hopefully and probably I'll come back after a few minutes

10    and say we're done.

11                    THE WITNESS:  Beautiful.

12                    MR. SCHERN:  So if you can give just me

13    about ten minutes.  Thank you.

14                    THE VIDEOGRAPHER:  We're off the record.

15    The time is 12:36 p.m.  This is the end of Media Two.

16                    (A recess was taken from 12:36 p.m. to

17    12:49 p.m.)

18                    THE VIDEOGRAPHER:  We're back on the record.

19    The time is 12:49 p.m.  This begins Media Three.

20                    MR. SCHERN:  Okay.  Ms. Gutierrez, thank

21    you.  I don't believe I have anything for you.

22                    MR. BOWEN:  Do you have --

23                    MR. STOUTNER:  Yeah, I just have a few

24    questions.

25                    If we would mark this as the next exhibit,

 1   please.

 2                    MR. BOWEN:  Is this 17.

 3                    THE COURT REPORTER:  Yes.

 4                    (Deposition Exhibit Number 17 was marked

 5   for identification.)

 6                    MR. BOWEN:  And I don't know that we need to

 7   do it on the record because I know I'll forget if you can

 8   remind me that we need to talk about how the exhibits are

 9   working and the copies, okay?  But we don't need to do

10   that now.

11                    MR. STOUTNER:  Are we ready?

12

13                         EXAMINATION

14   BY MR. STOUTNER:

15        Q.   You have Exhibit 17 in front of you?  Yes?

16        A.   Correct.

17        Q.   Can you tell me if you recognize it?

18        A.   Yes.

19        Q.   Do you see your name and signature on the bottom?

20        A.   Correct.

21        Q.   And you also see the name and signature for

22   Michael Schern on the bottom?

23        A.   Correct.

24        Q.   Along with the date of April 1st, 2016?

25        A.   Correct.

Videotaped

98

1    Q.    What is your understanding of what this document

2    is?

3    A.    This form is Department of Child Safety's duty to

4    inform.  I can go over it briefly if you would like.  It

5    pretty much lets the parents know there's an investigation

6    going on, what the allegations are, that they do have

7    rights as parents, whether they work with us or not, that

8    we have to ensure the safety of the children in the home.

9    It does go on and talk about the judicial system if we

10   have to further intervene, and then it talks about the

11   ombudsman's office.

12   Q.    And this document, Exhibit 17, contains your

13   writing on the top?

14   A.    My chicken scratch, yes.

15   Q.    And it says, "Neglect"?

16   A.    Yes.

17   Q.    And then obviously that's your signature to the

18   left of the printed name Cristina Baggen?

19   A.    Correct.

20   Q.    Do you recall using this document in this case?

21   A.    Are you asking if I provided it to the family?

22   Q.    Yes.

23   A.    I did provide it to mother in the presence of the

24   attorney.

25   Q.    Did you do that at the Family Advocacy Center?

1      A.    That's correct.

2      Q.    So if we consider Exhibit 17 a document, were

3  there any other documents that you remember giving to

4  either Janna Bentley or Brian Bentley on this case?

5      A.    Any other documents I gave them?

6      Q.    Yes.

7      A.    No.

8      Q.    Same question as to Mr. -- Mr. Schern.  Do you

9  recall giving him any other documents on this case?

10      A.    Besides this one, no.

11      Q.    Okay.  There was another lawyer at the -- at the

12  house at the time of the investigation.  Do you recall

13  that individual?

14      A.    I didn't even know.

15      Q.    So then I take it you didn't provide any

16  documents to anyone, whether it's the family or people you

17  understood to be the lawyers of that family, on April 1st,

18  2016?

19      A.    I did not physically provide any documents.

20      Q.    Other than Exhibit 17?

21      A.    Correct.

22      Q.    And going back, I think, to the very beginning of

23  your -- of your testimony about the -- the communication

24  you had with Janna Bentley and her attorney, Mr. Schern,

25  at the Family Advocacy Center, did you say that you

1    reviewed, whether it was a recording or whether it was a

2    transcript of that, did you say that you recalled doing

3    that at some point?

4        A.    There was an audio --

5        Q.    Okay.

6        A.    -- transcript I was provided.

7        Q.    In this case there is also a transcript that --

8    that is written.  It's part of this case, and that is

9    Exhibit 6, previously marked as Exhibit 6.  I wanted to

10   give you a chance to take a look at the -- at the

11   transcript, which you now have in front of you, and let

12   me -- let me get you to a page here.

13              If you turn to the very last page of the

14   transcript, which is page 20, there are a few things after

15   it, but page 20, line 11.

16              Do you see that?

17       A.    Yes, line 11.

18       Q.    Sorry.  Line 11.

19       A.    Yes.

20       Q.    It's listed as being an unidentified speaker and

21   it provides, "Okay.  I'm going to go ahead and give you my

22   duty to inform."

23              Do you see that?

24       A.    Yes.

25       Q.    Would that be the same duty to inform document

1    that I just showed you, Exhibit 17?

2         A.   That's the duty to inform.

3         Q.   So unidentified speaker here on -- on this page,

4    page 20, line 11, is it fair to say that that is you?

5         A.   If I actually heard it, I can confirm that for

6    you but --

7         Q.   Okay.

8         A.   -- I don't want to make an assumption.

9         Q.   If we turn to page 17 on that document and look

10   at line 21 and -- and read that from -- actually, line 20

11   all the way to the bottom of page 17.  When you're done

12   with that, just please look up.

13        A.   (Witness complies.)

14        Q.   Again, it's listing unidentified speaker.  My

15   question to you is:  Now having read what this portion of

16   the transcript provides, does that look like something

17   that you said that you recall saying?

18        A.   I believe that was what I had listened to of the

19   transcript I was provided.

20        Q.   Okay.  And this portion here that I've had you

21   look at provides, "Okay.  So I did staff that with my

22   supervisor, and she said Talon does need to be

23   interviewed, um, so if you guys want to leave, you can

24   leave but Talon can't leave until he's been interviewed."

25                Do you see that?

1     A.    Correct.

2     Q.    Did I read that correctly?

3     A.    Correct.

4     Q.    When you refer to, again, staffing that with the

5     supervisor, I think earlier you -- earlier in the

6     deposition, you indicated that that would have been Sara

7     Greenway.  Would it be the same supervisor here when

8     you're referencing staffing it with a supervisor?

9     A.    Correct.

10    Q.    In order for you to have previously been at the

11    Bentley home and then arrived at the Family Advocacy

12    Center, did you drive Gina Cordova's car to the Family

13    Advocacy Center and then -- and then go pick her up at the

14    hospital using her car and bring her back to the Family

15    Advocacy Center?

16    A.    Correct.  It was her State vehicle.

17    Q.    So getting back to that information that we just

18    went over about you staffing it with a supervisor and

19    saying that Talon can't leave until he's been interviewed,

20    was it your ultimate understanding that Janna was

21    consenting to the interview of Talon?

22    A.    It was.

23    Q.    And was it your understanding that her attorney,

24    Mr. Schern, was also consenting to that forensic interview

25    of Talon?

1    A.    It was.

2    Q.    Why do you have that understanding?

3    A.    Based on what I heard on that audio, I heard okay

4    and all right.  I can't tell you what had been

5    posture-wise or what after that, but it's my belief at

6    this point.

7    Q.    Did you have a temporary custody notice drafted

8    in the event that Janna and Mr. Schern refused that

9    forensic interview?

10   A.    I had one ready to serve if they refused to allow

11   him to be interviewed.

12   Q.    Would that have been something you would have

13   also staffed with your supervisor?

14   A.    Yes.

15   Q.    In terms of your experience as a DCS employee all

16   the way up to this April 1st, 2016, investigation, you had

17   obviously provided families with temporary custody notices

18   before; correct?

19   A.    Yes.

20   Q.    And in this circumstance, you had one drafted and

21   ready to go at the house; is that correct?

22   A.    Correct.

23   Q.    And ultimately you chose not to provide that to

24   either Janna or Brian; correct?

25   A.    Correct.

1      Q.   And if I'm understanding your testimony, that was

2  because at the very end of your time at the house, Janna

3  ultimately agreed to the medical transport for the

4  evaluation at a hospital by a doctor; correct?

5      A.   It was agreed to at some point.  I don't remember

6  if it was the end or where.

7      Q.   Okay.  Do you have a memory of Janna having a

8  conversation with one of the paramedics in the house about

9  what his thoughts were on a medical evaluation at a

10  hospital?

11      A.   I don't recall.

12      Q.   I want to ask you to turn within that same

13  Exhibit 6 to page 19.  If you look at line 14 of page 19,

14  you see the name Gina Cordova?

15      A.   Yes.

16      Q.   Do you recall her being present during your

17  conversation with Janna and Mr. Schern at the Family

18  Advocacy Center?

19      A.   I don't recall completely, but I believe she was

20  there for a bit.  I couldn't tell you at what point or how

21  long.

22      Q.   Okay.  Looking at --

23              MR. BOWEN:  Just so I'm clear, she was there

24  at the Center or she was there for part of your

25  conversation when you say a bit?

1          THE WITNESS:  She was at the Center and she

2   was there in the lobby where we were all talking.

3   BY MR. STOUTNER:

4     Q.   And I would just point your attention to line 9

5   there where there's an individual saying I'm Gina.

6          Looking at line 21, and then all the way

7   down to the bottom, if you could please read that and when

8   you're done, please look up.

9     A.   (Witness complies.)

10    Q.   This transcript provides that Mr. Schern

11  explained in your presence, "Are you telling me that him

12  being released right now is -- will not happen without

13  that interview?"  And then there is an unidentified

14  speaker who explains, "At this point in time, yes."

15          Do you see that?

16    A.   Yes.

17    Q.   Did -- or I should say:  Do you remember

18  listening to that audio recording and recognizing you as

19  being the individual that said, "At this point in time,

20  yes"?

21    A.   Yes.

22    Q.   And then turning to that last page, page 20, it

23  continues on with the question about how long it takes for

24  the forensic interview and an unidentified speaker saying,

25  "Not that long."

1          Do you see that?

2     A.   Uh-huh.

3     Q.   Would that be you as well there?

4     A.   I think it was.

5     Q.   So after you leave the Bentley home, you -- you

6  drive to the Family Advocacy Center in Ms. Cordova's work

7  vehicle; correct?

8     A.   Correct.

9     Q.   Did you have an understanding that -- that

10  Ms. Cordova was going along in the ambulance with Talon,

11  his mother and those paramedics?

12     A.   Yes.

13     Q.   And did you have an understanding that

14  Ms. Cordova was going to the hospital to be present for

15  the evaluation by a doctor?

16     A.   Yes.

17     Q.   Later on after the forensic interviews, there's a

18  reference to a visit to the house to -- to observe one of

19  the other children.

20          Do you recall that?

21     A.   Yes.

22     Q.   And was that an attempt by yourself to make sure

23  that you had observed all of the Bentley children?

24     A.   Yes.

25     Q.   When you were within the Bentley home, I don't

1    know quite how to describe it, but there's that main --

2    that main room in the house where the front door is.  Do

3    you understand the -- the main room where if you were

4    outside, you walk in, and there's a main room that

5    ultimately leads to a hallway where the bathroom and the

6    bedrooms are or potentially downstairs to a basement or

7    you could just keep walking and go into the kitchen.

8                      Do you have a memory of that house in terms

9    of that layout?

10       A.   I recall there was an entryway and there was a

11   room this way and then there were -- there's more of the

12   home moving forward from there.

13       Q.   The entryway, we could call it, is separate from

14   the hallway and the bedrooms, and it's -- is it's own

15   room; correct?  The entryway area where I assume you

16   recall standing and talking to the -- to the Bentleys on

17   April 1st, 2016.  So I'll just use that terminology, if

18   that's okay, the entryway?

19       A.   That's fine.

20       Q.   That is different from kind of a lower level of a

21   room, a lower living room area.

22                      Do you recall that?

23       A.   I didn't go into a lower living room area.

24       Q.   Well, in any event, there's -- there's -- there's

25   a main area where multiple people were -- were gathered

1   during this investigation.

2             Do you recall that?

3     A.   Yes.

4     Q.   And it was in relative close proximity to the --

5   to the front door.

6             Do you recall that?

7     A.   Yes.

8     Q.   Do you recall at any point the paramedics talking

9   to Janna Bentley or the group of people that were in that

10  room?

11     A.   Specifically, I don't remember.

12     Q.   Did you have an understanding that ultimately the

13  paramedics were not able to complete an assessment of

14  Talon and that that was the basis for the recommendation

15  that he be medically evaluated at a hospital by a doctor?

16          MR. SCHERN:  Object to form; foundation.

17          THE WITNESS:  I don't recall the specifics

18  of it, but they did say he needed to be medically

19  evaluated.

20  BY MR. STOUTNER:

21     Q.   Do you still have Exhibit 16 in front of you?

22  That's another transcript.

23     A.   Yes.

24     Q.   I'd like you to please turn to page 17.  I'd like

25  you to read the question -- the questions and answers that

1   begin on page 17 at line 7 and then carry onto the next

2   page, page 18, ending at line 4, and if you could do that,

3   please, and then just look up.

4        A.   (Witness complies.)

5        Q.   You've read that?

6        A.   Yes.

7        Q.   Do you believe that that fairly explains the --

8   the answers to the -- to the questions asked on those

9   pages and the lines I asked you to read?

10       A.   Yes.

11       Q.   In terms of your explanation that what you were

12  observing as to Talon's interaction with his father seemed

13  very unusual and concerning, tell me if you can, please, a

14  little bit about why that was very unusual and concerning

15  to you.

16       A.   Well, first off, based on my knowledge, education

17  and training, that's not typical behavior when a child has

18  been missing, not seeing their parents.  He was trying to

19  get away from father which seemed unusual.

20       Q.   And in terms of your educational background,

21  training and experience, what did those observations

22  indicate to you with regard to the need for DCS to take

23  action in this case?

24       A.   Will you repeat that question for me?

25       Q.   Sure.  Based on your training and experience,

1    what about that observation you made of the father and --

2    and Talon's interaction between each other, what about

3    that caused you to believe that DCS needed to take action?

4                MR. BOWEN:  Form.

5                THE WITNESS:  Again, it was unusual

6    behavior, his squirming trying to get away from dad.  He

7    didn't want to be held by him, anything.  It was -- it was

8    not normal behavior for a child that's been in that

9    situation.

10   BY MR. STOUTNER:

11        Q.   In terms of the temporary custody notices that

12   you've served or submitted in your career or seen served

13   or submitted, is it fair to say that that's done by the

14   Department of Child Services or OCWI rather than the

15   police in your experience?

16        A.   Police can serve TCNs as well.

17        Q.   In this particular circumstance, you didn't have

18   any knowledge that the police served a TCN; correct?

19        A.   I didn't have knowledge of that, no.

20        Q.   Did you have an understanding as you were at the

21   Bentley home that you were going to be the one to have

22   served or provided any TCN in this case?

23        A.   Typically if we're with them, we -- we will serve

24   it depending on what the circumstances are.

25        Q.   And is it typical that you will get approval from

111

1  your DCS supervisor in order to accomplish that?

2      A.   You have to have approval from a supervisor, yes.

3      Q.   And that's approval from your supervisor, not a

4  police officer; correct?

5      A.   It would have to be my supervisor or a DCS

6  supervisor or OCWI.

7      Q.   And in this particular circumstance, did you have

8  multiple conversations with your supervisor about the

9  issue of temporary custody in light of all the different

10 communications that were taking place in that Bentley

11 home?

12     A.   To the best of my recollection, I believe so.

13     Q.   Is it fair to say that there was a lot of back

14 and forth communications in the Bentley home between all

15 of the different individuals that were inside that home

16 prior to Talon being transported?

17     A.   Yes.

18              MR. STOUTNER:  Let's take just a really

19 quick break if it's all right with everyone.

20              THE VIDEOGRAPHER:  We're off the record.

21 The time is 1:17 p.m.  This is the end of Media Three.

22              (A recess was taken from 1:17 p.m. to

23 1:30 p.m.)

24              THE VIDEOGRAPHER:  We're back on the record.

25 The time is 1:30 p.m.  This begins Media Four.

Videotaped

112

1

2                          EXAMINATION

3    BY MR. STOUTNER:

4        Q.   Okay.  We have what is titled Axon 10 on this

5    laptop next to you.

6                 Do you see that?  Do you see the video?

7        A.   Yes.

8        Q.   So what I'll do is I will play a few different

9    portions of it, and I'll, for the record, explain what

10   the -- what the timing is on this -- on this video, and in

11   terms of transcription, I don't think you need to

12   explain -- you don't have to type the audio.

13                 All right.  So this the beginning of Axon

14   number ten.

15                 (Video played.)

16   BY MR. STOUTNER:

17       Q.   And you'll -- you'll note that for the first 30

18   seconds, there is no audio.

19                 Do you see yourself in the picture?

20       A.   Uh-huh.

21       Q.   To the left?

22       A.   Yes.

23                 THE VIDEOGRAPHER:  Counsel?

24                 MR. STOUTNER:  Here.  Hold on one second.

25   We'll pick it up here at 23 seconds.

1          (Video played.)

2     BY MR. STOUTNER:

3          Q.   Okay.   That stopped at about one minute and

4     18 seconds into Axon 10.

5               Do you remember being there and having that

6     conversation with -- with Janna and Brian Bentley about

7     the medical transport?

8          A.   I don't recall the specifics, but seeing that,

9     yeah, I was there.

10         Q.   Obviously you -- you saw that you were speaking

11    directly to them about the need for the medical transport;

12    correct?

13         A.   Correct.

14         Q.   And did you also hear Sergeant Bina discuss the

15    TCN at that point?

16         A.   Yes.

17         Q.   The -- the question posed by Sergeant Bina was,

18    "Do we have the TCN ready?"

19               Do you recall responding to that at the

20    time?

21         A.   I don't recall my response.

22         Q.   Do you know whether the TCN was ready by then?

23         A.   To the best of my recollection, it probably was.

24         Q.   And you see to the left on this still frame here

25    of Axon 10 at one minute and 18 seconds, to the left you

1   see paramedics; correct?

2       A.   I believe so.

3       Q.   Do those look like the paramedics that you

4   remember seeing involved in the case?

5       A.   I don't remember that.

6       Q.   Okay.  I'm now starting at four minutes and 16

7   seconds on this same video, Axon 10.

8                (Video played.)

9   BY MR. STOUTNER:

10      Q.   Okay.  Okay.  So you couldn't hear that?

11      A.   No.

12      Q.   Let's see what we can do.

13               MR. SCHERN:  Hey, Duncan?

14               MR. STOUTNER:  Yes.

15               MR. SCHERN:  I'm quite certain if you plug

16  that speaker in and maybe just select the audio out on it.

17               MR. STOUTNER:  Yeah, we can try that.

18               MR. SCHERN:  It might work.

19               MR. STOUTNER:  Do you want to take a quick

20  break and do that?

21               MR. SCHERN:  I think it will be helpful for

22  everybody.  It will just take a second.

23               THE VIDEOGRAPHER:  Off the record at 1:35

24  ending Media Four.

25               (A recess was taken from 1:35 p.m. to

1   1:37 p.m.)

2              THE VIDEOGRAPHER:  Back on the record.  The

3   time is 1:37 p.m.  This begins Media Five.

4   BY MR. STOUTNER:

5      Q.   So I'd like to play for you just a portion,

6   again, of Axon 10, starting at four minutes and

7   16 seconds.

8              (Video played.)

9   BY MR. STOUTNER:

10     Q.   Were you able to hear anything that you

11  recognized to be your voice there?

12     A.   It sounded like my voice, but I don't know what

13  it said.

14     Q.   Okay.  Did you have any understanding as to what

15  the conversation was about?

16     A.   No, something about not being able to see her

17  kids.

18     Q.   In terms of what the -- what your -- your

19  conversation was.

20              Looking at this audio, going back to your

21  memory of the events, do you have any idea what that

22  conversation would have prompted you to say there?

23              MR. BOWEN:  Form.

24              THE WITNESS:  I have no idea.

25  ///

**Videotaped**

116

1    BY MR. STOUTNER:

2        Q.   Okay.  Starting at 9:19.

3                 (Video played.)

4                 MR. STOUTNER:  Okay.  I'm stopping it at

5    9:37.

6    BY MR. STOUTNER:

7        Q.   Do you have any understanding as to what the

8    discussion is there that we're -- that we're listening to?

9        A.   I -- I'm guessing it's still the medical

10   transport part.  I don't know.

11       Q.   Okay.  This is at 11:03.

12                (Video played.)

13   BY MR. STOUTNER:

14       Q.   Pardon me.  This is wrong.  This is at the

15   12-minute mark of Axon 10.

16                (Video played.)

17   BY MR. STOUTNER:

18       Q.   Okay.  I stopped that at 12 minutes and

19   24 seconds.

20                 Did you hear any discussion there about the

21   TCN?

22       A.   Yes.

23       Q.   Did you hear a reference to the -- the DCS

24   worker?

25       A.   Yes.

Videotaped

117

1    Q.   That was you; correct?

2    A.   Correct.

3    Q.   So fair to say that at this point in the

4    investigation, there was still discussion about the TCN

5    and your involvement in it; correct?

6    A.   Correct.

7    Q.   And obviously that was a conversation where you

8    heard Sergeant Bina's voice?

9    A.   Yes.

10   Q.   And Janna Bentley's voice?

11   A.   I believe so.

12   Q.   Okay.  Okay.  I'm now going to play a portion of

13   Axon 11 from the 21-minute mark to the 21 and 44 second

14   mark.

15              (Video played.)

16   BY MR. STOUTNER:

17   Q.   Okay.  You heard reference to the TCN again in

18   that clip?

19   A.   Yes.

20   Q.   And did you hear the question about whether or

21   not the TCN has been served?  Did you hear that?

22   A.   No.

23   Q.   Did you hear about a question relating to service

24   of the TCN there?

25   A.   I believe so.

118

1      Q.   It's fair to say, isn't it, that the discussion

2   of the TCN and temporary custody came up multiple times

3   during your interaction with the Bentleys at the house;

4   correct?

5      A.   Correct.

6      Q.   Okay.  This is Axon 11 at the 24 minute, 15

7   second mark to 25 minute and 56 second mark.

8           (Video played.)

9   BY MR. STOUTNER:

10      Q.   During that clip that we just played, did you

11   hear Sergeant Bina make a reference to the TCN and to the

12   DCS employee right here, as he said?

13      A.   Yes.

14      Q.   Did you have an understanding that that was you

15   standing to his left?

16      A.   If he said DCS, I believe so.

17      Q.   Did you have an understanding that that was a

18   conversation about the DCS employee explaining the TCN to

19   the Bentleys?

20      A.   Say that question again.

21      Q.   Yes.  Did you hear Sergeant Bina say the DCS

22   employee right here is going to be talking to you about

23   the TCN so we can get the ball rolling?

24      A.   It was on one of the prior ones.

25      Q.   And did you hear that on this particular clip?

**Videotaped**

1    A.   Not on this one.

2    Q.   Let's play it one more time.

3              THE VIDEOGRAPHER:  Counsel?  Counsel?

4              MR. STOUTNER:  Yes.

5              THE VIDEOGRAPHER:  The speaker is vibrating

6    the microphone off of it --

7              MR. STOUTNER:  Okay.

8              THE VIDEOGRAPHER:  -- being on top directly

9    if you can just hold it.

10             MR. STOUTNER:  Sure.

11             THE VIDEOGRAPHER:  Thank you.

12             MR. STOUTNER:  Okay.  I'm going to start at

13   the 58 second mark here.

14             (Video played.)

15   BY MR. STOUTNER:

16   Q.   So you now hear the conversation between Janna

17   Bentley with Brian standing right there and between

18   Sergeant Bina and the other individuals in the room about

19   the TCN and the explanation of it by the DCS employee;

20   correct?

21   A.   Correct.

22   Q.   Okay.  This is Axon 11 at the 29-minute mark.

23             (Video played.)

24   BY MR. STOUTNER:

25   Q.   Okay.  I just stopped it at the 29 minute and 20

 1    second mark.

 2                This is Janna Bentley talking to one of the

 3    paramedics; correct?

 4        A.   I don't know --

 5                MR. SCHERN:  Object to form; foundation.

 6                THE WITNESS:  -- who she's talking to.

 7    BY MR. STOUTNER:

 8        Q.   Okay.  Do you have a memory as you're watching

 9    this having any understanding as to who she could be

10    talking to?

11        A.   I have no idea.

12        Q.   Okay.  Let's pick it up from there.

13                (Video played.)

14                MR. SCHERN:  Hey --

15                MR. STOUTNER:  Let me finish the question.

16    BY MR. STOUTNER:

17        Q.   Having watched that, does that give you, whether

18    it's based on your memory or having watched the Axon video

19    before, any understanding as to who was talking as you

20    heard it there to Ms. Bentley?

21        A.   I can guess.  I mean --

22        Q.   I'm not asking you to guess.

23        A.   I can -- yeah.  I can make an assumption, but it

24    was very hard to understand that.

25        Q.   Okay.

1            MR. SCHERN:  I was just going to say I don't

2   know how many more video clips you have, but if there's

3   many more, I really suggest we take a break and try one

4   more time to get some audio working.  I can't hear it at

5   all, and I don't want to have to keep the deposition open

6   to call the witness back after we review it and hear it,

7   and I don't know that it's fair to the witness, either.  I

8   just don't know how many more you have.

