Exhibit 20

## DECLARATION OF PETER BINA

STATE OF ARIZONA    )
                        ) ss.
County of Maricopa     )

PETER BINA, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am currently a Sergeant with the City of Mesa Police Department's Special Victim's Unit, I began working as a Police Officer with the Mesa Police Department in January 1996. I have been certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification. In addition, I participated in numerous informal training at the Mesa Family Advocacy Center regarding child abuse and child neglect cases.

3.      From approximately 2001 to 2010, I was Mesa P.D. Detective in the Domestic Violence Unit and the Computer Forensics Unit.  From approximately 2010 through part of 2015, I worked as a plain clothes detective, a patrol officer, and as a Sergeant in patrol units.

4.      On the date of the incident, April 1, 2016, I was a Sergeant at the Mesa Family Advocacy Center ("MFAC") in the Computer Forensics Unit, I was also the sex

offender notification Sergeant in the Sex Offender Tracking Unit, and I was in the rotation for a weekly on-call Sergeant for the Special Victims Unit, all of which were positions located in the MFAC.

5.      By the time of the incident, I had received training both in the Mesa Police Academy and in continued law enforcement training regarding lawful entries into a residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine.

6.      By that date, I also received training both in the Mesa Police Academy and in continued law enforcement training regarding the parameters of 1st, 4th and 14th Amendment Constitutional rights as to seizures of persons by a police officer, exceptions to the warrant requirement relating to searches and seizures, objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

7.      By that date, I also had training and experience related to the investigations of child abuse and child neglect cases, the Multidisciplinary Protocol for the Investigation of Child Abuse by the Maricopa County Children's Justice Project, which regarded both child abuse and child neglect investigations by police officers and police detectives, and which provided guidelines for police investigations of child abuse and child neglect, of which Appendix 5 and Appendix 6 are attached, Mesa P.D. policy related to child abuse and child neglect investigations, the MFAC, interviews of juveniles, Arizona law regarding temporary custody notices, basic and advanced forensic interviewing, scene preservation,

investigations as to crimes against children regarding physical abuse, medical aspects, sexual crimes, and relevant portions of Titles 8 and 13 of the Arizona Revised Statutes.

8. I was advised of the Bentleys' 911 call regarding a missing seven-year-old child as part of my duties as the on-call Sergeant with the Special Victims Unit at the MFAC. At the time that I became aware of the call, I reviewed written call comments on Mesa PD's computer aided dispatch, and I understood that the child was seven years old and reportedly had been missing since approximately 9:15 pm the night before, that he did not want to do chores, that the child's parents had searched for him but that he was still missing as of approximately 8 am, and that the call was made to police at approximately 8 am.

9. I attended a briefing held by Special Victims Unit Sergeant Kaufman where assignments were given to various Special Victims Unit Detectives. Sergeant Kaufman and I then drove to the Bentley home, and we arrived just a few minutes after the child had been found.

10. At the scene, Sergeant Kaufman and I met with supervisors on the roadway to the west of the Bentley home, and I recall being advised by a Special Victims Unit Detective that paramedics were recommending that the child be evaluated by a doctor at the hospital and that the mother of the child was refusing to follow the paramedics' recommendation.

11. As a result, I walked to the house and entered while Sergeant Kaufman continued making notifications as to various resources that were deployed or in the process of being deployed when the child was found.

12.     Once inside the house, I learned from Detective Kessler and DCS social worker, Cristina Baggen, that the child was missing since approximately 9:15 p.m. the night before, that by 10:15 family members searched for the child inside and outside, but that the search ended at some point during the night because the parents stopped searching and slept, that when the parents awakened, the child had not yet returned home, that some of the Bentley's children were currently at school, that at approximately 8:00 a.m., the family called 911, that the child was found at approximately 10:15 am outside barefoot and in a bush, that the child was pulling away from his father when the father attempted to grab him and pick him up, that paramedics attempted to medically assess the child, that the paramedics were recommending that the child be transported to a hospital to be seen by a medical doctor because paramedics believed the child was agitated and acting abnormally for his age, and that the child had no diagnoses and was on no medication.

13.     I also knew that it had been cold overnight with temperatures dropping to approximately 50 degrees or slightly below, and that hazards existed in the general area such as a nearby canal, a nearby freeway and major road (Baseline), as well as common residential hazards outside such as moving vehicles, insect bites, and hazards in yards including pools, irrigation water, and miscellaneous items and debris that can be more difficult to navigate at night and without supervision.

14.     I also learned from Detectives on scene that there was a juvenile sex-offender group home two or three houses away from the Bentley home, to the west across the street.

15.     Based on all of these things, including my understanding that the child was unaccounted for, unsupervised, and missing outside for approximately twelve or thirteen

hours, including the fire department paramedics' recommendation that that the child should be assessed by a doctor at a hospital and my understanding that the paramedics had not been able to take vitals, and had not been able to complete a physical examination of the child, I believed that the seven-year-old child was in need of immediate medical care and emergency services by a doctor to account for the child's agitation and abnormal behavior and to complete an examination.

16.    Based on my training and experience as a police officer, I am trained to consider the recommendations of paramedics as emergency medical providers at a scene, and I regard paramedics as the medical experts at a scene. Therefore, I deferred to paramedics regarding their medical recommendations.

17.    I believed that the paramedics' recommendation for transportation of the child by ambulance to see a doctor at an emergency hospital was for emergent care, and I deferred to their expertise as the medical experts on scene.

18.    Based on my training and experience as a Sergeant in units such as the Police Department's Domestic Violence Unit, the Sexual Offender Unit, and the Special Victim's Unit, I understood that the police had the ability to exercise emergency aid and community caretaking for the welfare of a child. I also understood that police had the ability to accomplish immediate medical treatment where a parent consented, and I also understood that the State had the ability to take a minor child into temporary custody in order to accomplish such medical treatment.

19.    Ms. Baggen told Detective Kessler and me that DCS would be taking temporary custody if the parents refused to allow the paramedics' recommendation for a

medical transport of T.A. in order to receive a medical evaluation at a hospital. I knew that she had a DCS form with her for temporary custody, a TCN (temporary custody notice).

20.     Consistent with Axon 10 at :29-1:15 and my memory of being present in the foyer, Ms. Baggen asked Mr. Bentley if he was going to allow T.A. to be medically transported or not. She said: "if you are not going to allow him to be medically transported then we will move forward as we need to." Starting at Axon 10 at 1:08, I asked Ms. Baggen, "Do we have the TCN ready?" At 1:09, Ms. Baggen nodded affirmatively and I said to her, "Let's serve it." I understood Ms. Baggen to be explaining that DCS was prepared to take temporary custody of the child if the parents continued to protest the paramedics' recommendation. As depicted on this Axon clip, I believed the situation in the home was tense and chaotic because of Mr. Bentley's emotions.

21.     Thereafter, consistent with Axon 10 at 4:22-4:31 and my recollection, I again asked Ms. Baggen about the TCN and she responded, "I'm just seeing who else is going to be on it." Based on this conversation with Ms. Baggen, I believed her to be telling me that DCS was taking T.A. into temporary custody, and that DCS was also considering temporary custody as to additional children of the Bentleys.

22.     Consistent with Axon 11 at 21:07-21:28, which captured the same conversation, Mrs. Bentley responded, "you cannot take Talon"; Detective Kessler told Mrs. Bentley that "she [meaning Ms. Baggen] has the paperwork"; Mrs. Bentley responded, "Paperwork for what?"; and I responded: "Temporary custody."

23.     Consistent with Axon 11 at 26:25-26:36, and my memory of the incident, I informed Mr. and Mrs. Bentley, "the DCS worker is going to explain the TCN, okay? We

can wait for the attorney because by the time we get done explaining that and by the time the ambulance gets here, it should be about the same time that you say your attorney is going to be here, okay." At the time I made these statements, Ms. Baggen was standing a few feet away from me to my left.

24.     Consistent with Axon 10 at 13:20-15:15 and my recollection, Mrs. Bentley then talked to Town of Gilbert paramedic Adam Hellmann in the foyer about the paramedics' recommendation. Mrs. Bentley asked the paramedic: "Is this the only way? To go with him right now to do a medical evaluation?" Paramedic Hellmann responded at 14:55: "I think it would be the best way to do it." At 15:07, I understood paramedic Hellmann to have recommended that Mrs. Bentley ride in the ambulance with T.A., and Mrs. Bentley asked if paramedic Hellmann would come along. When he agreed to do that, Mrs. Bentley agreed to T.A. being transported by ambulance.

25.     At that time, I also believed that DCS had temporary custody of the child. I believed this because of Ms. Baggen previously telling me that she had the temporary custody notice prepared, because I saw the temporary custody notice filled out, because I asked her if the TCN was ready to go, because I understood her to respond affirmatively, because I also asked her to explain the notice to the parents and she agreed to do that, and because Ms. Baggen did not inform me that she had ultimately decided not to take temporary custody of T.A. [*See also* Cristina Baggen Deposition Transcript, 89:11-90:11; 113:17-23;125:5-16;125: 22-126:3]

26.     As a result, I believed that DCS had temporary custody of T.A. so as to allow the medical transport of T.A., I believed the emergency aid and community caretaking

doctrine also allowed for the medical transport of T.A., I believed that probable cause and exigent circumstances allowed for T.A. to be medically transported, and I believed that, thereafter, Mrs. Bentley had consented to have T.A. medically transported by ambulance and at a hospital after she spoke with paramedic Hellman about his recommendation.

27.     Consistent with Axon 6 at :53-1:04 and my memory of the incident, after Mrs. Bentley had talked with paramedic Hellman about going in the ambulance with T.A. and after she agreed to the medical transport by ambulance, I recall fielding a question from a gentleman in the foyer of the Bentley home. He asked everyone in the foyer area to step outside for a moment for a prayer, and I responded, "The child is in our custody with DCS." This statement occurred after Mrs. Bentley talked with paramedic Hellman. Ms. Baggen did not correct me or otherwise clarify to the extent that she believed there was no longer a need for temporary custody.

28.     As a result of this belief of temporary custody existing, I understood that the presence of two Mesa police officers remaining in the house during the family's prayer was directly related to the temporary custody of T.A., as he was still in the house.

29.     Mr. and Mrs. Bentley's attorney, Mr. Finter, arrived and spoke to Mr. Bentley about the other Bentley children coming to the MFAC for forensic interviews. It was also my understanding that the attorney advised us that they agreed to bring them there.

30.     I had received training in the investigation of, and elements of, crimes such as endangerment of a child by means of neglect. A.R.S. § 13-3619. I understood that probable cause existed for this crime where a person knowingly caused or permitted the life of a minor child to be endangered by neglect. Further, I understood that endangerment

required that a subject knowingly created a risk or possibility of harm to the child's life, rather than actual harm, substantial harm, or imminent harm.  I also understood neglect to include a failure to properly supervise a child.

31.     Here, I believed probable cause existed under A.R.S. § 13-3619 as to both Mr. Bentley and Mrs. Bentley because I learned from officers on scene that they reportedly knew last night that their seven-year-old son was missing, they did not know where he was, they had searched in the places where they thought he could be and when they did not find him they stopped their search until the next morning without calling for emergency responders to commence a search, that when they stopped searching they slept.  I believed that they had failed to supervise the child and had permitted this neglect of supervision to risk the endangerment of the seven-year-old's life due to the outside elements and hazards in the community, including nearby arterial and collector streets, a nearby canal, a nearby freeway, and a multitude of other hazards commonly found in residential yards and neighborhoods.

32.     I also believed that exigent circumstances existed to both be inside the Bentley home and for T.A.'s transportation by ambulance from the home to a hospital because the seven-year-old had been missing overnight and was unsupervised during that time. When found, he was reported to be very agitated, was not talking, and emergency responders attempted to evaluate him, but failed. He was also reported to have no pre-existing diagnoses and was reportedly not acting normal, and paramedics recommended that he needed be taken by ambulance to see a medical doctor.

33.     Shortly after the ambulance left the Bentley home, I went back to the Mesa Family Advocacy Center where I anticipated that forensic interviews of the Bentley children would occur.

34.     Based on my training and experience and knowledge of how child abuse and child neglect investigations are accomplished in Maricopa County, I understood that the Mesa Family Advocacy Center (MFAC) was an appropriate place for forensic interviews of children of T.A.'s age because the MFAC was designed to accommodate children, children victims, and adult victims, and was designed to provide an environment that made children feel comfortable.  For example, there are play areas, couches and carpeting that are similar to a home or school. There are no cells and it is not a detention facility.  It is my general understanding that the MFAC is a facility established as part of the Maricopa County Children's Justice Project's Multidisciplinary Protocol for the Investigation of Child Abuse and child neglect cases.

35.     At the MFAC, T.A. and Mrs. Bentley arrived after he had been evaluated at the hospital by a doctor.

36.     With her attorney present, my recollection is that Mrs. Bentley and her attorney asked Detective Kessler and myself whether T.A. was free to leave before a forensic interview.

37.     I recall responding to Mrs. Bentley and her attorney that T.A. was in the custody of the State right now [MFAC Lobby Transcript: 5:23-35; 6:7-8] and that the basis was a temporary custody notice. [*Id.*, 6: 9-17]

38.     At that point, Detective Kessler explained that DCS and the Mesa Police Department are separate entities, that DCS does its part and that we could have the DCS worker come down and explain the DCS position on the issue. [MFAC Lobby Transcript, 6:18-17:2]

39.     When Mrs. Bentley's attorney asked us whether a forensic interview of T.A. was part of the TCN in this case, Detective Kessler explained that the DCS worker on the case will come down and explain the answer to that question. Mrs. Bentley's attorney agreed to wait for the DCS worker to explain. [MFAC Lobby Transcript, 10: 8-18]

40.     While we were waiting for the DCS employee, OCWI's Ms. Cordova was also present and waiting with us and Mrs. Bentley and her lawyer. [MFAC Lobby Transcript, 11:11-25]

41.     Ms. Baggen joined us in the MFAC lobby and explained to Mrs. Bentley and her lawyer that Ms. Baggen had staffed the issue with her supervisor, who I understood from this MFAC lobby conversation to have been DCS employee Sara Greenway. [MFAC Lobby Transcript, 17:20-24]

42.     Ms. Baggen explained that her DCS supervisor said that T.A. needed to be interviewed and that T.A. could not leave until he's been interviewed. [MFAC Lobby Transcript, 17:20-24]

43.     Mrs. Bentley's lawyer, Mike Schern, then asked what the procedure was for a forensic interview, when it would happen, and whether it was recorded, while Mrs. Bentley asked what the interview would entail. [MFAC Lobby Transcript, 18:19-19:4]

44.     Mrs. Bentley's lawyer then asked Ms. Baggen, "Are you telling me that him being released right now is – will not happen without that interview?" [MFAC Lobby Transcript, 19:21-25]

45.     I heard Ms. Baggen respond, "At this point in time, yes. [MFAC Lobby Transcript, 19:21-25]

46.     Mrs. Bentley's lawyer then asked how long the interview would take, various individuals responded, and then Ms. Baggen told Mrs. Bentley and her lawyer that she was going to give them a DCS form. [MFAC Lobby Transcript, 20:1-13]

47.     Based on Ms. Baggen's response that T.A. was not free to leave until the forensic interview at MFAC was accomplished, I continued to believe that the child was— and continued to be-- in the temporary custody of DCS.  And I believed that DCS' position was that temporary custody of T.A. entailed both the medical evaluation at the hospital and, based on Ms. Baggen's statements in the MFAC lobby about T.A. not being free to leave until the forensic interview was completed, the forensic interview of T.A. at the MFAC.

48.     I do not believe I acted in a way that constitutes religious discrimination, nor do I believe other police officers did so.  I was made aware that Mr. and Mrs. Bentley stopped searching for T.A. and slept.  My focus was on the fact that they stopped, not that they prayed.

49.     As to the family's prayer inside their home, I do not believe that the prayer was prevented, delayed, or abridged by some officers remaining inside.  At the time of the family prayer, I understood that T.A. was inside the home, that he was to be transported by

ambulance imminently, and that he was in the temporary custody of DCS.  Further, myself

and other Officers were inside the house based on our concern for the safety and welfare

of T.A.

      50.    Throughout the entirety of my work on this case, I believed I was acting in

the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.

 

PETER BINA

 

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 18th day of

September, 2019, by PETER BINA, in the capacity and for the purposes herein stated.

etp - 09-25-2020

Notary Public

**THERESA NELSON**
**NOTARY PUBLIC, ARIZONA**
**MARICOPA COUNTY**
**My Commission Expires**
**September 25, 2020**

Attachment A



# Multidisciplinary Protocol for the Investigation of Child Abuse

Developed by the

**Interagency Council**

# Maricopa County Children's Justice Project

***Created July 1995***
*Revised July 1999, September 2003, June 2004, August 2008, March 2016*



**Bill Montgomery**
**Maricopa County Attorney**

Mesa/Bentley 000978

**APPENDIX 5: PRIORITIZING REPORTS AND RESPONSE**

Prioritizing Reports and Response

The Child Abuse Hotline shall assign each report a risk level and tracking characteristic, if applicable.

The Child Abuse Hotline shall notify the local office by telephone of the receipt of the report and its risk level for a high risk report or through a CHILDS Alert as soon as possible.  The local office and Group Care CPS Specialist shall cross-report to the appropriate law enforcement agency of the report, following district procedures.

Following the guidelines below, the Hotline Specialist is to determine and assign the appropriate risk level for the alleged abuse and neglect.

The timeframes for investigations are based on the following determinations of high risk, moderate risk, and low risk.

If there are extenuating circumstances that either require a faster response time or allow for a slower response, Hotline Specialists have the ability to aggravate or mitigate a report based on Aggravating or Mitigating Factors, or the Hotline Specialist can consult with the field regarding aggravation or mitigation, or leave this decision up to the field.

# High Risk Situations

**High Risk Physical Abuse**—Severe/life threatening injuries requiring emergency medical treatment and/OR parent presents severe physical harm to a child NOW.

The following injuries or situations constitute High Risk Abuse:

- Injuries requiring emergency medical treatment that may include:

- ☑ Head injury with risk of Central Nervous System damage
- ☑ Internal injury
- ☑ Multiple injuries or multiple plan injuries (battering)
- ☑ Severe facial bruises
- ☑ Fractures or bruises in a non-ambulatory child
- ☑ Fractures
- ☑ Instrumentation injury with risk of impairment
- ☑ Immersion burns
- ☑ Second and third degree burns
- ☑ Parent guardian or custodian provides prescribed/non-prescribed or illegal drugs or alcohol to a child **under the age of six (6)** and the child is exhibiting symptoms of the drug or alcohol
- ☑ Child under the age of twenty-four (24) months is shaken (shaken baby syndrome)
- ☑ Child under the age of six (6) observed or reported to be struck in the head, face, neck, genitals or abdomen which could likely cause an injury
- ☑ Physical abuse by a parent, guardian, or custodian who has a previous substantiated Priority 1 or High Risk report
- ☑ Parent, guardian or custodian threatens or presents serious bodily harm to a child **NOW**

**High Risk Neglect**—Severe/life threatening situations requiring emergency intervention due to the absence of a parent, or a parent who is either unable due to physical or mental limitations or is unwilling to provide minimally adequate care**.**

The Following Situations Constitute High Risk Neglect:

- **Delayed or** untreated medical condition which is life threatening or permanently disabling which may include Infant Doe, comatose state or debilitation from starvation or possible non-organic failure to thrive (aka pediatric under nutrition, poor weight gain).
- Child of any age who is alone and cannot care for self or for other children due to physical, emotional, or mental inability.  (This includes a parent, guardian, or custodian who is incarcerated or hospitalized.)

Mesa/Bentley 001107

- Child under the age of six (6) is alone **NOW.**
- Child six (6) to nine (9) years of age is alone for three (3) hours or longer or unknown when parent, guardian, or custodian will return.
- Imminent harm to child under the age of six (6) due to inadequate supervision by parent, guardian, or custodian.
- Neglect results in serious physical injury or illness requiring emergency medical treatment. *NOTE: Failure to use child restraints pursuant to ARS § 28-907 are not reports.*
- Imminent harm to child due to health or safety hazards in living environment which may include exposure to the elements.
- Child **assessed** as suicidal by qualified mental health professional and parent, guardian, or custodian is unwilling to secure needed emergency medical treatment including psychiatric treatment.
- No parent willing to provide immediate care for a child and child is with a caregiver who is unable or unwilling to care for the child NOW or child is left to his or her own resources.
- History of extensive gestational substance abuse to child under three (3) months of age or mother or child tests positive for non-prescribed or illegal drug or alcohol at time of birth.
- Child under two (2) months of age displays non-prescribed or illegal drug or alcohol withdrawal symptoms.
- Mother is using cocaine, heroin, methamphetamines, or PCP and is breastfeeding a child.

**High Risk Sexual Abuse**—Physical evidence of sexual abuse reported by a medical doctor or child reporting sexual abuse within the past seven (7) days.

The following situations constitute High Risk Sexual Abuse:

- Physical evidence of sexual abuse reported by a medical doctor or child reporting sexual abuse within the past 7 days.
- Child reporting vaginal or anal penetration or oral sexual contact (oral contact with the penis, vulva, or anus) within past seventy-two (72) hours AND has not been examined by a medical doctor.

| High Risk Response Times |
| --- |
| **Standard Response Time—SRT:  2 hours** |
| **Mitigated Response Time—MRT:  24 hours** |

# Moderate Risk

**Moderate Risk Physical Abuse**—Serious/multiple injuries which may require medical treatment and/or a child at risk for serious physical abuse if no intervention is received.

The following injuries or situations are considered Moderate Risk Abuse:

- Injuries: **That May Require Medical Treatment** which may include:

  - ☑ Multiple injuries or multiple plane injuries
  - ☑ Injuries to torso or extremities
  - ☑ Injuries to child under age one (1)
  - ☑ Fractures
  - ☑ Parent, guardian, or custodian provides prescribed/non-prescribed or illegal drug or alcohol to a child **six (6) years of age or older** and the child is exhibiting symptoms of the drug or alcohol
  - ☑ Munchausen's Syndrome by Proxy
  - ☑ Low Risk injury to child under the age of six (6)

Mesa/Bentley 001108

- ☑ Child six (6) years of age or older observed or reported to be struck in the head, face, neck, genitals, or abdomen which could likely cause an injury
- ☑ Parent, guardian or custodian **presents serious bodily harm to a child or** fears or threatens to harm child if no intervention received and he or she has a previous **substantiated** report of physical abuse
- ☑ Newborn child (under 3 months of age) born to parents whose parental rights have been previously terminated

**Moderate Risk Neglect**—Serious/Non-life threatening situations requiring intervention due to the absence of a parent, or a parent who is unable due to physical or mental limitations or is unwilling to provide minimally adequate care.

The following situations constitute Moderate Risk Neglect:

- Child age eleven (11) to thirteen (13) years of age caring for a child age six (6) or younger for twelve (12) hours or longer.
- Living environment presents health or safety hazards to a child under the age of six (6) which may include human/animal feces, indisposed garbage, exposed wiring, access to dangerous objects or harmful substances, etc.
- Due to inadequate supervision **or encouragement** by parent, guardian or custodian **sexual conduct or physical injury occurs between children.** This includes a licensed or certified DES facility or a licensed DHS Level I, II or III Behavioral Health Treatment facility
- (If the information is on a foster parent, group care facility, RTC, etc. use the designated questions. If it does not meet the criteria of a report for field investigation, send the information to the licensing specialist and case manager. If the licensing inquiry reveals inadequate supervision, the specialist will call back to make a report)
- No parent willing to care for a child and child is with a caregiver who is unable or unwilling to continue caring for the child less than ONE (1) WEEK.
- Newborn child (under 3 months of age) born to parents whose parental rights have been previously terminated.

**Moderate Risk Sexual Abuse**—Sexual behavior or attempted sexual behavior occurring 8 days or up to 1 year ago and/or child is exhibiting indicators consistent with sexual abuse.

The following situations constitute moderate risk sexual abuse:

- Several behavior within the past eight (8) to fourteen (14) days including sexual abuse, sexual assault, sexual exploitation of a minor, commercial sexual exploitation of a minor, incest, child prostitution, molestation of a child, and sexual conduct with a minor.
- Attempted sexual behavior or sexual behavior when last occurrence is unknown or when last occurred beyond fourteen (14) days and up to **one (1) year** including sexual abuse, sexual assault, sexual exploitation of a minor, commercial sexual exploitation of a minor, incest, child prostitution, molestation of a child and sexual conduct with a minor
- Parent, guardian or custodian suggests or entices a child to engage in sexual behavior, but there is no actual touching, including encouraging a child to view pornographic materials
- Child is exhibiting physical or behavioral indicators which are consistent with sexual abuse **AND** there are indicators the behavior is caused by parent, guardian, or custodian
- Child is living in the home with a person convicted of a sexual offense against a child

**Moderate Risk Emotional Abuse**—Child diagnosed by a mental health professional as exhibiting symptoms of emotional abuse caused by a parent.

30

Mesa/Bentley 001109

The following constitutes Moderate Risk Emotional Abuse:

■   Child diagnosed by qualified mental health professional as exhibiting severe anxiety, depression, withdrawal, or untoward aggressive behavior which could be due to serious emotional damage by parent, guardian or custodian.

| Moderate Risk Response Times: |
| :---: |
| SRT:  48 Hours |
| Aggravated Response Time—ART:  24 Hours |
| MRT:  72 Hours |

## Low Risk

**Low Risk Abuse**—**Injuries not requiring medical treatment and/or parent threatens physical harm if no intervention is received.**

■   The following injuries or situations are considered Low Risk Abuse:

☑  Injuries **Not Requiring Medical Treatment** which may include:
*   First degree or cigarette burns
*   Injury to buttocks or scalp (i.e., hair loss)
*   Injury to bony body parts (i.e., shins, knees, elbow, etc.)
*   Single or small bruises
*   Parent, guardian or custodian provides prescribed/non-prescribed or illegal drugs or alcohol to a child and the child is exhibiting symptoms of the drug or alcohol
*   Bleeding (i.e., hit in face, bloody nose)
*   Parent, guardian or custodian fears, or threatens to harm a child if no intervention is received.

**Low Risk Neglect**—Situations which may require intervention due to the absence of a parent, or a parent who is unable due to physical or mental limitations or is unwilling to provide minimally adequate care, which includes exploitation of a child.

The following situations constitute Low Risk Neglect:

■   Delayed or untreated medical problem causes child pain or debilitation that is not life threatening AND parent, guardian, or custodian is unwilling to secure medical treatment
■   Child under the age of nine (9), who is not alone at the time of the report, but has been left alone within the past fourteen (14) days
■   Parent, guardian or custodian demonstrates an inability to care for a child within the past thirty (30) days including leaving a child with inappropriate or inadequate caregivers
■   Living environment presents health or safety hazards to a child six (6) years of age or older which may include human/animal feces, indisposed garbage, exposed wiring, access to dangerous objects or harmful substances, etc.
■   Food not provided and child is chronically hungry
■   Significant developmental delays due to neglect
■   Use of a child by a parent, guardian, or custodian for material gain which may include forcing the child to panhandle, steal, or perform other illegal activities

Mesa/Bentley 001110

- Parent, guardian, or custodian is not protecting child from a person who does not live in the home AND who abused **a** child
- No parent willing to care for a child and child is with a caregiver who is unable or unwilling to continue caring for the child beyond ONE (1) WEEK UP TO THIRTY (30) DAYS (reporting source will need to call back if beyond thirty (30) days)

**Low Risk Sexual Abuse**—Sexual behavior or attempted sexual behavior occurring beyond 1 year and perpetrator currently has access to a child.

The following situations constitute Low Risk Sexual Abuse:

- Parent, guardian or custodian sexually abused a child in the past **AND** is now living in a home with a child.
- Attempted sexual behavior or sexual behavior when last occurrence was beyond **one (1) year** including sexual abuse, sexual assault, sexual exploitation of a minor, commercial sexual exploitation of a minor, incest, child prostitution, molestation of a child, and sexual conduct with a minor **and the perpetrator currently has access to the child.**

**Low Risk Emotional Abuse**—Parent demonstrates behavior which may result in emotional trauma to a child.

The following constitutes Low Risk Emotional Abuse:

- Parent, guardian or custodian demonstrates behavior or child reports parent, guardian or custodian behavior which is likely to have the effect of **fear** rejection, isolation, humiliation or debasement of a child.

| **Low Risk Response Times:** |
|:---:|
| **SRT:  72 Hours** |
| **Aggravated Response Time—ART:  48 Hours** |
| **MRT:  72 Hours Excluding Weekends & Holidays** |

**Potential Risk**

**Potential Risk Of Physical Abuse**—Child at risk of physical injury due to stressors in the home.

The following situations constitute Potential Risk of Physical Abuse:

- Home environment stressors place child at risk of physical abuse which may include:
  - ☑ domestic violence
  - ☑ mental illness
  - ☑ substance abuse
  - ☑ history of physical abuse with no current injury, etc.

**Potential Risk Of Neglect**—Child at risk of neglect due to stressors in the home.

The following situations constitute Potential Risk of Neglect:

- Parent, guardian or custodian has no resources to provide for child's needs (supervision, food, clothing, shelter, and medical care) and child's needs may be neglected.
- Home environment stressors place child at risk of neglect which may include mental illness, substance abuse, etc.

Mesa/Bentley 001111

**APPENDIX 6: ATTORNEY GENERAL OPINION**



STATE OF ARIZONA

OFFICE OF THE ATTORNEY GENERAL

GRANT WOODS
ATTORNEY GENERAL

1275 WEST WASHINGTON, PHOENIX 85007-2926

MAIN PHONE : 542-5025
TELECOPIER : 542-4085

October 2, 1998

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
1717 West Jefferson Street
Phoenix, Arizona 85005

RE: I98-008  (R98-017)

Dear Dr. Blessing:

You recently requested a formal opinion about whether private schools may impose requirements or limitations on Child Protective Services ("CPS") specialists who seek to interview children on school property. We conclude that Arizona law authorizes a CPS specialist to interview a child on school property without school-imposed requirements or limitations. In particular, we determine that the Legislature directed CPS to "immediately" "make a *prompt and thorough* investigation" to refute or substantiate an allegation about whether a child should be adjudicated dependent.[1]  Arizona Revised Statutes Annotated ("A.R.S.") § 8-802(C)(3)(b) (emphasis added); *see also* A.R.S. § 8-304(B). Moreover, the rules of the Department of Economic Security ("DES") relating to CPS's investigations of child abuse, neglect, dependency, or exploitation provide that "a child may be interviewed at any site deemed appropriate by the Child Protective Services worker." Arizona Administrative Code ("A.A.C.") R6-5-5504(B).  Personnel of both public and private schools also have a duty to protect the children under their care and to cooperate in the reporting and investigation of abuse, abandonment, dependency, or neglect. A.R.S. § 13-3620.[2]  Consequently, we find no legal basis

---

[1] A "dependent child" is one who is (i) adjudicated to be in need of appropriate and effective parental care and control, (ii) destitute, not being provided with the necessities of life, or in a home that is unfit due to abuse, neglect, cruelty or depravity of either parent, or (iii) younger than eight and committed an act that would have resulted in the child being adjudicated delinquent or incorrigible if the child were older. A.R.S. § 8-546(A)(6).

[2] Section 13-3620, A.R.S., requires school personnel, counselors, nurses, clergymen, priests, doctors, parents, and others responsible for the care and treatment of children who have reasonable grounds to believe that a minor has been the victim of abuse, injury, exploitation, or neglect to immediately report the information to a peace officer or CPS. That statute also requires release of confidential records to the peace officer or CPS specialist conducting the investigation and waives many of the privileges prohibiting disclosure of confidential information in litigation and administrative proceedings in which a child's abuse, abandonment, dependency, or neglect is an issue. *See also* A.R.S. § 8-805(B).

35

Mesa/Bentley 001114

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 2

on which schools – whether public (traditional and charter) or private (parochial or nonsectarian) – may erect barriers that impede the goal of protecting the welfare of children.

## Background

DES accepts reports of possible child abuse, neglect, exploitation, or abandonment twenty-four hours a day, seven days a week. A.R.S. § 8-802(C)(1) and A.A.C. R6-5-5503(A). DES operates a statewide, toll-free telephone service to receive these reports. Between July 1, 1996 and June 30, 1997, DES received 38,229 incoming communications to the Child Abuse Hotline that met the criteria of a report for investigation of maltreatment. ARIZONA DEPARTMENT OF ECONOMIC SECURITY, DIVISION OF CHILDREN, YOUTH AND FAMILIES, Annual Report for July 1, 1996 through June 30, 1997 at 2 (September 30, 1997). Forty-five percent of the reports related to allegations of neglect, 36% relayed concerns of physical abuse, 8% of the reports alleged sexual abuse, 8% encompassed reports of abandonment, 3% of the reports noted concerns of emotional abuse, and less then 1% of the reports concerned exploitation. *Id.*

When DES receives a report of child abuse, neglect, exploitation, or abandonment its Central Intake Unit is to evaluate the information to determine if the report should be referred for field investigation. DEPARTMENT OF ECONOMIC SECURITY, CHILDREN'S SERVICES MANUAL, ADMINISTRATION FOR CHILDREN, YOUTH AND FAMILIES, *Investigation and Assessment*, Chapter 5-1 (July 21, 1997). If DES determines that a field investigation is appropriate, it is to gather further information on the specific incident and then assess previous reports about the family and the status of prior cases. *Id.* at 5-2. Next, DES is to evaluate case-specific aggravating and mitigating factors and then prioritize the report. *Id.* at 5-3. DES is to make every effort to ensure that all CPS reports in a local office are assigned for field investigation or are referred to a CPS supervisor for an alternative investigation. *Id.* at 5-4.

