**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian L. Bentley, et al., | No. CV-17-00966-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendants. | |

Plaintiffs Janna and Brian Bentley and their seven minor children bring this action under 42 U.S.C. § 1983, alleging violations of the First, Fourth, and Fourteenth Amendments against the City of Mesa and Mesa Police Officers Darrel Palmer, Edward Clifford, Laurie Kessler, Domenick Kaufman, Lauren Glazer, and Rob Russo ("City Defendants"), and against Arizona Department of Child Safety ("DCS") employees Cristina Baggen and Gina Cordova ("State Defendants"). Doc. 59. The Court previously dismissed Count 9.1 against State Defendants. Doc. 124.[1] Plaintiffs have voluntarily dismissed Counts 10 and 11, and have stated that Counts 2, 3, and 8.1 are not asserted against State Defendants. Doc. 128.[2]

---

[1] Plaintiffs' second amended complaint asserts two claims as Count 9. Doc. 59 at 32-33. The Court previously dismissed the second (malicious prosecution and wrongful institution of civil proceedings), which the Court refers to in this order as Count 9.1.

[2] Plaintiffs' second amended complaint also labels two claims as Count 8. Doc. 59 at 28-29. The Court will refer to the first (religious discrimination) as Count 8 and the second (municipal liability) as Count 8.1.

Plaintiffs move for summary judgment on Counts 1-8.  Doc. 132.  State Defendants cross-move for summary judgment on Counts 1 and 4-9.  Doc. 137.  City Defendants cross-move for summary judgment on Counts 1-8, 8.1, and 9.  Doc. 139.  The motions are fully briefed (Docs. 132-1, 137, 139, 150, 153, 154), and oral argument will not aid the Court's decision, *see* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).  For reasons stated below, the Court will deny Plaintiffs' motion for summary judgment, grant City Defendants' cross-motion, and grant in part and deny in part State Defendants' cross-motion.

The Court apologizes to the parties for the delay in ruling on these motions.  The press of Court business, a large multi-district litigation proceeding, the COVID-19 pandemic, and other matters have interfered with a more timely ruling.

## I.    Background.

The following facts are taken from Plaintiffs' second amended complaint and undisputed evidence presented with the motions.  On March 31, 2016, at about 8:00 p.m., Mrs. Bentley told her seven-year-old son, T.A., to do his chores, but T.A. refused.  Doc. 59 at 5.[3]  At about 10:15 p.m., Mrs. Bentley went to T.A.'s bedroom to check on him, but two of T.A.'s siblings reported that he was not there.  *Id*. at 5.  Mrs. Bentley searched for T.A. for one hour in the house and outdoors.  *Id*. at 6.  His behavior was not uncommon.  On other occasions, T.A. had hidden from his parents or left his home.  Mrs. Bentley called Mr. Bentley (who was working late) around 11:30 p.m. to discuss a plan for finding T.A., and they remained in contact while Mrs. Bentley and two Bentley children searched the property and neighborhood.  *Id*.

Mr. Bentley arrived home at 1:30 a.m. and began searching for T.A.  Mrs. Bentley fell asleep at 2:30 a.m.  Mr. Bentley knew that T.A. was not wearing shoes and had not left with his bicycle.  The parents felt the neighborhood was safe, and families in the area were familiar with each other's children.  *Id*.  With that in mind, Mr. Bentley turned on the

---

[3] Citations are to page numbers placed at the top of each page by the Court's electronic filing system, not to original page numbers on the documents.

home's exterior flood lights, unlocked the doors, and at 3:30 a.m. laid down by the front door to wait for T.A.

The search continued at 6:30 a.m. and soon involved more than a dozen family members and neighbors.  *Id*. at 7.  Mrs. Bentley called 9-1-1 at 8:00 a.m., and Mesa Police Department ("MPD") officers began searching the neighborhood with the aid of a helicopter.  Just over two hours later, T.A. was spotted hiding in a bush in the yard of the Bentleys' next-door neighbor.  He was nervous and upset.  *Id*. at 7-8.

Mr. Bentley carried T.A. into their home and several officers and DCS workers followed.  *Id*. at 8-9.  Paramedics were unable to examine T.A. because of his level of distress, and recommended that he be examined by a doctor at a hospital.  Mrs. Bentley and T.A. were transported to the hospital in an ambulance, where he was examined by a doctor and found to be healthy.  *Id*. at 9-10.  T.A. and Mrs. Bentley were then driven by an officer to the Mesa Family Advocacy Center ("MFAC") where T.A. was forensically interviewed while Mrs. Bentley waited.  *Id*. at 12-13, 16.

Meanwhile, about 10:15 a.m., MPD officers arrived at Great Hearts Academy where two of the Bentley children, B.J. and M.J., attended school.  *Id*. at 13.  The officers took custody of the children and directed the school's administration not to notify Mr. and Mrs. Bentley.  *Id*. at 13-14.  The officers transported B.J. and M.J. to the MFAC where they were interviewed by DCS.  *Id*. at 13-16.  Mrs. Bentley, T.A., B.J., and M.J. were allowed to return home that afternoon.  *Id*. at 15-16.