9            MR. STOUTNER:  You know, I really don't have

10  many more.

11            MR. SCHERN:  Okay.

12            MR. STOUTNER:  However you guys want to

13  approach it is fine with me.

14            MR. BOWEN:  Yeah, I mean I'm not -- I'm not

15  sure what she can hear.  I couldn't hear almost any of it.

16            MR. SCHERN:  I may have another set of

17  desktop computer speakers that I can try to plug in there

18  that might work, but I can't hear anything.  It's up to

19  you.

20            MR. STOUTNER:  Okay.  So if you can't hear

21  anything, then we should probably see what we can do.  I

22  think I've got two left.

23            THE VIDEOGRAPHER:  Counsel, I think it's the

24  source audio.  So the speakers isn't going to make it any

25  better.

1                    MR. SCHERN:  Okay.

2                    MR. STOUTNER:  And are you able to hear it

3    on the video?

4                    THE VIDEOGRAPHER:  It's the source audio of

5    the clip.

6                    MR. STOUTNER:  Okay.  So you're not able to

7    hear it on the video?

8                    THE VIDEOGRAPHER:  It's very hard to

9    decipher, especially that last one.

10                    MR. STOUTNER:  Okay.

11                    THE VIDEOGRAPHER:  It's the source audio.

12    There's nothing you can do unless post production bumping

13    it up.

14                    MR. STOUTNER:  So I only have two left.  You

15    know, I'm -- I'm ready to play those, if you guys have a

16    better idea or if you think it's --

17                    MR. SCHERN:  I mean, I'm happy to try it

18    with another set of speakers, but if it's the source, I

19    don't know that it will help.  I'm happy to try.

20                    MR. STOUTNER:  No, that's fine.

21                    THE VIDEOGRAPHER:  I'd played the clips how

22    they are what we have and see if they're any better than

23    that last one.

24                    MR. STOUTNER:  Okay.  This will be a short

25    one.  Okay.  So this will be Axon 6 -- actually, let's

1    take a quick break here and pull it up.

2                   THE VIDEOGRAPHER:  Off the record at 1:58

3    ending Media Five.

4                   (A recess was taken from 1:58 p.m. to

5    1:59 p.m.)

6                   THE VIDEOGRAPHER:  Back on the record at

7    1:59.  This begins Media Six.

8                   MR. STOUTNER:  This is Axon 6 at the

9    53-second mark.

10                   (Video played.)

11   BY MR. STOUTNER:

12       Q.   Okay.  You see yourself in the -- in the video;

13   correct?

14       A.   Uh-huh.

15                   MR. BOWEN:  That's yes?

16                   THE WITNESS:  Yes.

17   BY MR. STOUTNER:

18       Q.   Did you hear Sergeant Bina explain that the --

19   the child is in custody?

20       A.   I heard that in that recording, yes.

21       Q.   Do you remember that occurring on April 1st,

22   2016?

23       A.   I do not.

24       Q.   Now having heard that, do you see that at least

25   the -- the understanding of -- of all involved as to

1  whether or not the TCN had or had not been served or

2  submitted, was at least confusing to the individuals in

3  that room?

4                    MR. BOWEN:  Form.

5                    THE WITNESS:  That could be confusing.

6  BY MR. STOUTNER:

7      Q.  Okay.  This will be Axon 5 at the 20 -- 20-second

8  mark.

9                    (Video played.)

10  BY MR. STOUTNER:

11      Q.  Were you able to hear that same comment by the

12  sergeant?

13      A.  Can you replay that?

14      Q.  Starting again at 27 seconds on Axon 5.

15                    (Video played.)

16  BY MR. STOUTNER:

17      Q.  Were you able to hear that?

18      A.  I heard something about custody.

19      Q.  Okay.  Play it one more time for you from the

20  25-second mark.

21                    (Video played.)

22  BY MR. STOUTNER:

23      Q.  Okay.  I'm stopping it at the 35-second mark.

24      A.  I heard the same thing.

25      Q.  Okay.  Does it appear to you to be just a

1    different view on an Axon video of that same conversation

2    that we had just listened to on Axon 6 about the sergeant

3    explaining the child being in custody?

4        A.   I believe so.

5        Q.   Prior to leaving the Bentley home, you don't

6    recall having any conversations with any of the Mesa

7    police officers about the status of the service of a TCN,

8    do you?

9        A.   I don't recall.

10       Q.   And on that same date, April 1st, 2016, at the --

11   at the Family Advocacy Center when you ended up talking to

12   Janna and Mr. Schern in the lobby about the forensic

13   interview of Talon, you didn't have any conversation with

14   the Mesa police officers at that time about the status of

15   the service of a TCN, did you?

16       A.   I don't recall.

17       Q.   Ultimately, if you believed that either Janna or

18   Brian Bentley or their lawyers had refused the forensic

19   interview, you would have at that point served a TCN; is

20   that fair?

21       A.   That's correct.

22       Q.   And same question as to the medical transport,

23   the medical evaluation.  If you had believed that day that

24   Janna or Brian Bentley or their lawyers had refused the

25   transportation and ambulance for a medical evaluation of

1  Talon, you would have served a temporary custody notice at

2  that time; correct?

3      A.   If they -- if they continued to refuse, yes.

4           MR. STOUTNER:  Thank you.  I have no further

5  questions.

6           MR. BOWEN:  Do you have anything else?  I

7  just have a couple of housekeeping.

8           MR. SCHERN:  I don't.  You go ahead.

9

10                    EXAMINATION

11 BY MR. BOWEN:

12     Q.   Just a couple of things.  We've been talking a

13 lot about DCS and OCWI kind of like they're separate

14 entities.  Is there a relationship between DCS and OCWI?

15     A.   OCWI is DCS.  They just focus on criminal --

16 criminal conduct.

17     Q.   So it's just a division of DCS, a different

18 division?

19     A.   Correct.

20     Q.   The other thing that we talked about or some

21 testimony about particularly OCWI does criminal

22 investigations of serious felony type issues.  I think of

23 criminal investigations as the investigator does their

24 thing, gives it to a prosecutor and they go prosecute

25 that.

1           Does OCWI do criminal investigations in the

2    sense -- in that sense?

3        A.    No.

4        Q.    What -- what does OCWI do?  Do they do any

5    criminal investigations in the sense I described or do

6    they do something -- what is it their function really is?

7        A.    Their function is the safety of the child or

8    children.

9        Q.    So they do abuse and neglect?

10       A.    Abuse, neglect, correct.

11       Q.    But they don't prosecute any cases?

12       A.    No.

13              MR. BOWEN:  Okay.  That's -- are we done?

14              MR. SCHERN:  I am.

15              MR. BOWEN:  We'll read and sign.

16              THE VIDEOGRAPHER:  This concludes the

17    videotaped deposition of Cristina Baggen.  We're off the

18    record at 2:05 p.m.

19              (Whereupon, the proceedings were concluded

20    at 2:05 p.m.)

21

22

                        CRISTINA BAGGEN

23

24

25

1  STATE OF ARIZONA          )
                            ) ss.
2  COUNTY OF MARICOPA        )

3        BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   foregoing pages are a full, true, and accurate record of
5  the proceedings, all done to the best of my skill and
   ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
   direction.

7

8        I CERTIFY that I am in no way related to any of
   the parties hereto, nor am I in any way interested in the
   outcome hereof.

9

10       [X]  Review and signature was requested; any
   changes made by the witness will be attached to the
11 original transcript.
             [ ]  Review and signature was waived/not
12 requested.
             [ ]  Review and signature not required.

13

14       I CERTIFY that I have complied with the ethical
   obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
15 J(1)(g)(1) and (2).
             Dated at Phoenix, Arizona, this 24th day of
16 March, 2019.

17

18                     Marisa L. Montini, RPR
                         Certified Reporter
19                     Arizona CR No. 50176

20           *       *       *       *       *

21       I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
   complied with the ethical obligations set forth in
22 ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                     GRIFFIN & ASSOCIATES, LLC
                       Registered Reporting Firm
25                       Arizona RRF No. R1005

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 259 of 333

Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

**/**

**/// (7)**
38:25;61:25;64:25;
76:25;84:25;87:25;
115:25

**A**

**ABD (2)**
18:17;19:3
**ability (2)**
7:11;51:22
**able (7)**
108:13;115:10,16;
122:2,6;124:11,17
**above (1)**
30:16
**absolutely (1)**
50:17
**abuse (21)**
19:13,14,15;30:8;
35:10,17;37:19;
38:13,19;39:4;66:17,
21;72:4,20;75:8,15;
76:3,5,23;77:18;78:7
**abused (1)**
95:15
**abusive (1)**
77:10
**access (1)**
27:7
**accomplish (2)**
87:7;111:1
**account (4)**
12:20,22;17:17,18
**action (2)**
109:23;110:3
**actual (2)**
14:17;69:19
**actually (9)**
26:7;45:6;57:21,
24;79:24;80:13;
101:5,10;122:25
**additional (1)**
42:2
**address (4)**
11:25;12:2,8,18
**addressing (1)**
68:17
**advices (1)**
41:11
**Advocacy (9)**
23:2;98:25;99:25;
102:11,13,15;104:18;
106:6;125:11
**affect (1)**
7:10
**afternoon (2)**
85:7;86:4
**again (28)**
10:18;22:25;27:25;

**36:13,17,20,23;41:2;
43:23;44:11;49:16,
18;53:8;64:18;72:8;
75:8;76:1,10;77:11;
79:20;82:18;101:14;
102:4;110:5;115:6;
117:17;118:20;
124:14**
**against (1)**
41:11
**age (1)**
20:19
**agencies (2)**
65:4,13
**agency (2)**
21:22;66:13
**ago (2)**
8:16;38:11
**agree (2)**
83:5;90:9
**agreeable (2)**
91:8,9
**agreed (6)**
81:22;87:16;92:8;
93:17;104:3,5
**agreement (1)**
69:15
**ahead (18)**
13:6;24:23;28:18;
49:15,16;51:19;
63:24;64:7;66:5;
69:14;72:14;76:21;
81:18;85:11;95:13,
23;100:21;126:8
**al (2)**
4:7,7
**alcohol (1)**
7:7
**Allah (1)**
47:1
**allegation (1)**
72:10
**allegations (17)**
66:7;71:13,16,17;
72:5,8,9,21,22,25;
75:7,18;76:23;77:11,
12,17;98:6
**allege (1)**
44:14
**alleged (1)**
31:3
**allow (4)**
41:10;89:21;92:14;
103:10
**allowed (3)**
65:19;71:12,15
**allowing (1)**
37:2
**allows (1)**
95:14
**almost (5)**
8:18,20;16:5;
29:19;121:15

**alone (5)**
31:14,25;33:2;
44:3;80:12
**along (4)**
31:21;57:4;97:24;
106:10
**although (1)**
68:10
**always (2)**
23:8;54:14
**ambulance (5)**
34:12,16;65:5;
106:10;125:25
**amongst (2)**
19:16;89:14
**and/or (4)**
12:17;68:24;71:1;
95:20
**answered (1)**
79:19
**anymore (3)**
9:25;10:3;17:25
**apologize (2)**
5:19;21:11
**appear (2)**
30:7;124:25
**appeared (8)**
31:15,16;32:4,5,13,
14;76:1;78:15
**appears (2)**
31:17;32:15
**appreciate (4)**
65:2;69:5;88:2;
95:8
**apprised (4)**
53:18;57:16,19;
60:8
**approach (1)**
121:13
**appropriate (2)**
31:16;32:14
**approval (3)**
110:25;111:2,3
**April (42)**
6:14;7:17;8:7,17,
22;9:13;10:5;11:5,
11,19;12:7,7,10;15:6,
10;19:23;20:7,7,8;
22:21,24;23:1;27:9,
14,18;34:11;43:4;
52:8;56:18,24;61:4;
62:3;63:5,7,15;85:7;
97:24;99:17;103:16;
107:17;123:21;
125:10
**area (4)**
78:15;107:15,21,
23,25
**Arizona (7)**
4:1,8,11,13,15;8:9,
11
**Around (4)**
41:9;42:15,16;56:5

**arrive (1)**
74:14
**arrived (3)**
57:5;62:15;102:11
**arrives (1)**
62:17
**Aside (1)**
7:3
**assessment (19)**
32:22;34:21;35:2;
36:12,24;39:19,25;
51:4,4,6,8,12;62:8;
78:8;95:6,19,19;
96:5;108:13
**assessments (1)**
40:1
**assigned (2)**
22:16;57:4
**assignments (1)**
52:21
**assist (1)**
64:1
**assistant (1)**
14:1
**assume (6)**
12:17;33:11,11,12,
13;107:15
**assuming (3)**
10:2;11:24;21:1
**assumption (2)**
101:8;120:23
**attempt (1)**
106:22
**attention (2)**
76:13;105:4
**attorney (7)**
5:14;24:25;28:7,
22;98:24;99:24;
102:23
**audio (15)**
23:17,20,22;25:10;
100:4;103:3;105:18;
112:12,18;114:16;
115:20;121:4,24;
122:4,11
**author (1)**
41:3
**authored (1)**
36:13
**authorities (2)**
36:20,23
**Avenue (1)**
4:15
**aware (15)**
27:11,12,20,21;
29:23;33:25;34:1;
37:12,12;52:9,15;
53:24;80:17,21,22
**away (15)**
36:17,17,18,20,23,
25;53:6,7,9;56:21;
87:3;109:19;110:6
**Axon (18)**

**24:20;112:4,13;
113:4,25;114:7;
115:6;116:15;
117:13;118:6;
119:22;120:18;
122:25;123:8;124:7,
14;125:1,2**

**B**

**baby (1)**
78:1
**bachelor's (2)**
18:14;19:2
**back (26)**
11:22;13:21;15:14;
17:23;20:21;32:24;
34:12;40:12;44:1;
45:9;52:5;53:4;
74:16;75:2;96:1,9,
18;99:22;102:14,17;
111:13,24;115:2,20;
121:6;123:6
**background (3)**
18:13;30:1;43:15;
109:20
**Baggen (8)**
4:5,21;5:6;6:6;5:
30:11,15;31:7;98:18
**ball (1)**
118:23
**base (1)**
37:18
**Based (18)**
26:25;31:8;35:12,
19;40:11;41:21;
43:14,23;52:16;56:1,
10;75:13,25;93:12;
103:3;109:16,25;
120:18
**basement (1)**
107:6
**basic (1)**
71:11
**basis (2)**
45:19;108:14
**Bates (7)**
30:24;31:1,2;
34:23,25;39:17;
40:25
**bathroom (3)**
71:1,3;107:5
**Beautiful (1)**
96:11
**became (4)**
21:23;23:8;63:12,
13
**become (5)**
17:13;27:11,21;
52:9;60:6
**becomes (1)**
76:12
**bed (8)**

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 260 of 333
Bentley vs.
City of Mesa
Videotaped
Cristina Baggen
March 6, 2019

40:15;41:18;42:6,
11;44:7;45:19;48:5;
49:19
**bedroom (6)**
31:15;32:4;33:2;
64:5;70:24;71:5
**bedrooms (2)**
107:6,14
**beg (1)**
82:2
**begin (1)**
109:1
**beginning (1)**
85:2;99:22;112:13
**Begins (5)**
52:6;96:19;111:25;
115:3;123:7
**behalf (3)**
21:6,14;61:6
**behavior (5)**
93:9,11;109:17;
110:6,8
**belief (16)**
44:8,11,13,18,22;
45:23;46:9,13,14;
47:14,21;50:2,8,13;
96:6;103:5
**Bell (3)**
4:22,23;16:18
**Bentley (64)**
4:7;10:17,22;
12:15,22;13:1;15:5,5,
21;16:2,14;17:21,21;
18:5,10;23:23;25:14;
31:24;42:4;43:16,18;
44:15;47:5;52:9;
53:20;57:5;59:3,15;
61:1;68:7,25;73:11;
76:17;78:11;80:18;
81:14;84:4,5;85:5,
18;86:9,14,18;89:11;
90:16;93:24;99:4,4,
24;102:11;106:5,23,
25;108:9;110:21;
111:10,14;113:6;
119:17;120:2,20;
125:5,18,24
**Bentleys (14)**
5:14;52:18;54:11;
55:14;59:15,24;77:3;
79:23;80:11;82:15;
95:20;107:16;118:3,
19
**Bentleys' (5)**
7:19;48:12;53:12;
78:13;95:18
**Bentley's (1)**
117:10
**besides (3)**
6:19;7:24;99:10
**best (26)**
6:3;11:1;14:3;
16:15;18:12;32:18;

34:6;37:16;42:18;
52:10;53:8;59:6;
62:24;63:17;64:19;
69:3,21,25;77:25;
79:11;84:2;86:24;
88:5;90:11;111:12;
113:23
**bet (2)**
9:5;22:25
**better (5)**
27:24;44:12;
121:25;122:16,22
**Bible (1)**
46:22
**big (3)**
14:16,19,20
**bin (3)**
14:16,19,20
**Bina (10)**
24:4,5;62:6,7;
113:14,17;118:11,21;
119:18;123:18
**Bina's (1)**
117:8
**bit (3)**
104:20,25;109:14
**blanket (1)**
56:4
**block (1)**
30:13
**body (2)**
42:16,20
**both (2)**
10:11;17:2
**bottom (8)**
30:6,23;31:6;35:3;
97:19,22;101:11;
105:7
**BOWEN (75)**
4:20,20,23;13:5;
24:22;28:17,23;29:1;
37:8,24;38:7,15,21;
39:22;44:19;45:3,6,
11,14,17,24;46:2;
47:23;49:15;50:4,7,
11,24;51:19;58:25;
60:20;61:19;62:12;
63:23;64:6,17;65:16;
66:4;67:1;69:12,14;
71:9;72:13;75:6,17;
76:9,20;77:19;80:6;
81:9,17;85:10,23;
86:11,21;87:9,21;
88:15,23;89:18;
94:19;95:2,12,22;
96:22;97:2,6;104:23;
110:4;115:23;
121:14;123:15;
124:4;126:6,11

22,23;40:3;41:1,3
**boy (5)**
25:20;52:9;57:8;
76:4;84:11
**boys (2)**
26:4;80:25
**break (7)**
51:20,24;96:8;
111:19;114:20;
121:3;123:1
**Brian (9)**
4:7;75:15;84:4;
99:4;103:24;113:6;
119:17;125:18,24
**brief (2)**
62:18,20
**briefing (5)**
52:19,24;62:10,16;
63:1
**briefly (1)**
98:4
**bring (4)**
85:20,21,25;
102:14
**bringing (1)**
70:12
**brothers (1)**
31:20
**brought (5)**
70:3,11,14;76:13;
85:6
**bruises (2)**
31:18;32:16
**Bryson (2)**
25:20;80:18
**bumping (1)**
122:12

**C**

**calendar (1)**
14:25
**call (21)**
6:3;13:4;17:17;
19:3;30:12,13;31:2;
52:17,20;54:10;
55:14;57:21;58:14;
60:7,15;67:12,14,15;
77:5;107:13;121:6
**called (7)**
30:24;57:24;58:1,
1,2,3;71:11
**calm (1)**
74:24
**came (11)**
22:2;34:19;48:13,
24;52:11,20;53:1,18;
58:7;77:8;118:2
**Camelback (1)**
4:12
**camera (1)**
42:17
**cameras (1)**

42:20
**can (47)**
15:1;17:22;24:23;
25:6;29:7;30:24;
37:16,25;40:12,16;
41:2;45:9,9;51:24;
53:4;55:8;65:2;66:9,
9;69:5,16;70:14;
86:24;87:23;88:2;
91:6;96:1,12;97:7,
17;98:4;101:5,23;
109:13;110:16;
114:12,17;118:23;
119:9;120:21,23,23;
121:15,17,21;122:12;
124:13
**capacity (1)**
21:6
**car (2)**
102:12,14
**carbon (1)**
90:21
**career (1)**
110:12
**carry (1)**
109:1
**Case (44)**
4:6;5:14;6:11,11,
12;7:15,16,25;12:23;
13:1;14:24;15:5,7,7,
21;16:9,14;17:21;
18:1,5,10;19:10;
20:16;22:16;24:20;
25:8,11;28:9,23;
50:16,17;51:1;54:21;
56:23;92:13;95:18;
98:20;99:4,9;100:7,
8;109:23;110:22;
114:4
**cases (7)**
14:8;22:12,15,18;
54:15;56:24;66:17
**categories (1)**
22:12
**categorized (1)**
56:7
**category (1)**
56:6
**caused (1)**
110:3
**CCTV (1)**
26:7
**cell (9)**
9:14,16,16,20;10:6,
19;11:12,14,18
**Center (14)**
23:2,19;80:23;
87:15,16;92:13;
94:14;98:25;99:25;
102:12,13,15;104:18,
24;105:1;106:6;
125:11
**Central (1)**

4:15
**certain (4)**
17:24;34:18;55:25;
114:15
**certainly (1)**
55:12
**certificate (1)**
19:9
**certificates (2)**
19:5,6
**certified (4)**
4:11,14;5:8;43:3
**chance (1)**
100:10
**change (3)**
21:24;23:12;91:8
**changed (7)**
5:16;12:3,4,11,12;
27:21;93:11
**check (2)**
34:7;70:23
**checked (3)**
43:17;74:22;79:6
**chicken (1)**
98:14
**Child (76)**
8:8;16:16;19:13,
13,14,15;31:3;32:22;
33:16,19;34:22;
36:13,18;37:6,13,19,
21,22;38:4,5,5,13,18,
20;39:7,19;41:15;
44:3,9,23;46:9;48:7;
49:20;51:23;52:18;
53:6,8,9;54:11,14;
55:3,6,15,16,18,20;
56:20,21,23;60:12,
16;61:6,7;66:16,16,
17,17,21,25;73:9;
82:19;89:1,3;90:1;
93:13;94:9;95:5,14,
21;96:5;98:3;109:17;
110:8,14;123:19;
125:3
**children (35)**
19:16;20:16;21:5;
25:15,19;59:16;67:4,
5,6;73:1;76:12,17;
77:23;78:6,11,12;
80:18;85:5,12,14,18,
25;86:9,13,17,24;
87:19,23;88:16,25;
90:13,16;98:8;
106:19,23
**children's (1)**
21:6
**child's (1)**
94:17
**chose (1)**
103:23
**Chris (1)**
4:13
**Christ (1)**

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 261 of 333
Bentley vs.
City of Mesa
Videotaped
Cristina Baggen
March 6, 2019

47:3
**church (1)**
46:20
**circumstance (3)**
103:20;110:17;
111:7
**circumstances (4)**
68:6;74:2;85:18;
110:24
**City (2)**
4:7;5:1
**civil (2)**
7:4;15:7
**civilians (1)**
59:7
**claim (1)**
50:18
**clarify (3)**
15:1;22:6;92:22
**class (1)**
18:15
**clean (2)**
78:14,16
**clear (2)**
72:10;104:23
**clearance (1)**
78:25
**cleared (1)**
83:14
**clip (4)**
117:18;118:10,25;
122:5
**clips (1)**
121:2;122:21
**close (2)**
48:10;108:4
**closed (3)**
18:1;41:16,17
**coach (1)**
19:10;20:17;21:6,8
**coaching (4)**
20:19,23;21:14,15
**collaboratively (1)**
63:7
**collected (3)**
51:10;62:19;75:1
**comfortable (1)**
50:25
**comma (2)**
30:11,15
**comment (3)**
32:3;68:17;124:11
**communicate (7)**
10:6,10,16,20;
11:15;12:14,22
**communication (2)**
10:24;99:23
**communications (3)**
35:22;111:10,14
**competitive (1)**
20:23
**complete (3)**
18:23;60:3;108:13

**completed (4)**
18:15;71:10,21,23
**completely (1)**
104:19
**completion (1)**
19:6
**complicated (1)**
55:13
**complies (3)**
101:13;105:9;
109:4
**computer (3)**
13:22;15:15;
121:17
**concept (1)**
61:10
**concern (45)**
36:19,22;37:3;
39:12,20;40:5,6;
44:11,13,24;45:7;
46:10;47:5,10,11,14,
20,21,25;49:3,6,9,9,
11,11,13;50:21;
51:14,16,16,17,18;
72:11,23;75:3,13,14,
16;77:2;80:11;84:10;
95:1,4,11,15
**concerned (6)**
72:3,6;77:6,9,17;
79:19
**concerning (5)**
44:8,23;46:9;
109:13,14
**concerns (8)**
41:13;43:13,22;
68:9;72:8,19;74:3;
93:12
**conclude (1)**
35:16
**concluded (1)**
34:1
**conduct (3)**
22:18;66:7;126:16
**conducted (2)**
41:23,24
**conducting (1)**
65:23
**confidential (1)**
28:3
**confirm (1)**
101:5
**confused (2)**
9:1;40:24
**confusing (2)**
124:2,5
**congratulations (2)**
6:1,2
**consent (2)**
87:7;88:9
**consenting (2)**
102:21,24
**consider (1)**
99:2