Although DES's first priority in conducting an investigation is to determine whether the child who is the subject of the report (and all other children in the home) are safe from harm, it should also respect the rights of parents, guardians, and custodians. *Id.* at 5-8 and 5-11.[3] In conducting its interviews, the CPS worker must make many judgment calls. Among the preinterview decisions that confront CPS specialists in each investigation are: who should be interviewed, where the interviews should take place, in what order interviews should occur, whether interviews should be prearranged or unannounced, and who should be present during the interviews. *See id.* at 5-10. One obvious option that allows CPS to complete its investigation

---

[3] *See also* A.R.S. § 8-803(A) ("Upon initial contact with a parent, guardian or custodian under investigation pursuant to this article, a protective services worker shall inform the family that the family is under investigation . . . .").

Mesa/Bentley 001115

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 3

promptly and immediately is to interview children at their schools.

## Analysis

Parents and guardians are primarily responsible for the care and protection of their children. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 258 (1983). The State intercedes only when there is a report of abuse, neglect, or dependence where the health and welfare of a child may be imperiled. *See, e.g.,* A.R.S. §§ 8-304 (formerly A.R.S. § 8-224) (investigation of alleged acts of delinquency, dependency, and incorrigibility) and 8-802 (scope of responsibilities of CPS specialists); *Bohn v. County of Dakota,* 772 F.2d 1433, 1439 (8th Cir. 1985), *cert. denied,* 475 U.S. 1014 (1986) (recognizing the State's strong interest in "protecting powerless children who have not attained their age of majority but may be subject to abuse or neglect").

CPS's right to interview children on private school property during an investigation to evaluate allegations of abuse, dependency, neglect, or exploitation is based solidly on its statutory mandate and the explicit and implicit power to fulfill that mandate. First, CPS is required to "immediately," "promptly and thoroughly" investigate conditions that tend to support or rebut an allegation that a child should be adjudicated dependent. A.R.S. § 8-802(C)(3)(b). This statutory authority is consistent with the traditional role of the State as sovereign and guardian of persons under legal disability such as infants and children. *See Stewart v. Superior Court,* 163 Ariz. 227, 230, 787 P.2d 126, 129 (App. 1989). Indeed, courts routinely have recognized the State's compelling interest in identifying and protecting victims of child abuse when they have balanced the parents' constitutional interests in family autonomy against the State's intrusion into that interest during a child abuse, abandonment, neglect, or exploitation investigation. *See, e.g., Watterson v. Page,* 987 F.2d 1, 8 (1st Cir. 1993) ("the government has a compelling interest in the welfare of children, and the relationship between parent and child may be investigated"); *Fitzgerald v. Williamson,* 787 F.2d 403 (8th Cir. 1986) (caseworkers do not infringe on parents' liberty interest when the caseworker takes reasonable steps to protect a child from abuse); *Doe v. Staples,* 717 F.2d 953 (6th Cir. 1983), *cert. denied,* 465 U.S. 1033 (the State can remove a child from an abusive parent for the best interest of the child). We are aware of no privacy or liberty interest that a private school might possess that would override the State's compelling interest in making a prompt and thorough investigation of reports of child abuse, abandonment, neglect, or exploitation.

Second, although a private school may have a general right to prohibit entry onto its property, Arizona statutes, decisional law, and administrative rules authorize appropriate interview and intervention activities. The Arizona Court of Appeals has recognized that peace officers, with reason to believe that a child's health, morals, or welfare are being endangered,

Mesa/Bentley 001116

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 4

have a right and legal duty to act.[4] *State v. Hunt*, 2 Ariz. App. 6, 12, 406 P.2d 208, 214 (App. 1965); *cf.* A.A.C. R6-5-5504(F) ("a child can be removed if suffering or in danger of imminently suffering abuse"). Authorized action includes entering onto private property, investigating, and taking the child into custody, if necessary, with or without a search warrant and with or without the consent of all persons who have a proprietary interest in the premises.[5] *Hunt*, 2 Ariz. App. at 12, 406 P.2d at 214. When investigating allegations of child abuse, abandonment, neglect, or exploitation, we see little distinction between a peace officer's legal duty and responsibility and that of a CPS specialist.[6] CPS specialists and peace officers have the authority to investigate and immediately take a child into temporary custody regardless of where the child is located. A.R.S. § 8-821. *Compare* A.R.S. § 8-304(A) (formerly A.R.S. § 8-224(A)) (law enforcement officers have responsibility to investigate completely alleged acts of delinquency or incorrigibility) *with* A.R.S. § 8-304(B) (formerly A.R.S. § 8-224(B)) (CPS specialists have responsibility to investigate completely all complaints of alleged dependency, and DES has responsibility for the disposition of a child unless the matter requires intervention of the juvenile court).

As the court recognized in *Hunt*:

> Considering Bernal's obligations as a peace officer and the details of Miss Hengsteler's description of Tina's condition just related to him, he had a duty to proceed forthwith, without delaying to get anyone's permission (whether it be a magistrate's or the property owners') to extend the protective arm of the State of Arizona through its juvenile code to Tina without being concerned with what or who was responsible, or what

---

[4] Our analysis assumes that CPS workers, before approaching private school officials to interview a student, have sufficient cause to initiate an investigation into child abuse, abandonment, neglect, or exploitation.

[5] In 1965, when *Hunt* was decided, the statutory authority under which the peace officer acted provided as follows: "This article shall not be construed to prohibit a peace officer from taking into custody a child . . . whose surroundings are such as to endanger his health, morals, or welfare unless immediate action is taken." A.R.S. § 8-221 (1965).

[6] The Arizona Court of Appeals recently agreed when it found that constitutional due process protections came into play when determining the voluntariness of a confession of a suspected child abuser obtained by a CPS specialist . *In Re Timothy C.*, 275 Ariz. Adv. Rep. 43 (App. August 13, 1998). In *Timothy C.*, the CPS specialist interviewed a sibling of the alleged victim. The sibling was also the suspected abuser who was subject to possible criminal action pending the outcome of the investigation. The court considered the CPS specialist's interview as an example of "State action . . . under the State's police powers in the general sense." We note that the court did not place restrictions on CPS's right to investigate or interview under A.R.S. § 8-802, only the use that criminal prosecutors could make of the information that CPS obtained.

38

Mesa/Bentley 001117

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 5

> subsequent criminal or civil proceedings might be instituted. To enter her
> home to protect Tina is certainly not a judicial or quasi-judicial
> proceeding but a matter of protective custody.

> If officer Bernal had delayed his actions unreasonably under these
> circumstances, he would have been remiss in this duty. To require him to
> determine the existence and extent of each person's proprietary interest in
> the premises and obtain their consent before performance of his duty
> under A.R.S. § 8-221 would, in this case, have rendered the statute
> nugatory.

2 Ariz. App. at 13, 406 P.2d at 215.

Furthermore, DES rule A.A.C. R6-5-504(B) authorizes CPS specialists who investigate
reports of child abuse, neglect, dependency, or exploitation to interview a child "at any site
deemed appropriate" by the CPS specialist. This rule was adopted in 1983 and is legally binding
on private schools. *See* A.R.S. § 41-1001(18) (a "'rule' means an agency statement of general
applicability that implements, interprets or prescribes law or policy . . ."); *see also Herzberg v.
David*, 27 Ariz. App. 418, 419, 555 P.2d 677, 679 (App. 1976) (rules adopted pursuant to
statutory authority have the force and effect of law).

We recognize that not all CPS investigations require immediate access to a child victim
or witness. The urgency of the interview will depend on the facts known to the CPS specialist at
the time the specialist makes a request to interview a child at a private school. Because the CPS
specialist must maintain confidentiality, the specialist is not at liberty to share this information
with the school and thus must independently make a reasonable determination of urgency. *See*
A.R.S. § 41-1959(A). For example, in some circumstances it might be reasonable and prudent
for a CPS specialist to delay an interview until the end of a class to alleviate disruption to the
school environment or to avoid embarrassment to the child being interviewed.[7]

Of course, when a CPS specialist arrives at a school, there are introductory and
notification procedures that each CPS specialist should follow. At the outset, the specialist
should (i) provide official identification to school officials, (ii) advise school officials of the

---

[7] Section 8-821(B), A.R.S., allows peace officers and CPS specialists to take children into protective
custody if it is clearly necessary to protect the child. We hope that a private school would not make such measures
necessary by refusing to allow the CPS specialist to interview a child on school property. Such refusal could cause
additional trauma to innocent and vulnerable children and will require CPS to resort to a legal process that is both
unnecessary and intrusive to the child, the school, and the child's family merely to conduct an interview.

Mesa/Bentley 001118

Dr. Linda J. Blessing, Director
Arizona Department of Economic Security
October 2, 1998
Page 6

specialist's need to interview the child while maintaining the confidentiality mandated by A.R.S. § 41-1959(A), and (iii) inform school officials whether parental consent is a necessary prerequisite for conducting the interview, A.R.S. § 8-802(C)(2)(a)-(b).[8] This information will supply the school with the factual and legal prerequisites necessary to release the student to be interviewed.

### Conclusion

We determine that A.R.S. § 8-802(C)(3)(b) (previously A.R.S. § 8-546.01), which requires a CPS specialist to *immediately* make a *prompt and thorough* investigation to refute or substantiate an allegation about whether a child should be adjudicated dependent, in conjunction with A.A.C. R6-5-5504(B), which provides a CPS specialist with discretion to interview a child at any site the specialist deems appropriate, authorize the CPS specialist to enter onto private school property to conduct interviews authorized by law. Personnel of both public and private schools have a duty to protect the children under their care and to cooperate in the reporting and investigation of abuse, dependency, neglect, or exploitation. Consequently, we find no legal basis on which schools -- whether public (traditional or charter) or private (parochial or nonsectarian) -- may erect barriers that impede the goal of protecting the welfare of children.

Sincerely,

Grant Woods
Attorney General

---

[8] In pursuing its investigation, CPS specialists are not required to obtain parental consent to interview a child who initiates contact with the worker, a child who is the subject of the investigation, or a sibling of or a child living with the subject of the investigation. A.R.S. § 8-802(C)(2)(a)-(b). Once the CPS specialist confirms to school officials that the investigation is one that does not require parental consent, school officials may not interfere.

Mesa/Bentley 001119

Exhibit 21

<u>AFFIDAVIT OF DOMENICK KAUFMAN</u>

STATE OF ARIZONA        )
                        ) ss.
County of Maricopa      )

DOMENICK KAUFMAN, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I was a Sergeant with the City of Mesa Police Department's Special Victim's Unit on April 1, 2016, the date referenced in the Plaintiff's Complaint. Now, retired, I was certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification. In addition, I participated in numerous informal training at the Mesa Family Advocacy Center regarding child abuse and child neglect cases.

3.      Prior to the date of this incident, I had received training and experience as a police officer, detective and ultimately as a sergeant with Mesa Police Department's Special Victim's Unit.

4.      By the time of the incident, I had received training both in the Mesa Police Academy and in continued law enforcement training regarding lawful entries into a

residence, including entry by consent, entry based on probable cause and exigent circumstances, and entry and care based on a police officer's community caretaking function and the emergency aid doctrine.

5.      By that date, I also received training both in the Mesa Police Academy and in continued law enforcement training regarding the parameters of 1st, 4th and 14th Amendment Constitutional rights as to seizures of persons by a police officer, exceptions to the warrant requirement relating to searches and seizures, objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

6.      By that date, I also had training and experience related to the investigations of child abuse and child neglect cases, use of the Multidisciplinary Protocol for the Investigation of Child Abuse by the Maricopa County Children's Justice Project, which regarded both child abuse and child neglect investigations by police officers and police detectives, and I was familiar with Mesa P.D. policy related to child abuse and child neglect investigations, the MFAC, interviews of juveniles, Arizona law regarding temporary custody notices, basic and advanced forensic interviewing, scene preservation, investigations as to crimes against children regarding physical abuse, medical aspects, sexual crimes, and relevant portions of Titles 8 and 13 of the Arizona Revised Statutes.

7.      On April 1, 2016, I received a page via email from dispatch notifying me of a missing seven-year-old boy who was reportedly missing overnight, and that the parents delayed calling emergency services to look for the child.

8.     In response to the page received from dispatch, I sent a page via email to the Mesa Family Advocacy Center ("MFAC") personnel asking all available personnel to meet for a missing persons/suspicious circumstances briefing.

9.     As a result of learning information by phone from officers currently at the scene, I determined that the incident should also be investigated as to the missing child and as to suspicious circumstances related to the fact that the child was missing.  Specifically, based on the initial information I had from police officers at the scene, the seven-year-old child had been missing since roughly 9 pm the night before, the parents had looked for the child and then went to sleep or ceased looking for whatever reason and didn't notify police for several hours later this morning. Further, I understood from police officers on scene that one or both of the parents was acting unusually calm despite the child being missing overnight.

10.     I requested and attended a briefing at the MFAC where the above facts were discussed and where case assignments were given so that the Special Victims Unit Detectives could deploy into the field to assist in locating the child and investigate the circumstances.

11.     Because of the young age of the child, because he had been missing overnight, and because the parents had reportedly stopped looking at some point overnight and then failed to call police until approximately 8 am this morning, I also asked that employees from the Department of Child Services come to the MFAC briefing.

12.    I also learned that two siblings of the missing child were at a school. I learned this either before or at the briefing, and I recall that Detective Russo was to go to the school and contact those siblings.

13.    Dispatch advised that TA had been found just prior to Sergeant Bina and I arriving at the Bentley address.  In order to determine if my assistance was needed further, I made contact with Mesa P.D. supervisors at the scene, including Sergeant Walters and some of the patrol officers on scene to discuss details of the events.

14.    I then spoke with detectives and officers that were at the house and I received information that some suspicious circumstances were continuing.  For instance, once T.A. was found, I was told that he was trying to break away from his father and run away.  I was also told by officers on scene that the parents were refusing medical treatment of their seven-year-old child who had been missing overnight.

15.    I recall generally standing by the outside of the front of the Bentley home near the open front door and later the closed front door, and I was aware that paramedics, police officers, detectives, and DCS were in the house discussing the issue of medical treatment.

16.    I did not enter the Bentley home, and I do not recall speaking to any of the Bentley children or Mr. or Mrs. Bentley.

17.    I do not recall seeing the missing child that day.

18.    I also did not see the forensic interviews at the MFAC of any of the Bentley children.

19.     Based on my training and experience through the date of the incident as a Mesa Police Department Special Victim's Unit Sergeant, I did not direct actions of separate entities such as the Department of Child Services and the Office of Child Welfare, or those entities' employees.   Those entities were not considered to be part of the Mesa Police Department, as they had their own employees and supervisors employed by those entities.

20.     Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his health, safety, and welfare.

Further affiant sayeth not.

_____
DOMENICK KAUFMAN

SUBSCRIBED AND SWORN TO before me, a Notary Public, this __19__ day of September, 2019, by DOMENICK KAUFMAN, in the capacity and for the purposes herein stated.

BRYNN SOLLINGER
Notary Public - State of Arizona
PINAL COUNTY
Commission # 546825
Expires August 17, 2022

_____
Notary Public

Exhibit 22

## DECLARATION OF ROBERT RUSSO

STATE OF ARIZONA    )
                       ) ss.
County of Maricopa    )

ROBERT RUSSO, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am a Detective with the City of Mesa Police Department. I was employed in that capacity on April 1, 2016, the date referenced in the Plaintiff's Complaint. I have been certified as a sworn peace officer through AZPOST and that certification was in effect at all times related to this April 1, 2016, incident. Further, I attended continued law enforcement training on yearly basis, and my understanding is that this was also required as part of my continued AZPOST certification. In addition, I have participated in numerous informal training at the Mesa Family Advocacy Center ("MFAC") regarding child abuse and child neglect cases.

3.      Prior to my employment with Mesa Police Department, I was a patrol officer and detective with ASU for approximately 13 years. While at ASU, I also completed training including basic forensic interviewing, advanced forensic interviewing, child abuse and neglect investigations and sex crimes training.

4.      On the date of the incident, April 1, 2016, I was a Detective in the Special Victims Unit out of the MFAC. By that date, I had received law enforcement academy

training and continued law enforcement training regarding the parameters of 1st, 4th and 14th Amendment Constitutional rights as to seizures of persons by a police officer, exceptions to the warrant requirement relating to searches and seizures, objectively reasonable uses of force, and as to Constitutional, civil rights violations pertaining to freedom of religion and discrimination based on religion, race, and ethnicity.

5.     By that date, I also had training and experience related to the investigations of child abuse and child neglect cases, the Multidisciplinary Protocol for the Investigation of Child Abuse by the Maricopa County Children's Justice Project, which regarded both child abuse and child neglect investigations by police officers and police detectives, and I was familiar with Mesa P.D. policy, including policy related to child abuse and child neglect investigations, the MFAC, interviews of juveniles, Arizona law regarding temporary custody notices, basic and advanced forensic interviewing, scene preservation, investigations as to crimes against children regarding physical abuse, medical aspects, sexual crimes, and relevant portions of Titles 8 and 13 of the Arizona Revised Statutes.

6.     As part of my role as an ASU Officer and as a Mesa Police Department Special Victims Unit Detective, I was sometimes tasked with doing forensic interviews of children of child abuse and child neglect cases. It was my general understanding that the MFAC, one of multiple centers formed in conjunction with the Maricopa County Children's Justice Project, was an appropriate and desired setting because it was designed for that purpose.

7.     Upon my arrival at work on April 1, 2016 at the MFAC as a Special Victims Unit Detective, I recall being notified of a missing seven-year-old boy who was reportedly

missing overnight. My understanding was that the child's parents had not called police to look for the child until this morning. I was then given the task and responsibility of picking up two of the child's brothers and roommates at the house, M.J. and B.J., from the Great Hearts Academy in order to take them to the center for forensic interviews.

8.      I do not recall who specifically directed me to pick up M.J. and B.J. from Great Hearts Academy. However, I do recall that before leaving for the school, I was aware of the existence of a child neglect and/or child abuse investigation related to T.A., the brother of M.J. and B.J. and that their parents were the subjects of the investigation, and that our Special Victims Unit was involved in the investigation. I was also aware that T.A. had been gone missing overnight and was still missing, and I understood the urgency to talk to these siblings of T.A.

9.      I did not go to the Bentley home, but instead, proceeded to the Great Hearts Academy to pick up M.J. and B.J., as directed, along with one of our Unit's Forensic Investigators, Lauren Glazer. We were both wearing plain clothes, as opposed to wearing police uniforms, and we were not carrying visible guns or weapons at any time.

10.      Prior to entering Great Hearts Academy and talking to staff, I recall generally learning through either dispatch or a phone call that T.A. had been located, so I recall starting to drive back to the MFAC. However, I also recall being contacted by either dispatch or phone while starting to drive back to the MFAC that I needed return to Great Hearts Academy to transport M.J. and B.J. to the MFAC for forensic interviews. I do not recall who specifically informed me of this, but it would have been from Mesa P.D.

personnel involved in the Bentley investigation and it would have been regarding the investigation of child neglect and/or child abuse related to T.A. having been missing.

11.     Upon entering Great Hearts Academy, I completed a standard form commonly related to police officers transporting children from a school to another location. I also informed the school that we needed to speak to two of their students M.J. and B.J.  I recall being provided with the form to fill out by the school in order to sign out M.J. and B.J., and I provided my police badge for the staff to make a copy.  Because of my understanding that Mr. and Mrs. Bentley were the subjects of the criminal investigation, I checked a box to request that the school not contact the parents at this time.  It was my understanding that Detectives at the scene were handling this aspect of the case, as I knew that Detectives and DCS were at the scene with the parents.

12.     Upon driving M.J. and B.J. to the MFAC, I remotely monitored the interviews as Forensic Interviewer Lauren Glazer conducted the interviews of M.J. and B.J.

13.     During the entirety of my involvement in the Bentley investigation, I believe I was acting in the best interests of the alleged victim, T.A., and his welfare.

Further affiant sayeth not.

_____
ROBERT RUSSO


SUBSCRIBED AND SWORN TO before me, a Notary Public, this _18th_ day of September, 2019, by ROBERT RUSSO, in the capacity and for the purposes herein stated.

_Patricia Bolanos_

Notary Public



Exhibit 23

## DECLARATION OF LAUREN GLAZER

STATE OF ARIZONA      )
                      ) ss.
County of Maricopa    )

LAUREN GLAZER, being first duly sworn upon her oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      I am a Police Forensic Interviewer with the City of Mesa Police Department. I was employed in that capacity on April 1, 2016, the date referenced in the Plaintiff's Complaint.

3.      I had been a Forensic Interviewer for approximately 6 years prior to April 1, 2016. In February 2010, I received basic forensic interview training at the National Children's Advocacy Center in Huntsville, Alabama.  In April 2015, I also received basic forensic interview training, and advanced forensic interview training.  I also had experience by taking multiple forensic interviews by the date of this investigation at the Mesa Family Advocacy Center ("MFAC").

4.      By that date, I was also familiar with the Multidisciplinary Protocol for the Investigation of Child Abuse by the Maricopa County Children's Justice Project, which regarded both child abuse and child neglect investigations and forensic interviews of minor victims and witnesses, and I was familiar with Mesa P.D. policy related to child abuse and child neglect investigations, the MFAC, interviews of juveniles, basic and advanced

forensic interviewing. In addition, I participated in numerous informal training at the MFAC regarding child abuse and child neglect cases.

5.      Based on my training and experience as a Police Forensic Interviewer, I am trained to conduct forensic interviews of minor children who are believed to be victims and/or witnesses of facts underlying criminal investigations, including child neglect and child abuse.  It was my general understanding that the MFAC, one of multiple centers formed in conjunction with the Maricopa County Children's Justice Project, was an appropriate and desired setting because it was designed for that purpose.

6.      On the morning of April 1, 2016, I recall going with Special Victims Unit Detective Rob Russo to a school where two siblings of T.A. were located.  At this time, I was aware that seven-year-old T.A. was alleged to be the victim of child neglect relating to him being missing overnight and the parents not reporting the child missing until the next day.

7.      I interviewed 11-year-old B.J., 9-year-old M.J. and 7-year-old T.A. at the request of Detective Kessler

8.      I believe it was Detective Kessler who asked that I conduct the forensic interviews to see if something had happened to the child.  At that time, it was my understanding that there was an urgency to conduct the forensic interviews because T.A. was missing, and had been missing overnight.

9.      I recall going to the school with Detective Russo.  Just after we had arrived to the school grounds, we learned that T.A. had just been found.  As I recall, we started to return to the MFAC, but received a call to go back and bring two of T.A.'s brothers to the

MFAC for forensic interviews.  Detective Russo completed paperwork at the school, we waited in the school's front office, introduced ourselves to M.J. and B.J., and we brought them to the MFAC. Both Detective Russo and I were in plain clothes rather than uniforms.

10.     Prior to interviewing M.J., B.J. or T.A., I introduced myself and my role at the MFAC as an interviewer.  I informed all three of the Bentley children that they were not in any trouble prior to any questioning.  In addition to asking the children about themselves and their family dynamic, I questioned the children regarding their knowledge about T.A.'s disappearance.  Prior to the interviews, I was aware that DCS was also involved in the investigation, and I asked questions pursuant to my training and experience generally regarding potential neglect and potential abuse, whether physical, sexual or emotional.

11.     First, I interviewed eleven-year-old B.J.  B.J. informed me that T.A. ran away the night before and that he had been gone overnight and that he wasn't sure if he had been found yet. When I asked him what happened, he stated that he thought T.A. was afraid because their father liked to yell and he gets mad sometimes as the result of them not listening to their mother.  He also stated that he became aware that T.A. was missing the night before when his parents couldn't find T.A., that they searched the house over and over, and that his parents looked until about 3:30 a.m. and then slept and woke up really early.  B.B. explained that this morning T.A. was not there, but that they just had a regular day and got ready for school.  When asked if T.A. had ever done something like this before, he responded that T.A. had run away before but never overnight.  He also stated that their father sometimes pulls their hair, and that they get lots of consequences and lots of jobs.

B.J. stated no one's body gets hurt.  B.J. also indicated that in other instances of T.A. running away, his parents call the police.  He further said that T.A. does not typically come back on his own, but instead waits until someone finds him.

12.     Second, I interviewed nine-year-old M.J.  M.J. told me that his brother T.A. didn't go to school this day and that their mother and father didn't really talk about where he was this morning.  He also stated that when he asked his mother where T.A. was she told him she didn't know and that his neighbors took him to school that day.  MB also told me that when he and his brothers and sisters get into trouble, they have to do jobs and lose privileges.  He said T.A. has run away before and that he believes T.A. does this when he's mad or in trouble.

13.     Third, I interviewed seven-year-old T.A.  T.A. told me that the night he ran away he was in trouble and had to do lots of jobs, and that his mother told him that he would be going to his father's office as punishment for not completing the jobs.  T.A. said that sometimes he has to go to his father's office until 3 am, and that last night when he was told he had to go to his father's office, he decided to run away.  When asked what happens when he is in trouble at home, T.A. told me that he is assigned jobs, that his father hurts him as well as his siblings by throwing them around like they're rocks.  T.A. also said that he did not always feel safe at home because of his brothers and because his father "hurts us" and 'throws us like we're rocks" and that it almost always happens at night. When asked if he heard anyone looking for him last night (the night he ran away), he responded that he did not hear anyone looking for him until the morning when he heard

people and police calling him.   He also said he was comfy in the bush he was in, and that he was not scared or afraid.

14.     The forensic interviews were recorded as part of the investigation and referenced by summary in my supplement to the Mesa Department Report.

15.     When interviewing M.J., B.J., and T.A., my intent was to try to learn what had had happened to T.A. last night and what caused T.A. to run away overnight. Throughout the entirety of my work on this case, I believed I was acting in the best interests of T.A. and his welfare.

Further affiant sayeth not.

_____
LAUREN GLAZER

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 18th day of September, 2019, by LAUREN GLAZER, in the capacity and for the purposes herein stated.

_____
Notary Public



OFFICIAL SEAL
PATRICIA BOLANOS
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Commission Expires October 15, 2021

Exhibit 24

## DECLARATION OF PAUL HAWKINS

STATE OF ARIZONA    )
                        ) ss.
County of Maricopa    )

      PAUL HAWKINS, being first duly sworn upon his oath, deposes and says:

    1.     I make this Declaration in connection with *Brian L. Bentley, et al. v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

    2.     I am an Assistant City Prosecutor with the City of Mesa.  I was employed in that capacity on April 1, 2016, the date referenced in the plaintiffs' complaint, I remain employed in that capacity, and I had been an Assistant City Prosecutor for approximately 9 years prior to that date.

    3.     The Mesa Police Department submitted to the City of Mesa Prosecutor's Office a request for criminal charges against Brian Bentley and Janna Bentley related to Mesa P.D. Departmental Report Number 2016-0920181 and an incident reported to have occurred from the evening of March 31, 2016, through the morning of April 1, 2016, where their seven-year-old child, T.A., was missing and unaccounted for outside overnight.

    4.     I was the prosecutor who reviewed the Mesa Police Department's submittal for criminal charges against Brian and Janna Bentley, I was the prosecutor who filed criminal charges against Brian Bentley and Jana Bentley for misdemeanor crimes under A.R.S. §§ 13-3613 and 13-3619, and I was the prosecutor who tried the consolidated criminal cases against Brian and Janna Bentley to a jury.

5.      Based on my review of the Departmental Report and my understanding of

A.R.S. § 13-3619, I found there to be sufficient probable cause to commence the

prosecution against Brian Bentley and Janna Bentley for violating this Arizona statute,

which provided: A person having custody of a minor under sixteen years of age who

knowingly causes or permits the life of such a minor to be endangered by neglect is guilty

of a class 1 misdemeanor. *See State v. Villareal*, 2008 WL 2917128 (Ariz. Ct. App. Jul. 29,

2008) (endangerment constitutes knowingly creating or knowingly permitting a risk or

possibility of harm such that death could potentially result; actual harm is not required; the

risk of harm need be neither substantial nor imminent).

6.      Specifically, I believed that both Mr. and Mrs. Bentley violated A.R.S. § 13-

3619 by failing to supervise seven-year-old T.A. while knowing he was missing and

unaccounted for overnight on March 31, 2016, by their knowledge that they did not know

where T.A. was located despite their attempts to find T.A. both inside their home and

outside the house on the night of March 31 and early morning hours of April 1, by

recognizing that the outside temperature was cold overnight and that seven-year-old T.A.

was unsupervised and unaccounted for in a neighborhood they knew to have nearby

hazards, including but not limited to, a nearby canal, a nearby freeway, a nearby major

arterial street, a nearby collector street, a nearby juvenile group home, Mrs. Bentley's

knowledge of a stranger walking near her home that she encountered during her search for

T.A. outside and that concerned her, and knowledge that T.A. had told her of a plan to run

away and live off of fruit trees; further, that probable cause existed because Mr. and Mrs.

Bentley made a conscious decision to stop their search, did in fact stop searching, slept

during the time they stopped their search-whether voluntarily or involuntarily, and then after awakening, delayed calling emergency services to look for T.A. until approximately 8:00 a.m. on April 1, 2016. For example, I believed that Mr. and Mrs. Bentley's decision to stop looking while also choosing not to alert emergency responders before stopping their search were acts that constituted endangerment of their minor child by means of neglect, including a lack of supervision of the seven-year-old child.

7.     Based on my review of the Departmental Report and my understanding of A.R.S. § 13-3613, I also found there to be sufficient probable cause to commence the prosecution against Brian Bentley and Janna Bentley for violating this Arizona statute, which provided: A person who by any act, causes, encourages or contributes to the dependency or delinquency of a child, as defined by section 13-3612, or who for any cause is responsible therefor is guilty of a class 1 misdemeanor. A.R.S. § 13-3612 defined delinquency as any act that tends to debase or injure the morals, health or welfare of a child.

8.     Specifically, I believed that Mr. and Mrs. Bentley both violated A.R.S. § 13-3613 by acting in ways that contributed to the delinquency of seven-year-old T.A. when failing to supervise seven-year-old T.A. while knowing he was missing and unaccounted for overnight on March 31, 2016, by their knowledge that they did not know where T.A. was located despite their attempts to find T.A. both inside the house and outside the house on the night of March 31 and early morning hours of April 1, by recognizing that the outside temperature was cold overnight and that seven-year-old T.A. was unsupervised and unaccounted for in an area with nearby hazards, including but not limited to, a nearby canal, a nearby freeway, a nearby major arterial street, a nearby collector street, and a nearby

group home; further, that probable cause existed because Mr. and Mrs. Bentley made a conscious decision to stop their search, did in fact stop searching, slept-whether voluntarily or involuntarily, and then after awakening delayed calling emergency services to look for T.A. until approximately 8:00 a.m. on April 1, 2016. Mr. and Mrs. Bentley's decision to stop looking while also choosing not to alert emergency responders before stopping their search were acts that tended to debase or injure the morals, health or welfare of the child.

9.      Based on the foregoing, on August 9, 2016, I filed criminal complaints in the Mesa Municipal Court against Mr. Bentley and against Mrs. Bentley because I believed probable cause existed as to A.R.S. §§ 13-3619 and 13-3613.

10.     On September 2, 2016, Mr. and Mrs. Bentley's criminal defense attorney entered appearances on the cases, requested that a not guilty plea be entered on their behalves, requested that the Court vacate the arraignment, and requested that the matters be set for a pre-trial conference in lieu of arraignment.

11.     Based on my understanding of the criminal procedure rules applicable to the Municipal Court and based on my experience as a prosecutor, it is my general understanding that criminal defendants have the right to challenge the existence of probable cause, for example, at an arraignment. However, in both of these cases, Mr. and Mrs. Bentley's attorneys requested to vacate the Court's scheduled arraignment hearings and to proceed directly to a pretrial conference, as is a criminal defendant's right under Ariz. R. Crim. P. 14.2(c)(2). It is my understanding that Mr. and Mrs. Bentley's criminal defense attorneys did not challenge the existence of probable cause by, for example, raising with the Court the issue whether probable cause existed before commencement of the jury trial.

12.     However, I continued to believe that probable cause existed to warrant continuation of the prosecution through trial, and this continued belief was based on my review, analysis, and response to the criminal defense attorneys' pre-trial disclosures, the criminal defendants' notice of defenses, witnesses and evidence, and the criminal defendants' May 15, 2017, motion to preclude the City's expert witness, Mr. Conrad, where the parties briefed the expert's anticipated testimony as to risks of harm to a child missing overnight and where the criminal defense attorney admitted that when Mr. and Mrs. Bentley each knowingly stopped searching, they fell asleep inadvertently; my continued belief that probable cause remained was further based on my review of Axon video related to the incident, my review of DCS records, my interview of approximately seven lay witnesses disclosed by the criminal defense, my consultation with expert witnesses as to the potential risk of harm to minors, my conferral with my supervisor, the July 10, 2017, criminal defense motion requesting a jury trial, the Court's granting of that motion, and the failure of the criminal defense to move for pre-trial dismissal of the charges or to request an evidentiary hearing challenging probable cause; at the August 2017 jury trial I continued to believe that probable cause remained due to the City's presentation of evidence, and the fact that after the City rested its case, Mr. and Mrs. Bentley put on their case rather than obtaining a directed verdict at that point.

13.     Ultimately, a jury found that the City had not met its burden of proving beyond a reasonable doubt that Brian and Janna Bentley committed the crimes, and the jury found in favor of Brian and Janna Bentley.