On August 9, 2016, the State of Arizona charged Mr. and Mrs. Bentley with two misdemeanors: one count of child neglect and one count of contributing to the delinquency of a minor.  *Id*.  A jury acquitted them on all counts on August 9, 2017.  *Id*. at 18.

In June 2017, DCS started an investigation into whether Mr. and Mrs. Bentley should be placed on the DCS Central Registry.  *Id*. at 33-34.  The investigation finished in November 2017 with a decision to place the parents on the registry based on a finding that they neglected T.A. and failed to provide supervision while he was missing.  *Id*. at 34-35.  The Bentleys requested a hearing before an administrative law judge who ruled in their

favor.  DCS adopted the ALJ's opinion and did not add the Bentleys to the registry.  *Id.* at 35-36.

## II.   Legal Standard – Summary Judgment.

A party seeking summary judgment "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   Count 1 – Unlawful Entry of Plaintiffs' Home (All Defendants).

Plaintiffs claim that Defendants violated their Fourth and Fourteenth Amendment rights by unlawfully entering their home on the morning of April 1, 2016, after T.A. was found.  Docs. 59 ¶¶ 151-69, 132-1 at 9.  Defendants assert that the Bentleys consented to their entry and that the entry was also justified by the officers' community caretaking function.  Doc. 139 at 9-11.

### A.   Consent.

At the core of the Fourth Amendment guarantee "stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961).  A warrant is generally required for police to enter a home, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), but an owner or occupant's voluntary consent obviates this requirement, *Fernandez v. California*, 571 U.S. 292, 298

(2014) ("requiring a warrant despite the owner's consent would needlessly inconvenience everyone involved").  In actions brought under § 1983, a plaintiff must establish lack of consent to entry of a residence.  *Pavao v. Pagay*, 307 F.3d 915, 918-19 (9th Cir. 2002).  Consent is determined by looking at the totality of the circumstances.  *Id.* at 919.  Courts may infer consent where officers request permission to enter and the plaintiff's actions suggest consent.  *See United States v. Garcia*, 997 F.2d 1273, 1281 (9th Cir. 1993).

In this case, officers, DCS employees, neighbors, and volunteers had been in and out of the Bentley house without objection during the morning of April 1 before T.A. was found.  After he was found, Mr. Bentley again consented to re-entry of the house.  While carrying T.A. into the house, Mr. Bentley told one of the officers that it was "fine" for paramedics to check T.A.  Doc. 140-1 at 86.  After officers entered the house, Mr. Bentley again told them it was "fine" for paramedics to come in and that he and T.A. would "be waiting in the bathroom."  *Id.* at 87.  These circumstances show that the Bentleys consented to the entry of their house.

Plaintiffs fail to offer any evidence to the contrary.  *See* Doc. 150.  They address the issue only in passing: "the parents, Brian and Janna Bentley, did not consent to Defendants entering the home after T.A. was found."  *Id.* at 2.  This unsupported assertion is not enough to create a genuine issue of material fact.  *See Anderson*, 477 U.S. at 249-50; *Celotex*, 477 U.S. at 322-23.

## B.    Community Caretaking Function.

Police officers in an emergency situation may enter a home as part of their "community caretaking function."  *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004) (quoting *United States v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003)).  Officers Clifford and Palmer and Detective Kessler, along with the two DCS Defendants, entered the house after T.A. was found.  They knew the seven-year old had been outside overnight and unsupervised, they had not heard the child talk, and they saw that he was extremely agitated and physically struggling with his father.  In this circumstance, they had reasonable grounds to evaluate the boy's condition and the circumstances surrounding his

disappearance.  Their community caretaking function permitted them to enter the home to ensure T.A.'s health and safety.

On Count 1, the Court will deny Plaintiffs' motion for summary judgment and grant Defendants' motions.

## IV.    Count 2 – Unreasonable Seizure of Mr. Bentley (City Defendants).

Plaintiffs claim that Officer Clifford unreasonably seized Mr. Bentley by physically barring him from entering a room inside his home to be with T.A., and then by refusing to allow him to be alone inside another room to call his attorney.  Docs. 59 ¶¶ 170-92, 132-1 at 10.

The evidence shows that after putting T.A. in a darkened bedroom, Mr. Bentley left the bedroom and went into the foyer to talk with his wife and others gathered there.  Officer Clifford was standing outside the open door of T.A.'s bedroom while DCS worker Cordova talked to T.A. in the bedroom.  Mr. Bentley left the foyer and attempted to enter the open door by walking past Officer Clifford.  The officer extended his right hand, placed it on Mr. Bentley's left bicep, and explained that he could not let Mr. Bentley enter the room "right now."  Mr. Bentley took a step back, stood in the hall, and began to make a call on his cell phone.  He then started to walk into another room which had not been cleared, and Officer Clifford explained that, given how things were going right then (an apparent reference to Mr. Bentley's somewhat agitated state), he would not allow Mr. Bentley to be alone in a room where there might be a gun.  He said that if Mr. Bentley wanted privacy, he could go outside and the officer would not follow him.  Mr. Bentley chose to make his call in the bathroom with the door open, directly across from Officer Clifford.