**considered (1)**
82:8
**contact (5)**
36:19,23;37:3;
44:6;67:24
**contacted (3)**
53:10;54:3;57:15
**contains (1)**
98:12
**content (3)**
14:12;31:11;41:3
**context (2)**
60:10;82:14
**continued (2)**
89:20;126:3
**continues (1)**
105:23
**control (1)**
28:10
**conversation (13)**
85:4;104:8,17,25;
113:6;115:15,19,22;
117:7;118:18;
119:16;125:1,13
**conversations (5)**
59:14,21;94:2;
111:8;125:6
**copies (1)**
97:9
**copy (2)**
28:7;90:21
**Cordova (22)**
4:22,24,24;16:17;
18:6;31:14,24;32:4,
17;33:2,8,15;34:14,
20;63:5;64:4;71:5;
75:22;83:12;104:14;
106:10,14
**Cordova's (3)**
32:7;102:12;106:6
**corners (1)**
43:11
**correcting (1)**
43:8
**correctly (3)**
69:16;78:24;102:2
**Counsel (7)**
4:16,18;5:3;
112:23;119:3,3;
121:23
**counseling (2)**
18:21,22
**County (1)**
65:6
**couple (4)**
33:23;78:17;126:7,
12
**course (3)**
7:17;19:2;25:20
**Court (5)**
4:8;5:4;6:22,24;
97:3
**credits (1)**

18:15
**criminal (22)**
6:12;22:18;26:21;
60:7,16,18,19;61:1,5;
65:23;66:2,6,10,16,
17,23,24;74:24;
126:15,16,21,23
**Cristina (6)**
4:5;5:6;30:11,15;
31:7;98:18
**criteria (2)**
55:25;56:13
**crossing (1)**
27:25
**CSR (2)**
13:14;29:12
**CSRA (27)**
13:8,15,23,25;14:2,
12,23;15:16;17:6,11;
18:2;23:17;24:15;
29:9,13;39:12,17;
40:10,12,18,25;
44:24;48:4;53:5;
55:10;56:2;95:3
**custody (18)**
28:10;88:8,17;
89:4,4,12,22,25;90:4;
103:7,17;110:11;
111:9;118:2;123:19;
124:18;125:3;126:1
**cutesy (1)**
77:16

## D

**dad (3)**
71:1;74:16;110:6
**danger (13)**
35:2;44:9,23;
46:10;73:20,22;74:8,
9,17,21;75:4;76:17;
88:22
**database (1)**
14:2
**date (6)**
4:9;22:25;23:1;
30:11;97:24;125:10
**dates (1)**
19:24
**day (10)**
7:20,20;10:22;
15:20,20;23:5;33:15;
70:19;83:1;125:23
**DCS (84)**
8:15,22;9:7,22;
10:20;11:17,22,24;
12:8,13;16:12;17:17,
17;20:13,20;21:12,
16,22;22:8;23:10;
28:16;30:3;39:3;
54:12,14,20;55:4,5,
13,17,19,21;56:9;
57:19;58:7;61:4,11;

63:6,18,20,21;65:5;
66:12,13,18;67:25;
74:25;79:1;81:3,13;
83:1,25;84:3;85:19;
86:7;87:6,17,18;
89:24;90:10;93:23;
94:5,11,16,23,24;
95:1,10,11;103:15;
109:22;110:3;111:1,
5;116:23;118:12,16,
18,21;119:19;126:13,
14,15,17
**DCS's (3)**
13:4;63:21;94:18,
20;95:19
**DDD (1)**
19:12
**decipher (1)**
122:9
**decision (11)**
64:4,14;65:11;
78:25;83:25;84:3,20;
92:24;93:2,6,8
**decisions (1)**
82:7
**defendant (2)**
6:11;7:5
**defendants (2)**
4:20;5:2
**Definitely (1)**
12:24
**degree (2)**
19:2,3
**delete (5)**
17:18,19,20,24;
18:3
**denomination (1)**
46:4
**Department (16)**
8:8,11;52:19;
54:10,12;61:6,11;
65:6;68:13;69:8;
71:1;73:9;78:19;
90:1;98:3;110:14
**departments (2)**
65:4,13
**depending (1)**
110:24
**deposited (1)**
14:16
**deposition (15)**
4:5;6:7,20;7:14;
23:16;24:17;26:20;
29:16;42:24;52:16;
78:17;85:2;97:4;
102:6;121:5
**depositions (1)**
61:8
**describe (2)**
66:9;107:1
**desktop (1)**
121:17
**destroy (1)**

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 262 of 333
Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

15:16
**destroyed (1)**
14:22
**details (3)**
41:9;63:2,4
**Detective (29)**
24:3,4;26:12,15;
33:5;42:14;52:10;
53:1,14,24;56:16,25;
57:3,6;58:8,24;59:3,
11,17;60:25;62:3,15;
64:20;67:9;68:18;
69:22;70:10;73:6,13
**detectives (4)**
11:3;62:18;69:10,
14
**developmentally (2)**
31:17;32:15
**device (1)**
10:3
**diaries (1)**
14:25
**difference (6)**
66:10,11,14,15;
71:4,7
**different (13)**
8:11;9:16;22:11;
45:8;64:23;65:4,4;
107:20;111:9,15;
112:8;125:1;126:17
**digits (2)**
30:25;34:25
**direction (2)**
25:2;65:14
**directly (2)**
113:11;119:8
**disabilities (1)**
20:17
**disclose (4)**
35:10,17;36:3;
76:12
**disclosures (1)**
73:1
**discrimination (1)**
50:18
**discuss (4)**
71:20;90:5,6;
113:14
**discussed (5)**
36:11;89:12,13,14;
90:13
**discussing (1)**
39:24
**discussion (11)**
29:1;64:11;79:8;
80:25;89:17;90:3;
91:1;116:8,20;117:4;
118:1
**discussions (2)**
90:12,15
**Disneyland (1)**
88:10
**dissertation (1)**

18:17
**distance (1)**
44:5
**District (2)**
4:8,8
**division (2)**
126:17,18
**divorce (1)**
7:3
**divorced (2)**
5:18,21
**doctor (11)**
43:17,19;68:25;
69:4;74:22;79:24;
80:12;82:16;104:4;
106:15;108:15
**doctors (1)**
83:15
**document (17)**
29:8,10,16,18,22,
24;30:23;34:24;
40:19;43:10;56:2;
98:1,12,20;99:2;
100:25;101:9
**documentation (2)**
18:2;51:3
**documents (6)**
28:8;99:3,5,9,16,19
**domestic (1)**
19:12
**done (21)**
15:9,24;16:1,3;
17:4;19:8,10;34:2;
38:24;43:14,20,23;
51:20;61:23;80:14,
16;85:13;96:10;
101:11;105:8;110:13
**door (2)**
107:2;108:5
**down (9)**
13:22;15:14;30:6,
22;31:6;36:12;74:12,
24;105:7
**downstairs (1)**
107:6
**DP (1)**
41:8
**drafted (2)**
103:7,20
**dressed (3)**
31:16;32:5,14
**Drive (3)**
4:10;102:12;106:6
**drove (1)**
53:13
**due (2)**
74:2,9;93:8;96:5
**duly (1)**
5:7
**Duncan (2)**
5:1;114:13
**during (10)**
7:14;26:15;27:3;

48:22;90:12;94:2;
104:16;108:1;118:3,
10
**duty (4)**
98:3;100:22,25;
101:2
**dynamic (1)**
71:11

**E**

**earlier (3)**
26:19;102:5,5
**East (1)**
4:12
**education (1)**
109:16
**educational (2)**
18:13;109:20
**effects (2)**
19:14,15
**Eichler (1)**
4:13
**either (7)**
32:20;71:20;79:1;
99:4;103:24;121:7;
125:17
**elec- (1)**
13:4
**electronic (1)**
13:4
**else (24)**
7:18,25;16:8,11,
13;24:12,16;29:1;
30:13;41:24;42:13;
48:21;53:25;54:8;
55:20;57:19;58:17,
21;64:15;67:14,25;
83:1,3;126:6
**else's (2)**
37:20;91:6
**e-mail (14)**
11:25;12:2,8,13,18,
20,21;17:10,13,18,
22;18:4,6,7
**e-mailed (2)**
16:25;17:10
**e-mails (11)**
12:3;17:15,16,18,
19,20,24,25;18:3,9;
28:8
**emergency (1)**
79:4
**employee (5)**
103:15;118:12,18,
22;119:19
**employer (2)**
8:6,10
**employment (2)**
20:11,14
**EMS (3)**
84:11,15,18
**EMT (4)**

68:10,15,16,21
**EMTs (5)**
78:19,25;79:5,18;
80:1
**EMT's (1)**
41:11
**end (11)**
8:23;9:9,11;49:22;
52:2;79:8,12;96:15;
104:2,6;111:21
**ended (3)**
80:20;91:13;
125:11
**ending (5)**
40:19;56:2;109:2;
114:24;123:3
**ends (2)**
34:11;41:1
**enforce (1)**
79:2
**enforcement (16)**
37:4;42:1;53:10;
58:19;59:7;60:2;
61:24;62:17,20;
71:20,21,23;84:3;
85:14;87:14;89:15
**enforcement's (1)**
65:19
**engage (1)**
37:1
**enough (5)**
18:25;20:1;31:22;
32:11;46:6
**ensues (2)**
60:18,19
**ensure (1)**
98:8
**enter (5)**
13:14;14:2,11;
15:15;17:11
**entered (7)**
13:15,23,25;14:3,
23;17:6;30:15
**entities (1)**
126:14
**entries (2)**
14:24,25
**entry (1)**
30:2
**entryway (4)**
107:10,13,15,18
**environment (1)**
86:25
**especially (1)**
122:9
**estimate (2)**
53:17;57:2
**et (2)**
4:7,7
**evaluated (22)**
68:10,11,14;74:2,
6;78:20;79:7,9;
81:15,16,21;82:16,

19;83:9;84:12,13;
89:21;90:9;91:22;
93:18;108:15,19
**evaluation (11)**
79:17;83:5;92:19;
93:1,21;94:6;104:4,
9;106:15;125:23,25
**Even (3)**
70:17;75:9;99:14
**event (4)**
5:16;29:20;103:8;
107:24
**events (4)**
7:17,18;15:6;
115:21
**Everybody (3)**
37:15;59:8;114:22
**everyone (3)**
31:21;38:12;
111:19
**evidence (1)**
74:25
**exact (1)**
91:5
**exactly (3)**
17:3;83:13;88:5
**EXAMINATION (4)**
5:11;97:13;112:2;
126:10
**examined (2)**
5:9;41:11
**excuse (3)**
23:15;53:6;68:10
**Exhibit (16)**
29:7;34:24;42:24;
90:18,25;96:25;97:4,
15;98:12;99:2,2,20;
100:9,9;101:1;
104:13;108:21
**exhibits (1)**
97:8
**expect (2)**
50:21,22
**expectations (1)**
63:21
**experience (4)**
94:16,23;95:10;
103:15;109:21,25;
110:15
**explain (6)**
48:2;50:22,23;
112:9,12;123:18
**explained (2)**
41:13;105:11
**explaining (2)**
118:18;125:3
**explains (2)**
105:14;109:7
**explanation (2)**
109:11;119:19
**expressed (1)**
84:10
**expresses (1)**

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 263 of 333
Bentley vs.
City of Mesa
Videotaped
Cristina Baggen
March 6, 2019

43:19
**expressly (1)**
51:16

### F

**fact (2)**
27:20;65:2
**factor (2)**
94:17,20
**factors (3)**
36:13;39:19;93:16
**facts (1)**
27:11
**fair (18)**
7:21;18:25;20:1;
27:2;32:11;59:22;
66:22;70:6;78:8;
80:14;81:13;101:4;
110:13;111:13;
117:3;118:1;121:7;
125:20
**fairly (1)**
109:7
**fairness (1)**
27:1
**faith (15)**
39:13,21;40:6,7;
44:25;46:11;48:1,2;
50:20;51:12,14;
94:17,25;95:11,20
**familiar (1)**
22:13
**families (1)**
103:17
**family (17)**
7:3;23:1;40:15;
41:18;43:19;71:11;
98:21,25;99:16,17,
25;102:11,12,14;
104:17;106:6;125:11
**family's (8)**
30:8;39:13,20;
40:6,7;46:10;50:20;
94:25
**father (10)**
31:20;41:7;70:15;
72:4,20;93:10,12;
109:12,19;110:1
**feared (1)**
44:7
**February (3)**
8:23;9:9,11
**feel (7)**
50:25;69:2;79:22;
87:5;88:8,11,12
**fell (1)**
56:6
**felony (3)**
66:16,17;126:22
**felt (1)**
73:21
**few (7)**

38:5;41:12;61:9;
96:9,23;100:14;
112:8
**field (2)**
19:6;20:3
**file (2)**
13:4;17:15;18:2,7,
11;41:8
**filed (1)**
4:7
**final (1)**
65:15
**finally (2)**
91:3,9
**find (8)**
24:8;27:19;38:4;
52:21;60:12,16,17;
93:13
**fine (6)**
49:13;79:5;91:3;
107:19;121:13;
122:20
**finish (1)**
120:15
**finished (3)**
34:4,8;96:7
**fire (5)**
65:5;68:13;71:1;
78:19;79:5
**first (18)**
4:18;5:7;29:25;
30:8;33:7,14;40:23;
42:1;52:8;58:22;
68:6;70:16,18;93:9,
23;94:11;109:16;
112:17
**Five (2)**
115:3;123:3
**focus (3)**
18:20;40:23;
126:15
**folks (1)**
62:21
**follow (3)**
42:2;65:19;67:17
**followed (2)**
59:11,13
**following (2)**
7:20;69:9
**follows (1)**
5:9
**food (1)**
31:22
**forensic (12)**
19:18;25:14;35:21,
23;92:19;93:2;
102:24;103:9;
105:24;106:17;
125:12,18
**forensically (14)**
19:17;20:6;35:9;
64:12;83:24;84:1,6,
16,21;92:14,24;93:5,

25;94:12
**forget (2)**
66:12;97:7
**Form (106)**
13:5;24:22,22;
25:5;28:17;33:17;
36:4;37:7,14,23,24;
38:7,8,21,22;42:22;
44:19,20;45:3,4,5,11,
12,25;47:8,15,22,23;
49:14,24;50:4,7,11;
51:19;53:3;54:2,16,
22;55:24;58:9,25;
59:18;60:1,20;61:13,
18,19,22;63:23;64:6,
16;65:16,17;66:4;
67:1,10;69:12,13;
71:8,9,25;72:13;
73:4;75:5,6,17;76:6,
20;77:19,19;79:10;
80:3,6;81:9,17;
83:16;84:22;85:10,
23;86:11,12,21,22;
87:8,9,21,22;88:14,
15,23,24;89:18;
90:21;91:24;93:19;
94:13,19;95:2,12,22;
98:3;108:16;110:4;
115:23;120:5;124:4
**forms (1)**
92:1
**forth (1)**
111:14
**forward (3)**
74:18;82:18;
107:12
**found (11)**
38:19;52:9;57:8,
12;69:24;70:9;74:15,
16;75:2;76:1;93:10
**Foundation (18)**
28:17;42:22;49:24;
61:22;64:6,16;65:17;
69:12;71:8;76:6,19;
80:3;83:7;84:7;93:7;
94:13;108:16;120:5
**Four (4)**
111:25;114:6,24;
115:6
**foyer (1)**
33:4
**frame (1)**
113:24
**front (9)**
13:22;15:14;57:23;
70:10;97:15;100:11;
107:2;108:5,21
**further (3)**
37:1;98:10;126:4

### G

**game (1)**

25;94:12
**forget (2)**

19:10
**gathered (1)**
107:25
**gathering (2)**
67:20,22
**gave (8)**
16:21;17:5;27:3,
13,18;32:20;81:25;
99:5
**gentleman (1)**
26:22
**gets (2)**
54:12;80:14
**Gina (13)**
16:16,17;31:24;
32:7,17;34:7;63:5;
70:23;71:5,10;
102:12;104:14;105:5
**Gina's (1)**
4:21
**given (2)**
14:1;32:19
**gives (1)**
126:24
**giving (2)**
99:3,9
**Glazer (4)**
35:23,24,24;81:4
**global (2)**
71:11;75:23
**God (18)**
40:14;41:17;42:5,
10;44:15;46:15;47:6,
6;48:4;49:12,12,12,
18;50:2,10,20,21;
95:4
**goes (1)**
83:4
**Good (7)**
5:13;6:2;8:3;28:1;
31:15;32:5,13
**Greenway (16)**
11:6,7;24:9,10,11;
57:16;67:25;68:4;
81:7;82:4;83:2;90:3,
6,8,15;102:7
**greeting (1)**
70:18
**Griffin (1)**
4:12
**Group (6)**
4:12;44:4;48:8,12;
74:11;108:9
**guess (4)**
30:12;44:11;
120:21,22
**guessing (1)**
116:9
**Gutierrez (4)**
5:16;6:4;44:12;
96:20
**guys (6)**
80:1;81:14;88:11;

101:23;121:12;
122:15

### H

**half (3)**
21:20;33:11;53:22
**hallway (2)**
107:5,14
**hand (3)**
7:17;29:6;92:7
**handle (2)**
22:15,18
**hands (2)**
72:20,24
**handwriting (1)**
15:16
**handwritten (12)**
13:13,13,16,18;
14:5,22;15:8,13,17;
16:25;17:8;29:12
**happen (11)**
62:4,23;74:23;
75:1;79:18;80:2;
81:22;85:9,22;88:6;
105:12
**happened (6)**
16:5;64:24;74:3,
10,13;85:4
**happening (1)**
33:3
**happens (2)**
71:18;88:4
**happy (2)**
122:17,19
**hard (2)**
120:24;122:8
**harmed (1)**
49:23
**hear (28)**
45:13;68:12,15;
88:2,7;113:14;
114:10;115:10;
116:20,23;117:20,21,
23;118:11,21,25;
119:16;121:4,6,15,
15,18,20;122:2,7;
123:18;124:11,17
**heard (3)**
44:14;61:8;84:18;
101:5;103:3,3;117:8,
17;120:20;123:20,
24;124:18,24
**hearing (2)**
55:16;84:19
**held (1)**
110:7
**help (3)**
58:1;63:25;122:19
**helpful (1)**
114:21
**helps (1)**
56:9

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 264 of 333

Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

**herein (1)**
5:7
**here's (4)**
27:17;82:15,15;
91:2
**hey (14)**
34:2;43:17;52:20;
53:1;55:3,15,18;
60:15;64:11,22;65:9;
75:14;114:13;120:14
**hiding (1)**
56:21
**hired (1)**
21:18
**history (4)**
20:11,14;30:2;
36:17
**hold (3)**
40:23;112:24;
119:9
**home (64)**
7:19;16:2;31:21,
22;33:4;41:22;44:5;
48:8,10,12,15;49:4;
53:6,7,12,20;56:3;
57:6,9,11;59:3;62:11,
12,13;68:1,2,8;70:15,
24;73:3,13,18;74:12,
14,15,16;75:3;77:24;
78:13;81:14;84:4;
86:9,14,18;87:3,19;
89:11;91:15,18,20;
92:25;94:7,8,9;98:8;
102:11;106:5,25;
107:12;110:21;
111:11,14,15;125:5
**Honestly (2)**
53:23;63:13
**hope (1)**
6:5
**hopefully (1)**
96:9
**horrible (1)**
21:9
**horrific (1)**
78:4
**hospital (13)**
7:19;68:14;83:4,6,
9,15,19;94:5;102:14;
104:4,10;106:14;
108:15
**hotline (6)**
21:18,21;22:8;
58:3,4,14
**hour (4)**
33:12;53:22,22;
73:16
**hours (2)**
7:8;38:5
**house (14)**
48:12;69:24;70:4,
11,13;75:15;99:12;
103:21;104:2,8;

106:18;107:2,8;
118:3
**housekeeping (1)**
126:7
**hygiene (3)**
31:15;32:5,13
**hyphen (3)**
30:11,14;31:7
**hypothetical (1)**
27:17

**I**

**idea (7)**
9:21;11:20;12:4;
115:21,24;120:11;
122:16
**identification (2)**
42:25;97:5
**identify (2)**
4:16;23:18
**ill (1)**
20:15
**imagine (3)**
11:11;19:23;78:4
**immediate (4)**
73:20,22;74:7;
88:22
**Immediately (4)**
14:13;33:15;74:23;
81:23
**imminent (4)**
74:9,17;75:3;76:17
**impacts (1)**
51:12
**impair (2)**
48:3,6
**impairs (6)**
39:13,21;40:7;
44:25;46:11;48:1
**impede (1)**
60:3
**impeded (1)**
51:22
**important (2)**
75:20;93:20
**impression (1)**
73:19
**impressive (2)**
19:4,21
**inaccurate (1)**
29:22
**inasmuch (1)**
69:9
**include (2)**
39:15;50:19
**included (6)**
34:15,19;39:5;
40:9;41:20;49:5
**including (1)**
10:20
**indicate (1)**
109:22

**indicated (1)**
102:6
**indicating (1)**
90:21
**indication (4)**
76:4,8,14,16
**individual (3)**
99:13;105:5,19
**individuals (5)**
10:8;35:20;111:15;
119:18;124:2
**inform (5)**
54:4;98:4;100:22,
25;101:2
**information (33)**
26:25;27:1;28:4,4;
30:1,16;32:6,9,17,19;
34:14,19;35:5;41:19;
48:13,20,22,24;
51:10;54:4,23;62:18,
25;67:20,22;71:12;
75:13;76:11;82:23,
23;83:21;93:11;
102:17
**informed (8)**
74:1,4;82:24;83:8,
11,17;93:24;94:11
**initial (1)**
35:8
**Initially (2)**
92:12;93:20
**initiate (2)**
59:14,21
**injuries (2)**
75:10;78:12
**injury (4)**
74:17,19;75:4;
76:18
**input (2)**
62:4,7
**inside (3)**
69:23,25;111:15
**instruct (2)**
81:4,6
**instructed (1)**
81:19
**instruction (1)**
81:25
**instructs (1)**
25:4
**intake (3)**
21:18;22:9,10
**interact (1)**
93:10
**interaction (6)**
70:17,17,19;
109:12;110:2;118:3
**International (1)**
4:12
**intervene (1)**
98:10
**interview (53)**
6:14;25:14,16,23;

26:2,6,13,20,23,24;
27:4,6,9,9,12,13,14,
18;31:19,23;32:16;
34:1,4,8;35:13,20,25;
40:14;41:21,23;43:4,
19;64:4;71:5,6;
75:23;76:2;78:23;
79:16;82:6;87:7;
88:12,17;92:19;93:2,
13;102:21,24;103:9;
105:13,24;125:13,19
**interviewed (40)**
31:14;32:4;33:2;
35:10;37:2;41:7;
59:12;71:22;74:11;
75:20,20,22;80:22;
83:24;84:1,6,16,21;
85:6,13,15,19;86:10,
20;87:14,15,19,24;
88:10;92:14,25;93:5,
18,25;94:10,12;
101:23,24;102:19;
103:11
**interviewer (2)**
35:21,23
**interviewing (4)**
19:18;33:9;86:24;
90:16
**interviews (10)**
25:19,19,23;33:16;
40:11;41:9;71:7,11;
94:2;106:17
**into (23)**
13:14,15,23,25;
14:2,12,16,23;15:16;
17:6,11;29:12;32:6;
33:18;52:11;54:10;
58:3;70:4,15;89:4;
107:7,23;113:4
**introduced (1)**
73:6
**investigate (3)**
22:12;54:24;66:6
**investigates (2)**
66:16,18
**investigating (2)**
77:21,21
**investigation (36)**
10:8,22;13:19;
15:6;17:21;35:9;
38:24;41:8,25;48:23;
51:7;59:23;60:3,4,7,
18,19;61:2,7,11,12,
17;63:16;65:3,24;
71:19;72:9;74:25;
87:24;94:18,21;98:5;
99:12;103:16;108:1;
117:4
**investigations (8)**
23:10;37:2;61:23;
65:18;85:13;94:24;
126:22,23
**investigator (11)**

21:23;22:1,10,11,
15,23:8;61:5;66:2,
10,12;126:23
**involve (2)**
56:20;66:24
**involved (19)**
10:8;52:16,23;
54:12,14,21;55:13,
20,21;56:10;63:10,
12,14;64:11;83:1,3;
94:24;114:4;123:25
**involvement (2)**
80:24;117:5
**involving (1)**
39:4
**issue (6)**
60:12,13;76:13;
89:24;90:10;111:9
**issues (1)**
126:22
**issuing (1)**
90:1

**J**

**James (1)**
4:20
**Janna (21)**
42:4,10;47:5;
75:15;84:5;99:4,24;
102:20;103:8,24;
104:2,7,17;108:9;
113:6;117:10;
119:16;120:2;
125:12,17,24
**Janna's (1)**
50:2
**Jesus (1)**
47:3
**Jim (1)**
28:24
**job (2)**
78:5;91:25
**Join (6)**
37:8;49:16;60:21;
64:17;76:9;89:19
**joint (7)**
41:8,25;61:10,12,
17;84:2,20
**jointly (1)**
22:19
**journal (1)**
14:24
**judge (2)**
50:22
**judgment (11)**
38:1;39:14,21;
40:8;44:25;46:11;
48:1,3,6;87:10,13
**judicial (1)**
98:9