14.     But at no point during my work on this file did I believe the City lacked probable cause for the above-referenced criminal charges against Mr. and Mrs. Bentley.

15.     Consistent with my training, experience, and practice as a prosecutor, if I had ever felt that the City lacked probable cause to proceed on either charge against either Mr. or Mrs. Bentley, I would have promptly moved to voluntarily dismiss the charge or charges in the interest of justice.

16.     But that did not occur here, because I believed probable cause existed through the entirety of my work on these files.

17.     Further affiant sayeth not.

PAUL HAWKINS

SUBSCRIBED AND SWORN TO before me, a Notary Public, this 18th day of September, 2019, by PAUL HAWKINS, in the capacity and for the purposes herein stated.

David Ocampo
Notary Public
Maricopa County, Arizona
My Comm. Expires 7-19-2020

Notary Public

Exhibit 25

## DECLARATION OF BENTLEY J. BOBROW

STATE OF TEXAS          )
                        ) ss.
County of Harris        )

BENTLEY J. BOBROW, being first duly sworn upon his oath, deposes and says:

1.      I make this Declaration in connection with *Brian L. Bentley v. City of Mesa, et al.,* United States District Court Case No. CV 17-00966-PHX-DJH, based on my personal knowledge.

2.      As noted on my curriculum vitae at the time of my report in this case, labeled as Mesa/Bentley 005454-5507, I have been a board-certified Emergency Physician and was an EMS Medical Director for 24 years.  I served as a Distinguished Professor of Emergency Medicine and the Associate Director of the Arizona Emergency Medicine Research Center, was the Medical Director of the Arizona Department of Health Services, Bureau of EMS and Trauma System for 15 years, and my role included development of EMT guidelines, regional protocols, and case quality reviews of EMS agencies and individual EMTs.

3.      I make this Declaration by incorporating by reference my April 16, 2019, report in this case, titled Case Review and labeled as Mesa/Bentley 005448-005453, and my curriculum vitae, labeled as Mesa/Bentley 005454-5507, both of which I declare to be true and accurate at the time I drafted them.

4.      Further affiant sayeth not.



BENTLEY J. BOBROW

SUBSCRIBED AND SWORN TO before me, a Notary Public, this ll____ day of September, 2019, by BENTLEY J. BOBROW, in the capacity and for the purposes herein stated.

_____
Notary Public

ANNETTE K. ROBERTS
My Notary ID # 7842212
Expires June 10, 2021

Attachment A

# Curriculum Vitae and Bibliography
## Bentley J. Bobrow, MD, FACEP, FAHA

## PERSONAL INFORMATION

| | |
|---|---|
| Place of Birth: | Chicago, IL |
| Citizenship: | United States |
| Work Address: | University of Arizona Health Sciences |
| | Arizona Emergency Medicine Research Center |
| | 1609 North Warren Avenue |
| | Room 118 |
| | P.O.Box 245057 |
| | Tucson, AZ  85724-5057 |
| Email Address: | Bobrowben@gmail.com |

## CHRONOLOGY OF EDUCATION

| | |
|---|---|
| Undergraduate Education<br>BS, Biology<br>University of Arizona<br>Tucson, Arizona | 1983 - 1986 |
| Medical Education<br>MD<br>Jefferson Medical College<br>Thomas Jefferson University<br>Philadelphia, Pennsylvania | 1987 - 1991 |
| Transitional Internship<br>Residency, Emergency Medicine<br>Maricopa Integrated Health Services<br>Phoenix, Arizona | 1991 - 1992<br>1992 - 1995 |
| Arizona State Medical License | 1992 - present |
| Nevada State Medical License | 1995 - 2003 |
| Board Certified in Emergency Medicine | 1995 - present<br>2005 - recertified<br>2015 - recertified |

## CHRONOLOGY OF EMPLOYMENT

## (Professional & Academic Appointments)

| | |
|---|---|
| **Attending Physician**<br>Department of Emergency Medicine<br>University Medical Center<br>Las Vegas, Nevada | 07/95 - 06/02 |

Mesa/Bentley 005454

**Clinical Assistant Professor of Surgery**                          07/95 - 06/02
University of Nevada School of Medicine
Las Vegas, Nevada

**Assistant Medical Director**                                       05/00-06/02
Department of Emergency Medicine
University Medical Center
Las Vegas, Nevada

**Senior Associate Consultant**                                      07/02 - 08/03
Department of Emergency Medicine
Mayo Clinic Arizona

**Consultant**                                                       09/03 - 04/05
Department of Emergency Medicine
Mayo Clinic Arizona

**Instructor**
Department of Emergency Medicine                                     05/05 - 11/06
College of Medicine
Mayo Clinic Arizona

**Assistant Professor**                                              12/06 - 07/09
Department of Emergency Medicine
College of Medicine
Mayo Clinic Arizona

**Research Faculty Member**                                          01/09 - present
Arizona Emergency Medicine Research Center
Associate Director
Co-Director EMS Research                                             01/15 - present
Department of Emergency Medicine
College of Medicine, University of Arizona

**Clinical Associate Professor**                                     08/09 - 06/12
**EMS Fellowship Director**
Department of Emergency Medicine
Maricopa Medical Center
Phoenix, Arizona

**Associate Professor**                                              09/09 - 06/12
Department of Emergency Medicine
College of Medicine, University of Arizona
Phoenix Campus (Primary)

Department of Emergency Medicine
College of Medicine, University of Arizona
Tucson Campus (Joint)

**Professor**                                                        07/12 - 12/14
Maricopa Medical Center
Department of Emergency Medicine
College of Medicine, University of Arizona
Phoenix, Arizona

Mesa/Bentley 005455

**Distinguished Professor**                                          01/15 - present
Distinguished Professor of Emergency Medicine
College of Medicine
University of Arizona
Tucson, Arizona


## LEADERSHIP TRAINING
Emergency Physicians Medical Group (EPMG)                            1999-2000
Twelve Month - Advanced Medical Director Leadership Course

Mayo Clinic
Conflict Resolution Course                                          2005


## HONORS AND AWARDS
Graduated with Distinction                                          1986
University of Arizona
Tucson, Arizona

Housestaff                                                          President1993-1994
Maricopa Medical Center
Phoenix, Arizona

Chief Resident
Department of Emergency Medicine                                    1995
Maricopa Medical Center
Phoenix, Arizona

Diplomate                                                           1995 - present
American Board of Emergency Medicine

Richard A. Walsh Outstanding Resident Award                         1995
Department of Emergency Medicine
Maricopa Medical Center
Phoenix, Arizona

Fellow                                                              1996 - present
American College of Emergency Physicians

Emergency Medicine Educator of the Year                             2000
University Medical Center
Las Vegas, Nevada

Member                                                              2004 - 2014
American Academy of Emergency Medicine

Compassion in Action, Disaster/Emergency Services Award             2005
American Red Cross
Outstanding EMS Contribution                                        2006
Arizona Emergency Medical Systems

Mesa/Bentley 005456

Best Abstract Award                                                              2007
"The Survival Rate from Witnessed Ventricular Fibrillation
Out-of Hospital Cardiac Arrest is Superior with Passive Oxygen
Insufflation Compared to Active Bag-Valve-Mask-Ventilation"
American Heart Association Scientific Sessions
Resuscitation Science Symposium

Best of the Best Abstract Award                                                  2007
"Statewide Out-of-Hospital Cardiac Arrest Survival Improves
after Widespread Implementation of Cardiocerebral Resuscitation"
American Heart Association Scientific Sessions
Resuscitation Science Symposium

Health Care Heroes Award - Finalist in the First Responder Category              2008
Phoenix Business Journal

John M. Doll Memorial Award                                                      2008
Outstanding Contribution to Public Health Literature - Finalist
"The Save Hearts in Arizona Registry & Education (SHARE) Program,
Who is Performing CPR and Where are They Doing it?"
Arizona Department of Health Services

John M. Doll Memorial Award                                                      2009
Outstanding Contribution to Public Health Literature
"Minimally Interrupted Cardiac Resuscitation by Emergency Medical Services
for Out-of-Hospital Cardiac Arrest"
Arizona Department of Health Services

Scholar Quest Mentor Award                                                       2009
Arizona Emergency Medicine Research Center
Department of Emergency Medicine
College of Medicine
University of Arizona
Tucson, Arizona

Best Abstract Award                                                              2009
"The Impact of State and National Efforts to Improve
Bystander CPR Rates in Arizona"
American Heart Association, Scientific Sessions
Resuscitation Science Symposium

Best EMS Professional Research Presentation                                      2010
"There is Increased Cardiopulmonary Resuscitation Variability
During Ground Ambulance Transport of Patients in Cardiac Arrest"
National Association of EMS Physicians Annual Meeting

John M. Doll Memorial Award
Outstanding Contribution to Public Health Literature - Finalist                 2010
"Passive Oxygen Insufflation is Superior to Bag-valve Mask Ventilation
 for Witnessed Ventricular Fibrillation Out-of-Hospital Cardiac Arrest"
Arizona Department of Health Services

Public Leadership Award (National)                                               2010
Save Hearts in Arizona Registry & Education Program
Sudden Cardiac Arrest Association

Mesa/Bentley 005457

| | |
|---|---|
| Vision Award (National)<br>For Creative and Innovative Approach to Addressing public Health Challenges<br>Arizona Cardiac Receiving Center Program<br>Association of State and Territorial Health Officials | 2010 |
| William H. Montgomery, MD Excellence in Education Award<br>Emergency Cardiovascular Care Update 2010 | 2010 |
| Outstanding Contribution to EMS, Trauma and the Citizens of Arizona<br>Arizona Emergency Medical Systems | 2011 |
| John M. Doll Memorial Award<br>Outstanding Contribution to Public Health Literature - Finalist<br>"Chest Compression-Only CPR and Survival from Out-of-Hospital Cardiac Arrest"<br>Arizona Department of Health Services | 2011 |
| Finalist - Healthcare Leadership Award, Physician Category<br>Arizona Business Magazine | 2011 |
| Public Health Service Award<br>Arizona Medical Association/Arizona Department of Health Services | 2011 |
| Arizona Super Doctors 2012 Award (peer selected)<br>Arizona Magazine – January 2012 issue | 2011 |
| John M. Doll Memorial Award<br>Outstanding Contribution to Public Health Literature<br>"The Effectiveness of Ultra-Brief and Brief Educational Videos for<br> Training Lay Responders in Hands-Only Cardiopulmonary Resuscitation:<br>Implications for the Future of Citizen CPR Training"<br>Arizona Department of Health Services | 2012 |
| Fellow<br>American Heart Association | 2012 - present |
| Abstract awarded The Best of SAEM—Gallery of Excellence<br>Gender and Survival In Out-of-hospital Cardiac Arrest (OHCA):<br>Results From The OPALS (Ontario Prehospital Advanced Life Support) Study.<br>Presented at the Annual Meeting of the Society for Academic Medicine,<br>Atlanta, Georgia. | 2013 |
| Abstract awarded The Best of SAEM—Gallery of Excellence<br>Prehospital Glasgow Coma Scale and Risk Stratification in Major Pediatric<br>Traumatic Brain Injury:  Association With Mortality and Non-Mortality Outcomes.<br>Presented at the Annual Meeting of the Society for Academic Medicine,<br>Atlanta, Georgia | 2013 |
| Vision Award (National)<br>Arizona Telephone CPR Program<br>Association of State and Territorial Health Officials | 2013 |
| American Heart Association/Resuscitation Science Symposium—<br>Medical Student/Young Investigator Abstract Award.  Project Mentor.<br>The Accuracy of Prehospital Provider Oxygen Saturation and End-Tidal C02<br>Documentation in Severe Traumatic Brain Injury. | 2013 |

Mesa/Bentley 005458

| | |
|---|---|
| American Heart Association/Resuscitation Science Symposium—<br>Medical Student/Young Investigator Abstract Award.  Project Mentor.<br>Length of Coma in Out-of-Hospital Cardiac Arrest Survivors Treated<br>with Mild Therapeutic Hypothermia. | 2013 |
| National Clinical Trial of the Year:<br>The Rapid Anticonvulsant Medication Prior to Arrival Trial (RAMPART).<br>Awarded by The Society for Clinical Trials<br>Intramuscular versus Intravenous Therapy for Prehospital Status Epilepticus.<br>N Engl J Med. 2012;366 (7):591-600.<br>Site Co-Investigator for the Arizona Hub for the Trial and<br>one of the NETT Investigators. | 2013 |
| American Board of Emergency Medicine<br>LLSA Certification<br>2013 Reading List | 2013 |
| Best Scientific Abstract Award<br>"The Effect of Prehospital Hypoxia and Hypotension on<br>Outcome in Major Traumatic Brain Injury: A Deadly Combination"<br>Resuscitation Science Symposium—Trauma Resuscitation<br>American Heart Association/Resuscitation Science Symposium<br>Chicago, Illinois | 2014 |
| Best of the Best Oral Abstract Presentation<br>"The Effect of Prehospital Hypoxia and Hypotension on<br>Outcome in Major Traumatic Brain Injury: A Deadly Combination"<br>American Heart Association/Resuscitation Science Symposium<br>Chicago, Illinois | 2014 |
| Best of the Best Oral Abstract Presentation<br>"Statewide Implementation of a Standardized Pre-Arrival Telephone CPR<br>Program is Associated with Increased Bystander CPR and Survival from<br>Out-of-Hospital Cardiac Arrest"<br>American Heart Association/Resuscitation Science Symposium<br>Chicago, Illinois | 2014 |
| Best Cardiac Arrest Scientific Presentation Award<br>Statewide Implementation of a Standardized Pre-Arrival<br>Telephone CPR Program is Associated with Increased Bystander CPR and<br>Survival from Out-of-Hospital Cardiac Arrest<br>National Association of EMS Physician's Annual Meeting<br>New Orleans, Louisiana | 2015 |
| Best Scientific Presentation Award<br>Association Between Lowest Prehospital Systolic Blood Pressure and<br>Non-Morality Outcomes in Major Traumatic Brain Injury: Is There a<br>"Hypotension" Threshold?<br>National Association of EMS Physician's Annual Meeting<br>New Orleans, Louisiana | 2015 |

Mesa/Bentley 005459

Best Scientific Presentation Award       2016
Comparison of the Performance of Prehospital Systolic Blood Pressure
Versus Calculated Mean Arterial Pressure in Predicting Mortality in
Major Traumatic Brain Injury
National Association of EMS Physicians Annual Meeting
San Diego, California

Best of the Best Oral Abstract Presentation       2016
Evaluation of Prehospital Hypotension Depth-Duration Dose and Mortality in
Major Traumatic Brain Injury
American Heart Association/ Resuscitation Science Symposium
New Orleans, Louisiana

One of the 5 Most Highly Cited Research Papers in       2016
Annals of Emergency Medicine (1/2014-6/2016)
The influence of scenario-based training and real-time audiovisual feedback
on out-of-hospital cardiopulmonary resuscitation quality and survival from
out-of-hospital cardiac arrest

The Maestros of Medicine       2016
The 25 most influential people in Valley healthcare
Phoenix Magazine
Phoenix, Arizona

Top Research Poster       2017
Telecommunicator Breathing Assessment Techniques In Out-Of-Hospital
Cardiac Arrest
Annual Scientific Assembly
National Association of EMS Physicians
New Orleans, Louisiana

Best Scientific Presentation Award       2017
Widespread Implementation Of A Prehospital Spinal Motion Restriction
Protocol is Not Associated with Increased Spinal Cord Injury
Annual Scientific Assembly
National Association of EMS Physicians
New Orleans, Louisiana

       2018
Best-of-the-Best Oral Scientific Abstract Presentation
Statewide Trends in Out-of-Hospital Cardiac Arrest Related to Drug Overdose
Annual Scientific Assembly
National Association of EMS Physicians
New Orleans, Louisiana

Best-of-the-Best Oral Scientific Abstract Presentation       2018
Death by Suicide: The EMS Profession Compared to the General Public
Annual Scientific Assembly
National Association of EMS Physicians
New Orleans, Louisiana

American Board of Emergency Medicine       2019
LLSA Certification
2020 Reading List
The effect of combined out-of-hospital hypotension and hypoxia
on mortality in major traumatic brain injury.

Mesa/Bentley 005460

## COURSE DIRECTORSHIP

High Performance CPR University                                        2016-present
High fidelity, kinesthetic, resuscitation simulation course
International cardiac resuscitation course (students from over 20 countries to date) University of Arizona
Simulation Center
Phoenix, Arizona
https://cpru.arizona.edu/


## SERVICE/OUTREACH

**Local/State Outreach**

*Nevada*

Emergency Medicine Residents' Association
Resident Representative                                               1994 - 1995

Clark County, Nevada Health District
    Emergency Medical Service, Assistant Director              1998 - 2000
    Medical Advisory Board, Member                             1998 - 2000

Mercy Air Aeromedical Program
Las Vegas, Nevada,
    Medical Director                                           2000 - 2002

Clark County Fire Department
    EMS Medical Director                                       2000 - 2002

Y2K New Year's Eve Emergency Medical Service, Las Vegas, NV
    Medical Director                                           2001 - 2002

Federal Emergency Management Agency (FEMA)              09-11/2001
NV Task Force 1 - NVTF-1 Urban Search & Rescue Team
Ground Zero - World Trade Center
    FEMA NVTF -1 Team Physician

*Arizona*

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    Medical Director                                           2004 - present

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    Emergency Medical Services Council, Chair                  2004 - present

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    Medical Direction Commission, Chair                        2004 - present

Mesa/Bentley 005461

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    Save Hearts in Arizona Registry & Education (SHARE) Program,
    Medical Director                               2004 - present

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    State Trauma Advisory Board, Chair          2004 - present
Paradise Valley Police Department
Paradise Valley, Arizona
    Medical Director                             2004 - 2008

    Early Defibrillation Program
    Implementation Coordinator              2004 - 2008

Scottsdale Fire Department
Scottsdale, Arizona
    Medical Director                             2005 - 2010

Scottsdale Police Department
Scottsdale, Arizona
    Medical Director                             2005 - 2010

Arizona State Cardiovascular Disease Plan
    Emergency Care Committee, Co-Chair       2005

Arizona Stroke Summit
    Co-Chair                                 2006

Arizona Telemedicine Program Council
    Member                                 2010 - 2019

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    Excellence in Prehospital Injury Care (EPIC) Project
    Co-Medical Director                      2011 - 2019

Republic of South Korea
Ministry of Health & Welfare
    Seoul, South Korea
    Development of National Trauma System
    Consultant                               2012-2014

Bureau of Emergency Medical Services and Trauma System
Arizona Department of Health Services
Phoenix, Arizona
    EMT Resiliency & Wellness Program
    Medical Director                           2017-2019

San Carlos Apache Healthcare
Chronic Pain Management Clinic
    Chair of the Comprehensive Pain Management Committee
    Director                                2017-2018

Mesa/Bentley 005462

University of Arizona Health Sciences
Faculty Diversity Advisory Committee
    Member                                           2018-2019

**National/International Outreach**

| | |
|---|---|
| National Park Service | 1998 - 2000 |
| Western Region National Park Service | |
| Emergency Medical Service | |
| Co-Medical Director | 1998 - 2000 |
| Federal Emergency Management Agency | |
| Nevada Task Force 1, Team Physician | 2000 - 2002 |
| | |
| National Association of EMS Physicians, Member | 2000 - present |
| | |
| American Stroke Association | |
| Operation Stroke, Executive Committee Member | 2004 - 2007 |
| | |
| Brain Trauma Foundation | |
| Emergency Medical Services Committee, Member | 2008 - present |
| | |
| American Heart Association, Emergency Cardiovascular Care (ECC) | |
| Basic Life Support Subcommittee Member | 2008 - 2009 |
| | |
| American Heart Association, Mission: Lifeline | |
| Arizona Co-Chair | 2009 – 2010 |
| | |
| Cardiac Resuscitation System of Care Committee Member (National) | 2011 - 2017 |
| | |
| American Heart Association, Emergency Cardiovascular Care (ECC) | 2009 - 2011 |
| Basic Life Support Subcommittee Vice-Chair | |
| | |
| American Heart Association, Emergency Cardiovascular Care (ECC) | 2010 |
| 2010 Guidelines Spokesperson - China | |
| | |
| American Heart Association, Emergency Cardiovascular Care (ECC) | 2011 - 2013 |
| Basic Life Support Subcommittee Chair | |
| | |
| American Heart Association, Emergency Cardiovascular Care (ECC) | 2011 - present |
| Metrics Task Force Member | |
| | |
| International Liaison Committee on Resuscitation (ILCOR) | 2012 - 2015 |
| Basic Life Support Task Force Member | |
| | |
| Citizen CPR Foundation Board | 2012 - present |
| Member | |
| | |
| Google X | 2012 |
| Medical Consultant | |
| | |
| Asian Emergency Medical Services (EMS) Council | 2013 - present |
| Advisory Member | |
| | |
| National Association of EMS Physicians | 2013 |

Mesa/Bentley 005463

Certification Review Course Curriculum Committee Member

| | |
|---|---|
| Clinton Global Health Initiative<br>International Telephone-CPR Program<br>Medical Director | 2013 - present |
| Institute of Medicine<br>Member<br>Committee on Treatment of Cardiac Arrest:<br>Current Status & Future Directions | 2014 - 2015 |
| Global Resuscitation Alliance Proceedings from the Utstein Abbey<br>Founding Member<br>Improving Survival from OHCA: A Call to Establish a Global Resuscitation<br>Stavanger, Norway | 2015 - present |
| The Pain Project www.thepainproject.com<br>Educational web resource designed for individuals suffering from chronic pain<br>and substance abuse disorders and to self-manage pain using CBT and MBSR<br>Medical Director | 2016 - present |
| Arizona EMT Resiliency, Safety, and Wellness Program<br>Medical Director | 2017 - present |
| American Heart Association - Council on Cardiopulmonary, Critical Care,<br>Perioperative and Resuscitation (3CPR) Committee<br>Member | 2017 - present |
| American College of Emergency Physicians (ACEP)<br>Task Force Member to develop resuscitation maintenance of competency<br>course and certification | 2018-present |

**Departmental Committees**

Department of Emergency Medicine
University Medical Center, Las Vegas, Nevada

| | |
|---|---|
| Paramedic Training Class Physician Instructor | 1995 - 2002 |
| Assistant Director | 2000 - 2002 |

Department of Emergency Medicine
Mayo Clinic Hospital
Mayo Clinic Arizona

| | |
|---|---|
| Joint Commission Certified Primary Stroke Center | |
| Stroke Research Team Member | 2005 - 2009 |
| ST-Elevation MI Committee Member | 2007 - 2009 |
| Director, EMS Fellowship Program | 2006 - 2009 |

Department of Emergency Medicine
Maricopa Medical Center
Phoenix, Arizona

| | |
|---|---|
| Director, Resuscitation Science Center | 2009 - 2014 |
| Chair, Hospital Resuscitation Committee | 2009 - 2014 |
| Director, EMS Fellowship Program | 2010 - 2014 |

Mesa/Bentley 005464

**University Committees**

University of Arizona
Sarver Heart Center
CPR Research Team, Member                                                    2005 - present

**Other Committees**

Journal Review

Peer Reviewer
        *American Heart Journal*

Peer Reviewer
        *Cephalalgia*

Peer Reviewer
        *Circulation*

Peer Reviewer
        *Critical Care*

Peer Reviewer
        *Emergency Medicine Practice*

Peer Reviewer
        *Journal of the American Medical Association (JAMA)*

Peer Reviewer
        *Mount Sinai Journal of Medicine*

Peer Reviewer
        *Prehospital Emergency Care*

Peer Reviewer
        *Resuscitation*

Editorial Board Member
        *Clinical and Experimental Emergency Medicine Journal*
        *Prehospital Emergency Care*

## PUBLICATIONS/CREATIVE ACTIVITY

**(⁺ Plus sign indicates mentees - students, residents, or fellows)**

**Chapters in Scholarly Books**

1.  Demaerschalk BM, Miley ML, Kiernan TEJ, **Bobrow BJ**, Corday DA, Wellik KE, Aguilar MI,
    Ingall TI, Dodick DW, Brazdys K, Ward MP, Richemont PC.  Telestroke - extending the reach of
    acute stroke teams.  In:  Research Advances in Stroke. Kerala, India: Global Research Network,
    T.C.; 2008.

Mesa/Bentley 005465

2.  Post Cardiac Arrest Syndrome, Tintinalli's Emergency Medicine: A Comprehensive Study Guide, Eighth Edition. Benjamin S. Abella, **Bentley J. Bobrow.**

**Peer-Reviewed Journal Articles**

1.  Crum R, **Bobrow B**, Shackford S, Hansbrough J, Brown MR; The neurohumoral response to burn injury in patients resuscitated with hypertonic saline; *Journal of Trauma;*1988;28(8):1181-7.

2.  **Bobrow BJ**, Mohr J, Pollack CV Jr.  An unusual complication of missed appendicitis; *Journal of Emergency Medicine*;1996;14(6):719-22.

3.  **Bobrow BJ**, Pollack CV Jr, Gamble S, Seligson RA; Incision and drainage of cutaneous abscesses is not associated with bacteremia in afebrile adults; *Annals of Emergency Medicine;* 1997;29(3):404-8.

4.  **Bobrow BJ**; Cowboy; *Annals of Emergency Medicine;*1997;30(4):548-9.

5.  Kelley J, Richman PB, Ewy GA, Clark L, Bulloch B, **Bobrow BJ**;  Eighth grade students become proficient at CPR and use of an AED following a condensed training programme; *Resuscitatio*n;2006;71(2):229-36.

6.  Morris MC, Mechem CC, Berg RA, **Bobrow BJ**, Burns S, Clark L, De Maio VJ, Kusick M, Richmond NJ, Stiell I, Nadkarni VM, CanAm Pediatric Cardiopulmonary Arrest Investigators; Impact of the privacy rule on the study of out-of-hospital pediatric cardiac arrest; *Prehospital Emergency Care;*2007;11(3):272-7.

7.  **Bobrow BJ**, Demaerschalk BM, Wood JP, Montgomery C, Clark L. Assessment of emergency medical technicians serving the Phoenix metropolitan matrix of primary stroke centers; *Stroke*; 2007;38(6):e25.

8.  Vadeboncoeur T, **Bobrow BJ**, Clark L, Kern KB, Sanders AB, Berg RA, Ewy GA;  The Save Hearts in Arizona Registry and Education (SHARE) program: Who is performing CPR and where are they doing it?;  *Resuscitation;*2007;75(1):68-75.

9.  Richman PB, **Bobrow BJ**, Clark L, Noelck N, Sanders AB; Ability of citizens in a senior living community to perform lifesaving cardiac skills and appropriately utilize AEDs; *Journal of Emergency Medicine;*2007;33(4):395-9.

10. **Bobrow BJ**, Clark LL, Ewy GA, Chikani V, Sanders AB, Berg RA, Richman PB, Kern KB; Minimally interrupted cardiac resuscitation by emergency medical services for out-of-hospital cardiac arrest; *JAMA: The Journal of the American Medical Association;*2008;299(10):1158-65.

11. Demaerschalk BM, **Bobrow BJ**, Paulsen M, Phoenix Operation Stroke Executive Committee; Development of a metropolitan matrix of primary stroke centers: the Phoenix experience; *Stroke;* 2008;39(4):1246-53. Epub 2008 Feb 28.

12. **Bobrow BJ**, Aufderheide TP; Maximizing survival from out-of-hospital cardiac arrest: Putting effective emergency cardiac care into practice; *Emergency Medicine Reports*;2008;29(11):121-32.

13. Ewy GA, Kellum MJ, **Bobrow BJ**; Cardiocerebral resuscitation; *Emergency Medical Services Magazine;*2008;37(6):41-2,44,46 passim.

Mesa/Bentley 005466

14. Richman PB, Vadeboncoeur TF, Chikani V, Clark L, **Bobrow BJ**; Independent evaluation of an out-of-hospital termination of resuscitation (TOR) clinical decision rule; *Academic Emergency Medicine;*2008;15(6):517-21.

15. **Bobrow BJ**, Vadeboncoeur TF, Clark L, Chikani V;  Establishing Arizona's statewide cardiac arrest reporting and educational network; *Prehospital Emergency Care;*2008;12(3):381-7.

16. Vadeboncoeur TF, Richman PB, Darkoh M, Chikani V, Clark L, **Bobrow BJ**.  Bystander cardiopulmonary resuscitation for out-of-hospital cardiac arrest in the Hispanic vs the non-Hispanic populations; *American Journal of Emergency Medicine;*2008;26(6):655-60.

17. Spaite DW, **Bobrow BJ**, Vadeboncoeur TF, Chikani V, Clark L, Mullins T, Sanders AB. The impact of prehospital transport interval on survival in out-of-hospital cardiac arrest: implications for regionalization of post-resuscitation care. *Resuscitation.* 2008;79(1):61-66.

18. **Bobrow BJ**, Zuercher M, Ewy GA, Clark L, Chikani V, Donahue D, Sanders AB, Hilwig RW, Berg RA, Kern KB; Gasping during cardiac arrest in humans is frequent and associated with improved survival; *Circulation;*2008;118(24):2550-2554.

19. Demaerschalk BM, Miley ML, Kiernan TE, **Bobrow BJ**, Corday DA, Wellik KE, Aguilar MI, Ingall TJ, Dodick DW, Brazdys K, Koch TC, Ward MP, Richemont PC, STARR Co Investigators; Stroke telemedicine;*Mayo Clinic Proceedings;*2009;84(1):53-64.

20. Spencer BR, Khan OM, **Bobrow BJ**, Demaerschalk BM;  Emergency medical services support for acute ischemic stroke patients receiving thrombolysis at a primary stroke center; *Journal of Brain Disease;*2009;1:1-5.

21. Tobin WO, Hentz JG, **Bobrow BJ**, Demaerschalk BM;  Identification of stroke mimics in the emergency department setting; *Journal of Brain Disease;*2009;1:1-4.

22. **Bobrow BJ**, Demaerschalk BM, Wood JP, Villarin A, Clark L. and Jennings A. Views of Emergency Physicians on Thrombolysis for Acute Ischemic Stroke; *Journal of Brain Disease;*2009:1 29-37.

23. Almaraz AC, **Bobrow BJ**, Wingerchuk DM, Wellik KE, Demaerschalk BM; Serum neuron specific enolase to predict neurological outcome after cardiopulmonary resuscitation: a critically appraised topic; *Neurologist*;2009;15(1):44-48.

24. Spaite DW, Stiell IG, **Bobrow BJ**, de Boer M, Maloney J, Denninghoff K, Vadeboncoeur TF, Dreyer J, Wells GA; Effect of transport interval on out-of-hospital cardiac arrest survival in the OPALS study: implications for triaging patients to specialized cardiac arrest centers; *Annals of Emergency Medicine;* 2009;54(2):248-255.

25. Capampangan DJ, Wellik KE, **Bobrow BJ**, Aguilar MI, Ingall TJ, Kiernan TE, Wingerchuk DM, Demaerschalk BM;  Telemedicine versus telephone for remote emergency stroke consultations: a critically appraised topic;  *Neurologist;* 2009;15(3):163-6.

26. **Bobrow BJ,** Ewy GA; Ventilation during resuscitation efforts for out-of-hospital primary cardiac arrest; *Current Opinion in Critical Care;* 2009;15(3):228-233.

27. **Bobrow BJ**, Kern KB; Regionalization of postcardiac arrest care; *Current Opinion in Critical Care.* 2009;15(3):221-7.

28. Ewy GA, Kellum MJ, **Bobrow BJ**; Cardiocerebral Resuscitation Improving cardiac arrest survival with a new technique; *Journal of Emergency Medical Services;* 2009;34(7):58-69.

Mesa/Bentley 005467

29. Vadeboncoeur TF, **Bobrow BJ**; Maximizing Survival from Severe Traumatic Brain Injury: Applying Guidelines to Clinical Practice. Part I; *Emergency Medicine Reports*; 2009;30(21):257-267.

30. Vadeboncoeur TF, **Bobrow BJ**; Maximizing Survival from Severe Traumatic Brain Injury: Applying Guidelines to Clinical Practice. Part II; *Emergency Medicine Reports*; 2009;30(22):1-12.

31. Miley ML, Demaerschalk BM, Olmstead NL, Kiernan TE, Corday DA, Chikani V, **Bobrow BJ**; The state of emergency stroke resources and care in rural Arizona: a platform for telemedicine; *Telemedicine Journal and e-Health;* 2009;15(7):691-699.

32. **Bobrow BJ,** Ewy GA, Clark L, Chikani V, Berg RA, Sanders AB, Vadeboncoeur TF, Hilwig RW, Kern KB; Passive oxygen insufflation is superior to bag-valve-mask ventilation for witnessed ventricular fibrillation out-of-hospital cardiac arrest; *Annals of Emergency Medicine;* 2009;54(5):656-662e651.

33. **+**Poles JC, Vadeboncoeur TF, **Bobrow BJ**; Persistent Ventricular Fibrillation during Therapeutic Hypothermia and Prolonged High-dose Vasopressor Therapy: Case Report; *Journal of Emergency Medicine;* 2009;doi:10.1016/j.jemermed.2009.05.027.

34. **Bobrow BJ,** Spaite DW; Do not pardon the interruption; *Annals of Emergency Medicine;* 2009;54(5):653-655.