Warrantless seizures inside a home, like warrantless searches, are presumptively unreasonable.  *Payton v. New York*, 445 U.S. 573, 586 (1980).  Such seizures are lawful, however, if "one of a carefully defined set of exceptions" to the warrant requirement applies.  *Id.* at 586 n.25 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971)).  The government bears the burden of establishing that an officer's conduct was justified by one of these exceptions.  *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).

City Defendants assert that the community caretaker exception applies and that Officer Clifford's actions toward Mr. Bentley were reasonable.  Doc. 139 at 12.  Police officers often engage in community caretaking functions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  Promoting public safety is a recognized community caretaking purpose.  *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016).  "Officers may also detain individuals" in carrying out this function.  *Liberti v. City of Scottsdale*, No. CV-17-02813-PHX-DLR, 2018 WL 4335442, at *3 (D. Ariz. Sept. 11, 2018).

The Supreme Court has recognized that "the detention of [an] occupant of a home . . . represents only an incremental intrusion on personal liberty when the search of a home has been authorized[.]"  *Michigan v. Summers*, 452 U.S. 692, 703 (1981).  The search of the home in *Summers* was authorized by a warrant, but the case is nonetheless instructive on the question of reasonableness when officers are lawfully in a home.  Legitimate law enforcement interests may justify limited intrusions on the personal liberty of occupants during an officer's otherwise lawful presence in the home.  "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  *Id.* at 702-03.

The Court concludes, on the basis of undisputed facts, that Officer Clifford's actions were reasonable and consistent with his community caretaking function.  As noted, the caretaking function permitted the officers to be in the Bentleys' home to ensure the health and safety of T.A.  Officer Clifford's body camera video shows that Mr. Bentley was somewhat upset as he approached the room where Defendant Cordova was talking with T.A.  Officer Clifford verbalized his safety concerns about allowing Mr. Bentley to enter the room as he briefly touched Mr. Bentley's arm.  The officer also explained that if Mr. Bentley wanted privacy for a phone call, he was free to step outside, but he could not go alone into a room where a weapon might be present.  These intrusions on Mr. Bentley's liberty were reasonable and proportional to a situation where officers needed to maintain

control.  City Defendants have shown that Officer Clifford's conduct was justified by the community caretaker exception to the warrant requirement.  *See Hawkins*, 249 F.3d at 872.

The burden then shifts to Plaintiffs to show the existence of a genuine dispute of material fact regarding the reasonableness of Officer Clifford's conduct.  *See Celotex*, 477 U.S. at 322-23.  Plaintiffs do not address the reasonableness of his conduct.  *See* Doc. 150. Because Plaintiffs have failed to "set out specific facts showing a genuine issue for trial" on this claim, Fed. R. Civ. P. 56(e), the Court will deny Plaintiffs' motion for summary judgment and grant City Defendants' motion on Count 2.  *See also Celotex*, 477 U.S. at 322 (summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## V.     Counts 3-7 – Qualified Immunity.[4]

Defendants argue that they are entitled to qualified immunity with respect to the claims in Count 3-7.  After carefully reviewing the current law on qualified immunity and the facts of this unique case, the Court agrees.

### A.     The Current Qualified Immunity Law.

A defendant sued under § 1983 is entitled to qualified immunity if his conduct did not violate a clearly established constitutional right of which a reasonable person would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has established a two-step inquiry for resolving a qualified immunity defense.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The first step asks whether, taken in the light most favorable to the plaintiff, the facts show that the officer's conduct violated a constitutional right.  *Id*. at 201.  The second step asks whether the right was "clearly established" at the time of the violation.  *Id*.  Defendants "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted).  Courts may address either step first.  *Pearson v. Callahan*, 555

---

[4] Count 3 is asserted against City Defendants, Counts 4-7 against all Defendants.

U.S. 223, 236 (2009).  The Court will begin with the second step – whether the alleged unlawfulness of Defendants' conduct was "clearly established" at the time of their actions.

The law recognizes that parents have a constitutional right not to have their children removed from their home without a warrant or exigent circumstances.  The Ninth Circuit has stated:

> [O]ur case law clearly establishes that the rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue.

*Keates v. Koile*, 883 F.3d 1228, 1237-38 (9th Cir. 2018).

The Supreme Court has repeatedly and recently stressed, however, that general principles such as these are not sufficient to defeat qualified immunity.  To satisfy the "clearly established" standard, the law must make clear that the officer's conduct – in the specific factual circumstances he faced – was unlawful.  Thus, the Supreme Court has cautioned "that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably *in the particular circumstances that he or she faced*.'"  *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)) (emphasis added).  The "clearly established" analysis "must be undertaken *in light of the specific context of the case*, not as a broad general proposition."  *Saucier*, 533 U.S. at 201 (emphasis added).  It "requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*.  The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.'"  *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202) (emphasis added).  "This requires a high 'degree of specificity.'"  *Id*. (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).