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 265 of 333

Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

# K

**keep (5)**
4:24;54:18;91:25;
107:7;121:5
**Kessler (24)**
24:3;33:5;42:14;
52:10;53:1,14,24;
56:16,25;57:6;58:8,
24;59:4,11,17;60:25;
62:3,15;67:9;68:18;
69:22;70:10;73:6,14
**kid (4)**
44:6;52:22;60:12,
17
**kids (10)**
20:19;21:2,4,13,
14;65:10;81:5,6;
88:8;115:17
**killer (1)**
27:19
**Kind (8)**
18:17;20:24;52:20;
55:3;59:24;79:1;
107:20;126:13
**kinds (1)**
39:4
**kitchen (1)**
107:7
**knowledge (10)**
16:10;18:12;32:18;
34:6;48:14;79:11;
82:23;109:16;
110:18,19
**Kwan (2)**
29:3,4

# L

**label (5)**
31:2;34:23,25;
39:18;41:1
**laptop (1)**
112:5
**last (13)**
5:16;7:8;30:25,25;
34:25;39:11,19,23;
41:14;100:13;
105:22;122:9,23
**later (8)**
27:19;29:19,19;
33:15;71:6;85:21;
86:4;106:17
**laundry (1)**
19:20
**Laurie (1)**
81:4
**law (19)**
37:3,5,12;41:25;
53:10;58:18;59:7;
60:2;61:24;62:17,20;
65:19;71:20,20,23;

84:3;85:14;87:14;
89:14
**laws (1)**
37:10
**lawsuit (3)**
7:2,4,16
**lawyer (3)**
7:24;28:5;99:11
**lawyers (3)**
99:17;125:18,24
**laying (1)**
60:10
**layout (1)**
107:9
**lead (4)**
59:25;61:24;65:19;
69:9
**leader (1)**
61:21
**leads (1)**
107:5
**learned (1)**
52:17
**least (5)**
81:21;89:7,9;
123:24;124:2
**leave (8)**
75:14;81:14,21;
101:23,24,24;102:19;
106:5
**leaving (2)**
12:11;125:5
**left (16)**
21:25,25;22:5;
48:7;53:19;54:1;
56:3;57:14;80:12;
98:18;112:21;
113:24,25;118:15;
121:22;122:14
**Legal (2)**
4:14,14
**less (1)**
67:8
**lets (1)**
98:5
**letting (1)**
59:24
**level (2)**
17:24;107:20
**licenses (1)**
20:3
**licensures (1)**
20:2
**light (1)**
111:9
**likely (1)**
25:3
**line (14)**
43:12;79:15;91:1;
100:15,17,18;101:4,
10,10;104:13;105:4,
6;109:1,2
**lines (1)**

109:9
**list (1)**
19:21
**listed (1)**
100:20
**listen (1)**
25:13
**listened (6)**
24:1,15;25:10;
85:3;101:18;125:2
**listening (2)**
105:18;116:8
**listing (1)**
101:14
**little (1)**
109:14
**living (3)**
31:19;107:21,23
**lobby (2)**
105:2;125:12
**located (1)**
69:20
**location (1)**
4:10
**long (13)**
8:14,17;20:1,12,
18;21:19;53:17,18;
57:11;73:13;104:21;
105:23,25
**longer (1)**
93:12
**look (20)**
24:19;40:12;43:11;
53:4;77:13;78:7;
90:18,19,20,24,24;
100:10;101:9,12,16,
21;104:13;105:8;
109:3;114:3
**looked (2)**
25:7;29:15
**looking (8)**
19:25;29:24;41:14;
60:9;68:19;104:22;
105:6;115:20
**looks (4)**
29:25;31:1,2;90:25
**lost (1)**
72:15
**lot (8)**
39:3;42:15;59:6;
65:3,6,12;111:13;
126:13
**lower (3)**
107:20,21,23

# M

**ma'am (1)**
51:15
**maiden (1)**
5:24
**mailbox (1)**
17:23

**main (7)**
19:17;66:15;107:1,
2,3,4,25
**maintained (1)**
78:14
**maker (1)**
65:12
**makes (1)**
78:5
**making (1)**
14:9
**manager (2)**
19:10;20:16
**mandated (1)**
37:15
**mandatory (1)**
38:12
**many (6)**
56:24;89:3;121:2,
3,8,10
**March (2)**
4:1,5,9
**Maricopa (1)**
65:6
**Marisa (1)**
4:11
**mark (13)**
96:25;116:15;
117:13,14;118:7,7;
119:13,22;120:1;
123:9;124:8,20,23
**marked (4)**
29:7;42:24;97:4;
100:9
**marks (2)**
31:18;32:16
**married (1)**
5:15
**Mason (2)**
25:20;80:18
**master (1)**
18:19
**master's (2)**
18:14;19:3
**matter (12)**
7:21;10:17,22;
12:15,23;26:21;
33:13;60:16;61:9;
62:2;91:4;95:18
**matters (5)**
11:15;39:4;56:16,
20;66:24
**may (8)**
6:4;20:21;21:12,
17;63:6;65:14;87:4;
121:16
**maybe (5)**
15:19;45:20;66:22,
23;114:16
**mean (31)**
6:24;11:1;22:5;
30:15;35:4;37:21;
38:5,11,19;40:9;

46:3;49:5,23;51:8;
53:5;55:11,12;58:2;
64:15,22;67:14,18;
71:15;74:11;82:10,
21;87:12;88:4;
120:21;121:14;
122:17
**meaning (1)**
55:12
**means (5)**
8:3;28:1;30:19;
31:10;82:22
**meant (2)**
92:5,10
**Media (10)**
52:2,6;96:15,19;
111:21,25;114:24;
115:3;123:3,7
**medical (23)**
74:5;76:2;78:18,
25;79:12,17,24,25;
80:15;81:20;83:5;
92:19;93:1,21;94:6;
104:3,9;113:7,11;
116:9;125:22,23,25
**medically (23)**
41:10;68:10,11,14;
74:2,5;78:20;79:6,9;
81:15,16;82:19;83:9;
84:11,13;89:21;90:9;
91:22;93:17,18;
94:10;108:15,18
**medications (1)**
7:10
**members (1)**
46:17
**memoranda (1)**
15:18
**memory (6)**
7:11;104:7;107:8;
115:21;120:8,18
**mental (1)**
19:9
**mentally (1)**
20:15
**mention (1)**
44:10
**Mesa (10)**
4:1,7,10;5:2;23:1;
41:7;52:18;69:11;
125:6,14
**messages (1)**
28:8
**met (1)**
56:1
**MFAC (26)**
7:19;23:2,23;
35:10;52:13;54:1;
57:15;71:6,23;80:21;
81:1;83:20,23;84:1,6,
21;85:4,6,19,20,21;
86:10,19;87:20;
88:10;94:4

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 266 of 333

Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

**Michael (1)**
97:22
**microphone (1)**
119:6
**midway (1)**
40:20
**might (8)**
7:10;57:24,25;
64:20,21;78:1;
114:18;121:18
**Mike (2)**
4:19;5:13
**mind (2)**
44:2;91:8
**minimize (1)**
67:19
**minimum (1)**
77:3
**minute (5)**
113:3,25;118:6,7;
119:25
**minutes (7)**
33:12,14;96:9,13;
114:6;115:6;116:18
**missing (20)**
37:6,13,21;39:7;
41:15;52:18;54:11,
14;55:3,7,15,16,19,
20;56:6,11,20,23;
60:12;109:18
**mom (2)**
74:16;78:1
**moment (1)**
38:11;79:19;80:2
**Montini (1)**
4:11
**more (11)**
22:18;55:18;67:8;
107:11;119:2;121:2,
3,4,8,10;124:19
**morning (4)**
5:13;52:19;53:10;
77:6
**most (1)**
25:3
**mother (10)**
31:20;41:6,10,15,
21;70:1;72:4,21;
98:23;106:11
**mother's (1)**
40:14
**mouth (2)**
91:5,5
**move (1)**
82:18
**moving (4)**
65:3,7;74:18;
107:12
**Mrs (10)**
23:23;24:9;35:23;
43:16,18;59:15;61:1;
68:25;73:11;93:24
**much (4)**

18:18;24:18;25:17;
98:5
**multiple (3)**
107:25;111:8;
118:2
**Muslim (1)**
46:4
**must (2)**
55:25;70:7
**myself (1)**
70:10

## N

**name (20)**
4:13;5:13,16,24;
6:16;26:22;29:3;
30:16,17,17,19;31:7,
9;35:3,3;41:4;97:19,
21;98:18;104:14
**names (1)**
26:11
**near (1)**
48:12
**necessary (12)**
56:13;64:1;79:1;
86:8,17,19;87:5,18;
88:8,11,13;91:13
**need (22)**
8:5;38:24;43:17;
45:21;46:3,4;57:2;
64:22;65:9;79:6;
82:24;85:12;91:2,13;
92:1;97:6,8,9;
101:22;109:22;
112:11;113:11
**needed (19)**
68:11,13;74:1,5,
22;78:20,20;80:16;
81:20;84:1,5,11;
85:14;87:24;88:16;
92:24;93:13;108:18;
110:3
**needing (2)**
79:8;84:15
**needs (2)**
60:2;75:1
**neglect (15)**
35:11,17;37:19;
38:13,19;39:4;56:6,
7;66:21;76:24;77:8,
12,21;93:13;98:15
**neglected (1)**
38:6
**neglectful (2)**
77:3,7
**neighbors (1)**
16:13
**neurological (1)**
19:14
**neutral (1)**
86:25
**new (1)**

19:10
**next (6)**
21:22;36:12;39:11;
96:25;109:1;112:5
**night (12)**
41:14;44:4;48:7;
49:4,10;53:9;56:4;
71:18;74:4,12;77:5,6
**normal (1)**
110:8
**North (1)**
4:15
**note (2)**
15:19;112:17
**notes (36)**
12:25;13:3,12,13,
13,16,18,23,25;14:4,
5,9,11,15,18,21,23;
15:9,10,13,15,17,18;
16:13,16,21,25;17:4,
10;28:9;29:12;32:7,
20;34:15;75:25;96:8
**notice (5)**
89:5,12,25;103:7;
126:1
**notices (2)**
103:17;110:11
**notified (1)**
52:12
**nourished (3)**
31:16;32:5,14
**Number (12)**
4:6;9:17,19,24;
11:18;29:7;31:1;
33:12;42:24;57:1;
97:4;112:14
**numbers (3)**
30:23,24;43:10
**numerous (1)**
19:8

## O

**object (5)**
25:1;45:24;85:10;
108:16;120:5
**objection (1)**
45:13
**objects (1)**
25:5
**observation (2)**
34:22;110:1
**observations (3)**
59:4;93:9;109:21
**observe (4)**
70:3;77:23;78:13;
106:18
**observed (7)**
25:17;26:13;35:13,
17;59:20;75:9;
106:23
**observer (1)**
67:19

**observing (6)**
26:9;35:20;67:16,
18,21;109:12
**obviously (7)**
21:1,4;67:20;
98:17;103:17;
113:10;117:7
**OC (1)**
66:1
**occasionally (1)**
92:2
**occur (1)**
19:22
**occurring (1)**
123:21
**OCWI (33)**
8:11,15,22;9:7;
10:21;11:3,22;12:11,
14;16:12;20:12,14;
22:2,19;23:13;31:14;
39:3;61:11;63:7,20;
65:5;66:1,3,11,13,15;
81:13;110:14;111:6;
126:13,14,15,21
**off (12)**
27:25;41:21;51:25;
52:1;83:4;92:9;
96:14;109:16;
111:20;114:23;
119:6;123:2
**offended (1)**
6:5
**offender (6)**
44:4;48:8,11,15;
49:4;74:11
**office (13)**
6:18;10:7;13:22;
14:14;15:14;23:1,7,9,
11;52:11,13;53:18;
98:11
**officer (4)**
18:6;42:16;81:4;
111:4
**officers (10)**
10:7,16,21;12:15;
16:12;24:20;41:7;
42:19;125:7,14
**often (4)**
94:16,25;95:10,16
**older (1)**
78:2
**ombudsman's (1)**
98:11
**Once (2)**
18:1;75:2
**one (44)**
17:3;22:14;25:23;
28:20;30:19,20;31:4,
10;33:19;35:5;36:7;
37:12;40:23;50:25;
52:2,11;54:18;57:2;
60:12;66:13,13;89:9;
92:22,25;93:1;95:6;

99:10;103:10,20;
104:8;106:18;
110:21;112:24;
113:3,25;118:24;
119:1,2;120:2;121:3;
122:9,23,25;124:19
**ones (3)**
19:17;26:3;118:24
**only (12)**
15:5;30:17,19,20;
31:6,9,10;35:3,17;
41:4;52:11;122:14
**onto (1)**
109:1
**open (1)**
121:5
**order (2)**
102:10;111:1
**others (2)**
19:16;37:2
**otherwise (1)**
17:24
**out (13)**
17:15;18:1,7,11;
24:8;27:19;28:2;
33:4;36:1;43:17;
44:3;48:7;49:3,10;
63:25;65:10;70:9,9,
11,12,14;74:4,12,22;
77:4,6;79:6;91:14,18,
22;92:6;93:14;
114:16
**outside (3)**
69:24;70:7;107:4
**over (17)**
8:3,16;9:7;10:10;
11:21;20:20;22:25,
25;23:8,12;34:6;
57:2;80:20;81:1;
96:8;98:4;102:18
**overall (1)**
36:24
**own (5)**
43:19;68:25;80:12;
82:16;107:14

## P

**page (31)**
29:25;30:25;31:1;
34:24;35:1;39:12,17;
40:18,25;41:1;43:9,
10;90:19,24;91:1;
100:12,13,14,15;
101:3,4,9,11;104:13,
13;105:22,22;
108:24;109:1,2,2
**pages (2)**
8:2;109:9
**paramedics (7)**
104:8;106:11;
108:8,13;114:1,3;
120:3

**pardon (2)**
82:2;116:14
**parent (5)**
37:6,13,20;38:4;
39:6
**parents (28)**
33:4;36:19,22;
38:12;44:5,6;56:4,
11;60:13;72:24;73:3;
74:21;85:20,25;87:7;
89:20;90:9,23;92:8,
13;93:17;94:3,11,17,
25;98:5,7;109:18
**parents' (4)**
40:11;41:9;88:9;
95:10
**part (20)**
13:4;25:16,22;
32:22;34:21;35:17,
19;36:21,24;40:4;
49:6;56:13;60:14;
66:23;87:24;91:25;
92:1;100:8;104:24;
116:10
**particular (8)**
19:6;46:17;54:20;
58:23;65:13;110:17;
111:7;118:25
**particularly (1)**
126:21
**parts (2)**
65:3,7
**party (2)**
7:2,4
**pattern (1)**
30:8
**PD (4)**
22:19;41:7;44:6;
69:11
**people (7)**
42:15;59:7;65:10;
78:6;99:16;107:25;
108:9
**permission (1)**
65:21
**pers- (1)**
15:12
**person (6)**
45:18;58:23;63:22;
64:11;65:11,14
**personal (17)**
11:12,14;12:17,20,
21;14:9,24;15:19,20,
22;18:24;37:25;
48:14;50:8,13;51:4;
95:6
**personally (3)**
14:1;48:17;68:12
**personnel (2)**
78:18;79:5
**pertain (1)**
19:9
**pertinent (2)**

50:16,17
**PhD (3)**
18:16,19;19:3
**Phoenix (2)**
4:13,15
**phone (11)**
9:14,16,20;10:6,16,
20;11:12,14,18,21;
29:2
**physical (11)**
74:17,19;75:4,8;
76:5,18,23;77:18;
78:7,10,12
**physically (7)**
28:11;70:20;75:9,
15;77:10;90:19;
99:19
**pick (5)**
81:4,6;102:13;
112:25;120:12
**picked (1)**
80:25
**picks (1)**
43:21
**picture (1)**
112:19
**pillow (1)**
56:4
**place (5)**
27:9;31:24;43:4;
88:5;111:10
**placed (2)**
95:20;96:5
**plaintiff (2)**
6:10;7:5
**plaintiffs (3)**
4:6,19;5:14
**plaintiffs' (1)**
4:17
**planner (2)**
15:20,20
**plans (1)**
18:23
**play (6)**
112:8;115:5;
117:12;119:2;
122:15;124:19
**played (18)**
112:15;113:1;
114:8;115:8;116:3,
12,16;117:15;118:8,
10;119:14,23;
120:13;122:21;
123:10;124:9,15,21
**please (11)**
4:16,18;9:4;55:9;
97:1;101:12;105:7,8;
108:24;109:3,13
**plug (2)**
114:15;121:17
**pm (8)**
96:15,19;111:21,
25;114:25;115:1,3;

123:5
**point (44)**
13:22;15:13;28:10;
33:19,24;34:11,18;
42:4;60:6,17,19,25;
61:16;62:2,7;63:11;
65:14;67:23;68:1,24;
69:1,18,19;71:17;
73:18,21;74:15,18;
75:8,19;83:14;86:6;
91:16;100:3;103:6;
104:5,20;105:4,14,
19;108:8;113:15;
117:3;125:19
**points (1)**
82:6
**police (21)**
10:7,21;12:15;
16:12;24:20;52:19;
54:10,11;59:24;
61:11;65:5;71:19;
77:5;79:1;87:6;
110:15,16,18;111:4;
125:7,14
**portion (5)**
96:2;101:15,20;
115:5;117:12
**portions (1)**
112:9
**posed (1)**
113:17
**possibilities (2)**
17:2;64:23
**possibility (3)**
18:1;38:9,23
**possible (1)**
66:16
**possibly (1)**
70:1
**post (1)**
122:12
**post-traumatic (1)**
19:14
**posture-wise (1)**
103:5
**potentially (1)**
107:6
**practice (5)**
14:8;17:14;18:7,8;
86:24
**pray (1)**
47:6
**prayed (5)**
41:16;42:5,10;
44:15;47:1;49:12
**preparation (1)**
29:16
**prepare (2)**
23:15;24:16
**prepared (3)**
91:12,17;92:13
**prepares (1)**
36:18

**presence (2)**
98:23;105:11
**present (14)**
6:23;26:7;35:2;
42:3,7,11,12,13;
70:25;71:2;89:3,10;
104:16;106:14
**Pretty (5)**
18:18;19:4,21;
24:18;98:5
**prevention (2)**
19:13,13
**previously (3)**
29:7;100:9;102:10
**primarily (1)**
4:25
**print (2)**
17:15;18:7
**printed (2)**
18:11;98:18
**prior (21)**
12:3,11;19:22;
20:7,14,22;21:7,7,13;
30:1,3;52:16;56:18,
24;62:17;74:14;
91:14,17;111:16;
118:24;125:5
**privacy (1)**
19:11
**privileged (2)**
25:4;28:4
**probably (6)**
11:3;33:6,23;96:9;
113:23;121:21
**problem (1)**
6:6
**proceed (1)**
82:24
**proceeding (2)**
7:3,3
**production (1)**
122:12
**professional (10)**
19:10;51:4,6,8,11;
79:13;80:15;81:20;
95:5;96:4
**professionals (2)**
74:5;79:25
**prompted (2)**
84:12;115:22
**prosecute (1)**
126:24
**prosecutor (1)**
126:24
**protect (1)**
51:23
**provide (6)**
28:14;82:22;98:23;
99:15,19;103:23
**provided (15)**
9:22;23:17;28:7,
15;32:9;54:5;63:1;
76:11;83:21;93:11;

98:21;100:6;101:19;
103:17;110:22
**provides (4)**
100:21;101:16,21;
105:10
**proximity (1)**
108:4
**psychology (4)**
18:14,15,21,22
**pull (2)**
65:10;123:1
**pursuant (1)**
89:4
**put (9)**
14:18;18:7,11;
33:12;34:15;36:21;
50:19;82:13;91:5
**putting (1)**
32:6

## Q

**quick (3)**
111:19;114:19;
123:1
**quite (4)**
19:20,20;107:1;
114:15
**quote (5)**
41:16,16,16,17;
86:1
**Quran (1)**
46:24

## R

**ran (4)**
36:25;53:6,7;56:21
**rather (2)**
60:8;110:14
**read (10)**
45:9;96:1,3;
101:10,15;102:2;
105:7;108:25;109:5,
9
**ready (4)**
91:12;92:7;97:11;
103:10,21;113:18,22;
122:15
**reality (1)**
38:2
**really (3)**
111:18;121:3,9
**re-ask (1)**
9:3
**reason (3)**
54:20;73:3;90:22
**recall (79)**
6:16;9:24;10:12,
14,15,19,24;11:1;
12:12,16;17:2;24:14;
25:9,12;26:17,23,24;
27:24;33:24;34:17;

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 268 of 333
Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

36:10;42:14;48:13;
52:25;53:21;54:8;
56:22;57:7,13;61:2,
3;62:5,9,11,25;63:2,
4;64:8;68:21;69:16,
18,23;70:12,15;73:5,
10,12;80:7,8;81:2;
83:3,13;84:8,19;
85:24;90:14,17;92:5;
98:20;99:9,12;
101:17;104:11,16,19;
106:20;107:10,16,22;
108:2,6,8,17;113:8,
19,21;125:6,9,16
**recalled (1)**
  100:2
**receive (2)**
  17:25;18:5
**received (4)**
  17:17;18:10;48:20,
  22
**receiving (1)**
  91:17
**recently (1)**
  29:21
**recess (5)**
  52:3;96:16;111:22;
  114:25;123:4
**recognize (1)**
  97:17
**recognized (1)**
  115:11
**recognizing (1)**
  105:18
**recollection (18)**
  11:2;14:3;16:15;
  42:18;52:10;53:9;
  59:6;62:24;63:17;
  64:19;69:3,21,25;
  77:25;84:2;90:11;
  111:12;113:23
**recommendation (3)**
  62:4,8;108:14
**record (18)**
  4:4,17,24;45:10;
  51:25;52:1,5;96:2,14,
  18;97:7;111:20,24;
  112:9;114:23;115:2;
  123:2,6
**recording (10)**
  23:18,20,22,24;
  24:13,16;85:3;100:1;
  105:18;123:20
**recordings (2)**
  25:14;28:9
**records (1)**
  28:13
**refer (5)**
  7:15,15;30:14;
  55:10;102:4
**reference (6)**
  31:23;39:6;106:18;
  116:23;117:17;

118:11
**referencing (1)**
  102:8
**referred (4)**
  26:20;61:9;78:18;
  85:3
**referring (14)**
  6:13,15;7:16,18;
  13:3;16:4;23:24;
  25:24;29:11;30:4;
  40:16;45:2;55:4;58:5
**refuse (1)**
  126:3
**refused (5)**
  37:1;103:8,10;
  125:18,24
**regard (1)**
  109:22
**regarding (7)**
  16:8,14;17:20;
  18:5;28:9;71:18,19
**related (2)**
  7:20;19:5
**relating (1)**
  117:23
**relationship (1)**
  126:14
**relative (1)**
  108:4
**released (1)**
  105:12
**relevant (2)**
  50:11;51:1
**religion (20)**
  39:13,21;40:7;
  44:24;45:1,2,15,18,
  20;46:3,10,18;48:1,3;
  50:20;51:12;94:17,
  25;95:11,20
**religious (12)**
  44:8,10,13,18,22;
  45:23;46:8,13,13;
  47:14,21;50:18
**reluctant (1)**
  74:21
**relying (1)**
  48:20
**remember (14)**
  54:9;63:13;65:12;
  68:16;79:23;86:1;
  99:3;104:5;105:17;
  108:11;113:5;114:4,
  5;123:21
**remind (1)**
  97:8
**remotely (1)**
  26:13
**removal (2)**
  90:22,22
**remove (6)**
  86:8,13,17,19;87:6,
  18
**removed (1)**

80:20
**repeat (1)**
  109:24
**replay (1)**
  124:13
**report (34)**
  23:4;30:9;37:6,13;
  39:6;41:8,20;49:3;
  50:19,20;51:17,18;
  54:24,24;55:2,3,4,5,
  6,10,14,15,17,18;56:6,
  10,13;57:23,23;58:3,
  4,7,14;75:25;76:23
**reported (4)**
  31:19,20,21;41:15
**reporter (8)**
  4:11;5:4,8;6:23;
  37:16;38:12;45:9;
  97:3
**reporting (1)**
  52:18
**reports (5)**
  30:3;66:7,19,20,23
**requested (1)**
  96:2
**requirement (1)**
  39:6
**requires (2)**
  37:5,13
**resistant (2)**
  36:25;41:10
**respect (4)**
  38:13;51:15;67:3;
  79:8
**responding (1)**
  113:19
**response (4)**
  26:18;79:2;95:9;
  113:21
**responsibility (1)**
  37:20
**rest (1)**
  74:24
**restate (1)**
  95:24
**reveal (2)**
  28:3;76:2
**review (1)**
  121:6
**reviewed (5)**
  23:17;24:15;27:6;
  29:21;100:1
**rewrite (1)**
  93:1
**rewritten (4)**
  91:7;92:4,10,17
**rid (1)**
  8:4
**right (65)**
  13:19;21:1;26:12;
  27:21;30:20;31:7,11,
  25;32:11;33:9;34:12;
  35:24;38:14;40:5,15;