35. Zuercher M, Ewy GA, Otto CW, Hilwig RW, **Bobrow BJ**, Clark L, Chikani V, Sanders AB, Berg RA, Kern KB; Gasping in Response to Basic Resuscitation Efforts: Observation in a Swine Model of Cardiac Arrest; *Critical Care Research and Practice;* 2010;doi:10.1155/2010/351638**.**

36. Demaerschalk BM, **Bobrow BJ**, Raman R, Kiernan TE, Aguilar MI, Ingall TJ, Dodick DW, Ward MP, Richemont PC, Brazdys K, Koch TC, Miley ML, Hoffman Snyder CR, Corday DA, Meyer BC; Stroke team remote evaluation using a digital observation camera in Arizona: the initial Mayo Clinic experience trial; *Stroke;* 2010;41(6):1251-1258.

37. **+**Mosier J, **+**Itty A, Sanders A, Mohler J, Wendel C, Poulsen J, Shellenberger J, Clark L, **Bobrow B**; Cardiocerebral resuscitation is associated with improved survival and neurologic outcome from out-of-hospital cardiac arrest in elders; *Academic Emergency Medicine*; 2010;17(3):269-275.

38. **Bobrow BJ**, Spaite DW, Berg RA, Stolz U, Sanders AB, Kern KB, Vadeboncoeur TF, Clark LL, Gallagher JV, Stapczynski JS, LoVecchio F, Mullins TJ, Humble WO, Ewy GA; Chest compression-only CPR by lay rescuers and survival from out-of-hospital cardiac arrest; *JAMA: The Journal of the American Medical Association*; 2010;304(13):1447-1454**.**

39. Blewer AL, Leary M, Decker CS, Andersen JC, Fredericks AC, **Bobrow BJ**, Abella BS; Cardiopulmonary resuscitation training of family members before hospital discharge using video self-instruction: A feasibility trial; *Journal of Hospital Medicine*; 2010.

40. Travers AH, Rea TD, **Bobrow BJ**, Edelson DP, Berg RA, Sayre MR, Berg MD, Chameides L, O'Connor RE, Swor RA; Part 4: CPR Overview: 2010 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care; *Circulation;* 2010;122(18 Suppl 3):S676-684.

Mesa/Bentley 005468

41. D'Onofrio G, Jauch E, Jagoda A, Allen MH, Anglin D, Barsan WG, Berger RP, **Bobrow BJ**, Boudreaux ED, Bushnell C, Chan Y-F, Currier G, Eggly S, Ichord R, Larkin GL, Laskowitz D, Neumar RW, Newman-Toker DE, Quinn J, Shear K, Todd KH, Zatzick D; NIH Roundtable on Opportunities to Advance Research on Neurologic and Psychiatric Emergencies; *Annals of Emergency Medicine;* 2010;56(5):551-564.

42. Cone DC, Brooke Lerner E, Band RA, Renjilian C, **Bobrow BJ**, Crawford Mechem C, Carter AJ, Kupas DF, Spaite DW; Prehospital care and new models of regionalization; *Academic Emergency Medicine;* 2010;17(12):1337-1345.

43. **Bobrow BJ**, Stolz U, Spaite DW; Survival From Out-of-Hospital Cardiac Arrest After Chest Compression–Only CPR—Reply; *JAMA: The Journal of the American Medical Association*; 2011;305(2):148.

44. Kern KB, Ewy GA, **Bobrow BJ**; Experiences and the use of Cardiocerebral Resuscitation by a Chinese Emergency Department; *Resuscitation*; 2011;82(5):630.

45. Rea T, **Bobrow B**, Spaite D; Chest-compression-only versus standard CPR; *Lancet;* 2011;377(9767):717; author reply 718-719.

46. Abella BS, **Bobrow BJ**, Cone DC, Vadeboncoeur TF, Chikani V; Instant Replay:  Perform CPR with Immediate Feedback; *Journal of Emergency Medical Services*; 2011;36(3):50.

47. **Bobrow BJ**, Vadeboncoeur TF, Spaite DW, Potts J, Denninghoff K, Chikani V, Brazil PR, Ramsey B, Abella BS; The Effectiveness of Ultra-Brief and Brief Educational Videos for Training Lay Responders in Hands-Only Cardiopulmonary Resuscitation:  Implications for the Future of Citizen CPR Training; *Circulation: Cardiovascular Quality and Outcomes*; 2011;4:220-226.

48. **Bobrow BJ**, **+**Rafael S; Emergency Department Evaluation of Stroke and TIA: Beyond the CT Scan: Part I; *Emergency Medicine Reports;* 2011;32(8):93-103.

49. **Bobrow BJ**, **+**Rafael S; Emergency Department Evaluation of Stroke and TIA: Beyond the CT Scan: Part II; *Emergency Medicine Reports;* 2011;32(9):105-115.

50. Mohler MJ, Wendel CS, **+**Mosier J, **+**Itty A, Fain M, Clark L, **Bobrow B**, Sanders AB; Cardiocerebral Resuscitation Improves Out-of-Hospital Survival in Older Adults; *Journal of the American Geriatrics Society*; 2011;59(5):822-826.

51. **Bobrow BJ**; Climbing the Summit to Improve National Cardiac Arrest Survival – Systematically; *Circulation;* 2011;doi:10.1161/CIR.0b013e31821d79f3.

52. Lerner EB, Rea TD, **Bobrow BJ**, Acker JE, 3rd, Berg RA, Brooks SC, Cone DC, Gay M, Gent LM, Mears G, Nadkarni VM, O'Connor RE, Potts J, Sayre MR, Swor RA, Travers AH. Emergency medical service dispatch cardiopulmonary resuscitation prearrival instructions to improve survival from out-of-hospital cardiac arrest: A scientific statement from the American Heart Association. *Circulation*. 2012;125:648-655.

53. Silbergleit R, Durkalski V, Lowenstein D, Conwit R, Pancioli A, Palesch Y, Barsan W, for the **NETT Investigators**:  Intramuscular versus Intravenous Therapy for Prehospital Status Epilepticus.  *New England Journal of Medicine*; 2012;366 (7):591-600.

54. Blewer AL, Leary M, Esposito EC, Gonzalez M, Riegel B, **Bobrow BJ**, Abella BS.  Continuous chest compression cardiopulmonary resuscitation training promotes rescuer self-confidence and increased secondary training: A hospital-based randomized controlled trial.  *Critical Care Medicine*; 2012 Mar;40(3):787-92.

Mesa/Bentley 005469

55.  **Bobrow BJ,** Panczyk M, Subido C. Dispatch-assisted cardiopulmonary resuscitation: The anchor link in the chain of survival. *Current opinion in critical care.* 2012;18:228-233.

56.  Burdick M, Panczyk M, **Bobrow BJ**. Saving lives from sudden cardiac arrest in your community. How dispatchers can make the difference between life and death. *EMS world.* 2012;41:50-54

57.  Cudnik MT, Sasson C, Rea TD, Sayre MR, Zhang J, **Bobrow BJ**, Spaite DW, McNally B, Denninghoff K, Stolz U. Increasing Hospital Volume is Not Associated with Improved Survival in Out of Hospital Cardiac Arrest of Cardiac Etiology. *Resuscitation.* 2012;83(7):862-868.

58.  Gaither JB, Spaite DW, **Bobrow BJ**, Denninghoff KR, Stolz U, Beskind DL, Meislin HW. Balancing the Potential Risks and Benefits of Out-of-Hospital Intubation in Traumatic Brain Injury: The Intubation/Hyperventilation Effect. *Annals of Emergency Medicine.* (DOI: 10.1016/j.annemergmed.2012.06.017)

59.  Panchal AR, **Bobrow BJ**, Spaite DW, Berg RA, Stolz U, Vadeboncoeur TF, Sanders AB, Kern KB, Ewy GA. Chest compression-only cardiopulmonary resuscitation performed by lay rescuers for adult out-of-hospital cardiac arrest due to non-cardiac aetiologies. *Resuscitation.* 2013;84:435-439.

60.  Demaerschalk BM, Vargas JE, Channer DD, Noble BN, Kiernan TE, Gleason EA, Vargas BB, Ingall TJ, Aguilar MI, Dodick DW, **Bobrow BJ**. Smartphone teleradiology application is successfully incorporated into a telestroke network environment. *Stroke;* published online before print, 13 September 2012.

61.  Demaerschalk BM, **Bobrow BJ,**  Raman R,  Ernstrom K,  Hoxworth JM,  Patel AC, Kiernan TJ, Aguilar MI,  Ingall TJ, Dodick DW,  Meyer BC. CT Interpretation in a Telestroke Network: Agreement Among a Spoke Radiologist, Hub Vascular Neurologist, and Hub Neuroradiologist. *Stroke;* published online before print, 13 September 2012.

62.  **+**Roosa JR, Vadeboncoeur TF, **+**Dommer PB, Panchal AR, Venuti M, Smith G, Silver A, Mullins M, Spaite D, **Bobrow BJ**. CPR variability during ground ambulance transport of patients in cardiac arrest. *Resuscitation.* 2013;84:592-595.

63.  Sasson C, Meischke H, Abella BS, Berg RA, **Bobrow BJ**, Chan PS, Root ED, Heisler M, Levy JH, Link M, Masoudi F, Ong M, Sayre MR, Rumsfeld JS, Rea TD. Increasing cardiopulmonary resuscitation provision in communities with low bystander cardiopulmonary resuscitation rates: A science advisory from the american heart association for healthcare providers, policymakers, public health departments, and community leaders. *Circulation.* 2013;127:1342-1350.

64.  Berg RA, **Bobrow BJ**. Cardiac resuscitation: Is an advanced airway harmful during out-of-hospital CPR? *Nature reviews. Cardiology.* 2013

65.  Meaney PA, **Bobrow BJ**, Mancini ME, Christenson J, de Caen AR, Bhanji F, Abella BS, Kleinman ME, Edelson DP, Berg RA, Aufderheide TP, Menon V, Leary M. Cardiopulmonary resuscitation quality: improving cardiac resuscitation outcomes both inside and outside the hospital: A consensus statement from the American Heart Association. *Circulation.* 2013;128:417-435.

66.  **Bobrow BJ**, Vadeboncoeur TF, Stolz U, Silver AE, Tobin JM, Crawford SA, Mason TK, Schirmer J, Smith GA, Spaite DW. The influence of scenario-based training and real-time audiovisual feedback on out-of-hospital cardiopulmonary resuscitation quality and survival from out-of-hospital cardiac arrest. *Annals of emergency medicine.* 2013;62:47-56 e41.

Mesa/Bentley 005470

67. van Diepen S, Abella BS, **Bobrow BJ**, Nichol G, Jollis JG, Mellor J, Racht EM, Yannopoulos D, Granger CB, Sayre MR. Multistate implementation of guideline-based cardiac resuscitation systems of care: Description of the HeartRescue project. *American heart journal*. 2013;166:647-653 e642

68. Panczyk M, McNally BF, **Bobrow BJ**. Telephone CPR: Saving lives around the world. New program will help dispatchers and track vital data. *EMS World*. 2013;42:35-36, 39.

69. Aufderheide TP, Nolan JP, Jacobs IG, van Belle G, **Bobrow BJ**, Marshall J, Finn J, Becker LB, Bottiger B, Cameron P, Drajer S, Jung JJ, Kloeck W, Koster RW, Huei-Ming Ma M, Shin SD, Sopko G, Taira BR, Timerman S, Eng Hock Ong M. Global health and emergency care: A resuscitation research agenda-part 1. *Academic emergency medicine : official journal of the Society for Academic Emergency Medicine*. 2013;20:1289-1296.

70. Hock Ong ME, Aufderheide TP, Nichol G, **Bobrow BJ**, Bossaert L, Cameron P, Finn J, Jacobs I, Koster RW, McNally B, Ng YY, Shin SD, Sopko G, Tanaka H, Iwami T, Hauswald M. Global health and emergency care: A resuscitation research agenda-part 2. *Academic emergency medicine : official journal of the Society for Academic Emergency Medicine*. 2013;20:1297-1303.

71. **Bobrow BJ**. The Case for AED Registries. *The Journal of Emergency Medical Services*. December, 2013.

72. Vadeboncoeur T, Stolz U, Panchal A, Silver A, Venuti M, Tobin J, Smith G, **+**Nunez M, **+**Karamooz M, Spaite D, **Bobrow B**. Chest compression depth and survival in out-of-hospital cardiac arrest. *Resuscitation*. 2014;85:182-188.
http://www.resuscitationjournal.com/article/S0300-9572(13)00769-7/pdf

73. **Bobrow BJ**, Stolz U, Spaite DW. In reply. *Annals of emergency medicine*. 2014;63:270-271.

74. Song KJ, Shin SD, Park CB, Kim JY, Kim do K, Kim CH, Ha SY, Eng Hock Ong M, **Bobrow BJ**, McNally B. Dispatcher-assisted bystander cardiopulmonary resuscitation in a metropolitan city: A before-after population-based study. *Resuscitation*. 2014;85:34-41.

75. **+**Dameff C, Vadeboncoeur T, **+**Tully J, Panczyk M, Dunham A, **+**Murphy R, Stolz U, Chikani V, Spaite D, **Bobrow B**. A standardized template for measuring and reporting telephone pre-arrival cardiopulmonary resuscitation instructions. *Resuscitation*. 2014;85:869-873
http://dx.doi.org/10.1016/j.resuscitation.2014.02.023

76. **Bobrow BJ**, Meaney PA, Berg RA. Resuscitation game changer: The AHA CPR quality consensus statement offers agencies a framework to maximize cpr quality & save more lives from cardiac arrest. *JEMS : a journal of emergency medical services*. 2014;39:38-41

77. Kim Y, Shin SD, **+**Moon S, **Bobrow BJ**. International trauma system collaboration. A report on the 201 3 korea-arizona trauma summit. *JEMS : a journal of emergency medical services*. 2014;39:44-49

78. Eisenberg MS, **Bobrow BJ**, Rea T. Fulfilling the promise of "anyone, anywhere" to perform cpr. *JAMA : the journal of the American Medical Association*. 2014;311:1197-1198

79. Conover Z, Kern KB, Silver AE, **Bobrow BJ**, Spaite DW, Indik JH. Resumption of chest compressions following successful defibrillation and risk for recurrence of ventricular fibrillation in out-of-hospital cardiac arrest. *Circulation. Arrhythmia and electrophysiology*. 2014.

80. Panchal AR, Meziab O, Stolz U, Anderson W, Bartlett M, Spaite DW, **Bobrow BJ**, Kern KB. The impact of ultra-brief chest compression-only CPR video training on responsiveness, compression rate, and hands-off time interval among bystanders in a shopping mall. *Resuscitation*. 2014;85:1287-1290.

Mesa/Bentley 005471

81.   Indik JH, Conover Z, McGovern M, Silver AE, Spaite DW, **Bobrow BJ**, Kern KB. Association of amplitude spectral area of the ventricular fibrillation waveform with survival of out-of-hospital ventricular fibrillation cardiac arrest. *Journal of the American College of Cardiology*. 2014;64:1362-1369.

82.   **Bobrow BJ**, Eisenberg MS, Panczyk M. Telecommunicator CPR: Pushing for performance standards. *Prehospital emergency care: official journal of the National Association of EMS Physicians and the National Association of State EMS Directors*. 2014;18:558-559

83.   Safdar B, Stolz U, Stiell IG, Cone DC, **Bobrow BJ**, deBoehr M, Dreyer J, Maloney J, Spaite DW. Differential survival for men and women from out-of-hospital cardiac arrest varies by age: Results from the OPALS study. *Academic emergency medicine : official journal of the Society for Academic Emergency Medicine*. 2014;21:1503-1511.

84.   Spaite DW, **Bobrow BJ**, Stolz U, Berg RA, Sanders AB, Kern KB, Chikani V, Humble W, Mullins T, Stapczynski JS, Ewy GA.  Statewide Regionalization of Emergency Medical Services and Hospital Care for Out-of-Hospital Cardiac Arrest:  Association with Improved Outcomes. *Ann Emerg Med*. 2014;64:496-506. http://dx.doi.org/10.1016/j.annemergmed.2014.05.028

85.   **+**Moon S, **Bobrow BJ**, Vadeboncoeur TF, Kortuem W, Kisakye M, Sasson C, Stolz U, Spaite DW. Disparities in bystander CPR provision and survival from out-of-hospital cardiac arrest according to neighborhood ethnicity. *The American journal of emergency medicine*. 2014;32:1041-1045. http://www.ajemjournal.com/article/S0735-6757(14)00449-5/pdf

86.   Eisenberg MS, **Bobrow BJ**, Rea T. Early descriptions of closed-chest cardiac massage--reply. *JAMA : the journal of the American Medical Association*. 2014;312:438

87.   Spaite DW, **Bobrow BJ**, Stolz U, Sherrill D, Chikani V, Barnhart B, Sotelo M, Gaither JB, Viscusi C, Adelson PD, Denninghoff KR.  Evaluation of the Impact of Implementing the EMS Traumatic Brain Injury Guidelines in Arizona: The Excellence In Prehospital Injury Care (EPIC) Study Methodology.  *Academic Emerg Med*.  2014;21:818-830

88.   Ong ME, Shin SD, Tanaka H, Ma MH, Nishiuchi T, Lee EJ, Ko PC, Edwin Doctor N, Khruekarnchana P, Naroo GY, Wong KD, Nakagawa T, Ryoo HW, Lin CH, Goh ES, Khunkhlai N, Alsakaf OA, Hisamuddin NA, **Bobrow BJ**, McNally B, Assam PN, Chan ES. Rationale, methodology, and implementation of a dispatcher-assisted cardiopulmonary resuscitation trial in the asia-pacific (pan-asian resuscitation outcomes study phase 2). *Prehospital emergency care: official journal of the National Association of EMS Physicians and the National Association of State EMS Directors*. 2014.

89.   Spaite DW, **Bobrow BJ**, Stolz U, Sherrill D, Chikani V, Barnhart B, Sotelo M, Gaither JB, Viscusi C, Adelson PD, Denninghoff KR. Evaluation of the impact of implementing the emergency medical services traumatic brain injury guidelines in Arizona: The excellence in prehospital injury care (EPIC) study methodology. *Acad Emerg Med*. 2014;21:818-830

90.   **+**Moon S, Vadeboncoeur TF, Kortuem W, Kisakye M, **+**Karamooz M, White B, Brazil P, Spaite DW, **Bobrow BJ**. Analysis of out-of-hospital cardiac arrest location and public access defibrillator placement in metropolitan Phoenix, Arizona. *Resuscitation*. 2015;89:43-49. http://dx.doi.org/10.1016/j.resuscitation.2014.10.029

91.   **+**Kovacs A, Vadeboncoeur TF, Stolz U, Spaite DW, **+**Irisawa T, Silver A, **Bobrow BJ**. Chest compression release velocity: Association with survival and favorable neurologic outcome after out-of-hospital cardiac arrest. *Resuscitation*. 2015;92:107-114 http://dx.doi.org/10.1016/j.resuscitation.2015.04.026

Mesa/Bentley 005472

92. **+**Crowe C, **Bobrow BJ**, Vadeboncoeur TF, **+**Dameff C, Stolz U, Silver A, Roosa J, Page R, LoVecchio F, Spaite DW. Measuring and improving cardiopulmonary resuscitation quality inside the emergency department. *Resuscitation.* 2015;93:8-13
http://dx.doi.org/10.1016/j.resuscitation.2015.04.031

93. Gaither JB, Galson S, Curry M, Mhayamaguru M, Williams C, Keim S, **Bobrow BJ**, Spaite DW; Environmental Hyperthermia in Prehospital Patients With Major Traumatic Brain Injury; J. Emerg Med. 2015; 49(3): 375-381

94. Ong ME, Shin SD, Tanaka H, Ma MH, Nishiuchi T, Lee EJ, Ko PC, Edwin Doctor N, Khruekarnchana P, Naroo GY, Wong KD, Nakagawa T, Ryoo HW, Lin CH, Goh ES, Khunkhlai N, Alsakaf OA, Hisamuddin NA, **Bobrow BJ**, McNally B, Assam PN, Chan ES. Rationale, methodology, and implementation of a dispatcher-assisted cardiopulmonary resuscitation trial in the asia-pacific (pan-asian resuscitation outcomes study phase 2). *Prehospital emergency care : official journal of the National Association of EMS Physicians and the National Association of State EMS Directors.* 2015;19:87-95

95. **+**Sutter J, Panczyk M, Spaite D, Ferrer J, Roosa J, **+**Dameff C, Langlais B, **+**Murphy R, **Bobrow B**. Telephone CPR instructions in emergency dispatch systems: Qualitative survey of 911 call centers. *Western Journal of Emergency Medicine.* 2015;16:736-742.

96. Ewy GA, **Bobrow BJ**, Chikani V, Sanders AB, Otto CW, Spaite DW, Kern KB. The time dependent association of adrenaline administration and survival from out-of-hospital cardiac arrest. *Resuscitation.* 2015;96:180-185

97. Kleinman ME, Brennan EE, Goldberger ZD, Swor RA, Terry M, **Bobrow BJ**, Gazmuri RJ, Travers AH, Rea T. Part 5: Adult basic life support and cardiopulmonary resuscitation quality: 2015 american heart association guidelines update for cardiopulmonary resuscitation and emergency cardiovascular care. *Circulation.* 2015;132:S414-435.

98. **Bobrow BJ**, Spaite DW, McNally BF. Focus on quality. *JEMS: a journal of emergency medical services.* 2015;40:56-58,63.

99. Indik JH, Conover Z, McGovern M, Silver AE, Spaite DW, **Bobrow BJ**, Kern KB. Amplitude-spectral area and chest compression release velocity independently predict hospital discharge and good neurological outcome in ventricular fibrillation out-of-hospital cardiac arrest. *Resuscitation.* 2015;92:122-128.

100. Ewy GA, **Bobrow BJ**. Cardiocerebral resuscitation: An approach to improving survival of patients with primary cardiac arrest. *Journal of intensive care medicine.* 2016;31:24-33.

101. **Bobrow BJ,** Eisenberg MS, Panczyk M. The institute of medicine says time to act to improve cardiac arrest survival: Here's how. *Annals of Emergency Medicine.* 2016;67:492-495.

102. **+**Murphy RA, **Bobrow BJ**, Spaite DW, Hu C, McDannold R, Vadeboncoeur TF.  Association between Prehospital CPR Quality and End-Tidal Carbon Dioxide Levels in Out-of-Hospital Cardiac Arrest.  *Prehosp Emerg Care* 2016 May-Jun;20(3):369-77. doi: 10.3109/10903127.2015.1115929. Epub 2016 Feb.  PubMed PMID: 26830353.

103. Brooks SC, Simmons G, Worthington H, **Bobrow BJ**, Morrison LJ. The pulsepoint respond mobile device application to crowdsource basic life support for patients with out-of-hospital cardiac arrest: Challenges for optimal implementation. *Resuscitation.* 2016;98:20-26.

104. **Bobrow BJ**, Panczyk M. Focused interventions. Four ways to achieve higher cardiac arrest survival rates. *JEMS : a journal of emergency medical services.* 2016;41:30-33.

Mesa/Bentley 005473

105. **Bobrow BJ,** Spaite DW, Vadeboncoeur TF, Hu C, Mullins T, Tormala W, **+**Dameff C, Gallagher J, Smith G, Panczyk M. Implementation of a regional telephone cardiopulmonary resuscitation program and outcomes after out-of-hospital cardiac arrest. *JAMA Cardiology.* 2016;1:294-302.

106. **+**Fukushima H, Panczyk M, Spaite DW, Chikani V, **+**Dameff C, Hu C, Birkenes TS, Myklebust H, Sutter J, Langlais B, **+**Wu Z, **Bobrow BJ.** Barriers to telephone cardiopulmonary resuscitation in public and residential locations. *Resuscitation.* 2016;109:116-120.

107. Spaite DW, Hu C, **Bobrow BJ,** Chikani V, Barnhart B, Gaither JB, Denninghoff KR, Adelson PD, Keim SM, Viscusi C, Mullins T, Sherrill D:  The Effect of Combined Out-of-Hospital Hypotension and Hypoxia on Mortality in Major Traumatic Brain Injury. *Ann Emerg Med.* 2017;69:62-72. doi:10.1016/j.annemergmed.2016.08.007.  PubMed PMID 27692683; PubMed Central PMCID: PMC5173421 (Available on 2018-01-01); NIH Manuscript System ID: NIHMS809058.

108. Spaite DW, Hu C, **Bobrow BJ,** Chikani V, Sherrill D, Barnhart B, Gaither JB, Denninghoff KR, Viscusi C, Mullins T, Adelson PD:  Mortality and Prehospital Blood Pressure in Patients With Major Traumatic Brain Injury: Implications for the Hypotension Threshold. *JAMA Surg* 2016 Dec 7. doi: 10.1001/jamasurg.2016.4686.  PubMed PMID: 27926759

109. Ro YS, Shin SD, Lee YJ, Lee SC, Song KJ, Ryoo HW, Ong ME, McNally B, **Bobrow B**, Tanaka H, Myklebust H, Birkenes TS. Effect of dispatcher-assisted cardiopulmonary resuscitation program and location of out-of-hospital cardiac arrest on survival and neurologic outcome. *Ann Emerg Med.* 2017;69:52-61 e51.

110. **+**Irisawa T, Vadeboncoeur TF, **+**Karamooz M, Mullins M, Chikani V, Spaite DW, **Bobrow BJ.** Duration of coma in out-of-hospital cardiac arrest survivors treated with targeted temperature management. *Ann Emerg Med.* 2017;69:36-43.

111. Nolan JP, Berg RA, Bernard S, **Bobrow BJ,** Callaway CW, Cronberg T, Koster RW, Kudenchuk PJ, Nichol G, Perkins GD, Rea TD, Sandroni C, Soar J, Sunde K, Cariou A. Intensive care medicine research agenda on cardiac arrest. *Intensive Care Med.* 2017.

112. Nuno T, **Bobrow BJ,** Rogge-Miller KA, Panczyk M, Mullins T, Tormala W, Estrada A, Keim SM, Spaite DW. Disparities in telephone CPR access and timing during out-of-hospital cardiac arrest. *Resuscitation.* 2017;115:11-16.

113. Langlais BT, Panczyk M, Sutter J, **+**Fukushima H, **+**Wu Z, Iwami T, Spaite D, **Bobrow B.** Barriers to Patient Positioning for Telephone Cardiopulmonary Resuscitation in Out-Of-Hospital Cardiac Arrest. *Resuscitation* 2017; 115: 163-8.

114. Spaite DW, Hu C, Bobrow BJ, Chikani V, Barnhart B, Gaither JB, Denninghoff KR, Adelson PD, Keim SM, Viscusi C, Mullins T, Rice AD, Sherrill D:  Association of Out-of-Hospital Hypotension Depth and Duration with Traumatic Brain Injury Mortality. *Ann Emerg Med.* 2017 Oct 70(4):522-530.e1.  doi: 10.1016/j.annemergmed.2017.03.027; pii: S0196-0644(17)30323-2. PMID: 28559036; NIH Manuscript System ID: NIHMS862574

115. **+**Fukushima H, Panczyk M, Hu C, **+**Dameff C, Chikani V, Vadeboncoeur TF, Spaite D, **Bobrow BJ.** Description of Abnormal Breathing is Associated with Improved Outcomes and Delayed Telephone Cardiopulmonary Resuscitation Instructions. *J Am Heart Assoc.* 2017 (online before print) DOI:10.1161/JAHA.116.005058.

116. +Wu Z, Panczyk M, Spaite DW, Hu C, +Fukushima H,+Langlais B, +Sutter J, **Bobrow BJ.** Telephone Cardiopulmonary Resuscitation is Independently Associated with Improved Survival and Improved Functional Outcome after Out-of-Hospital Cardiac Arrest. *Resuscitation.* 2017. http://dx.doi.org/10.1016/j.resuscitation.2017.07.016

Mesa/Bentley 005474

117.   2017 American Heart Association Focused Update on Adult Basic Life Support and Cardiopulmonary Resuscitation Quality: An Update to the American Heart Association Guidelines for Cardio pulmonary Resuscitation and Emergency Cardiovascular Care Kleinman ME, Goldberger ZD, Rea T, Swor RA, **Bobrow BJ**, Brennan EE, Terry M, Hemphill R, Gazmuri RJ, Hazinski MF, Travers AH.  *Circulation.* 2017, originally e-published November 6, 2017.

118.   Out-of-Hospital Cardiac Arrest Resuscitation Systems of Care: A Scientific Statement From the American Heart Association. McCarthy JJ, Carr B, Sasson C, **Bobrow BJ**, Callaway CW, Neumar RW, Ferrer JME, Garvey JL, Ornato JP, Gonzales L, Granger CB, Kleinman ME, Bjerke C, Nichol G; American Heart Association Emergency Cardiovascular Care Committee; Council on Cardiopulmonary, Critical Care, Perioperative and Resuscitation; and the Mission: Lifeline Resuscitation Subcommittee. *Circulation.* 2018 Feb 26.

119.   Vadeboncoeur TF, Chikani V, Hu C, Spaite DW, **Bobrow BJ**. Association between coronary angiography with or without percutaneous coronary intervention and outcomes after out-of-hospital cardiac arrest. *Resuscitation.* 2018 Mar 13;127:21-25.

120.   A. Ramesh, K.A. LaBresh, R. Begeman, **BJ Bobrow**, T. Campbell, N. Chaudhury, M. Edison, T.B. Erickson, J.D. Manning, B.S. Prabhakar, P. Kotini-Shah, N. Shetty, P.A. Williams, T. VandenHoek, Implementing a STEMI system of care in urban Bangalore: Rationale and Study Design for heart rescue India, *Contemporary Clinical Trials Communications.* 2018. doi: 10.1016/j.conctc.2018.04.002.

121.   Smith LG, Beger SB, Vadeboncoeur TF, Chikani V, Walter F, Spaite DS, **Bobrow BJ**: Trends in Overdose-Related Out-of-Hospital Cardiac Arrests.  *Resuscitation.* 2018. (Published on-line).

122.   Berg, DD, **Bobrow BJ**, Berg RA:  Key Components of a Community Response to Out-of-Hospital Cardiac Arrest. *Nature Reviews Cardiology.*2018.

123.   H-Index = 32


**Electronic Publications**
1.   New techniques in cardiopulmonary resuscitation (CPR).  Audio-Digest Emergency Medicine 2008 Aug; 25(15).


## WORK IN PROGRESS

**Publications**
**Peer Reviewed Full-Length Journal Articles, Books**

1.   Spaite DW, **Bobrow BJ**, Gaither JB, Hu C:  In reply:  The Effect of Combined Out-of-Hospital Hypotension and Hypoxia on Mortality in Major Traumatic Brain Injury.  *Ann Emerg Med* 2017. (In Press) (Letter).

2.   Spaite DW, Hu C, **Bobrow BJ**, Chikani V, Gaither JB, Barnhart BJ, Adelson PD, Rice AD, Grady K, Denninghoff KR, Keim SM, Viscusi C, Mullins T, Sherrill D:  Evaluation of Prehospital Hypoxia "Depth-Duration Dose" and Mortality in Major Traumatic Brain Injury.  *Prehospital Emerg Care* (In press).

3.   Literacy-Adapted Cognitive-Behavioral Therapy vs Education for Chronic Pain at Low-Income Clinics: A Randomized Controlled Trial. Annals of Internal Medicine (in press).

Mesa/Bentley 005475

4.    Post Cardiac Arrest Syndrome, Tintinalli's Emergency Medicine: A Comprehensive Study Guide, Ninth Edition. Benjamin S. Abella, **Bentley J. Bobrow.**

5.    Fletcher P, Gaither JB, Rice A, Castro-Marin F, Blust R, Chikani V, Vossbrink A**, Bobrow BJ**. Does an EMS Protocol Change Decrease Spinal Board Use in Patients with Spinal Cord Injury? Western Journal of Emergency Medicine; 2018. (In press).

6.    Franco Castro-Marin F, Gaither JB, Rice AD, Blust RN, Chikani V, Vossbrink A, **Bobrow BJ**. Prehospital Protocol Reducing Long Spinal Board Use, Not Associated with a Change in Incidence of Spinal Cord Injury. *Prehospital Emerg Care*. 2018. (Submitted).

## MEDIA

1.    Continuous Chest Compression CPR.  Mayo Clinic Medical Edge Video. Mayo Foundation for Medical Education and Research. June 10, 2008. Website hits: Over 5 million YouTube views.

2.    National Television Appearance. CNN Special Report: Cheating Death. October 2009.

3.    National Television Appearance. Discovery Channel. Surviving Death: Stone Cold. March 2010.

4.    Surviving Adult Cardiac Arrest Increases When Bystanders Perform Hands-Only C-P-R in the Community. The *JAMA* Report Video. October 5, 2010.

5.    American Heart Association Hands Only CPR Twitter Q & A Event.  June 7, 2011. Audience reach: 5.4 million.

6.    Journal of Emergency Medical Services Webinar. CPR Quality Improves Survival: Implementing the 2010 ECC & CPR Guidelines & Saving Lives from Cardiac Arrest in Your Community. June 30, 2011.

7.    Implementation of a Regional Telephone Cardiopulmonary Resuscitation Program and Outcomes After Out-of-Hospital Cardiac Arrest. The *JAMA* Report Video. May, 4, 2016.