- 9 -

Stated differently, the law must be so clear "that *every* 'reasonable official would understand that what he is doing'" is unlawful. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S.Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"[T]he 'specificity' of the rule is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). Decisions on entry, search, and custody matters, especially when they involve possibly exigent circumstances, turn on "the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)). Thus, "[w]hile there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Wesby*, 138 S. Ct. at 590 (quoting *al-Kidd*, 563 U.S. at 741).

This demanding standard has been adopted to give law enforcement officers the ability to operate in difficult and often urgent circumstances without fearing that a misstep could result in their personal liability. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. It recognizes "that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

Plaintiffs urge the Court to adopt a less demanding "clearly established" standard. They cite *Hope v. Pelzer*, 536 U.S. 730, 731 (2002), and argue that "the Supreme Court 'expressly rejected a requirement that previous cases be 'fundamentally similar.'" Doc. 150 at 8. But *Hope* does not reflect current qualified immunity law as reflected in the

Supreme Court cases discussed above, including *Wesby*, *Mullenix*, and *al-Kidd*.  Indeed, other courts correctly note that "*Hope v. Pelzer* appears to have fallen out of favor, yielding to a more robust qualified immunity."  *N.E.L. v. Douglas Cty., Colorado*, 740 F. App'x 920, 928 n.18 (10th Cir. 2018); *see also Aldaba v. Pickens*, 844 F.3d 870, 874 n.1 (10th Cir. 2016).[5]

### B.    Relevant Ninth Circuit Law.

The demanding nature of the "clearly established" standard is illustrated by a Ninth Circuit case dealing with removal of a child from the custody of her parents.  In *Kirkpatrick v. County of Washoe*, 843 F.3d 784 (9th Cir. 2016) (en banc), the biological father of B.W. brought suit against a social worker who removed the child from the hospital where B.W. and her mother were staying two days after B.W.'s birth.  "B.W. was born five weeks premature," her mother "admitted to nursing staff that she used methamphetamine throughout her pregnancy, including as recently as two days" before the birth, and "B.W. tested positive for methamphetamine at birth."  *Id.* at 786.  The mother "was unemployed and living with a friend," and "had recently self-admitted to a drug rehabilitation program but left after three days."  *Id.*

The initial panel decision in *Kirkpatrick* denied qualified immunity in reliance on the following clearly established law:  "a child could not be removed from the home without prior judicial authorization absent evidence of 'imminent danger of serious bodily injury and unless the scope of the intrusion is reasonably necessary to avert that specific injury."  *Kirkpatrick v. Cty. of Washoe*, 792 F.3d 1184, 1195 (9th Cir. 2015) (quotation marks and citation omitted).  On rehearing en banc, however, the Ninth Circuit held that qualified immunity could not be defeated by such general legal principles:

---

[5] The Ninth Circuit has suggested "that, in a sufficiently 'obvious' case of constitutional misconduct, we do not require a precise factual analogue in our judicial precedents."  *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 n.3 (9th Cir. 2017).  The Ninth Circuit further explained, however, that "'the bar for finding such obviousness is quite high[.]'"  *Id.* (quoting *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011)).  Plaintiffs do not argue that this exception applies, and the Court does not find the alleged constitutional violations in this case to be sufficiently obvious to invoke it.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> In July 2008 it was well-settled that a child could not be removed without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury. But the Supreme Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality. Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures.
>
> In 2008, it was not beyond debate that the confluence of factors set forth above would not support a finding of exigency. No Supreme Court precedent defines when a warrant is required to seize a child under exigent circumstances. And although the Supreme Court has assumed that circuit precedent can be a dispositive source of clearly established law, none of the cases from this court explain when removing an infant from a parent's custody at a hospital to prevent neglect, without a warrant, crosses the line of reasonableness and violates the Fourth Amendment. In fact, very few cases from any circuit have addressed what constitutes exigent circumstances in a case that remotely resembles this one. No matter how carefully a reasonable social worker had read our case law, she could not have known that seizing B.W. would violate federal constitutional law. Without that fair notice, the social workers in this case are entitled to qualified immunity.

15
16
17
18
19
20

*Kirkpatrick*, 843 F.3d at 792-93 (citations and quotation marks omitted). Notably, the Ninth Circuit focused on the specific facts of the case before it when considering whether the unlawfulness of the social worker's conduct was clearly established: "none of the cases from this court explain when removing an infant from a parent's custody at a hospital to prevent neglect, without a warrant, crosses the line of reasonableness and violates the Fourth Amendment." *Id.* at 793.

21
22
23
24
25

Applying the Supreme Court's "clearly established" standard, as discussed above and as illustrated by the Ninth Circuit's decision in *Kirkpatrick*, the Court concludes that the unlawfulness of the City and State Defendants' conduct as alleged in Counts 3-7 was not clearly established at the time of the events in this case. Defendants are therefore protected by qualified immunity.