41:4,18;43:25;45:13;
46:6;47:7,17;48:25;
49:5,7,23;50:3;55:13,
19;58:24;60:11,12;
61:2,12;66:1,15;67:4,
6,16,18;70:22;72:7,
11;74:12;77:5,10,18;
78:7;79:17;83:15;
84:13;86:7;87:17;
91:3,25;92:23;93:3;
94:5;103:4;105:12;
111:19;112:13;
118:12,22;119:17
**right-hand (1)**
  43:11
**rights (1)**
  98:7
**risk (6)**
  19:11;36:13,16;
  39:19;95:21;96:5
**Road (2)**
  4:12;74:12
**role (14)**
  21:17,22,24,25;
  22:2;42:1;61:4;
  63:15,16,20;66:2,10;
  71:21,23
**roles (3)**
  22:7;65:4;66:14
**rolling (1)**
  118:23
**room (20)**
  26:8,9;29:2;31:25;
  33:18;34:7;70:21;
  71:2;93:12;107:2,3,4,
  11,15,21,21,23;
  108:10;119:18;124:3
**rough (1)**
  53:17
**run (2)**
  36:16;53:9
**running (2)**
  36:17;61:16
**runs (3)**
  36:18,20,23
**Russo (3)**
  26:13,15;81:4
**Ryan (2)**
  6:14;26:22

**S**

**safe (1)**
  27:2
**Safety (8)**
  8:9;19:11;61:7,7;
  66:24;73:9;90:1;98:8
**Safety's (1)**
  98:3
**salutation (1)**
  70:18
**same (18)**
  10:2;30:7;34:24,

24;49:17;62:6;70:21;
79:15;99:8;100:25;
102:7;104:12;114:7;
124:11,24;125:1,10,
22
**Sara (13)**
  11:6;24:10,11;
  57:15;68:4;81:7;
  82:4;83:2;90:3,6,8,
  15;102:6
**sat (1)**
  13:22
**saw (2)**
  25:17;113:10
**saying (13)**
  43:18;51:17;60:15;
  70:9;77:16;78:19;
  80:1;88:3,7;101:17;
  102:19;105:5,24
**scenarios (1)**
  60:11
**scene (10)**
  15:10,25;16:5;
  59:10;63:11;67:8;
  69:20;75:22;78:19;
  80:19
**Schern (122)**
  4:19,19;5:12,13;
  13:9;24:24;28:21;
  33:21;36:5;37:11,17;
  38:3,10,17;39:1;
  40:2;42:23;43:1,2;
  44:21;45:5,8,12,16,
  21;46:1,6,7;47:9,16,
  24;49:21;50:1,5,9,14;
  51:5,21,24;52:7;
  53:11;54:6,19;55:1;
  56:8;58:10;59:2,19;
  60:5,23;61:15,20;
  62:1,13,14;64:2,9;
  65:1,22;66:8;67:2,
  13;69:17;71:14;72:2,
  17;73:7;75:11,21;
  76:7,15;77:1,22;
  79:14;80:4,10;81:10,
  24;83:10,18;84:9;
  85:1,16;86:3,15;87:1,
  11;88:1,18;89:2,23;
  93:15,22;94:15,22;
  95:7,17;96:1,7,12,20;
  97:22;99:8,24;
  102:24;103:8;
  104:17;105:10;
  108:16;114:13,15,18,
  21;120:5,14;121:1,
  11,16;122:1,17;
  125:12;126:8
**school (5)**
  65:10;80:19,20,25;
  87:3
**scratch (1)**
  98:14
**searching (7)**

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 269 of 333
Bentley vs.
City of Mesa
Videotaped
Cristina Baggen
March 6, 2019

**second (11)**
24:8;32:12;39:18;
92:22;112:24;
114:22;117:13;
118:7,7;119:13;
120:1
**seconds (8)**
112:18,25;113:4,
25;114:7;115:7;
116:19;124:14
**secretary (1)**
14:2
**Section (9)**
29:25;30:18;34:19;
35:2;36:14;40:19,22;
41:8;56:2
**seeing (3)**
109:18;113:8;
114:4
**seem (2)**
43:23;91:21
**seemed (3)**
91:7;109:12,19
**select (1)**
114:16
**send (1)**
17:25
**sent (1)**
81:15
**sentence (5)**
32:13;36:22;39:11,
20,23
**sentences (1)**
41:12
**separate (4)**
55:17;58:13;
107:13;126:13
**Sergeant (13)**
24:5,6;62:6,7;
113:14,17;117:8;
118:11,21;119:18;
123:18;124:12;125:2
**serial (1)**
27:19
**series (1)**
30:23
**serious (1)**
126:22
**seriously (1)**
20:15
**serve (5)**
89:22;92:15;
103:10;110:16,23
**served (12)**
15:23;90:22;91:3,
10;110:12,12,18,22;
117:21;124:11;
125:19;126:1
**service (6)**
14:15,17,20;
117:23;125:7,15

**Services (1)**
110:14
**set (2)**
121:16;122:18
**several (4)**
42:19;91:7;92:5,11
**severity (3)**
43:24;44:1;79:21
**sex (6)**
44:4;48:8,11,15;
49:4;74:11
**sexual (4)**
19:15,15;72:4,20
**shadowing (2)**
67:9,21
**Sheriff's (1)**
65:6
**shift (1)**
9:7
**short (2)**
96:8;122:24
**show (1)**
23:4
**showed (1)**
101:1
**shows (1)**
63:11
**shredded (6)**
14:7,9,12,16;
15:23;17:7
**shredder (1)**
14:18
**shredding (3)**
14:15,16,20
**shreds (1)**
14:17
**siblings (1)**
78:2
**side (1)**
33:6
**signature (4)**
30:13;97:19,21;
98:17
**signs (1)**
78:10
**simply (2)**
38:18;44:14
**sincerity (1)**
78:3
**sisters (1)**
31:20
**sit (1)**
15:14
**situation (14)**
43:24;44:2;53:2,
19,25;54:1;57:16,20;
58:23;60:8;61:21;
71:18;79:21;110:9
**Six (1)**
123:7
**skipping (2)**
8:3;28:1
**slash (7)**

16:17;39:13,21;
40:6,7;44:24;46:11
**sleep (3)**
41:14;48:5;49:19
**slip (1)**
6:4
**small (1)**
78:15
**smart (1)**
36:18
**Soccer (1)**
20:25
**solid (2)**
57:1,2
**someone (10)**
11:17;29:1;41:23;
48:21;58:17,21;
63:19;64:15;65:8;
85:19
**sometime (1)**
94:2
**somewhere (2)**
88:9;93:2
**son (1)**
43:17;44:16;47:7;
49:12;84:5
**soon (3)**
14:11;60:7,8
**sooner (1)**
28:2
**Sorry (12)**
4:25;6:1;18:19;
34:9;39:16;40:4,6;
43:7;63:4;66:17;
72:15;100:18
**sort (1)**
88:21
**sounded (1)**
115:12
**sounds (1)**
39:3
**source (4)**
121:24;122:4,11,
18
**South (1)**
4:10
**speak (4)**
33:14;53:25;65:20;
76:11
**speaker (7)**
100:20;101:3,14;
105:14,24;114:16;
119:5
**speakers (3)**
121:17,24;122:18
**speaking (3)**
54:8;68:16;113:10
**speaks (1)**
33:13
**specialist (5)**
4:14;21:18,21;
22:9,10
**Specialists (1)**

4:15
**specialized (2)**
22:17,22
**specific (9)**
19:24;22:16;26:11;
33:20;36:10;80:7;
84:8;86:2;94:1
**specifically (4)**
10:15;56:22;70:1;
108:11
**specifics (11)**
10:12;11:1;37:9;
39:8;61:3;64:8;
68:19;73:5;85:24;
108:17;113:8
**Spelled (1)**
11:9
**split (1)**
24:8
**spoke (8)**
16:16,23;32:2;
33:7;59:12;68:3,7;
74:13
**spoken (1)**
7:24
**sport (1)**
20:24
**sports (1)**
20:23
**squirming (1)**
110:6
**staff (1)**
101:21
**staffed (7)**
82:9,9,10,18,21;
92:7;103:13
**Staffing (5)**
82:22;91:20;102:4,
8,18
**standard (1)**
17:14
**standing (4)**
68:18;107:16;
118:15;119:17
**Stapley (1)**
4:10
**start (6)**
20:20;21:12;43:12,
12;91:22;119:12
**started (2)**
20:21;21:16
**starting (5)**
4:17;114:6;115:6;
116:2;124:14
**State (8)**
6:24;8:9,10;27:24;
50:19,21;51:16;
102:16
**stated (3)**
46:8;48:4;95:3
**statement (2)**
32:12;80:14
**States (2)**

4:8;41:6
**stating (2)**
40:11;72:5
**stats (1)**
54:18
**status (2)**
125:7,14
**statutory (1)**
39:6
**stay (1)**
77:4
**stepped (1)**
24:7
**stick (1)**
76:22
**still (13)**
8:10;22:22;25:6;
44:8,9;45:11,24;
46:9;79:22;108:21;
113:24;116:9;117:4
**stomach (1)**
78:5
**stood (1)**
35:25
**stop (1)**
43:25
**stopped (11)**
41:13;44:5;46:16;
47:11,20;49:19;56:5;
95:4;113:3;116:18;
119:25
**stopping (2)**
116:4;124:23
**Stoutner (105)**
5:1,1;33:17;36:4;
37:7,14,23;38:8,22;
42:22;44:20;45:4;
47:8,15,22;49:14,24;
53:3;54:2,16,22;
55:24;58:9;59:18;
60:1,21;61:13,18,22;
64:16;65:17;67:10;
69:13;71:8,25;73:4;
75:5;76:6,19;79:10;
80:3;83:7,16;84:7,
22;86:12,22;87:8,22;
88:14,24;89:19;93:7,
19;94:13;96:23;
97:11,14;105:3;
108:20;110:10;
111:18;112:3,16,24;
113:2;114:9,14,17,
19;115:4,9;116:1,4,6,
13,17;117:16;118:9;
119:4,7,10,12,15,24;
12,20;122:2,6,10,14,
20,24;123:8,11,17;
124:6,10,16,22;126:4
**street (1)**
11:9
**stuff (1)**
27:25

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 270 of 333

Bentley vs.                                              Videotaped                                    Cristina Baggen
City of Mesa                                                                                          March 6, 2019

styled (1)
    4:6
subcategory (2)
    30:1;31:3
subject (1)
    25:21
submit (2)
    26:21;27:8
submitted (3)
    110:12,13;124:2
sudden (1)
    34:3
suffering (1)
    76:18
suggest (1)
    121:3
Suite (1)
    4:10
Sunday (1)
    46:20
superiors (3)
    10:7,16,21
supervision (1)
    44:4
supervisor (30)
    11:2,4;12:14;24:7;
    28:16;54:4;57:15;
    58:18;67:24;68:3;
    82:1,3,11,22;90:3,5;
    91:21;92:7;101:22;
    102:5,7,8,18;103:13;
    111:1,2,3,5,6,8
support (3)
    63:18,20,21
supporting (1)
    63:19
sure (21)
    10:13,19;15:2,4;
    20:1;39:17;40:13;
    55:9;63:5;65:2;
    79:24;80:13;82:19;
    84:12;87:2;91:19;
    96:1;106:22;109:25;
    119:10;121:15
surmise (1)
    41:2
surprise (1)
    34:2
surrounding (1)
    74:2
swear (1)
    5:4
sworn (1)
    5:7
synopsis (1)
    56:1
system (3)
    17:22,23;98:9

**T**

table (1)
    92:9

tag (1)
    57:4
Tait (11)
    6:14;26:22,22;
    27:3,10;43:4,13,21,
    25;78:23;79:16;82:7,
    17;92:4
talk (9)
    16:6;35:24;43:16;
    65:10,19;71:12,16;
    97:8;98:9
talked (3)
    20:12;64:22;
    126:20
talking (25)
    7:22;13:7;15:5;
    16:17;22:20;33:3;
    55:2;65:12;67:3,5,6;
    70:1,24;82:11;87:17;
    105:2;107:16;108:8;
    118:22;120:2,6,10,
    19;125:11;126:12
talks (1)
    98:10
Talon (72)
    16:23;25:20,20;
    26:7,13;27:19;31:14,
    15,17,18,19,24;32:3,
    13;33:1,9;34:1,11;
    35:9;36:16,18,20,23;
    40:14;41:10,14,17;
    42:5;46:15;48:4;
    49:18,22;56:3;64:4;
    68:9;69:20;70:3,11,
    17;71:1,5,6,22;72:3,
    19;73:19;74:13;
    75:16,19;77:3;78:20;
    79:8;81:14;83:4,19;
    86:18;90:8;92:12,14;
    93:13,24;94:11;
    101:22,24;102:19,21,
    25;106:10;108:14;
    111:16;125:13;126:1
Talon's (5)
    25:25;34:3;93:9;
    109:12;110:2
tape (1)
    24:12
TCN (29)
    15:22;16:4;90:10,
    12,19;91:1,2,11,23;
    92:15;110:18,22;
    113:15,18,22;116:21;
    117:4,17,21,24;
    118:2,11,18,23;
    119:19;124:1;125:7,
    15,19
TCNs (1)
    110:16
telephone (2)
    10:11;11:18
telling (2)
    79:13;105:11

temporary (9)
    89:4,12,24;103:7,
    17;110:11;111:9;
    118:2;126:1
ten (3)
    89:7;96:13;112:14
terminology (1)
    107:17
terms (7)
    103:15;107:8;
    109:11,20;110:11;
    112:11;115:18
testified (7)
    5:9;6:25;29:11;
    38:11;45:7,15,18
testimony (10)
    12:10;35:4,12;
    42:3;52:17;81:3,5;
    99:23;104:1;126:21
texted (1)
    17:1
Thankfully (1)
    49:25
thinking (1)
    55:17
though (2)
    20:7;60:17
thought (3)
    38:1;69:11;72:16
thoughts (1)
    104:9
three (6)
    20:19;25:19,19;
    29:19;96:19;111:21
throughout (1)
    78:17
times (7)
    61:10;78:17;89:3;
    91:7;92:5,11;118:2
timing (1)
    112:10
titled (1)
    112:4
today (7)
    7:12,15;22:25;
    23:16;24:17;29:16;
    78:17
Today's (1)
    4:9
together (2)
    52:20;61:24
told (24)
    31:9;32:21;36:2;
    40:14;41:17;42:5,10;
    44:15;46:15;47:6;
    48:4,11;49:18;50:2;
    53:5,7;61:1;64:20;
    80:15;81:20;83:13;
    84:5;94:9;95:4
tongue (1)
    66:18
took (6)
    15:8;27:9;29:11;

31:24;43:4;70:15
top (5)
    35:1;39:18;41:1;
    98:13;119:8
track (2)
    31:18;32:15
trafficking (1)
    19:15
train (1)
    72:15
trained (3)
    19:17;20:7;64:12
training (6)
    39:3,5;78:7;
    109:17,21,25
trainings (8)
    19:8,11,11,11,12,
    12,12,13
transcribed (1)
    29:12
transcript (10)
    43:3;100:2,6,7,11,
    14;101:16,19;
    105:10;108:22
transcription (1)
    112:11
transition (3)
    8:15,21;11:22
transport (6)
    81:22;104:3;113:7,
    11;116:10;125:22
transportation (1)
    125:25
transported (4)
    65:11;83:20,22;
    111:16
tricky (1)
    55:12
triplicate (1)
    91:24
truth (2)
    5:8,9
truthful (1)
    27:4
try (6)
    23:18;114:17;
    121:3,17;122:17,19
trying (8)
    9:6;24:8;51:11;
    55:22;77:13,14;
    109:18;110:6
turn (10)
    11:21;30:22,24;
    34:23;43:9;78:5;
    100:13;101:9;
    104:12;108:24
turning (2)
    8:2;105:22
twice (1)
    12:3
twister (1)
    66:18
two (17)

8:16,18;9:8;22:7;
    26:3;29:19;30:25;
    34:25;40:1;52:6;
    60:11;71:7;78:2;
    80:18;96:15;121:22;
    122:14
type (8)
    16:7;22:16;62:16;
    71:12;72:4;76:18;
    112:12;126:22
types (3)
    6:23;22:12;25:5
typical (2)
    109:17;110:25
Typically (3)
    17:14;42:1;110:23

**U**

ultimate (2)
    65:11;102:20
ultimately (6)
    91:9;103:23;104:3;
    107:5;108:12;125:17
um (1)
    101:23
under (2)
    56:6;85:18
underneath (1)
    30:10
understood (1)
    99:17
unidentified (5)
    100:20;101:3,14;
    105:13,24
unit (2)
    22:17,22
United (1)
    4:8
unknown (2)
    23:18,19
unless (5)
    25:3,3;65:20;
    67:15;122:12
unsafe (4)
    37:19,22;38:14,20
unsupervised (2)
    48:8;56:3
unusual (4)
    109:13,14,19;
    110:5
up (28)
    6:4;19:25;23:4;
    32:24;34:12;35:1;
    42:2;43:21;49:22;
    63:11;72:10;80:20,
    25;81:4,6;91:13;
    101:12;102:13;
    103:16;105:8;109:3;
    112:25;118:2;
    120:12;121:18;
    122:13;123:1;125:11
upon (2)

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 271 of 333

Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

26:25;87:16
**upper (1)**
  43:10
**urgency (1)**
  79:17
**use (6)**
  10:6;11:14;12:13;
  13:13;14:11;107:17
**used (8)**
  10:16,19;11:18;
  12:21;14:14,15;17:3,
  10
**using (2)**
  98:20;102:14

## V

**vague (1)**
  46:2
**various (1)**
  41:7
**vehicle (4)**
  53:15,19;102:16;
  106:7
**verbally (3)**
  32:9,10,21
**versus (1)**
  4:7
**via (1)**
  54:12
**vibrating (1)**
  119:5
**victim (8)**
  31:3;72:3,6,20,23;
  76:5;89:1;95:15
**Video (31)**
  4:14,14;24:20;
  25:7;26:10,14;112:6,
  10,15;113:1;114:7,8;
  115:8;116:3,12,16;
  117:15;118:8;
  119:14,23;120:13,18;
  121:2;122:3,7;
  123:10,12;124:9,15,
  21;125:1
**VIDEOGRAPHER (22)**
  4:4;5:3;52:1,5;
  96:14,18;111:20,24;
  112:23;114:23;
  115:2;119:3,5,8,11;
  121:23;122:4,8,11,
  21;123:2,6
**videos (1)**
  28:9
**videotaped (1)**
  4:5
**view (2)**
  26:6;125:1
**violence (1)**
  19:12
**visible (2)**
  31:18;32:16
**visit (1)**

106:18
**voice (7)**
  10:10,13;23:19;
  115:11,12;117:8,10

## W

**walk (3)**
  33:18;70:10;107:4
**walked (2)**
  34:6;70:8
**walking (2)**
  44:5;107:7
**wants (1)**
  87:14
**watched (2)**
  120:17,18
**watching (1)**
  120:8
**way (10)**
  8:15;49:23;50:25;
  64:1;79:22;86:8;
  101:11;103:16;
  105:6;107:11
**wearing (1)**
  42:16
**weather (2)**
  31:17;32:15
**weren't (12)**
  31:25;43:14,22;
  70:25;71:2;72:6;
  77:9,17,18;79:20;
  81:14;88:21
**what's (7)**
  4:21;45:5,12;66:9,
  11,13;71:10
**Wherever (4)**
  33:5;59:11;67:17;
  70:8
**whichever (1)**
  64:1
**whole (2)**
  59:23;60:24
**Who's (2)**
  61:21;65:11
**wind (1)**
  58:23
**within (3)**
  44:5;104:12;
  106:25
**without (4)**
  19:25;87:6;88:9;
  105:12
**WITNESS (84)**
  4:22;5:4,7;6:11,25;
  13:7;28:19;33:18;
  37:9,15,25;38:9,16,
  23;39:25;49:17,25;
  50:8,13;51:3,22;
  53:4;54:3,17,23;
  55:25;59:1;60:2,22;
  61:14,23;63:25;64:8,
  18;65:18;66:6;67:11;

69:15;71:10;72:1,15;
73:5;75:7,18;76:10,
22;77:20;79:11;80:7;
81:19;83:8,17;84:8,
23;85:12,24;86:13,
23;87:10,23;88:16,
25;89:20;93:8,20;
94:14,20;95:3,14,24;
96:4,11;101:13;
105:1,9;108:17;
109:4;110:5;115:24;
120:6;121:6,7;
123:16;124:5
**words (2)**
  33:23;91:5
**work (17)**
  9:14,17,20;10:6,
19;11:15,18,25;
14:25;22:19;23:5;
63:6,6;98:7;106:6;
114:18;121:18
**worked (7)**
  20:15,16,17;21:5;
56:15,23,25
**worker (1)**
  116:24
**workers (5)**
  10:21,21;12:14;
16:12,12
**working (10)**
  9:7;21:2,4,13,16;
22:8;65:13;94:16;
97:9;121:4
**works (1)**
  63:7
**write (2)**
  47:19;91:22
**writing (2)**
  16:7;98:13
**written (5)**
  56:1;91:6;92:4,6;
100:8
**wrong (2)**
  60:14;116:14
**wrote (9)**
  30:20;31:10;35:5;
39:12;47:13,13,20;
49:2;92:25

## Y

**year (2)**
  21:20;27:19
**years (5)**
  8:16,18;9:8;29:19,
19

## 1

**1 (11)**
  15:6;19:23;22:21;
23:1;29:25;56:24;
61:4;62:3;63:5,7,15

**1:17 (1)**
  111:21
**1:17 pm (1)**
  111:22
**1:30 (1)**
  111:25
**1:30 pm (1)**
  111:23
**1:35 (2)**
  114:23,25
**1:37 (2)**
  115:1,3
**1:58 (1)**
  123:2
**1:58 pm (1)**
  123:4
**1:59 (2)**
  123:5,7
**10 (6)**
  112:4;113:4,25;
114:7;115:6;116:15
**10:30 (4)**
  31:14;33:1,8,9
**10:40 (1)**
  41:10
**10:58 (2)**
  52:2,3
**11 (7)**
  100:15,17,18;
101:4;117:13;118:6;
119:22
**11:03 (1)**
  116:11
**11:21 (2)**
  52:4,6
**12 (1)**
  116:18
**12:36 (1)**
  96:15
**12:36 pm (1)**
  96:16
**12:49 (1)**
  96:19
**12:49 pm (1)**
  96:17
**12-minute (1)**
  116:15
**132 (1)**
  4:10
**14 (1)**
  104:13
**15 (1)**
  118:6
**16 (9)**
  42:23,24;43:1;
90:18,25;91:1;
108:21;114:6;115:7
**1640 (1)**
  4:10
**17 (14)**
  6:14;9:11;20:19;
97:2,4,15;98:12;99:2,
20;101:1,9,11;

108:24;109:1
**18 (3)**
  109:2;113:4,25
**19 (2)**
  104:13,13
**19th (4)**
  27:9,14,18;43:4
**1A (1)**
  30:18
**1st (23)**
  7:17;8:7,17;9:13;
11:5,11,19;12:7,10;
15:10;20:7,7,8;
34:11;52:8;56:18;
85:7;97:24;99:17;
103:16;107:17;
123:21;125:10

## 2

**2 (1)**
  40:18
**2:00 (1)**
  56:5
**2:17-cv-00966-DJH (1)**
  4:6
**20 (10)**
  33:12,14;57:2;
100:14,15;101:4,10;
105:22;119:25;124:7
**2012 (3)**
  20:21;21:12,17
**2016 (35)**
  7:17,18;8:7,17;
9:13,20;10:5;11:5,11,
19;12:7,11;15:6,10;
19:23;20:8;22:21;
23:1;34:11;43:5;
52:8;56:18,25;61:4;
62:3;63:5,8,16;85:7;
97:24;99:18;103:16;
107:17;123:22;
125:10
**2017 (5)**
  9:9,11;27:9;43:6,7
**2018 (2)**
  8:22,23
**2019 (2)**
  4:1,5,9
**20-second (1)**
  124:7
**21 (3)**
  101:10;105:6;
117:13
**21-minute (1)**
  117:13
**23 (1)**
  112:25
**2398 (1)**
  4:12
**24 (3)**
  7:8;116:19;118:6
**25 (1)**

Case 2:17-cv-00966-DGC   Document 140-1   Filed 09/20/19   Page 272 of 333

Bentley vs.
City of Mesa

Videotaped

Cristina Baggen
March 6, 2019

118:7
**25-second (1)**
124:20
**27 (1)**
124:14
**29 (1)**
119:25
**29-minute (1)**
119:22

### 3

**3 (1)**
29:7
**3:12 (1)**
31:8
**30 (1)**
112:17
**3033 (1)**
4:15
**35-second (1)**
124:23

### 4

**4 (1)**
109:2
**4/1/16 (4)**
31:13;33:1;35:9;
41:6
**4/20/2016 (1)**
31:8
**44 (1)**
117:13
**46 (1)**
43:9

### 5

**5 (3)**
40:25;124:7,14
**53-second (1)**
123:9
**56 (1)**
118:7
**58 (1)**
119:13
**59 (1)**
56:2

### 6

**6 (10)**
4:1.5;39:12,17;
43:12;100:9,9;
104:13;122:25;
123:8;125:2
**61 (4)**
31:1,2;90:25;91:1
**62 (1)**
90:19
**63 (2)**
40:19;41:1

**64 (2)**
34:25;39:18
**6th (1)**
4:9

### 7

**7 (1)**
109:1
**7-year-old (5)**
41:15;44:3;48:7;
49:20;53:5

### 8

**8 (4)**
39:12,17;40:18,25
**8:00 (1)**
77:5

### 9

**9 (1)**
105:4
**9:19 (1)**
116:2
**9:37 (1)**
116:5
**9:43 (2)**
4:2,9
**911 (1)**
60:15

Exhibit 15

## AFFIDAVIT OF BRIAN WALTERS

STATE OF ARIZONA    )
                      ) ss.
County of Maricopa    )

BRIAN WALTERS, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am a Sergeant with the City of Mesa Police Department.  I was employed in that capacity on April 1, 2016, the date referenced in the Plaintiffs' Complaint.  I have been certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification.