8.    National Highway Traffic Safety (NHTSA) Webinar: EMS and 911 Experts Unite to Improve CPR September 26, 2018.

## SCHOLARLY PRESENTATIONS

### Invited

1.    The Arizona Cardiovascular Disease State Plan                    08/2005
      American Heart Association
      Tempe, Arizona

2.    Primary Stroke Center System                                     02/2006
      Internal Medicine Grand Rounds, Mayo Clinic Hospital
      Phoenix, Arizona

3.    Cardiocerebral Resuscitation, Clinical Decision Making           06/2006
      Emergency Medicine Conference
      Mayo Clinic Jacksonville
      Jacksonville, Florida

Mesa/Bentley 005476

4.  Stroke Telemedicine for Arizona Rural Residents                                      11/2006
    Mayo Alumni Conference
    Rochester, Minnesota

5.  Cardiocerebral Resuscitation: The Suburban Experience                                11/2007
    American Heart Association, Resuscitation Symposium. General Session
    Orlando, Florida

6.  Internal Medicine Grand Rounds                                                       02/2008
    Mayo Clinic Jacksonville
    Jacksonville, Florida

7.  New Techniques in CPR                                                                03/2008
    Mayo Clinic 5th Annual Emergency Medicine 2008 - Moving Forward
    Scottsdale, Arizona

8.  Standardizing Post-Resuscitation Care in Arizona                                     03/2008
    Arizona Heart Institute
    Phoenix, Arizona

9.  The Arizona Blueprint for Success                                                    04/2008
    Mayo Clinic Conference: Stroke: Incorporating Evidence
    into Clinical Decision-Making Emergency Medical Services and Stroke
    Scottsdale, Arizona

10. Cardiocerebral Resuscitation                                                         04/2008
    Arizona Fire Chiefs' Association Conference
    Phoenix, Arizona

11. Emergency Medicine Grand Rounds                                                      07/2008
    Mount Sinai School of Medicine
    New York, New York

12. The Arizona Cardiac Arrest Center Consortium                                         09/2008
    Arizona Heart Hospital
    Acute Cardiovascular Treatment Nurses' Day Conference
    Phoenix, Arizona

13. Keynote Speaker                                                                      10/2008
    Cardiocerebral Resuscitation:
    Improving the Odds of Survival from Cardiac Arrest
    American College of Osteopathic Emergency Physicians Scientific Seminar
    Las Vegas, Nevada

14. The Save Hearts in Arizona Registry and Education (SHARE) Program                    11/2008
    American Heart Association Scientific Sessions
    New Orleans, Louisiana

15. Implementation of Mission: Lifeline in Arizona                                       11/2008
    American Heart Association Executive Board
    Tempe, Arizona

Mesa/Bentley 005477

16. National Institutes of Health                                           12/2008
    National Institute of Neurological Disorders and Stroke
    Invited Discussant
    Roundtable on Opportunities to Advance Research on Neurological
    and Mental Health Emergencies
    Bethesda, Maryland

17. Keynote Speaker
    Neurological Emergencies and Neurocritical Care                         06/2009
    Columbia University
    New York, New York

18. Regionalization of EMS Care: Beyond Trauma                              01/2010
    National Association of EMS Physicians Annual Meeting
    Phoenix, Arizona

19. Advanced Topics in Medical Direction Course—Putting Science            01/2010
    in the Streets: How to Implement Best Practices in Your EMS System
    National Association of EMS Physicians
    Phoenix, Arizona

20. The University of Chicago                                               05/2010
    Grand Rounds
    Chicago, Illinois

21. Statewide Regionalization of Cardiac Arrest Care                        05/2010
    American College of Cardiology
    Emergency Cardiovascular Care 2010
    Washington DC

22. The Arizona Cardiac Resuscitation System of Care:                      05/2010
    Past, Present, and Future
    EMS Week Conference – Tucson Medical Center
    Tucson, Arizona

23. Regionalized Cardiac Care – Bringing a System to Life                   06/2010
    California American College of Emergency Physicians Scientific Assembly
    San Diego, California

24. Survival Improves after County-wide Implementation of a                06/2010
    Regionalized Post-Arrest Care System
    Annual Scientific Assembly of the Society for Academic Emergency Medicine
    Phoenix, Arizona

25. Taking it To Heart: The Big Picture of Cardiac Care in Arizona.         10/2010
    Concepts in Cardiac Transport 2010
    Flagstaff, Arizona

26. Presenter: A Pro-Con Debate on Continuous Chest Compressions           11/2010
    versus Standard CPR
    American Heart Association
    Scientific Sessions Resuscitation Science Symposium
    Chicago, Illinois

Mesa/Bentley 005478

27. Moderator: Need for Ongoing Quality Assessment in Cardiac
    and Trauma Systems
    American Heart Association
    Scientific Sessions Resuscitation Science Symposium
    Chicago, Illinois                                                    11/2010

28. High Quality Prehospital Resuscitation: Making the Leap from
    Concept to 'Real Life'
    Emergency Cardiovascular Care Update Conference
    San Diego, California                                               12/2010

29. The SHARE Program: Implementing Improvements in Cardiac Arrest
    Reporting and Care in Arizona
    Denver Metropolitan Emergency Medical Services Medical Directors' Meeting
    Denver, Colorado                                                    01/2011

30. The Arizona Cardiac Arrest System of Care – Past, Present and Future
    Evolution of the 2010 ECC Guidelines- An Opportunity to Save Lives
    Grand Rounds
    University of Cincinnati
    Cincinnati, Ohio                                                    01/2011

31. The 2010 Guidelines for Cardiopulmonary Resuscitation and
    Emergency Cardiovascular Care
    AHA Delegation
    Beijing, Wuhan, Shanghai, China                                     03/2011

32. Statewide Approach to Improving Survival of Patients with
    Cardiac Arrest
    Heart Rhythm Society
    32nd Annual Scientific Sessions
    San Francisco, California                                           05/2011

33. Cardiac Resuscitation
    Turkish Emergency Medicine Congress
    Antalya, Turkey                                                     05/2011

34. Coordinating a Statewide System of Cardiac Arrest Care:
    Winning Hearts and Brains
    Seattle Citywide Grand Rounds
    University of Washington
    Seattle, Washington                                                 06/2011

35. Improving Sudden Cardiac Arrest Survival
    Through a System of Care Approach: The Arizona Experience
    The Irwin R. Callen, MD Memorial Lectureship
    Florida Chapter, American College of Cardiology
    25th Annual Meeting
    Orlando, Florida                                                    08/2011

36. Changes to ACLS
    Current Concepts in Cardiac Care
    Sedona, Arizona                                                     10/2011

Mesa/Bentley 005479

37. Keynote Lecture                                                                10/2011
    The 2010 American Heart Association CPR and Emergency
    Cardiovascular Care Guidelines
    ITLS Course/AzCEP
    Beating the Odds: Emergency Care in the 21st Century
    Laughlin, Nevada

38. Arizona's VERY COOL System of Post-Cardiac Care                                10/2011
    ITLS Course/AzCEP
    Beating the Odds: Emergency Care in the 21st Century
    Laughlin, Nevada

39. Mission: Improve Cardiac Arrest Survival Rates in Your Community               10/2011
    Western Arizona Region EMS Resuscitation Academy
    Yuma, Arizona

40. Rethinking Sudden Cardiac Arrest – State-Wide Strategies                       01/2012
    to Improve SCA Survival Rates
    National Association of EMS Physicians Annual Meeting
    Tucson, Arizona

41. Statewide Implementation of the Prehospital Traumatic                          01/2012
    Brain Injury Guidelines: The EPIC Project
    National Association of EMS Physicians Annual Meeting
    Tucson, Arizona

42. Implementation of the 2010 ECC and CPR Guidelines and Saving Lives            02/2012
    from Cardiac Arrest: The Arizona Experience
    Cardiovascular Care Update 2012
    Scottsdale, Arizona

43. Save Hearts in Arizona Registry and Education: SHARE Program                   02/2012
    Seoul International Resuscitation Symposium
    Seoul, South Korea

44. Excellence in Prehospital Injury Care (EPIC) – Traumatic Brain Injury          02/2012
    2012 Arizona Pediatric Symposium
    Prescott, Arizona

45. Regionalization and Hypothermia                                                03/2012
    Hypothermia and Resuscitation Training Institute at Penn (HART)
    University of Pennsylvania
    Philadelphia, Pennsylvania

46. Community Intervention for Improving Resuscitation Outcomes                    04/2012
    in Arizona, USA
    Pan Asian Resuscitation Outcomes Study (PAROS)
    1st International Pre-hospital Care Conference
    Dubai, United Arab Emirates

47. Implementation of Dispatch CPR                                                 04/2012
    Pan Asian Resuscitation Outcomes Study (PAROS)
    1st International Pre-hospital Care Conference
    Dubai, United Arab Emirates

Mesa/Bentley 005480

48. Coordinating a Statewide System of Cardiac Arrest Care:       05/2012
    Winning Hearts and Brains
    Grand Rounds
    Northwestern Memorial Hospital, Northwestern University
    Chicago, Illinois

49. The New Era of Manual CPR Quality and Improving Survival from OHCA   06/2012
    International Congress on Emergency Medicine
    Dublin, Ireland

50. Approach to EMS Training and Protocol Implementation       08/2012
    The Korean Paramedic Council
    Seoul, South Korea

51. Approach to EMS Protocol Implementation and Measurement    08/2012
    The Korean Medical Directors' Council
    Seoul, South Korea

52. Crucial Strategies to Getting CPR into Your Community       08/2012
    Korean Community CPR – SAPHIA
    Seoul, South Korea

53. Improving Prehospital CPR Quality                           10/2012
    European Resuscitation Council Meeting
    Vienna, Austria

54. Prehospital Care                                            11/2012
    Shanghai EMS Meeting
    Shanghai, China

55. Cardiocerebral Resuscitation and Maximizing Survival from   03/2013
    Out-of-Hospital Cardiac Arrest: The Arizona Experience;
    Development of an Effective Emergency Medical System;
    CPR Evidence and Action Update: The Arizona Experience

56. 77th Annual Scientific Meeting of the Japanese Circulation Society   03/2013
    Plenary Presentation on Cardiac Resuscitation
    Yokohama, Japan

57. Seamless Community Based Approach to Increasing OHCA Survival   04/2013
    Keynote Address, The Society for Emergency Medicine in Singapore
    Annual Scientific Meeting (SEMS ASM)
    Singapore

58. Developing an Action Agenda for Improving OHCA Survival     04/2013
    Through Telephone CPR
    Pan-Asian Resuscitation Outcomes Dispatch CPR Academy
    Singapore

59. Strengthening the Chain of Survival: the Arizona Experience   04/2013
    EMS Asia 2013
    Singapore

Mesa/Bentley 005481

60. Keynote Address: Engineering a National Trauma Care System;
    Trauma System Leadership; Trauma Registries: Lessons Learned;
    Prehospital Management of Traumatic Brain Injury
    Pan-Pacific Trauma Congress
    Busan, South Korea
    06/2013

61. Implementation of a Cardiac Resuscitation System of Care
    West Midlands Ambulance Service Meeting
    Birmingham, England
    07/2013

62. Developing an Action Agenda for Improving OHCA Survival
    through Telephone CPR
    EMS Dispatcher Course
    The 7th Asian Conference on Emergency Medicine (ACEM 2013)
    Tokyo, Japan
    10/2013

63. National Trauma Registries
    Pan Asian Trauma Outcomes Study
    Tokyo, Japan
    10/2013

64. Prehospital Research
    Kyoto University Research Meeting
    Kyoto, Japan
    10/2013

65. High-Quality CPR and Maximizing Survival for Cardiac Arrest
    Osaka Resuscitation Academy
    Osaka Fire Department
    Osaka, Japan
    10/2013

66. The New BLS Guidelines: Implementing with Precision & Quality
    Emergency Cardiovascular Care Update (ECCU) Conference
    San Diego, California
    12/2015

67. Science of Resuscitation
    Grand Rounds Webinar
    University of Pittsburgh
    2/2016

68. Banner University Medical Center
    Department of Psychiatry
    Grand Rounds
    Phoenix, Arizona
    4/2017

69. Arizona Public Health Association - Webinar
    "Focusing on the Demand-Side of Opioids and Chronic Pain"
    10/2017

70. Mount Sinai Medical Center
    Department of Emergency Medicine
    Icahn School of Medicine
    Grand Rounds
    New York, New York
    10/2017

71. Honor Health
    Department of Internal Medicine
    Grand Rounds
    Scottsdale, Arizona
    3/2018

Mesa/Bentley 005482

72. University of Arizona                                                3/2018
    College of Medicine Phoenix
    Keynote Presentation
    Scholarly Project Student Research Symposium

73. Arizona Academy of Family Physicians                                 4/2018
    Annual Clinical Education Conference
    Carefree, Arizona


## Scholarly Presentations/Peer-Reviewed Published Abstracts
## (+ Plus sign indicates mentees - students, residents, fellows, or international visiting Professors)

### Oral Abstract Presentations

1. **Bobrow BJ**, Vadeboncoeur TF, Clark L, Chikani V, Ewy G, Sanders AB. Abstract 1: Statewide Out-of-Hospital Cardiac Arrest Survival Improves After Widespread Implementation of Cardiocerebral Resuscitation. Oral abstract presentation to the American Heart Association, Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November 2007. *Circulation;* 2007 Oct; 116(16 Suppl S):923.

2. Vadeboncoeur TF, **Bobrow BJ**, Clark L, Chikani V, Ewy GA; Abstract 3: The Survival Rate from Out-of-Hospital Cardiac Arrest is Superior with Passive Oxygen Insufflation Compared to Active Assisted Ventilation. Oral abstract presentation to the American Heart Association, Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November 2007. *Circulation;* 2007 Oct; 116(16 Suppl S):923.

3. Spaite DW, Stiell IG, **Bobrow BJ**, de Boer M, Maloney J, Denninghoff K, Vadeboncoeur TF, Dreyer J, Wells GA.  Impact of longer transport on out-of-hospital cardiac arrest survival: implications for regionalizing post-resuscitation care. Oral abstract presentation to the 38th Annual Scientific Meeting of the Society for Academic Emergency Medicine. Washington, District of Columbia. May 2008. *Academic Emergency Medicine.* 2008; 15(Suppl 1):S71S72.

4. **Bobrow B**, Spaite D, Mullins T, **+**Geyer B, Vadeboncouer T, Chikani V, Clark L, LoVecchio F, Bunis J, Ewy G; Abstract 11: The Impact of State and National Efforts to Improve Bystander CPR Rates in Arizona. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida. November, 2009. *Circulation;* 2009;120(18_MeetingAbstracts):S1443-a-.

5. **+**Geyer B, Vadeboncoeur T, Spaite DW, Sanders AB, Clark L, Chikani V, Mullins M, **Bobrow BJ**; Abstract 85: The association between cardiac arrest center patient volume and survival in a statewide post-cardiac arrest care system. Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Phoenix, Arizona. January, 2010. *Prehospital Emergency Care*; 2010;14(Suppl 1):39.

6. **+**Geyer BC, Vadeboncoeur TF, Sanders AB, Buttram S, Clark L, Spaite DW, Kern KB, **Bobrow BJ**; Abstract 418: Bypassing Out-of-Hospital Cardiac Arrest Patients to Specialty Centers Results in Improved Survival. Oral abstract presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Phoenix, Arizona. June, 2010. *Academic Emergency Medicine*; 2010;17(5 Suppl. 1):S1-S205. *Best Medical Student Research Award SAEM.*

Mesa/Bentley 005483

7.   **+**Crawford S, Venuti M, Mason T, Walka P, Smith G, Mullins M, Silver A.  **Bobrow B,** Spaite D; Pre-Hospital Chest Compression Quality is Improved with Scenario Based Training and Use of Novel Defibrillator Technology. Oral abstract presentation to the European Resuscitation Council Congress in Porto, Portugal. December, 2010. *Resuscitation*; 2010;81(2)(suppl1):S12.

8.   Spaite DW, Stolz U, **Bobrow BJ**, Chikani V, Sotelo M, Gaither J, Viscusi C, Harden D, Denninghoff KR:  The Association Between Prehospital Glasgow Coma Scale and Trauma Center Outcomes in Victims of Moderate and Severe TBI:  A Statewide Trauma System Analysis. Oral abstract presentation to the Annual Scientific Congress of the International Brain Injury Association, Edinburgh, Scotland, March, 2012. *Brain Injury; 2012;26(4-5):309-799.*

9.   Spaite DW, Stolz U, **Bobrow BJ**, Chikani V, Sotelo M, Gaither JB, Viscusi C, Harden D, Denninghoff KR:  The Association Between Prehospital Glasgow Coma Scale and Trauma Center Outcomes in Victims of Moderate and Severe TBI:  A Statewide Trauma System Analysis.  Oral abstract presentation to the Annual Scientific Meeting of the Society for Academic Emergency Medicine, Chicago, Illinois, May, 2012. *Academic Emergency Medicine* 2012;19:S4-S393.

10.   **+**Murphy RA, Spaite DW, Stolz U, Smith G, Silver A, **+**Karamooz M, Mullins M, Tobin J, **Bobrow BJ**:  Evaluation of End-Tidal $CO_2$ Levels Before, During, and After Return of Spontaneous Circulation in Out-of-Hospital Cardiac Arrest.  Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida, January, 2013. *Prehospital Emergency Care* 2013;17(1):106-107.

11.   Spaite DW, Chikani V, **Bobrow BJ**, Sotelo M, Barnhart B, Denninghoff KR, Gaither JB, Viscusi C, Adelson DP, Sherrill D, Harden D, Stolz U:  The Influence of Prehospital Hypotension and Hypoxia on Outcomes in Patients with Major Traumatic Brain Injury. Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida, January, 2013. *Prehospital Emergency Care;* 2013;17(1):106.

12.   Spaite DW, **Bobrow BJ**, Stolz U, Chikani V, Humble W, Mullins T, Mullins M, Stapczynski JS, Kern K, Ewy GA:  System-wide Regionalization of EMS and Hospital Care for Out-of-Hospital Cardiac Arrest:  Association with Improved Survival and Neurologic Outcomes. Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida, January, 2013. *Prehospital Emergency Care* 2013;17(1):103.

13.   **+**Dunham A, **+**Karamooz M, Heagerty N, Silver A, **+**Nunez M, McDannold R, Kassel D, **Bobrow B**. The Accuracy of Prehospital Provider Oxygen Saturation and End-Tidal C02 Documentation in Severe Traumatic Brain Injury. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A15.

14.   Spaite DW, Stolz U, **Bobrow BJ**, Chikani V, Sherrill D, Sotelo M, Barnhart B, Gaither JB, Adelson PD, Viscusi C, Mullins T, Humble W, Denninghoff KR:  Association Between Lowest Prehospital Systolic Blood Pressure and Mortality in Major Traumatic Brain Injury:  Is There a "Hypotension Threshold"? Oral abstract presentation to the Annual Scientific Congress of the International Brain Injury Association, San Francisco, California, March, 2014. *Brain Injury.*

15.   Spaite DW, Stolz U, **Bobrow BJ**, Gaither JB, Chikani V, Sherrill D, Sotelo M, Barnhart B, Adelson PD, Viscusi C, Mullins T, Humble W, Denninghoff KR:  Mortality as a Function of Prehospital Systolic Blood Pressure in Major Traumatic Brain Injury:  What is the Optimum Pressure for Survival?  Oral abstract presentation to the Annual Scientific Congress of the International Brain Injury Association, San Francisco, California, March, 2014. *Brain Injury.*

Mesa/Bentley 005484

16. **Bobrow B**, Silver A, Stolz U, +Irisawa T, +Karamooz M, +Murphy RA, Kovacs A, Spaite D. Chest compression release velocity is independently associated with survival from out-of-hospital cardiac arrest. Oral abstract presentation to the European Resuscitation Council Resuscitation Symposium in Bilbao, Spain, May, 2014. *Resuscitation,* 2014;85, Supplement 1:S1-S2.

17. +Irisawa T, +Karamooz M, Stolz U, +Murphy RA, McDannold R, Venuti M, Silver A, Spaite D, **Bobrow B**. Compliance with prehospital traumatic brain injury guidelines is poor with longer prehospital treatment duration. Oral abstract presentation to the European Resuscitation Council Resuscitation Symposium in Bilbao, Spain, May, 2014. *Resuscitatio*n, 2014;85, Supplement 1:S1-S2.Resuscitation. 2014;85, Supplement 1:S14.

18. **Bobrow B**, Panczyk M, Stolz U, Sotelo M, Vadeboncoeur T, Sutter J, Langlais B, Spaite D. Abstract 1: Statewide implementation of a standardized pre-arrival telephone CPR program is associated with increased bystander CPR and survival from out-of-hospital cardiac arrest. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation.* 2014;130:A1.

19. Spaite DW, Stolz U, **Bobrow BJ**, Chikani V, Sherrill D, Sotelo M, Barnhart B, Gaither JB, Adelson PD, Viscusi C, Mullins T, Humble W, Denninghoff KR. Abstract 4: The effect of prehospital hypoxia and hypotension on outcome in major traumatic brain injury: A deadly combination. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation.* 2014;130:A4.

20. **Bobrow B**, Panczyk M, Stolz U, Vadeboncoeur T, Sutter J, Langlais B, Spaite D. Statewide Implementation of a Standardized Pre-Arrival Telephone CPR Program is Associated with Increased Bystander CPR and Survival from Out-of-Hospital Cardiac Arrest. Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. *Prehospital Emergency Care*;19(1):140-141.

21. Sutter J, Langlais B, +Dameff C, +Tully J, Panczyk M, Chikani V, Vadeboncoeur TF, Spaite DW, **Bobrow BJ**. Abstract 12075: Telecommunicator CPR intervention improves recognition of cardiac arrest and time to first chest compression. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation.* 2015;132:A12075

22. Spaite DW, Hu C, **Bobrow BJ**, Sherrill D, Chikani V, Barnhart B, Gaither JB, Denninghoff KR, Adelson PD, Viscusi C, Mullins T, Stolz U. Abstract 14938: Association between survival and increases in prehospital systolic blood pressure after its nadir in major traumatic brain injury. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation.* 2015;132:A14938

23. Gaither JB, Chikani V, Spaite DW, Smith JJ, Curry M, Mhayamaguru M, Barnhart B, Adelson PD, Viscusi C, Denninghoff K, **Bobrow BJ**. Abstract 16144: Association between elevated initial trauma center body temperature and non-mortality outcomes following major traumatic brain injury. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation.* 2015;132:A16144

Mesa/Bentley 005485

24. Spaite DW, Hu Chengcheng, **Bobrow BJ**, Sherrill D, Chikani V, Barnhart B, Gaither JB, Adelson PD, Viscusi C, Mullins T, Denninghoff KR, Stolz U.  Association Between Survival and Increases in Prehospital Systolic Blood Pressure After Its Nadir in Major Traumatic Brain Injury:  New Findings From the EPIC Study.  Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California. January, 2016. *Prehospital Emergency Care*. 2016;20:137-173.

25. Spaite DW, Hu Chengcheng, **Bobrow BJ**, Chikani V, Sherrill D, Barnhart B, Gaither JB, Denninghoff KR, Viscusi C, Mullins T, Stolz U, Adelson PD.  Comparison of the Performance of Prehospital Systolic Blood Pressure Versus Calculated Mean Arterial Pressure in Predicting Mortality in Major Traumatic Brain Injury.  Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California. January, 2016. *Prehospital Emergency Care*. 2016;20:137-173.

26. Panczyk M,  Sutter J,  Langlais B,  Hu C, Vadeboncoeur TF,  Mullins T, DW Spaite,  **Bobrow BJ**. Telephone CPR is Independently Associated With an Increase in Initial Shockable Rhythms in Patients With Out-of-Hospital Cardiac Arrest. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation*. 2016;134:A13846.

27. Vadeboncoeur TF, Chikani V, Spaite DW, Hu C, Mullins M, **Bobrow BJ**. Association Between Coronary Angiography With or Without Percutaneous Coronary Intervention and Outcomes After Out-of-Hospital Cardiac Arrest. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation*. 2016;134:A13806.

28. Perez O, Spaite DW, Helfenbein E, Barnhart BJ, Babaeizadeh S, Hu C, Vatsal C, Gaither JB, Denninghoff KR, Keim SM, Viscusi C, Sherrill D, **Bobrow BJ**:  Accuracy of Prehospital Documentation of Hypoxia Compared to Continuous Non-Invasive Monitor Data Tracking in Major Traumatic Brain Injury. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation* 2016;A13835.

29. Spaite DW, Hu C, **Bobrow BJ**, Chikani V, Barnhart BJ, Gaither JB, Denninghoff KR, Adelson PD, Keim SM, Viscusi C, Mullins T, Sherrill D:  Evaluation of Prehospital Hypotension Depth-Duration Dose and Mortality in Major Traumatic Brain Injury. Oral abstract presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation*. 2016;134:A15910.

30. Hu C, Spaite DW, Silver A, Gaither J, McDannold R, Mullins M, Vadeboncoeur T, **Bobrow B**. Differential Correlation of $ETCO_2$ and CPR Quality Between Out-of-Hospital Arrests of Cardiac and Respiratory Etiology. Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana, January, 2017. *Prehospital Emergency Care* 2017;21(1):92.

31. Perez O, Spaite DW, Helfenbein E, Barnhart BJ, Babaeizadeh S, Hu C, Chikani V, Gaither JB, Denninghoff KR, Keim SM, Viscusi C, Sherrill D, Rice AD, **Bobrow BJ**. Prehospital Use of Nasal Cannula End-Tidal $CO_2$ Monitoring in Non-Intubated Major Traumatic Brain Injury Patients. Oral abstract presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana, January, 2017.  *Prehospital Emerg Care* 2017;21(1):97.

32. Spaite DW, Hu C, Bobrow BJ, Chikani V, Gaither JB, Barnhart BJ, Adelson PD, Rice AD, Grady K, Keim SM: Effect of Prehospital Hypoxia "Depth-Duration Dose" on Mortality in Major Traumatic Brain Injury. Oral abstract presentation to the Mediterranean Emergency Medicine Congress, September 6-10, 2017, Lisbon, Portugal.

Mesa/Bentley 005486

33. **Bobrow BJ**, Panczyk M, Blust R, Brazil P, George T, Chikani V, Hu C, Spaite DW:  Death by Suicide: The EMS Profession Compared to the General Public.   The National Association of EMS Physicians (NAEMSP) in San Diego, CA. January, 2018. *Prehospital Emergency Care.*

34. **+**Beger S, **+**Smith G, Chikani, V, Panczyk M, Spaite DW, **Bobrow BJ**:  Statewide Trends in Out-of-Hospital Cardiac Arrest Related to Drug Overdose.  The National Association of EMS Physicians (NAEMSP) in San Diego, CA. January, 2018. *Prehospital Emergency Care*.

35. Beger S, Smith G, Chikani V, Spaite D, Keim S, Mullins T, George T, **Bobrow B**:  Statewide Trends in Out-of-Hospital Cardiac Arrest Related to Drug Overdose.  *Prehospital Emerg Care* 2018;22(1):102.

36. Rice A, Gaither J, Spaite D, Chikani V, Wentworth S, Vadeboncoeur T, George T, Mullins T, **Bobrow B**:  Rearrest Incidence and Post-ROSC Rhythms after Prehospital Return of Spontaneous Circulation in Out-of-Hospital Cardiac Arrest.  *Prehospital Emerg Care* 2018;22(1):120.

37. **Bobrow BJ**, Panczyk M, Blust R, Brazil P, George T, Chikani V, Hu C, Spaite DW:  Death by Suicide: The EMS Profession Compared to the General Public.  *Prehospital Emerg Care* 2018;22(1):102.

38. Gaither J, Rice A, Hu C, McDannold R, Mullins M, Spaite D, Vadeboncoeur T, George T, Mullins T, **Bobrow B**:  Comparison of Manual Vs. Mechanical Chest Compression Quality During Prehospital Cardiac Resuscitation.  *Prehospital Emerg Care* 2018;22(1):122-123.

39. Spaite DW, Hu C, **Bobrow BJ**, Chikani V, Gaither JB, Barnhart B, Adelson PD, Denninghoff KR, Rice AD, Viscusi C, Sherrill D, Keim SM:  Combined Prehospital Hypoxia-Hypotension "Depth-Duration Dose" and Mortality in Major Traumatic Brain Injury.  *Prehospital Emerg Care* 2018;22(1):105-106.

40. Fletcher P, Gaither JB, Rice A, Castro-Marin F, Blust R, Chikani V, Vossbrink A, **Bobrow B**.  Does an EMS Protocol Change Decrease Spinal Board Use in Patients with Spinal Cord Injury? 21st Annual Western Regional Society for Academic Emergency Medicine Meeting. Albuquerque, NM. February 2-3, 2018.

41. Spaite DW, Hu C, **Bobrow BJ**, Barnhart B, Chikani V, Gaither JB, Denninghoff KR, Rice AD, Keim SM:  Three-Dimensional Models of Complex Interactions Between Age, Prehospital Blood Pressure, and Mortality in Major Traumatic Brain Injury.  *Circulation* 2018;138 (Suppl 2).

42. Spaite DW, Hu C, **Bobrow BJ**, Barnhart B, Chikani V, Gaither JB, Denninghoff KR, Rice AD, Keim SM:  Differential Effects of Prehospital Hypotension and Injury Severity in Isolated Versus Multisystem Major Traumatic Brain Injury.  *Circulation 2018*;138 (Suppl 2).

43. Sutter JH, Beger S, Hu C, Spaite DW, Silver A, McDannold R, Mullins M, Vadeboncoeur T, **Bobrow BJ**: Associations of Chest Compression Release Velocity and Age, Weight, and Gender During Cardiac Resuscitation. *Circulation* 2018;138 (Suppl 2); Abs 260.

44. Spaite DW, Hu C**, Bobrow BJ**, Barnhart BJ, Chikani V, Gaither JB, Denninghoff K, Rice A, Keim SM:  Differential Effects of Prehospital Hypotension and Injury Severity in Isolated Versus Multisystem Major Traumatic Brain Injury.  *Prehospital Emerg Care* 2019 (in press).

45. Gaul C, Rice AD, Castro-Marin F, Blust RN, Chikani V, Vossbrink A, Tolson J, **Bobrow BJ**, Gaither JB: Why Are Long Spinal Boards Used in Prehospital Cases with Retrospective Diagnosed Spinal Cord Injury? *Prehospital Emerg Care* 2019 (in press).

Mesa/Bentley 005487

**Poster Presentations**

1. Demaerschalk BM, **Bobrow BJ**, Paulsen M, Phoenix Operation Stroke Executive Committee; Abstract 226: Establishing emergency medical services for a metropolitan matrix of primary stroke centers: the Phoenix experience. Poster presentation to the American Neurological Association Annual Meeting in San Diego, California, September, 2005. *Annals of Neurology*; 2005;58(9):S42.

2. Demaerschalk BM, Stemper-Bartkus CL, Lendzion NF, **Bobrow BJ**, Dodick DW, Ingall TJ; Abstract 225: Setting Targets in the Emergency Department Improves Door-to-Needle Time for Acute Ischemic Stroke Patients. Poster presentation to the American Neurological Association Annual Meeting in San Diego, California, September, 2005. *Annals of Neurology*; 2005;58(Suppl 9):S41-2.

3. Spencer BR, Khan OM, Clark L, Montgomery C, **Bobrow BJ**, Demaerschalk BM.  Emergency medical services support for a primary stroke center. Poster presentation to the International Stroke Conference in Kissimee, Florida, February, 2006. *Stroke;* 2006;37(2):740.

4. **Bobrow BJ**, Sanders AB, Clark L, Ines C, Noelck N, Zehring B, Richman PB. Abstract 194: Ability of citizens in a senior living community to perform basic life support skills and appropriately utilize automated external defibrillators. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in San Francisco, California. May, 2006. *Academic Emergency Medicine*; 2006;13(5 Suppl 1):S83.

5. **Bobrow BJ**, Demaerschalk B, Wood J, Jennings A, Clark L, Villarin A Jr. Abstract 130:Emergency physicians' outlook on thrombolysis for acute ischemic stroke in a metropolitan matrix of primary stroke centers. Poster presentation to the American College of Emergency Medicine (ACEP) Research Forum in New Orleans, Louisiana, October, 2006. *Annals of Emergency Medicine*; 2006;48(4 Suppl):S41.

6. Murdock T, Richman PB, Dominguez S, Collins C, **Bobrow B**.  Abstract 181: Emergency department screening for improper child safety restraint use - parent confidence versus practice.  Poster presentation to the American College of Emergency Medicine (ACEP) Research Forum in New Orleans, Louisiana, October, 2006. *Annals of Emergency Medicine*; 2006;48(4 Suppl):S56.

7. **Bobrow B**, Ewy G, Sanders A, Clark L, Berg R, Kem K, Sayre M.  Abstract 1774: Establishing a statewide cardiac arrest reporting and educational network: the Arizona experience. Poster presentation to the American Heart Association Scientific Sessions in Chicago, Illinois. November, 2006. *Circulation;* 2006;114(18):350.

8. Vadeboncoeur T, Ewy G, Clark L, Berg R, Kern K, Sanders A, **Bobrow B**.  Abstract 3: The save hearts in Arizona registry and education (SHARE) program: Who is performing cardiopulmonary resuscitation and where are they doing it? Poster presentation to the American Heart Association Scientific Sessions in Chicago, Illinois.  November, 2006. *Circulation;* 2006;114(18):1189.

9. Owens J, **+**Shimmin SR, **Bobrow BJ**, Richman PB, Vadeboncoeur TM.  Abstract 28: Emergency medical technician practice patterns in adult cardiac arrest resuscitation. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Naples, Florida.  January, 2007. *Prehospital Emergency Care;* 2007;11(1):94-136.