26

### C.   Count 3 – Removal of B.J. and M.J. From School (City Defendants).

27
28

Count 3 alleges that City Defendants violated the Constitution when they removed B.J. and M.J. from school without their parents' consent. Doc. 59 ¶¶ 193-216. City

Defendants cite cases which show that the right at issue in Count 3 was not clearly established in 2016.  In *McManus v. County of San Diego*, No. 15cv0138 JM(RBB), 2016 WL 3552007 (S.D. Cal. Jun. 30, 2016), the court held that county social workers did not violate a clearly established constitutional right when they removed a 14-year-old child from school and took him to a children's center to be interviewed about possible abuse.  *Id.* at *3-5.  *McManus* rejected the plaintiff's contention that the social workers "violated clearly established federal constitutional law when they assisted the police in a child abuse investigation by removing 14-year-old C.M. from his school and transporting him to Polinsky where he was interviewed."  *Id.* at *5; *see also Capp v. Cty. of San Diego*, No. 16-CV-2870-AJB-MDD, 2017 WL 1400148, at *5 (S.D. Cal. Apr. 19, 2017) (social worker's interview of a child at school concerning abuse allegations did not violate clearly established rights).

In response, Plaintiffs cite cases recognizing that parents have constitutional rights in not having children removed from their custody.  Doc. 150 at 11.  For example, Plaintiffs cite *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018), which concerned allegations that state officials violated the plaintiffs' constitutional rights by removing a child from her mother's custody following the child's hospitalization for depression and suicidal ideation. Plaintiffs also cite the first panel decision in *Kirkpatrick*, 792 F.3d 1184, which involved the removal of an infant from her mother's custody, but that panel decision was reversed by the Ninth Circuit sitting en banc, as discussed above, because the right at issue was not clearly established.  843 F.3d at 792-93.  Plaintiffs also cite *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000), but that case arose when police officers removed children from their parents and subjected them to invasive medical examinations.[6]

None of Plaintiffs' cases involve the removal of a child from school.  Nor do they address the level of investigation that is warranted when a family has allowed a seven-year-

---

[6] Without discussion, Plaintiffs also cite two cases that do not address any issue relevant to this litigation:  *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), and *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987).  Doc. 150 at 11.

old child to be out all night alone without notice to law enforcement.  Thus, even though it generally is true that officials cannot remove a child from his parents' custody without a valid basis, Plaintiffs provide no case which places the alleged illegality of Defendants conduct in this specific set of circumstances "beyond debate," as required by the Supreme Court.  *Wesby*, 138 S. Ct. at 590.

### D.  Counts 4-7 (All Defendants).

Plaintiffs claim in these counts that Defendants violated their constitutional rights by transporting T.A. to the hospital (Count 4), interviewing B.J. and M.J. at MFAC and interviewing T.A. at his home and at MFAC (Count 5), examining T.A. at the hospital (Count 6), and interfering with the parental relationships of the Bentleys (Count 7). Doc. 59 ¶¶ 217-63.  The parties address the question of qualified immunity for these counts together, and the Court will as well.

### 1.  Undisputed Facts.

The following facts are not in dispute.  Defendants learned on the morning of April 1, 2016, that the seven-year-old T.A. had been missing from his home all night with no law enforcement contact by the parents.  During a search by the family, neighbors, and law enforcement, T.A. was found in the bushes of the home next door.  As Mr. Bentley picked up T.A. and carried him into the house, T.A. was upset and was pushing away from his father.[7]  T.A. was agitated and unresponsive to questions.[8]  Upon observing T.A.'s reaction to his father, Defendants became concerned that something was wrong with the boy and suggested that paramedics evaluate him, to which Mr. Bentley consented.[9] Paramedics from the Town of Gilbert arrived on scene a short while later, but were unable

---

[7] Plaintiffs dispute this fact, but cite no contrary evidence.  Doc. 151 ¶ 16.  The Court overrules Plaintiffs' objection to this and other declarations based on their being self-serving and conclusory.  The Court does not find this to be a valid basis for concluding that the testimony of the individuals who signed the declarations would not be inadmissible at trial.  In addition, Mr. Bentley admitted in his deposition that T.A. was "wiggly" and resisting him (Doc. 140-1 at 76), and the officers' body camera video confirms this fact.

[8] Plaintiffs dispute this fact, but cite no contrary evidence.  Doc. 151 ¶ 17.

[9] Plaintiffs dispute this fact, but cite no contrary evidence.  Doc. 151 ¶ 18.

to conduct a physical examination of T.A. because of his agitated state.  Doc. 140-1 at 74-75, 77-78.  As Mr. Bentley testified in his deposition, they had "[n]o physical contact with him." *Id.* at 78.

In an effort to determine whether T.A.'s behavior could be explained by other conditions, Paramedics asked T.A.'s parents whether he had any pre-existing medical conditions or was on any medication, and were told no.[10]  Paramedic Ramos concluded that T.A. was not acting normally and recommended that he be evaluated at a hospital by a medical doctor.  Ramos did not want to upset the child further by attempting a physical examination.  Doc. 140-1 at 92-93.[11]  Defendants concluded that T.A. needed to be medically evaluated based on the recommendation of the paramedics.[12]  Mrs. Bentley rode in the back of the ambulance with T.A. to the hospital.