3.      I had been a City of Mesa Police Officer for approximately 22 years prior to this April 1, 2016, incident, and by that date I had received training both in a police academy and as part of continued law enforcement training regarding lawful police work, including entries into a residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine.

4.      By that date, I also received training both in the academy and in continued law enforcement training regarding the parameters of 1st, 4th and 14th Amendment

Constitutional rights held by citizens as to seizures, exceptions to the warrant requirement, and objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

5.      I was dispatched to the Bentley home on the morning of April 1, and it was my understanding from dispatch information that at approximately 8:00 am., the reporting party, Mrs. Bentley, called police to report her minor son missing.

6.      I left our police substation at approximately 8:05 am, and by that time I understood from dispatch information that the missing child was a seven-year-old boy last seen the night prior at approximately 9:15 pm, that the reporting party, Mrs. Bentley, had reportedly been looking for the child since approximately 10:20 pm, and that the child reportedly did not want to do chores last night and ran off or hid.

7.      By approximately 8:18 am, I had arrived at the Bentley home at approximately the same time as Mesa P.D. Officer Jackson, subsequently known as Officer Chopra.

8.      We both approached Mrs. Bentley as soon as we arrived, and she was standing outside of her home near the street.  There, Officer Jackson recorded our initial contact with Mrs. Bentley with her Axon body camera, listed as Axon video number 24 in this case, and during our initial contact with Mrs. Bentley, I was standing next to Officer Jackson, listening to Mrs. Bentley and also asking her questions in an attempt to best focus our efforts on locating her missing child.

9.      Consistent with Axon 24 at :33-1:16 and my recollection while standing next to Mrs. Bentley, I learned from Mrs. Bentley that last night her child did not want to do his

chores, that the child was hiding outside near the front of the house at the time that Mrs.

Bentley had to leave the house at approximately 9 pm, that at about 9:15 pm one of Mrs.

Bentley's other children saw the child again but still saw that he was outside hiding, that

Mrs. Bentley returned home around 9:30 pm, and at approximately 10:15pm Mrs. Bentley

went to the child's bedroom and saw that he was not in bed.

10.    Consistent with Axon 24 at 1:16-1:19 and my recollection while standing

next to Mrs. Bentley, Mrs. Bentley said that once she saw that the child was not in his bed

they then looked for him until 2:30 am: "From then on, we looked 'til about 2:30 in the

morning."

11.    Mrs. Bentley told me that the child's pillow and blanket are missing, and that

she believed he was last wearing tan pants and shirt.

12.    Consistent with Axon 24 at 1:54-2:06 and my recollection while standing

next to Mrs. Bentley, I learned from Mrs. Bentley that the home immediately east of her

home had been checked: "I honestly thought we'd wake up in the morning and we would

find him in their house, and that they just didn't see him even though they looked because

he's good. And when they didn't then we got nervous."

13.    Based on the information I was hearing, I believed Mrs. Bentley was

explaining that she and at least some of her family had searched for the child last night, but

then stopped searching at approximately 2:30 am, and that she slept and woke up this

morning.

14.    Consistent with Axon 24 at 4:15-4:41 and my recollection while standing

next to Mrs. Bentley, I learned from Mrs. Bentley that last week the child told her that he

was going to run away because he did not like doing chores, and that the child would live in fruit trees. Mrs. Bentley said: "But that's the only thing I have to go off him leaving our property. He doesn't leave our property unless he goes to their house." While Mrs. Bentley said "their house," I saw her gesture or point to the immediate house to the east of the Bentley home.

15.     Consistent with Axon 24 at 4:43-5:04 and my recollection while standing next to Mrs. Bentley, I heard Mrs. Bentley say: "At 10:20 is when I knew that he was hiding" and that "at 9, everyone was up a little bit late, so I wasn't so worried yet." Mrs. Bentley continued by saying, "at 10:15 is when I became worried."

16.     Mrs. Bentley continued explaining the timing of events to me, consistent with Axon 24 at 5:04 – 5:24, by saying, "We looked until my husband got home at 2 or a little before 2 from work, and we looked until 2:30. He slept by the front door. We left all our doors unlocked, thinking he would just come back in, but at that point we were pretty sure that he found somewhere warm to sleep because it was cold and he doesn't like the dark; he won't even take the trash out by himself."

17.     Consistent with Axon 24 at 6:02-7:05 and my recollection while standing next to Mrs. Bentley, I asked Mrs. Bentley, "You said he has a history of this or no?" I heard Mrs. Bentley respond to my question: "He's a runner for sure. But since he's gotten older that he never runs far." Mrs. Bentley continued: "He's never left where he's left the premises or – so just Sunday, he got- this is the only thing that's new for him, is- on Sunday at church- we just go to church right on the other side of Baseline and 32nd Street, so it's like a mile, and I have seven kids. And so, he had gotten in and then he was gone. Well my

husband was still at the church. And so I said 'I'm taking everyone home. Look for [T.A].' The next thing we know he showed up here, and he said, 'I just crossed Baseline by myself.'" Mrs. Bentley continued, "So that's new for him." Mrs. Bentley continued: "So, that's the only thing that made us feel like, 'Okay, our scope of where we need to look is bigger now because he just crossed Baseline.'"

18.     Consistent with Axon 24 at 7:08-7:20 and my recollection, Mrs. Bentley told me that police officers could enter her home.

19.     During our search for the child, Officers went to the school that the child attended and confirmed that that the child was not there but that some of the Bentley's other children were present at school.

20.     Based on the conversation with Mrs. Bentley as described above and based on my understanding that the child, T.A., had been missing for approximately 11 hours by then and that no one knew where he was, and based on my belief due to my training and experience, that it was extremely unusual for a mother or father of a missing, young child to stop searching and sleep before calling for emergency responders, I determined that Detectives at the Mesa Family Advocacy Center should be notified, and I did so. By that point, I was extremely concerned for the welfare of the missing child, knowing that he had been missing for 11 hours already and that he was only seven years old. I also believed Mrs. Bentley was extremely calm in light of 11 hours already elapsing.

21.     I notified Sergeant Kaufman at the Mesa Family Advocacy Center and briefed the Sergeant and Detectives by phone, explaining: the child did not want to do his chores and had been missing since approximately 9:15 pm last night; that he was last seen

outside hiding at that time; that at 10:20 pm the mother realized he was not in bed; that she and her family searched inside, searched her yard and searched neighbor's yards; that she confirmed last night that the neighbor's immediately next door to the East looked in their house and did not find him; that her husband, Mr. Bentley, came home from work a little before 2 am; that they searched some more and then stopped, that when they woke up they searched some more and then called the police; that I believed it was unusual that Mrs. Bentley was so calm.

22.     While I was on scene prior to the child being located, I became aware from another Officer that a juvenile sex-offender group home existed just a few houses away from the Bentley home at 1820 South Los Alamos.

23.     Once the Detectives from the Mesa Family Advocacy Center arrived on scene, I participated in a briefing with other Officers where we discussed that a group home for juvenile sex offenders was located 1820 South Los Alamos.

24.     Thereafter, I was aware the Officers continued searching, and that the child was found in the bushes of the neighboring home to the immediate West.

25.     Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.

/     /     /

/     /     /

/     /     /

/     /     /

_SGT Brian Walters_
_____
**BRIAN WALTERS**

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 18th day of September, 2019, by BRIAN WALTERS, in the capacity and for the purposes herein stated.

_Claire Hopewell_
_____
Notary Public

OFFICIAL SEAL
CLAIRE HOPEWELL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
Comm. # 542419 Expires February 25, 2022

Exhibit 16

## DECLARATION OF DARREL PALMER

STATE OF ARIZONA        )
                        ) ss.
County of Maricopa      )

DARREL PALMER, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am an Officer with the City of Mesa Police Department.  I was employed in that capacity on April 1, 2016, the date referenced in the Plaintiffs' Complaint. I have been certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification.

3.      I had been a City of Mesa Police Officer since 1993 with eleven months as a Police Officer with the City of Maricopa prior to this April 1, 2016, incident, and by that date I had received training both in a police academy and as part of continued law enforcement training regarding lawful police work, including entries into a residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine.

4.     By that date, I also received training both in the academy and in continued law enforcement training regarding the parameters of 1st, 4th and 14th Amendment Constitutional rights held by citizens as to seizures, exceptions to the warrant requirement, and objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

5.     At approximately 8:18 a.m., I was dispatched to the area of 3045 E. Inverness in Mesa, which is the address of the Bentley home.

6.     I was dispatched to help locate a missing seven-year-old boy, and I was informed that the boy had been missing since approximately 10:00 p.m. the night before.

7.     I searched the inside of the Bentley home, looking for the child, and when I did so, other police officers were inside the home.

8.     I also searched the large yard of 3026 E. Inverness because the fence gate to the yard was open and the owner told me he keeps the fence gate closed.  While searching this area, I noted that the yard had many hiding spots for a child.

9.     I also searched a business complex at 3130 E. Southern Avenue, and I went to some of the other houses in the neighborhood.

10.     I also went to a residence two houses west of the Bentley home at the intersection of Inverness and the closest cross street to the Bentley home: South Los Alamos.

11.     I was aware from prior police work that a nearby house, listed as 1820 South Los Alamos, was a group home for juveniles and that in my prior experience, some or all of the residents were juvenile sex offenders.

12.    I relayed my understanding that the group home existed and that it included juvenile sex-offender residents to other Officers on scene.

13.    As a result, I was told to search and did search the front and back yard of this address, but I did not find the child there or anywhere else.

14.    I was advised that the child was found at approximately 10:15 a.m. hiding in bushes to the west of the Bentley home and to the east of the juvenile, sex-offender group home.

15.    Within a minute or two minutes, I saw the child's father carrying him from the driveway of the home next door straight toward the Bentley home, and I saw the child pushing off his father or away from his father.

16.    While standing near the front yard of the Bentley home, I knew that fire department paramedics were responding and that they would check the boy and determine if he was okay.

17.    At this time, I saw that the boy was agitated or upset because he was physically resisting as his father carried him.  I had not heard the child talk, and I had not yet seen the child walk.

18.    I also was aware that the child had been missing all night, I knew that he had just been found, I believed that it was currently unknown where he had been all night and who or what he came into contact with, and I also knew it had been cold overnight.

19.    Based on the way the child was acting by pushing away against his father and the fact that he had been missing for so long overnight, and based upon the extremely little amount of time that had gone by between the moment the child was found and the

moment that I arrived and saw the father carrying him, I thought there was something wrong with the child that was caused by something he experienced overnight while alone and unsupervised.

20.     As the father carried the boy toward the house, I told the father that the fire department paramedics were on their way to check out the boy.

21.     The father continued into the house carrying the boy.  He did not respond, so I went inside to tell him that the fire department was on its way to check out the boy.

22.     When doing so, I was concerned for the welfare of the child. I was also aware that there were multiple police officers inside the home very recently, that I was in the Bentley home previously, and I did not have an understanding when re-entering that each and every Officer was already outside the house.

23.     Based on my training and experience as a patrol officer, I am trained to assist fire department paramedics by clearing a scene as "code 4" to alert the fire department paramedics that it is safe to enter so that they can perform their work.

24.     Along those lines, I recall waiting in the house for paramedics.

25.     At no time did the father or mother or anyone else tell me that they did not want me present in the house or that they did not want paramedics to enter the house or that they did not want paramedics to evaluate their child.

26.     Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.

DARREL PALMER

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 18th day of September, 2019, by DARREL PALMER, in the capacity and for the purposes herein stated.

OFFICIAL SEAL
SANDY BOONE
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Commission Expires February 9, 2021

Notary Public

Exhibit 17

## AFFIDAVIT OF MARCUS RUDOLPH

STATE OF ARIZONA          )
                          )  ss.
County of Maricopa        )

MARCUS RUDOLPH, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am an Officer with the City of Mesa Police Department. I was employed in that capacity on April 1, 2016, the date referenced in the Plaintiffs' Complaint. I have been certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification.

3.      I had been a City of Mesa Police Officer for approximately 16 years prior to this April 1, 2016, incident, and by that date I had received training both in a police academy and as part of continued law enforcement training regarding lawful police work, including entries into a residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine.

4.      By April 1, 2016, I also received training both in the academy and in continued law enforcement training regarding the Constitutional rights of citizens,

including rights under the 1st, 4th and 14th Amendment as to seizures, exceptions to the warrant requirement, and objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

5.      I was dispatched to the Bentley home on the morning of April 1, and it was my understanding from dispatch information that at approximately 8:00 am., the reporting party, Mrs. Bentley, called police to report her seven-year-old son missing.

6.      I left our police substation at approximately 8:11 am, and by that time I understood that the missing child was a seven-year-old boy last seen at approximately 9:15 pm the night before, that he was not currently at the school he attended, that Mrs. Bentley had been looking for the child since approximately 10:20 pm, and that Mrs. Bentley reported that he did not want to do chores last night and that when something like that happens, the child normally would run off to hide or go sit out in a tree in the backyard.

7.      At approximately 8:23 am, I arrived at the Bentley home, and I was advised by a Mesa P.D. Supervisor to enter the Bentley home and help search for T.A. inside.  By that time, I was aware that other Police Officers were also inside searching and that additional Police Officers were searching the neighborhood.

8.      Based on my prior experience as a Patrol Officer, I had an understanding that just 2 or 3 houses to the West and across the street named South Los Alamos was a group home for juvenile sex offenders.

9.      I recognized the location of the group home from my prior police work as soon as I entered the neighborhood, and I remembered that the group home contained juvenile residents who were sex offenders.

10.     I advised a Mesa P.D. Supervisor on scene that a juvenile sex-offender group home was about 2 or 3 houses away (to the west) from the Bentley home, and I was then told to the group home and search it for the missing child.

11.     I walked to the group home, located at 1820 South Los Alamos, and I searched the group home's back yard, which was flooded with irrigation. I also searched the inside of the house with permission from the employee currently there that morning.

12.     I learned from him that all of the juvenile residents were currently in school, as it was a weekday.

13.     I did not locate the missing child at the group home, and I continued searching for the child in other areas of the neighborhood.

14.     At approximately 10:15 am, I was outside near the area of the Bentley home when someone spotted the child in bushes in the backyard of the neighboring home immediately west of the Bentley home and adjacent to the street where the group home was located.

15.     The child had been found hiding in bushes directly across the street from the group home.

16.     I walked toward the general area where the child was found and I saw Mr. Bentley with the child in the front yard or driveway of this neighbor's house.

17.     Mr. Bentley carried the child from that location back to the Bentley home, and at that time I was standing outside next to Mrs. Bentley.

18.     Mrs. Bentley told me that last night they searched for T.A. until approximately 3am, and that they then prayed and slept.

19.     Mrs. Bentley also told me that some of their children were taken to school this morning, and that by 8am when they still could still not find T.A., they called police.

20.     I asked Mrs. Bentley if she knew of the juvenile sex-offender group home a few houses down on South Los Alamos.

21.     She told me she was aware of it.

22.     While still standing outside with Mrs. Bentley after T.A. had been found, Mrs. Bentley asked me if I would come inside the Bentley home with her.

23.     From talking to Mrs. Bentley, my understanding was that she was asking me to come inside with her and to talk with T.A. and try to calm him down, and possibly to explain to the child that it was not a good idea to run away from home or to hide from his parents.

24.     I agreed to do that, and we both walked back to the house.

25.     Once inside the foyer of the house, I saw paramedics and I was told that T.A. was in the nearby, hallway bathroom with Mr. Bentley and that paramedics were in there too.

26.     I told Mrs. Bentley that the bathroom was crowded and that I should wait before trying to talk to T.A.

27.     Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.

_14/00_

_____
MARCUS RUDOLPH


SUBSCRIBED AND SWORN TO before me, a Notary Public, this 8th day of September, 2019, by MARCUS RUDOLPH, in the capacity and for the purposes herein stated.

OFFICIAL SEAL
TABITHA A HULSEY
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
Comm. # 554709 Expires October 15, 2022

_____
Notary Public

Exhibit 18

DECLARATION OF EDWARD CLIFFORD

STATE OF ARIZONA        )
                                         ) ss.
County of Maricopa       )

EDWARD CLIFFORD, being first duly sworn upon his oath, deposes and says:

1.       I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.       I am an Officer with the City of Mesa Police Department. I was employed in that capacity on April 1, 2016, the date referenced in the Plaintiff's Complaint. I have been certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification.

3.       By that date I received law enforcement training regarding lawful entries into a residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine.

4.       By that date, I also received training both in the Mesa Police Academy and in continued law enforcement training regarding the parameters of 1st, 4th and 14th Amendment Constitutional rights as to seizures, exceptions to the warrant requirement, and

objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

5.      At approximately 8:35 a.m., I was dispatched to the area of 3045 E. Inverness in Mesa, which is the address of the Bentley home.  I was dispatched to help locate a missing seven-year-old boy, and I was informed that the boy had been missing and unaccounted for overnight.

6.      Upon arrival to the neighborhood of the Bentley home, I searched the back yard of 3044 E. Jerome in Mesa.  This house was directly south of the Bentley residence.

7.      This back yard was heavily forested by trees and shrubs, and it took me some time to clear the yard and make sure the missing child was not there.

8.      I also searched a lot (3032 E. Jerome) immediately southwest of the Bentley home. This lot contained numerous hazards, including an RV, trailers, and two boats which were open and one of which was big enough to have an interior enclosed cabin in the bow.

9.      I then spoke to Mr. and Mrs. Bentley about addresses where the child could possibly go and the people the child knew in the area, and they gave me a list of people and addresses.

10.     When the child was located, I went to the reported location in the vicinity of 3031 E. Inverness, and Mr. Bentley was holding the child in the driveway area of that address. Mr. Bentley was holding the child with his arms around the child, and the child was squirming and trying to get away.

11.    I did not hear the child, T.A., say anything up to that point, but I did hear him make grunting noises. I knew it had been cold overnight, and I saw that child was not wearing any socks, shoes, or a coat.

12.    While seeing and listening to the child and watching him struggle to get free from his father, I was concerned that there was something wrong.

13.    I asked Mr. Bentley if he wanted medics to come check out the child since he was outside all night.

14.    Mr. Bentley said that was fine.

15.    As the child continued to struggle in his father's grasp, Mr. Bentley picked up the child, started walking him to the Bentley home, and carried him in both hands while entering the house.

16.    I entered the house to stand by for paramedics who were on their way. I am trained as a police officer to clear a scene as "code 4", or in other words as being safe for medics to enter, and to stand by while the medics do their jobs.

17.    I knew police officers were inside in the home before he was found, and I believed there were police officers still inside the Bentley home when I re-entered it just a minute or two after he was found.

18.    Inside the house and prior to the medics' arrival, Mr. Bentley never told me that he no longer wanted the medics to check on the child, and he never told me that I was unwelcomed in the home. The child was extremely agitated and he was not making eye contact and I still had not heard the child say anything other than grunting noises in the yard.

19.     Mr. Bentley asked if he could take T.A. into the bathroom while we waited for paramedics, and paramedics entered within just a few minutes from the time that Mr. Bentley took the child into the bathroom.

20.     Once the medics arrived, they went into the bathroom.

21.     When the child's mother, Mrs. Bentley, came by, I let her know that the paramedics were in the bathroom with Mr. Bentley and her son and that the paramedics were checking her son out, and she did not tell me or the paramedics that she disagreed with the paramedics doing this.

22.     Ultimately, I went into the bathroom and started recording with my body worn camera, and at that general time, a person I later determined to be Gina Cordova from the Office of Child Welfare, entered the bathroom as well.

23.     During the time that I observed the child in the bathroom, he was not responding to questions by the paramedics or Ms. Cordova.  I saw that the child was still pulling away from his father, trying to hide in the corner of the bathtub, and trying to hide his face.

24.     Then Mr. Bentley put a bath towel over the child's head, appeared to be telling the child something underneath the towel, and then Mr. Bentley took the child to a bedroom with the towel over the child's head.

25.     I followed Mr. Bentley into the hall and into the bedroom, along with Ms. Cordova, but I remember that the paramedics did not come with us to the bedroom.

26.     In the bedroom, Mr. Bentley put the child on the bottom bunk of a bunk bed and put a comforter or blanket over the child's body and face.

27.    Up to that point, I did not see the medics do vitals, physically touch the child, examine him for injuries, or get the child to talk.

28.    Consistent with Axon 11 at 13:16-13:38, after putting the child in bed, Mr. Bentley stood in the bedroom doorway and talked to his wife down the hall.

29.    Consistent with Axon 11 at 14:09-14:55, Mr. Bentley walked down the hall and began talking to a person I later determined to be the State of Arizona's Department of Child Safety's Cristina Baggen about whether the child should be transported to a hospital to be medically evaluated.

30.    Mr. Bentley was becoming upset and his voice was raised.

31.    Ms. Baggen was explaining to Mr. Bentley that the child needed to be medically evaluated, consistent with Axon 11 at 14:19-14:29: "he needs to be medically evaluated."

32.    Mr. Bentley was getting more upset, consistent with Axon 11 at 14:40-14:45, and at 14:45-14:55,  Ms. Baggen told Mr. Bentley:

> "Okay, I need to know this first. Are you going to allow him to be medically transported or not? If you are not going to allow him to be medically transported then we will move forward as we need to."

33.    Consistent with Axon 11 at 14:45-14:58, I heard Detective Kessler tell Mr. and Mrs. Bentley, "This has also turned into a criminal investigation."

34.    Consistent with Axon 11 15:18-15:22, I heard Mr. Bentley say: "Stop it. Stop it" and I believed he continued to get more upset.

35.     Consistent with Axon 11 at 15:22-15:27, I heard Sergeant Bina ask, "Do we have the TCN ready?" and then say, "Let's serve it and then we can take custody of the child and be on our way."

36.     Based on my training and experience as a police officer, I believed DCS was taking custody of the child because the child's parents were not allowing the child to be transported for a medical evaluation.

37.     Consistent with Axon video 11 at 15:28-15:31, I saw that in response to Mr. Bentley hearing the discussion about taking custody of the child, he said, "Come on you guys," and I further believed that Mr. Bentley was upset.

38.     Consistent with Axon video 11 at 15:40-15:42, I heard Mr. Bentley say with a raised voice, "Oh, now you're being belligerent," and I continued to believe he was upset.

39.     Consistent with Axon 11 at 15:47-15:56, I saw Mr. Bentley turn around and walk toward me as I was standing next to the open bedroom door. He looked obviously upset to me and got well within arm's reach of me. I said, "I'm sorry, I can't let you back in there right now." Mr. Bentley responded, "Are you serious? Why?" As he said this, he tried to go around me and I put my right hand on his left bicep in as light a manner as possible.

40.     Consistent with Axon 11 at 15:53-16:00, as I was responding to his question "why" by saying, "Because of the discussion that went on out there," Mr. Bentley then cut me off by saying, "I want to be able to see my son-what she's doing in there to him. I'm going to keep an eye on him. Come on."

41.     At the time he was saying those things, Mr. Bentley was trying to move past me to my right.

42.     Because Mr. Bentley was very upset, and based on Mr. Bentley now showing increased hostility, agitation, and anger by twice trying to walk past me and through me, I was concerned about the safety of officers and others in the house, including myself, and I believed there was an immediate need to act in furtherance of officer safety.

43.     Consistent with Axon 11 at 16:00 – 16:07, I finished answering Mr. Bentley's question of "why" by saying, "I don't want this to go south, okay?", and I took my hand off of Mr. Bentley.

44.     Mr. Bentley then walked into the back bedroom and I followed him because I was concerned that Mr. Bentley was extremely upset and that he had just tried to move past or through me despite obviously knowing I was a police officer in a standard police uniform.

45.     Consistent with Axon 11 at 16:40-16:44, Mr. Bentley turned toward the back of the house and took around three steps to get to the doorway of the back bathroom, and as he started a phone call and he turned around and saw that I was also at this doorway.

46.     Consistent with Axon 11 at 16:44-16:58, Mr. Bentley was still upset and agitated. I explained to him my officer-safety concerns by saying: "With how things went, I'm not going to let you go anywhere where there might be guns, okay? I'm going to follow you if you go somewhere. If you go outside, that's fine. I'm not going to follow you outside if you want privacy. But with how things are going right now, I'm not going to let you go anywhere where I can't see where you're going."