10. **Bobrow B**, Demaerschalk B, **+**Shimmin SR, Clark L, McKinzie G.  Abstract 35: Utilization of a prehospital stroke scale in an urban matrix of primary stroke centers.  Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Naples, Florida. January, 2007. *Prehospital Emergency Care;* 2007; 11(1):94-136.

Mesa/Bentley 005488

11.   +Shimmin SR, Petri R, **Bobrow BJ**, Shem, Rode S.  Abstract 60: Remote triage center for hurricane Katrina victims:The Arizona Operation Good Neighbor Experience. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Naples, Florida.  January, 2007. *Prehospital Emergency Care;* 2007;11(1):94-136.

12.   **Bobrow BJ**, Demaerschalk BM, +Shimmin SR, Clark L, Aguilar MI, Ingall TJ.  Prehospital time intervals in a metropolitan matrix of primary stroke centers: Where has the time gone? Poster presentation for the International Stroke Conference in San Francisco, California. February, 2007. *Stroke*; 2007;38(2):503.

13.   Demaerschalk BM, **Bobrow B**;  Ancrod for acute ischemic stroke: A systematic review and meta-analysis.  Poster presentation for the International Stroke Conference in San Francisco, California. February, 2007.*Stroke*; 2007;38(2):506

14.   Demaerschalk BM, **Bobrow BJ**, +Shimmin SR, Clark L, Aguilar MI, Ingall TJ;  Establishing the Arizona stroke prehospital identification registry and education (ASPIRE) program. Poster presentation for the International Stroke Conference in San Francisco, California. February, 2007. *Stroke;* 2007;38(2):579.

15.   **Bobrow BJ**, Clark L, Sanders AB, Richman PB, Kern KB, Berg RA, Ewy GA;  Abstract 10: Cardiocerebral resuscitation improves survival from out-of-hospital cardiac arrest. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Chicago, Illinois, May, 2007. *Academic Emergency Medicine;* 2007;14(5 Suppl 1):S11.

16.   Darkoh M, Richman PB, Clark L, +Shimmin S, **Bobrow BJ**;  Abstract 262: Outpatient cardiac arrest in Hispanic vs non-Hispanic patients: Observations from a statewide database with respect to bystander performance of CPR, presenting rhythm and outcome.  Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Chicago, Illinois, May, 2007. *Academic Emergency Medicine*; 2007;14(5 Suppl 1):S106.

17.   **Bobrow BJ**, Demaerschalk BM, +Shimmin SR, Clark L, Aguilar MI, Donahue D, Ingall TJ; Abstract 429: Acute stroke in an urban matrix of primary stoke centers: Who is calling 9-1-1?. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Chicago, Illinois, May, 2007. *Academic Emergency Medicine;* 2007;14(5 Suppl 1):S169.

18.   Richman PB, **Bobrow BJ**, Vadeboncoeur TJ, Clark L; Abstract 430: Independent validation of an out-of-hospital termination of resuscitation (TOR) clinical decision rule. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Chicago, Illinois, May, 2007. *Academic Emergency Medicine;* 2007;14(5 Suppl 1):S169.

19.   +Shimmin S, Clark L, Richman PB, Darkoh M, Vadeboncoeur TF, **Bobrow BJ**;  Abstract 439: Establishing a state-wide automated external defibrillator database and educational network: The save hearts in Arizona registry and education experience. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Chicago, Illinois, May, 2007. *Academic Emergency Medicine*; 2007;14(5 Suppl 1):S173.

20.   Vadeboncoeur TF, Sanders AB, Kern KB, Clark L, Richman PB, +Shimmin S, **Bobrow BJ**; Abstract 197: Witnessed arrest with bystander-initiated cardiopulmonary resuscitation increases the incidence of ventricular fibrillation found by first responders. Poster presentation to the American College of Emergency Medicine (ACEP) Research Forum in Seattle, Washington. October, 2007. *Annals of Emergency Medicine;* 2007;50(3 Suppl S):S62-3.

Mesa/Bentley 005489

21.  **+**Tran M, **+**Shimmin S, Vadeboncoeur TF, Clark L, LoVecchio F, **Bobrow BJ**; Abstract 198: Paramedic performance of resuscitation in the setting of standardized guidelines. Poster presentation to the American College of Emergency Medicine (ACEP) Research Forum in Seattle, Washington. October, 2007. *Annals of Emergency Medicine;* 2007;50(3 Suppl S):S63.

22.  **+**Shimmin S, Richman PB, Ewy GA, Vadeboncoeur TF, Lani C, **Bobrow BJ**; Abstract 262: Knowledge and attitudes toward performance of cardiac resuscitation within a cohort of layperson workers at a mass gathering venue. Poster presentation to the American College of Emergency Medicine (ACEP) Research Forum in Seattle, Washington. October, 2007. *Annals of Emergency Medicine;* 2007;50(3 Suppl S):S82-3.

23.  **Bobrow BJ**, Vadeboncoeur TF, Spaite DW, Chikani V, Clark L, Sanders AB; Abstract 90: Safety evaluation of a prehospital cardiac arrest regionalization protocol for patients with return of spontaneous circulation in the field. Poster presentation to the National Association of EMS Physicians (NAEMSP) in Phoenix, Arizona.  January, 2008. *Prehospital Emergency Care*; 2008;12(1):134.

24.  Spencer BR, Smith MA, Aguilar MI, **Bobrow BJ**, Ingall TJ, Dodick DW, Lendzion NF, Miller PH, Demaerschalk BM;  Poster 146: Relationship between inaccurate thrombolytic dosing and hemorrhagic complications in acute stroke. Poster presentation to the International Stroke Conference in New Orleans, Louisiana. February, 2008. *Stroke;* 2008 Feb; 39(2):605.

25.  Demaerschalk BM, **Bobrow BJ**, Chikani V, Clark L, Laubham K, Flood T; Poster 536: Outcomes from a prehospital stroke database in a metropolitan matrix of primary stroke centers. Poster presentation to the International Stroke Conference in New Orleans, Louisiana. February, 2008. *Stroke;* 2008 Feb; 39(2):699-700.

26.  Miley ML, **Bobrow BJ**, Demaerschalk BM;  Poster 563: The state of emergency stroke resources and care in rural Arizona. Poster presentation to the International Stroke Conference in New Orleans, Louisiana. February, 2008. *Stroke;* 2008 Feb; 39(2):706

27.  Tobin WO, Hentz J, **Bobrow BJ**, Demaerschalk B; Poster P07.052: Identification of stroke mimics in the emergency department setting. Poster presentation to the American Academy of Neurology, 60th Annual Meeting in Chicago, Illinois. April, 2008. *Neurology;* 2008;70(11):Supp 1:A358.

28.  Miley ML, **Bobrow BJ**, Demaerschalk BM;  Stroke telemedicine for Arizona rural residents (STARR). Poster presentation to the 17th European Stroke Conference in Nice, France in May, 2008. *Cerebrovascular Diseases;* 2008; 25(Suppl 2):101.

29.  Tobin WO, **Bobrow BJ**, Hentz J, Demaerschalk BM;  Identification of stroke mimics in the emergency department setting. Poster presentation to the 17th European Stroke Conference in Nice, France in May, 2008. *Cerebrovascular Diseases;* 2008;25(Suppl 2):77.

30.  Miley ML, Olmstead NL, **Bobrow BJ**, Demaerschalk BM; The state of emergency stroke resources and care in rural Arizona. Poster presentation to the 17th European Stroke Conference in Nice, France in May, 2008. *Cerebrovascular Diseases;* 2008;25(Suppl 2):101.

31.  Miley ML, **Bobrow BJ**, Demaerschalk BM; Poster 193: The state of emergency stroke resources and care in rural Arizona. Poster presentation to the 43rd Annual Congress of the Canadian Neurological Sciences Federation in Victoria, British Columbia.  June, 2008. *Canadian Journal of Neurological Sciences;* 2008;35(2 Suppl 1):S94, P193.

Mesa/Bentley 005490

32.   Miley ML, **Bobrow BJ**, Demaerschalk BM;  Poster 194: Stroke telemedicine for Arizona rural residents (STARR). Poster presentation to the 43rd Annual Congress of the Canadian Neurological Sciences Federation in Victoria, British Columbia.  June, 2008. *Canadian Journal of Neurological Sciences;* 2008;35(2 Suppl 1):S94, P194.

33.   Miley ML, **Bobrow BJ**, Demaerschalk BM; Abstract M-54: Stroke Telemedicine for Arizona Rural Residents (STARR). Poster presentation to American Neurological Association Meeting in Salt Lake City, Utah. September, 2008. *Annals of Neurology;* 2008;64(S12).

34.   Miley ML, Olmstead NL, **Bobrow BJ**, Demaerschalk BM;  Abstract M-55: The State of Emergency Stroke Resources and Care in Rural Arizona. Poster presentation to American Neurological Association Meeting in Salt Lake City, Utah. September, 2008. *Annals of Neurology;* 2008;64(S12).

35.   **Bobrow BJ**, Spaite DW, Mullins T, Sanders AB, Vadeboncoeur TF, Clark LL, Kern KB, Berg RA, Ewy GA;  Abstract P145: Development of the Arizona statewide consortium of cardiac arrest centers. Poster presentation to the American Heart Association, Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana.  November, 2008. *Circulation;* 2008;118(18 Suppl 2):S1476-7.

36.   **Bobrow BJ**, Spaite DW, Sanders AB, Ewy GA, Kern KB, Vadeboncoeur TF, Clark LL, Chikani V, Berg RA;  Abstract P55: Survival from out-of-hospital cardiac arrest among patients receiving AHA 2000 ACLS guidelines, AHA 2005 ACLS guidelines, or cardiocerebral resuscitation: a statewide analysis. Poster presentation to the American Heart Association, Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana. November, 2008. *Circulation;* 2008;118(18 Suppl 2):S1457.

37.   **Bobrow BJ**, Zuercher M, Ewy GA, Clark LL, Chikani V, Donahue D, Sanders AB, Hilwig RW, Berg RA, Kern KB;  Abstract P56: Gasping during cardiac arrest in humans is frequent, associated with improved survival, and needs re-emphasis. Poster presentation to the American Heart Association, Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana.  November, 2008. *Circulation;* 2008;118(18 Suppl 2):S1457.

38.   +Poles JC, Mandair S, Donahue D, **Bobrow BJ**, Lendzion N, Miller P, Demaerschalk BM, Ingall T; Abstract P39: Emergency medical dispatcher accuracy at predicting stroke in a metropolitan matrix of primary stroke centers. Poster presentation to the International Stroke Conference in San Diego, California. February 2009. *Stroke;  2009*; 40(4):E207-8.

39.   Mohler MJ, Wendel C, +Mosier J, +Itty A, Poulsen J, Shellenberger J, **Bobrow B**, Clark L, Sanders A;  Abstract B-19: The effect of cardiocerebral resuscitation in aging adults. Poster presentation to the American Geriatrics Society Annual Scientific Meeting in Chicago, Illinois. April/May 2009. *Journal of the American Geriatrics Society;* 2009;57(Suppl 1):S70.

40.   Poulsen J, Shellenberger J, +Itty A, +Mosier J, Wendel C, Mohler J, **Bobrow B**, Sanders A; Abstract 372: Predictors of survival from out-of-hospital cardiac arrest do not change with age. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in New Orleans, Louisiana. May, 2009. *Academic Emergency Medicine;* 2009;16(Suppl 4):S151-S152.

41.   +Geyer B,  **Bobrow B**, Spaite D, Sanders A, Vadeboncoeur T, Demaerschalk B, Clark L, Ewy G; Abstract 525: A Statewide Network of Cardiac Arrest Centers Significantly Improves Outcomes from Out of Hospital Cardiac Arrest. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in New Orleans, Louisiana. May, 2009. *Academic Emergency Medicine;* 2009;16(Suppl 4):S211-S212.

Mesa/Bentley 005491

42. **+**Itty A, **+**Mosier J, Sanders A, Mohler J, Wendel C, Shellenberger J, Poulsen J, **Bobrow B**; Abstract 527: Cardiocerebral resuscitation improves survival from out-of-hospital cardiac arrest in the elderly. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in New Orleans, Louisiana. May, 2009. *Academic Emergency Medicine*; 2009;16(Suppl 4):S212.

43. **+**Geyer BC, Striegel T, Spaite DW, Mullins T, Sanders AB, Clark L, Kern KB, Ewy GA, Vadeboncoeur TF, **Bobrow BJ**; Abstract P36: Statewide Network of Cardiac Arrest Centers Improves Survival From Out of Hospital Cardiac Arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida. November, 2009. *Circulation*; 2009;120(18_MeetingAbstracts):S1448-c-1449.

44. Spaite D, Ducote J, Gallagher J, Smith G, Valenzuela D, Stapczynski S, Chikani V, Clark L, **Bobrow B**; Abstract P177: Fire Department-Led Community CPR Education Impacts Bystander CPR Performance. Poster Presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida. November, 2009. *Circulation;* 2009;120(18_MeetingAbstracts):S1479-d-1480.

45. Bunis J, Chikani V, Mullins T, Conditt VA, Salvino CK, **Bobrow BJ**; Abstract 15: An Analysis of Air Ambulance Utilization for Field Trauma Patients in Arizona. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Phoenix, Arizona. January, 2010. *Prehospital Emergency Care*; 2010;14(Suppl 1):7.

46. Venuti M, Mason T, Smith G, Ewy G, LoVecchio F, Stapczynski S, Clark L, Mullins M, Silver A, **Bobrow B**; Abstract 105: There is increased cardiopulmonary resuscitation variability during ground ambulance transport of patients in cardiac arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Phoenix, Arizona. January, 2010. *Prehospital Emergency Care*; 2010;14(Suppl 1):49.

47. Ingall TJ, Aguilar MI, Demaerschalk BM, Dodick DW, Kiernan TJ, Spencer BR, **Bobrow BJ**; How Accurate is a Stroke Alert System? Poster presentation to the 2010 International Stroke Conference in San Antonio, Texas. February, 2010. *Stroke;* 2010;41(4):e254-e393.

48. Williams B, Panchal A, Stolz U, Clark L, **Bobrow B**, Sanders A; Abstract 419: Cardiocerebral Resuscitation Improves Survival and Neurological Outcome From Out-of-Hospital Cardiac Arrest. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Phoenix, Arizona.  June, 2010. *Academic Emergency Medicine*; 2010;17(5 Suppl. 1):S1-S205.

49. Vadeboncoeur T, Silver A, Venuti M, Smith G, Clark L, LoVecchio F, Mullins M, **+**Page R, **Bobrow B**; Abstract 502: Out-of-hospital Cardiac Arrest Survival Improves With Chest Compression Depth Exceeding the Guideline Recommendation. Poster presentation to the Society for Academic Emergency Medicine (SAEM) Annual Meeting in Phoenix, Arizona. June, 2010. *Academic Emergency Medicine*; 2010;17(5 Suppl. 1):S1-S205.

50. **+**Roosa J, Vadeboncoeur T, **+**Geyer B, Spaite D, Panchal A, Sanders A, **Bobrow B**, Kern K, SHARE Study Group; Abstract 44: Prevalence of Cardiac Catheterization and Outcomes From Out-of-Hospital Cardiac Arrest in a Consortium of Cardiac Receiving Centers. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A44-.

Mesa/Bentley 005492

51.  **Bobrow B**, Spaite D, Stolz U, Geyer B, Panchal A, Mullins T, Kern K, Sanders A, Ewy G, SHARE Study Group; Abstract 36: The Impact of a Statewide, Comprehensive System of Care on Survival From Out-of-Hospital Cardiac Arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A36-.

52.  **+**McCarty K, Nichol G, Chikani V, Bunis J, **+**Roosa J, Spaite D, Mullins M, **Bobrow B**, SHARE Study Group; Abstract 232: Early Withdrawal of Post-Arrest Care After Therapeutic Hypothermia in Victims of Out-of-Hospital Cardiac Arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A232

53.  Panchal AR, Stolz U, Spaite DW, Sanders AB, Kern KB, Ewy GA, **Bobrow B**, SHARE Study Group; Abstract 86: The Impact of Hands-Only™ CPR by Bystanders on Survival in Adult Victims of Out-of-Hospital Arrest Caused by Non-Cardiac Etiologies. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A86-.

54.  **+**Rafael S, **+**Karamooz M, **+**McCarty K, Vadeboncoeur T, Mullins M, Welch A, **Bobrow B**, SHARE Study Group; Abstract 241: Organ Procurement Rates in a Statewide System of Cardiac Arrest Centers. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A241-.

55.  **+**Dommer P, **+**McCarty K, Vadeboncoeur T, Walka P, Crawford S, Smith G, Silver A, **Bobrow B**; Abstract 263: Reduction in Chest Compression Fraction During Transition From Pre-Hospital to In-Hospital Care. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A263-.

56.  Blewer AL, Leary M, Decker CS, Andersen JC, Fredericks AC, **Bobrow BJ**, Abella BS; Abstract 17196: Hands-only CPR Video Self-instruction Promotes Self-confidence and Secondary Training: A Hospital-based Randomized Trial. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A17196-.

57.  **Bobrow B**, Vadeboncoeur T, Spaite D, Potts J, Denninghoff K, Chikani V, Brazil P, Ramsey B, Abella B, SHARE Study Group; Abstract 114: The Effectiveness of Ultra-Brief and Brief Educational Videos for Training Lay Responders in Hands-Only™ Cardiopulmonary Resuscitation: Implications for the Future of Citizen CPR Training. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois. November, 2010. *Circulation*; 2010;122(21_MeetingAbstracts):A114-.

58.  **Bobrow BJ**, Vadeboncoeur TF, Spaite DW, Potts J, Denninghoff K, Chikani V, Brazil PR, Ramsey B, Abella BS; Impact of brief or ultra-brief Hands-Only CPR video training on the confidence of lay citizens to perform CPR. Poster presentation to the European Resuscitation Council Congress in Porto, Portugal. December, 2010. *Resuscitation*; 2010:81(2)(suppl1):S96.

59.  **+**Geyer BC, Spaite DW, Stolz U, Panchal AR, Vadeboncoeur TF, Mullins T, Sanders AB, Mullins MJ, Gallagher JV, Ewy GA, **Bobrow BJ**; The Impact of a Statewide Comprehensive System of Care on Survival from Out-of-Hospital Cardiac Arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida. January, 2011. *Prehospital Emergency Care*; 2011;15(1):104-137.

Mesa/Bentley 005493

60. Crawford S., Venuti M, Mason T, Walka P, Smith G, Mullins M, Silver A. **Bobrow B,** Spaite D; Prehospital Chest Compression Quality is Improved with Scenario Based Training and Use of Novel Defibrillator Technology. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida. January, 2011. *Prehospital Emergency Care*; 2011;15(1):104-137.

61. Vadeboncoeur T, **+**Dommer P, **+**McCarty K, Walka P, Smith G, Silver A, **Bobrow B**; Reduction in Chest Compression Fraction during Transition from Prehospital to In-Hospital Care. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida. January, 2011. *Prehospital Emergency Care;* 2011;15(1):104-137.

62. Demaerschalk BM, Vargas JE, Channer DD, Noble BN, Kiernan TJ, Gleason EA, Vargas BB, Ingall TJ, Aguilar MI, Dodick DW, **Bobrow BJ**, STARR Trial Investigators; Incorporating smartphone teleradiology application into a telestroke network environment. Poster presentation to the International Stroke Conference. Los Angeles, California. February, 2011. *Stroke*; 2011;42(3):e111-350.

63. Cudnik M, Sasson C, Rea T, Sayre M, **Bobrow BJ**, Spaite D, McNally B, Denninghoff K, Stolz U; Hospital Volume and Survival in Out-of hospital Cardiac Arrest. Poster presentation to the Society of Academic Emergency Medicine Annual Meeting, Boston, MA; June 2011.*Academic Emergency Medicine*; 2011;18:S4–S249.

64. Spaite DW, Crawford S, Venuti M, Mason T, Walka P, Smith G, Silver A, Stolz U, **Bobrow BJ**. The Impact of Scenario-based Training and Real-time Technology Feedback on CPR Quality and Survival From Out-of-hospital Cardiac Arrest. Poster presentation to the Society of Academic Emergency Medicine (SAEM) Annual Meeting, Boston, MA; June 2011. *Academic Emergency Medicine*; 2011;18:S4–S249.

65. Spaite DW, Stolz U, Silver AE, Kaufman CL, Smith G, Venuti M, Mullins M, **Bobrow BJ**, Ewy G; The association between end-tidal CO2 and CPR quality metrics in out-of-hospital cardiac arrest. Poster presentation to the European Resuscitation Congress. Valetta, Malta; October 2011. *Resuscitation*; 2011: 82(suppl1), S4.

66. Panchal AR, Vadeboncoeur TF, Stolz U, Spaite DW, Berg RA, Sanders AB, Kern KB, Welch A, **Bobrow BJ**, Ewy GA, SHARE Study Group. Abstract 64: Ability of bystanders to appropriately provide rescue breathing in the setting of a chest compression--only CPR campaign for sudden cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida; November 2011. *Circulation*. 2011;124:A64

67. **+**Roosa JR, Spaite DW, Panchal AR, Stolz U, Vadeboncoeur TF, Silver A, Kern KB, **Bobrow BJ**, Ewy GA, SHARE Study Group. Abstract 75: Body weight-related adjustments to chest compression depth by ems providers during out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida; November 2011. *Circulation*. 2011;124:A75

68. Panchal AR, Vadeboncoeur TF, Stolz U, **+**Roosa JR, Berg RA, Ewy GA, Mullins MJ, **Bobrow BJ**, Spaite DW, SHARE Study Group. Abstract 164: Impact of an AHA guideline-based, statewide post-arrest system of care on survival from out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida; November 2011. *Circulation*. 2011;124:A164

Mesa/Bentley 005494

69. **Bobrow BJ**, Spaite DW, Stolz U, Panchal AR, Vadeboncoeur TF, Silver A, Pyers K, Venuti M, Smith G, Ewy GA, SHARE Rsch Group. Abstract 208: Achieving the 2010 AHA guideline metrics for CPR quality is associated with improved survival from out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida; November 2011. *Circulation*. 2011;124:A208

70. **+**Roosa JR, **+**McCarty K, **+**Kitamura B, **+**Page R, **+**Dommer PB, Silver A, Panchal AR, LoVecchio F, Spaite DW, **Bobrow BJ**, SHARE Study Group. Abstract 218: CPR quality in an urban teaching hospital emergency department: Are 2010 aha guidelines being implemented? Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida; November 2011. *Circulation*. 2011;124:A218

71. Spaite DW, **Bobrow BJ**, Stolz U, Gaither J, Sherrill D, Viscusi C, Denninghoff KR: Before-After Cohort Model for Evaluating the Impact of Implementing the Prehospital Guidelines for Severe TBI in a Statewide EMS System: The EPIC Study. Poster presentation to the Annual Scientific Congress of the International Brain Injury Association, Edinburgh, Scotland, March, 2012. *Brain Injury; 2012;26(4-5):309-799.*

72. Spaite DW, **Bobrow BJ**, Denninghoff KR, Gaither J, Viscusi C, Stolz U: An EMS Agency-Public Health-University Partnership Model for the Human Subjects Approach to Evaluating the Implementation of Prehospital Evidence-Based Guidelines. Poster presentation to the Annual Scientific Meeting of the Society for Academic Emergency Medicine, Chicago, Illinois, May, 2012. *Academic Emergency Medicine* .

73. **+**McCarty K, **+**Roosa J, **+**Kitamura B, **+**Page R, **+**Roque P, Silver A, Spaite D, Stolz U, Vadeboncoeur T, **Bobrow B**. Ventilation rates and tidal volume during emergency department cardiac resuscitation. Poster presentation to the European Resuscitation Council Resuscitation Symposium in Vienna, Austria, October 2012. *Resuscitation*. 2012;83:e45.

74. Spaite DW, Stolz U, **+**Murphy RA, **+**Karamooz M, Silver A, Tobin J, Mullins T, Ewy GA, **Bobrow BJ**. Correlations between CPR quality metrics and end-tidal co2 in out-of-hospital cardiac arrest. Poster presentation to the European Resuscitation Council Resuscitation Symposium in Vienna, Austria, October 2012. *Resuscitation*. 2012;83:e9.

75. Spaite DW, **Bobrow BJ**, Stolz U, Chikani V, Humble W, Mullins T, Mullins M, Stapczynski JS, Kern K, Ewy G. System-wide regionalization of ems and hospital care for out-of-hospital cardiac arrest: Association with improved survival and neurologic outcomes. Poster presentation to the European Resuscitation Council Resuscitation Symposium in Vienna, Austria, October 2012. *Resuscitation*. 2012;83:e19.

76. Ludgate MB, Kern KB, **Bobrow BJ**, Ewy GA. Abstract 39: Donating automated external defibrillators may not be enough. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation*. 2012;126:A39

77. Blewer AL, Le J, Buckler D, Leary M, Riegel B, **Bobrow BJ**, Abella BS. Abstract 81: Feasibility of using hospital personnel to create a sustainable CPR training program for family members of hospitalized patients. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation*. 2012;126:A81

Mesa/Bentley 005495

78. Stolz U, **+**Murphy RA, Panchal A, Silver A, Vadeboncoeur T, Welch A, **+**Nunez M, **Bobrow B**, Spaite D, SHARE Study Group. Abstract 130: The effect of cpr quality on survival and neurological outcome after out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation.* 2012;126:A130

79. Vadeboncoeur T, **+**Murphy RA, Tobin J, Venuti M, Spaite D, **+**Karamooz M, Silver A,**+**Roque P, Stolz U, **Bobrow B**, SHARE Study Group. Abstract 135: The association of preshock pause and survival from out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation.* 2012;126:A135

80. **+**Tully J, **+**Dameff C, **+**Murphy RA, **+**Dunham A, Panczyk M, Stolz U, Tobin J, Kotsur B, **+**Karamooz M, Spaite D, **Bobrow B**, SHARE Study Group. Abstract 242: A standardized template for measuring and reporting dispatch pre-arrival CPR. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation.* 2012;126:A242

81. **+**Dameff C, **+**Tully J, **+**Murphy RA, **+**Dunham A, Panczyk M, Stolz U, Tobin J, **+**Karamooz M, Spaite D, **Bobrow B**, Ewy G, SHARE Study Group. Abstract 247: The impact of the AHA guidelines on dispatch-assisted cardiopulmonary resuscitation. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012.*Circulation.* 2012;126:A247.

82. **+**Murphy RA, **+**Dunham A, **+**Tully J, **+**Dameff C, Panczyk M, Wasick D, Spaite D, **Bobrow B**, SHARE Study Group. Abstract 274: Primary reasons bystanders do not perform CPR when receiving dispatcher instructions. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation.* 2012;126:A274.

83. **+**Roosa J, **+**Kitamura B, **+**McCarty K, **+**Page R, **+**Roque P, Silver A, Spaite D, Stolz U, Vadeboncoeur T, **Bobrow B**, SHARE Study Group. Abstract 281: Does chest compression-only CPR provide meaningful gas exchange in humans? Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Los Angeles, California, November 2012. *Circulation.* 2012;126:A281

84. Spaite DW, Stolz U, **+**Murphy RA, **+**Karamooz M, Silver A, Tobin J, Mullins T, Ewy GA, **Bobrow BJ**:  Correlations Between CPR Quality Metrics and End-Tidal CO2 in Out-of-Hospital Cardiac Arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) Scientific Assembly in Bonita Springs, Florida, January, 2013. *Prehospital Emergency Care* 2013;17(1):107-108.

85. Spaite DW, Chikani V, Bobrow BJ, Stolz U, Viscusi C, Adelson PD, Sotelo M, Barnhart B, Gaither JB, Sherrill D, Denninghoff KR:  Prehospital Glasgow Coma Scale and Risk Stratification in Major Pediatric Traumatic Brain Injury:  Association With Mortality and Non-Mortality Outcomes.  Poster presented to the Society for Academic Medicine, in Atlanta, Georgia, May, 2013. *Academic Emergency Medicine* 2013;20:S4-S336.

86. Spaite DW, Chikani V, Bobrow BJ, Stolz U, Sherrill D, Sotelo M, Barnhart B, Gaither JB, Mullins T, Humble W, Denninghoff KR:  The Influence of Prehospital Hypotension and Hypoxia on Non-mortality Outcomes in Moderate and Severe Traumatic Brain Injury:  Implications for Implementing the EMS TBI Management Guidelines.  Poster presented to the Society for Academic Medicine, in Atlanta, Georgia, May, 2013. *Academic Emergency Medicine* 2013;20:S4-S336.

Mesa/Bentley 005496

87. Spaite DW, Stolz U, **Bobrow BJ**, Chikani V, Sherrill D, Sotelo M, Barnhart B, Gaither JB, Mullins T, Humble W, Denninghoff KR:  The Synergistic Effect of Prehospital Hypotension and Hypoxia in Major Traumatic Brain Injury:  Profound Impact on Mortality.  Poster presented to the Society for Academic Medicine, in Atlanta, Georgia, May, 2013. *Academic Emergency Medicine* 2013;20:S4-S336.

88. Safdar B, Stolz U, Stiell IG, Cone DC, **Bobrow B**, de Boer M, Dreyer J, Maloney J, Spaite DW:  Gender and Survival In Out-of-hospital Cardiac Arrest (OHCA):  Results From The OPALS (Ontario Prehospital Advanced Life Support) Study.  Poster presented to the Society for Academic Medicine, in Atlanta, Georgia, May, 2013. *Academic Emergency Medicine* 2013;20:S4-S336.

89. **Bobrow B**, Panczyk M, Heagerty N, **+**Dameff C, **+**Tully J, **+**Murphy RA, Vadeboncoeur T, Spaite, D. The Impact of Pre-Arrival Dispatch-Assisted CPR on Bystander CPR Rates, Time to Starting CPR and Survival from Out-of-Hospital Cardiac Arrest.Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A81.

90. Brooks SC, Worthington HC, Gonedalles TE, **Bobrow B**, Morrison LJ. Barriers to Implementation of the PulsePoint Smartphone Application. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A83.

91. Heagerty N, **+**Nunez M, Chikani V, Stolz U, **+**Karamooz M, Mullins M, Sutter J, Mullins T, Spaite D, **Bobrow B**. Length of Coma in Out-of-Hospital Cardiac Arrest Survivors Treated with Mild Therapeutic Hypothermia. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A100.

92. **+**Moon S, Kortuem W, Kisakye M, **+**Karamooz M, Hwang S, White B, Spaite D, **Bobrow B**. Analysis of Out-of-Hospital Cardiac Arrest Location and Public Access Defibrillator Placement in Metro Phoenix, Arizona. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A103.

93. Helfenbein E, Babaeizadeh S, Daya M, **Bobrow B**, Barnhart B, Haro G, Spaite D. Comparison of CPR Quality Metrics Before and After Placement of Advanced Airways in Out-of-Hospital Cardiac Arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A140

94. Panchal AR, Meziab O, Stolz U, Anderson W, Bartlett M, Spaite DW, **Bobrow B**, Kern KB. Randomized Controlled Trial of the Impact of Ultra-Brief Chest Compression-Only CPR Video Training on Responsiveness, Compression Rate, and Hands-Off Time Interval Among Bystanders in a Shopping Mall. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A157.

95. Ristagno G, Quan W, Silver A, Herken U, **Bobrow B**. Amplitude Spectrum Area as a Tool to Identify the Circulatory Phase of Ventricular Fibrillation. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A241.

Mesa/Bentley 005497

96.    **+**Crowe C, Bronnenkant T, Silver A, Hefner M, Vadeboncoeur T, LoVecchio F, Stolz U, Spaite D, **Bobrow** B. Improvements in Emergency Department CPR Quality Utilizing Real-Time Audiovisual CPR Feedback. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A268.

97.    **+**Moon S, Kortuem W, Kisakye M, White B, Shin S, Martinez R, Vadeboncoeur, Spaite D, **Bobrow B**. Disparities in Bystander CPR and Neurologic Outcomes from Cardiac Arrest According to Neighborhood Ethnicity Characteristics in Arizona. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A283.

98.    Vadeboncoeur T, Silver A, **+**Murphy RA, **+**Moon S, Tobin J, Venuti M, **+**Karamooz M, Spaite D, **Bobrow B**. Use of Real-Time Audiovisual CPR Feedback is Associated with Improved CPR Quality during Patient Transfer from the Scene to the Ambulance in Out-of-Hospital Cardiac Arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*;2013;128(22_MeetingAbstracts):A306.

99.    Indik J, Conover Z, McGovern M, Silver A, Spaite DW, **Bobrow BJ**, Kern KB. Amplitude-Spectral Area is Associated With Survival From Out-of-Hospital Ventricular Fibrillation Cardiac Arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*;2013;128(22_MeetingAbstracts):A10855.

100.   Conover Z, Kern KB, Silver AE, **Bobrow BJ**, Spaite DW, Indik J. Does Early Resumption of Chest Compressions After Successful Prehospital Defibrillation Increase the Risk for Early Recurrence of Ventricular Fibrillation? Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Dallas, Texas, November, 2013. *Circulation*; 2013;128(22_MeetingAbstracts):A10858.