At the Banner Desert Hospital emergency room, T.A. was examined by Dr. Shah with his mother present.  Doc. 140-2 at 135.  The doctor concluded: "Given the strange circumstances of this child's running away from home, I believe this patient would benefit from further evaluation by DCS and investigation by police." *Id.*[13]  A video clip from the officer's body camera shows Dr. Shah discussing this recommendation with Mrs. Bentley.

After the hospital examination, Officer Clifford drove T.A. and Mrs. Bentley to the MFAC.[14]  Mrs. Bentley and her attorney, who had arrived at MFAC, were told that T.A. was not free to leave before the forensic interview, and they eventually signed a consent to

---

[10] Plaintiffs dispute this fact, but the only controverting evidence they cite is two pages from the criminal trial testimony of Paramedic Ramos in which he states that T.A. appeared to be, "for the most part, fine." Docs. 132-5 at 22, 151 ¶ 27.  The testimony does not dispute that the parents said T.A. was not on medication and had no medical conditions.

[11] Plaintiffs dispute these facts, but the only controverting evidence they cite is two pages from the criminal trial testimony of Paramedic Ramos, as discussed in the previous footnote.  Docs. 132-5 at 22, 151 ¶¶ 28-29.  The testimony does not dispute Ramos' concerns or that he recommended T.A. be seen at a hospital.

[12] Plaintiffs dispute this fact, but cite no contrary evidence.  Doc. 151 ¶¶ 30-31.  The Court overrules this and other objections based on *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  Plaintiffs do not identify prior inconsistent testimony.

[13] Plaintiffs dispute this fact, but cite no contrary evidence.  Doc. 151 ¶ 39.

[14] Plaintiffs dispute this fact, but cite no contrary evidence.  Doc. 151 ¶ 56.

- 15 -

the interview.  T.A. was forensically interviewed, as B.J. and M.J. had been earlier, and was released to the custody of his parents that afternoon.

### 2.     Applicable Law.

In support of their claim that the rights asserted in Counts 3-7 were clearly established at the time of these events, Plaintiffs cite general statements of law in *Keates*, 883 F.3d at 1237-38, that parental rights and family relationships are entitled to constitutional protection.  Doc. 150 at 10-11.  But the Supreme Court has repeatedly held that such general principles are not enough to defeat qualified immunity.  Plaintiffs cite several cases in the "clearly established" section of their brief (*id.* at 11-13), but the actual holdings of those cases do not establish that the alleged unlawfulness of Defendants' conduct in this situation was clearly established and beyond debate.

In *Keates*, a 13-year-old was taken to the hospital by her mother because she was experiencing depression and suicidal ideation.  883 F.3d at 1232.  Although the child had never attempted suicide and said she had no such plans, she was transferred to a mental health facility for a week and then placed in foster care for more than three months, contrary to her mother's wishes.  *Id.* at 1232-34.  The Ninth Circuit reversed a grant of summary judgment in favor of the defendants, holding that "our case law clearly establishes that the rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent, and without a court order, unless information at the time of the seizure, after reasonable investigation, establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury, and the scope, degree, and duration of the intrusion are reasonably necessary to avert the specific injury at issue."  *Id.* at 1237-38. *Keates* said nothing about the unusual circumstances confronted by Defendants here – a seven-year-old child who had been out all night alone and, upon being found, was agitated and acting strangely; the paramedics' inability to examine the boy due to his high level of agitation; the paramedics' recommendation that he be seen by a doctor at a hospital; the doctor's recommendation that the situation warranted further investigation; forensic

- 16 -

interviews of the three children; and an entire process that was completed in one day and with the parents' participation in every step but the forensic interviews.

Plaintiffs also cite the *Wallis* decision mentioned above.  Doc. 150 at 11.  The Ninth Circuit described the essential facts in *Wallis* as follows:

> Escondido police officers, evidently acting on the basis of a non-existent court order, seized the children, aged two and five, placed them in a county-run institution, and several days later, without obtaining judicial authorization and without notifying their parents, took them to a hospital for the performance of highly intrusive anal and vaginal physical examinations. The children were not returned to their parents for approximately two and one-half months.  All of this occurred after a mental patient who had a long history of delusional disorders and was confined to a mental institution told her therapist a fantastic tale of Satanic witchcraft within her family and an impending child sacrifice.

*Id.* at 1131.  The Court of Appeals reversed a grant of summary judgment, holding that "a jury could reasonably conclude that the information possessed by the officers was insufficient to give rise to reasonable cause or that the officers' conduct in failing to investigate the mental patient's bizarre tale before acting was not reasonable."  *Id.* at 1140. The court further found that "[t]here is no evidence that the children could not have been taken with their mother to a shelter, or placed under some other form of protective custody with her until after the Equinox, or even until some later date."  *Id.*  These facts are not remotely similar to those faced by City and State Defendants in this case.

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), concerned the wrongful arrest, extradition, and incarceration of Kerry Sanders, a mentally disabled Los Angeles resident.  Defendants incorrectly identified Kerry Sanders as the fugitive Robert Sanders, a convicted embezzler who absconded from a New York state prison, and extradited him from California to New York where he was incarcerated for two years.  As the Ninth Circuit noted, "[h]ad defendants at any time compared Kerry Sanders's fingerprints or other identifying characteristics with those of Robert Sanders, or had defendants in any other way verified the identity of the man they had in custody, Kerry Sanders would not have

been arrested, extradited, or incarcerated." *Id.* at 676-77.  This case is quite unlike the facts that confronted City and State Defendants.