47.    After finishing his phone call, Mr. Bentley walked back through the hall and into the main room where.

48.    Consistent with Axon 11 at 21:00 – 21:20, Sergeant Bina and Ms. Baggen talked about the TCN (temporary custody notice). Mrs. Bentley said, "What is this code talk?" and then "You can't take [the child]. Is that what this code talk is?"

49.    Consistent with Axon 11 at 21:20-21:21, Detective Kessler responded, "she's got the paperwork" and I understood Detective Kessler to be referring to Ms. Baggen.

50.    Consistent with Axon 11 at 21:21 – 21:26, when Mrs. Bentley then asked, "Paperwork for what?" I heard Sergeant Bina respond, "temporary custody notice."

51.    Consistent with Axon 11 at 25:09-25:23, I heard Mrs. Bentley say that the child's "behavior" was "not normal for him right now."

52.    Consistent with Axon 11 25:30-25:35, I heard Sergeant Bina explain to Mr. and Mrs. Bentley: "The DCS employee right here [pointing to Ms. Baggen] is going to be talking to you about the TCN so we can get this all over, okay."

53.    Consistent with Axon 11 at 27:30-27:36, Mrs. Bentley asked the medic in the room, "What is your call on this?"

54.    Consistent with Axon 11 at 28:56-29:02, Mrs. Bentley told the medic, "I'm all for him getting checked out. I want to know everything's okay."

55.    Consistent with Axon 11 at 29:02-29:09 and my recollection of the incident inside the home, I heard Mrs. Bentley ask the medic, "Is this the only way? To go with him to the hospital right now for a medical evaluation? I know you're talking to my soul. Is this the only way? You understand what I'm asking?"

56.     Consistent with Axon 11 at 29:09-29:28, I heard the medic respond about her riding with him in the ambulance, and then I heard Mrs. Bentley ask the medic, "Will you come?" The medic responded that he could ride with her, and I saw Mrs. Bentley nodding and then say, "Okay."

57.     Consistent with Axon 11, I heard the medic indicate that the hospital would be Cardon's.

58.     Thereafter, consistent with Officer Chopra's Axon body camera, Axon 6 at :57-1:00, and my recollection of the incident, I was standing in the foyer or main room where Sergeant Bina said that the child was in custody.

59.     The family then held a prayer in the living room.

60.     At this point, I intended to follow the ambulance to the hospital in my patrol car, and because the child was in temporary custody, I expected to transport Mrs. Bentley and the child to the Mesa Family Advocacy Center if a doctor at the hospital evaluated the child and medically discharged him.

61.      At the hospital, I was present in the E.R. room with Mrs. Bentley and the child when the Doctor evaluated the child, and OCWI's Ms. Cordova was also present at least for the initial portion of the evaluation.

62.     Consistent with Axon 2 at :30-:35, as the Doctor started the evaluation, he asked Ms. Cordova and myself to step outside.

63.     Ms. Cordova responded to the Doctor, "I'm not," and I recall responding, "We can't."

64.     It was my understanding that at the time I responded to the Doctor by saying "We can't," that the child was in temporary custody, and that someone needed to stay with the child while he was in temporary custody so as to maintain that custody.  My belief that the child was in temporary custody was re-affirmed by Ms. Cordova's response when asked by the Doctor to step outside, by her saying "I'm not."

65.     Consistent with Axon 2 at 9:26-10:05, the Doctor told Mrs. Bentley during the evaluation that there are some questions that need to be answered, that it was bizarre that the child was missing overnight, that there was a little delay in the parents calling for police, and that DCS may need to get involved to make sure that the child is safe.

66.     I understood that the Doctor was in agreement with the temporary custody of the child by DCS, and no one ever told me that temporary custody was no longer existing or that it was no longer necessary.

67.     The Doctor discharged the child, and I then transported Mrs. Bentley and the child to the Mesa Family Advocacy Center for a forensic interview of the child.

68.     After walking inside the front lobby of the Mesa Family Advocacy Center with Mrs. Bentley and the child, my involvement in the case ended.

69.     Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.


EDWARD CLIFFORD

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 18th day of September, 2019, by EDWARD CLIFFORD, in the capacity and for the purposes herein stated.

OFFICIAL SEAL
SANDY BOONE
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Commission Expires February 9, 2021

_____
Notary Public

Exhibit 19

## DECLARATION OF LAURIE KESSLER

STATE OF ARIZONA        )
                        )  ss.
County of Maricopa      )

LAURIE KESSLER, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      On the date of this April 1, 2016, incident, I was a Detective within the Special Victims Unit of the City of Mesa Police Department, and working at the Mesa Family Advocacy Center ("MFAC"). I was certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification. In addition, I participated in numerous informal training at the MFAC regarding child abuse and child neglect cases.

3.      By the time of the incident, I had received training both in the Mesa Police Academy and in continued law enforcement training regarding lawful entries into a residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine. By that date, I also received training both in the Mesa Police Academy and in continued law enforcement training regarding the parameters

of 1st, 4th and 14th Amendment Constitutional rights as to seizures of persons by a police officer, exceptions to the warrant requirement relating to searches and seizures, objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

4.      By that date, I also had training and experience related to the investigations of child abuse and child neglect cases, the Multidisciplinary Protocol for the Investigation of Child Abuse by the Maricopa County Children's Justice Project, which regarded both child abuse and child neglect investigations by police officers and police detectives, and which provided guidelines for police investigations of child abuse and child neglect, of which Appendix 5 and Appendix 6 are attached, Mesa P.D. policy related to child abuse and child neglect investigations, the MFAC, interviews of juveniles, Arizona law regarding temporary custody notices, basic and advanced forensic interviewing, scene preservation, investigations as to crimes against children regarding physical abuse, medical aspects, sexual crimes, and relevant portions of Titles 8 and 13 of the Arizona Revised Statutes.

5.      On the morning of April 1, 2016, I was called to a briefing held by Special Victims Unit Sergeant Kaufman where assignments were given to various Special Victims Unit Detectives.  The briefing regarded a missing person and a suspicious circumstances call out.

6.      As a result of attending the briefing, it was my understanding that a seven-year-old boy had been missing overnight, but that the parents waited until approximately 8:00 am to call police, that the mother had searched last night but then had stopped searching and slept without calling for help to find the missing child.

7.      I responded to the scene, which was Mr. and Mrs. Bentley's home address of 3045 E. Inverness, along with Department of Child Safety ("DCS") employee Cristina Baggen. She was there to perform that entity's investigation as a result of the report of potential child neglect by the delayed call to police and the mother stopping the search overnight.

8.      We arrived on scene prior to the child being located, along with other Detectives from the MFAC.  A number of Police Officers were already in the neighborhood searching, and from talking to Officers on scene, the inside of the Bentley home, the front and back yards of the Bentley home and the adjacent yards of the Bentley's immediate neighbors on East Inverness were also searched by Officers.

9.      Once on scene, I learned that Police Officers were checking a nearby park, that an air unit was helping in the search, that other Officers were searching residences in the neighborhood, a canal which was located just to the west of the subdivision, the US 60 freeway which was located approximately half a mile north, the child's school, businesses and strip malls in the area, and Baseline Road which was half a mile south.

10.     By this point, the seven-year-old child had reportedly been missing for over 12 hours, and Mesa P.D. Officers were discussing the possibility of getting the F.B.I. and K-9s involved, notifying nearby cities, entering T.A. into state and national databases for missing persons, and issuing ATLs ("attempt to locate") to all police officers and emergency responders in order to find the child.

11.     Based on my training and experience as a Special Victims Unit Detective and based on my training and experience regarding missing juvenile investigations, and

C.A.R.T. investigations, I knew this was an unusual circumstance to have such a young child missing for so many hours overnight before police agencies were alerted. I also knew of training which generally regarded the concept that the longer a missing child remained missing, the more likely the possibility that the child could be subjected to harm and the more likely that the child may not be found.

12.     Once on scene, I learned from Officers who had interacted with Mrs. Bentley that the child, T.A., was missing since approximately 9:15 p.m. the night before, that by 10:15 she started searching the house and yard, that their immediate next door neighbors also searched their houses and yards, but that the search ended at some point during the night because Mr. and Mr. Bentley stopped searching and slept, that T.A. did not like the cold or the dark, that when the parents woke up in the morning, the child had not yet returned home, that some of the Bentley's children were currently at school but that T.A. was not at school, and that at approximately 8:00 a.m., the family called 911.

13.     From briefing, I learned that the initial, responding Police Officers believed the parents were unusually calm considering they did not know where their son was and that he had been missing overnight. Based on my training and experience being involved in missing child cases and child neglect cases, when I make contact with parents of a currently missing child at a scene, I typically recognize that the parents of a missing child do not appear calm and do not appear to lack a sense of urgency regarding the missing child.

14.     On scene, I learned from responding Officers that one week prior to this incident T.A. told his mother about a plan to run away from home, that approximately one

week prior to this incident T.A. had also crossed Baseline road on his own for the first time and that he did this without the parents' knowledge, permission or consent. I also learned from Officers on scene that just two houses to the West there existed a residential group home for juvenile sex offenders. Officers informed me that T.A. was last seen with a pillow and blanket, which indicated to me, based on my training and experience, that he may have intended to remain hidden or missing for an extended period of time.

15.     I entered the Bentley home through the open front door and introduced myself to Mrs. Bentley. Ms. Baggen was with me and she introduced herself to Mrs. Bentley as well. We had just started to sit down with Mrs. Bentley in the front living room when at 10:15 a.m., we heard someone say that they had spotted T.A.

16.     I hurried outside and saw Mr. Bentley with T.A. in the yard of the neighbor's house immediately west of the Bentley home. By this point, T.A. had been missing for approximately 13 hours. I saw that T.A. was upset, and kicking his legs and arms as Mr. Bentley picked him up from bushes in that yard. I knew it had been relatively cold overnight. I saw that T.A. was barefoot, not wearing a coat, and I also had not yet heard him say anything.

17.     I was extremely concerned for T.A.'s safety and well-being as a result of being missing overnight at such a young age, and as the result of being unaccounted for during the entirety of the 13 hours that he was missing. No one knew what or who he had encountered or why he ran away overnight. I was also concerned because I knew Police Officers were searching the area and neighborhood for approximately two hours, including with loud speakers, and yet the child was not found until 10:15 am.

18.     Mr. Bentley brought the child back into the home.  Mrs. Bentley stayed outside momentarily, and within just a few minutes of T.A. being found, I walked back to the house and re-entered.

19.     Paramedics from the Town of Gilbert Fire Department responded to the scene.  At the time, Mr. Bentley was in the bathroom with T.A.  Based on my understanding from talking to Officers standing by in the main room or foyer of the Bentley home, the paramedics intended to perform an assessment of the child since he had been missing and unaccounted for overnight.

20.     One of the paramedics entered the bathroom and shortly thereafter came out and reported to me that T.A. needed to be evaluated by a medical doctor at a hospital because he would not talk to them, because he was not acting normal for his age, and because the paramedics were not able to complete their evaluation.  According to the Bentleys, the child was not acting normal and had no pre-existing medical conditions or pre-existing diagnoses.

21.     The paramedic told me that he recommended that the child be transported to the hospital to see a medical doctor, and that the parents were refusing.  Ms. Baggen, who was also present in the house, informed me that DCS would take T.A. into temporary custody if the parents did not consent to the paramedics' recommendation for a medical evaluation at a hospital.

22.     Based on what I knew up to that point, I believed the paramedics' recommendation for T.A. to be transported to an emergency hospital to be evaluated by a medical doctor was reasonable and in the best interests of the child's safety and well-being,

whether physical or behavioral. I understood the paramedics to be recommending this because they could not complete their paramedic assessment, because they knew the child had been missing overnight, because the child was not speaking to them, because the parents said he was acting abnormally and did not have any prior medical conditions or diagnoses, and because they believed the seriousness of the seven-year-old being outside overnight and unsupervised called for an ambulance, an emergency room, and a medical doctor.

23.     Based on the totality of the events that I was aware of thus far as to the T.A.'s behavior and the risks that he had been exposed to overnight, and based on my understanding of the paramedics' recommendation, I believed that the seven-year-old child was in need of immediate medical care and emergency services by a doctor to account for his agitation and abnormal behavior and to complete an examination.

24.     Based on my training and experience as a police officer, I am trained to consider the recommendations of paramedics as emergency medical providers at a scene, and I regard paramedics as the medical experts at a scene. Therefore, I deferred to paramedics regarding their medical recommendations.

25.     Consistent with Axon 10 at :29-1:15, I saw and heard Mr. Bentley talking to DCS employee Cristina Baggen where the foyer and hallway meet, Ms. Baggen asked Mr. Bentley if he was going to allow T.A. to be medically transported or not. She said: "if you are not going to allow him to be medically transported then we will move forward as we need to." I understood Ms. Baggen to be explaining that DCS was prepared to take

temporary custody of the child if the parents continued to protest the paramedics' recommendation.

26.     As depicted on Axon 10 at :29-1:15, I believed the situation in the home was tense and chaotic because of Mr. Bentley becoming upset.

27.     Based on my training and experience with incidents involving the potential for temporary custody, I knew that Ms. Baggen, on scene on behalf of DCS, was prepared to make the determination whether to affirmatively take temporary custody of T.A. on behalf of DCS. I also knew that Ms. Baggen would be the one to document the temporary custody through her use of DCS forms, and that prior to doing so she would obtain approval of temporary custody through her DCS supervisor. During this incident, I was aware that she was in contact with her supervisor to obtain approval for temporary custody.

28.     Consistent with Axon 10 at 1:08-1:15 and my memory of the incident, due to my perception of the Bentley's resistance up to this point to the paramedics' recommendation for T.A. to be transported by ambulance to see a medical doctor at a hospital, I heard Sergeant Bina ask Ms. Baggen if she had the temporary custody notice – "TCN" ready. I understood her to respond affirmatively.

29.     Later, consistent with Axon 10 at 4:22-4:31, I heard Ms. Baggen explaining: "I'm just seeing if it's, what it's gunna be", and "I'm just seeing who else is going to be on it." I understood her to be talking about temporary custody and the TCN, that DCS was taking T.A. into temporary custody, and possibly other children.

30.     Consistent with Axon 11 at 21:07-21:28 and my memory of the incident, I also knew that Ms. Baggen had the temporary custody paperwork in her hand and filled

out.  Mrs. Bentley said, "you cannot take Talon"; I responded: "she [Ms. Baggen] has the paperwork"; Mrs. Bentley responded, "Paperwork for what?"; Sergeant Bina responded: "Temporary custody."

31.     Thereafter, at Axon 11 at 26:25-26:36, Sergeant Bina explained to Mr. and Mrs. Bentley: "the DCS worker is going to explain the TCN, okay? We can wait for the attorney because by the time we get done explaining that and by the time the ambulance gets here, it should be about the same time that you say your attorney is going to be here, okay." At this time, Ms. Baggen was standing a few feet away from Sergeant Bina.

32.     Thereafter, at Axon 10 at 13:20-15:15, Mrs. Bentley then talked to Town of Gilbert paramedic and Fire Captain Adam Hellmann in the foyer about the paramedics' recommendation.  Mrs. Bentley asked him: "Is this the only way? To go with him right now to do a medical evaluation?" Paramedic Hellmann responded at 14:55: "I think it would be the best way to do it." Mrs. Bentley agreed to T.A. being transported by ambulance when Paramedic Hellmann said she could ride in the ambulance with T.A., and that Paramedic Hellmann would also ride in the ambulance.

33.     At this time, I believed that DCS had temporary custody of T.A. because I saw Ms. Baggen in the foyer with a TCN filled out, because Sergeant Bina asked her if the TCN was ready to go, because she responded affirmatively, and Sergeant Bina then asked Ms. Baggen to explain the TCN to Mr. and Mrs. Bentley, and because Ms. Baggen did not inform me that she had ultimately decided not to take temporary custody of T.A.

34.     At no time did I hear Ms. Baggen inform me that she was not going to explain the TCN to the Bentleys or that DCS was not taking temporary custody of T.A., and I

believed T.A. to be removed from the home by ambulance and to an emergency hospital due to DCS' temporary custody of him, as well as by Mrs. Bentley's consent after talking to Paramedic Hellmann.

35.     Later, as shown by Axon 6 at :53-1:04, after Mrs. Bentley had already talked with the paramedic about going in the ambulance with T.A., Sergeant Bina commented: "The child is in our custody with DCS." Ms. Baggen was in the room when this statement was made, but Ms. Baggen did not take that opportunity to clarify. Before I left the Bentley home I saw a completed temporary custody notice sitting on a wooden table in the Bentley foyer. Based on all of these things, I continued to believe that DCS had taken temporary custody of TA.

36.     Prior to Mrs. Bentley talking to Paramedic Hellmann agreeing to allow T.A. to be transported, I informed the parents of a potential criminal investigation related to child abuse and neglect, and I observed that Mr. Bentley responded, "Oh Stop it. Stop it." [Axon 10 at :29-1:15]

37.     As a Detective with the Special Victim s Unit, I had received training in the investigation of, and elements of, crimes such as endangerment of a child by means of neglect. A.R.S. § 13-3619. I understood that probable cause existed for this crime where a person knowingly caused or permitted the life of a minor child to be endangered by neglect. Further, I understood that endangerment required that a subject knowingly created a risk or possibility of harm to the child's life, rather than actual harm, substantial harm, or imminent harm. I also understood neglect to include a failure to properly supervise a child.

38.     Here, I believed probable cause existed under A.R.S. § 13-3619 as to both Mr. Bentley and Mrs. Bentley because I learned from officers on scene that they reportedly knew last night that their seven-year-old son was missing, they did not know where he was, they had searched in the places where they thought he could be and when they did not find him they stopped their search until the next morning without calling for emergency responders to commence a search, that when they stopped searching they slept.  I believed that they had failed to supervise the child and had permitted this neglect of supervision to risk the endangerment of the seven-year-old's life due to the outside elements and hazards in the community, including nearby arterial and collector streets, a nearby canal, a nearby freeway, and other hazards commonly found in residential yards and neighborhoods. Based on the juvenile sex-offender group home being nearby, and because T.A. had not been evaluated by paramedics or reported to them who if anyone he came into contact with overnight, I also believed this was a potential child abuse case.

39.     I also believed that exigent circumstances existed to both be inside the Bentley home and for T.A.'s transportation by ambulance from the home to a hospital because the seven-year-old had been missing overnight and was unsupervised during that time. When found, he was reported to be very agitated, was not talking, and emergency responders attempted to evaluate him, but failed. He was also reported to have no pre-existing diagnoses and was reportedly not acting normal, and paramedics recommended that he needed be taken by ambulance to see a medical doctor at a hospital.  Based on my training and experience, paramedics transport patients to emergency rooms of hospitals.

40.     Based on all of the foregoing, I believed that DCS had temporary custody of T.A. so as to allow the medical transport of T.A., I believed the emergency aid and community caretaking doctrine also allowed for the medical transport of T.A., I believed that probable cause and exigent circumstances allowed for T.A. to be medically transported, and I believed that, thereafter, Mrs. Bentley had also agreed to have T.A. medically transported by ambulance after she spoke to Paramedic and Fire Captain Hellmann about his recommendation.

41.     Shortly after the ambulance left the Bentley home, I went back to the MFAC where I anticipated that forensic interviews of the Bentley children would occur. I understood that Ms. Baggen drove OCWI's vehicle back to the MFAC because Ms. Cordova had ridden along in the ambulance with T.A. and his mother.

42.     Based on my training and experience and knowledge of how child abuse and child neglect investigations are accomplished in Maricopa County, I understood that the MFAC was an appropriate place for forensic interviews of children of T.A.'s age because the MFAC was designed to accommodate children, children victims, and adult victims, and was designed to provide an environment that made children feel comfortable. For example, there are play areas, couches and carpeting that are similar to a home or school. There are no cells and it is not a detention facility. The MFAC is a facility established as part of the Maricopa County Children's Justice Project as part of that organization's Multidisciplinary Protocol for the Investigation of Child Abuse and child neglect cases.

43.     At the MFAC, T.A. and Mrs. Bentley arrived after T.A. had been evaluated at the hospital by an emergency medical doctor.

44.     Mrs. Bentley's attorney, Mike Schern, was also present. In the MFAC lobby, Mr. Schern asked if T.A. was free to leave before a forensic interview. At the time of this question, Sergeant Bina and I were present, along with Mrs. Bentley.

45.     Sergeant Bina responded that T.A. was in the custody of the State right now and that the basis was a temporary custody notice.

46.     I explained that DCS and the Mesa Police Department are separate entities, that DCS does its part and that we could have the DCS worker come down and explain their part, meaning the TCN.

47.     When Mrs. Bentley's attorney asked us whether a forensic interview of T.A. was part of the TCN in this case, I explained that we would need to have a DCS worker (Ms. Baggen or her supervisor) come down and explain the answer to that question. Mrs. Bentley's attorney agreed to wait for the DCS worker to explain.

48.     While we were waiting for the DCS employee, OCWI's Ms. Cordova was also present and waiting with us and Mrs. Bentley and her lawyer.

49.     In a few minutes, Ms. Baggen came down and explained to Mrs. Bentley and her lawyer that Ms. Baggen had staffed the issue with her supervisor, who I knew from experience to be a DCS employee as well.

50.     Ms. Baggen explained that her DCS supervisor said that T.A. needed to be interviewed and that T.A. could not leave until he's been interviewed.

51.     Mrs. Bentley's lawyer then asked Ms. Baggen, "Are you telling me that him being released right now is – will not happen without that interview?" [MFAC Lobby Transcript, 19:21-25]

52.     I heard Ms. Baggen respond, "At this point in time, yes. [MFAC Lobby Transcript, 19:21-25]

53.     Based on this discussion, I continued to believe that T.A. was in the temporary custody of T.A.

54.     Based on the totality of the investigation, I believed that probable cause existed to submit misdemeanor charges against Mrs. Bentley and Mr. Bentley related to A.R.S. § 13-3619 due to their endangerment of T.A. when allowing neglect in the form of a lack of supervision of T.A., by stopping their search to sleep despite the fact that their seven-year old was missing overnight and despite their knowledge that this had never happened before.

55.     Throughout the entirety of the investigation, I believed I was acting in the best interests of the child, T.A., and pursuant to reasonable suspicion as well as probable cause.

56.     I do not believe I acted in a way that constitutes religious discrimination, nor do I believe other officers did so. Instead, I believe I accurately described in my police report Mrs. Bentley's explanation as to why she and her husband stopped searching for T.A. and slept. I was merely attempting to document the context provided by Mrs. Bentley when she explained why they had decided to stop searching for T.A. overnight.

57.     Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.

/      /      /

LAURIE KESSLER

SUBSCRIBED AND SWORN TO before me, a Notary Public, this _20_ day of September, 2019, by LAURIE KESSLER, in the capacity and for the purposes herein stated.

JAYMIE D CHRISTIAN
NOTARY PUBLIC for the
State of Montana
Residing at Great Falls, Montana
My Commission Expires
June 12, 2020

Notary Public JAYMIE D. CHRISTIAN

Further affiant sayeth not.

LAURIE KESSLER

SUBSCRIBED AND SWORN TO before me, a Notary Public, this _20_ day of September, 2019, by LAURIE KESSLER, in the capacity and for the purposes herein stated.

JAYMIE D CHRISTIAN
NOTARY PUBLIC for the
State of Montana
Residing at Great Falls, Montana
My Commission Expires
June 12, 2020

Notary Public JAYMIE D. CHRISTIAN

Attachment A



# Multidisciplinary Protocol for the Investigation of Child Abuse

Developed by the

**Interagency Council**

# Maricopa County Children's Justice Project

***Created July 1995***
*Revised July 1999, September 2003, June 2004, August 2008, March 2016*



**Bill Montgomery**
**Maricopa County Attorney**

Mesa/Bentley 000978

**APPENDIX 5: PRIORITIZING REPORTS AND RESPONSE**

Prioritizing Reports and Response

The Child Abuse Hotline shall assign each report a risk level and tracking characteristic, if applicable.

The Child Abuse Hotline shall notify the local office by telephone of the receipt of the report and its risk level for a high risk report or through a CHILDS Alert as soon as possible.  The local office and Group Care CPS Specialist shall cross-report to the appropriate law enforcement agency of the report, following district procedures.

Following the guidelines below, the Hotline Specialist is to determine and assign the appropriate risk level for the alleged abuse and neglect.

The timeframes for investigations are based on the following determinations of high risk, moderate risk, and low risk.

If there are extenuating circumstances that either require a faster response time or allow for a slower response, Hotline Specialists have the ability to aggravate or mitigate a report based on Aggravating or Mitigating Factors, or the Hotline Specialist can consult with the field regarding aggravation or mitigation, or leave this decision up to the field.

# High Risk Situations

**High Risk Physical Abuse**—Severe/life threatening injuries requiring emergency medical treatment and/OR parent presents severe physical harm to a child NOW.