101.   Stolz U, **Bobrow B**, Spaite D, Gaither J, Chikani V, Sherrill D, Sotelo M, Barnhart B, Viscusi C, Adelson D, Mullins T, Humble W, Denninghoff K. Mortality as a function of prehospital systolic blood pressure in major traumatic brain injury: What is the optimum pressure for survival? Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona, January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

102.   Quan W, Ristagno G, Silver A, Herken U, **Bobrow B**. Amplitude spectrum as a tool to identify the circulatory phase of ventricular fibrillation**.** Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona, January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

103.   Spaite D, Stolz U, **Bobrow B**, Adelson D, Viscusi C, Mullins T, Humble W, Denninghoff K, Chikani V, Sherrill D, Sotelo M, Barnhart B, Gaither J. Pressure treatment threshold in major traumatic brain injury: "Normotension" may be too low. Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona, January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

104.   **Bobrow B**, Panczyk M, Stolz U, Heagerty N, **+**Dameff C, **+**Tully J, **+**Murphy RA, Vadeboncoeur T. The impact of pre-arrival dispatch-assisted CPR on bystander CPR rates, time to starting CPR, and survival from out-of-hospital cardiac arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona, January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

Mesa/Bentley 005498

105. Roosa J, **Bobrow B**, Gent L, Ferrer J, Daya M, Macy D, Robb K, Potts J. Telephone CPR instructions for out-of-hospital cardiac arrest: A survey of public service answering points in the United States. Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona.  January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

106. **Bobrow B**, Silver A, Vadeboncoeur T, Venuti M, Tobin J, Smith G, Mullins M, Daniel Spaite. Chest compression quality declines in the minutes preceding scene departure in out-of-hospital cardiac arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona.  January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

107. **Bobrow B**, **+**Karamooz M, Silver A, Heagerty N, Dunham A, **+**Nunez M, McDonald R, Kassel D, Spaite D. The accuracy of prehospital provider oxygen saturation and end-tidal CO2 documentation in severe traumatic brain injury. Poster presentation to the National Association of EMS Physicians (NAEMSP) in Tucson, Arizona.  January, 2014. *Prehospital Emergency Care*; 2014;18(1):123-162.

108. Brooks SC, Worthington H, Gonedalles T, **Bobrow B**, Morrison LJ. Implementation of the PulsePoint smartphone application for crowd-sourcing bystander resuscitation. Poster presentation to the 34th International Symposium on Intensive Care and Emergency Medicine in Brussels, Belgium, March, 2014. *Critical Care;* 2014, 18(Suppl 1):P484 (doi: 10.1186/cc13674).

109. Ewy GA, **Bobrow BJ**, Chikani V, Sanders AB, Otto CW, Zuercher M, Spaite D, Kern KB. Abstract 110: The association between the timing of epinephrine (adrenalin) administration and survival from out-of-hospital ventricular fibrillation arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation.* 2014;130:A110

110. Langlais B, Panczyk M, Sotelo M, Irisawa T, Ryoo HW, Jaber J, Spaite D, **Bobrow B**. Abstract 113: Barriers to effective bystander-initiated CPR in out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation.* 2014;130:A113

111. Ryoo HW, Chikani V, Mullins M, Vadeboncoeur T, **+**Irisawa T, Spaite D, **Bobrow B**. Abstract 235: Emergent PCI is associated with good neurological outcome after OHCA. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014.*Circulation.* 2014;130:A235.

112. Yannopoulos D, Eisenberg M, Granger C, Jollis J, **Bobrow B**, Eckstein T, Abella B, Becker LB, Rea TD. Abstract 254: Systems-based statewide program for cardiac resuscitation leads to increased survival over time: A report of the 5 initial states in the heart rescue project. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation.* 2014;130:A254.

113. Stolz U, **+**Irisawa T, Ryoo HW, Silver A, McDannold R, Jaber J, **Bobrow B**, Spaite D. Abstract 295: Time in CPR is significantly related to CPR quality and survival. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014.  *Circulation.* 2014;130:A295.

Mesa/Bentley 005499

114. McDannold R, Bronnenkant T, **+**Crowe C, Silver A, Geheb F, Herken U, Spaite D, **Bobrow B**. Abstract 346: Passive ventilation during cardiopulmonary resuscitation inside the emergency department. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation*. 2014;130:A346.

115. Indik J, Conover Z, McGovern M, Silver A, Spaite D, **Bobrow B**, Kern K. Abstract 12769: Amplitude-spectral area of the ventricular fibrillation waveform and chest compression quality in witnessed and unwitnessed out-of-hospital cardiac arrest: Can we predict who is unlikely to survive? Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Chicago, Illinois, November, 2014. *Circulation*. 2014;130:A12769.

116. Langlais B, Panczyk M, **+**Irisawa T, Ryoo H, Jaber J, Spaite D, **Bobrow B**. Barriers to Effective Bystander-Initiated CPR in Out-of-Hospital Cardiac Arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. *Prehospital Emergency Care*; 19(1):170.

117. Stolz U, **+**Irisawa T, Ryoo H, Silver A, McDannold R, Jaber J, Spaite D, **Bobrow B**. Time in CPR is Significantly Related to CPR Quality and Survival. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. *Prehospital Emergency Care*; 19(1):145.

118. **+**Irisawa T, Stolz U,  Spaite D, Silver A, Vadeboncoeur T, **Bobrow B**. Chest Compression Release Velocity Declines over Time during CPR. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. *Prehospital Emergency Care*; 19(1):144-145.

119. **Bobrow B**, Spaite D, **+**Murphy RA, Silver A, McDannold R, Mullins M, Stolz U, Kaufman C. The Association Between ETC02 and Chest Compression Depth During Prehospital Resuscitation:  ETCO2 Alone is Inadequate to Assess CPR Quality. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. *Prehospital Emergency Care*; 19(1):144.

120. Gaither J, Chikani V, Spaite D, Stolz U, Garison S, Smith J, Barnhart B, Adelson PD, Viscusi C, Denninghoff K, **Bobrow B**. Association Between Initial Trauma Center Body Temperature and Mortality from Major Traumatic Brain Injury. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. *Prehospital Emergency Care*; 19(1):165.

121. Stolz U, Denninghoff K, Spaite D, **Bobrow B**, Chikani V, Sherril D, Barnhart B, Gaither J, Adelson D, Viscusi C, Mullins T, Humble W. Association between Lowest Prehospital Systolic invasive Blood Pressure and Non-Mortality Outcomes in Major Traumatic Brain Injury: Is There a "Hypotension" Threshold? Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana. January, 2015. Prehospital Emergency Care; 19(1):143.

122. **+**Irisawa T, Vadeboncoeur T, Hypes C, Silver A, McDannold R, Mullins M, Spaite D, **Bobrow B**. Abstract 17760: Maintaining high quality CPR with an integrated manual/mechanical resuscitation protocol. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation*. 2015;132:A17760.

123. Leary M, Delfin G, Grossestreuer A, **Bobrow B**, Santos J, Buckler D, Abella BS, Blewer A. Abstract 15675: Variability in post-arrest targeted temperature management practice in the us: 33°c vs. 36°c. . Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation*. 2015;132:A15675.

124. Hu C, Spaite D, Vadeboncoeur T, Hypes C, +Murphy RA, Silver A, **Bobrow B**. Abstract 18435: Etco2 alone is inadequate to verify CPR quality. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation*. 2015;132:A18435.

125. Hypes C, Spaite D, Vadeboncoeur T, +Murphy RA, Hu C, McDannold R, Silver A, **Bobrow B**. Abstract 19572: Elevated petco2 during cardiac resuscitation without return of spontaneous circulation. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation*. 2015;132:A19572.

126. +Dameff C, +Tully J, +Murphy RA, Panczyk M, Vadeboncoeur TF, Kannan V, Spaite DW, **Bobrow BJ**. Abstract 12080: 9-1-1 caller descriptions of gasping during out-of-hospital cardiac arrest. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in Orlando, Florida, November, 2015. *Circulation*. 2015;132:A12080.

127. Gaither JB, Chikani V, Spaite DW, Smith JJ, Curry M, Mhayamaguru M, Barnhart B, Adelson PD, Viscusi C, Denninghoff KR, **Bobrow B**: Elevated Initial Trauma Center Body Temperatures Are Associated With Poor Non-Mortality Outcomes Following Major Traumatic Brain Injury. Poster presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California, January, 2016. *Prehospital Emerg Care*. 2016;20(1):141

128. +Irisawa T, Vadeboncoeur T, Hypes C, McDannold R, Mullins M, Silver A, Spaite DW, **Bobrow BJ**: Maintaining High Quality CPR With an Integrated Manual/Mechanical Resuscitation Protocol. Poster presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California, January, 2016. *Prehospital Emerg Care*. 2016;20(1):141-142.

129. Hu C, Spaite DW, Vadeboncoeur T, Hypes C, +Murphy RA, Silver A, **Bobrow BJ**: ETC0$_2$ Alone is Inadequate to Verify CPR Quality. Poster presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California, January, 2016. *Prehospital Emerg Care*. 2016;20(1):141-142.

130. Nuno T, **Bobrow BJ**, Rogge-Miller KA, Panczyk M, Esparza M, Martinez R, Mullins T, Spaite DW: Disparities in Utilization of 9-1-1 for Out-of-Hospital Cardiac Arrests Among Spanish Speaking Callers. Poster presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California, January, 2016. *Prehospital Emerg Care*. 2016;20(1):146-147.

131. +Dameff CJ, +Tully J, Panczyk M, Kannan V, Vadeboncoeur T, Spaite DW, **Bobrow BJ**: 9-1-1 Caller descriptions of Abnormal Breathing During Out-of-Hospital Cardiac Arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California, January, 2016. *Prehospital Emerg Care*. 2016;20(1):147.

132. McDannold R, Glenn M, Tobin J, Venuti M, Silver A, Spaite D, **Bobrow B**: Prehospital Vital Sign Monitoring and Traumatic Brain Injury: What We Don't See Could Kill You. Poster presentation to the National Association of EMS Physicians (NAEMSP) in San Diego, California, January, 2016. *Prehospital Emerg Care*. 2016;20(1):172.

Mesa/Bentley 005501

133. **+**Fukushima H, Silver A, Gould J, Edgell K, Appleby D, Iwami T, Mullins M, McDannold R, **Bobrow BJ**. Predictors of Resuscitation Success Prior to EMS Arrival in Out-of-Hospital Cardiac Arrest Patients Treated With a Public Access AED. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation*. 2016;134:A15429.

134. Beger S, Sutter J, Hu C, Spaite DW, Silver A, McDannold R, Mullins M, Vadeboncoeur TF, **Bobrow BJ**. Decline in Chest Compression Release Velocity Over Time is Associated With Out-of-Hospital Cardiac Arrest Outcomes. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation*. 2016;134:A20257.

135. Barnhart BJ, Spaite DW, Helfenbein E, Perez O, Babaeizadeh S, Hu C, Chikani V, Gaither JB, Denninghoff KR, Keim SM, Viscusi C, **Bobrow BJ**:  Prehospital Use of Nasal Cannula End-Tidal CO2 Monitoring in Non-Intubated Major Traumatic Brain Injury Patients. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016. *Circulation* 2016;A15795.

136. Hu C, Spaite D, Silver A, Gaither J, McDannold R, Mullins M, Vadeboncoeur T, **Bobrow B**. Differential Correlation of ETCO2 and CPR Quality Between Out-of-Hospital Arrests of Cardiac and Respiratory Etiology. Poster presentation to the American Heart Association (AHA) Resuscitation Science Symposium, Scientific Sessions in New Orleans, Louisiana, November, 2016.  *Circulation*. 2016;134:A20338.

137. Liu F, Zhang L, Ge M, Xing J, You B, Zhang X, Shi O, **Bobrow B**, LaBresh KA, Trisolini MG, Zheng Z. Public health interventions to improve access and quality of care for patients with acute cardiac events: Overview of the HeartRescue China program. *Cardiol Plus* 2016;1:30-7.

138. Castro-Marin F, Gaither JB, Blust RN, Chikani V, Vossbrink A, Martinez R, **Bobrow BJ**. Widespread Implementation Of A Prehospital Spinal Motion Restriction Protocol is Not Associated with Increased Spinal Cord Injury. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana, January 2017. *Prehosp Emerg Care*. 2017;21(1):90.

139. Silver A, **+**Fukushima H, Gould J, Edgell K, Appleby D, Iwami T, Mullins M, McDannold R, **Bobrow B**. Predictors Of Resuscitation Success Prior To EMS Arrival In Out-Of-Hospital Cardiac Arrest Patients Treated With A Public Access AED. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana, January 2017. *Prehospital Emerg Care*. 2017;21(1):85.

140. Langlais B, Sutter J, Bohm K, Panczyk M, Hu C, Spaite DW, **Bobrow BJ**. Telecommunicator Breathing Assessment Techniques In Out-Of-Hospital Cardiac Arrest. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana, January 2017. *Prehosp Emerg Care*. 2017;21(1):150.

140. Barnhart BJ, Spaite DW, Helfenbein E, Perez O, Babaeizadeh S, Hu C, ChikaniV, Gaither JB, Sherrill D, Denninghoff KR, Keim SM, Viscusi C, Rice AD, **Bobrow BJ**. Accuracy Of Prehospital Documentation Of Hypoxia Compared To Continuous Non-Invasive Monitor Data Tracking In Major Traumatic Brain Injury. Poster presentation to the National Association of EMS Physicians (NAEMSP) in New Orleans, Louisiana, January 2017. *Prehosp Emerg Care*. 2017;21(1):27.

141. **Bobrow BJ**, Panczyk M, Blust R, Brazil P, George T, Chikani V, Hu C, Spaite DW:  Death by Suicide: The EMS Profession Compared to the General Public.  The National Association of EMS Physicians (NAEMSP) in San Diego, CA. January, 2018. *Prehospital Emergency Care.*

Mesa/Bentley 005502

142. **+**Beger S, **+**Smith G, Chikani, V, Panczyk M, Spaite DW, **Bobrow BJ**:  Statewide Trends in Out-of-Hospital Cardiac Arrest Related to Drug Overdose.  The National Association of EMS Physicians (NAEMSP) in San Diego, CA. January, 2018. *Prehospital Emergency Care.*

143. **+**Beger S, **+**Smith G, Chikani V, Spaite D, Keim S, Mullins T, George T, **Bobrow B**:  Statewide Trends in Out-of-Hospital Cardiac Arrest Related to Drug Overdose.  *Prehospital Emerg Care* 2018;22(1):102.

144. Rice A, Gaither J, Spaite D, Chikani V, Wentworth S, Vadeboncoeur T, George T, Mullins T, **Bobrow B**:  Rearrest Incidence and Post-ROSC Rhythms after Prehospital Return of Spontaneous Circulation in Out-of-Hospital Cardiac Arrest.  *Prehospital Emerg Care* 2018;22(1):120.   **Bobrow BJ**, Panczyk M, Blust R, Brazil P, George T, Chikani V, Hu C, Spaite DW:  Death by Suicide: The EMS Profession Compared to the General Public.  *Prehospital Emerg Care* 2018;22(1):102.

145. Gaither J, Rice A, Hu C, McDannold R, Mullins M, Spaite D, Vadeboncoeur T, George T, Mullins T, **Bobrow B**:  Comparison of Manual Vs. Mechanical Chest Compression Quality During Prehospital Cardiac Resuscitation.  *Prehospital Emerg Care* 2018;22(1):122-123.

146. Spaite DW, Hu C, **Bobrow BJ**, Chikani V, Gaither JB, Barnhart B, Adelson PD, Denninghoff KR, Rice AD, Viscusi C, Sherrill D, Keim SM:  Combined Prehospital Hypoxia-Hypotension "Depth-Duration Dose" and Mortality in Major Traumatic Brain Injury.  *Prehospital Emerg Care* 2018;22(1):105-106.

147. Fletcher P, Gaither JB, Rice A, Castro-Marin F, Blust R, Chikani V, Vossbrink A, **Bobrow B**. Does an EMS Protocol Change Decrease Spinal Board Use in Patients with Spinal Cord Injury? 21st Annual Western Regional Society for Academic Emergency Medicine Meeting. Albuquerque, NM. February 2-3, 2018.

148. McDannold R, **Bobrow BJ**, Chikani V, Silver A, Spaite DW, Vadeboncoeur T Quantification of ventilation volumes produced by compressions during emergency department cardiopulmonary resuscitation. Am J Emerg Med. 2018 Jun 30. pii: S0735-6757(18)30539-4.

149. Vigil NH,Grant AR,Perez O,Blust RN,Chikani V,Vadeboncoeur TF, Spaite DW, **Bobrow BJ**. Death by Suicide the EMS Profession Compared to the General Public, *Prehospital Emerg Care* - Accepted author version published online: 23 Aug 2018

150. **Bobrow B,** Panczyk M. Time to Compress the Time to First Compression. J of Am Heart Assoc.  2018 (online before print) DOI: 10.1161/JAHA.118.009247.

151. Gaul C, Rice AD, Castro-Marin F, Blust RN, Chikani V, Vossbrink A, Tolson J, **Bobrow BJ**, Gaither JB: Why Are Long Spinal Boards Used in Prehospital Cases with Retrospective Diagnosed Spinal Cord Injury? Prehospital Emerg Care 2019 (in press)


## GRANTS AND CONTRACTS

### Federal

1. 5U10NS058962                          Denninghoff                 9/1/06-8/31/119/1/06-8/31/11

   NIH/NINDS                              $1,500,000
    Arizona Neurological Emergencies Treatment Trial (AzNETT)

This five year grant supports the Arizona neurological emergencies clinical trials hub at the University of Arizona with coordinated research in several EMS systems and many hospitals in across the state.  AzNETT is one of 17 centers in the nation.
Role:  Co-Investigator

2. U01NS056975/3000691503-RPT07        Spaite              11/2008 - 6/2012
NIH/NINDS                               $450,000
Rapid Anticonvulsant Medication Prior to Arrival Trial (RAMPART).
This trial, a study of the NETT/AzNETT, is an exception from informed consent (EFIC) RCT comparing IM midazolam and IV lorazepam in the prehospital treatment of status epilepticus.
Role:  Site Principal Investigator

3. 1U0NNS062778-01/3001300049-PIII; NCT00822900 Denninghoff (PI) 7/2010 - 2/2014
5% effort
NIH/NINDS                               $336,000
ProTECT
This is a clinical trial designed to determine the effectiveness of intravenous progesterone initiated within 4 hours of injury and administered for 96 hours as compared to placebo at improving functional outcome in patients with moderate to severe traumatic brain injury.
Role: Site Co-Principal Investigator - Maricopa Medical Center, Phoenix, Arizona

4. 1R01NS071049-01A1                     Spaite/Bobrow (Co-PIs) 3/1/2011-2/29/2016
NIH/NINDS                               $2,773,320
Impact of Implementing the EMS Traumatic Brain Injury Treatment Guidelines.  To test the hypothesis that statewide implementation of the nationally-vetted, evidence-based TBI guidelines in the 911 EMS system will significantly reduce mortality and improve non-mortality outcomes in adults and mature children (age ≥18) with severe TBI.
Role: Co-Principal Investigator

5. NIH/                                  NHLBI  Abella  (PI)        08/2011 – 08/2015
Implementation of cardiopulmonary resuscitation training for at-risk families, R18 (Research Dissemination and Implementation Grant), NHLBI, 4 years.
Role: Consultant

6. PA-07-070: 3R01GRANT10914658         Spaite/Bobrow (Co-PIs)
NIH/NINDS                               $1,084,043
Impact of Implementing the EMS Traumatic Brain Injury Treatment Guidelines in Children:  The EPIC4Kids Study.
Aim:  To test the hypothesis that statewide implementation of the nationally-vetted, evidence-based TBI guidelines in the 911 EMS system will significantly reduce mortality and improve non-mortality outcomes in children (age < 18) with severe TBI.

7. 5R25HL126140-02:                      Garcia/Moreno (Co-PIs)  9/15/2014-5/31/2018
NIH/NHLBI                               $641,437
Arizona Pride-25: Advanced Health Disparities Training Program in Heart, Lung, Blood, and Sleep Conditions
Aim:  To mentor young investigators in health disparities research.
Role:  Co-Investigator—Faculty Mentor for Tomas Nunez, PhD.

8. NHTSA                                 Bobrow (PI)             10/2017-present
Contract Number: GS07F0548W             $750,000
Order Number:  DTNH2217F00203
Establish standardized training curriculum for high-performance CPR and Dispatch-Assisted CPR per the 2015 report, *Strategies to Improve Cardiac Arrest Survival: A Time to Act*
Role: Principal Investigator

Mesa/Bentley 005504

9.  5R01HL141841-04                          Carr (PI)              04/2018 - 01/2023
    A Population Based Approach to Improve Outcomes after Out-of-Hospital Cardiac Arrest. The goal
    of this project is to analyze regional boundaries that allows for benchmarking of outcomes, and
    facilitates development of population-based incentives analogous to recent efforts at the Center for
    Medicare & Medicaid Innovation (CMMI) that encourage improved system design within a region.
    Role: Advisory Board Member

10. 5U24NS100673-02 REVISED               Bobrow (PI)            11/21/2018-5/21/2022
    NIH/NINDS - Strategies to Innovate Emergency Care Clinical Trials Network (SIREN)
    CORE-EM HUB ALLIANCE
    SIREN purpose is to conduct of high-quality, multi-site clinical trials to improve the outcomes for
    patients with neurologic, cardiac, respiratory, and hematologic, and trauma emergency events.
    Role: Principal Investigator

11. DoD-FOA: W81XWH-17-R-BAA1           Spaite (PI)             1/2019-12/2021
    Grant #:  BA170359                      $1,497,987
    Congressionally Directed Medical Research Programs (CDMRP)/US Army Medical Research and
    Materiel Command (USAMRMC):
    Title:  Prehospital Treatment of Moderate to Severe Traumatic Brain Injury: Analysis of Civilian Data
    to Inform Military Practice.
    Aim:  Utilizing the massive EPIC Traumatic Brain Injury Database based at the University of
    Arizona's AEMRC, we will do multiple deep-dive queries into the influence of prehospital physiology
    and treatment on mortality and other important outcomes in major Traumatic Brain Injury. The
    findings will have significant implications for the management of major TBI in both military and
    civilian settings.
    Role: Co-Investigator


**State**

1.  Governor of Arizona's Health Crisis Fund Grant                06/2007
    Executive Order 2007-11              $200,000
    "To Mitigate the Effects of Sudden Cardiac Arrest in Arizona"
    Produced videos and training kits for all middle and high schools throughout the state.
    Role: Principal Investigator

2.  E8H23858/HI754123/HP961118-001      Bobrow/Demaerschalk(Co-PIs)  04/2007-03/2010
    Arizona Department of Health Services    $1,500,000
    Stroke Team Remote Evaluation using a Digital Observation Camera (STRokE DOC) - PERIOD I, II,
    III.

3.  Bureau of Tobacco and Chronic Disease    Bobrow (PI)            6/2011
    Arizona Department of Health Services    $100,000
    Development of a Telephone-CPR internet training program and public service announcement
    http://www.cprlinktolife.com/language    (Translated into 9 languages as part of Clinton Global
    Health Initiative) https://www.youtube.com/watch?v=Kv7KA5rBE9o

4.  University of Washington              Bobrow  (PI)            5/2016-5/2018
                                            $70,000
    HeartRescue US-Phase II out-of-hospital cardiac arrest (OHCA) data collection and linkage focused
    on identifying and mitigating disparities in access to care.

5.  Bureau of Tobacco and Chronic Disease    Bobrow (PI)            1/2016-1/2019

Mesa/Bentley 005505

Contract No. ADHS16-121042                $500,000
Statewide acute cardiovascular disease system of care intervention implementation and evaluation.


**Private Foundations**

Medtronic Foundation                Bobrow                (PIs) 10/2010-9/2015
                                    $2,600,000
HeartRescue US Grant.  This grant funded the 5-year implementation and analysis of broad, widespread changes in the prehospital and in-hospital critical care of out-of-hospital cardiac arrest (OHCA) as a statewide effort in Arizona.  This includes the integration of OHCA care across 100 EMS agencies, over 40 hospitals, and 4 regional 9-1-1 dispatch centers, and a statewide registry of over 6,000 automated external defibrillators.  http://www.heartrescueproject.com/
Role: Principal Investigator for Arizona


Research Triangle International (RTI)        Bobrow (PI)            10/2015-present
                                    $961,000
HeartRescue Global Grant.  This grant currently funds the role of technical advisor for a 5-year implementation and evaluation of the impact of an acute cardiovascular system of care project targeting ST-elevation myocardial infarction (STEMI) and out-of-hospital cardiac arrest (OHCA) in China, India, and Brazil.  http://www.heartrescueproject.com/heartrescue-project-partners/international-partners/
Role: International Program Technical Advisor


**Industry Funding**

Zoll Medical                        Bobrow  (PI)            2005-present
                                    $1,500,000
Funding for the ongoing statewide out-of-hospital cardiac arrest (OHCA) quality improvement interventions.


**Other**

American Heart Association            Bobrow                1//2009-8/20121//2009-8/2012

                                    $99,500
Comparison of the Effectiveness of Ultra-Brief and Brief Hands-Only CPR Video Training With and Without Psychomotor Skill Practice for Lay Responders: a Controlled Randomized Study:  American Heart Association.  This study will compare the effectiveness of 3 different approaches to very short Hands-Only CPR training in non-medical lay persons.  *Circulation: Cardiovascular Quality and Outcomes*; 2011;4:220-226.
Role: Principal Investigator


**Grants Submitted/Pending**

Centers for Disease Control and Prevention (CDC):  National Center for Injury Prevention and Control
Extramural Research Program                Bobrow (Co-PI)

RFA-CE-18-006 Research Grants for the Primary or Secondary Prevention of Opioid Overdose (R01)
Title: Arizona Community Opioid Reduction & Prevention System (AZ-CORPS)
Description: Goals: The project goals is to significantly reduce opioid overdose events and deaths by implementing a community-based health systems approach with interdisciplinary partners at a rural Arizona pilot site. It is also intended to improve opioid use disorder referral to and retention in treatment through Arizona's unique and innovative Opioid Assistance and Referral (OAR) Line.
--Total Funding:  $2,244,678, Subaward for UA/AEMRC:  $600,000 (3 years)

Mesa/Bentley 005506

Centers for Disease Control and Prevention        Cairns  /Bobrow (Co-PIs) 2018-2021
Arizona Surveillance of Opioid-Involved Morbidity and Mortality:  This project will integrate statewide EMS data with the ability to provide near-real time "signals" for fatal and nonfatal opioid-involved cases. This will provide the ability to identify spikes in opioid-related health events to better understand the epidemiology of this important public health problem and to provide facile spike reporting for potential interventions to reduce opioid-related health events in the future.  $ 2,277,806 (3 years).

U.S. Department of Health and Human Services; Substance Abuse and Mental Health Services Administration (SAMHSA)                    Bobrow/Spaite   (Co-PIs) 1/2018-12/2022

FOA Number: SM-17-006; CFDA Number: 93.243; Cooperative Agreement to Implement Zero Suicide in Health Systems Title: AZ-STRONG (Arizona Zero Suicide Tolerance Ready to be Our Neighbor's Guardian). Description: Under the guidance of the Arizona Department of Health Services, AZ-STRONG will bring together behavioral health organizations, emergency medical services, hospitals, public health, and public-private organizations across the state to improve suicide awareness, screening, access and quality of care, and dramatically reduce the number of tragic suicide deaths in Arizona. The Zero Suicide model is a comprehensive, multi-setting approach to suicide prevention in health systems. The purpose of this program is to implement suicide prevention and intervention programs, for individuals who are 25 years of age or older, that are designed to raise awareness of suicide, establish referral processes, and improve care and outcomes for such individuals who are at risk for suicide.Total funding request: $3,500,000.

U.S. Department of Health and Human Services; Agency for Healthcare Research and Quality (AHRQ)                    Bobrow/Brooks/Derksen/Spaite (Co-PIs) 9/2019-8/2024

FOA Number: PA-18-795; SEN Number: NOT-HS-18-015; Health Services Research to Address the Opioids Crisis Title: AZ-CORPS (Arizona Community Opioid Reduction and Prevention System). Description: AZ-CORPS will develop, implement, and evaluate the impact of an opioid-targeted, community-based, integrated, and multidisciplinary stakeholder health systems approach through the state Opioid Assistance and Referral Line, while also improving opioid prescribing practices and discharge instructions. The university-led effort in collaboration with local partners, such as public health systems, hospitals, providers, EMS and other first responders, law enforcement and public safety agencies, community health workers, tribes, and peer support services, will focus on a rural pilot site with a large senior population, two tribal communities, and multiple areas of low-income residents. Urgently needed evaluation tools to mitigate opioid exposure and prevent opioid overdoses morbidity and mortality, including among non-addicted/non-medical users and senior adults, will be developed and disseminated for scaling and replication. Total funding request: $2,000,000

Mesa/Bentley 005507

Attachment B

Bentley v. Department of Child Services and the City of Mesa

Case Review


I was asked to review the case of Bentley v. Department of Child Services and the City of Mesa specifically from the viewpoint of appropriateness and completeness of prehospital medical care rendered by the Emergency Medical Technicians involved.

I have been a board-certified Emergency Physician and an EMS Medical Director for 24 years.  I am a Distinguished Professor of Emergency Medicine and the Associate Director of the Arizona Emergency Medicine Research Center and have been the Medical Director of the Arizona Department of Health Services, Bureau of EMS and Trauma System for 15 years.  My role includes the development of EMT guidelines, regional protocols, and case quality reviews of EMS agencies and individual EMTs.  My CV is attached.

I have reviewed the documentation for this case including the EMS written first care reports from the Gilbert Fire Department and Rural Metro Corporation, EMT trial testimony, Axon bodycam video, Mesa Police Department records, 9-1-1 recording, and the developmental evaluations of T.A. My opinions on the medical appropriateness and quality of care provided are based on my professional emergency medicine and EMS clinical work experience, knowledge of state and local EMS protocols and standards of prehospital practice, and the patient care reports detailing the events of this case occurring on April 1st, 2016.

Event:

T.A.'s family called 9-1-1 at 08:01 on April 1st, 2016 and T.A.'s mother reported that her 7-year-old son T.A. had been missing since 21:15 the night before.  The Mesa Police Department was dispatched to T.A.'s family home for a missing person call. T.A.'s family, neighbors, and Mesa PD all performed an extensive search of the entire area around T.A.'s home including areas around the neighborhood and the nearby water canal.  At approximately10:13 am T.A. was found and had presumably been sleeping in the bushes overnight for ~ 13 hours.  Mesa PD requested EMS providers respond to medically evaluate T.A. to rule out any possible problems.

Gilbert Fire Department was then dispatched to the family's home, arriving on scene at 10:28.

The Gilbert Fire Department EMTs and Rural Metro EMTs both responded to T.A.'s home and made written first care reports.  They each individually documented that T.A. was agitated to the point which they were not able to adequately assess him.  T.A. would not allow the EMTs to examine him or perform a routine set of vital signs including pulse rate, blood pressure, respiratory rate, pulse oximetry, and in this case temperature, or obtain a blood sugar check.

1

Mesa/Bentley 005448

The Axon videos were closely reviewed.  Axon video number 15 was taken very soon after T.A. was found in the neighbor's bushes.  In this video, T.A. is noted to be highly agitated as his father carries him and he is noted to be attempting to get out of his father's arms.  T.A. does not have the appearance of being relieved to see his father or to be found; rather he is nearly uncontrollable.  Then on Axon video 11601 for several minutes in the bathroom at the family's home T.A. continues to be very difficult to control, even to the point where he would not allow the EMTs to come near him or evaluate him.  At minute 01:10 in this Axon video, T.A.'s father says to Gilbert EMT-Paramedic Alex Ramos, "…He has never done something like this before."

T.A.'s behavior did not fit with anything he had done previously per his family who knows him best.  Gilbert EMT-Paramedic Alex Ramos stated in his trial testimony, "*Well, it -- what crossed my mind was like, I don't think he was acting appropriate for his age.  And what I mean by that, he wasn't, like, clinging onto dad, acting scared, whatnot.  He was more agitated, didn't want anything to do with anybody, including the family member, his dad.  So it crossed my mind he might be almost autistic maybe.*"

Obtaining a complete set of vital signs is a fundamental component of the EMT patient evaluation. This is particularly indicated for any patient presenting with agitation and/or altered mental status as was the case with T.A.  Not being able to perform this standard assessment. As the Gilbert EMT-Paramedic Alex Ramos accurately stated in his trial testimony with respect to his standard patient assessment, "*…consist of doing a physical exam on the patient, meaning get your hands on and palpating the head and body and taking a set of vital signs, pulse rate, respirator -- respiratory rate, blood pressure, skin color, skin tone, looking at oxygen levels.*"

The events surrounding T.A. being missing for ~ 13 hours were highly unusual for multiple reasons. These include the extended duration he was missing, his behavior once located, the fact his parents repeatedly said he had never done this before, a large number of potentially serious and even life-threatening causes of his agitation, the unknown factors of where he had been, including a nearby canal and youth home. The EMT's duty to follow their standard treatment protocols when this highly unusual scenario did not fit precisely into any of their common scenarios.

There were numerous aspects of this patient encounter and particularly with the timeline being highly atypical which added to the number of potentially serious causes of the boy's behavior.  These potential causes (not in order of likelihood) included the possibility of some form of intoxication, some type of physical abuse, environmental exposure, a traumatic brain injury, an endocrine disorder such as hypoglycemia, or other electrolyte abnormality, an infection, or a serious mental health issue.  Each of these are a potential cause of abnormal behavior and due to the fact T.A. had been missing for an extended period of time and could not offer any reliable history, each of these required considerations.  The fact that it was not extremely cold that night is irrelevant because there was a plausibility that T.A. had suffered from environmental exposure.