Plaintiffs also cite *Smartwood v. County of San Diego*, 84 F. Supp. 3d 1093, 1097 (S.D. Cal. 2014).  Doc. 150 at 12.  In that case, D.S. and R.S. were removed from their home without a warrant and subjected to medical exams, which included a urine test and examination of their genitalia, without notice to their parents, on the basis of one child having an abrasion on his face.  84 F. Supp. 3d at 1101.  Plaintiffs do not explain why these facts are similar to the present case or how a district court decision from San Diego should be viewed as creating "clearly established" law for Arizona.

In short, although each of these cases can be cited for the general proposition that children cannot be removed from their parents or subjected to medical tests without a warrant or exigent circumstances, the Court "must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably *in the particular circumstances that he or she faced.*'"  *Wesby*, 138 S. Ct. at 590 (citation and quotation marks omitted; emphasis added).  The Court simply cannot conclude, based on the cases cited, "that *every* reasonable official" in the circumstances of this case "would understand that what he is doing" is unlawful.  *al-Kidd*, 563 U.S. at 741 (emphasis added).[15]

---

[15] Earlier in their brief, Plaintiffs provide a string cite to other Ninth Circuit cases, with no page citations.  Doc. 150 at 6-7.  None of those cases is similar to the facts at issue here.  In *Burke v. County of Alameda*, 586 F.3d 725 (9th Cir. 2009), the Court of Appeals affirmed a grant of summary judgment in favor of an officer who took a 14-year-old girl into protective custody after she reported to the officer that her father had physically and sexually abused her.  The Ninth Circuit held that the officer was protected by qualified immunity.  *Id.* at 734.  *Rogers v. County of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007), concerned a social worker's decision to remove children from their parents' custody based on filthy conditions in the home and neglect of the children, none of which rose to the level of exigency.  The court concluded that the conditions did not present imminent health risks, but did not address a situation like the present case, where paramedics recommended that T.A. receive an immediate health check at the hospital.  *Id.* at 1295-96.  *Mabe v. San Bernardino County, Department of Public Social Services*, 237 F.3d 1101 (9th Cir. 2001), concerned the removal of a 14-year-old girl from her home on the basis of alleged sexual abuse by her stepfather, and placement of the child in foster care for four years.  Like *Rogers*, the "clearly established" law relied on by the court was only general in nature: "The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies."  *Id.* at 1107.  Such a general statement of the law is not sufficient under the Supreme Court cases decided since *Mabe*,

1   Because the law was not clearly established at the level necessary to overcome

2   qualified immunity, the Court need not address the first step of the qualified immunity

3   analysis.  *Pearson*, 555 U.S. at 236.  The Court will grant summary judgment in favor of

4   Defendants on Counts 3-7.

5   **VI.    Count 8 – Religious Discrimination (All Defendants).**

6       Plaintiffs claim that Defendants' actions were based on religious discrimination.

7   Doc. 59 ¶¶ 253-63.  City Defendants assert that to establish a § 1983 discrimination claim,

8   Plaintiffs must show that City Defendants committed an act that caused the violation.

9   Doc. 139 at 22 (citing *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988)).  City Defendants

10  further assert that Plaintiffs cannot present evidence to support a claim of religious

11  discrimination against any City Defendant.  *Id.* at 22-23.

12      In response, Plaintiffs cite evidence showing that State Defendant Christina Baggen

13  noted in a DCS report that "[t]here is concern the family's religion/faith impairs their

14  judgment" and "the parents went to sleep at 2:00 a.m. because 'God' told them [T.A.]

15  would be ok."  Doc. 132-4 at 101.  Plaintiffs also cite portions of Baggen's deposition

16  confirming that she made these observations.  Doc. 132-2 ¶¶ 80-81.  This evidence

17  concerns only a State Defendant.  It says nothing about City Defendants' alleged

18  discriminatory actions.

19      Without discussion, Plaintiffs also cite two paragraphs of Mr. Bentley's declaration

20  which state that Plaintiffs asked for privacy so they could pray before T.A. and Mrs.

21  Bentley left for the hospital, and that "[w]e were not given that privacy.  The police officers,

22  and DCS case managers remained in the house and watched."  Docs. 132-4 at 4, ¶¶ 44-45.

23  Plaintiffs cite no other evidence with respect to City Defendants.  *See* Doc. 150 at 16-17.[16]

24  and the facts of *Mabe* are clearly different than the facts here.  *Ram v. Rubin*, 118 F.3d
25  1306 (9th Cir. 1997), involved a social worker who took the plaintiff's six children into
    protective custody on allegations of sexual abuse which had been investigated twice and
26  found to be unsubstantiated.  *Id.* at 1309.  Finally, Plaintiffs cite *Demaree v. Pederson*, 887
    F.3d 870 (9th Cir. 2018), a factually distinguishable case that was not in existence at the
27  time of the events in this case and therefore could not contribute to any clearly established
    law at the time.