The following injuries or situations constitute High Risk Abuse:

- Injuries requiring emergency medical treatment that may include:

- ☑ Head injury with risk of Central Nervous System damage
- ☑ Internal injury
- ☑ Multiple injuries or multiple plan injuries (battering)
- ☑ Severe facial bruises
- ☑ Fractures or bruises in a non-ambulatory child
- ☑ Fractures
- ☑ Instrumentation injury with risk of impairment
- ☑ Immersion burns
- ☑ Second and third degree burns
- ☑ Parent guardian or custodian provides prescribed/non-prescribed or illegal drugs or alcohol to a child **under the age of six (6)** and the child is exhibiting symptoms of the drug or alcohol
- ☑ Child under the age of twenty-four (24) months is shaken (shaken baby syndrome)
- ☑ Child under the age of six (6) observed or reported to be struck in the head, face, neck, genitals or abdomen which could likely cause an injury
- ☑ Physical abuse by a parent, guardian, or custodian who has a previous substantiated Priority 1 or High Risk report
- ☑ Parent, guardian or custodian threatens or presents serious bodily harm to a child **NOW**

**High Risk Neglect**—Severe/life threatening situations requiring emergency intervention due to the absence of a parent, or a parent who is either unable due to physical or mental limitations or is unwilling to provide minimally adequate care**.**

The Following Situations Constitute High Risk Neglect:

- **Delayed or** untreated medical condition which is life threatening or permanently disabling which may include Infant Doe, comatose state or debilitation from starvation or possible non-organic failure to thrive (aka pediatric under nutrition, poor weight gain).
- Child of any age who is alone and cannot care for self or for other children due to physical, emotional, or mental inability.  (This includes a parent, guardian, or custodian who is incarcerated or hospitalized.)

Mesa/Bentley 001107

- Child under the age of six (6) is alone **NOW.**
- Child six (6) to nine (9) years of age is alone for three (3) hours or longer or unknown when parent, guardian, or custodian will return.
- Imminent harm to child under the age of six (6) due to inadequate supervision by parent, guardian, or custodian.
- Neglect results in serious physical injury or illness requiring emergency medical treatment. *NOTE: Failure to use child restraints pursuant to ARS § 28-907 are not reports.*
- Imminent harm to child due to health or safety hazards in living environment which may include exposure to the elements.
- Child **assessed** as suicidal by qualified mental health professional and parent, guardian, or custodian is unwilling to secure needed emergency medical treatment including psychiatric treatment.
- No parent willing to provide immediate care for a child and child is with a caregiver who is unable or unwilling to care for the child NOW or child is left to his or her own resources.
- History of extensive gestational substance abuse to child under three (3) months of age or mother or child tests positive for non-prescribed or illegal drug or alcohol at time of birth.
- Child under two (2) months of age displays non-prescribed or illegal drug or alcohol withdrawal symptoms.
- Mother is using cocaine, heroin, methamphetamines, or PCP and is breastfeeding a child.

**High Risk Sexual Abuse**—Physical evidence of sexual abuse reported by a medical doctor or child reporting sexual abuse within the past seven (7) days.

The following situations constitute High Risk Sexual Abuse:

- Physical evidence of sexual abuse reported by a medical doctor or child reporting sexual abuse within the past 7 days.
- Child reporting vaginal or anal penetration or oral sexual contact (oral contact with the penis, vulva, or anus) within past seventy-two (72) hours AND has not been examined by a medical doctor.

---

**High Risk Response Times**
**Standard Response Time—SRT:  2 hours**
**Mitigated Response Time—MRT:  24 hours**

---

# Moderate Risk

**Moderate Risk Physical Abuse**—Serious/multiple injuries which may require medical treatment and/or a child at risk for serious physical abuse if no intervention is received.

The following injuries or situations are considered Moderate Risk Abuse:

- Injuries: **That May Require Medical Treatment** which may include:

  - ☑ Multiple injuries or multiple plane injuries
  - ☑ Injuries to torso or extremities
  - ☑ Injuries to child under age one (1)
  - ☑ Fractures
  - ☑ Parent, guardian, or custodian provides prescribed/non-prescribed or illegal drug or alcohol to a child **six (6) years of age or older** and the child is exhibiting symptoms of the drug or alcohol
  - ☑ Munchausen's Syndrome by Proxy
  - ☑ Low Risk injury to child under the age of six (6)

Mesa/Bentley 001108

- ☑ Child six (6) years of age or older observed or reported to be struck in the head, face, neck, genitals, or abdomen which could likely cause an injury
- ☑ Parent, guardian or custodian **presents serious bodily harm to a child or** fears or threatens to harm child if no intervention received and he or she has a previous **substantiated** report of physical abuse
- ☑ Newborn child (under 3 months of age) born to parents whose parental rights have been previously terminated

**Moderate Risk Neglect**—Serious/Non-life threatening situations requiring intervention due to the absence of a parent, or a parent who is unable due to physical or mental limitations or is unwilling to provide minimally adequate care.

The following situations constitute Moderate Risk Neglect:

- Child age eleven (11) to thirteen (13) years of age caring for a child age six (6) or younger for twelve (12) hours or longer.
- Living environment presents health or safety hazards to a child under the age of six (6) which may include human/animal feces, indisposed garbage, exposed wiring, access to dangerous objects or harmful substances, etc.
- Due to inadequate supervision **or encouragement** by parent, guardian or custodian **sexual conduct or physical injury occurs between children.** This includes a licensed or certified DES facility or a licensed DHS Level I, II or III Behavioral Health Treatment facility
- (If the information is on a foster parent, group care facility, RTC, etc. use the designated questions. If it does not meet the criteria of a report for field investigation, send the information to the licensing specialist and case manager. If the licensing inquiry reveals inadequate supervision, the specialist will call back to make a report)
- No parent willing to care for a child and child is with a caregiver who is unable or unwilling to continue caring for the child less than ONE (1) WEEK.
- Newborn child (under 3 months of age) born to parents whose parental rights have been previously terminated.

**Moderate Risk Sexual Abuse**—Sexual behavior or attempted sexual behavior occurring 8 days or up to 1 year ago and/or child is exhibiting indicators consistent with sexual abuse.

The following situations constitute moderate risk sexual abuse:

- Several behavior within the past eight (8) to fourteen (14) days including sexual abuse, sexual assault, sexual exploitation of a minor, commercial sexual exploitation of a minor, incest, child prostitution, molestation of a child, and sexual conduct with a minor.
- Attempted sexual behavior or sexual behavior when last occurrence is unknown or when last occurred beyond fourteen (14) days and up to **one (1) year** including sexual abuse, sexual assault, sexual exploitation of a minor, commercial sexual exploitation of a minor, incest, child prostitution, molestation of a child and sexual conduct with a minor
- Parent, guardian or custodian suggests or entices a child to engage in sexual behavior, but there is no actual touching, including encouraging a child to view pornographic materials
- Child is exhibiting physical or behavioral indicators which are consistent with sexual abuse **AND** there are indicators the behavior is caused by parent, guardian, or custodian
- Child is living in the home with a person convicted of a sexual offense against a child

**Moderate Risk Emotional Abuse**—Child diagnosed by a mental health professional as exhibiting symptoms of emotional abuse caused by a parent.

Mesa/Bentley 001109

The following constitutes Moderate Risk Emotional Abuse:

▪       Child diagnosed by qualified mental health professional as exhibiting severe anxiety, depression, withdrawal, or untoward aggressive behavior which could be due to serious emotional damage by parent, guardian or custodian.

| |
|---|
| **Moderate Risk Response Times:**<br>**SRT:  48 Hours**<br>**Aggravated Response Time—ART:  24 Hours**<br>**MRT:  72 Hours** |

## Low Risk

**Low Risk Abuse**—**Injuries not requiring medical treatment and/or parent threatens physical harm if no intervention is received.**

▪       The following injuries or situations are considered Low Risk Abuse:

☑   Injuries **Not Requiring Medical Treatment** which may include:
*   First degree or cigarette burns
*   Injury to buttocks or scalp (i.e., hair loss)
*   Injury to bony body parts (i.e., shins, knees, elbow, etc.)
*   Single or small bruises
*   Parent, guardian or custodian provides prescribed/non-prescribed or illegal drugs or alcohol to a child and the child is exhibiting symptoms of the drug or alcohol
*   Bleeding (i.e., hit in face, bloody nose)
*   Parent, guardian or custodian fears, or threatens to harm a child if no intervention is received.

**Low Risk Neglect**—Situations which may require intervention due to the absence of a parent, or a parent who is unable due to physical or mental limitations or is unwilling to provide minimally adequate care, which includes exploitation of a child.

The following situations constitute Low Risk Neglect:

▪       Delayed or untreated medical problem causes child pain or debilitation that is not life threatening AND parent, guardian, or custodian is unwilling to secure medical treatment
▪       Child under the age of nine (9), who is not alone at the time of the report, but has been left alone within the past fourteen (14) days
▪       Parent, guardian or custodian demonstrates an inability to care for a child within the past thirty (30) days including leaving a child with inappropriate or inadequate caregivers
▪       Living environment presents health or safety hazards to a child six (6) years of age or older which may include human/animal feces, indisposed garbage, exposed wiring, access to dangerous objects or harmful substances, etc.
▪       Food not provided and child is chronically hungry
▪       Significant developmental delays due to neglect
▪       Use of a child by a parent, guardian, or custodian for material gain which may include forcing the child to panhandle, steal, or perform other illegal activities

Mesa/Bentley 001110

- Parent, guardian, or custodian is not protecting child from a person who does not live in the home AND who abused **a** child
- No parent willing to care for a child and child is with a caregiver who is unable or unwilling to continue caring for the child beyond ONE (1) WEEK UP TO THIRTY (30) DAYS (reporting source will need to call back if beyond thirty (30) days)

**Low Risk Sexual Abuse**—Sexual behavior or attempted sexual behavior occurring beyond 1 year and perpetrator currently has access to a child.

The following situations constitute Low Risk Sexual Abuse:

- Parent, guardian or custodian sexually abused a child in the past **AND** is now living in a home with a child.
- Attempted sexual behavior or sexual behavior when last occurrence was beyond **one (1) year** including sexual abuse, sexual assault, sexual exploitation of a minor, commercial sexual exploitation of a minor, incest, child prostitution, molestation of a child, and sexual conduct with a minor **and the perpetrator currently has access to the child.**

**Low Risk Emotional Abuse**—Parent demonstrates behavior which may result in emotional trauma to a child.

The following constitutes Low Risk Emotional Abuse:

- Parent, guardian or custodian demonstrates behavior or child reports parent, guardian or custodian behavior which is likely to have the effect of **fear** rejection, isolation, humiliation or debasement of a child.

> **Low Risk Response Times:**
> **SRT:  72 Hours**
> **Aggravated Response Time—ART:  48 Hours**
> **MRT:  72 Hours Excluding Weekends & Holidays**

**Potential Risk**

**Potential Risk Of Physical Abuse**—Child at risk of physical injury due to stressors in the home.

The following situations constitute Potential Risk of Physical Abuse:

- Home environment stressors place child at risk of physical abuse which may include:
  - ☑ domestic violence
  - ☑ mental illness
  - ☑ substance abuse
  - ☑ history of physical abuse with no current injury, etc.

**Potential Risk Of Neglect**—Child at risk of neglect due to stressors in the home.

The following situations constitute Potential Risk of Neglect:

- Parent, guardian or custodian has no resources to provide for child's needs (supervision, food, clothing, shelter, and medical care) and child's needs may be neglected.
- Home environment stressors place child at risk of neglect which may include mental illness, substance abuse, etc.

Mesa/Bentley 001111

## APPENDIX 6: ATTORNEY GENERAL OPINION



STATE OF ARIZONA

OFFICE OF THE ATTORNEY GENERAL

GRANT WOODS
ATTORNEY GENERAL

1275 WEST WASHINGTON, PHOENIX 85007-2926

MAIN PHONE : 542-5025
TELECOPIER : 542-4085

October 2, 1998

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
1717 West Jefferson Street
Phoenix, Arizona 85005

RE: I98-008   (R98-017)

Dear Dr. Blessing:

You recently requested a formal opinion about whether private schools may impose requirements or limitations on Child Protective Services ("CPS") specialists who seek to interview children on school property. We conclude that Arizona law authorizes a CPS specialist to interview a child on school property without school-imposed requirements or limitations. In particular, we determine that the Legislature directed CPS to "immediately" "make a *prompt and thorough* investigation" to refute or substantiate an allegation about whether a child should be adjudicated dependent.[1]  Arizona Revised Statutes Annotated ("A.R.S.") § 8-802(C)(3)(b) (emphasis added); *see also* A.R.S. § 8-304(B). Moreover, the rules of the Department of Economic Security ("DES") relating to CPS's investigations of child abuse, neglect, dependency, or exploitation provide that "a child may be interviewed at any site deemed appropriate by the Child Protective Services worker." Arizona Administrative Code ("A.A.C.") R6-5-5504(B).  Personnel of both public and private schools also have a duty to protect the children under their care and to cooperate in the reporting and investigation of abuse, abandonment, dependency, or neglect. A.R.S. § 13-3620.[2]  Consequently, we find no legal basis

---

[1] A "dependent child" is one who is (i) adjudicated to be in need of appropriate and effective parental care and control, (ii) destitute, not being provided with the necessities of life, or in a home that is unfit due to abuse, neglect, cruelty or depravity of either parent, or (iii) younger than eight and committed an act that would have resulted in the child being adjudicated delinquent or incorrigible if the child were older.  A.R.S. § 8-546(A)(6).

[2] Section 13-3620, A.R.S., requires school personnel, counselors, nurses, clergymen, priests, doctors, parents, and others responsible for the care and treatment of children who have reasonable grounds to believe that a minor has been the victim of abuse, injury, exploitation, or neglect to immediately report the information to a peace officer or CPS. That statute also requires release of confidential records to the peace officer or CPS specialist conducting the investigation and waives many of the privileges prohibiting disclosure of confidential information in litigation and administrative proceedings in which a child's abuse, abandonment, dependency, or neglect is an issue. *See also* A.R.S. § 8-805(B).

Mesa/Bentley 001114

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 2

on which schools — whether public (traditional and charter) or private (parochial or nonsectarian) — may erect barriers that impede the goal of protecting the welfare of children.

### Background

DES accepts reports of possible child abuse, neglect, exploitation, or abandonment twenty-four hours a day, seven days a week. A.R.S. § 8-802(C)(1) and A.A.C. R6-5-5503(A). DES operates a statewide, toll-free telephone service to receive these reports. Between July 1, 1996 and June 30, 1997, DES received 38,229 incoming communications to the Child Abuse Hotline that met the criteria of a report for investigation of maltreatment. ARIZONA DEPARTMENT OF ECONOMIC SECURITY, DIVISION OF CHILDREN, YOUTH AND FAMILIES, Annual Report for July 1, 1996 through June 30, 1997 at 2 (September 30, 1997). Forty-five percent of the reports related to allegations of neglect, 36% relayed concerns of physical abuse, 8% of the reports alleged sexual abuse, 8% encompassed reports of abandonment, 3% of the reports noted concerns of emotional abuse, and less then 1% of the reports concerned exploitation. *Id.*

When DES receives a report of child abuse, neglect, exploitation, or abandonment its Central Intake Unit is to evaluate the information to determine if the report should be referred for field investigation. DEPARTMENT OF ECONOMIC SECURITY, CHILDREN'S SERVICES MANUAL, ADMINISTRATION FOR CHILDREN, YOUTH AND FAMILIES, *Investigation and Assessment*, Chapter 5-1 (July 21, 1997). If DES determines that a field investigation is appropriate, it is to gather further information on the specific incident and then assess previous reports about the family and the status of prior cases. *Id.* at 5-2. Next, DES is to evaluate case-specific aggravating and mitigating factors and then prioritize the report. *Id.* at 5-3. DES is to make every effort to ensure that all CPS reports in a local office are assigned for field investigation or are referred to a CPS supervisor for an alternative investigation. *Id.* at 5-4.

Although DES's first priority in conducting an investigation is to determine whether the child who is the subject of the report (and all other children in the home) are safe from harm, it should also respect the rights of parents, guardians, and custodians. *Id.* at 5-8 and 5-11.[3] In conducting its interviews, the CPS worker must make many judgment calls. Among the preinterview decisions that confront CPS specialists in each investigation are: who should be interviewed, where the interviews should take place, in what order interviews should occur, whether interviews should be prearranged or unannounced, and who should be present during the interviews. *See id.* at 5-10. One obvious option that allows CPS to complete its investigation

---

[3] *See also* A.R.S. § 8-803(A) ("Upon initial contact with a parent, guardian or custodian under investigation pursuant to this article, a protective services worker shall inform the family that the family is under investigation . . . .").

Mesa/Bentley 001115

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 3

promptly and immediately is to interview children at their schools.

### Analysis

Parents and guardians are primarily responsible for the care and protection of their children. *See, e.g., Lehr v. Robertson*, 463 U.S. 248, 258 (1983). The State intercedes only when there is a report of abuse, neglect, or dependence where the health and welfare of a child may be imperiled. *See, e.g.,* A.R.S. §§ 8-304 (formerly A.R.S. § 8-224) (investigation of alleged acts of delinquency, dependency, and incorrigibility) and 8-802 (scope of responsibilities of CPS specialists); *Bohn v. County of Dakota*, 772 F.2d 1433, 1439 (8th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986) (recognizing the State's strong interest in "protecting powerless children who have not attained their age of majority but may be subject to abuse or neglect").

CPS's right to interview children on private school property during an investigation to evaluate allegations of abuse, dependency, neglect, or exploitation is based solidly on its statutory mandate and the explicit and implicit power to fulfill that mandate. First, CPS is required to "immediately," "promptly and thoroughly" investigate conditions that tend to support or rebut an allegation that a child should be adjudicated dependent. A.R.S. § 8-802(C)(3)(b). This statutory authority is consistent with the traditional role of the State as sovereign and guardian of persons under legal disability such as infants and children. *See Stewart v. Superior Court*, 163 Ariz. 227, 230, 787 P.2d 126, 129 (App. 1989). Indeed, courts routinely have recognized the State's compelling interest in identifying and protecting victims of child abuse when they have balanced the parents' constitutional interests in family autonomy against the State's intrusion into that interest during a child abuse, abandonment, neglect, or exploitation investigation. *See, e.g., Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993) ("the government has a compelling interest in the welfare of children, and the relationship between parent and child may be investigated"); *Fitzgerald v. Williamson*, 787 F.2d 403 (8th Cir. 1986) (caseworkers do not infringe on parents' liberty interest when the caseworker takes reasonable steps to protect a child from abuse); *Doe v. Staples*, 717 F.2d 953 (6th Cir. 1983), *cert. denied*, 465 U.S. 1033 (the State can remove a child from an abusive parent for the best interest of the child). We are aware of no privacy or liberty interest that a private school might possess that would override the State's compelling interest in making a prompt and thorough investigation of reports of child abuse, abandonment, neglect, or exploitation.

Second, although a private school may have a general right to prohibit entry onto its property, Arizona statutes, decisional law, and administrative rules authorize appropriate interview and intervention activities. The Arizona Court of Appeals has recognized that peace officers, with reason to believe that a child's health, morals, or welfare are being endangered,

37

Mesa/Bentley 001116

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 4

have a right and legal duty to act.[4] *State v. Hunt*, 2 Ariz. App. 6, 12, 406 P.2d 208, 214 (App. 1965); *cf.* A.A.C. R6-5-5504(F) ("a child can be removed if suffering or in danger of imminently suffering abuse"). Authorized action includes entering onto private property, investigating, and taking the child into custody, if necessary, with or without a search warrant and with or without the consent of all persons who have a proprietary interest in the premises.[5] *Hunt*, 2 Ariz. App. at 12, 406 P.2d at 214. When investigating allegations of child abuse, abandonment, neglect, or exploitation, we see little distinction between a peace officer's legal duty and responsibility and that of a CPS specialist.[6] CPS specialists and peace officers have the authority to investigate and immediately take a child into temporary custody regardless of where the child is located. A.R.S. § 8-821. *Compare* A.R.S. § 8-304(A) (formerly A.R.S. § 8-224(A)) (law enforcement officers have responsibility to investigate completely alleged acts of delinquency or incorrigibility) *with* A.R.S. § 8-304(B) (formerly A.R.S. § 8-224(B)) (CPS specialists have responsibility to investigate completely all complaints of alleged dependency, and DES has responsibility for the disposition of a child unless the matter requires intervention of the juvenile court).

As the court recognized in *Hunt*:

> Considering Bernal's obligations as a peace officer and the details of Miss Hengsteler's description of Tina's condition just related to him, he had a duty to proceed forthwith, without delaying to get anyone's permission (whether it be a magistrate's or the property owners') to extend the protective arm of the State of Arizona through its juvenile code to Tina without being concerned with what or who was responsible, or what

---

[4] Our analysis assumes that CPS workers, before approaching private school officials to interview a student, have sufficient cause to initiate an investigation into child abuse, abandonment, neglect, or exploitation.

[5] In 1965, when *Hunt* was decided, the statutory authority under which the peace officer acted provided as follows: "This article shall not be construed to prohibit a peace officer from taking into custody a child . . . whose surroundings are such as to endanger his health, morals, or welfare unless immediate action is taken." A.R.S. § 8-221 (1965).

[6] The Arizona Court of Appeals recently agreed when it found that constitutional due process protections came into play when determining the voluntariness of a confession of a suspected child abuser obtained by a CPS specialist. *In Re Timothy C.*, 275 Ariz. Adv. Rep. 43 (App. August 13, 1998). In *Timothy C.*, the CPS specialist interviewed a sibling of the alleged victim. The sibling was also the suspected abuser who was subject to possible criminal action pending the outcome of the investigation. The court considered the CPS specialist's interview as an example of "State action . . . under the State's police powers in the general sense." We note that the court did not place restrictions on CPS's right to investigate or interview under A.R.S. § 8-802, only the use that criminal prosecutors could make of the information that CPS obtained.

Mesa/Bentley 001117

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 5

subsequent criminal or civil proceedings might be instituted. To enter her home to protect Tina is certainly not a judicial or quasi-judicial proceeding but a matter of protective custody.

If officer Bernal had delayed his actions unreasonably under these circumstances, he would have been remiss in this duty. To require him to determine the existence and extent of each person's proprietary interest in the premises and obtain their consent before performance of his duty under A.R.S. § 8-221 would, in this case, have rendered the statute nugatory.

2 Ariz. App. at 13, 406 P.2d at 215.

Furthermore, DES rule A.A.C. R6-5-504(B) authorizes CPS specialists who investigate reports of child abuse, neglect, dependency, or exploitation to interview a child "at any site deemed appropriate" by the CPS specialist. This rule was adopted in 1983 and is legally binding on private schools. *See* A.R.S. § 41-1001(18) (a "'rule' means an agency statement of general applicability that implements, interprets or prescribes law or policy . . ."); *see also Herzberg v. David*, 27 Ariz. App. 418, 419, 555 P.2d 677, 679 (App. 1976) (rules adopted pursuant to statutory authority have the force and effect of law).

We recognize that not all CPS investigations require immediate access to a child victim or witness. The urgency of the interview will depend on the facts known to the CPS specialist at the time the specialist makes a request to interview a child at a private school. Because the CPS specialist must maintain confidentiality, the specialist is not at liberty to share this information with the school and thus must independently make a reasonable determination of urgency. *See* A.R.S. § 41-1959(A). For example, in some circumstances it might be reasonable and prudent for a CPS specialist to delay an interview until the end of a class to alleviate disruption to the school environment or to avoid embarrassment to the child being interviewed.[7]

Of course, when a CPS specialist arrives at a school, there are introductory and notification procedures that each CPS specialist should follow. At the outset, the specialist should (i) provide official identification to school officials, (ii) advise school officials of the

---

[7] Section 8-821(B), A.R.S., allows peace officers and CPS specialists to take children into protective custody if it is clearly necessary to protect the child. We hope that a private school would not make such measures necessary by refusing to allow the CPS specialist to interview a child on school property. Such refusal could cause additional trauma to innocent and vulnerable children and will require CPS to resort to a legal process that is both unnecessary and intrusive to the child, the school, and the child's family merely to conduct an interview.

Mesa/Bentley 001118

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 6

specialist's need to interview the child while maintaining the confidentiality mandated by A.R.S. § 41-1959(A), and (iii) inform school officials whether parental consent is a necessary prerequisite for conducting the interview, A.R.S. § 8-802(C)(2)(a)-(b).[8] This information will supply the school with the factual and legal prerequisites necessary to release the student to be interviewed.

### Conclusion

We determine that A.R.S. § 8-802(C)(3)(b) (previously A.R.S. § 8-546.01), which requires a CPS specialist to *immediately* make a *prompt and thorough* investigation to refute or substantiate an allegation about whether a child should be adjudicated dependent, in conjunction with A.A.C. R6-5-5504(B), which provides a CPS specialist with discretion to interview a child at any site the specialist deems appropriate, authorize the CPS specialist to enter onto private school property to conduct interviews authorized by law. Personnel of both public and private schools have a duty to protect the children under their care and to cooperate in the reporting and investigation of abuse, dependency, neglect, or exploitation. Consequently, we find no legal basis on which schools — whether public (traditional or charter) or private (parochial or nonsectarian) — may erect barriers that impede the goal of protecting the welfare of children.

Sincerely,

Grant Woods
Attorney General

---

[8] In pursuing its investigation, CPS specialists are not required to obtain parental consent to interview a child who initiates contact with the worker, a child who is the subject of the investigation, or a sibling of or a child living with the subject of the investigation. A.R.S. § 8-802(C)(2)(a)-(b). Once the CPS specialist confirms to school officials that the investigation is one that does not require parental consent, school officials may not interfere.

Mesa/Bentley 001119