Mesa/Bentley 005449

As Dr. Coffman stated on page 8 of her sworn testimony, most 7-year old children are grounded in the present moment and do not possess the decision-making capability to fully understand all of the consequences of their actions.  They are not fully prepared to deal with what they may encounter.  In this case, T.A. was not able to fully understand all the risks and what could happen to him by leaving his home and being outside overnight for 13 hours.

Gilbert EMT-Paramedic Alex Ramos documented, *"After a long discussion with the parents they agreed to let the child be transported to the hospital. L253 followed up and the pt. mom also rode in the ambulance with us to the hospital."* Rural Metro EMT-Paramedic Zebadiah Miller also documented that T.A. was transported to the hospital without incident.

In Axon video 10 at approximately minutes 13-16 the Gilbert Fire Department EMTs are discussing with T.A.'s parents what is the best course of action to assure his health and safety.  After the open discussion, T.A.'s mother agrees to T.A. being transported to Cardon's Children's Hospital which is the closest most appropriate hospital for T.A.  There is not any apparent argument or any evidence that T.A. is transported to the hospital without consent.

Then on Axon video 02 which takes place immediately after ambulance transport, at approximately minute 12, T.A. and his mother are noted to be inside the emergency department and the mother signs the transport agreement without any objection or disagreement.

Emergency Medical Technicians are trained to evaluate patients (without the benefit of knowing the entire history of their patients) in undifferentiated prehospital settings and to look for behavioral, anatomical, and physiological abnormalities that *could* represent emergency medical conditions.  They operate under both off-line and on-line medical protocols which are designed to cast a wide net and not miss any potentially serious conditions.  EMTs are trained that once called to perform an evaluation, if they find anything *othe*r than completely normal, typical, scenarios, behavior, vital signs, physical exam, the EMTs are required to transport their patient to the hospital for further medical care.  Had they done anything other than what they did, in this case, it would have been highly unusual for them, and they would not have been following their protocols. This is one of the reasons that a patient with abnormal vital signs is specifically prohibited from refusing care or refusing transportation to the hospital if the EMTs believe there is a likelihood of an emergency medical condition.

Gilbert EMT-Paramedic Alex Ramos did exactly what all EMTs are trained to do which is to evaluate their patient and situation as thoroughly as possible and to look at the complete circumstances of both.  When asked in trial testimony whether he thought T.A. needed to be transported to the hospital, EMT-Paramedic Alex Ramos stated, "*I don't recall.  If -- if I did, it was probably more towards the line that he probably should, just based on we can't do a physical exam on him, and we couldn't get vital signs on him.*

Mesa/Bentley 005450

*And based on the fact that he had been missing overnight was a long time, so there was a lot of unknowns.   So, I -- I just kind of felt, in the best interest of the child, he probably should be looked at by a doctor, just to -- just to be safe and make sure he was okay.*"

It is not reasonable to expect the EMTs to function as "on-scene physicians."  They do not have the training to do this and are not allowed to practice as physicians, make the same patient evaluation or treatment decisions, administer the same treatments.  EMT-Paramedic Alex Ramos reaffirms this while being questioned in his trial testimony about, what *he thought* a physician would look for when examining T.A.  He clearly understood his training and scope of practice and he correctly stated, "*I don't know. cause, like I said, I don't know how far a doctor would take an exam, you know.  A doctor could take it all the way to, hey, let's do a chest x-ray, to make sure his lungs are fine.  I don't know how far a doctor would take it.  That's something we can't do in the field.  We could just do a physical, visual exam on him. Do a pal -- you know, palpate his little body and take his vital signs is all we could do out in the -- in the field…… So for me to say, okay, just sign here, a refusal form, without having any vital signs or actually doing the physical exam, I -- I just wouldn't be doing my job to the fullest.*"

While T.A.'s behavior that day was not normal to any EMT, the Gilbert EMTs had very good reason to question whether T.A.'s behavior was even normal for him. This was clear by the testimony of Gilbert EMT-Paramedic Alex Ramos who stated, "*You know, at this point, I didn't know any history on the patient.  So I asked mom if there was any medical conditions that we needed to know about, about the child, like if he was on any medicine or anything.  And she said, no, that he was healthy, not on any medications*." This statement by the patient's mother to the EMT-Paramedics certainly led them to believe there could be something else causing his highly unusual state of agitation since the patient's mother herself said he did not have a history of any similar behavior.

EMTs frequently encounter patients and family members who call 9-1-1 for help and then later decide they do not want or need transportation to the hospital. This is a common occurrence which EMTs encounter every day.  When this happens, EMTs must decide whether there is the potential for a medical emergency and whether there is any other social dynamic or ulterior motive which could be influencing the patient (or in this case guardian's) decision making.

EMS Providers and Law Enforcement Officers are required to make decisions in complex and fluid situations where all of the facts and details may not be completely known or entirely clear.  When this happens, they make the best decision they can with a focus on what is in the best interest of their patient and in this case what was in the best interest of 7-year-old T.A.  The patient in this case, T.A., was behaving bizarrely and it was not clear to anyone, including his family, exactly why this was. This could have been for any number of reasons as outlined above.  The EMTs knew there was a potential for serious complication and they rightly decided he urgently required a higher level of medical care.  Emergency Medical Technicians are *the* medical experts on the

4

Mesa/Bentley 005451

scene.  It would have been extraordinary for the Law Enforcement Officers on the scene to go against the recommendations of the Gilbert Fire Department EMTs when they recognized that it was in T.A.'s best interest to be transported to the hospital for evaluation (as opposed to later or in a medical office setting).  The Mesa Police Department and the Department of Child Services officials at the scene were correct in agreeing and assisting with this decision focused on T.A.'s health and safety.

EMTs do not have the luxury of knowing the results of tests performed later.  In other words, it is not appropriate or fair to judge their decision making based on all the details and test results, and the events have become clearer.  They must make judgments with limited information in compressed time-frames, and they must err on the side of caution to prevent missing any serious conditions. This is termed *over-triage* and is a well known and necessary aspect of prehospital medical care.  Frankly, had the EMTs done anything other than what they did, it would have been substandard care.

As to the issue of why the EMTs did not transport T.A. to the family's physician, they do not do this by licensure as they are permitted to transport patients to certified hospitals and not private medical offices.

There was also the suggestion that T.A.'s family be allowed to sign a refusal of care form and not have T.A. transported.  As EMT-Paramedic Alex Ramos states in his testimony,  "*Given the circumstances, I think even after doing the physical exam and doing vital signs, I probably would have called my doctor 'cause -- and would consider that call, what we call a high-risk refusal.  And the reason I think it would be a high-risk refusal is because, like I said, the child had been missing for -- for quite a while.*"

Arizona's Central Region guidelines clearly state that one of the criteria required for a patient to refuse care or refuse transportation to the hospital is that the patient has a complete set of normal vital signs.  Because of T.A.'s agitation, EMTs were not able to obtain any vital signs.  Therefore the option of allowing T.A.'s parents to refuse care would have been clearly against their local EMS protocols. Please see attached Arizona EMS Central Region Guidelines referred to as the Red Book.  Specifically Pages 12-14, and page 16 which explicitly states which patients can refuse care and transport to the hospital along with the criteria for refusal.  From the AEMS Red Book:

- The patient must meet all of the following criteria:

Is an adult (18 or over), or if under 18, is being released to a parent, guardian, responsible party, or law enforcement personnel

Is oriented to person, place, time, and event.

Exhibits no evidence of:

Altered level of consciousness

Alcohol or drug use that impairs judgment

Mesa/Bentley 005452

Understands the nature of his/her medical condition, as well as the risks, and consequences of refusing care. (Decision making capacity.)

- An adult accepting care for a minor must sign the refusal form.

Arizona's Central Region Guidelines stipulate that (See Red Book Attached):

**Criteria 1:**   Non-emergency category must have vital signs within the following limits:

|  | Adult | Child |
|---|---|---|
| •Temp* | < 101 | < 101 |
| •Respirations | 10 to 24 | 20 to 30 |
| •BP | 90 to 160 systolic | 70 mm Hg + (2 times age in years)** |
|  | 60 to 110 diastolic |  |
| •Pulse | 60 to 100 | 60 to 150 |

 * If fever suspected

My summary of the facts of this case is:  On March 31st-April 1st, 2016, T.A. was missing from his home overnight for over 13 hours and when he was found he was agitated to the point where EMTs were unable to perform a medical assessment.   The event was highly unusual, and T.A.'s behavior was not normal for him as stated several times by the family.  There were numerous potential serious things which could have happened to T.A. while he was outside the entire night. T.A. deserved a thorough evaluation and performing such a proper medical assessment required a complete history and physical examination.  This evaluation was not possible at the family's home due to T.A. being agitated and inconsolable, and the EMTs recognized the scope of potential complications warranted a qualified medical provider.  The EMTs appropriately followed their protocol and standard prehospital medical practice and did so with professionalism.  They transported T.A. to the hospital for full evaluation with his T.A.'s mother.

*Bentley J. Bobrow MD*

_____   4/16/2019
Bentley J. Bobrow, MD

Mesa/Bentley 005453

Exhibit 26

CSO-1005A (8-14)
PS-045 (1-13)

ARIZONA DEPARTMENT OF CHILD SAFETY

## NOTICE OF DUTY TO INFORM

When the Department of Child Safety (DCS) receives an allegation of child abuse or neglect by a parent, guardian custodian or adult member of household and a report is taken, Arizona law requires DCS to conduct an investigation. The following allegation concerning your child (or children) is currently being investigated by DCS.

*Neglect*

This **notice** is to inform you that:

- DCS has no legal authority to compel or make you cooperate with the investigation or to accept services, but it is our hope that by working together we can find solutions to ensure that your child (or children) is safe and that your family has what it needs.
- DCS has a duty to proceed with the investigation even if you decide not to cooperate to ensure that your child (or children) is safe, although we would prefer to carry on with the investigation with your support.
- DCS has the authority to petition the Juvenile Court for a determination that your child (or children) is dependent and in need of protection. Your refusal to cooperate with the investigation or services offered does not in itself form a basis for DCS to take temporary custody of your child (or children), unless it is clearly necessary to protect your child (or children) from abuse or neglect.
- You have the right to provide written, telephonic or verbal responses to the allegation, including any documentation, and to have the information considered in determining whether your child (or children) is in need of child safety services.
- Anything you say or write can be used in a court proceeding and may be included in DCS's report of the investigation.
- Any written response that you provide, including any documentation, will be included in the DCS case record.
- Any information that you provide in response to the complaint or allegation(s) will be considered during the investigation.
- You have the right to appeal determinations made by DCS about the results of the investigation and will be notified in writing of these results and how to appeal.
- You have the right to file a complaint with the Arizona Ombudsman-Citizens Aide. The telephone number in Phoenix is (602) 277-7292, and statewide toll-free is 1-800-872-2879. The Ombudsman-Citizen Aide office is available to handle inquiries, concerns and complaints about agency actions, including DCS.

More information about DCS and your parental rights are outlined in the pamphlet, "**Guide to Department of Child Safety**" that I am leaving with you today.

**ASK: Is the child's parent(s) of American Indian heritage/ancestry?**  ☐ Yes  ☐ No

*If Yes, Mother's Tribe:* _____ *Father's Tribe:* _____

☐ Unknown *(explain):* _____

By signing this form, you are acknowledging that I have reviewed the information contained in this notice with you.

| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | PARENT, GUARDIAN OR CUSTODIAN'S NAME *(Please print)* | DATE |
|---|---|---|
|  | *MICHAEL A SCHERN, ATTY FOR BENTLEY* | 4/01/2016 |
| DCS REPRESENTATIVE'S SIGNATURE | DCS REPRESENTATIVE'S NAME *(Please print)* | DATE |
|  | Cristina Bergen | 4/1/16 |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for department services is available upon request. • Disponible en español en la oficina local.

AZ-STATE000088

Exhibit 27

1

1                  UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF ARIZONA

3

4  BRIAN L. BENTLEY, et al.,

5        Plaintiffs,

6    vs.                 NO. 2:17-cv-00966-PHX-DGC

7  CITY OF MESA, et al.,

8        Defendants.
_____/

9

10

11

12

13

14

15           DEPOSITION OF TIMOTHY TURNER

16   Taken at 212 West Perkins Street, Ukiah, California,
      on Wednesday, July 10, 2019, at 10:22 a.m.
17       Reported by Anne Ramirez, CSR 6186.

18

19

20

21

22

_____

23

24         ADAIR, POTSWALD & HENNESSEY
         Certified Shorthand Reporters
      P.O. Box 761, Ukiah, California  95482
25       (707) 462-8420 and (800) 747-3376

105

1    is there -- the term "P-45 Form," is that a term you

2    might recognize from your time a number of years ago?

3        A    No.  It's been over ten years; long time ago.

4    I don't remember the specific form numbers.

5        Q    Okay.  Well, --

6        A    And they change, too.

7        Q    The Duty of Notice to Inform, and sometimes I

8    think I've heard it referred to it as a P-45, would say,

9    "I'm letting you know we're investigating, you do not

10   have to cooperate," and gives them kind of that scenario

11   of their rights.

12            If they and/or their attorney were provided

13   that form and signed it that they saw it and read it,

14   would you -- even though you don't -- you've never seen

15   it, you would agree with me, would you not, that they

16   were told they don't have to cooperate, they can do what

17   they want?

18            MS. BOKHARI:  Form.

19            THE WITNESS:  If that form was produced and if

20   they saw it and if they signed it, then they knew that

21   they could ask these people to leave and they didn't

22   have to cooperate.  They apparently didn't know that.

23       Q    (BY MR. BOWEN)  Okay.  Next page, 40, second

24   paragraph -- first full paragraph, last sentence:

25   "Neither parent gave up looking for their son as it has

121

1        Q     So that I can understand, I want to ask a

2   follow-up question on this.  This item here,

3   miscellaneous correspondence and letters, are you

4   talking about correspondence and letters in the 2016

5   time frame?

6        A     Within a disclosed file.  I didn't read

7   anything that wasn't part of what I was sent.

8        Q     So you're talking about miscellaneous

9   correspondence and letters, as you've described it,

10  between various people involved in this 2016 incident?

11       A     Yes, sir.

12       Q     I understand.

13             Same thing with e-mails, you're talking about

14  e-mails that are in 2016 rather than --

15       A     Yes.

16       Q     -- the present?

17       A     Yes, sir.  Yeah, nothing current.

18       Q     Item "M", "Department of Child Safety Policy &

19  Procedure Manual."  Do you see that?

20       A     Yes, sir.

21       Q     I take that to mean you reviewed policies and

22  procedures relating to the Department of Child Safety;

23  is that fair?

24       A     Yes.

25       Q     You did not review policies related to the

122

1    Mesa Police Department; is that correct?

2         A    No, sir.

3         Q    All right.  In terms of your training and

4    experience, you are not a police officer; correct?

5         A    No, sir.  Oh, it's correct.  Sorry.

6         Q    You've never been a police officer; correct?

7         A    Correct.

8         Q    You've never gone to a police academy;

9    correct?

10        A    Correct.

11        Q    You are not a paramedic; correct?

12        A    Correct.

13        Q    You are not an EMT; correct?

14        A    Correct.

15        Q    You are not certified to provide paramedic

16   services or EMT services; correct?

17        A    Correct.

18        Q    You are not a medical doctor?

19        A    Correct.

20        Q    You are not a psychologist?

21        A    Correct.

22        Q    You are not an accountant?

23        A    Correct.

24        Q    I want to direct your attention to Exhibit 3.

25        A    Exhibit 3.  Okay.

131

1    child is assessing the risk; correct?

2         A    Correct.

3         Q    In terms of documents that you've reviewed and

4    used to formulate your opinions as provided in Exhibit 3

5    and Exhibit 4, are there any other documents that you

6    understand to be from the Mesa Police Department or any

7    of its police officers that we have not discussed today?

8         A    No.   The videos and the police report.

9         Q    In terms of invoices on this case that you

10   have generated, --

11        A    Yes, sir.

12        Q    -- you have provided those to the attorneys

13   representing the Bentleys?

14        A    Yes.

15        Q    You have copies?

16        A    Yes.

17        Q    Those list the dates --

18        A    Yes, the dates when --

19        Q    -- when you --

20        A    -- I worked --

21        Q    -- were providing the services?

22        A    (Nodding head.)

23        Q    Yes?

24        A    Yes.

25        Q    And they provide the amount of time that you

Exhibit 28

**8-821. Taking into temporary custody; medical examination; placement; interference; violation; classification**

A. A child shall be taken into temporary custody in proceedings to declare a child a temporary ward of the court to protect the child, pursuant to an order of the juvenile court on a petition by an interested person, a peace officer or a child safety worker under oath that reasonable grounds exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect. If a child is taken into temporary custody pursuant to this section, the child's sibling shall also be taken into temporary custody only if reasonable grounds independently exist to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect.

B. A child may be taken into temporary custody by a peace officer, a child welfare investigator or a child safety worker if temporary custody is clearly necessary to protect the child because probable cause exists to believe that the child is either:

1. A victim or will imminently become a victim of abuse or neglect.

2. Suffering serious physical or emotional injury that can only be diagnosed by a medical doctor or psychologist.

3. Physically injured as a result of living on premises where dangerous drugs or narcotic drugs are being manufactured. For the purposes of this paragraph, " dangerous drugs" and " narcotic drugs"

have the same meanings prescribed in section 13-3401.

4. Reported by the department to be a missing child at risk of serious harm.

C. In determining if a child should be taken into temporary custody, the interested person, peace officer, child welfare investigator or child safety worker shall take into consideration:

1. As a paramount concern the child's health and safety.

2. Whether the parent is willing to participate in any services that are offered to the parent.

D. A person who takes a child into custody pursuant to subsection B, paragraph 2 of this section shall immediately have the child examined by a medical doctor or psychologist. After the examination the person shall release the child to the custody of the parent or guardian of the child unless the examination reveals abuse or neglect. Temporary custody of a child taken into custody pursuant to subsection B, paragraph 2 of this section shall not exceed twelve hours.

E. A child who is taken into temporary custody pursuant to this article shall not be detained in a police station, jail or lockup where adults charged with or convicted of a crime are detained.

F. A child shall not remain in temporary custody for more than seventy-two hours excluding Saturdays, Sundays and



1-24-19   EXH # 12
WITNESS L. Kessler
MARISA L. MONTINI, RPR
CERTIFIED COURT REPORTER #50176

holidays unless a dependency petition is filed.

G. A person who knowingly interferes with the taking of a child into temporary custody under this section is guilty of a class 2 misdemeanor.

## 8-822. Removal of child from home; rules and policies; approval; definition

A. The department shall adopt rules and establish clear policies and procedures, where appropriate, to:

1. Determine the circumstances under which it is appropriate to remove a child from the custody of the child's parents, guardian or custodian.

2. Ensure the immediate notification of the child's parents, guardian or custodian regarding the removal of the child from home, school or child care and the timely interview of the child and the child's parent, guardian or custodian.

B. The department shall apply its rules, policies and safety and risk assessment tools uniformly across this state.

C. Except as provided in subsection D of this section, the department may not remove a child from the custody of the child's parents, guardian or custodian unless both of the following occur before the removal:

1. The child safety worker who is recommending the removal submits the reasons for removal and supporting information to the worker's supervisor.

2. The worker's supervisor reviews the reasons and supporting information and approves the removal.

D. If an emergency exists affecting the health or safety of a child, a child safety worker may remove the child before notifying the worker's supervisor. The child safety worker shall submit the reasons for removal and supporting information to the worker's supervisor for the supervisor's review and approval within two hours after the removal of the child or, if the removal occurs after regular working hours, by 8:30 a.m. the next day.

E. For the purposes of this section, " supervisor" includes the permanent supervisor of a child safety worker and a temporary supervisor assigned to the child safety worker in the absence of the permanent supervisor.

## 8-823. Notice of taking into temporary custody

A. If a child is taken into temporary custody pursuant to this article, the interested person, peace officer or child safety worker taking the child into custody shall provide written notice within six hours to the parent or guardian of the child, unless:

1. The parent or guardian is present when the child is taken into custody, then written and verbal notice shall be provided immediately.

2. The residence of the parent or guardian is outside this state and notice cannot be provided within six hours, then

written notice shall be provided within twenty-four hours.

3. The residence of the parent or guardian is not ascertainable, then reasonable efforts shall be made to locate and notify the parent or guardian of the child as soon as possible.

B. The written notice shall contain a signature line for the parent or guardian to acknowledge receipt of both written and verbal notices. The written and verbal notices shall contain the name of the person and agency taking the child into custody, the location from which the child was taken and all of the following information:

1. Specific reasons as to why the child is being removed. The notice shall list the specific factors that caused the determination of imminent danger.

2. Services that are available to the parent or guardian, including a statement of parental rights and information on how to contact the ombudsman-citizens aide's office and an explanation of the services that office offers.

3. The date and time of the taking into custody.

4. The name and telephone number of the agency responsible for the child.

5. A statement of the reasons for temporary custody of the child.

6. A statement that the child must be returned within seventy-two hours excluding Saturdays, Sundays and holidays unless a dependency petition is filed and a statement that a child in temporary custody for examination pursuant to section 8-821, subsection B, paragraph 2 must be returned within twelve hours unless abuse or neglect is diagnosed.

7. One of the following:

(a) If a dependency petition has not been filed or if the information prescribed in subdivision (b) is not available, a statement that if a dependency petition is filed, the parent or guardian will be provided a written notice no later than twenty-four hours after the petition is filed that contains the information prescribed in subdivision (b).

(b) In all other cases, the date, time and place of the preliminary protective hearing to be held pursuant to section 8-824 and the requirements of subsection D of this section.

8. A statement of the right of the parent or guardian to counsel and that counsel will be appointed pursuant to section 8-221 through the juvenile court if a dependency petition is filed and the person is indigent.

9. Information regarding the ability of the person about whom the report was made to provide a verbal, telephonic or written response to the allegations. A verbal response shall be included in the written report of the investigation. A written response, including any documentation, shall be included in the case file.

3

10. A statement that the hearing may result in further proceedings to terminate parental rights.

11. A statement that the parent or guardian must immediately provide to the department the names, the type of relationship and all available information necessary to locate persons who are related to the child or who have a significant relationship with the child. If there is not sufficient information available to locate a relative or person with a significant relationship with the child, the parent shall inform the department of this fact. If the parent or guardian obtains information regarding the existence or location of a relative or person with a significant relationship with the child, the parent or guardian shall immediately provide that information to the department.

12. A statement that the parent or guardian must be prepared to provide to the court at the preliminary protective hearing the names, the type of relationship and all available information necessary to locate persons who are related to the child or who have a significant relationship with the child.

C. The child safety worker shall provide the parent or guardian with the notice even if the parent or guardian refuses to sign the acknowledgment.

D. Immediately before the time of the preliminary protective hearing, the persons described in section 8-824, subsection B shall meet and attempt to reach an agreement about placement of the child, services to be provided to the child, parent or guardian and visitation of the child. The parties shall meet with their counsel, if any, before this meeting. Consideration shall be given to the availability of reasonable services to the parent or guardian and the child's health and safety shall be a paramount concern. The persons described in section 8-824, subsection C may attend the meeting to reach an agreement.

E. If a dependency petition is filed by the department, the child safety worker is responsible for delivering the notice of the preliminary protective hearing prescribed in subsection B, paragraph 7 of this section to the parent or guardian. In all other cases, the person who files the dependency petition is responsible for delivery of this notice to the parent or guardian. If the location of the parent or guardian is unknown, the person who is responsible for serving this notice shall make reasonable efforts to locate and notify the parent or guardian.

Exhibit 29



**Gilbert Fire Department**
Patient Care Report

All Times Are Approximate

12-11-18   EXH #5
WITNESS: P. Bina
MARISA L. MONTINI, RPR
CERTIFIED COURT REPORTER #50176

## Incident Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident** | 2016026222 | **Date** | 04/01/2016 | **Time** | 10:18:48 | **Unit** | L253 | **AZ State #** | P00057964 |
| **Address** | 3045 E INVERNESS AVE | | | **City** | Mesa | **State** | AZ | **ZIP** | 85204 |

## Patient Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name** | Bentley | **DOB** | | **Age** | 7 Years  7 Months | **Gender** | M | **Wgt Lbs** | 55 | **Wgt Kg** | 25 |
| **Address** | Same as dispatched | **City** | | **State** | | **Zip** | | **Destination** | Banner Desert/Cardon's |

## Medical History

| | | | | | |
|---|---|---|---|---|---|
| **Medical History** | Denies | | | | |
| **Medications** | Denies | | **Allergies** | Denies | |
| **Doctor** | Unknown | | **Pregnancy** | G | **P** | | **Due Date** | |

## Chief Complaints

| | | | | |
|---|---|---|---|---|
| **Chief Complaint** | none | | **Onset** | Unknown |
| **LOC** | Unknown | **Related To Injury** | Unknown | **Cause Of Injury** | | **Intent Of Injury** | |
| **Additional Info** | | | | |

## Impression

**EMS Impression**  Refusal-Other-See Narrative

**Protocol Used**  Admin-Initial Medical Care

**Narrative**  On arrival found pt. being held by his dad in the bathroom, the pt. was pulling away and dad was trying to calm him down. Pt. was not crying or appear to be injured and was not complaining of anything. Pt. would not allow us to assess him. MPD and DCS was also on scene. Dad was asked if the pt. was autistic and dad said no, he was just an over active 7 year old and he stated that the pt. did not have any medical conditions. Dad also stated that the way the pt. was acting was not normal for him. Per the pt. dad, pt. went missing sometime last night. The family went out looking for the pt. and they looked for him till 3:00a.m. and could not find him. At that point, per dad, they stopped looking for him, then resumed the search at about 6:45a.m. Per MPD, they were called out at around 8:00a.m. The pt. was found next door of their home in some bushes, at around 10:00a.m. The parents were advised that the pt. should be transported to the hospital to be examined and looked at by a doctor. They asked us if we were seeing something physically wrong with him and we advised them that we could not do a detailed assessment, and that it was in the best interest of the pt. to be looked at by a doctor. The pt. mom and dad at that point said that they did not want the pt. transported to the hospital and that they would call a family doctor, that was a friend of theirs to look at the pt. MPD and DCS at this point stepped in to talk to the parents about the importance of the situation and that it was in the best interest for pt. to be transported to the hospital to be looked at by a doctor. After a long discussion with the parents they agreed to let the child be transported to the hospital. L253 followed up and the pt. mom also rode in the ambulance with us to the hospital. At this point the pt. was very calm, acting normal and talking to mom. L253 did not take any vitals, as to not upset the pt. On arrival at the hospital, pt. care was transferred to the ER RN and report was given to the ER doctor.

Mesa/Bentley 000483

Exhibit 30

# <u>DECLARATION OF CUSTODIAN OF RECORDS</u>

STATE OF ARIZONA                )
                                )
County of Maricopa              )

Re:    *Bentley, et al. v. Arizona Department of Child Safety, et al.*
       United States District Court Case No. CV17-00966-PHX-DJH

1.     I am a duly authorized custodian of records for Cardon Children's Medical Center. I have reviewed the Subpoena served by the City of Mesa, and I have authority to certify the records requested.

2.     The attached documents are true and correct copies of all the records requested in the Subpoena with the following exceptions:

_____

_____

3.     The records were prepared in the ordinary course of office business at or near the time of the act, condition or event described therein or were received and maintained by our office in the ordinary course of business.

4.     I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

By: _____
    Custodian of Records

Print name: _Leonard Cisneros_

Title: _PFS Senior Rep_

Date: _23 November 2018_

**Banner Health**
BANNER DESERT MEDICAL CENTER
1400 S. Dobson Road
Mesa, AZ 85202-4707

**Patient:** BENTLEY, TALON AZROE
**DOB:** ▇▇▇▇▇   **Sex:** Male   **Age:** 10 years
**MR#:**   1928009
**Patient Location:**  05 EER
**Attending Physician:**   SHAH MD,KUNAL KALPESH

---

| ED REPORTS |
|---|

**Neurologic symptoms:** No dizziness, no seizure.
**Additional review of systems information:** All Other ROS are reviewed and are negative except as noted above in the HPI.

**Health Status**
    **Allergies:**
        <u>Allergic Reactions (Selected)</u>
            No known allergies.
    **Medications:** (Selected)
        <u>Documented Medications</u>
           *Documented*
                Meds Reviewed / Updated:
                None - as stated by pt/family at this time: .
    **Immunizations:** Immunizations (ST)
    **Immunization Info** .

**Past Medical/ Family/ Social History**
    **Medical history:**
        <u>Resolved</u>
            None (387958016):  Resolved..
    **Surgical history:**
        None (387958016)..
    **Family history:**
        No family history items have been selected or recorded..
    **Social history:** Social History (ST)
    **Social History** .

**Physical Examination**

    **Vital Signs**

    **VITALS**

    **MAX TEMP 24HRS** .
        **General:**  Alert, no acute distress.
        **Skin:**  Warm, dry, intact, normal for ethnicity.
        **Head:**  Normocephalic, atraumatic.
        **Neck:**  Supple, trachea midline.
        **Eye:**  Pupils are equal, round and reactive to light, extraocular movements are intact, normal conjunctiva.
        **Ears, nose, mouth and throat:**  Tympanic membranes clear, oral mucosa moist, no pharyngeal erythema or exudate.
        **Cardiovascular:**  Regular rate and rhythm, No murmur, Normal peripheral perfusion.
        **Respiratory:**  Lungs are clear to auscultation, respirations are non-labored, breath sounds are equal.
        **Chest wall:**  No tenderness, No deformity.
        **Back:**  Nontender, Normal range of motion.
        **Musculoskeletal:**  Normal ROM, normal strength.
        **Gastrointestinal:**  Soft, Nontender, Non distended, No organomegaly, Bowel sounds: Normal.
        **Neurological:**  Alert and oriented to person, place, time, and situation, No focal neurological deficit observed, CN II-XII intact, normal speech
            observed, normal coordination observed.
        **Lymphatics:**  No lymphadenopathy.

**Medical Decision Making**
    **Rationale:**  This is a 7-year-old male who presents to emergency department via EMS along with mother for examination after the child was
        missing for approximately 12 hours overnight. No concerning findings on exam. Given the strange circumstances of this child's running
        away from home, I believe this patient would benefit from further evaluation by DCS and investigation by the police..
    **Orders**  Import Selected Orders (Selected)
        <u>Inpatient Orders</u>
            *Ordered*
                Ambulance Arrival:

---

Mesa/Bentley 000554

**Banner Health**
BANNER DESERT MEDICAL CENTER
1400 S. Dobson Road
Mesa, AZ 85202-4707

**Patient:** BENTLEY, TALON AZROE
**DOB:** ▇▇▇▇  **Sex:** Male                    **Age:** 10 years
**MR#:**  1928009
**Patient Location:**  05 EER
**Attending Physician:**  SHAH MD,KUNAL KALPESH

---

### *ED REPORTS*

---

Social Service Consult:
*Completed*
ED Assessment:
ED Intake:
ED Quick Look: .

**Reexamination/ Reevaluation**
Time: 04/01/2016 12:40 .
Course.
Notes: Pt is medically cleared. Has been seen by social work here. Plan is for further investigation by DCS and police department that will occur at an
    outside facility. Will discharge..

**Impression and Plan**
WCC (well child check)
Strange and inexplicable behavior
Diagnosis
WCC (well child check)  (Encounter for routine child health examination without abnormal findings, Z00.129)
**Plan**
**Condition:** Improved, Stable.
**Disposition:** Medically cleared, Discharged: to home.
**Patient was given the following educational materials:** NORMAL EXAM, (6y - Adult).
**Follow up with:** Followup with primary care provider Within 1 - 2 days Followup with your pediatrician within the next 48 hours for reevaluation,
    return to the emergency department for any worsening symptoms including respiratory distress, persistent vomiting, lethargy, altered
    mental status, decreased urine output, or any other concerns..
**Counseled:** Family, Regarding diagnosis, Regarding diagnostic results, Regarding treatment plan, Regarding prescription, parent understood.
**Notes:** Parent agrees to return the child to the emergency department immediately if the condition worsens in any way.  All of the parent's
    questions answered.  Parent agrees with the treatment and follow-up plan , I have reviewed all documentation entered above by the scr be
    and made any needed modifications.  I agree with and validate all of the contents of this document , 04/01/2016 18:00.

---

Document Name:                                      ED Nursing Documents
Result Status:                                         Auth (Verified)
Signed By:                                              Book RN,Krystle L (4/1/2016 12:06 MST)

**Vital Signs Entered On:  04/01/2016 12:07 MST**
**Performed On:  04/01/2016 12:06 MST by Book RN, Krystle L**

**Vital Signs**
*Smart Template Height & Weight :*  HT & WT
*Weight :*  24.9 kg(Converted to: 54 lb 14 oz, 54.90 lb)

Book RN, Krystle L - 04/01/2016 12:06 MST

---

Document Name:                                      ED Nursing Documents
Result Status:                                         Auth (Verified)
Signed By:                                              Book RN,Krystle L (4/1/2016 12:21 MST)

**ED Intake Entered On:  04/01/2016 12:26 MST**
**Performed On:  04/01/2016 12:21 MST by Book RN, Krystle L**

**Quick Look**
<u>DCP GENERIC CODE</u>
*Tracking Acuity :*  2

L = Low          H = High          C = Critical          * = Abnormal          ^ = Interpretive Data          c = Corrected          f = Footnote
**Printed:**  11/16/2018 15:50 MST                              Page 28 of 64                              **Report Request ID:**  346832027

Mesa/Bentley 000555