28      [16] Plaintiffs assert, without any citation to the record, that camera footage shows
    Mrs. Bentley being reprimanded for stating that she prayed about T.A. and that

- 19 -

The single piece of evidence cited by Plaintiffs against City Defendants – that they remained in the house and watched while Plaintiffs gathered to pray – is not sufficient for a reasonable jury to find that City Defendants' actions in this case were based on religious discrimination.  The Court fully understands why Plaintiffs felt this intrusion on their family prayer was unwarranted, but it does not show that City Defendants' other actions that day – which are the basis for the claim in Count 8 – were motivated by religious discrimination.   The Court will therefore grant summary judgment in favor of City Defendants on Count 8.  *See Celotex*, 477 U.S. at 322 (summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); *Anderson*, 477 U.S. at 248 (disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party").

State Defendants' motion on the religious discrimination claim consists of five sentences – and no legal citations – arguing that Baggen's observations in the DCS report were professional, not personal, and that Plaintiffs should not have curtailed their search for T.A. on the basis of prayer.  Doc. 137 at 12.  This appears to be a jury argument that State Defendants did not discriminate.  It is not asserted as an undisputed fact, and State Defendants identify no basis for granting summary judgment.  The Court will therefore deny summary judgment for State Defendants on Count 8.[17]

The Court will also deny Plaintiffs' motion for summary judgment on Count 8.  Plaintiffs cite Baggen's DCS report statements, but do not explain why those statements

---

"Defendants are recorded smirking and mocking the Bentleys as they gathered to pray." Doc. 150 at 17.  But the record in this case consists of thousands of pages of documents and many video clips, and without record citations the Court cannot verify the existence of this evidence.  The Court is not obligated to "'scour the record in search of a genuine issue of triable fact.'" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted).  The parties must identify with reasonable particularity the evidence that precludes summary judgment.  *Id.*

[17] In their reply brief, State Defendants argue that Plaintiffs have failed to show that they were treated differently than others due to the religious beliefs, and cite *Furnace v. Sullivan*, 705 F.3d 1021, 1031 (9th Cir. 2013).  Doc. 153 at 8.  The Court will not consider arguments raised for the first time in a reply brief.  *See Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007).

1    are inappropriate observations that, standing alone, establish religious discrimination.

2    Doc. 132-1 at 25.  Surely every reference to a person's religion in a government report does

3    not constitute religious discrimination, and Plaintiffs do not explain why the references

4    here constitute discrimination as a matter of law.  *Id.*

## VII.    Count 8.1 – Municipal Liability (Defendant City of Mesa).

"[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)).  Plaintiffs must prove that the alleged constitutional violations were committed pursuant to a formal governmental policy, or a longstanding practice or custom which is the City's standard operating procedure.  *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

City Defendants assert that Plaintiffs cannot present evidence in support of such a claim against the City of Mesa.  Doc. 139 at 23-27.  Plaintiffs fail to respond to this argument.  *See* Doc. 150.  The Court accordingly will grant summary judgment in favor of the City of Mesa on Count 8.1 (Doc. 59 ¶¶ 264-69).  *See Celotex*, 477 U.S. at 322.

## VIII.    Count 9 – Wrongful Prosecution (All Defendants).

This claim is based on Plaintiffs' misdemeanor prosecution.  Doc. 59 ¶¶ 147-50, 270-76.  State Defendants contend that they did not participate in the prosecution, and all Defendants contend that Plaintiffs cannot show the prosecution was instituted with malice and without probable cause.  Doc. 137 at 13 (citing *Awabdy v. City of Adelanto*, 368 F.3d 1026, 1066 (9th Cir. 2004)); Doc. 139 at 27 (citing *Cullison v. City of Peoria*, 584 P.2d 1156, 1160 (Ariz. 1978)).  Plaintiffs do not respond to these arguments.  Doc. 150.  The Court therefore will grant summary judgment in favor of Defendants on this claim.  *See Celotex*, 477 U.S. at 322.

**IT IS ORDERED:**

1.    Plaintiffs' motion for summary judgment (Doc. 132) is **denied**, City Defendants' cross-motion for summary judgment (Doc. 139) is **granted**, and State Defendants' cross-motion for summary judgment (Doc. 137) is **granted** with respect to

Counts 1, 4-7, and 9, and **denied** with respect to Count 8.  The Court will hold a telephonic conference with Plaintiffs and the State Defendants to set a firm trial date and final pretrial deadlines on **May 13, 2020 at 3:00 p.m.** before the Honorable David G. Campbell, 401 West Washington Street, Phoenix, AZ 85003.  Counsel for Plaintiffs shall set up a dial in number for the call and shall advise counsel for the State Defendants and the Court of the dial in number no later than **12:00 noon on May 12, 2020.**

      2.      City Defendants' motion to preclude expert testimony of Timothy Turner (Doc. 135) is **denied** as moot.

      Dated this 16th day of April, 2020.

David G. Campbell
Senior United States District Judge